# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA, *et al.*,

<div style="padding-left:4em">Plaintiffs,</div>

v.

APPLE INC.,

<div style="padding-left:4em">Defendant.</div>

Case No. 2:24-cv-04055

Hon. Julien X. Neals, U.S.D.J.
Hon. Leda D. Wettre, U.S.M.J.

***Oral argument requested***

***Document filed electronically***


# MEMORANDUM IN SUPPORT OF APPLE INC.'S
# MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT


WALSH PIZZI O'REILLY FALANGA LLP
100 Mulberry Street, 15th Floor
Newark, NJ 07102

KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004

GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................1

BACKGROUND ......................................................................................................5

LEGAL STANDARD...............................................................................................8

ARGUMENT ...........................................................................................................9

I.      The Complaint Does Not Allege Exclusionary Conduct ..............................10

        A.      The Complaint Challenges Only Lawful Refusals To Deal ..............11

        B.      The Government Does Not—And Cannot—Plead An *Aspen Skiing* Exception...................................................................................20

        C.      Apple Is Not Microsoft .....................................................................22

II.     The Complaint Does Not Allege Substantial Anticompetitive Effects In The Smartphone Market ................................................................................27

III.    The Complaint Does Not Plausibly Allege That Apple Has Monopoly Power In Any Relevant Market ...................................................................33

IV.     The Complaint Does Not Allege Specific Intent ..........................................38

V.      The Complaint's Kitchen-Sink Allegations Fail As A Matter Of Law ........38

CONCLUSION ......................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*3Shape Trios A/S v. Align Tech., Inc.*,
  2019 WL 3824209 (D. Del. Aug. 15, 2019)........................................25, 26, 40

*In re Adderall XR Antitrust Litig.*,
  754 F.3d 128 (2d Cir. 2014) ...............................................................11

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
  836 F.3d 1171 (9th Cir. 2016) .......................................................12, 16

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
  458 U.S. 592 (1982)...........................................................................32

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
  592 F.3d 991 (9th Cir. 2010) ..............................................................13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................9

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)...............................................................20, 21, 22

*Bailey v. Allgas, Inc.*,
  284 F.3d 1237 (11th Cir. 2002) ..........................................................35

*Bakay v. Apple Inc.*,
  2024 WL 3381034 (N.D. Cal. July 11, 2024) .................................29, 31

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins.*,
  784 F.2d 1325 (7th Cir. 1986) ............................................................37

*Barr Laboratories, Inc. v. Abbott Laboratories*,
  978 F.2d 98 (3d Cir. 1992) ............................................................36, 38

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................4, 39, 40

*Blix Inc. v. Apple, Inc.*,
  2021 WL 2895654 (D. Del. July 9, 2021) .............................................32

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
    985 F. Supp. 2d 612 (S.D.N.Y. 2013) ................................................................11

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)............................................................................................34

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011) .................................................................................9

*Chase Mfg., Inc. v. Johns Manville Corp.*,
    84 F.4th 1157 (10th Cir. 2023) ..........................................................................19

*Christy Sports, LLC v. Deer Valley Resort Co.*,
    555 F.3d 1188 (10th Cir. 2009) ..........................................................................18

*Columbia Metal Culvert Co. v. Kaiser Aluminum & Chem. Corp.*,
    579 F.2d 20 (3d Cir. 1978) .................................................................................36

*Conley Publ'g Grp. Ltd. v. Journal Commc'ns, Inc.*,
    665 N.W.2d 879 (Wis. 2003)..............................................................................10

*Coronavirus Rep. v. Apple Inc.*,
    2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) ..................................................22

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
    821 F.3d 394 (3d Cir. 2016) ...............................................................................10

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007) ..................................................................11, 18, 21

*Epic Games, Inc. v. Apple Inc.*,
    559 F. Supp. 3d 898 (N.D. Cal. 2021)................................................5, 28, 31, 36

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ..........................................................................6, 35

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
    44 F.4th 959 (10th Cir. 2022) ............................................................................26

*FTC v. Facebook, Inc.*,
    560 F. Supp. 3d 1 (D.D.C. 2021).......................................................................26

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) .......................................................................*passim*

*Garshman v. Universal Res. Holding Inc.*,
    824 F.2d 223 (3d Cir. 1987) ................................................................................27

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
    423 F.3d 374 (3d Cir. 2005) ..........................................................................33, 34

*Harrison v. Jefferson Par. Sch. Bd.*,
    78 F.4th 765 (5th Cir. 2023) ...............................................................................32

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*,
    32 F.4th 242 (3d Cir. 2022) ...........................................................................20, 22

*IDT Corp. v. Bldg. Owners & Managers Ass'n Int'l*,
    2005 WL 3447615 (D.N.J. Dec. 15, 2005)....................................................27, 29

*Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp.*,
    146 F. Supp. 3d 1217 (S.D. Cal. 2015)..............................................................21

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.*,
    864 F.2d 1409 (7th Cir. 1989) .............................................................................37

*Intergraph Corp. v. Intel Corp.*,
    195 F.3d 1346 (Fed. Cir. 1999) ...........................................................................12

*IQVIA Inc. v. Veeva Systems Inc.*,
    2018 WL 4815547 (D.N.J. Oct. 3, 2018) ...........................................................22

*It's My Party, Inc. v. Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016) ...............................................................................37

*Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*,
    748 F.3d 160 (4th Cir. 2014) ...............................................................................35

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) ................................................................................25

*LiveUniverse, Inc. v. MySpace, Inc.*,
    304 F. App'x 554 (9th Cir. 2008) ........................................................................11

*loanDepot.com v. CrossCountry Mortg., Inc.*,
    399 F. Supp. 3d 226 (D.N.J. 2019) .....................................................39

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951).............................................................................19

*Metro Mobile CTS, Inc. v. NewVector Commc'ns, Inc.*,
    892 F.2d 62 (9th Cir. 1989) ...............................................................36

*Miller Indus. Towing Equip. Inc. v. NRC Indus.*,
    659 F. Supp. 3d 451 (D.N.J. 2023) .....................................................27

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd.*,
    838 F.3d 421 (3d Cir. 2016) ...............................................................33

*Mylan Pharms. v. Celgene Corp.*,
    2014 WL 12810322 (D.N.J. Dec. 23, 2014)...............................22, 34

*N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian*
    *Healthcare Servs.*,
    994 F.3d 1166 (10th Cir. 2021) ..........................................................18

*NCAA v. Alston*,
    594 U.S. 69 (2021)..........................................................................8, 27

*New York v. Facebook, Inc.*,
    549 F. Supp. 3d 6 (D.D.C. 2021).......................................................16

*New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023).....................................................*passim*

*NLMK Pa., LLC v. U.S. Steel Corp.*,
    592 F. Supp. 3d 432 (W.D. Pa. 2022)................................................31

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ..................................................*passim*

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)...........................................................28, 33, 37

*OJ Com., LLC v. KidKraft, Inc.*,
    34 F.4th 1232 (11th Cir. 2022) ..........................................................18

*Oxbow Carbon & Mins. LLC v. Union Pac. R.R.*,
   926 F. Supp. 2d 36 (D.D.C. 2013) ......................................................................11

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
   555 U.S. 438 (2009) ..............................................................................*passim*

*Phila. Taxi Ass'n v. Uber Techs., Inc.*,
   886 F.3d 332 (3d Cir. 2018) ...................................................................2, 22, 38

*Princo Corp. v. ITC*,
   616 F.3d 1318 (Fed. Cir. 2010) ..................................................................27, 28

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) ..............................................................................8

*Rambus Inc. v. FTC*,
   522 F.3d 456 (D.C. Cir. 2008) .........................................................................29

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ......................................................................34, 37

*Reilly v. Ceridian Corp.*,
   664 F.3d 38 (3d Cir. 2011) ..............................................................................40

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
   471 F. Supp. 3d 981 (N.D. Cal. 2020).........................................................11, 26

*In re Revlimid & Thalomid Purchaser Antitrust Litig.*,
   2024 WL 2861865 (D.N.J. June 6, 2024).........................................................20

*Sambreel Holdings LLC v. Facebook, Inc.*,
   906 F. Supp. 2d 1070 (S.D. Cal. 2012).............................................................11

*Santiago v. Warminster Twp.*,
   629 F.3d 121 (3d Cir. 2010) ..............................................................................9

