# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

UNITED STATES, et al.,

                    *Plaintiffs,*

v.

APPLE, INC.

              *Defendant.*

**Civil Action No. 2-24-cv-04055 (JXN-LDW)**

*ORAL ARGUMENT REQUESTED*

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION .........................................................................................1

FACTUAL BACKGROUND ..........................................................................3

LEGAL STANDARD ....................................................................................7

ARGUMENT ...............................................................................................8

I.  The Complaint Alleges Monopoly Power .........................................10

    A.  The Complaint Pleads U.S. Markets for Smartphones and Performance Smartphones ......................................................................................11

    B.  The Complaint Pleads Monopoly Power in Both Smartphone Markets..13

II.  Apple Willfully Maintains Its Monopolies Through Anticompetitive Conduct.18

    A.  The Complaint Alleges Anticompetitive Conduct Under Section 2's Burden-Shifting Test......................................................................18

    B.  Refusal-to-Deal-with-Rivals Doctrine Does Not Provide a Basis For Dismissal ......................................................................................27

        i.  Apple's Conduct Is Not a Refusal to Deal ..........................................27

            a. Apple Is Not Alleged to Be Refusing to Cooperate with Smartphone Rivals..........................................................................................28

            b. Apple Harms Competition by Restricting Developers and Users...30

            c. Apple's Expansive View of Refusal to Deal Should Be Rejected...34

        ii.  The Complaint Alleges Anticompetitive Conduct Even Under a Refusal-to-Deal-with-Rivals Analysis ...............................................36

III. The Complaint Alleges Attempted Monopolization ..........................................38

IV. The State Plaintiffs Have Standing .................................................................39

CONCLUSION ............................................................................................40

# <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

**Case**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
    458 U.S. 592 (1982) ........................................................................39

*American Tobacco Co. v. United States*,
    328 U.S. 781 (1946) ................................................................ 14, 30

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ................................................. 28, 29, 36, 37

*Blix Inc. v. Apple, Inc.*,
    2021 WL 2895654 (D. Del. July 9, 2021) ...................................25

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007)................................................. passim

*Brown Shoe Co. v. United States*,
    5 U.S. 294 (1962) ........................................................................11

*California v. American Stores Co.*,
    495 U.S. 271 (1990) ....................................................................40

*Chase Mfg., Inc. v. Johns Manville Corp.*,
    84 F.4th 1157 (10th Cir. 2023)....................................................29

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ....................................................................25

*Conwood Co. L.P. v. U.S. Tobacco Co.*,
    290 F.3d 768 (6th Cir. 2002)........................................................32

*Davis v. Wells Fargo*,
    824 F.3d 333 (3d Cir. 2016)...........................................................7

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
    111 F.4th 337 (4th Cir. 2024)............................................. passim

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) ............................................................. 17, 32

*Epic Games, Inc. v. Apple Inc.*,
    559 F. Supp. 3d 898 (N.D. Cal. 2021)..........................................13

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009).........................................................1, 8

*FTC v. Wilh. Wilhelmsen Holding ASA*,
    341 F. Supp. 3d 27 (D.D.C. 2018)...............................................14

*FTC v. AbbVie Inc.*,
    976 F.3d 327 (3d Cir. 2020).........................................................14

*FTC v. IQVIA Holdings Inc.*,
  2024 WL 81232 (S.D.N.Y. Jan. 8, 2024)...........................................................13
*FTC v. Whole Foods Market, Inc.*,
  548 F.3d 1028 (D.C. Cir. 2008)........................................................................12
*Garshman v. Universal Resources Holding Inc.*,
  824 F.2d 223 (3d Cir. 1987)..............................................................................26
*GN Netcom, Inc. v. Plantronics, Inc.*,
  967 F. Supp. 2d 1082 (D. Del. 2013).................................................................11
*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*,
  806 F.3d 162 (3d Cir. 2015)..............................................................................12
*Harrison Aire, Inc. v. Aerostar International, Inc.*,
  423 F.3d 374 (3d Cir. 2005)..............................................................................13
*Harrison v. Jefferson Parish*,
  78 F.4th 765 (5th Cir. 2023) .............................................................................40
*Host Int'l, Inc. v. Marketplace, PHL, LLC*,
  32 F.4th 242 (3d Cir. 2022)...............................................................................29
*Houser v. Fox Theatres Mgmt. Corp.*,
  845 F.2d 1225 (3d Cir. 1988)............................................................................14
*IDT Corp. v. Bldg. Owners & Managers Ass'n Int'l*,
  No. 03-cv-4113, 2005 WL 3447615 (D.N.J. Dec. 15, 2005) ............................26
*Illumina, Inc. v. FTC*,
  88 F.4th 1036 (5th Cir. 2023) ...........................................................................11
*In re Adderall XR Antitrust Litig.*,
  754 F.3d 128 (2d Cir. 2014)..............................................................................29
*In re eBay Seller Antitrust Litig.*,
  545 F. Supp. 2d 1027 (N.D. Cal. 2008).............................................................19
*In re Generic Pharms. Pricing Antitrust Litig.*,
  605 F. Supp. 3d 672 (E.D. Penn. 2022).............................................................39
*In re Google Digital Advert. Antitrust Litig.*,
  627 F. Supp. 3d 346 (S.D.N.Y. 2022) ........................................................ 23, 35
*In re Google Play Store Antitrust Litig.*,
  2024 WL 3302068 (N.D. Cal. July 3, 2024) .....................................................20
*In re Insurance Antitrust Litig.*,
  938 F.2d 919 (9th Cir. 1991).............................................................................39
*In re Suboxone Antitrust Litig.*,
  967 F.3d 264 (3d Cir. 2020)..............................................................................25
*In re Thalomid & Revlimid Antitrust Litig.*,
  2015 WL 9589217 (D.N.J. Oct. 29, 2015) ................................................... 36, 38
*Iqvia, Inc. v. Veeva Sys. Inc.*,
  2018 WL 4815547 (D.N.J. Oct. 3, 2018) ...........................................................37

*John Wyeth & Brothers Ltd. v. CIGNA Int'l Corp.*,
    119 F.3d 1070 (3d Cir. 1997) ..................................................................8
*Kolon Industries v. E.I. DuPont de Nemours & Co.*,
    748 F.3d 160 (4th Cir. 2014) .................................................................14
*LePage's, Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) ............................................. 9, 18, 19, 35
*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951) ....................................................................... 32, 34
*Miller Indus. Towing Equip. Inc. v. NRC Indus.*,
    659 F. Supp. 3d 451 (D.N.J. 2023) ......................................................26
*Mylan Pharm. Inc. v. Warner Chilcott Public Ltd.*,
    838 F.3d 421 (3d Cir. 2016) ...................................................... 9, 19, 35
*NCAA v. Alston*,
    594 U.S. 69 (2021) ......................................................................... 26, 35
*New York v. Meta Platforms*,
    66 F.4th 288 (D.C. Cir. 2023) ....................................................... 32, 33
*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 20130) .............................................. 27, 33, 34
*Ohio v. American Express Co.*,
    585 U.S. 529 (2018) ..............................................................................26
*Otter Tail Power Co. v. United States*,
    410 U.S. 366 (1973) ..................................................................... 29, 36, 37
*Pacific Bell Telephone Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009) ...................................................................... 16, 28, 29
*Pennsylvania Dental Ass'n v. Med. Serv. Ass'n of Pennsylvania*,
    745 F.2d 248 (3d Cir. 1984) .................................................................38
*Phillips v. Cnty. of Allegheny*,
    515 F.3d 224 (3d Cir. 2008) .......................................................... 3, 25
*Princo Corp. v. ITC*,
    616 F.3d 1318 (Fed. Cir. 2010) ............................................................26
*Re/Max Int'l, Inc. v. Realty One, Inc.*,
    173 F.3d 995 (6th Cir. 1999) ................................................................16
*Roxul USA, Inc. v. Armstrong World Indus., Inc.*,
    2018 WL 810143 (D. Del. Feb. 9, 2018) .............................................19
*Stepan Co. v. Pfizer, Inc.*,
    2024 WL 3199834 (D.N.J. June 26, 2024) ...........................................27
*Times-Picayune Publ'g Co. v. United States*,
    345 U.S. 594 (1953) ..............................................................................38
*U.S. Airways v. Sabre Holding Corps.*,
    2022 WL 874945 (S.D.N.Y. Mar. 24, 2022) ................................. 15, 16

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
   7 F.3d 986 (11th Cir. 1993)..................................................................38

*United States v. Bertelsmann SE & Co.*,
   646 F. Supp. 3d 1 (D.D.C. 2022)..........................................................12

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919) ..............................................................................34

*United States v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005).......................................................... passim

*United States v. E. I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956) ...................................................................... 10, 13

*United States v. Gen. Dynamics Corp.*,
   415 U.S. 486 (1974) ..............................................................................14

*United States v. Gillette Co.*,
   828 F. Supp. 78 (D.D.C. 1993)..............................................................12

*United States v. Google LLC*,
   -- F. Supp. 3d --, 2024 WL 3647498 (D.D.C. Aug. 5, 2024)...................10, 11, 16

*United States v. Griffith*,
   334 U.S. 100 (1948) ................................................................................2

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966) ...................................................................... 10, 14

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ........................................................ passim

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ...................................................................... passim

*Viamedia Inc. v. Comcast Corp.*,
   951 F.3d 429 (7th Cir. 2020)............................................. 32, 36, 37, 38

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010).............................................................. passim

## Statutes

15 U.S.C. § 1 ...........................................................................................26
15 U.S.C. § 2 .............................................................................................8
15 U.S.C. § 26 .........................................................................................40

## Rules

FED. R. CIV. P. 8(a) ..................................................................................8
FED. R. CIV. P. 12(b)(6) ..........................................................................27

# INTRODUCTION

The question before the Court is simple: whether Plaintiffs' First Amended Complaint ("FAC" or "Complaint") "set[s] forth sufficient facts to support plausible claims." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211-12 (3d Cir. 2009). It does. The Complaint's detailed, well-pled allegations that Apple is a monopolist and has acted anticompetitively to protect its monopoly meet and exceed the pleading standard under Rule 12(b)(6). Apple's motion should therefore be denied.

