UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA, et        .
al.,                                .
                                    .
        Plaintiffs,                 .  Case No. 24-cv-04055
                                    .
vs.                                 .  Newark, New Jersey
                                    .  October 10, 2024
APPLE INC.,                         .
                                    .
        Defendant.                  .


                       TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE LEDA DUNN WETTRE
                UNITED STATES MAGISTRATE JUDGE

This transcript has been reviewed and revised in accordance
with L. Civ. R. 52.1.

APPEARANCES (the parties appeared via video conference):

For the United        JONATHAN LASKEN, ESQ.
States:               Department of Justice
                      Antitrust Division
                      450 Fifth Street NW, Suite 8600
                      Washington, DC 20530
                      (202) 598-6517
                      jonathan.lasken@usdoj.gov

                      AARON MICHAEL SHEANIN, ESQ.
                      DOJ-ATR
                      Antitrust Division
                      450 Golden Gate Avenue, Suite 10-0101
                      San Francisco, CA 94102
                      (415) 436-6660
                      aaron.sheanin@usdoj.gov


Audio Operator:

Transcription Service:    KING TRANSCRIPTION SERVICES, LLC
                          3 South Corporate Drive, Suite 203
                          Riverdale, NJ  07457
                          (973) 237-6080


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

```
 1   (APPEARANCES continued)

 2   For the United          JESSICA TATICCHI, ESQ.
     States:                 DOJ-ATR
 3                           Antitrust
                             450 Fifth Street, NW
 4                           Washington, DC 20530
                             (202) 705-5900
 5                           jessica.taticchi@usdoj.gov

 6                           JOHN ANDREW RUYMANN, ESQ.
                             Office of the US Attorney
 7                           402 East State Street, Suite 430
                             Trenton, NJ 08608
 8                           (609) 989-2190
                             john.ruymann@usdoj.gov
 9
                             LORRAINE VAN KIRK, ESQ.
10                           DOJ-ATR
                             450 Golden Gate Avenue, Suite 10-0101
11                           San Francisco, CA 94102
                             (202) 826-8830
12                           lorraine.vankirk@usdoj.gov

13
     For the State of        ISABELLA REGINA PITT, ESQ.
14   New Jersey and          New Jersey Attorney General
     Plaintiff-States:       124 Halsey Street, 5th Floor
15                           Newark, NJ 07102
                             (201) 912-7444
16                           isabella.pitt@dol.lps.state.nj.us

17
     For the State of        BRIAN FRANCIS MCDONOUGH, ESQ.
18   New Jersey and          State of New Jersey
     Plaintiff-States:       Division of Law
19                           124 Halsey Street
                             Newark, NJ 07101
20                           (973) 648-2482
                             Brian.McDonough@law.njoag.gov
21

22

23

24

25
```

```
 1  (APPEARANCES continued)

 2  For the Defendant:        LIZA M. WALSH, ESQ.
                              Walsh Pizzi O'Reilly Falanga LLP
 3                            Three Gateway Center
                              100 Mulberry Street, 15th Floor
 4                            Newark, NJ 07102
                              (973) 757-1100
 5                            lwalsh@walsh.law

 6                            DOUGLAS E. ARPERT, ESQ.
                              Walsh Pizzi O'Reilly Falanga LLP
 7                            Three Gateway Center
                              100 Mulberry Street, Suite 1500
 8                            Newark, NJ 07102
                              (973) 757-1042
 9                            Darpert@walsh.law

10                            WINN ALLEN, ESQ.
                              Kirkland & Ellis, LLP
11                            301 Pennsylvania Avenue, N.W.
                              Washington, D.C.  20004
12                            (202) 389-5078
                              Winn.allen@kirkland.com
13
                              MARY MILLER, ESQ.
14                            Kirkland & Ellis, LLP
                              301 Pennsylvania Avenue, N.W.
15                            Washington, D.C.  20004
                              (202) 389-3277
16                            Mary.miller@kirkland.com

17                            JULIAN W. KLEINBRODT, ESQ.
                              Gibson Dunn
18                            One Embarcadero Center, Suite 2600
                              San Francisco, CA 94111-3715
19                            (415) 393-8382
                              Jkleinbrodt@gibsondunn.com
20

21  For the Nonparty          MICHAEL W. SCARBOROUGH, ESQ.
    Samsung Electronics       Vinson & Elkins
22  America, Inc.:            555 Mission Street, Suite 2000
                              San Francisco, California 94105
23                            (415) 979-6935
                              Mscarborough@velaw.com
24

25
```

```
 1   (APPEARANCES continued)

 2   For the Nonparty          ALEX A. PARKINSON, ESQ.
     Microsoft Corp.:          Kellogg, Hansen, Todd, Figel &
 3                             Frederick, PLLC
                               Sumner Square
 4                             1615 M Street NW, Suite 400
                               Washington, DC 20036
 5                             (202) 326-7961
                               Aparkinson@kellogghansen.com
 6

 7   For the Nonparty          JOHN E. SCHMIDTLEIN, ESQ.
     Google LLC:               Williams & Connolly LLP
 8                             680 Maine Avenue SW
                               Washington, DC 20024
 9                             (202) 434-5901
                               Jschmidtlein@wc.com
10

11   For the Nonparty          DOUGLAS J. DIXON, ESQ.
     Match Group, Inc.:        Hueston Hennigan, LLP
12                             620 Newport Center Drive, Suite 1300
                               Newport Beach, CA 92660
13                             (949) 226-6741
                               ddixon@hueston.com
14

15   For the Nonparty          MARC A. GOLDMAN, ESQ.
     JPMorgan Chase            Massey & Gail LLP
16   Bank, NA:                 The Wharf
                               1000 Maine Avenue SW, Suite 450
17                             Washington, D.C. 20024
                               (202) 652-4511
18

19   For the Nonparty          KEVIN J. ORSINI, ESQ.
     Meta Platforms,           Cravath Swaine & Moore LLP
20   Inc.:                     Two Manhattan West
                               375 Ninth Avenue
21                             New York, NY 10001
                               (212) 474-1596
22                             Korsini@cravath.com

23

24

25
```

```
 1   (APPEARANCES continued)

 2   For the Nonparty          MATTHEW CANTOR, ESQ.
     PayPal, Inc.:             Shinder Cantor Lerner LLP
 3                             14 Penn Plaza, 19th Floor
                               New York, NY 10122
 4                             (646) 960-8606
                               matthew@scl-llp.com
 5

 6   For the Nonparty          PATRICK HEIN, ESQ.
     Capital One               A&O Shearman
 7   Financial                 140 New Montgomery
     Corporation:              San Francisco, CA 94105
 8                             (415) 616-1218
                               Patrick.hein@aoshearman.com
 9
                               BENJAMIN GRIS, ESQ.
10                             A&O Shearman
                               1101 New York Avenue, NW
11                             Washington DC 20005
                               (202) 508-8011
12                             Ben.gris@aoshearman.com

13                             MAUREEN THERESA COGHLAN, ESQ.
                               Archer & Greiner, PC
14                             1025 Laurel Oak Road
                               Voorhees, NJ 08043
15                             (856) 354-3034
                               mcoghlan@archerlaw.com
16

17

18

19

20

21

22

23

24

25
```

1                    (Commencement of proceedings)

2

3            THE COURT:  Okay.  Good morning, everyone.  I am

4   Magistrate Judge Wettre.

5            We are here in U.S. v. Apple, 24-cv-4055, for

6   purposes of a hearing on some discovery issues that were

7   raised in counsel's joint -- the parties' joint submission of

8   September 20th, 2024, at ECF 117.

9            Let me now take appearances for the record.

10           And may I have appearances for the United States

11   first.

12           MR. LASKEN:  Yes, Your Honor.  Good morning.

13           May it please the Court, Jonathan Lasken, counsel

14   for the United States.

15           And with me today is Mr. Andy Ruymann, Ms. Lorraine

16   Van Kirk, Mr. Aaron Sheanin, and Ms. Jessica Taticchi.

17           THE COURT:  Good morning to all.  Good morning.

18           And for the Plaintiff-States, who do I have?

19       (Simultaneous conversation)

20           THE COURT:  I see you, Ms. Pitt.  I'll give your

21   appearance for you, since you have an echo.