*Schor v. Abbott Laboratories*,
   457 F.3d 608 (7th Cir. 2006) ...........................................................................27

*Shire US, Inc. v. Allergan, Inc.*,
   375 F. Supp. 3d 538 (D.N.J. 2019)....................................................................10

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993).............................................................................8, 38

*Stepan Co. v. Pfizer, Inc.*,
    2024 WL 3199834 (D.N.J. June 26, 2024)........................................39

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919)..........................................................................12, 18

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ...................................................................36

*United States v. Eastman Kodak Co.*,
    63 F.3d 95 (2d Cir. 1995) ........................................................................35

*United States v. Google LLC*,
    687 F. Supp. 3d 48 (D.D.C. 2023)....................................................26, 36

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)..............................................................................8, 33

*United States v. Microsoft Corp.*,
    147 F.3d 935 (D.C. Cir. 1998) ................................................................13

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ..........................................................*passim*

*United States v. Microsoft Corp.*,
    87 F. Supp. 2d 30 (D.D.C. 2000)............................................................35

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004).........................................................................*passim*

**Statutes**

15 U.S.C. § 2 ..................................................................................................8

Tenn. Code Ann. § 47-25-102 ...................................................................10

**INTRODUCTION**

The Government asks this Court to endorse a theory of antitrust liability that no court has ever recognized and to sanction a judicial redesign of one of the most innovative and consumer-friendly products ever made: iPhone.  Apple has invested billions of dollars to create a revolutionary, cutting-edge product and to distinguish iPhone in a fiercely competitive smartphone market through consumer-oriented features.  This lawsuit is based on the false premise that iPhone's success has come not through building a superior product that consumers trust and love, but through Apple's intentional degradation of iPhone to block purported competitive threats.  That outlandish claim bears no relation to reality.  And the Government's theory that Apple has somehow violated the antitrust laws by not giving third parties broader access to iPhone runs headlong into blackletter antitrust law protecting a firm's right to design and control its own product.

The truth, of course, is that Apple has granted third parties exceptionally broad access to iPhone, its features, and the App Store, while also enforcing reasonable limitations to protect consumers and ensure the safe, secure, and seamless iPhone experience for which Apple is justifiably known.  But even setting that aside, it is simply not a viable theory of antitrust law for the Government to contend that Apple must open its own platform and its own technologies to third parties on the terms and conditions that those parties prefer.  The third parties at issue here are well-

capitalized social media companies, big banks, and global gaming developers, all of whom are formidable competitors in their own right and none of whom have the same incentives to protect the integrity or security of iPhone as Apple has.

There are five reasons why the Government's ill-conceived complaint should be dismissed. ***First***, Apple has not engaged in exclusionary conduct, a necessary element of any Section 2 claim. *See, e.g.*, *Phila. Taxi Ass'n v. Uber Techs., Inc.*, 886 F.3d 332, 338 (3d Cir. 2018). The Supreme Court has made clear that a firm's decisions about the terms on which it chooses to deal with third parties are not "exclusionary" as a matter of law under Section 2. *See Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). Rather, "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *linkLine*, 555 U.S. at 448. There is "no duty to deal under terms and conditions that the rivals find commercially advantageous." *Id.* at 450. Those rules apply with full force here, and for good reason: Forcing competitors to share their technology risks chilling the very innovation the Government claims to protect. And endorsing such a theory would require courts to oversee product-design and policy choices in dynamic technical markets, a task for which the Supreme Court has said courts are ill-suited.

***Second***, even if Apple's conduct were actionable, the complaint does not connect that conduct to any anticompetitive effects in the alleged smartphone markets.  The complaint targets Apple's approach to so-called "super apps," cloud streaming apps, messaging apps, smartwatches, and digital wallets, but nowhere does it explain how those purported restrictions impact consumers' choices about what smartphones to purchase.  It is implausible to claim, as the Government does, that Apple has deterred any customers from switching to Google or Samsung because of its policies with respect to "super apps," cloud gaming, smartwatches, or anything else.  The opposite is much more plausible: Users unhappy with Apple's reasonable policies on third-party access can and do *switch away to competitors'* devices, where those limits do not exist.  This disconnect between the conduct that is alleged to be exclusionary and the lack of any harm in the smartphone market is fatal to the Government's theory and requires dismissal.

***Third***, Apple is not a monopolist.  As even the complaint must concede, Apple competes against global behemoths like Google (owner of the world's dominant mobile operating system) and Samsung (the global leader in smartphone sales).  Because Apple faces such stiff competition, the Government is unable to allege the typical hallmarks of monopoly power: The complaint lacks well-pleaded allegations that Apple can charge supracompetitive prices or restrict output in the alleged smartphone markets, without simultaneously giving advantages to Samsung and

Google that would quickly make such conduct untenable.  And while the Government seeks to liken Apple to Microsoft in the late 1990s, Apple's share of global smartphone sales pales next to Microsoft's then-95% share of the worldwide operating system market.

*Fourth*, the Government's attempted monopolization claims should be dismissed because the complaint's conclusory allegations of specific intent are insufficient.  And *fifth*, the Government's attempt to broaden its case by making cursory references to numerous Apple products and services fails baseline federal pleading requirements under a straightforward application of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

Ultimately, this case is foreclosed by longstanding antitrust law.  This Court should reject the Government's invitation to forge a new theory of antitrust liability that no court has recognized, based on five disparate examples of Apple design choices that do not harm smartphone competition.  And to the extent the Government seeks to use these five examples to seize unprecedented authority to control Apple design choices more broadly, the case is even more far-fetched.  Such a sweeping rule, if recognized, would harm innovation and risk depriving consumers of the private, safe, and secure experience that differentiates iPhone from every other option in the marketplace.  The complaint should be dismissed.

## BACKGROUND

iPhone is one of the most successful in a long line of innovative Apple products.  First Am. Compl. ("FAC") (ECF No. 51) ¶¶ 1–3.[1]  It combines state-of-the-art hardware and software to create a platform meticulously designed by Apple to ensure a seamless, easy to use, private, and secure consumer experience.  Apple faces robust competition from other smartphone manufacturers around the world, including Google and Samsung.  *See id.* ¶ 127.  As one court found, iPhone "only has 15 percent of global market share," *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 955 (N.D. Cal. 2021), and in the U.S. confronts major competitive pressures that keep its market share below traditional monopoly levels.

Apple aims to provide iPhone customers with safe, private, and reliable devices that are also user-friendly—a philosophy that permeates all of Apple's design decisions.  *See* FAC ¶¶ 1–4.  Third-party apps and services bring tremendous benefits to iPhone users and developers alike.  But they also bring risks, including to children, from viruses, malware, fraud, pornography, glitches, and other potential harms that disrupt or degrade the user experience or that could expose users' private information.  So while Apple provides third-party developers a vast library of tools and other services to create and distribute apps on iPhone, *id.* ¶ 4, Apple must make

---

[1]  Although Apple disputes many allegations, it accepts as true the complaint's well-pleaded allegations for purposes of this motion, as the Federal Rules require.

many decisions about how to balance that access with minimizing risks to users and preserving the exceptional user experience that distinguishes iPhone. Apple's policies governing third-party access to its products reflect these decisions, *see id.* ¶ 41, and are an important way in which Apple competes and differentiates its brand. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 987 (9th Cir. 2023).

The Government disagrees with Apple's business decisions, alleging that its product design and other decisions regarding third-party access constitute unlawful conduct that maintains—or, alternatively, attempts to maintain—monopolies on smartphones and so-called "performance smartphones" in violation of Section 2 of the Sherman Act and three states' statutes. FAC ¶¶ 199–235. The complaint charges that Apple harms competition by (1) "set[ting] the conditions for apps it allows on the Apple App Store through its App Store Review Guidelines," and (2) by deciding which iPhone features and application programming interfaces ("APIs") to make available to app developers. *Id.* ¶¶ 41–42.

The complaint points to five purported "examples" of Apple using one or both of those mechanisms to regulate access by third-party technologies:

- *Super apps.* The complaint alleges Apple hampered the development of "super apps"—defined as apps that "provide a user with broad functionality in a single app" by "serv[ing] as a platform for smaller 'mini' programs"—by limiting the ways in which developers can categorize and display mini programs in the App Store as well as their access to Apple's in-app payment system. *Id.* ¶¶ 9, 60–70. The Government acknowledges, as it must, that Apple has since extended its in-app payment system to mini programs and no longer limits how mini programs are displayed. *See id.* ¶¶ 60, 69–70. There is thus nothing "continuing" to "[e]njoin." *Id.* ¶ 236.