Rather than accepting the Complaint's allegations as true, Apple's motion repeatedly raises and argues factual disputes that are not appropriate for resolution at this stage of the case. For example, Apple disputes the Complaint's allegations of market definition, the reasonableness of Apple's conduct, and other fundamental factual questions. Resolving these disputes is not a matter for the Court at this time. The very fact that Apple raises factual disputes demonstrates the need for a factfinder to determine these matters using evidence, not conjecture.

In addition to its efforts to turn a motion to dismiss into a factfinding exercise, Apple's motion seeks to apply the wrong standard by recasting the Complaint's allegations of a complex exclusionary campaign as a case about refusal to deal with rivals. Apple's own motion belies its argument that the allegations fit this narrow subcategory of antitrust cases, stating that Apple "has granted third parties exceptionally broad access to iPhone, its features, and the App Store while also

1

enforcing reasonable limitations to protect consumers." Mot. 1. Apple has it halfway right: this case is, indeed, about limitations on third parties, not a refusal to deal with rivals. But those limitations have suppressed competition and harmed consumers. And contrary to Apple's baldfaced assertions, whether those limitations are "reasonable" and "protect consumers" are ultimate fact questions for the Court, but not on a motion to dismiss.

The gist of Apple's motion appears to be that it believes it is being punished for creating a popular product. Not so. Creating a popular product like the iPhone does not confer upon Apple the right to violate antitrust laws by preventing other companies, small and large, from delivering innovation and choice or preventing consumers from considering other smartphones. And winning competition yesterday does not entitle Apple to stop competition tomorrow, since "[t]he anti-trust laws are as much violated by the prevention of competition as by its destruction." *United States v. Griffith*, 334 U.S. 100, 107 (1948).

The Complaint alleges in great detail that Apple has engaged in a course of conduct to reduce competition, stifle innovation, and deprive users of choices they should have had, all aimed at protecting its smartphone monopoly. Rather than competing on merit, Apple has created a host of barriers to prevent developers from sharing their innovations across smartphone platforms. And although Apple's campaign may not be visible to the public, its protection of the iPhone's dominance

in the U.S. smartphone market has come at a great and continuing cost to consumers. This case addresses that continuing harm, and the Complaint's "[f]actual allegations" go well beyond "rais[ing] a right to relief above the speculative level." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008).

For the reasons set forth more fully below, Apple's motion to dismiss should therefore be denied.

## FACTUAL BACKGROUND

The Complaint alleges the facts below, which are accepted as true and viewed in the light most favorable to Plaintiffs for purposes of this motion to dismiss:

Apple's iPhone is the dominant smartphone in the United States today. FAC ¶¶ 165, 172, 181. Smartphones are portable electronic devices that are essential to Americans' daily lives. FAC ¶¶ 17, 140, 147. With their combination of advanced hardware and software, they enable consumers to perform a wide variety of functions, from making phone calls and sending text messages to playing games, browsing the internet, making payments, and interacting with accessories like smartwatches. FAC ¶¶ 10, 149.

These functions are generally provided through software applications, known as "apps," often created by third-party developers. FAC ¶¶ 50, 158. To run on a smartphone, an app must communicate with the smartphone's operating system ("OS"). FAC ¶¶ 50, 158. The OS is foundational software that manages the

smartphone's hardware and other software programs on the device. FAC ¶¶ 50, 158. Smartphone apps use application programming interfaces ("APIs") to engage with the OS in connecting to other apps or hardware to provide the functionality users want. FAC ¶¶ 50, 158. For example, smartwatches use APIs to receive notifications from smartphone apps, such as a new text message or calendar invitation. FAC ¶ 101. Third-party developers use APIs for the iPhone's OS ("iOS") to create apps for the iPhone. FAC ¶¶ 158-159. They can also write apps using APIs that run on a "middleware" layer that can be standardized across OSs instead of relying on APIs that work solely with a smartphone's OS. FAC ¶ 163. After creating apps that work with iOS, developers need a way to reach iPhone users. Apple limits that pathway to one: Apple's App Store. FAC ¶ 41.

The iPhone is a platform that connects iPhone users with the innovative apps, accessories, and services created by developers that make the iPhone useful and valuable. FAC ¶ 4. Today, users and developers depend on the iPhone, but certain apps and technologies threaten its dominance by offering a wealth of content or features that could disintermediate the iPhone or work equally well on non-iPhone devices, lessening dependence on the iPhone. FAC ¶¶ 6, 52. "Cross-platform" products would make it easier for consumers to enjoy the content and features they value on any smartphone—some better, some cheaper—leading to greater smartphone competition on the merits. FAC ¶¶ 6, 8.

4

In response to these threats, Apple has imposed a web of technical and contractual restrictions to impede developers from offering cross-platform technologies that threaten Apple's monopoly power, FAC ¶¶ 41-42, such as super apps, FAC ¶¶ 60-70, cloud-streaming games, FAC ¶¶ 71-79, messaging apps, FAC ¶¶ 80-93, smartwatches, FAC ¶¶ 94-103, and digital wallets, FAC ¶¶ 104-118. These restrictions serve Apple by driving consumers to the iPhone and degrading consumer experience in a variety of ways.

Super apps reduce developer and user dependence on iOS and the App Store by providing the same user experience across devices, reducing dependence on the iPhone. FAC ¶¶ 63-64. Apple has responded by forcing developers to display mini programs within these apps in unappealing text-only lists (as opposed to descriptive icons, tiles, or pictures), FAC ¶¶ 67, 69, and by forbidding them from collecting payment—even if developers were willing to pay Apple's monopoly tax, FAC ¶ 70.

Text messaging is one of the most critical features of any smartphone. Apple's messaging app, Apple Messages, is available only on the iPhone. FAC ¶ 80. While third-party developers have created cross-platform messaging alternatives, Apple blocks them from exchanging text messages unless the other user has the same app. FAC ¶ 85. Apple Messages' advanced features (e.g., sending quality videos, encrypting messages) work only for iPhone-to-iPhone communications. FAC ¶¶ 82-85. This conduct drives users to Apple Messages, artificially pushing users to buy

iPhones. FAC ¶¶ 88, 91. In response to a complaint about broken iPhone-to-Android messaging, Apple's CEO replied, "Buy your mom an iPhone." FAC ¶ 92.

Digital wallet apps enable consumers to store and use important credentials on their phones, such as credit cards, transit passes, forms of ID, and digital car keys. FAC ¶¶ 105, 108. To "drive more sales of iPhone and increase stickiness to the Apple ecosystem," FAC ¶ 108, Apple has blocked third-party developers from adding tap-to-pay functionality to any third-party digital wallet on the iPhone, undermining third-party wallets, which, in turn undermines smartphone competition. FAC ¶ 104.

Smartwatches enable users to respond to messages, monitor health and fitness, and make mobile payments, among their many features. FAC ¶ 95. Apple Watch works only with an iPhone. FAC ¶ 96. Apple restricts third-party, cross-platform watches from responding to messages and notifications and maintaining reliable connections to the iPhone. FAC ¶ 100-101.

Cloud-streaming games let users play games on the cloud, making it easier to buy a non-iPhone and get the same experience. FAC ¶¶ 71-72. Cloud platforms also offer developers additional options for how to create programs and interact with users. FAC ¶ 74. For years, Apple has blocked them through onerous and user-unfriendly requirements that each app and update be approved and downloaded separately. FAC ¶ 76. The result is that no effective cloud-gaming subscription services are available to iPhone users. FAC ¶¶ 73-75.

The Complaint identifies other areas where Apple has suppressed cross-platform third-party technologies, such as cloud-storage apps (making it harder to transfer data across phones), web browsers (limiting capabilities of third-party browsers), video communication apps (steering users to FaceTime), and location trackers (impeding cross-platform devices). FAC ¶ 120. Likewise, Apple's wireless carrier contracts inhibit carriers' ability to sell competing smartphones. FAC ¶ 188.

All told, Apple uses its dominance over business partners to stymie valuable technologies that function as middleware, facilitate switching phones, or reduce the need for expensive hardware. FAC ¶ 120. This harms users in at least two ways. First, it deprives users of the benefits of increased smartphone competition, including lower smartphone prices and more innovation in smartphones and smartphone OSs. FAC ¶ 126. Second, it deprives users of the benefits of the cross-platform technologies that would have been developed but for Apple's conduct, including wallets with enhanced rewards and features, the ability to message properly with family members regardless of smartphone choice, and fully functional smartwatches with cameras or better battery life. FAC ¶¶ 10, 129-132.

## LEGAL STANDARD

On a Rule 12(b)(6) motion, "the defendant bears the burden to show that the plaintiff has not stated a claim." *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016). The court accepts factual allegations as true, construes the complaint in the

light most favorable to the plaintiff, and determines whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Fowler*, 578 F.3d at 210. In antitrust cases as in any other, a motion to dismiss must be denied if the factual allegations, "taken as a whole, render the plaintiff's entitlement to relief plausible." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010); FED. R. CIV. P. 8(a). Arguments "raised in passing (such as, in a footnote), but not squarely argued" are waived. *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997); *see, e.g.*, Mot. 32 n.6 (*parens patriae*), 38 n.8 (dangerous probability of success), 40 (dismissal of allegations).

## **ARGUMENT**

The Complaint lays out a straightforward violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Apple possesses monopoly power in U.S. smartphone and performance smartphone markets, and "engage[s] in anti-competitive conduct that reasonably appears to be a significant contribution to maintaining monopoly power," as measured by Section 2's burden shifting test. *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005). Like Microsoft before it, Apple impedes middleware and middleware-like technologies "to meet the threat to [Apple's] monopoly in" the smartphone market. *United States v. Microsoft Corp.*, 253 F.3d 34, 60 (D.C. Cir. 2001) (en banc). Apple attempts to recast the Complaint, revise the law, and dispute the facts, but fails to provide any legitimate basis for dismissal.