22           I see Isabella Pitt for the Plaintiff-States.

23           And do I have Mr. McDonough?  Oh, I see

24   Mr. McDonough.  But he's muted.

25           Just unmute and give your appearance.

1              Oh, you're muted again.

2              MR. MCDONOUGH:  Good morning, Your Honor.  Brian

3    McDonough for the Plaintiff-State of New Jersey and the

4    Plaintiff-States.

5              THE COURT:  Good morning to you.

6              MR. MCDONOUGH:  Good morning, Your Honor.

7              THE COURT:  And for defendant Apple?

8              Ms. Walsh, you're muted.

9              MS. WALSH:  I apologize.

10             Liza Walsh and Doug Arpert from the Walsh firm.

11             And with us, we have Winn Allen from Kirkland &

12   Ellis and Mary Miller, also from Kirkland & Ellis.  And

13   Julian Kleinbrodt from Gibson Dunn.

14             THE COURT:  Okay.  Good morning to all and welcome.

15             And for nonparty Samsung?

16             MR. SCARBOROUGH:  Good morning, Your Honor.  This

17   is Mike Scarborough with Vinson & Elkins for nonparty Samsung

18   Electronics America, Inc.

19             THE COURT:  Good morning.

20             And for nonparty Microsoft?

21             MR. PARKINSON:  Good morning, Your Honor.  Alex

22   Parkinson from Kellogg Hansen on behalf of Microsoft.

23             THE COURT:  Good morning.

24             And for nonparty Google?

25             MR. SCHMIDTLEIN:  Good morning, Your Honor.  John

|Hearing
|24-cv-04055, October 10, 2024

```
 1   Schmidtlein, Williams & Connolly, for Google LLC.

 2              THE COURT:  Good morning.

 3              And for nonparty Match?

 4              MR. DIXON:  Good morning, Your Honor.  Doug Dixon

 5   of Hueston Hennigan for nonparty Match Group.

 6              THE COURT:  Good morning.

 7              And for nonparty JPMorgan Chase.

 8              MR. GOLDMAN:  Good morning, Your Honor.  Marc

 9   Goldman from Massey & Gail for JPMorgan Chase Bank, NA.

10              THE COURT:  Good morning.

11              And for nonparty Meta?

12              MR. ORSINI:  Good morning, Your Honor.  Kevin

13   Orsini, Cravath Swaine & Moore, on behalf of Meta.

14              THE COURT:  Good morning.

15              And for nonparty PayPal.

16              MR. CANTOR:  Good morning, Your Honor.  Matthew

17   Cantor from Shinder Cantor Lerner for nonparty PayPal, Inc.

18              THE COURT:  Are you joined by Mr. Hall this morning

19   or not?

20              MR. CANTOR:  I believe I am.

21              Mr. Hall?

22              THE COURT:  Okay.  I'll just -- I had him on my

23   emailed appearance sheet.

24              For nonparty Capital One?

25              MR. HEIN:  Good morning, Your Honor.  Patrick Hein
```

 1   of A&O Shearman for nonparty Capital One Financial

 2   Corporation.

 3          THE COURT:  Okay.  And are you joined by colleagues

 4   for Capital One?

 5          MR. HEIN:  I am, Your Honor.  I am joined by Ben

 6   Gris of A&O Shearman and Maureen Coghlan, as local counsel.

 7          THE COURT:  Okay.  Good morning to all of you.

 8          So that's all I have.

 9          Did I miss anybody?  Okay.

10          So, as I said, we're here to have a hearing on a

11   joint submission from the parties.  And that joint submission

12   concerns the parties' differences with respect to three

13   proposed orders:  One is a protective order, which we call,

14   around these parts, a "discovery confidentiality order"

15   because it really pertains to discovery.  It won't control

16   court filings, and it won't control trial.  And, secondly, an

17   ESI protocol.  And, third, a source code protocol.

18          I have also reviewed carefully the submission of

19   third party Samsung Electronics America on the protective

20   order.  And that's at ECF 123.

21          I know that I also received submissions late on

22   October 8th from Google; Match Group, Inc.; and a group

23   comprised of Capital One Financial Corporation, Garmin

24   International, JPMorgan, Meta, Microsoft, and PayPal at

25   ECF 154, 156, and 157.

1          And just to be candid, I like to read everything

2     carefully.  I was very, very busy yesterday.  And I just had

3     time to skim those letters.  But I have a working familiarity

4     with what's in them.

5          So I'd like to start by just addressing the issues

6     as they were presented in the order in which they were

7     presented in the parties' joint submission and dive right

8     into it.

9          I should pause, though, to ask the parties if there

10    have been any developments since you submitted the letter on

11    September 20th that might obviate any of the issues.

12         So Government -- either States or federal

13    government, please let me know.

14         MR. LASKEN:  Your Honor, I am not aware of anything

15    that has obviated the issues.  We have worked with the third

16    parties to avoid some issues that the Court would have to

17    resolve, and we'll propose one small addition to the source

18    code protocol.  We could do that now or later.

19         THE COURT:  Okay.  Why don't we wait a little bit.

20    Okay.  Thank you.

21         And is the same true from Apple's perspective, that

22    nothing -- no issue has really been eliminated since the

23    joint letter was submitted?

24         MR. ALLEN:  Good morning, Your Honor.  This is Winn

25    Allen from Kirkland on behalf of Apple.

1          That is still our view, that nothing's been

2    eliminated, although we, like you, just received the various

3    nonparty submissions the other evening, and we're reviewing

4    those.  And there might be an opportunity for us to have a

5    discussion with those nonparties to reach some type of

6    agreement and to work those out.  We just haven't had an

7    opportunity to do that since --

8          THE COURT:  Right.  Okay.  Well, spoiler alert:

9    Most of what I'm going to do today is to give you my

10   impressions of the issues you submitted and send you back to

11   the drawing board, and when you go back to the drawing board,

12   you should liaise with the third parties to see if you can

13   address their concerns.

14         And some of the things I say may at least partially

15   address the third parties' concerns.  Okay?

16         Okay.  Let's go right into the first issue, which

17   is each of the orders has a definition of "parties."  And

18   there's a dispute as to what that definition should be.

19         The way I see this issue, it seems like an advance

20   battle as to the scope of discovery on -- as to who is the

21   plaintiff.  Obviously, the caption says that the lead

22   plaintiff is the United States of America.  And, you know,

23   the Government raises issues about should that be -- should

24   Apple be able to serve discovery requests on any agency or

25   subdivision of the United States as if it were a party?  And

 1    I guess that would apply to Rule 34 requests, deposition

 2    notices, and the like.

 3            And the same with the States, the analogue being,

 4    you know, should every subdivision of every Plaintiff-State

 5    be open to party discovery?

 6            And I'm, frankly, not sure this is an issue that

 7    really needs to be decided for purposes of these orders with

 8    the one exception of the ESI order because I think the scope

 9    of preservation and ESI collection does raise the issue of,

10    you know, which federal and state agencies need to be

11    preserving information and collecting ESI.

12            But aside from that, I guess I was curious, first

13    of all, why, given that the Government has expressed from the

14    beginning of this case that it seeks to move the case as

15    expeditiously as possible in the public interest, why would

16    the Government want any agency treated as a nonparty where

17    they would have to be subpoenaed and there could be motions

18    to quash?  Why isn't the Government just focusing on the

19    proportionality prong of Rule 26 with regard to discovery and

20    saying, you know, to use the Government's hypothetical, well,

21    you can't seek this information from NASA.  That's way

22    outside the scope of antitrust.  You know, I'd be

23    hard-pressed to believe that the Department of Justice

24    doesn't have control under the possession, custody, and

25    control standard of any agency of the United States.

 1            So let me pause there and just ask, what is the

 2    Government's ultimate concern here?

 3            MS. VAN KIRK:  Good morning, Your Honor.  Lorraine

 4    Van Kirk.

 5            THE COURT:  I see you, Ms. Van Kirk.

 6            MS. VAN KIRK:  Thank you.

 7            Your Honor's absolutely right that there's no

 8    dispute between the parties about who's in the case caption.

 9    And that's properly the United States and the

10    Plaintiff-States acting by and through their respective

11    Attorneys General.

12            But it is deeply important to the Government and

13    the law is clear that public party discovery is limited to

14    the agency that participated in investigating and bringing

15    the case.  And that's true in civil cases.  That's true in

16    criminal cases.  And holding otherwise would explode party

17    discovery in public actions.  We believe it would impose

18    unjustifiable and unworkable burdens.  And this case was

19    investigated by the antitrust division.  There were --

20        (Simultaneous conversation)

21            THE COURT:  Ms. Van Kirk, let me ask you.  Not

22    including a particular agency in the definition of "party"

23    doesn't mean that Apple can't seek discovery from them.  It

24    just means that it will take longer and possibly be subject

25    to a different standard, you know, a subpoena under Rule 45

1   where there's a duty not to unduly burden third parties.

2          But otherwise Rule 45 incorporates Rule 26

3   standards.

4          So what's the difference ultimately?

5          MS. VAN KIRK:  Respectfully, Your Honor, we believe

6   it would take much longer and be much more onerous if

7   potentially the entire government was subject to party

8   discovery.  Senior executives of federal and state agencies

9   shouldn't need to preserve all their emails due to the

10  pendency of this litigation.