6

- *Cloud streaming apps.* The Government challenges Apple's prior decision to allow streaming games on its platform only if they were submitted as standalone apps for Apple's review instead of *en masse* in a single app, depriving Apple of the ability to review the code and content of those games. *Id.* ¶¶ 71–79. Today, however, Apple makes it easier for developers to offer streaming games by not requiring each to be submitted for review. *See id.* ¶ 77. Here too, then, there is nothing to enjoin.

- *Messaging apps.* The Government complains that Apple does not enable third-party messaging apps to send and receive text messages on iPhone using the short message service ("SMS") protocol, run in the background while the apps are closed, or sometimes access iPhone's camera. *Id.* ¶¶ 82–86. The Government also alleges Apple should be compelled to develop a version of its proprietary iMessage service for Android devices. *Id.* ¶ 80.

- *Smartwatches.* The Government alleges Apple does not allow third-party smartwatches paired with an iPhone to respond to iPhone notifications, maintain a Bluetooth connection in some circumstances, or receive messages using their own cellular connections without disabling iMessage. *Id.* ¶¶ 100–03. The Government also complains that Apple has not offered an Apple Watch that is compatible with rival Android devices. *Id.* ¶ 94.

- *Digital wallets.* The complaint criticizes Apple's decision to limit developers' access to highly-sensitive financial information and allegedly not allow digital wallet apps, other than Apple Wallet, to access iPhone's near-field communication ("NFC") antenna to enable NFC tap-to-pay or to serve as alternatives to certain Apple payment methods. *Id.* ¶¶ 111–17.

The Government asserts this alleged conduct has built a "moat" around Apple's

supposed "smartphone monopoly." *Id.* at ¶¶ 119–25.

The complaint also asserts other Apple products and services are or could be

part of an unlawful "playbook" with little or no explanation. According to the

complaint, Apple "uses a similar playbook to maintain its monopoly," *id.*, in location

tracking devices, video communication apps, iPhone web browsers, cloud storage

apps, voice and AI assistants, subscription services, digital car keys, Apple's

CarPlay infotainment system, and undefined smartphone "sales channels." *Id.*

¶¶ 120–25.   It also speculates that Apple "*may* use its smartphone monopoly playbook," which the complaint does not define, to engage in some future anticompetitive conduct with respect to "AirPods, iPads, Music, Apple TV, photos, maps, iTunes, CarPlay, AirDrop, Apple Card, and Cash."  *See id.* ¶¶ 136–40.

## LEGAL STANDARD

Section 2 of the Sherman Act, prohibits firms from "monopoliz[ing], or attempt[ing] to monopolize, . . . any part of the trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 2.  A monopolization claim requires two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997).  A Sherman Act claim also requires a plaintiff to show that the challenged conduct has substantial anticompetitive effects in the relevant market.  *NCAA v. Alston*, 594 U.S. 69, 96 (2021).  To establish a Section 2 violation for attempted monopolization, "a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

To survive dismissal, a complaint must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Conclusory allegations are "not entitled to the presumption of truth." *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010).  Drawing "on its judicial experience and common sense," the Court instead "determine[s] whether the well-pleaded facts state a plausible claim for relief." *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011).

## ARGUMENT

The Government cannot show any of the pillars of a Section 2 case, and its claims fail multiple times over.  ***First***, the Government cannot establish any exclusionary conduct because it challenges only Apple's unilateral decisions about the terms and conditions on which to give third parties access to Apple's proprietary hardware and software—a theory foreclosed by longstanding Supreme Court precedent.  As a matter of law, Apple is not required to grant third parties *more* access—or to build altogether new technology for their use—on the less-secure, less-private terms certain developers prefer.  ***Second***, the Government cannot show substantial anticompetitive harm in the relevant market; its alleged harm to consumers rests on implausible assumptions about how Apple's design decisions with respect to smartwatches, NFC access, or a handful of apps affects smartphone competition.  ***Third***, the Government does not allege facts demonstrating monopoly

power in its alleged smartphone (or "performance smartphone") market.  **Fourth**, the Government fails to plead a factual predicate for its attempt claims.  **Finally**, while the Government has not stated a plausible claim for relief based on any of its allegations, it certainly has not done so based on cursory allegations referencing more than a dozen Apple products and services with little or no factual support.[2]

## I.   THE   COMPLAINT   DOES   NOT   ALLEGE   EXCLUSIONARY CONDUCT

Foundational principles of antitrust law and binding precedent make clear that the conduct challenged by the complaint is not exclusionary as a matter of law.  To satisfy the second element of a Section 2 claim, the Government must prove the challenged conduct has a substantial "anticompetitive effect," meaning it "must harm the competitive *process* and thereby harm consumers."  *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc) (per curiam); *see also Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402, 407–08 (3d Cir. 2016).  Because antitrust law is aimed at protecting consumers, courts have recognized "certain forms of conduct" that are deemed lawful and *not* exclusionary as a matter

---

[2]   Because New Jersey, Wisconsin, and Tennessee antitrust laws mirror the Sherman Act, those States' state-law claims fail for the same reasons.  *See Shire US, Inc. v. Allergan, Inc.*, 375 F. Supp. 3d 538, 546 (D.N.J. 2019); *Conley Publ'g Grp. Ltd. v. Journal Commc'ns, Inc.*, 665 N.W.2d 879, 885–86 (Wis. 2003); Tenn. Code Ann. § 47-25-102.

of law where "experience teaches" that the conduct "almost never harm[s] consumers." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013).

One type of conduct protected as a matter of law is the conduct the Government challenges here: Courts consider a company's refusal to deal with a third party on the third party's preferred terms to be entirely lawful and not "exclusionary," subject to a narrow exception that does not apply here. And because such conduct is generally lawful, courts routinely dismiss these cases on the pleadings, as in *Trinko* and *linkLine*—before subjecting defendants to protracted litigation over the other Section 2 elements.[3]

## A.    The Complaint Challenges Only Lawful Refusals To Deal

The Sherman Act "protect[s] the process of competition, with the interests of consumers, not competitors, in mind." *Novell*, 731 F.3d at 1072. To that end, the Supreme Court made clear over a century ago that antitrust law "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom

---

[3]    *See, e.g.*, *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 306 (D.C. Cir. 2023); *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 135 (2d Cir. 2014); *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 556 (9th Cir. 2008); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 54 (2d Cir. 2007) (per curiam); *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1002–03 (N.D. Cal. 2020); *Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1075 (S.D. Cal. 2012); *Oxbow Carbon & Mins. LLC v. Union Pac. R.R.*, 926 F. Supp. 2d 36, 40, 47–48 (D.D.C. 2013); *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 623 (S.D.N.Y. 2013).

he will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919); *accord linkLine*, 555 U.S. at 448.  And it has since reaffirmed that principle in cases decided on the pleadings: "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *linkLine*, 555 U.S. at 448; *accord Trinko*, 540 U.S. at 408.  Accordingly, antitrust law generally does not impose a "duty to deal" on any company, and "certainly . . . no duty to deal under terms and conditions that [third parties] find commercially advantageous." *linkLine*, 555 U.S. at 450.  Were it otherwise, a company would be beholden to others in deciding how to run its business, and competition, innovation, and consumer welfare would suffer.  *Trinko*, 540 U.S. at 407–08; *see also Novell*, 731 F.3d at 1073 (explaining that forced sharing reduces incentives to "innovate, invest, and expand").