Section 2 is "designed to curb the excesses of monopolists and near-monopolists." *LePage's, Inc. v. 3M*, 324 F.3d 141, 169 (3d Cir. 2003) (en banc). "[T]he means of illicit exclusion, like the means of legitimate competition, are myriad." *Microsoft*, 253 F.3d at 58. As the Fourth Circuit held in *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337 (4th Cir. 2024), "Section 2 focuses on anticompetitive conduct, not on court-made subcategories of that conduct." *Id.* at 354. Most conduct is therefore analyzed under the general burden shifting framework that balances the benefits and harm of conduct.

Fighting the allegations in the Complaint, Apple argues that the "refusal to deal" subcategory should apply. Mot. 11-19. It should not. "[W]hen anticompetitive conduct is alleged to be typical . . . refusing to deal . . . the case law has developed tests for analyzing such claims," but for "a complex or atypical exclusionary campaign . . . application of such specific conduct tests would prove too rigid." *Duke Energy*, 111 F.4th at 354. This case is not a typical refusal to deal with rivals but rather an exclusionary campaign by Apple, so the flexible Section 2 burden-shifting framework applies. *See, e.g., Mylan Pharm. Inc. v. Warner Chilcott Public Ltd.*, 838 F.3d 421, 438 (3d Cir. 2016); *Microsoft*, 253 F.3d at 58-60.

The elements of monopolization under Section 2 are (1) possession of monopoly power in a relevant market and (2) willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a

superior product, business acumen, or historic accident. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306-307 (3d Cir. 2007). The elements of attempted monopolization are that the defendant (1) has a specific intent to monopolize and (2) has engaged in anticompetitive conduct that, taken as a whole, creates (3) a dangerous probability of achieving monopoly power. *W. Penn*, 627 F.3d at 108. For the reasons set forth below, the Complaint states claims for relief under Section 2. Apple's motion should be denied.

## I.    The Complaint Alleges Monopoly Power

The Complaint alleges that Apple possesses monopoly power in U.S. markets for smartphones and performance smartphones. FAC ¶¶ 164-190. "Monopoly power is the power to control prices or exclude competition." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). It "may be inferred from the predominant share of the market," which is sometimes referred to as indirect proof. *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966); *Dentsply*, 399 F.3d at 187. Monopoly power also can be demonstrated by direct proof. *Id*. The Complaint alleges both.

Monopoly power can be found regardless of how it is acquired. *Microsoft*, 253 F.3d at 56; *United States v. Google LLC*, -- F. Supp. 3d --, 2024 WL 3647498, at *2 (D.D.C. Aug. 5, 2024). Apple's claim that it cannot have monopoly power due to "iPhone users' overall satisfaction" is wrong as a matter of law and contrary to the

Complaint's allegations. Mot. 37. A monopolist can violate Section 2 even if its product is popular or high-quality. *See Google*, 2024 WL 3647498, at *2.

## A. The Complaint Pleads U.S. Markets for Smartphones and Performance Smartphones

The Complaint pleads two common-sense markets for smartphones that reflect the reality of smartphone sales and usage in the United States. FAC ¶¶ 164, 166-167, 172-175. A relevant market consists of a product and geographic market. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962). A relevant product market contains products that "are readily substitutable for one another." *Broadcom*, 501 F.3d at 307. Courts typically identify such products using practical indicia from *Brown Shoe* and other economic evidence. The *Brown Shoe* factors are "(1) industry or public recognition, (2) the product's peculiar characteristics and uses, (3) unique production facilities, (4) distinct customers, (5) distinct prices, (6) sensitivity to price changes, and (7) specialized vendors." *Google*, 2024 WL 3647498, at *67.

Apple does not dispute the alleged relevant product market containing all smartphones. FAC ¶¶ 164, 172-175. Performance smartphones are a narrower alleged market that excludes entry-level smartphones. FAC ¶¶ 165-171. Apple's own documents distinguish between competition among higher-end and entry-level smartphones, as do those of other industry participants. FAC ¶¶ 166-167; *see Illumina, Inc. v. FTC*, 88 F.4th 1036, 1050 (5th Cir. 2023) (relying on defendant's "own internal documents" to discern product market); *GN Netcom, Inc. v.*

*Plantronics, Inc.*, 967 F. Supp. 2d 1082, 1088 & n.4 (D. Del. 2013). Other *Brown Shoe* factors reinforce the industry recognition: performance phones have distinct uses, characteristics, purchase terms, and customers. FAC ¶¶ 167-169.

Apple claims that the performance smartphone market is "divorced from commercial reality." Mot. 35. But that is a fundamentally factual issue that must be decided through evidence, not on a motion to dismiss. Plaintiffs' allegations supporting the market, based on information gathered from Apple's own assessments and third parties, must be accepted as true and are more than sufficient to establish that performance smartphones are "the 'high end' of other broad markets" and thus a "distinct submarket[] for antitrust purposes." *United States v. Bertelsmann SE & Co.*, 646 F. Supp. 3d 1, 28 (D.D.C. 2022) (top-selling books).[1]

Plaintiffs have similarly alleged a valid geographic market because the United States "is the area in which a potential buyer may rationally look for the [smartphone] he or she seeks." *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 183-84 (3d Cir. 2015). The allegations that U.S. consumers are unlikely to shop for smartphones in other countries, which have different distribution channels, regulatory requirements, compatibility requirements, customer support, prices, features, and promotions, FAC ¶¶ 176-179, more than satisfy this

---

[1] *See also FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1039 (D.C. Cir. 2008) (premium grocery); *United States v. Gillette Co.*, 828 F. Supp. 78, 82 (D.D.C. 1993) (premium pens).

requirement. And, as alleged, Apple sets U.S. prices separately from prices around the world and makes other strategic decisions targeted to the U.S. market. FAC ¶ 179. Apple's contentions regarding a broader global, all-smartphone market, Mot. 35, do nothing to disprove a narrower one. Almost all competition takes place in multiple possible markets, some narrower and some broader. *See FTC v. IQVIA Holdings Inc.*, 2024 WL 81232, at *17 (S.D.N.Y. Jan. 8, 2024). Apple's factual disputes on these points are neither relevant nor appropriate at this stage. [2]

### B. The Complaint Pleads Monopoly Power in Both Smartphone Markets

The Complaint pleads monopoly power. Monopoly power is "the power to control prices or exclude competition." *E.I. du Pont*, 351 U.S. at 391. Monopoly power can be established by indirect or direct evidence. The Complaint alleges both.

<u>Indirect Evidence.</u> Indirect evidence of monopoly power can be shown by dominant market share and barriers to entry. *Broadcom*, 501 F.3d at 307. As alleged, Apple's market shares—65 percent of all smartphones and 70 percent of performance smartphones—reflect a dominant share. FAC ¶ 181. They exceed this Circuit's rule that "[a]bsent other pertinent factors, a share significantly larger than 55% has been required to establish[] prima facie market power." *Dentsply*, 399 F.3d

---

[2] Apple relies on cases about single-brand "aftermarkets" for products that are sold after the initial purchase of a product. *See* Mot. 33, 36 (citing *Harrison Aire, Inc. v. Aerostar International, Inc.*, 423 F.3d 374 (3d Cir. 2005); *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021)). These cases raise unique considerations that do not apply here as the alleged markets are not aftermarkets.

at 187. And they exceed the shares of other monopolists. *See, e.g.*, *FTC v. AbbVie Inc.*, 976 F.3d 327, 373 (3d Cir. 2020) (60-71.5% share); *Houser v. Fox Theatres Mgmt. Corp.*, 845 F.2d 1225, 1230 (3d Cir. 1988) (66-71% share).

Apple argues that Plaintiffs must plead a 75% market share, relying on *Kolon Industries v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014). Mot. 35. But *Kolon* never suggested that 75% was required for monopoly power. Instead, it recognized that "control[] over 70% of the relevant market" "adequately plead[s] [] monopoly power" and that even a "market share of less than 60%" does not "foreclose a finding of monopoly power." *Kolon*, 748 F.3d at 174. Nor could *Kolon* contain the holding Apple claims because the Supreme Court has held that "two-thirds" of a market "constitute[d] 'a substantial monopoly.'" *Grinnell*, 384 U.S. at 571 (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 796-98 (1946)).

Apple also argues that shares must be pleaded by units rather than revenue. Mot. 36. Determining the right market shares is a fact-intensive inquiry because the right metric of "a company's ability to compete" can vary depending on the circumstances of a case or industry. *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 502 (1974). Courts routinely look to revenue-based shares. *See, e.g.*, *Dentsply*, 399 F.3d at 188; *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 59-61 (D.D.C. 2018). Apple cites no case dismissing a complaint for failure to plead market shares by units, another factual issue appropriately reserved for trial.

14

The entry barriers and additional "pertinent factors" alleged in the Complaint further support Apple's monopoly power. *See Dentsply*, 399 F.3d at 187; *Broadcom*, 501 F.3d at 307; *U.S. Airways, Inc. v. Sabre Holdings Corp.*, 2022 WL 874945, at *9 (S.D.N.Y. Mar. 24, 2022). The smartphone markets here feature significant barriers to entry and expansion, including high switching costs and customer "stickiness," substantial network effects, product introduction costs, carrier relationships, and regulatory hurdles. FAC ¶¶ 180-186. Indeed, Apple's challenged course of conduct is directed at raising barriers to smartphone competition, FAC ¶ 183, and locking consumers to their iPhone, FAC ¶ 128. These barriers are evident from the repeated, failed attempts at entry by well-resourced firms. FAC ¶ 186. Moreover, Apple's gatekeeper power allows it to block competitively threatening apps and accessories, such as the super apps and cloud-gaming apps that Apple effectively blocked. These factors, along with Apple's pricing and imposed terms, FAC ¶ 188, support the monopoly power allegations.