11         THE COURT:  Well, that's a different issue.  And I

12  will address that.  I agree that that needs -- it needs to be

13  defined for purposes of preservation.

14         MS. VAN KIRK:  Thank you, Your Honor.

15         Similarly, our interrogatory responses shouldn't

16  need to collect a vast array of information from across the

17  entirety of the federal government and state governments.

18         Our party meet-and-confers won't involve other

19  federal and state agencies.

20         There are over 400 federal agencies and nearly four

21  million federal employees.  Apple's proposal would impose

22  massive expenses, paid for by taxpayers.  It would debilitate

23  and chill public enforcement actions, especially against

24  well-resourced companies like Apple.

25         THE COURT:  Okay.  Let me ask a representative of

1   the States if they wish to be heard separately from

2   Ms. Van Kirk on this.

3            MR. MCDONOUGH:  We do, Your Honor.  Brian McDonough

4   speaking on behalf of New Jersey and the States.

5            And, you know, first of all, we concur and join in

6   all of Ms. Van Kirk's comments.

7            In addition, with respect to Your Honor's concern

8   about whether treating the state agencies as nonparties,

9   which, in fact, they are, is going to slow down discovery, we

10  don't think that is necessarily the case.  What has happened

11  in other cases -- at least I speak for New Jersey; I can't

12  speak for all the States -- but if the defendants want to

13  serve third-party subpoenas upon a particular agency, we put

14  them in touch with the deputy within the Division of Law who

15  counsels that agency.  They generally accept service and meet

16  and confer with respect to compliance with the subpoena.  And

17  to the extent there are any concerns regarding overbreadth of

18  the subpoena, those would arise whether that agency is

19  treated as a party or a third party.

20           So we do not think that this is going to

21  appreciably slow down discovery.  But, you know, treating

22  these agencies as parties, as DOJ noted, could explode the

23  amount of resources that are required to prosecute this case

24  on the state level if we were required to spend the next

25  several weeks running around serving lit-holds on hundreds,

|Hearing
|24-cv-04055, October 10, 2024

```
 1  if not thousands, of state agencies, issuing authorities,
 2  trusts, councils, you name it, who are complete strangers to
 3  this action and, frankly, did not know that this action was
 4  even being filed until they heard about it on the morning
 5  news.
 6          THE COURT:  I understand.
 7          And I wouldn't ask the government which agencies it
 8  did issue the litigation holds.  But litigation holds have
 9  long been triggered.  So it is known who -- at least by the
10  respective governments, who is subject to a lit-hold.  And,
11  perhaps, in the future, when there is formal discovery opened
12  and discovery requests are served, both Apple and the
13  government will have to confer about the extent of, you know,
14  the government's preservation requests, who is preserving
15  information.  And, frankly, Apple has a lot of knowledge, I
16  would assume, from the investigation that preceded this case
17  as to what agencies it will be seeking discovery from, and it
18  will have to be transparent about who should be preserving
19  information, who should be subject to ESI searches, or it
20  won't be heard later to complain about spoliation if
21  something wasn't preserved.
22          So that's just a little preview of how I see it.
23          Let me hear from Apple on this issue.
24          MR. ALLEN:  Good morning, Your Honor.  This is Winn
25  Allen on behalf of Apple.
```

1            Look, we do believe that at the appropriate time,

2    there is a reasonable scope of discovery that we can pursue

3    from relevant federal and state agencies.  We do not intend

4    to subpoena or seek discovery from 400 federal or state

5    agencies, but we do believe there's a universe of relevant

6    material that we would like to seek.  We do believe that that

7    is properly party discovery and that State AGs' Offices and

8    DOJ will be found to have control over those materials.

9            But the key point for present purposes is we very

10   much agree with Your Honor that that's a question that can

11   and should be resolved when the actual discovery requests are

12   served on various state and federal agencies.  That's the

13   context in which courts, at least that we've found, have

14   analyzed this question.

15           And our concern is it's premature, in the context

16   of negotiating these baseline case organization and discovery

17   agreements, to just decide once for all that neither DOJ nor

18   State AGs' Offices have any responsibility at all to collect

19   and produce documents from relevant federal and state

20   agencies.  That's a determination that we think should be

21   made after we issue specific requests directed to specific

22   agencies, and then the Court, in that context, if there's

23   still a disagreement as to whether it's Rule 34 discovery or

24   Rule 45 discovery, can then decide in that context whether

25   the control standard is met.  We just don't think it should

1    be done in the context of these baseline discovery documents.

2            THE COURT:  Yeah.  I mean, I agree with that

3    because I'm all about practicality and moving the case to the

4    next step, and then we can take up issues as they arise in

5    context.

6            But I did -- I was curious and I'm grateful to

7    everyone for spelling it out a little bit for me, just to

8    have a sense of what's coming in the future.

9            But I absolutely think, looking carefully at each

10   of these orders, that you can define "parties" for purposes

11   of the needs of the order and just limit the definition to

12   say, "for purposes of this order, 'parties' shall mean."

13   That's a way to bypass it.

14           I think on the source code protocol, that's easy.

15   Most of the action on that protocol refers to "producing

16   party" and "receiving party," and you'll know who those are.

17           And with the protective order, it almost doesn't

18   matter.

19           I do still think it matters on the ESI order.  So

20   I'm going to direct the parties to meet and confer in good

21   faith on that, to define the scope of preservation of ESI.

22   And, you know, that involves a good deal of transparency on

23   both sides.  And at this point in the litigation before you

24   know each other -- and maybe never in this litigation --

25   there isn't a lot of trust.  But I'm going to force you to do

1    it anyway, because I'll take you to task if you've made my

2    job harder because you haven't been transparent, you haven't

3    been flexible, and you haven't worked with one another.

4         The meet-and-confer requirement's important

5    everywhere.  In New Jersey, we rely upon it because we're

6    such a busy District.  And it doesn't mean sending a CYA

7    email to someone.  It means having a real meeting.

8         And I'll check your bona fides as to what the

9    meet-and-confer consisted of and who said what and who was

10   willing to do what.  But you need -- you're going to have to

11   need -- you're going to need to go back on the ESI order.  As

12   I said, the Government knows to whom lit-holds were issued,

13   and it doesn't have to say, "We issued litigation holds

14   to" -- because that may be privileged.  But they can say

15   we're preserving information from this agency, from that

16   agency, we will ask them.  You know, you can designate

17   custodians.  We'll give you custodians from those agencies

18   and so forth.  Or we're not going this far.  We're not going

19   to that agency.

20        And then you'll have a discussion with Apple about

21   it.

22        And, you know, Apple, as I said, tell the

23   Government -- I'm sure you have a lot plans in the works

24   for -- to whom you're going to direct discovery requests.

25   Tell them we expect to see ESI collected from X, Y, and Z

```
 1   agency.  We're expecting you to designate custodians from

 2   those agencies or permit us to pick custodians.

 3            You all have done this before, and I have

 4   confidence in you.

 5            But you need to go back and work on that.

 6            MR. ALLEN:  Understood, Your Honor.  We will.

 7            THE COURT:  Okay.  So I don't think any of the

 8   third parties had issues on the definition of parties.  I

 9   think their issues came with the protective order, which

10   we're about to go into that.

11            MR. ALLEN:  Your Honor.

12            THE COURT:  Am I correct about that?

13            Go ahead, Mr. Allen.

14            MR. ALLEN:  One, just, point I wanted to make.  You

15   had asked earlier, had there been any updates to -- that the

16   parties had discussed.  There is one that I forgot, which

17   was --

18            THE COURT:  Okay.

19            MR. ALLEN:  And this goes to the nonparty, but my

20   understanding from speaking to counsel for the Government is

21   that some nonparties -- I am not sure who -- had expressed

22   concern that the source code protocol that the parties had

23   negotiated might be deemed to govern them.

24            And that was not our intention.  We were

25   negotiating a source code protocol for Apple specifically.
```

|Hearing
|24-cv-04055, October 10, 2024

 1        And so I believe -- and the Government can
 2   confirm -- that we've agreed with the Government that the
 3   source code protocol will just pertain to the parties to this
 4   case.  And if there are third parties that have concerns
 5   about source code issues down the line, we can address that
 6   at that point in time.
 7        THE COURT:  Okay.  All right.  So you'll
 8   customize -- you'll specify that in the proposed order.
 9        MR. ALLEN:  We will.
10        THE COURT:  Okay.  Very good.
11        Anything else for third parties?
12        And, excuse me, I need to grab a tissue.
13     (Pause in proceedings)
14        THE COURT:  All right.  Okay.
15        So the next issue is the protective order.  And,
16   you know, without intending to be pedantic, I thought it
17   would be useful to just set forth, you know, what the
18   protective order governs and what you can do with the
19   categories in the protective order.
20        So, you know, as I previewed when I started, the
21   protective order or discovery confidentiality order is to
22   facilitate the exchange of discovery by giving some measure
23   of protection to the producing party of sensitive
24   information.
25        So -- and, as you know -- and I am not inviting

1    disputes on this, but the producing party can unilaterally

2    designate the category of protection under the order.  And

3    then that's subject to challenge and the normal

4    meet-and-confer.