That is especially so with respect to claims implicating intellectual property, *see Novell*, 731 F.3d at 1066, and in "highly technical, . . . complex, and constantly changing" markets like those here, *Trinko*, 540 U.S. at 414; *accord FTC v. Qualcomm Inc.*, 969 F.3d 974, 990–91 (9th Cir. 2020).  In such cases, refusal-to-deal doctrine protects companies' decisions to "withhold[] . . . parts and technical data," *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016), or "access to [their] proprietary information . . . and technical services," *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1358 (Fed. Cir. 1999).  *Accord*

*Qualcomm*, 969 F.3d at 994; *Meta*, 66 F.4th at 305.  For good reason: Judges have "long recognized the undesirability of having courts oversee product design," *United States v. Microsoft Corp.*, 147 F.3d 935, 948 (D.C. Cir. 1998), because there are no criteria "to calculate the 'right' amount of innovation," *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 999–1000 (9th Cir. 2010).  And the risks of "false condemnations" are "especially costly, because they chill the very conduct"—innovation and competition—"the antitrust laws are designed to protect." *Trinko*, 540 U.S. at 414.  Such "[e]nforced sharing" would also force courts "to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited." *Id.* at 408; *Novell*, 731 F.3d at 1073 ("If forced sharing were the order of the day, courts would have to pick and choose the applicable terms and conditions.").

The Government's complaint fails as a matter of law under this settled case law.  For decades, Apple has made countless decisions about how to best design its platform, products, and services to prioritize security, privacy, and user experience—including for the five "technologies" at the center of this case.  FAC ¶¶ 3–4, 10.  Over time, Apple has opened up its platform, including by providing developers with access to the App Store, furnishing them with extensive software tools, and allowing iPhones to pair with third-party devices in many ways. *See id.* ¶¶ 10, 38–39.  As a result, the App Store is full of third parties' apps, and iPhone

owners use a variety of third-party smartwatches. *See id.* ¶¶ 10, 60, 69–72, 114, 117, 146. But in opening its platform, Apple also exercises careful judgment about where to devote its resources and whether and how to allow third parties access to iPhone, as developers' apps can introduce malware, impact device performance, expose consumers to fraud, and pose a multitude of other risks to smartphone users.

The entire premise of the complaint is that Apple should face antitrust liability for the balance that it struck. Unable to ignore Apple's successful but measured efforts to open its platform, the Government tries to find anticompetitive conduct in the things Apple allegedly did *not* do for third parties when designing its products and services. The Government faults Apple, for example, for historical limits on how in-app mini programs could be displayed, how cloud games were submitted for individualized review, and how in-app monetary transactions can be performed. *See id.* ¶¶ 41, 69–70, 76–78. But each of those choices is nothing more than Apple setting the terms on which third parties can access Apple's own proprietary platform. The fact that third-party competitors can offer these types of apps, but may want to display mini-programs in a different way or expose Apple customers to un-reviewed games, is nothing more than a bid to force Apple "to deal under terms and conditions that the rivals find commercially advantageous." *linkLine*, 555 U.S. at 450. And the Supreme Court has made clear that antitrust law protects Apple's judgments about its platform, not third parties' preferences. *Id.* at 448.

14

The same is true of the complaint's challenges to Apple's approach to smartwatches and digital wallets. Despite the broad access Apple offers for each, the Government complains third-party products lack exact parity with Apple's products. *See* FAC ¶¶ 100–03, 111, 116–17. But again, that reflects Apple's choices about how to design its product suite, the terms on which it is willing to deal with third-party rivals, and when and how to invest in further opening access to its technology. That those rivals might want greater access to Apple's technology and platform is no basis for liability: "[I]nsufficient assistance in the provision of service to rivals is not a recognized antitrust claim." *Trinko*, 540 U.S. at 410.

So, too, with Apple's design of its Messages app. Whether the Government is complaining about third-party messaging apps' ability to send and receive SMS messages, run in the background, or access iPhone's camera, it simply disagrees with Apple's own judgments about how much access to grant developers to proprietary Apple features and what investments and resources Apple dedicates to enable or support that access. *See* FAC ¶¶ 80, 85–86. The problem with this theory is made plain with respect to the Government's contention that Apple should have developed a new version of iMessage for Android devices. *Id.* ¶ 80. iMessage is Apple's proprietary, innovative messaging service that Apple created to competitively differentiate iPhone. Under the Government's view, companies like Apple should face antitrust liability for not expending the resources, cost, and time to develop

15

versions of proprietary products and services for *competitors' devices*.  That the Government wishes Apple provided *additional* or *different* access to Apple's innovations is no more than an unactionable complaint that Apple refused "to deal under the terms and conditions *preferred by* [third parties]."  *Aerotec*, 836 F.3d at 1184 (emphasis added); *accord linkLine*, 555 U.S. at 450; *Trinko*, 540 U.S. at 410.  The Government's theory would not only make Apple beholden to its competitors' preferences, but it would also require Apple to guess at the outset how myriad competitors would prefer Apple design its products in order to avoid future liability.

The D.C. Circuit rejected this same theory of Sherman Act liability in *New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023).  There, the plaintiffs alleged that Facebook had "leverag[ed] its dominance to foreclose and forestall the rise of new competitors" by regulating access to its platform, and specifically by withholding API access (after initially permitting it) from "any apps that linked or integrated with competing social platforms" or sought to replicate Facebook's core social networking business.  *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 16, 19 (D.D.C. 2021).  The D.C. Circuit affirmed dismissal of the plaintiffs' claims on the pleadings as lawful refusals to deal: "To consider Facebook's policy as a violation of § 2," the appeals court explained, "would be to suppose that a dominant firm must lend its facilities to its potential competitors," contrary to *Trinko* and its progeny. *Meta*, 66 F.4th at 305.  Just as Facebook could withhold its APIs, Apple has no

obligation to share or modify its own APIs for the benefit of "super apps," cloud streaming apps, digital wallets, or messaging apps, or to develop software for third-party watches to interface with iPhones. *See id.* And just as Facebook had no obligation to further open access to its platform or assist potential rivals in developing competing platforms, Apple is not required to give developers even more access to iPhone than the broad access they already have, even to theoretically facilitate the development of competing apps and technologies.

In its *amicus* brief in *Meta*, the United States sought to limit the refusal-to-deal doctrine, claiming there were only "two narrow," fact-specific "situations" where refusal-to-deal doctrine applies: (i) "outright" refusals to provide a rival with a requested product (*Trinko*) and (ii) refusals to offer more favorable terms to an already-ongoing deal (*linkLine*). Br. of the United States as Amicus Curiae, *Meta*, 2022 WL 266802, at *14. It argued that Facebook's "*conditions in deals* with app developers" were actionable as "conditional dealing" outside those two narrow circumstances. *Id.* at *15–16 (emphasis added). The D.C. Circuit squarely rejected that argument. First, it reaffirmed longstanding refusal-to-deal case law by applying *Trinko*; nowhere did the court accept the limited application articulated by the Government. *Meta*, 66 F.4th at 306. Second, it rejected a "conditional dealing" framework, reasoning that this was just "another way of saying that Facebook refused to deal with its rivals on the rivals' preferred terms," and therefore failed to

state an antitrust claim. *Id.* The Government's theory in this case—that Apple impeded competition by imposing conditions on developers' access to its proprietary platform—should be rejected for the same reason.[4]

The Government contends that these foundational antitrust principles do not apply at all because the challenged practices are not refusals to deal with "smartphone rivals." May 30, 2024 Pls.' Letter to Judge Neals (ECF No. 45) at 3. The Court should reject that formalistic, and incorrect, reading of precedent. Case law makes clear that purely unilateral conduct, which does not inhibit third parties' ability to deal with others off Apple's platform, is not exclusionary as a matter of law. *Colgate*, 250 U.S. at 307; *linkLine*, 555 U.S. at 448. Indeed, the Government itself has previously rejected the constricted view of refusal-to-deal doctrine it now advances, further demonstrating it seeks to change—not enforce—the law. Br. for the United States as Amicus Curiae, *linkLine*, 2008 WL 4125498, at *13 (arguing respondents' claims "amount to nothing more than a claim that petitioners refused to deal on terms that respondents desired"); *id.* at *14 ("A defendant that has no duty

---

[4]   Other cases confirm that the Government cannot evade the refusal-to-deal doctrine. *See linkLine*, 555 U.S. at 448; *Trinko*, 540 U.S. at 410; *Novell*, 731 F.3d at 1073–76; *In re Elevator Antitrust Litig.*, 502 F.3d at 52–54; *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F. 3d 1188, 1194–97, 1199 (10th Cir. 2009); *N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1172–74 (10th Cir. 2021); *OJ Com., LLC v. KidKraft, Inc.*, 34 F.4th 1232, 1244–47 (11th Cir. 2022).

to deal with rivals by definition has no duty to deal with them on particular terms that would permit them to compete."); Br. for the United States & FTC as Amici Curiae, *Trinko*, 2003 WL 21269559, at *18 ("[T]he antitrust laws generally afford all firms . . . great discretion in determining with whom they will and will not deal."); *id.* at *30 (arguing that finding liability based on petitioner's refusal to deal "would fundamentally transform the Sherman Act").