Samsung's and Google's smartphones do not negate the allegations of Apple's monopoly power but merely introduce yet another fact question into the mix. Mot. 36-37. The Complaint alleges that these firms, and others, face significant "barriers to entry and *expansion*," as demonstrated by Apple's increasing market share and many failed attempts to constrain Apple. FAC ¶¶ 182-183, 185-186 (emphasis added); *see also* Mot. 37 (acknowledging allegations of switching costs and network

effects). In addition, developers often need to reach iPhone users to reach viable scale, FAC ¶ 181, which Apple leverages to constrain competition, FAC ¶ 41—a market feature in platform cases that supports finding monopoly power with shares much lower than here. *See, e.g.*, *U.S. Airways*, 2022 WL 874945, at *9 (finding that platform operator had monopoly power with 49-52% share in market with other powerful competitors).[3] What matters here is that Plaintiffs have alleged in great detail that Apple's monopoly power is established through a dominant market share and reinforced by barriers to entry and expansion. The inquiry should end there.

Direct Evidence. Plaintiffs also plead Apple's monopoly power directly. Direct evidence includes evidence that a defendant is unconstrained by market forces. It can exert control over price, quality, innovation, or other dimensions of competition. *See Microsoft*, 253 F.3d at 56-58; *cf. Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 450 (2009) ("[F]or antitrust purposes, there is no reason to distinguish between price and nonprice components of [competition]"). Such evidence includes conduct that is "economically irrational absent market dominance." *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1020 (6th Cir. 1999); *see also Microsoft*, 253 F.3d at 57-58. It also includes proof that a defendant

---

[3] Apple relies on factual assertions that "Android, not Apple, [is] 'poised for world domination,'" mischaracterizing the Google complaint. Mot. 36. That quote comes from a 2010 Google document and addresses a different market that *excludes* Apple and iOS (licensable mobile operating systems). Am. Compl. ¶ 64, *United States v. Google*, ECF No. 94, No. 20-cv-03010-APM (Jan. 15, 2021).

can exclude rivals, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 477-78 (1992), as well as evidence of "supracompetitive prices" and "restricted output," *Broadcom*, 501 F.3d at 307.

As in *Microsoft*, Apple's "pattern of exclusionary conduct could only be rational" "if the firm knew that it possessed monopoly power." *Microsoft*, 253 F.3d at 58; *accord Dentsply*, 399 F.3d at 191. Apple forgoes quality-enhancing innovations and third-party technologies without fearing that other competitors might implement them and gain share. For example, Apple throttled user access to super apps and cloud-streaming apps, which blocked these technologies on the iPhone and reduced market-wide incentives to invest in them. FAC ¶¶ 67-71, 74-78, 182. Apple did this while *gaining* market share. Instead of market forces spurring Apple to adopt these valuable technologies, Apple has been able to stifle their growth and development, even on other U.S. smartphones. Only a monopolist can do that.

The Complaint is replete with other direct evidence of Apple's monopoly power. Apple judges product features "good enough" based on whether Apple (not the market) introduced them, FAC ¶ 187; imposes contract terms that impede the ability of carriers to promote rival smartphones, FAC ¶ 188; and charges static, high prices to Apple customers and third-party developers with profit margins far exceeding its next most profitable rival, FAC ¶¶ 56, 58, 188-189; *Dentsply*, 399 F.3d at 191 (finding monopoly power based in part on "Dentsply's profit margins").

17

Apple misconstrues the Complaint, arguing it does not "allege a restriction in output . . . to demonstrate supracompetitive pricing." Mot. 34. But Plaintiffs are not relying on supracompetitive pricing to plead monopoly power, so Apple's argument—even were it accurate—is irrelevant to such showing. No more is required at this stage. For these reasons, Plaintiffs have independently and sufficiently pleaded monopoly power through direct evidence.

## II.    Apple Willfully Maintains Its Monopolies Through Anticompetitive Conduct

The Complaint alleges that Apple engages in anticompetitive conduct to maintain its smartphone monopolies. "A monopolist willfully acquires or maintains monopoly power when it competes on some basis other than the merits," *LePage's*, 324 F.3d at 147, which can be "demonstrated by proof that a defendant has engaged in anti-competitive conduct that reasonably appears to be a significant contribution to maintaining monopoly power." *Dentsply*, 399 F.3d at 187. In addition to "competition on some basis other than the merits," *Broadcom*, 501 F.3d at 308, anticompetitive conduct means "attempt[ing] to exclude rivals on some basis other than efficiency," *W. Penn*, 627 F.3d at 108, or other conduct that "harm[s] the competitive process and thereby harm[s] consumers," *Microsoft*, 253 F.3d at 58.

### A. The Complaint Alleges Anticompetitive Conduct Under Section 2's Burden-Shifting Test

The Complaint alleges anticompetitive conduct that meets Section 2's burden

shifting test. Under this test, (1) the plaintiff "must initially provide evidence of the anticompetitive nature of a defendant's conduct," (2) "the defendant then has the burden of proffering nonpretextual procompetitive justifications for its conduct," and (3) "the plaintiff may then either rebut those justifications or demonstrate that the anticompetitive harm outweighs the procompetitive benefit." *Mylan*, 838 F.3d at 438 (cleaned up); *see also Microsoft*, 253 F.3d at 58-59. "To survive dismissal Plaintiffs are required only to establish" the first step, "a *prima facie* case." *In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1033 (N.D. Cal. 2008). Apple's claim that it has built "a superior product" and repeated previews of its flawed second-step justifications are unavailing and inappropriate at this stage of the case. Mot. 1, 13-14, 21. "Weighing pro-competitive and anti-competitive effects is best reserved for summary judgment or trial after the benefit of discovery." *Roxul USA, Inc. v. Armstrong World Indus., Inc.*, No. 17-cv-1258, 2018 WL 810143, at *6 (D. Del. Feb. 9, 2018).

Many types of conduct satisfy step one—and the burden-shifting test overall—because "the means of illicit exclusion, like the means of legitimate competition, are myriad." *Microsoft*, 253 F.3d at 58; *Duke Energy*, 111 F.4th at 354. For example, in *LePage's*, the defendant used "bundled rebates" across a diverse set of products to prevent customers from buying from a competitor that had a smaller product catalog. *LePage's*, 324 F.3d at 154-57. Likewise, courts have assessed

restrictions related to the distribution of apps on smartphones under the burden-shifting test. *In re Google Play Store Antitrust Litig.*, No. 20-cv-05671, 2024 WL 3302068, at *11 (N.D. Cal. July 3, 2024).

The landmark *Microsoft* ruling applied burden shifting to conduct analogous to Apple's. Microsoft used its OS monopoly to "prevent[] the effective distribution and use of products that might threaten that monopoly." 253 F.3d at 58. In particular, Microsoft targeted software called "middleware," which let developers create "applications [that] would run on any operating system on which the middleware was also present." *Id*. at 53. Middleware threatened Microsoft's monopoly because "[i]f a consumer could have access to the applications he desired—regardless of the operating system he uses—simply by installing a particular browser on his computer then he would no longer feel compelled to select Windows in order to have access to those applications; he could select an operating system other than Windows based solely upon its quality and price." *Id*. at 60. In short, "the market for operating systems would be competitive." *Id.*

Microsoft violated Section 2 because it used its control of the Windows platform to preference its own integrated products and suppress usage of third-party middleware, such as web browsers. Microsoft's restrictions on its own platform were of "particular importance" and included prohibiting third parties from "(1) removing any desktop icons, folders, or 'Start' menu entries; (2) altering the initial boot

20

sequence; and (3) otherwise altering the appearance of the Windows desktop," *id.* at 61; and (4) requiring applications to commit to "promote and distribute [Microsoft's Internet Explorer] and to exile [third-party] Navigator from the desktop" to secure Explorer's place "on the Windows desktop," *id.* at 67-68. Other anticompetitive tactics included technical integration that disadvantaged third-party browsers, *id.* at 64-67, exclusive dealing, *id.* at 73-74, and payoffs for default status, *id.* at 71-72, 75-76. Microsoft was not competing on the merits because it did not "mak[e] Microsoft's own browser more attractive to consumers." *Id.* at 65; *see also id.* at 62.

The Complaint alleges similarly anticompetitive conduct because, like Microsoft, Apple wields its control over the platform to (1) impose technical and contractual restrictions that suppress apps and accessories that (2) operate cross-platform and threaten Apple's smartphone monopoly.

Suppression of Apps and Accessories. The Complaint alleges that Apple uses a variety of means to suppress apps and accessories. First, Apple's monopoly power over smartphone users paired with limiting distribution to its App Store give Apple gatekeeper power that forces developers to submit to app review. FAC ¶¶ 41, 44-45, 126, 135. Apple then uses app review to undermine apps and accessories that threaten its smartphone monopoly. For example, Apple requires would-be super apps to display mini-programs in a flat, text-only list, rather than a user-friendly interface with icons or tiles, and prevents developers of super apps from collecting payments

from users. FAC ¶¶ 69-70. Apple likewise hinders cloud-gaming apps by requiring a separate app for each game, instead of a single app with a catalog of games that would be more convenient for users and lower cost for developers. FAC ¶¶ 75-77. Apple's restrictions have devastated these technologies, leaving them with little to no penetration among smartphone users today. FAC ¶ 75; *see Microsoft*, 253 F.3d at 65. Apple applies similar restraints to other apps and accessories like browsers, impeding the performance of these cross-platform products. FAC ¶ 120.

Second, Apple uses control over APIs to stop developers from offering iPhone users key features, and instead allows only Apple's proprietary Apple Watch, Apple Wallet, and Apple Messages to offer them. These restrictions have the practical effect of reducing usage of third-party alternatives. For example:

- **Watches:** Only Apple Watches can maintain a stable Bluetooth connection to iPhones, allowing them to respond to notifications, such as by sending a text message. FAC ¶¶ 101-102. Apple impairs third-party, cross-platform watches from offering comparable functionality, even though they might offer better battery life or other features that users prefer. FAC ¶¶ 101-102.

- **Digital wallets:** Apple has prevented third-party wallets from incorporating tap-to-pay functionality on the iPhone, "[t]he most important function for attracting users to a digital wallet for smartphones." FAC ¶¶ 111-112.

- **Messaging:** Apple prevents third-party messaging apps from working with carrier technologies necessary for text-to-anyone functionality. FAC ¶ 87. Because of that, Apple Messages is the lone iPhone app with that feature, forcing many users to make Apple Messages their primary messaging app.