5         And so there can be some fluidity between

6    categories.  Things can be dedesignated.

7         And, as you all know, things often are dedesignated

8    as you approach trial because something that's treated as

9    confidential in discovery sometimes doesn't qualify for that

10   treatment at trial.  It makes trial very difficult in and out

11   of the room and closing courtrooms, and, you know, there are

12   standards, other standards besides the confidentiality order

13   for closing courtrooms, constitutional standards.

14        So it's really just a discovery facilitation

15   device.  That's how I see it.

16        Also, you know, it doesn't -- at least specifically

17   under our local rule on sealing, the designation of something

18   unilaterally by parties as confidential under a protective

19   order does not mean it automatically is treated that way by

20   the Court when it's filed as part of a motion.  We have an

21   independent rule under Local Civil Rule 5.3, which

22   essentially codifies the Third Circuit standards on the

23   common law right of access to judicial filings.

24        So it's limited.  It's -- this is how the documents

25   will be treated in discovery.

1        However, it is important and I know the parties --

2    the Government is looking for one category in the protective

3    order -- I've reviewed that.  Apple is advocating for two.

4        And I have a different view of it, which I'll go

5    through.  And, again, the ultimate goal will be to get you to

6    go back to the drawing board and to consider what I say.  I

7    am not making a ruling on this.

8        So here's what I see as the workable tiers of

9    disclosure under the protective order.  So, first, there's a

10   category of internal documents, say, at Apple.  They may not

11   be the greatest corporate secrets, but they're not shared

12   with the public, and so Apple would not feel comfortable

13   putting those on the public docket.  And there may be some

14   similarly, slightly sensitive documents that the Government

15   produces that it would not want put on the public docket.

16       However, Apple has a client, and Apple needs to

17   confer not only with in-house counsel but business

18   decision-makers.  And I am not going -- and because there's a

19   unilateral designation that's possible, the Government could

20   designate every document so that Apple effectively, its

21   outside counsel wouldn't be able to get their client's

22   interpretation of things needed to defend the litigation.

23   And we can't have that.  There's still a client, and that

24   needs to be respected.

25       So for nonpublic documents that Apple can share

1    with business people -- and it can be a limited group; it

2    doesn't have to be everybody at the company.  There is a

3    litigation control group concept; maybe it's commensurate

4    with the litigation control group -- a few officers, some

5    in-house counsel.  And that could be just designated plain

6    "confidential."

7            So work on that.  Let me stop there -- well, let me

8    get through the four categories, and then I'll open it up to

9    you.  And I do foresee possibly four categories.

10           The second category I see is a category that's too

11   sensitive for any business decision-maker at Apple, but that

12   Apple's outside counsel might need to confer with its

13   in-house counsel about, an in-house limited group who have

14   agreed that they won't be involved in competitive

15   decision-making for a period of time.  So let's call that

16   category "highly confidential."

17           And then there's a third category that I think is

18   essential here, and it addresses a lot of the concerns of the

19   third parties.  And I thought this long before I even got

20   Samsung's letter.  As soon as I read the orders, I said there

21   is no way a competitor of Apple is going to be willing to

22   produce information that anyone at Apple is going to see.

23   There needs to be, at least in the first instance, an

24   "outside counsel-only" category.

25           That may not be enough.  I know that -- I think it

1    was Google submitted a letter about whether -- well, I won't

2    go into it because I didn't study it carefully.  But there

3    are further layers of complication that counsel may need to

4    address with one another.

5            And then -- and, again, I am not inviting extra

6    work for myself.  But this case could have such broad

7    discovery that there might need to be a customized category.

8    You can probably think of a hypothetical.  I am not going to

9    come up with one as I sit here now.  But a special

10   designation -- sort of a miscellaneous special designation

11   category where the parties agree to work with one another

12   toward an agreement as to who the information can be

13   disclosed to.

14           So I'm seeing three or four categories.

15           Let me stop there and collect your thoughts.

16           So, Government first.

17           MR. SHEANIN:  Good afternoon, Your Honor.  Aaron

18   Sheanin on behalf of the United States.

19           We absolutely appreciate your guidance on this

20   particular issue.  And I think that we, seeing your guidance,

21   can absolutely go back and have conversations with Apple to

22   discuss this.

23           The primary concern for the plaintiffs is to make

24   sure the competitively sensitive information from Apple's

25   customers and its competitors is kept out of the hands of

1   Apple personnel who are involved in competitive

2   decision-making.  And that is, I think, consistent with what

3   you just discussed, particularly with respect to Category 3

4   and, perhaps, to some extent, with respect to Category 2.

5           We will go back and have conversations with Apple

6   to ensure that we meet those goals.  And we will do so with

7   the guidance and input of the third parties whose documents

8   are at issue -- because it really is the third parties who

9   are of most concern here, in addition, obviously, Apple has

10  its concerns, and we respect those.

11          But it's more them than, say, the Government's

12  documents and the Government's concerns.

13          THE COURT:  Okay.  I appreciate that.

14          Anyone from the Plaintiff-States wish to be heard?

15          MS. PITT:  Your Honor, Isabella Pitt.

16          Just that we agree with the Department of Justice's

17  decision on this, and we would engage with the

18  meet-and-confer to see how we can narrow this issue down.

19          THE COURT:  Okay.  Thank you.

20          And Apple?

21          MR. KLEINBRODT:  Good morning, Your Honor.  Julian

22  Kleinbrodt for Apple.

23          THE COURT:  Oh, I have to find you.

24          Now I see you.

25          MR. KLEINBRODT:  I --

|Hearing
|24-cv-04055, October 10, 2024

1    THE COURT:  Why is it dark where you are?

2    MR. KLEINBRODT:  I'm in San Francisco; so the sun

3 has not risen yet.

4    THE COURT:  Oh, I'm sorry.  Got you up early.

5    MR. KLEINBRODT:  It's all right.

6    And I hate to just echo what everyone has said.

7 But thank you for the guidance.  It is extremely valuable.  I

8 think it makes sense, particularly, as you said, with the

9 many late-breaking submissions that have come in for the

10 parties and potentially interested third parties, to

11 rediscuss these provisions in light of your guidance.

12    I do think that these issues -- or at least some of

13 them -- should be resolvable -- or at least capable of

14 narrowing.  And I would, you know, just note that for the

15 point you were making about the last category, the proposed

16 order that we submitted, you know, provides for a

17 modification as they come along.  And that is common in large

18 complex cases with expansive third-party discovery like this,

19 for there to be a scope concern that may arise and for us to

20 work those out.

21    So we appreciate the opportunity to do that now

22 with the Government and third parties.

23    THE COURT:  Okay.  All right.

24    Let me hear from the third parties.  I know they

25 were concerned about this, and I'll let them weigh in.

 1              Who would like to speak?

 2              MR. SCARBOROUGH:  Your Honor, this is Mike

 3     Scarborough for Samsung.

 4              I don't have much to say here.  Very much

 5     appreciate the Court's comments.

 6              You know, probably the biggest issue, from our

 7     perspective, is the one you've addressed is that there has to

 8     be a category of information that is produced that is truly

 9     outside counsel only.  I mean, this is -- this is a matter

10     that it's not looking back at things that happened 10 years

11     ago and then stopped five years ago.  These are issues of

12     current concern.  So we definitely anticipate that there will

13     need to be the highest level of protection for at least some

14     of the information that Samsung produces in discovery.

15              And then outside of that, we appreciate the Court's

16     comments about, you know, three or potentially four tiers

17     here.  I think it's simply a matter of tightening up the

18     definitions, making it clear, if anyone at Apple, in-house

19     counsel or business folks, have access to information,

20     tightening up those definitions so that they're not vague.

21     And I would suggest also, given the importance of nonparty

22     information here, it would be very helpful, to the extent

23     that there is a -- sort of a disclosure regime about who

24     these folks at Apple are going to be approved to receive

25     certain categories of documents, the nonparties have a voice

1   for any changes that are made and it's not simply an exchange

2   between Apple and the government entities, but that

3   nonparties at least have some visibility in any changes that

4   go along with the sort of designated groups within Apple to

5   receive access to information.

6        But other than that, I think we can -- we can weigh

7   in and work with the parties to get to a place that works

8   with the protective order.