The cases the Government cited in its pre-motion letter all involved defendants reaching out into the marketplace to inhibit third parties' ability to deal with others—not companies like Apple that were simply setting the rules of the road *on its own platform*, conduct the Supreme Court has repeatedly said is protected. *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1162, 1173 (10th Cir. 2023) (defendant threatened to stop distributing to third parties who bought products from a new market entrant); *Lorain Journal Co. v. United States*, 342 U.S. 143, 152 (1951) (defendant newspaper refused to sell advertising space to third parties advertising with a radio station); *Microsoft*, 253 F.3d at 59–78 (defendant required third parties not to promote other products).  As the Government has elsewhere acknowledged, the refusal-to-deal doctrine applies in circumstances like these, where there has been no "assay . . . into the marketplace" and there are no allegations Apple has "fail[ed] to leave its rivals alone" in the broader marketplace.  *See* Br. for the United States as Amicus Curiae at 19, *Chase Mfg.*, 2022 WL 11194756, at *19.

**B.    The Government Does Not—And Cannot—Plead An *Aspen Skiing* Exception**

This case does not fit within the one, narrow exception to the general rule that firms do not have an antitrust duty to deal with rivals.  In *Aspen Skiing*, the Supreme Court affirmed a Section 2 violation where the defendant (a) unilaterally terminated a voluntary, pre-existing, and profitable course of dealing; and (b) sacrificed short-term profits to harm long-run competition.  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605–11 (1985); *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 250 & n.7 (3d Cir. 2022); *Qualcomm*, 969 F.3d at 993–94; *In re Revlimid & Thalomid Purchaser Antitrust Litig.*, 2024 WL 2861865, at *42–44 (D.N.J. June 6, 2024).  The Government alleges neither.  To the extent it seeks to invoke the *Aspen Skiing* exception—which "is at or near the outer boundary of § 2 liability," *Trinko*, 540 U.S. at 409—the Government cannot pass "through [its] narrow-eyed needle," *Novell*, 731 F.3d at 1074.

***First***, there are no allegations that Apple "terminat[ed] . . . a voluntary . . . course of dealing."  *Trinko*, 540 U.S. at 409.  The complaint contains no allegation that Apple previously allowed super-app or cloud-streaming-app developers to deploy their services on the terms the Government now proposes; that Apple once offered, but withdrew, iMessage for Android or SMS access to third-party messaging apps; that Apple provided rival smartwatches access to any particular iPhone feature or API that it no longer provides; or that Apple offered competing

20

digital wallets NFC access and then withdrew it.  That is fatal: Alleging that Apple has merely "maintained the[] course of dealing at the status quo," *Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp.*, 146 F. Supp. 3d 1217, 1235 (S.D. Cal. 2015), does not state a claim under *Aspen Skiing*.  *See Qualcomm*, 969 F.3d at 994–95; *In re Elevator Antitrust Litig.*, 502 F.3d at 52–54.  The logic of *Aspen Skiing* could never apply here because Apple has not exhibited a clear pattern of moving from an "open" to a "closed" platform—just the opposite: Apple has opened its platform over time, granting third parties greater access, where, in Apple's judgment, doing so improves user experience and otherwise makes business sense relative to the necessary investment of time and resources.  *See, e.g.*, FAC ¶¶ 60–79.

**Second**, the *Aspen Skiing* exception requires proof of conduct that is "irrational but for its anticompetitive effect," *Novell*, 731 F.3d at 1075, or whose "only conceivable rationale or purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition," *Qualcomm*, 969 F.3d at 993–94.  The complaint repeats that "Apple's conduct has made its own products worse, sacrificing the short-term profits."  FAC ¶ 131; *accord id.* ¶¶ 62, 71, 80, 109.  But that implausible assertion is supported by no factual allegations.  Courts have recognized that Apple's design choices—which prioritize privacy, security, and user experience and result in a more hospitable platform for users and developers alike—help Apple compete, sell more iPhones, and collect more revenue in the short

21

and long term.  *See, e.g.*, *Coronavirus Rep. v. Apple Inc.*, 2021 WL 5936910, at *14 (N.D. Cal. Nov. 30, 2021).  Speculation that more permissive policies would have caused Apple to sell more iPhones, FAC ¶¶ 62, 80, 109, is insufficiently pleaded and depends on a causal chain the complaint does not support.  Such conclusory allegations do not state a claim.  *See Phila. Taxi*, 886 F.3d at 339–41 (affirming dismissal of Section 2 claim for lack of alleged anticompetitive conduct).[5]

### C.   Apple Is Not Microsoft

The Government seeks to dress up its novel theory in precedent by likening its allegations to *Microsoft*, 253 F.3d 34.  Apple is nothing like Microsoft.  Setting aside that Microsoft's 95% share of the relevant worldwide market in that case blows past Apple's alleged position here, *id.* at 54, the conduct condemned in *Microsoft* is fundamentally different than the allegations brought by the Government now.

---

[5]  To the extent that the Government relies on *IQVIA Inc. v. Veeva Systems Inc.*, 2018 WL 4815547, at *3 (D.N.J. Oct. 3, 2018), to argue that the "termination of a voluntary agreement and the willingness to forsake short-term profits are not necessary elements of proving anticompetitive conduct," but merely "factors" that courts consider under *Aspen Skiing*, the Government is mistaken.  *See* ECF No. 45 at 3.  The Third Circuit has more recently said that a refusal to deal violates Section 2 "only if the parties have a history of dealing," *Host Int'l*, 32 F.4th at 250 & n.7, and even the case that *IQVIA* cites applied *Aspen Skiing* only where there was "no legitimate business reason" for the defendant's actions, *Mylan Pharms. v. Celgene Corp.*, 2014 WL 12810322, at *6 (D.N.J. Dec. 23, 2014).  The complaint's failure to plausibly allege that Apple terminated a prior course of dealing or sacrificed short-term profits is fatal.

Microsoft maintained a monopoly on operating systems. *Id.* at 45–46. To do so, it imposed contractual restrictions that impeded third-party developers' ability to deal with Microsoft's actual or potential competitors. Microsoft throttled "[equipment manufacturers] from distributing browsers"; induced internet access providers to promote Microsoft's internet browser exclusively; favored software vendors who exclusively used Internet Explorer; threatened to withdraw support for Mac Office unless Apple agreed to exclusively bundle Internet Explorer as its default browser; and favored, deceived, and pressured software developers into using competing implementations of Java. *See id.* at 60–62, 67–78. Microsoft's conduct was an "assay by the monopolist in the marketplace," *Novell*, 731 F.3d at 1072, because it tied up third parties with exclusive deals that restricted their ability to deal with the "producers of nascent competitive technologies" that "threatened to become viable substitutes for Windows," *Microsoft*, 253 F.3d at 54, 79.

The Government makes no comparable allegations here. Unlike in *Microsoft*, Apple is alleged only to have set terms and conditions about third parties' access to *Apple's own platform and technologies*; the complaint does not allege Apple seeks to control how third parties might deal with competitors *off* its platform or that Apple has interfered with a rival's activities in the marketplace. FAC ¶¶ 60–118; *see Novell*, 731 F.3d at 1076. It does not allege that Apple uses its market position (as

23

Microsoft did) to impose exclusive-dealing obligations on *any* third party or to otherwise restrict or influence *any* third party's ability to deal with any Apple rival.