None of this reflects a mere "lack [of] exact parity." Mot. 15. These restraints devastate third parties' ability to develop products and consumers' ability to use

them, which is straightforward anticompetitive conduct. *Microsoft*, 253 F.3d at 65; *see also Duke Energy*, 111 F.4th at 357 (monopolist's "blend-and-extend strategy hindered a new entrant's ability to compete on *the basis of efficiency*"); *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 385 (S.D.N.Y. 2022) (denying motion to dismiss where the defendant's technical integration meant that other firms "never had the opportunity" to win bid). Apple's exclusionary practices create the illusion that only Apple's products "just work" (a common Apple marketing trope) when in fact Apple is blocking equivalent or better alternatives from working properly. *Cf. Broadcom*, 501 F.3d at 313 (inaccurate information can "confer an unfair advantage and bias the competitive process"); FAC ¶ 90. This is the opposite of competition on the merits. These examples are illustrative, not exhaustive. The Complaint alleges a variety of other ways in which Apple restricts apps and accessories and impairs other categories of apps. FAC ¶¶ 52-135.

　　Harm to Smartphone Competition. The Complaint alleges that Apple's suppression and degradation of cross-platform apps and accessories "reasonably appears to be a significant contribution to maintaining monopoly power" in smartphone markets. *Dentsply*, 399 F.3d at 187; *Microsoft*, 253 F.3d at 79. As in *Microsoft*, the course of conduct here is directed at apps and accessories that are "middleware" or pose similar cross-platform threats. Super apps are "fundamentally disruptive" to Apple's monopolies because they serve as a platform for mini

programs that "do everything," and thereby reduce users' and developers' reliance on Apple's apps, OS, and hardware. FAC ¶ 62; *see also* FAC ¶¶ 60-61. Cloud-gaming technology offers a platform for creating and playing games using remote computing power instead of Apple's expensive hardware, empowering users to buy an "Android for 25 bux" and developers to be more efficient. FAC ¶¶ 71-74, 79. Degrading cross-platform messaging apps raises "obstacle[s] to iPhone families giving their kids Android phones." FAC ¶¶ 80, 91-92. Smartwatches pose a threat because they allow users to "rely less on a smartphone's proprietary software and more on the smartwatch itself," and because cross-platform smartwatches make it easier to choose alternate smartphones. FAC ¶¶ 97-98; *see also* FAC ¶¶ 94, 99. And undermining third-party digital wallets "increase[s] stickiness to the Apple ecosystem." FAC ¶¶ 108-10. These alleged threats to Apple's smartphone monopoly readily satisfy Plaintiffs' pleading burden. *See W. Penn*, 627 F.3d at 109-10.

Unsurprisingly given Apple's monopoly power, Apple's conduct harms all smartphone users. Users have fewer smartphone choices, pay higher smartphone prices, and suffer lower-quality smartphones, apps, and accessories. FAC ¶¶ 126-127, 130. And developers pay Apple higher fees and are unable to bring products to market. FAC ¶¶ 126, 131-132. Developers have abandoned plans to offer super apps, cloud-gaming apps, smartwatches, and digital wallets for U.S. smartphones because developing them just for non-iPhones is not cost-effective. FAC ¶¶ 131-132.

Plaintiffs need not isolate the specific harm from each aspect of Apple's conduct. Instead, the effects are assessed cumulatively. "[I]t is a misapplication of antitrust doctrine for a court to treat a plaintiff's allegations of anticompetitive conduct 'as if they were five completely separate and unrelated lawsuits,' effectively 'tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.'" *Duke Energy*, 111 F.4th at 355 (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962)); *In re Suboxone Antitrust Litig.*, 967 F.3d 264, 270 (3d Cir. 2020) (defendant "incorrectly asks us to examine each of these acts individually").

The Complaint's allegations do not "*presume*" harm to smartphone competition, Mot. 32 (emphasis in original), or reflect "implausible leaps," Mot. 30. They use Apple's ordinary-course assessments, *see e.g.* FAC ¶¶ 62, 71, 91-92, 108, of how cross-platform technologies impact iPhone sales—assessments other market participants echo. Apple can prove its own executives' views "far-fetched," Mot. 30, at trial, not on a motion to dismiss. *Phillips*, 515 F.3d at 231-34.

*Blix Inc. v. Apple, Inc.*, 2021 WL 2895654 (D. Del. July 9, 2021), is of no help to Apple. Mot. 32. There, the plaintiff had "not alleged (nor explained)" how Apple "eliminat[ed] competition in any market," because the only alleged harm from Apple's conduct was to "specifically, Blix," "a single competitor." *Blix*, 2021 WL 2895654, at *3-5. The court distinguished *Microsoft* where the middleware market

threat and OS competition were "interrelated." *Id.* at *4.

Apple asserts an incorrect standard of proof under a different section of the statute, 15 U.S.C. § 1, arguing that Plaintiffs must show "an actual adverse effect on competition in the relevant market" that is "substantial," Mot. 27. This is not the right standard, which under Section 2 is whether Apple's conduct "reasonably appears to be a significant contribution to maintaining monopoly power" in smartphone markets. *Dentsply*, 399 F.3d at 187. Apple's test is *one option* for showing competitive harm under Section 1, but even under that section, plaintiffs may show effects "directly or indirectly." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018). Section 1 direct evidence is "proof of actual detrimental effects on competition such as reduced output, increased prices, or decreased quality in the relevant market"—Apple's test. But Section 1 indirect proof—"proof of market power plus some evidence that the challenged restraint harms competition"—is a full substitute and more common form of proof. *Id.* Apple's cited cases do not support applying this test here because they are about Section 1,[4] or are about Section 2 but say nothing about actual adverse effects.[5] In any event, even if Apple's test

---

[4] Mot. 27 (citing *NCAA v. Alston*, 594 U.S. 69, 96 (2021); *Princo Corp. v. ITC*, 616 F.3d 1318, 1338 (Fed. Cir. 2010); *Garshman v. Universal Res. Holding Inc.*, 824 F.2d 223, 231 (3d Cir. 1987); *IDT Corp. v. Bldg. Owners & Managers Ass'n Int'l*, No. 03-cv-4113, 2005 WL 3447615, at *10 (D.N.J. Dec. 15, 2005)).

[5] Mot. 27 (citing *Microsoft* 253 F.3d at 58-59; *Miller Indus. Towing Equip. Inc. v. NRC Indus.*, 659 F. Supp. 3d 451, 466 67 (D.N.J. 2023))

were correct, Apple once again raises a factual dispute to the extent it argues that its conduct has not had a substantial adverse effect on the market.

Finally, the Court should reject any argument for dismissal of particular allegations. Mot. 38-40. Rule 12(b)(6) provides for dismissal of "claims," not allegations. FED. R. CIV. P. 12(b)(6). Plaintiffs have "provided actual factual support for [their] *particular claim[s]* at this stage of the litigation," *Stepan Co. v. Pfizer, Inc.*, 2024 WL 3199834, at *2 (D.N.J. June 26, 2024) (emphasis added).

## B. Refusal-to-Deal-with-Rivals Doctrine Does Not Provide a Basis For Dismissal

The practices in the Complaint are neither "refusals to deal" nor are they "lawful." Mot. 11. The refusal-to-deal-with-rivals doctrine is a narrow "court-made subcategor[y] of [anticompetitive] conduct" that applies to a specific fact pattern. *Duke Energy*, 111 F.4th at 354. Plaintiffs' allegations do not implicate this doctrine because they do not challenge Apple's interactions with smartphone rivals, and because Apple has harmed competition not by withholding resources from smartphone rivals but rather by imposing anticompetitive conditions on users and developers. But even if that doctrine applied, the Complaint states a claim.

### i. Apple's Conduct Is Not a Refusal to Deal with Rivals

Apple's conduct falls outside "the narrow field of refusals to deal." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1076 (10th Cir. 2013). Refusal-to-deal-with-rival claims assert that a company has monopolized a market "by establishing an

27

infrastructure that renders them uniquely suited to serve their customers" and is now harming competition by failing to "share the source of their advantage" in the monopolized market with rivals in that market. *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). The Supreme Court has applied this doctrine to two scenarios: (i) a challenge to a defendant's outright refusal to provide a rival a requested product or service, *see id.* at 407-409; *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608-11 (1985); or (ii) a rival's challenge to an ongoing deal with commercially disadvantageous terms, which the Court viewed as challenging the defendant's refusal to offer more favorable terms, *see linkLine*, 555 U.S. at 442, 451. As alleged, Apple's practices fit neither category. Under these circumstances, courts analyze the conduct using the fact-intensive burden-shifting test, rather than refusal-to-deal principles. *Duke Energy*, 111 F.4th at 354 (explaining that conduct-specific tests are "too rigid" for "allegations of a complex or atypical exclusionary campaign, the individual components of which do not fit neatly within pre-established categories").

### a. Apple Is Not Alleged to Be Refusing to Cooperate with Smartphone Rivals

The refusal-to-deal-with-rivals framework does not apply because it is limited to dealings with rivals in the monopolized market and this case does not allege that Apple fails to deal with smartphone rivals. Courts expressly limit the doctrine to dealing with *rivals*. *E.g.*, *linkLine*, 555 U.S. at 448 ("a firm's unilateral refusal to

28

deal with its rivals"); *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1173 (10th Cir. 2023) ("We have never extended a refusal-to-deal-with-rivals analysis outside that situation."); *Host Int'l, Inc. v. Marketplace, PHL, LLC*, 32 F.4th 242, 250 n.7 (3d Cir. 2022) (analysis applies "only among competitors"). Apple repeatedly edits the text of decisions to make its argument, replacing the narrow term "rivals" with the broader "third parties," Mot. 12 (*linkLine*), 16 (*Trinko*; *Aerotec*).