9        THE COURT:  Okay.  Thanks.

10        And, you know, you raised one other issue which I

11  thought was a good issue and other third parties echoed it,

12  and that was showing a deponent information and, you know,

13  the exception to -- basically that a deponent can be shown

14  something with which they're familiar or however it's phrased

15  in the protective order.  And there was great concern on the

16  part of the third parties that, say, you have a deponent from

17  Apple and they work on apps.  And it's about -- and, you

18  know, a Samsung document concerning apps is interpreted as

19  something that they can be shown because they're familiar

20  with apps.

21        I think if that document, the third-party document,

22  hypothetically, from Samsung is marked "outside

23  counsel-only," you can prescribe in that category that if

24  it's an "outside counsel-only" document, perhaps it cannot be

25  shown to a deponent without advance notice.

 1          So, you know, there's a way to address that because
 2   I think that's a legitimate concern.  Just a suggestion.
 3          MR. SCARBOROUGH:  Thank you, Your Honor.  We
 4   appreciate that.  Yes.
 5          THE COURT:  All right.
 6          And any other third parties want to weigh in?
 7          MR. PARKINSON:  Your Honor, this is Alex Parkinson
 8   from Kellogg Hansen on behalf of Microsoft, and I'll speak
 9   for a moment on behalf of the nonparty group that's signed on
10   to Docket 157.
11          We greatly appreciate Your Honor's guidance.  We
12   agree that there should be an "outside counsel-only" tier and
13   that there should be a plug on the deposition preparation
14   loophole, for lack of a better term.
15          And at least speaking on behalf of Microsoft, we
16   would be willing to engage in the meet-and-confer with
17   plaintiffs and with Apple.  You know, we were not involved in
18   the initial construction of the protective orders.  And we'd
19   be happy to be part of that this time around, at least as it
20   pertains to these confidentiality tiers.
21          One item that Your Honor mentioned in
22   Category Number 2, which was the highly confidential category
23   where there might be limited access to folks at Apple who are
24   not involved in competitive decision-making, and you
25   mentioned that those folks might not be involved in

1    competitive decision-making for some period of time after

2    they're shown the nonparty documents that are in that second

3    category, I think making sure that there is that cooling-off

4    period from the point of disclosure going onward is important

5    to the nonparties.  That's become an increasingly common

6    feature in protective orders, particularly in big

7    platform-defending cases where you have in-house counsel who

8    might move around and advise on different parts of a

9    multi-faceted business.  So we see that in the Amazon

10   protective order that Apple cited.  It's in the Google Search

11   protective order.

12          And so I think it's important -- Microsoft and the

13   other nonparties that signed on to Docket 157, that there is

14   a cooling-off period for folks who are given access to that

15   second tier that you described and make sure that there's not

16   inadvertent misuse of nonparty information years after the

17   fact.

18          THE COURT:  All right.  You'll discuss that with

19   Apple.

20          MR. PARKINSON:  Thank you, Your Honor.

21          THE COURT:  All right.  Any other third parties who

22   wish to be heard?  No?  Okay.

23          All right.  So sending you back to the drawing

24   board on the protective order as well.

25          And there was one other aspect of the protective

1    order, and that was how data produced under the protective

2    order and designated confidential or highly confidential,

3    what kind of data security will there be at the Government to

4    ensure it's not accessed by malicious actors.

5           And, of course, it is a very legitimate concern.

6    You know, those of us who were in the government during the

7    Solar Winds breach, it was very concerning to us that things

8    that were sealed may have been accessed by those who should

9    not have seen those materials.

10          However, I'm also sympathetic to the Government.

11   Working for the government, I understand the Government's

12   point that they're not necessarily able to customize their

13   data security.  The Government is subject to regulations as

14   to how it's kept.  And, you know -- and then taking a further

15   step back -- I'm no expert in data security.  I know in other

16   big cases, they tell me about data rooms, and I presume

17   there's a multi-factor authentication before you're permitted

18   in them.

19          I was wondering if there was a workaround here that

20   the parties could discuss.  I don't know if the Government's

21   permitted to hire an outside data room or if there's funding

22   for that.

23          But it seems like you-all could come to some kind

24   of agreement if there's a will.

25          So let me hear the Government on this.

1            MR. SHEANIN:  Sure.  Thank you, Your Honor.

2            From the Government's perspective, the data

3    security and data breach provisions that Apple's requesting

4    here are novel.  They're extraordinary.  And they're

5    unnecessary in this public enforcement action.  They're far

6    beyond what is required in the model confidentiality order in

7    the District of New Jersey.  There is nothing really in that

8    order that dictates how data should be securely stored.

9            And at best, with respect to --

10           THE COURT:  That was drafted about 15 years ago.

11   So maybe we haven't kept up with the times in that respect.

12           MR. SHEANIN:  That's possible too.  But with

13   respect to breach, it's about cooperation and notification.

14           The United States and plaintiffs in general are

15   highly attuned to issues of data security.  The United States

16   will host party and nonparty productions on secure government

17   systems.

18           I want to say these are the same systems where we

19   regularly store sensitive documents and data for

20   investigations into mergers and our litigations as well that

21   involve mergers and that involve anticompetitive conduct.

22   And they occur in a variety of sensitive areas and

23   industries, including defense, agriculture, media, and, yes,

24   technology.

25           Apple's own documents have been stored on these

1  exact servers in prior matters.

2         THE COURT:  Have you shared with Apple any

3  information about those systems to allay their concerns that

4  they're not sufficiently secure?

5         MR. SHEANIN:  We have explained and it's in the

6  letter to the Court that we comply -- that we have FISMA

7  requirements that we comply with, that we also comply with

8  one of the -- the most recent NIST protocol.  That is, again,

9  within the submission that we made to the Court as well,

10 which I think is overall consistent with the kinds of

11 concerns that Apple is raising.

12        But the problem, of course, is then do they want us

13 to move beyond those points?  And do they want us to tighten

14 that security up even higher?

15        What I want to say here is that the applicable laws

16 and policies with respect to the federal government take into

17 account national security and law enforcement equities.  In

18 the event of a data breach, for example, the Department of

19 Justice's initial priority will be to identify threats to

20 national security, including hostile foreign actors and other

21 hackers.  And then we'll also try to identify the individuals

22 who may be at risk of a breach.

23        As you pointed out, Your Honor, these concerns may

24 prohibit the Department of Justice from doing various things

25 that Apple is proposing.  For example, we may not be able to

1    notify affected persons about a data breach in any particular

2    time frame.  We may not be able to disclose certain

3    information about a data breach.  And we may not be able to

4    disclose certain sensitive information about government

5    investigations or vulnerabilities.

6           And what's interesting about this particular demand

7    in the protective order from Apple is that they also demand

8    mandatory discovery in any potential data breach.

9           Now, as I pointed out, we have extraordinarily

10   sensitive data in the United States' servers.  Neither Apple

11   nor any other private corporation is entitled to discovery

12   into the details of those security systems, into our

13   potential vulnerabilities, our potential countermeasures

14   involving hackers or guest hackers.  That's not information

15   that we provide to Apple.  It's not information we provide in

16   open court, though in the event that we would need to provide

17   something *in camera*, I'm sure that that can be discussed.

18          We have pointed out that we will, in the event of a

19   data breach, comply with the regulations and obligations

20   under the law.  We will do so in connection -- that's

21   consistent with what we've represented in our draft of the

22   proposed protective order in paragraph 34.

23          But we -- our position is that Apple is really

24   overreaching here in that the protective order should not

25   impose requirements that are inconsistent with the applicable

1    law or that might jeopardize national security or law

2    enforcement.

3               And, finally, I really want to point out that Apple

4    hasn't requested this in all -- right? -- in all of its

5    recent cases.  We cited several antitrust cases, private

6    antitrust cases, in the last four years in which Apple has

7    not requested anything of this nature with respect to private

8    actors -- or private plaintiffs.  There are simply no data

9    security or data breach provisions.

10              And if those concerns were raised subsequent, Apple

11   has not sought, to our knowledge, you know, to revise or

12   amend those protective orders to allow those kind of -- the

13   kinds of provisions it's seeking here.

14              We think it's inappropriate under these

15   circumstances.  And the cases that they cite in support of

16   their positions are primarily private litigations that do not

17   have the same kinds of national security or law enforcement

18   concerns, and the one case that they did cite that involved

19   public enforcement, the Anthem case, we really find

20   distinguishable, and we're happy to discuss that further if

21   that's of interest to the Court.

22              THE COURT:  Okay.  Thank you.

23              Let me hear from Apple on this, please.

24              MS. MILLER:  Thank you, Your Honor, and good

25   morning.  Mary Miller -- Apple.