The Government also ignores the more instructive antitrust case against Microsoft.  In *Novell*, then-Judge Gorsuch rejected a claim brought by the developer of WordPerfect, Microsoft's leading rival in word processing at the time that wanted access to certain Windows 95 APIs to develop its own office suite to rival Microsoft Office.  731 F.3d at 1067–69.  Microsoft initially chose to share certain APIs with vendors like Novell in a beta version of Windows 95, but then reversed course and decided those APIs would not be available in the final version.  *Id.*  In rejecting Novell's attempt to hold Microsoft liable for refusing to provide that access, the Tenth Circuit distinguished between actionable Section 2 misconduct—which "usually involves some assay by the monopolist into the marketplace," such as efforts "to limit the abilities of third parties to deal with rivals"—and refusals to deal that generally "do[] not run afoul of section 2," such as a firm's decisions about how and whether to provide access to its own platform.  *Id.* at 1072.  Because Microsoft's conduct, like that alleged here, involved choices about "whom to deal with and on what terms," *id.* at 1074, it was entitled to judgment as a matter of law under refusal-to-deal doctrine.  *Id.*  So too here: None of the challenged conduct involves any effort by Apple to venture beyond its proprietary platform to inhibit any third party's ability to deal with competing smartphone manufacturers (or anyone else).  The

Government instead attacks Apple's "unilateral decisions about with whom it will deal and on what terms," *id.* at 1076, and its claims fail as a matter of law.

### D. Apple's Lawful Conduct Cannot Be Aggregated Into An Unlawful "Course of Conduct"

The Government cannot evade the well-established hurdles to its claims by repeatedly invoking a so-called "course of conduct" or "monopoly playbook," or by otherwise characterizing the case as being about Apple's supposed "strategy" rather than the actual conduct that the complaint alleges. *See, e.g.*, FAC ¶¶ 10, 58, 59, 136, 203, 209, 215. Because all of Apple's challenged conduct is categorically lawful under controlling refusal-to-deal precedent, the Government has not plausibly alleged any anticompetitive course of conduct that could support Section 2 liability.

The Third Circuit has explained that courts may consider "the anticompetitive effect of [the defendant's] exclusionary practices considered together" *after* the challenged acts are deemed exclusionary in the first instance. *LePage's Inc. v. 3M*, 324 F.3d 141, 159, 162 (3d Cir. 2003) (en banc). But where, as here, a defendant's acts are each lawful, any supposed course of conduct is lawful: "[F]ive wrong claims do not make a right[.]" *3Shape Trios A/S v. Align Tech., Inc.*, 2019 WL 3824209, at *12 (D. Del. Aug. 15, 2019); *accord linkLine*, 555 U.S. at 457.

Other courts agree. In *Microsoft*, the D.C. Circuit expressly declined to decide that a party could violate the Sherman Act through a "series of acts, each of which harms competition only slightly but the cumulative effect of which is significant

enough to form an independent basis for liability." *Microsoft*, 253 F.3d at 78. Instead, the appellate court reversed the district court's conclusion that "Microsoft's course of conduct separately violates § 2 of the Sherman Act." *Id.* In subsequent cases, courts have held that "[f]or the sake of accuracy, precision, and analytical clarity, we must evaluate . . . allegedly exclusionary conduct separately," *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir. 2022), and that "lawful unilateral refusals to deal cannot be combined with other conduct, lawful or unlawful, into an overall scheme of monopoly acquisition or maintenance that can be separately challenged," *Facebook*, 549 F. Supp. 3d at 46–48. *See also United States v. Google LLC*, 687 F. Supp. 3d 48, 67–70 (D.D.C. 2023); *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 25 (D.D.C. 2021); *3Shape Trios*, 2019 WL 3824209, at *12.

*                *                *

The Government wants to remove Apple's ability to decide when, how, and to what extent it makes its own proprietary technology available to third parties. Its claims not only would wreak havoc in "highly technical, . . . complex, and constantly changing" markets, risking the suppression of innovative features that support smartphone competition, but would invent a new exception to a firm's right not to deal with others. *Trinko*, 540 U.S. at 408–10, 414. This is precisely the kind of case where courts have recognized that "the search for the rare situation" of consumer

26

harm "is not worth the candle" as it "has much more chance of condemning a beneficial practice than of catching a detrimental one." *Schor v. Abbott Laboratories*, 457 F.3d 608, 613 (7th Cir. 2006). The Government's novel theory should be rejected.

## II.   THE COMPLAINT DOES NOT ALLEGE SUBSTANTIAL ANTICOMPETITIVE EFFECTS IN THE SMARTPHONE MARKET

This case should be dismissed for another, independent reason: The complaint does not allege—as it must to satisfy the elements of a Section 2 claim—that Apple's challenged conduct has a substantial "anticompetitive effect" in the alleged smartphone (or "performance smartphone") market. *Microsoft*, 253 F.3d at 58–59; *see also NCAA*, 594 U.S. at 96 ("[T]he plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect."). This requires allegations of actual facts—not mere speculation—demonstrating "an actual adverse effect on competition in the relevant market." *Princo Corp. v. ITC*, 616 F.3d 1318, 1338 (Fed. Cir. 2010) (en banc). Courts routinely dismiss antitrust complaints, like this one, that do not allege such facts. *See, e.g.*, *Garshman v. Universal Res. Holding Inc.*, 824 F.2d 223, 231 (3d Cir. 1987); *Miller Indus. Towing Equip. Inc. v. NRC Indus.*, 659 F. Supp. 3d 451, 466–67 (D.N.J. 2023); *IDT Corp. v. Bldg. Owners & Managers Ass'n Int'l*, 2005 WL 3447615, at *10 (D.N.J. Dec. 15, 2005).

The disconnect between the complaint's conduct allegations and the alleged harm to smartphone competition requires dismissal. The Government must show

harm to competition in the alleged market.  *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018); *see also Qualcomm*, 969 F.3d at 992–93; *Microsoft*, 253 F.3d at 81–82. Alleged harms outside the relevant market do not suffice.  Here, the Government has attempted to define only smartphone markets, even while acknowledging that "additional markets may be implicated."  *See* FAC ¶¶ 164–79; ECF No. 45 at 2.

But the Government has not alleged facts demonstrating "an actual adverse effect on competition" in the smartphone markets.  *See Princo*, 616 F.3d at 1338. The alleged conduct that the Government challenges instead occurred in the other "implicated" markets that the complaint does not attempt to define.  For example, the complaint asserts that Apple has built "the most dominant smartphone platform and ecosystem in the United States . . . through a digital storefront called the App Store" and that Apple's anticompetitive conduct concerning "super apps" stems at least in part from its alleged "control over app distribution" via the App Store and its rules.  FAC ¶¶ 4, 60, 71, 80, 104.  The complaint also asserts that the five examples of anticompetitive conduct "harm[] developers."  *Id.* ¶ 10.  But the Government says that "the relevant market [is] a one-sided market," Br. of the United States as Amicus Curiae, *Epic*, 2022 WL 332864, at *36, in which smartphones are sold to consumers, *id.* ¶¶ 169, 176–77, 179.  It is not enough to challenge conduct that merely permits a firm "to avoid constraints on the exercise of

that [monopoly] power"—the conduct must actually harm competition in the relevant market. *See Rambus Inc. v. FTC*, 522 F.3d 456, 466 (D.C. Cir. 2008).

Nor does the complaint allege facts plausibly showing Apple's challenged conduct *outside* the relevant markets produced substantial anticompetitive effects *inside* the relevant markets. The Government asserts, for example, that the proliferation of "super apps" would increase smartphone competition by "lower[ing] barriers to entry for smartphone rivals." FAC ¶¶ 63–64. The implausible assumptions in that theory (at which the complaint merely gestures) are myriad and speculative: "super apps" would, in a but-for world, become almost the exclusive way users interact with their smartphones; these apps could and would run on all proprietary operating systems; app-related switching costs are a meaningful barrier to switching between devices; the multi-platform features of these new apps would include the features needed to neutralize those switching costs; and the proliferation of these "super apps" would in fact attract entry of new smartphone manufacturers who relied on them to make better devices to consumers' benefit. *See id.* ¶¶ 63–66. The complaint thus fails to bridge the "gulf of uncertainty" between Apple's challenged design decisions and consumers' smartphone purchasing behavior. *See Bakay v. Apple Inc.*, 2024 WL 3381034, at *6 (N.D. Cal. July 11, 2024) (dismissing injunctive relief in monopolization case because causation was too speculative to establish redressable injury under Article III); *IDT*, 2005 WL 3447615, at *8–10.

Similarly implausible leaps are needed to connect the Government's other complaints to alleged anticompetitive effects in the relevant market. For example, the Government implies that consumers would buy or switch to smartphones other than iPhone if Apple did not require developers to submit cloud streaming games for review "as a stand-alone app," but simply assumes—without factual support—that those phones would be capable of running cloud streaming games, and that this would lead consumers to buy cheaper, less advanced phones. FAC ¶¶ 73–78. With respect to cross-platform messaging apps, the complaint likewise cannot plausibly allege their lack of SMS functionality—which the Government elsewhere denigrates as "limited"—has affected smartphone purchases, particularly given the success of apps like WhatsApp and Facebook Messenger, which have even more users than iMessage. *Id.* ¶¶ 83–84, 90.