In this context, rivals are companies seeking to compete in the monopolized market. *E.g.*, *linkLine*, 555 U.S. at 442-443 (rivals in local DSL); *Trinko*, 540 U.S. at 402-04 (rivals for local telephone service); *Aspen Skiing*, 472 U.S. at 595 (rivals for downhill skiing in Aspen); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 368 (1973) (rivals in retail distribution of electric power). Apple's cases reflect this distinction. *See, e.g.*, *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 135 (2d Cir. 2014) (defendant failed to supply its "competitors" with off-brand drug to sell in competition with defendant). No part of this case involves forced sharing with smartphone rivals. Instead, Apple's alleged conduct originates from its smartphone monopoly and restricts users and third parties, as Apple acknowledges. Mot. 14.

Limiting the doctrine to rivals in the monopolized market is not "formalistic." Mot. 18. It is dictated by the very considerations that underlie this doctrine in the first place. For example, forcing monopolists "to share the source of their advantage . . . may lessen the incentive for the monopolist, the rival, or both to invest in those

economically beneficial facilities" that produced the monopoly. *Trinko*, 540 U.S. at 407-408; Mot. 2. But developers are not seeking to manufacture a smartphone or take a free ride on Apple's smartphone innovations. If anything, Apple has been able to rest on its laurels because it has affirmatively blocked innovation from developers. Restoring competition may well enhance Apple's incentive to invest to improve the iPhone because "immunity from competition is a narcotic, and rivalry is a stimulant, to industrial progress." *Am. Tobacco*, 328 U.S. at 813.

The *Trinko* Court also noted that forced dealing could facilitate collusion in the monopolized market. 540 U.S. at 408. Commercial dealings between Apple and developers do not raise these concerns. Finally, the *Trinko* Court expressed that refusal-to-deal cases raise unique remedy considerations. 540 U.S. at 408. Apple seizes on this to raise the specter of future, speculative remedies. But government enforcement actions provide the Court with an array of options that do not require it to sit as a "central planner," Mot. 13, or "judicial[ly] redesign" the iPhone, Mot. 1. What matters now is that Apple and the restricted third parties are not alleged to be smartphone rivals, so refusal-to-deal-with-rivals doctrine does not apply.

### b. Apple Harms Competition by Restricting Developers and Users

This case is not about Apple's refusal to "share the source of [its] advantage." *Trinko*, 540 U.S. at 407. It is about Apple imposing contractual restrictions and rules to control developers and restrict smartphone users in service of its monopoly. FAC

¶ 41. Apple uses control over app distribution to "dictate how developers innovate for the iPhone" and other smartphones, driving users away from products that threaten its monopoly. FAC ¶¶ 54-55. Apple likewise employs technological means to prevent developers from innovating in certain ways to tether users to Apple's platform, denying them choice. *E.g.*, FAC ¶¶ 94, 110, 118. In fact, Apple readily acknowledges that it invited developers to create iPhone apps but set "limitations" it believes are "reasonable." Mot. 1. The reasonableness of these limitations is the factual question in this case and cannot be decided on a motion to dismiss.

Seeking to dramatically expand this doctrine, Apple claims that "decisions about the terms on which it chooses to deal with third parties are not 'exclusionary' as a matter of law" because they constitute refusals to deal. Mot. 2. Contrary to Apple's sweeping assertion, Apple's restrictions on developers and users are straightforward exclusionary conduct—not refusals to deal with rivals—and their "reasonableness" is assessed by applying the burden-shifting standard to evidence introduced at trial. The *Microsoft* court did not treat analogous practices like overriding a user's browser choice and pressuring a business partner to abandon efforts to develop a competitively threatening technology as refusals to deal, nor did it defer to Microsoft's conception of "reasonable" restraints on competition. 253 F.3d at 65, 77. Other cases agree. In *Kodak*, the defendant "[sold] parts to third parties only if they agreed not to buy service from [Independent Service Organizations],"

and the Supreme Court rejected the idea that refusal-to-deal-with-rivals law governed that term of dealing between a monopolist and third party. 504 U.S. at 463 & n.8; *see also Lorain Journal Co. v. United States*, 342 U.S. 143, 152-53 (1951) (refusal-to-deal-with-rivals doctrine does not apply where the monopolist imposes conditions or restrictions that interfere with a customer's or third party's ability to do business with others). Likewise, courts apply "general standards of § 2"—burden shifting—when a monopolist requires "that the buyer also purchase[] a different (or tied) product." *Viamedia Inc. v. Comcast Corp.*, 951 F.3d 429, 468 (7th Cir. 2020).

The Complaint further alleges that Apple has harmed competition by affirmatively degrading other smartphones, not by refusing to cooperate with them. For example, Apple brands messages between iPhone and non-iPhone users with a green bubble and restricts their functionality. FAC ¶ 90. Such affirmative conduct is not a refusal to deal with rivals, *Conwood Co. L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 788 (6th Cir. 2002) (destroying sales materials analyzed under general test), and is properly a subject for trial, not a motion to dismiss, *see W. Penn*, 627 F.3d at 110.

*New York v. Meta Platforms*, 66 F.4th 288 (D.C. Cir. 2023), confirms these principles. Meta's "Competitor Integration Policy" provided that "Apps on Facebook may not integrate, link to, promote, distribute, or redirect to any app on any other competing social platform." *Id.* at 303. The court analyzed this policy "under cases discussing 'exclusive dealing'"—not as a refusal to deal—because the

alleged harm from the policy was restricting third parties in their dealings with others. *Id.* at 303-04. By contrast, Meta's "Core Functionality Policy" disallowed the use of the "Facebook platform to promote, or export user data to, a product or service that replicates a core Facebook product or service." *Id.* at 305. That policy was treated as a refusal to deal due to a critical distinction with this case: the Core Functionality Policy was concerned with developers "duplicat[ing] Facebook's core products." *Id.* The Complaint does not allege that other firms are entitled to duplicate the iPhone. Instead, it alleges that Apple has prevented third parties from creating and distributing apps and accessories that provide additional features that threaten Apple's monopoly. *See Microsoft*, 253 F.3d at 53 (middleware was distinct from Windows and could not "take over all operating system functions").

*Novell* does not help Apple either. Novell made "WordPerfect—Microsoft Word's leading rival in word processing applications," and originally claimed monopolization of office applications—a market in which Word and WordPerfect were rivals. 731 F.3d at 1069. Because those claims were time-barred, Novell "had to develop a different theory" and settled on a *Microsoft* copycat. *Id. Novell* is distinguishable in two critical ways. First, Novell sought to force Microsoft to share software code that Microsoft Word used to avoid having to develop its own. *Id.* This lawsuit seeks to force Apple to lift restrictions on developers, not share its own smartphone technology with smartphone competitors. Second, "Novell was able to

achieve the same functionality for consumers" without Microsoft's code. *Id.* Here, by contrast, users and developers have no way to achieve the same functionality to overcome Apple's app review process and API restrictions. FAC ¶¶ 41-45, 67, 71, 85-86, 101-102, 104. And ultimately, Novell failed to prove its analogy to *Microsoft* at trial; the case was not dismissed on the pleadings. *Novell,* 731 F.3d at 1068-69.

### c. Apple's Expansive View of Refusal to Deal Should Be Rejected

Apple's refusal-to-deal arguments are suffused with other fundamental errors. For example, Apple claims to have an unqualified right to "exercise [its] independent discretion as to parties with whom [it] will deal." Mot. 1 (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). But Apple omits the Court's qualification, in the very same sentence, that this "right" obtains only "*in the absence of any purpose to create or maintain a monopoly.*" *Colgate*, 250 U.S. at 307 (emphasis added). The Supreme Court has already rejected attempts to remove *Colgate*'s critical qualification: "[T]he word 'right' is one of the most deceptive of pitfalls; it is so easy to slip from a qualified meaning in the premise to an unqualified one in the conclusion." *See Lorain Journal*, 342 U.S. at 152.

Apple also asserts an unfettered "right" to make business "judgments," especially for "claims implicating intellectual property." Mot. 12, 14-15. The law holds otherwise and, in any event, the Complaint does not challenge Apple's intellectual property rights. Vague invocations of intellectual property change

nothing. "Intellectual property rights do not confer a privilege to violate the antitrust laws." *Microsoft*, 253 F.3d at 359. And a monopolist's business judgments are not immune from antitrust scrutiny. "[A] monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior." *LePage's*, 324 F.3d at 151-52. Apple's arguments regarding intellectual property are "no more correct than the proposition that the use of one's personal property, such as a baseball bat, cannot give rise to tort liability." *Microsoft*, 253 F.3d at 359.

Nor can Apple "relabel a restraint as a product feature and declare it immune from [antitrust] scrutiny." *Alston*, 594 U.S. at 101. Even if Apple's restraints were considered "features," product-design decisions are governed by the burden-shifting test, not refusal-to-deal-with-rivals doctrine. *See Mylan*, 838 F.3d at 438-41 (applying general Section 2 standard to change in product designs); *Microsoft*, 253 F.3d at 64-67; *In re Google Digital Advert.*, 627 F. Supp. 3d at 401 (denying motion to dismiss where publisher software restricted customers from connecting on comparable terms with third-party advertising exchanges).

Nor does the law contain a special rule applying refusal-to-deal-with-rivals doctrine to Apple's conduct setting "the rules of the road *on its own platform.*" Mot. 19, 23. *Microsoft* condemned multiple practices "setting the rules of the road" for Microsoft's Windows platform, including preventing Windows users from choosing

a default browser other than Microsoft's and requiring developers to use Microsoft features in applications sold "to Windows users." 253 F.3d at 64, 71-72, 75-76.

Finally, Apple challenges allegations concerning its decisions not "to develop versions of proprietary products and services for competitors' devices" like Android-compatible Apple Messages and Apple Watch. Mot. 7, 15-16. These facts are relevant for analyzing the purpose and effect of Apple's conduct directed at developers of cross-platform products. *See Microsoft*, 253 F.3d at 72.