1          Just to -- we appreciate the Court's comments,

2    particularly about engaging on this.  And I think first and

3    foremost, just to set the table, Apple is certainly not

4    trying to micromanage the Government's internal processes and

5    procedures and how they respond to national security threats.

6    I think the real issue for us is just getting a better

7    understanding of what the Government's policies and processes

8    are to the extent that they can share those.

9          And, you know, up until, really, the letter, we

10   weren't aware and they hadn't really engaged with us about

11   their -- the NIST protocol and that they are seeking to

12   comply with that.

13         And so I would just first point out, I think more

14   information would just be helpful and further engagement from

15   the Government on this issue, and I think we could really

16   work together without the Court having to intervene here.

17         On the letter, the representations in the letter

18   about compliance with that NIST protocol, I would just also

19   point out that the Government included language in there

20   saying that there are deviations from that.  And so, again,

21   we fully understand that the Government has certain

22   obligations with respect to public agencies and national

23   security interests, but we just want to understand, when they

24   say "deviations," what does that mean?  And what are we

25   talking about?  What are the processes and procedures that

1  are really in place here?

2          And I think, you know -- we don't think that this

3  is novel, as these threats continue to rise.  We're seeing

4  more and more protective orders that include provisions like

5  this, which are cited in our letter, including Floyd v.

6  Amazon, the In re Insulin case in this District, and other

7  cases that Apple has agreed to protective orders with similar

8  provisions.

9          And so we're not trying to ask for some novel

10  bespoke solution here.  We just think that there are certain

11  baseline things that we could discuss and agree to,

12  including, like, multi-factor authentication, encryption, and

13  things like that.

14          Just with respect to the breach issues, I would

15  just point out, the Government's letter includes the point

16  that we're asking for a 48-hour notification of breach.

17          That's not what we're asking for.  We're asking for

18  a reasonable time, you know, fully -- again, fully aware that

19  there are certain scenarios where 48 hours might not be

20  feasible for the Government.  And we really just want to be

21  able to include provisions in the protective order that

22  account for this increasing risk of data breach because, you

23  know, the information that Apple is going to be providing,

24  it's exceptionally importantly to Apple that that be

25  maintained and protected.

1          And so to the extent that the Government has

2    concerns about violating laws or regulations that it's

3    subject to through those breach procedures, we just ask that

4    they identify what those are.  They're mentioned in the

5    letter, but we still haven't heard what specifically they're

6    referring to.

7          And I think there's probably additional work and

8    engagement that could be done to reach resolution.

9          THE COURT:  Okay.  I mean, this is a very

10   legitimate issue.  A lot of what Apple has, that's its

11   competitive edge, is intellectual property that will be

12   produced in this case.  So I will advocate that the

13   Government adopt the most stringent security available to it.

14         I know the Government is limited as to what it's

15   able to do.  And to be very transparent, consistent with

16   national security, with Apple, about how the data will be

17   protected and what the Government will -- what the laws

18   prescribe the Government do in the event of a breach and what

19   it cannot do, I really don't -- and in any order I enter, I

20   don't want to enter something on an extensive protocol and

21   what happens in the event of a security breach.  That's

22   something that we hope never happens.  And if it does, we can

23   take it up then.  I don't think we need to troubleshoot that

24   right now.

25         But data security should be discussed intensely

1    now.

2              Mr. Sheanin, you wanted to say something.

3              MR. SHEANIN:  Yeah, Your Honor, if I may.

4              First of all, thank you for your guidance, again,

5    on this.

6              We appreciate that the data security issues are

7    exceptionally important to Apple.  They are exceptionally

8    important to the United States as well.  We are concerned

9    about Apple's data.  We're concerned about everyone else's

10   data that's in our systems.

11             We will be glad to work with Apple and have more

12   communications, particularly about our data security.

13             However, the extent of transparency is going to be

14   limited, I think, to some extent.  And I think Apple -- I

15   caution Apple and I just advise the Court that Apple may want

16   more information than we are actually able to provide about

17   our own systems, about how we secure things.

18             THE COURT:  Then just satisfy them that you're

19   limited by law as to what you can tell them and show them the

20   statute.

21             MR. SHEANIN:  That's fine, Your Honor.  We will be

22   glad to do that.

23             And we appreciate, again, your guidance on all of

24   this.

25             THE COURT:  Oh, you're welcome.  I'm full of

```
 1   guidance.

 2           All right.

 3           Let's turn to the last issue.  As Judge Bongiovanni

 4   would say, it'll make my head explode, these technological

 5   issues.

 6           But -- all right.  So this is the issue of in the

 7   ESI protocol of the production of metadata for linked

 8   documents.  So I will have -- I do want to check my

 9   understanding against yours to make sure I understand this

10   issue.  And my law clerk and I have been through the cases.

11   And we see that the law is still very much evolving in this

12   area as technology evolves.

13           However, the old standards of what a resisting

14   party to a discovery demand needs to show when it is not

15   automatically going to produce relevant information still

16   applies.  There's a burden on Apple to show exactly what the

17   burden is and that it cannot be obviated by existing

18   technology.  I am not going to order Apple to buy any

19   technology -- that's outside my jurisdiction -- or to utilize

20   any particular technology.  But it will go into the mix as to

21   whether any available technology could be used to ease

22   Apple's burden in this regard if I'm going to require the

23   Government to affirmatively have to request the information

24   on a limited basis from Apple rather than Apple voluntarily

25   providing and automatically providing all the metadata.
```

```
 1              All right.  So that's just to frame it a little

 2    bit.

 3              But let me go through what I understand, and don't

 4    laugh at me if I have a misunderstanding, technologically

 5    about the problem that the proposals in section roman V.10 of

 6    the ESI protocol are trying to address.

 7              So -- and I'm going to go a little bit offscript,

 8    which is always dangerous, but say we have an email dated

 9    July 1st that's produced.  And the email has a hyperlink to a

10    collaborative document.

11              Do you even understand my question so far?  Does

12    that make sense?

13              MS. WALSH:  We do, Your Honor.

14              THE COURT:  Okay.  So rather than "linked

15    documents," which is somewhat confusing, I'm going to call an

16    underlying document where there can be multiple authors and

17    commenters, I'll call that a "collaborative document."

18              So on July 1st, Jane Doe sends an email to John

19    Smith and says, "Hey, you know, see my recent edits to

20    collaborative document hyperlinked."  If that hyperlink is

21    still active at the time the email is produced, say in

22    November, if you were to click the hyperlink, it would not

23    necessarily be the collaborative document as it existed on

24    July 1st when the email was sent because that document is

25    always evolving.  It would be whatever it evolved into as of
```

 1    the date you clicked on the hyperlink.

 2            Am I correct about that?  And correct me.  I'm

 3    inviting you to.

 4            MS. VAN KIRK:  Yes, Your Honor.  That's correct.

 5            In addition to not knowing if the document --

 6            THE COURT:  That's correct?  I'm going to give

 7    myself a gold star.

 8            MS. VAN KIRK:  Yes, that's correct.  And then

 9    there's been --

10            THE COURT:  Oh, Raina -- I'll give Raina a gold

11    star.  Go ahead.

12            MS. VAN KIRK:  In addition to not knowing if that

13    document is the same version from July 1st in the

14    hypothetical, plaintiffs wouldn't be in a position to know

15    what that document is at all.

16            THE COURT:  Oh, because there'll never be a link to

17    it and the hyperlink won't work?

18            MS. VAN KIRK:  Under defendant's proposal, for most

19    of the linked documents like this one, when someone emails

20    someone that document and says, "Check this out" on July 1st,

21    plaintiffs have no way of knowing what that link was to, let

22    alone what -- it was like on July 1st.

23            THE COURT:  Okay.

24            MS. VAN KIRK:  And, obviously, we need that to

25    fact-find and litigate this case effectively.

1          THE COURT:  So the -- but there will be discovery

2    requests, presumably, that will be designed to get production

3    of various iterations of the collaborative document as it was

4    worked on; right?  So that might be produced separately.

5          MS. VAN KIRK:  Respectfully, Your Honor, it might

6    be in the production, certainly.

7          THE COURT:  Okay.

8          MS. VAN KIRK:  But what it won't have is the

9    relationship.

10          THE COURT:  Right.  And that's what the metadata

11    would provide; so the metadata to the collaborative document

12    would identify the document as it existed on various dates?

13          MS. VAN KIRK:  It's exactly right that it would

14    identify the document.

15          Whether it would have the July 1st version, a

16    version control, might depend on the system.

17          But even identifying the document --

18          THE COURT:  Okay.

19          MS. VAN KIRK:  -- obviously of massive importance.

20          THE COURT:  Okay.  So it would be to match up the

21    email, say, with the document the email was referencing.