Smartwatches and digital wallets are no different. The theory that someone will feel forced to buy another iPhone because her third-party smartwatch cannot access certain iPhone features is implausible, if not plainly backward; someone unhappy with Apple's limitations is *more* likely to switch to an Android device. *See id.* ¶¶ 94–103. Equally far-fetched is the theory that because third-party digital wallets lack NFC access, consumers are "locked into" iPhones and are prevented from switching to Android: Even the complaint concedes that Android provides access to multiple NFC wallets, meaning any consumer who wants that optionality

is already incentivized to switch. *See id.* ¶¶ 104–18. The complaint fails time and again to allege "facts to plausibly justify [its] inferential leap[s]." *NLMK Pa., LLC v. U.S. Steel Corp.*, 592 F. Supp. 3d 432, 441 (W.D. Pa. 2022); *see Bakay*, 2024 WL 3381034, at *6 ("[p]laintiffs cannot assume the conduct of these numerous sets of third parties" without adequate explanation).

The implausibility of the Government's claim that Apple's conduct has eroded smartphone competition is underscored by the complaint's implicit recognition that the smartphone market exhibits ongoing innovation and vigorous competition. *See* FAC ¶¶ 59, 119. Samsung and Google, among others, are major competitors. *See id.* ¶¶ 127, 158. Third-party developers are flourishing on Apple's platform, offering iPhone users a wide range of competitive choices. *See id.* ¶ 4. "Super apps" and other cross-platform apps and services, in particular, are highly popular in the App Store in the U.S. and abroad. *See id.* ¶ 66. That is unsurprising. Far from harming competition, Apple's challenged actions are examples of competition on the merits. "Apple's mode of competing resorts to its historic model: user-friendly, reliable, safe, private, and secure." *Epic*, 559 F. Supp. 3d at 985. This "differentiates Apple from Google" (and others)—increasing "consumer choice by allowing users who value open distribution to purchase Android devices" and those "who value security and the protection . . . [to] purchase iOS devices." *Coronavirus Rep.*, 2021 WL 5936910, at *14.

Courts reject complaints, like this one, that merely *presume* that the purported conduct causes anticompetitive effects in the smartphone market.  *See, e.g.*, ¶ 129.  In *Blix Inc. v. Apple, Inc.*, for example, the plaintiff challenged Apple's requirement that developers on its platform offer users Apple's "single-sign-on" option as an alternative to other single-sign-on options.  2021 WL 2895654, at *4 (D. Del. July 9, 2021).  The plaintiff perfunctorily alleged that "a 'moat'" made it "difficult and expensive for Apple iOS users to leave" Apple's ecosystem, but failed to "explain how Apple's [challenged] requirement" with respect to single-sign-on features "restricts competition in the [at issue] mobile operating system market."  *Id.*  The court dismissed the claim.  *Id.* at *6.  For the same reasons, the complaint here does not allege the facts needed to plausibly claim that Apple's conduct in a handful of scattered domains has had a significant anticompetitive effect on smartphone competition.  Absent allegations supporting any factual link, the Government fails to state a claim.[6]

---

[6]   For this reason, the Plaintiff States also lack standing to pursue their claims, including in their sovereign capacities or under a *parens patriae* theory.  *See Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 769–74 (5th Cir. 2023) (requiring a "tangible interference" with a state's "authority to regulate or to enforce its laws" not present here); *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982) (requiring a state, unlike here, to have a "quasi-sovereign interest" that is "apart from the interests of particular private parties" for *parens patriae* standing).  The Plaintiff States have not alleged that Apple's conduct has impaired their ability to enforce their laws and the harms they cursorily plead—higher prices, a worse iPhone experience—are harms for which private parties could seek their own remedies and, indeed, already have.

### III.  THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE THAT APPLE HAS MONOPOLY POWER IN ANY RELEVANT MARKET

A Section 2 claim requires "the possession of monopoly power in the relevant market." *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005); *accord Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd.*, 838 F.3d 421, 433–34 (3d Cir. 2016).  A plaintiff must adequately define the relevant market, *Qualcomm*, 969 F.3d at 992, for "[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition," *Amex*, 585 U.S. at 543. Once the relevant markets are defined, the plaintiff must demonstrate that the defendant has "the power to control prices or exclude competition" in the relevant markets.  *Harrison Aire*, 423 F.3d at 380.  Here, the Government fails to plausibly allege that Apple possesses monopoly power in the defined markets: U.S. smartphones and "performance smartphones."[7]

Apple is not a monopolist.  Apple vies against "meaningful competitors." FAC ¶¶ 127, 186.  There is no plausible allegation that Apple has or threatens to gain "the power to charge a price higher than the competitive price without inducing so rapid and great an expansion of output from competing firms as to make the supracompetitive price untenable." *Harrison Aire*, 423 F.3d at 380; *accord Grinnell*,

---

[7]  Apple also disputes that the complaint's two markets are properly defined, but even assuming they are, Apple does not possess monopoly power in either.

384 U.S. at 571.  Thus, Apple's actions cannot "threaten consumer welfare." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

The Government first fails to plead the extremely rare case where monopoly power is established by direct evidence.  *See Mylan Pharms.*, 838 F.3d at 434–35. The "ability to control output and prices" is "the essence of market power." *Rebel Oil*, 51 F.3d at 1441.  But the complaint's prime "example" of Apple's supposed monopoly power—a single marketing executive's concern about adding "especially expensive" features that would increase costs for consumers, FAC ¶ 187—shows Apple's focus on keeping prices *affordable*.  The Government does not plausibly allege that Apple's "powerful," "[h]igher performing," "high-end hardware," *id.* ¶¶ 3, 73, 151, costs consumers more than Android models of comparable quality. *See Harrison Aire*, 423 F.3d at 381 (alleging "supracompetitive prices" does "not support a reasonable inference of monopoly power" because "a firm's comparatively high price may simply reflect a superior product").  Nor does it even attempt to allege "a restriction in output"—required to demonstrate "[s]upracompetitive pricing." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993).

None of the other allegations about Apple's prices show monopoly power either.  The Government alleges that Apple charges carriers "more than its rivals" do for other phones, FAC ¶ 188, but the Government also admits that carriers and consumers alike benefit from the "valuable promotions" and "free financing" those

34

carriers are able to offer because they value the iPhone as a superior marketing tool, *see id.* ¶ 177.  That Apple charges "as much as 30 percent" commissions to some developers, *id.* ¶ 188, also is not direct proof.  *See Epic*, 67 F.4th at 999 (finding Apple charged 30% commission without monopoly power).  And general allegations about accounting profits and relative "per-unit smartphone profit margins," FAC ¶ 188, reveal "very little about [a defendant's] market power," *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1252 (11th Cir. 2002).

The complaint also fails to state an "indirect case" of monopoly power.  The Government says Apple has a market share of 65% to 70%.  FAC ¶ 22.  But the Supreme Court has never found monopoly power with "less than 75% market share." *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014); *see also, e.g.*, *Microsoft*, 253 F.3d at 54 (finding 95% market share).  And the Government only reaches 70% by narrowing the market to "performance smartphones"—an invented definition divorced from commercial reality that may not even encompass all iPhone models, much less older generation models and refurbished ones (the complaint does not say).  FAC ¶ 22.  The Government's gerrymandered market focuses on the U.S. alone, masking the worldwide primacy of Android smartphones.  *Id.* ¶ 3; *see also, e.g.*, *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 36 (D.D.C. 2000) (relevant market found to be "worldwide"); *United States v. Eastman Kodak Co.*, 63 F.3d 95, 109 (2d Cir. 1995) (same).  The

Government also measures market share by revenue, overweighting Apple's "high-end device," rather than reporting iPhone's lower share of devices sold.  *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 184 (3d Cir. 2005) (examining both revenue *and* unit numbers); Areeda & Hovenkamp, *Antitrust Law* § 535 ("[i]n most cases . . . physical units are presumptively the better measure").  Measuring by units is particularly appropriate here because they better demonstrate the large numbers of consumers developers can reach without dealing with Apple.  Apple thus "does not have market power in the smartphone market"; indeed, the *Epic* court found that "Apple only has 15 percent of global market share."  559 F. Supp. 3d at 955.