### ii. The Complaint Alleges Anticompetitive Conduct Even Under a Refusal-to-Deal-with-Rivals Analysis

Even if a refusal-to-deal-with-rivals analysis were applied, the Complaint more than adequately states a claim. *See Duke Energy*, 111 F.4th at 366 (reversing summary judgment where record facts showed a refusal to deal "achieve[d] anticompetitive ends"). A refusal-to-deal-with-rivals claim alleges a "predatory" refusal that has anticompetitive effect. *Aspen Skiing*, 472 U.S. at 605; *Otter Tail*, 410 U.S. at 377-78. Predatory means the refusal is "attempting to exclude rivals on some basis other than efficiency," *Aspen Skiing*, 472 U.S. at 605, or "motivated by anti-competitive goals," *In re Thalomid & Revlimid Antitrust Litig.*, 2015 WL 9589217, at *15 (D.N.J. Oct. 29, 2015). A variety of factors inform the "case-by-case assessment[] of whether a challenged refusal to deal is indeed anticompetitive," and "no factor is always decisive by itself." *Viamedia*, 951 F.3d at 457. For example, predatory purpose can be shown by a willingness to forsake short-term profits.

36

*Trinko*, 540 U.S. at 409. Similarly, the defendant's conduct can be compared with its behavior prior to obtaining monopoly power, its conduct in more competitive markets, and its conduct towards customers that do not pose a competitive threat. *Id.* at 410; *Aspen Skiing*, 472 U.S. at 603-04, 609. Contrary to Apple's argument, Mot. 20, a prior course of dealing and a short-term profit sacrifice "are helpful but not dispositive." *Viamedia*, 951 F.3d at 462; *see also Duke Energy*, 111 F.4th at 362-63; *Iqvia, Inc. v. Veeva Sys. Inc.*, 2018 WL 4815547, at *3 (D.N.J. Oct. 3, 2018). The Supreme Court condemned a refusal to deal even absent a prior course of dealing. *Otter Tail,* 410 U.S. at 377-79; *see also Trinko*, 540 U.S. at 410.

The Complaint plausibly pleads predatory purpose. As its market power has grown, Apple has progressively restricted the ability of certain types of developers to make innovative cross-platform products. FAC ¶¶ 3, 38-39, 67, 101. Apple has forsaken commissions on super apps and cloud games and sacrificed Apple Watch sales. *E.g.*, FAC ¶¶ 40, 51, 62, 70-71, 80, 131, 133. These profit sacrifices are not "implausible," Mot. 21, but well pleaded as a long-term, predatory strategy to restrain competition by suppressing apps and accessories that pose a competitive threat. The Complaint further alleges that Apple discriminates against competitively threatening technologies, FAC ¶¶ 41-42, 119, 146-147, and the Complaint includes statements by Apple executives reflecting its "dreams of monopoly" over smartphone rivals, *Trinko*, 540 U.S. at 409; *Aspen Skiing*, 472 U.S. at 608 n.39; FAC

37

¶¶ 71, 91-92, 98, 108-109, 147. Furthermore, the Complaint alleges that Apple does not impose these types of anticompetitive restrictions in more competitive markets. FAC ¶¶ 66 (noting presence of super apps in Asia), 142 (explaining that Apple does not restrict Mac developers to a single "Apple-controlled app store").

These allegations "support the inference that [Apple] acted with anticompetitive intent," and therefore a motion to dismiss is "too soon" to determine the legality of Apple's conduct. *In re Thalomid*, 2015 WL 9589217, at *15 (denying motion to dismiss); *Viamedia*, 951 F.3d at 463 (reversing dismissal).

## III. The Complaint Alleges Attempted Monopolization

The Complaint alleges the three elements of attempted monopolization. First, "a dangerous *probability* of achieving monopoly power may be established by a 50% share." *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 1000 (11th Cir. 1993). The Complaint pleads shares far above this threshold, as well as barriers to entry, Apple's continuously increasing share, and other supporting facts. *Supra* Section I. Second, the Complaint alleges anticompetitive conduct. *Supra* Section II.

Third, the Complaint pleads specific intent to monopolize—an intent "to destroy competition or build monopoly"—both directly and circumstantially. *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 626 (1953); *Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*, 745 F.2d 248, 260-261 (3d Cir. 1984). The Complaint quotes Apple executives explaining that they have intentionally erected barriers to

consumers choosing smartphones on their merits. *E.g.*, FAC ¶¶ 65, 71, 91; *see also Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F. Supp. 1250, (E.D. Pa. 1987). The Complaint also pleads facts from which intent may be inferred, including conduct that "lack[s] a legitimate business justification" and is unrelated to efficiency. *Broadcom*, 501 F.3d at 318 (reversing dismissal); *see also* FAC ¶¶ 131, 141-147. Apple's factual assertions to the contrary, Mot. 38, must be rejected at this stage.

## IV.    The State Plaintiffs Have Standing

Apple's challenge to the States' standing fails for two reasons. Mot. 32 n.6. First, the Complaint establishes the States' *parens patriae* standing. A state's interest in "preventing harm to its citizens by antitrust violations is, indeed, a prime instance of the interest that the *parens patriae* can vindicate by obtaining . . . an injunction." *In re Ins. Antitrust Litig.*, 938 F.2d 919, 927 (9th Cir. 1991). That interest includes "ensuring that their citizens are not denied the benefit of lower-priced [products] that would result from the market participants' adherence to [] fair marketplace regulations and ensuring . . . that those who sell [products] to their citizens abide by the federal antitrust system." *In re Generic Pharms. Pricing Antitrust Litig.*, 605 F. Supp. 3d 672, 680 (E.D. Penn. 2022); *see also Alfred L. Snapp & Son, Inc. v. P.R.*, 458 U.S. 592, 608 (1982). Such an interest exists here: the States seek to enjoin Apple's anticompetitive conduct that entrenches its monopoly over, and drives up prices within, U.S. smartphone markets. The Complaint alleges myriad facts

showing that Apple's conduct affects the States' general economies and substantial segments of their residents who use smartphones, FAC ¶¶ 198, 201, 207, 213, 226, 230, 234, including charging higher prices and making it hard to switch away from, or use other technologies with, the iPhone, FAC ¶¶ 5, 183, 185, 188-189, 192-193, 195, 226, 230, 234. The Complaint also alleges that Apple's anticompetitive conduct affects substantial segments of the States' residents because the iPhone's user-base totals "more than 250 million devices in the United States" and Apple's market share is now "over 70 percent," and growing. FAC ¶¶ 39, 180-181.

Second, Apple incorrectly argues that the States lack *parens patriae* standing unless their ability to enforce state law is impaired. Mot. 32 n.6. Federal law authorizes states to enforce federal antitrust law. 15 U.S.C. § 26; *Cal. v. Am. Stores Co.*, 495 U.S. 271, 284 (1990). *Harrison v. Jefferson Parish*, 78 F.4th 765, 769, 771 (5th Cir. 2023), is inapposite because it involved a State suit in federal court "to enforce state law against a subordinate." Apple is not a state subordinate.

## CONCLUSION

For the reasons set forth above, the Court should deny the motion to dismiss.

Dated: September 12, 2024

Respectfully submitted,

s/ Jonathan Lasken
By: JONATHAN LASKEN*
Assistant Chief, Civil Conduct Task
Force

PHILIP R. SELLINGER
United States Attorney

s/ J. Andrew Ruymann
By: J. ANDREW RUYMANN*
Assistant United States Attorney
U.S. Attorney's Office
402 East State Street, Room 430
Trenton, NJ 08608
Telephone: 609-989-0563
Email: John.Ruymann@usdoj.gov

*Attorneys of Record

s/ Jennifer Hane
JENNIFER HANE
SEAN CARMAN
PAM COLE
JAMES ROBERT DUNCAN III
ASHLEY D. KAPLAN
JEREMY C. KEENEY
ANDREW L. KLINE
PATRICK M. KUHLMANN
JACK G. LERNER
MATTHEW C. MANDELBERG
NOLAN J. MAYTHER
MICHAEL MIKAWA
SARAH OLDFIELD
SADEV S. PARIKH
MICHAEL A. RABKIN
AARON M. SHEANIN
MICAH D. STEIN
JESSICA JOHNSTON TATICCHI
LORRAINE VAN KIRK
    *Trial Attorneys*

United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 8600
Washington, DC 20530
Telephone: 202-598-6517
Email: Jonathan.Lasken@usdoj.gov

Attorneys for the United States

41

**FOR PLAINTIFF STATE OF NEW JERSEY:**

MATTHEW J. PLATKIN
Attorney General of New Jersey

By: /s/ Isabella R. Pitt
Isabella R. Pitt (NJ Bar No. 071002013)
Deputy Attorney General
Assistant Section Chief of Antitrust
Brian F. McDonough, Assistant Attorney General
Andrew F. Esoldi, Deputy Attorney General
Meghan Musso, Deputy Attorney General
Giancarlo G. Piccinini, Deputy Attorney General
Leslie Prentice, Deputy Attorney General
Lauren E. VanDriesen, Deputy Attorney General
New Jersey Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: 973-648-3070
lsabella.Pitt@law.njoag.gov

*Attorneys for Plaintiff State of New Jersey*

**FOR PLAINTIFF STATE OF ARIZONA:**

KRISTIN K. MAYES
Attorney General of Arizona

By:  /s/ Vinny Venkat
VINNY VENKAT
Assistant Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: 602-542-7757
Email: vinny.venkat@azag.gov

*Attorney for Plaintiff State of Arizona*


**FOR PLAINTIFF STATE OF CALIFORNIA:**

ROB BONTA
Attorney General of California

By:  /s/ Brian Wang
PAULA L. BLIZZARD, Senior Assistant Attorney General for Antitrust
MICHAEL JORGENSON, Supervising Deputy Attorney General
CARI JEFFRIES, Deputy Attorney General
ROBERT MCNARY, Deputy Attorney General
BRIAN WANG, Deputy Attorney General
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
Phone: 415-510-4400
Email: AppleAntitrustTeam@doj.ca.gov

*Attorneys for Plaintiff State of California*

**FOR PLAINTIFF STATE OF CONNECTICUT:**

WILLIAM TONG
Attorney General of Connecticut

By:  /s/ Nicole Demers
NICOLE DEMERS
Deputy Associate Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: 860-808-5030
Email: nicole.derners@ct.gov

By:  /s/ Rahul A. Darwar
RAHUL A. DARWAR
Assistant Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: 860-808-5030
Email: rahul.darwar@ct.gov