22          MS. VAN KIRK:  Precisely.

23          THE COURT:  I can understand why that's important

24    or could be important.

25          Let me ask Apple, then, to explain the burden in --

```
 1   I know there are a lot of these links, and so, you know,
 2   it's -- it's vast.  The Government is narrowing down what it
 3   is seeking to only relevant hyperlinks.  It may say a lot of
 4   it is relevant; so that might not narrow the field much.
 5          But someone from Apple walk me through
 6   technologically what's required here and what the burden is.
 7          MS. MILLER:  Thank you, Your Honor.  Mary Miller
 8   again.
 9          I'll do my best.
10          THE COURT:  You got all the good duty today, huh,
11   Ms. Miller?
12          MS. MILLER:  The technological piece, I can't
13   promise I'll be perfect.
14          So I think, just to level-set, the burden as
15   identified by Apple is that there is no automated tool to
16   connect the hyperlinked document, the collaborative document
17   that you were talking about, to the email in the ordinary
18   course.  So when we talk about, like, attachments to emails,
19   those are stored within the same email file, and so when you
20   collect and produce them, they're automatically associated as
21   family members for discovery purposes.
22          That's not the case with these linked doc -- the
23   links to the linked documents that we're talking about.  And
24   so absent an automated tool to connect those together, it
25   would have to be a manual process at Apple.
```

1          And so I understand that the Government is pitching

2   this as a narrow -- as a narrowing, but, in fact, the steps

3   that it would require would be quite manual.  And I can just

4   walk the Court through what it would require.

5          Apple would first have to manually identify all the

6   hyperlinks in produced documents and then determine whether

7   those doc- -- whether the links in those documents link to

8   another document and then make a determination based on the

9   link itself whether the linked document might be relevant and

10  then manually populate the metadata fields that plaintiffs

11  are asking for with those potentially relevant hyperlinks.

12         In addition to that, we would then have to go

13  search and see if any of the linked documents had already

14  been produced.  If they were produced, manually populate a

15  separate metadata field with the corresponding Bates number

16  of that produced document.  And if they were not produced,

17  create a log of the hyperlinked addresses themselves.

18         And so I understand that it's -- that the

19  Government's proposal is different from simply saying Apple

20  must produce all hyperlinked files, which has been rejected

21  even most recently in another -- by another judge in this

22  District, Judge Singh in the In re Insulin case.  And so

23  they're pitching this as a narrowing, but when you really

24  think about what the process would actually require, it's

25  quite a departure from what courts have done in other cases.

1          And so we think the better course, the most

2    efficient one that will avoid the inevitable delay that the

3    process I just painstakingly described is to just do this on

4    a case-by-case basis.  And that is what lots of courts have

5    chosen to do with this sort of highly technical difficult

6    issue is to have the parties meet and confer and make

7    reasonable requests for linked documents once we get a better

8    sense of what the hyperlinked documents that are actually

9    going to be relevant and of interest to the parties.

10         And we think that's the best course to proceed,

11   given that Apple doesn't have an automated tool to do this,

12   and so --

13         THE COURT:  Can it purchase one?  Are they readily

14   available, as the Government says?

15         MS. MILLER:  My understanding is no.  Not for --

16   not for the applications that Apple is using.  And I just

17   want to make a distinction:  There are other platforms --

18   like, Google has a platform by which there is an automated

19   tool.  And that's just not what we're dealing with here, and

20   so we wouldn't be in that position.

21         I do hear the Court that there may be additional

22   information that Apple could provide on its burden, so if

23   that would be helpful to the Court, we're happy to consider

24   declarations on this just to hopefully resolve the issue and

25   explain further the specific burden.

1          But I do want to stress that the lack of an

2     automated tool has been recognized by courts and these are

3     cited in our letter, the In re Insulin case, most recently in

4     May 2024; In re Meta, other cases from the Northern District

5     of California and the Southern District of New York.

6               THE COURT:  We saw them.

7               But, you know --

8               MS. VAN KIRK:  Your Honor --

9               THE COURT:  -- just a second.

10              Bear in mind that I may give you the kind of

11    schedule that behooves you to -- that pushes you to get an

12    automated tool because it may be a lot of person-hours

13    otherwise.

14              So, you know, this is something that Apple, rather

15    than spending a lot of resources telling me why it can't, it

16    probably should, behind the scenes, spend some time focusing

17    on how it can.

18              But that's just my general guidance.

19              Ms. Van Kirk, do you want to -- go ahead,

20    Ms. Miller --

21         (Simultaneous conversation)

22              THE COURT:  Just one second.  Let Ms. Miller finish

23    because I just said something to her.

24              MS. MILLER:  Thank you.  We appreciate the Court's

25    comments.

1          I just want -- I just want to be clear there is not

2     an automated tool, as I understand it, that we could use

3     based on the particular architecture of the applications that

4     we're talking about.

5          And so I completely hear the Court wanting us to

6     move as expeditiously as possible.  I just think given the

7     lack of an automated tool, the Government's proposal would

8     actually make it slower than the process that we're

9     proposing.

10          THE COURT:  Ms. Van Kirk?

11          MS. VAN KIRK:  Thank you, Your Honor.

12          We deeply appreciate the Court's guidance and

13     direction on this.

14          If I may make just a couple of points.  The first

15     is that unfortunately I think the parties are really talking

16     past each other, and that's despite our best efforts.

17     Defendant, in many ways, is fighting a proposal that we're

18     not suggesting.  Plaintiffs' proposal isn't In re Insulin

19     Litigation.  It's not Nichols v. Noom.  It's not the cases

20     cited in their briefing.  Those cases sought to have the

21     producing party identify links in the production; then go

22     back into the native system, find the linked files, export

23     them, and attach them as family members.  That's really

24     nothing like the Government's proposal.  We're not asking the

25     defendant to go back into the native system.  We're not

1  asking them to develop a tool.

2          As Your Honor said at the outset, we're asking just

3  for a metadata export.  And we're only requesting it for

4  linked documents in the production.

5          Now, Ms. Miller went through --

6          THE COURT:  What do you mean "linked documents in

7  the production"?

8          MS. VAN KIRK:  I should say collaborative

9  documents, meaning we're only requesting this metadata export

10  for relevant collaborative documents in the production.

11          THE COURT:  But you're receiving the collaborative

12  document in the production in your hypothetical.

13          So why would you also need that metadata separately

14  produced?  I don't understand that.

15          MS. VAN KIRK:  Exactly as I went through at the

16  beginning, without the metadata, we don't have the

17  relationship.  We might have -- and the relationship is

18  really what's key for fact finding and for understanding what

19  transpired.

20          THE COURT:  I see.  So if the collaborative

21  document is produced, along with that production in whatever

22  form, electronic, presumably, of the document you want the

23  metadata that goes with that production.

24          MS. VAN KIRK:  We want the ability to link the

25  email that says "See this" on July 1st with the actual

1    document.  We might have both, but there's going to be a lot

2    of documents produced in this litigation when we have no way

3    of telling what went to what.  But Apple does.  That's

4    tremendous prejudice, and it impairs our ability to litigate.

5            THE COURT:  But why can't you request it for

6    discrete documents rather than requiring them to undergo that

7    burdensome exercise every time.

8            MS. VAN KIRK:  First off, the -- as Your Honor

9    stated, again at the beginning, in general, the producing

10   party bears the burden of providing information about its own

11   documents.  That's the standard.

12           And then, second, it's also prejudicial --

13           THE COURT:  Although there are lines of cases and

14   standards that say if it's unduly burdensome, if it's the

15   equivalent of going, in the old days, to backup tapes, it

16   doesn't have to be produced and there can be a cost-shifting

17   in making a party do that.

18           MS. VAN KIRK:  And respectfully, our proposal is

19   not intended to do that because it's far narrowed from much

20   of the case law and it's far narrowed from even what we saw

21   at the outset in order to reduce these burdens on Apple.

22           And we also believe that it's very prejudicial and

23   sometimes it's impossible to give Apple a set of the

24   documents that we think are important, the key to our

25   deposition, the key to an expert report, and then say pull

```
 1    those links right before in the thick of the --
 2              THE COURT:  I doubt you'll do it right before.
 3              MS. VAN KIRK:  The way productions happen, you
 4    know, often the deadlines --
 5              THE COURT:  All right.
 6              MS. VAN KIRK:  -- that's certainly been part of our
 7    experience and part of the prejudice and the problem in other
 8    cases that have done this.
 9              I want to return for a moment, Ms. Miller took you
10    through what she listed in page 19 of their briefing of what
11    they -- what Apple calls, like, "seven manual steps."
12              Your Honor, we don't understand how those steps are
13    manual.  Apple says that it needs to identify manually all
14    hyperlinks in the documents to be produced.  But any
15    proficient user of e-discovery tools would do this
16    automatically.  It says it needs to evaluate whether a
17    hyperlink links to another document.
18              We're not asking for that.  Plaintiffs don't care
19    and aren't asking defendant to determine if the link is dead
20    or if it had a typo.
21              THE COURT:  Okay.  If you don't understand, I
22    certainly don't understand.  And this requires -- if you want
23    me to call this, don't have me calling it in the dark.  I
24    think it's going to require a further transparent meeting
25    between the Government and Apple.
```

1          And if you have to tee it up for Round 2 in front

2   of me, you better submit it with burdens met, with I's dotted

3   and T's crossed, e-discovery vendors consulted and so forth

4   and present it in a digestible form to me.  I'm no tech wiz.