The Government's contrived market share also presents a "misleading picture." *See Metro Mobile CTS, Inc. v. NewVector Commc'ns, Inc.*, 892 F.2d 62, 63 (9th Cir. 1989).  The complaint recognizes that Google and Samsung are powerful competitors to Apple, FAC ¶¶ 155, 186, which alone is compelling "evidence of countervailing power which would preclude monopolization."  *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chem. Corp.*, 579 F.2d 20, 27 n.11 (3d Cir. 1978); *see also, e.g.*, *Barr Laboratories, Inc. v. Abbott Laboratories*, 978 F.2d 98, 110–15 (3d Cir. 1992).  And in *United States v. Google*, the Government paints Android, not Apple, as "poised for world domination."  Am. Compl. ¶¶ 64, *Google*, No. 20-cv-03010-APM (D.D.C. Jan. 15, 2021), ECF No. 94.

36

The complaint does not even attempt to allege that Apple's "existing competitors lack the capacity to increase their output." *Rebel Oil*, 51 F.3d at 1434. Because such capacity constrains any exercise of power, *id.* at 1443, the absence of allegations that Google or Samsung or other global rivals are unable to expand their own output to undercut Apple's market share belies any notion that Apple could "curtail total market output." *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989); *see also Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins.*, 784 F.2d 1325, 1332 (7th Cir. 1986) (markets remain "competitive" where "existing [suppliers] can expand their sales quickly"). This is also dispositive.

The Government also points to alleged "switching costs" and "network effects." FAC ¶ 180. These purported restraints do not explain why "[o]ver the last decade, Apple *increased* its share of smartphones sold in the United States most years." *Id.* ¶ 182. The Government otherwise fails to support the assertion that the "stickiness" it says prevents switching between smartphones, *id.* ¶ 185, is attributable to anything other than iPhone users' overall satisfaction with their devices. *See Coronavirus Rep.*, 2021 WL 5936910, at *14; *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 686–88 (4th Cir. 2016). Similarly, the Government ignores that network effects—which make a platform more attractive as it attracts more participants—"limit the platform's ability to raise overall prices and impose a check on its market power." *Amex*, 585 U.S. at 536 n.1. Apple designed most of its

products before anyone contends it had monopoly power (and, indeed, the Government cannot even identify when Apple purportedly crossed that threshold). Making a great product that people want to buy again does not a monopolist make.[8]

## IV.   THE COMPLAINT DOES NOT ALLEGE SPECIFIC INTENT

The Government's attempt claims should be dismissed for failure to plead specific intent.  *See Phila. Taxi*, 886 F.3d at 341.  The allegations are wholly conclusory.  *See* FAC ¶¶ 210, 223.  The complaint's assertions that Apple wanted to "prevent iPhone customers from switching," *id.* ¶ 98, or "sacrificed substantial revenues" from certain "third-party apps and accessories" it believed threatened its ability to offer consumers a safe, secure, and reliable platform, *id.* ¶ 133, do not show anything but "an intent to compete vigorously," *Spectrum Sports*, 506 U.S. at 459.

## V.   THE COMPLAINT'S KITCHEN-SINK ALLEGATIONS FAIL AS A MATTER OF LAW

The Government's attempt to implicate huge swaths of Apple's business through a few paragraphs that indiscriminately reference products and services— with no apparent or alleged connection to the Government's theory of harm—are particularly meritless.  *See* FAC ¶¶ 119–25, 136–40.  The Court should "determine which allegations in the complaint are merely conclusory and therefore need not be

---

[8]   The Government does not even allege a dangerous probability that Apple can exclude Google, Samsung, and its other rivals to achieve a monopoly—as required for an attempted monopolization claim.  *See, e.g.*, *Barr Laboratories*, 978 F.2d at 112–15.

given an assumption of truth" in order to "assess whether [the Government] has provided adequate factual support for a particular claim at this stage of the litigation."  *See, e.g.*, *Stepan Co. v. Pfizer, Inc.*, 2024 WL 3199834, at *2, *5 (D.N.J. June 26, 2024) (Neals, J.); *loanDepot.com v. CrossCountry Mortg., Inc.*, 399 F. Supp. 3d 226, 235–36 (D.N.J. 2019).  The deficiently pleaded allegations include vague references to Apple's "similar" approaches to various products and services, FAC ¶¶ 119–25, as well as speculation that that Apple *could* employ its "playbook" in the future for still more products, *id.* ¶¶ 136–40.  The complaint pleads insufficient facts—or, in many cases, *no* facts—to demonstrate exclusionary conduct with regard to any of these business lines.

The Government's so-called "monopoly playbook" allegations are deficient under *Twombly*.  Take the alleged example that "Apple has undermined third-party location trackable devices."  FAC ¶ 120.  The complaint does not say *how* Apple did so or identify any alleged anticompetitive harm in the relevant markets from this alleged conduct.  One-line conclusory assertions that Apple "impaired," "impeded," or "limited" video communication apps, cloud storage apps, or WebKit, to "steer[] users" to Apple's own services likewise do not say anything about how Apple purportedly did so and are just bare conclusions.  *Id.* ¶ 120; *see Twombly*, 550 U.S. at 555.  So too with the Government's invocation of "sales channels" without explaining what sales channels Apple purportedly restricted or how Apple did so.

*See* FAC ¶ 120.  The Government's allegations about voice and AI assistants, eSIM, subscription services, digital car keys, and CarPlay are likewise too threadbare to raise a plausible claim for relief.  *See id.* ¶¶ 120–25.[9]

Allegations of possible future conduct are even further removed.  The complaint suggests that "AirPods, iPads, Music, Apple TV, photos, maps, iTunes, CarPlay, AirDrop, Apple Card, and Cash" could provide "future avenues for Apple to engage in anticompetitive conduct." *Id.* ¶ 137; *see also id.* ¶ 136 (alleging "Apple *may* use its smartphone monopoly playbook" for "next-frontier devices and technologies").  Such "allegations of hypothetical, future injury" are unripe for adjudication under Article III.  *Reilly v. Ceridian Corp.*, 664 F.3d 38, 41 (3d Cir. 2011).  These vague, speculative allegations fail to establish any plausible basis for a claim to relief—by themselves or otherwise—and, absent dismissal, invite expansive discovery on numerous products and services based on inadequate pleading. *Twombly*, 550 U.S. at 555.

## CONCLUSION

The complaint should be dismissed with prejudice in its entirety.

---

[9]   The Government does not even attempt to plead relevant markets for any of these products and services, which independently requires dismissal.  Nor can they otherwise be considered as part of any exclusionary "course of conduct" at issue in this case, particularly as the Government does not allege any acts at all that had any sort of anticompetitive effect.  *3Shape Trios*, 2019 WL 3824209, at *12.

Dated:  August 1, 2024

Respectfully submitted,

*/s/ Liza M. Walsh*

Devora W. Allon, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.:    (212) 446-5967
Email:  devora.allon@kirkland.com

Liza M. Walsh
Douglas E. Arpert
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
Tel.:    (973) 757-110
Email:  LWalsh@walsh.law
            DArpert@walsh.law

Cynthia E. Richman (*pro hac vice*
       pending)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Tel.:    (202) 955-8500
Email: crichman@gibsondunn.com

Daniel G. Swanson (*pro hac vice*
       pending)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel.:    (213) 219-7000
Email: dswanson@gibsondunn.com

Craig S. Primis, P.C. (*pro hac vice*)
Matthew J. Reilly, P.C. (*pro hac vice*)
K. Winn Allen, P.C. (*pro hac vice*)
Mary Elizabeth Miller (*pro hac vice*)
Luke P. McGuire (*pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel.:    (202) 389-5000
Email:  craig.primis@kirkland.com
            matt.reilly@kirkland.com
            winn.allen@kirkland.com
            mary.miller@kirkland.com
            luke.mcguire@kirkland.com

Julian W. Kleinbrodt (*pro hac vice*
       pending)
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Tel.:    (415) 393-8200
Email: jkleinbrodt@gibsondunn.com

*Counsel for Defendant Apple Inc.*