*Attorneys for Plaintiff State of Connecticut*

**FOR PLAINTIFF STATE THE DISTRICT OF COLUMBIA:**

BRIAN L. SCHWALB
ATTORNEY GENERAL

JENNIFER C. JONES
Deputy Attorney General
Public Advocacy Division

BETH MELLEN
WILLIAM F. STEPHENS
Assistant Deputy Attorneys General
Public Advocacy Division

By:  /s/ Elizabeth G. Arthur
ADAM GITLIN
Chief, Antitrust and Nonprofit Enforcement Section
Public Advocacy Division
ELIZABETH G. ARTHUR
Assistant Attorney General
Public Advocacy Division
400 6th Street NW, 10th Floor
Washington, D.C. 20001
Tel.: 202-442-9864
Email: elizabeth.arthur@dc.gov

*Attorneys for Plaintiff State the District of Columbia*

**FOR PLAINTIFF STATE OF INDIANA:**

THEODORE E. ROKITA
Attorney General of Indiana

By:  /s/ Matthew Michaloski
MATTHEW MICHALOSKI
Deputy Attorney General
SCOTT L. BARNHART
Chief Counsel and Director, Consumer Protection Division
JESSE MOORE
Deputy Attorney General
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Matthew.Michaloski@atg.in.gov
Scott.Barnhart@atg.in.gov
Jesse.Moore@atg.in.gov

*Attorneys for Plaintiff State of Indiana*

**FOR PLAINTIFF STATE OF MAINE:**

AARON M. FREY
Attorney General of Maine

By:  /s/ Christina M. Moylan
CHRISTINA M. MOYLAN
Assistant Attorney General
MICHAEL DEVINE
Assistant Attorney General
Consumer Protection Division
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006
Telephone: 207-626-8800
Email: christina.moylan@maine.gov
michael.devine@maine.gov

*Attorneys for Plaintiff State of Maine*

**FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS:**

ANDREA JOY CAMPBELL
Attorney General

By:  /s/ William T. Matlack
WILLIAM T. MATLACK
Assistant Attorney General
Chief, Antitrust Division
Tel: (617) 963-2414
Email: William.Matlack@mass.gov
KATHERINE W. KREMS
Assistant Attorney General, Antitrust Division
Tel: (617) 963-2189
Email: Katherine.Krems@mass.gov
DAVID MLAVER
Assistant Attorney General, Antitrust Division
Tel: (617) 963-2613
Email: David.Mlaver@mass.gov
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108

*Attorneys for Plaintiff Commonwealth of Massachusetts*

**FOR PLAINTIFF STATE OF MICHIGAN:**

DANA NESSEL
Attorney General of Michigan

By:  /s/ Jason R. Evans
JASON R. EVANS
Division Chief
Corporate Oversight Division
EvansJ@michigan.gov

By:  /s/ Scott A. Mertens
SCOTT A. MERTENS
Section Head
Corporate Oversight Division
MertensS@michigan.gov

By:  /s/ Jonathan S. Comish
JONATHAN S. COMISH
Assistant Attorney General
Corporate Oversight Division
ComishJ@michigan.gov

By:  /s/ LeAnn D. Scott
LEANN D. SCOTT
Assistant Attorney General
Corporate Oversight Division
ScottL21@michigan.gov

Michigan Department of Attorney General
525 W Ottawa St.
Lansing, MI 48933
Telephone: 517-335-7622

*Attorneys for Plaintiff People of the State of Michigan*

**FOR PLAINTIFF STATE OF MINNESOTA:**

KEITH ELLISON
Attorney General of Minnesota

JESSICA WHITNEY
Deputy Attorney General

JAMES W. CANADAY
Deputy Attorney General

By:  /s/ Justin Moor
JUSTIN MOOR
Assistant Attorney General
Atty. Reg. No. 0397596

ELIZABETH R. ODETTE
Manager, Antitrust Division
Atty. Reg. No.0340698

ERIN E. CONTI
Assistant Attorney General
Atty. Reg. No. 0395304
445 Minnesota Street, Suite 1400
Saint Paul, MN 55101-2130
Telephone: 651-724-9627
Telephone: 651-728-7208
Telephone: 651-757-1287
justin.moor@ag.state.mn.us
elizabeth.odette@ag.state.mn.us
erin.conti@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

**FOR PLAINTIFF STATE OF NEVADA:**

AARON D. FORD
Attorney General of Nevada

By: /s/ Raquel Fulghum
Raquel Fulghum
Deputy Attorney General
Samantha Feeley
Deputy Attorney General
State of Nevada,
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
Telephone: 775-684-1100
Email: rfulghum@ag.nv.gov

*Attorneys for Plaintiff State of Nevada*


**FOR PLAINTIFF STATE OF NEW HAMPSHIRE:**

By its attorney,

JOHN M. FORMELLA
Attorney General

By: /s/ Alexandra C. Sosnowki
ALEXANDRA C. SOSNOWSKI
Assistant Attorney General
Consumer Protection and Antitrust Bureau
New Hampshire Department of Justice
Office of the Attorney General
One Granite Place South
Concord, NH 03301
Telephone: 603-271-2678
Email: Alexandra.C.Sosnowski@doj.nh.gov

*Attorney for Plaintiff State of New Hampshire*

**FOR PLAINTIFF STATE OF NEW YORK:**

LETITIA JAMES
Attorney General of New York

Christopher D'Angelo
Chief Deputy Attorney General
Economic Justice Division

By:  /s/ Elinor R. Hoffman
Elinor R. Hoffman
Chief, Antitrust Bureau

By:  /s/ Amy McFarlane
Amy McFarlane
Deputy Chief, Antitrust Bureau

By:  /s/ Bryan Bloom
Bryan Bloom
Senior Enforcement Counsel
Antitrust Bureau

New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: 212-416-8598
Email: Bryan.Bloom@ag.ny.gov

*Attorneys for Plaintiff State of New York*

**FOR PLAINTIFF STATE OF NORTH DAKOTA:**

DREW H. WRIGLEY
Attorney General
State of North Dakota

By: /s/ Elin S. Alm
Elin S. Alm
Assistant Attorney General
Christopher G. Lindblad
Assistant Attorney General

Consumer Protection and Antitrust Division
Office of Attorney General
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
Telephone: 701-328-5570
ealm@nd.gov
clindblad@nd.gov

*Attorney for Plaintiff State of North Dakota*

**FOR PLAINTIFF STATE OF OKLAHOMA:**

GENTNER DRUMMOND
Attorney General of Oklahoma

By:  /s/ Robert J. Carlson
ROBERT J. CARLSON
*pro hac vice* application forthcoming
Senior Assistant Attorney General
Office of the Oklahoma Attorney General
15 West 6th Street, Suite 1000
Tulsa, OK 74119
Telephone: 918-581-2885
Email: Robert.Carlson@oag.ok.gov

*Attorney for Plaintiff State of Oklahoma*

**FOR PLAINTIFF STATE OF OREGON:**

ELLEN F. ROSENBLUM
Attorney General of Oregon

By:  /s/ Timothy D. Smith
TIMOTHY D. SMITH
Senior Assistant Attorney General
Antitrust and False Claims Unit
Oregon Department of Justice
100 SW Market Street
Portland, OR 9720 l
Telephone: 503-934-4400
Email: tim.smith@doj.state.or.us

*Attorney for Plaintiff State of Oregon*

**FOR PLAINTIFF STATE OF TENNESSEE:**

JONATHAN SKRMETTI
Attorney General and Reporter

By:  /s/ J. David McDowell
J. DAVID MCDOWELL
Deputy, Consumer Protection Division
S. ETHAN BOWERS
Senior Assistant Attorney General
AUSTIN C. OSTIGUY
HAMILTON M. MILLWEE
Assistant Attorneys General

Office of the Attorney General and Reporter
P.O Box 20207
Nashville, TN 37202
Telephone: 615-741-8722
Email: David.McDowell@ag.tn.gov
Ethan.Bowers@ag.tn.gov
Austin.Ostiguy@ag.tn.gov
Hamilton.Millwee@ag.tn.gov

*Attorneys for Plaintiff State of Tennessee*

**FOR PLAINTIFF STATE OF VERMONT:**

CHARITY R. CLARK
Attorney General of Vermont

By:  /s/ Jill S. Abrams
JILL S. ABRAMS
Assistant Attorney General
109 State Street
Montpelier, Vermont
Telephone: 802-828-1106
Email: jill.abrams@vermont.gov

*Attorney for Plaintiff State of Vermont*

**FOR PLAINTIFF STATE OF WASHINGTON:**

ROBERT W. FERGUSON
Attorney General of Washington

By:  /s/ Luminita Nodit
LUMINITA NODIT
Assistant Attorney General
Antitrust Division
Washington Attorney's General Office
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: 206-254-0568
Email: lumi.nodit@atg.wa.gov

*Attorney for Plaintiff State of Washington*


**FOR PLAINTIFF STATE OF WISCONSIN:**

JOSHUA L. KAUL
Attorney General of Wisconsin

By:  /s/ Laura E. McFarlane
LAURA E. MCFARLANE
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-8911
(608) 294-2907 (Fax)
mcfarlanele@doj.state.wi.us

*Attorney for Plaintiff State of Wisconsin*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| |
|---|
| UNITED STATES OF AMERICA et al., |
| |
| *Plaintiff*, |
| |
| v. |
| |
| APPLE INC. |
| |
| *Defendants*. |

Case No. 2:24-cv-04055-JXN-LDW

**CERTIFICATE OF SERVICE**

I hereby certify that the above brief and this Certificate of Service were served upon defendant's counsel, Liza M. Walsh, Esq., Craig S. Primis, Esq., Devora W. Allen, Esq., and K. Winn Allen, Esq. 1301 Pennsylvania Avenue, NW, Washington, D.C., 20004, by CM/ECF on September 12, 2024.

BY: s/ Jonathan Lasken
JONATHAN LASKEN
Assistant Chief
Civil Conduct Task Force
United States Department of Justice
Antitrust Division
*Attorney for Plaintiff United States*

1