5   I'm not totally ignorant, but you're going to have to

6   spoon-feed it a little bit on a basic level because I like to

7   understand what I'm doing before I order something.

8          MS. VAN KIRK:  I do -- we appreciate that,

9   Your Honor.  And forgive me for interrupting.

10          What I meant to say is not that we don't

11  technically understand -- don't --

12          THE COURT:  You don't understand where Apple's

13  coming from.  I understood that.

14          MS. VAN KIRK:  Exactly.  And that's not for want of

15  asking.  We have tried to work this out.  And we really want

16  to collaborate.  And for months, you know, these protocol

17  negotiations on ESI started over four months ago.  And we've

18  asked defendant how they'd manually identify hyperlinks in

19  the production or what processing and review tools they use

20  so that we can collaborate on solutions.

21          And we've offered to have our technical people and

22  their technical people get on a call together.  We've asked

23  them these questions repeatedly, and --

24          THE COURT:  Okay.  Well, if they haven't done it

25  before, they're going to do it now.

```
 1                 MS. VAN KIRK:  Thank you, Your Honor.

 2                 THE COURT:  And I'm confident they will.

 3                 Ms. Miller.

 4                 MS. MILLER:  Your Honor, just to respond to that.

 5    We have engaged and will continue to engage with the

 6    Government on this issue.  We've had multiple

 7    meet-and-confers.  We've been up front about the automated

 8    tool -- the lack of an automated tool to do this.  And so I

 9    just -- it's true the Government on Monday raised this issue

10    of maybe additional meet-and-confer on this would be helpful

11    to clarify where the parties are coming from, and we're

12    certainly willing to do that.

13                 But I think we just need the time.  And so it's

14    just not -- just to clarify, it's not the case that we're

15    declining to speak about this or to engage with them.  I just

16    want to make that very clear for the Court.

17                 THE COURT:  Okay.  Well, you'll have another

18    chance, if they misunderstood your intentions.

19                 So that's all I really want to do on that today.

20                 Go back and confer.

21                 And then just, you know, let's take a step back and

22    look at the forest here.  You know, this District has a lot

23    of big cases.  This is a big case.  It's an important case.

24    Every case is important.  We have MDLs and all sorts of

25    complex litigation here.
```

1     It concerns me that you've had this much trouble on

2  three pro forma orders -- not that your concerns aren't

3  legitimate.  They are.  But they're legitimate in a lot of

4  cases, yet they don't bubble up to multiple-page,

5  single-spaced letters to the Court to decide.  You know, I

6  want to get in there -- I'd love to -- I find this very

7  interesting, but I frankly don't have the time to do it on

8  every case.  And I gave you a fair hearing today.

9     But when I see things -- and this is Judge Neals's

10 business; it's not mine.  But when I see the letters I see --

11 I've seen from you all about a technology tutorial, something

12 in patent cases we see all the time, whatever goes on behind

13 the scenes remains behind the scenes as far as the Court is

14 concerned, we get a beautiful neutral presentation without a

15 peep from the parties that helps the Court focus on

16 technology -- I'm just telling you that you have to work

17 better together because we simply don't have -- I'll spend --

18 I'll spend time on an interesting case, but I don't have the

19 time to hand-hold and do a two-hour hearing on three pro

20 forma orders -- and I say "pro forma" because they're

21 negotiated without the Court's help in almost every single

22 case no matter how big the case is.

23    So as I said, you're all here in good faith, but

24 don't expect this level of attention on everything.  Don't be

25 this needy.  Take matters into your own hands.

 1          So I'll give you some time.  You take the time you

 2  need, because, frankly, I'm seeing -- I really would like

 3  that motion to dismiss decided before I open formal

 4  discovery.  I'll see how long it takes.  I'll keep an open

 5  mind.

 6          So you have time to work on these preliminary

 7  orders.  You take the time you need.  But just understand

 8  going forward that I expect a lot more cooperation,

 9  transparency and flexibility between counsel or you're,

10  frankly, just going to wait.  And I am not saying that and,

11  you know -- because I would -- I would want to punish anyone.

12  It's just that I put other things off so I could do this

13  today, in a prompt manner.  But I won't do that every time if

14  I find that you're not working well together.  Okay?

15          MR. ALLEN:  We understand, Your Honor.  And we

16  thank the Court for its time and attention.

17          THE COURT:  Okay.  Great.

18          MR. LASKEN:  Could I actually be heard for a minute

19  on that?

20          THE COURT:  Sure, Mr. Lasken.

21          MR. LASKEN:  So, we obviously appreciate the

22  Court's guidance.

23          I do think one challenge that we have here is when

24  someone says "Answer 700 interrogatories," I can't in good

25  faith commit the Government to do that or to reach a middle

1    ground on that.

2            And I think a lot of the positions here disclose

3    the measures you use to stop foreign actors from hacking

4    government systems through a private corporation.

5            You know, we are trying to work with Apple, and I

6    want the Court to understand that.

7            But particularly where there's been a lack of

8    deadlines, we haven't even been able to get Apple on the

9    phone.  And so we are doing our absolute best, and I want the

10   Court to understand that.  But at the same time, we can

11   only -- I can't compromise on 350 interrogatories --

12       (Simultaneous conversation)

13           THE COURT:  Okay.  Well -- let's take that example.

14   Not one interrogatory has served -- has been served or has

15   been permitted to be served.  And if the United States is

16   treated as one entity, then they're limited to 25

17   interrogatories, not 400 or 700.

18           You're actually advocating a position to treat --

19   to allow separate discovery requests to agencies within the

20   government.  Interrogatories is a bad example, but there are

21   other limitations that by wanting plaintiff to be defined as

22   the Department of Justice, may inure to the Government's

23   detriment.

24           So I am not going to have a debate with you.  I

25   have no doubt you're doing the best for your client in your

1   eyes.

2          But unfortunately, you're not the one who's going

3   to ultimately decide the disputed issues.  I or Judge Neals

4   are.  And I'm trying to tell you how the Government's being

5   perceived and the parties in general are being perceived, out

6   of fairness to you.

7          MR. LASKEN:  I appreciate that, Your Honor.  And I

8   did not mean to overstep or suggest that.  I was just trying

9   to articulate that, you know, we are -- we are doing our best

10  to work with what we can in the context of what is occurring.

11         THE COURT:  Okay.

12         MR. LASKEN:  -- if that sounded -- sounded --

13         THE COURT:  I know you're trying to represent your

14  client to the best of your ability, as is Apple.

15         Okay, everyone.  Nice speaking with you.  I'll see

16  what you resubmit -- you know, I'll see what I get.  I am not

17  going to make any advance statements about what I'm going do.

18  But it's not out of the realm of possibilities that you

19  submit your respective views and I enter what I see fit, and

20  it may be one of your views or neither of your views.  Okay?

21         UNIDENTIFIED SPEAKER:  Thank you very much,

22  Your Honor.

23         THE COURT:  Thank you, everyone.  Take care.  Bye.

24              (Conclusion of proceedings)

25

|Hearing
|24-cv-04055, October 10, 2024
|Certification

59

```
 1                         Certification

 2         I, SARA L. KERN, Transcriptionist, do hereby certify

 3   that the 59 pages contained herein constitute a full, true,

 4   and accurate transcript from the official electronic

 5   recording of the proceedings had in the above-entitled

 6   matter; that research was performed on the spelling of proper

 7   names and utilizing the information provided, but that in

 8   many cases the spellings were educated guesses; that the

 9   transcript was prepared by me or under my direction and was

10   done to the best of my skill and ability.

11         I further certify that I am in no way related to any of

12   the parties hereto nor am I in any way interested in the

13   outcome hereof.

14

15

16

17

18   S/ Sara L. Kern                    11th of October, 2024

19   _____    _____
     Signature of Approved Transcriber            Date

20

21
     Sara L. Kern, CET**D-338
22   King Transcription Services, LLC
     3 South Corporate Drive, Suite 203
23   Riverdale, NJ  07457
     (973) 237-6080
24

25
```