```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF NEW JERSEY
 2

 3  ─────────────────────────          CIVIL ACTION NUMBER:
    UNITED STATES OF AMERICA, et
 4  al,                                2:24 Civ. 04055

 5        Plaintiffs,                  ORAL ARGUMENT

 6        v.

 7  APPLE, INC.,

 8        Defendant.

 9  ─────────────────────────

10        Martin Luther King Building & U.S. Courthouse
          50 Walnut Street
11        Newark, New Jersey 07101
          Wednesday, November 20, 2024
12        Commencing at 11:06 a.m.

13  B E F O R E:              THE HONORABLE JULIEN XAVIER NEALS,
                             UNITED STATES DISTRICT JUDGE
14                                    - and -
                             THE HONORABLE LEDA D. WETTRE,
15                           UNITED STATES MAGISTRATE JUDGE

16  A P P E A R A N C E S:

17        DEPARTMENT OF JUSTICE - ANTITRUST DIVISION
          BY:  JONATHAN LASKEN, ESQUIRE
18        450 Fifth Street NW
          Washington, DC 20530
19        Counsel for Plaintiff United States of America

20

21

22          MELISSA A. MORMILE, Official Court Reporter

23              melissa_mormile@njd.uscourts.gov
                       973-776-7710
24
       Proceedings recorded by mechanical stenography; transcript
25            produced by computer-aided transcription.
```

1    **A P P E A R A N C E S (Continued):**

2

3        DEPARTMENT OF JUSTICE
         BY:  MATTHEW C. MANDELBERG, ESQUIRE
4        950 Pennsylvania Avenue NW
         Washington, DC 20004
5        Counsel for Plaintiff United States of America

6        OFFICE OF THE ATTORNEY GENERAL
         BY:  JOHN BASAIK, ESQUIRE
7        402 East State Street
         Trenton, New Jersey 08608
8        For the Plaintiff United States of America

9
         OFFICE OF THE ATTORNEY GENERAL - STATE OF NEW JERSEY
10       BY:  BRIAN FRANCIS MCDONOUGH, ESQUIRE
              ISABELLA REGINA PITT, ESQUIRE
11            GIANCARLO PICCININI, ESQUIRE
         124 Halsey Street
12       Newark, New Jersey 07102
         For the State of New Jersey
13

14       WALSH PIZZI O'REILLY FALANGA LLP
         BY:  LIZA WALSH, ESQUIRE
15            LAUREN MALAKOFF, ESQUIRE
              DOUGLAS E. ARPERT, ESQUIRE
16       Three Gateway Center
         100 Mulberry Street - 15th Floor
17       Newark, New Jersey 07102
         Counsel for the Defendant Apple, Inc.
18

19       KIRKLAND & ELLIS LLP
         BY:  CRAIG S. PRIMIS PC, ESQUIRE
20            DEVORA W. ALLON, ESQUIRE
              K. WINN ALLEN, ESQUIRE
21            MARY MILLER, ESQUIRE
              CONLEY HURST, ESQUIRE
22       1301 Pennsylvania Avenue NW
         Washington, DC 20004
23       Counsel for the Defendant Apple, Inc.

24

25

1    **A P P E A R A N C E S (Continued):**

2

3        STATE OF MINNESOTA - OFFICE OF THE ATTORNEY GENERAL
         BY:  JUSTIN MOOR, ESQUIRE

4        445 Minnesota Street - Suite 1400
         Saint Paul, Minnesota 55101

5        Counsel for the State of Minnesota

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      **I N D E X**

2      ARGUMENT                              PAGE

3      By Mr. Primis                         7, 125

4      By Ms. Allon                          32, 127

5

6      By Mr. Lasken                          56, 122, 131

7      By Ms. Pitt                           116

8      By Mr. Piccinini                      120

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*
*District of New Jersey*

1              (PROCEEDINGS held in open court before **The Honorable**

2    **JULIEN XAVIER NEALS,** United States District Judge.)

3              THE COURTROOM DEPUTY:  All rise.

4              The Honorable Julien Xavier Neals presiding.

5              HON. JULIEN X. NEALS:  Good morning.  Please be

6    seated.

7              THE COURTROOM DEPUTY:  We are on the record in

8    *United States of America v. Apple*; Case Number 24-cv-4055.

9              HON. JULIEN X. NEALS:  Counsel, your appearances,

10   please.

11             MR. LASKEN:  Yes, your Honor.

12         Jonathan Lasken, counsel for the United States.  May it

13   please the Court.

14         With me today is Matthew Mandelberg and John Basiak, for

15   the United States Attorney's Office.

16         Also with us today for the State of New Jersey is

17   Ms. Isabella Pitt and Mr. Brian McDonough and Mr. Giancarlo

18   Piccinini.

19             HON. JULIEN X. NEALS:  Thank you.

20             MS. WALSH:  Good morning, your Honors.

21         Liza Walsh appearing on behalf of Apple.  With me from

22   my firm is Doug Arpert.  I will allow my co-counsel to

23   introduce themselves.

24         We will start with Mr. Primis who will introduce himself

25   and his team.

```
 1          MR. PRIMIS:  Good morning, your Honors.
 2       Craig Primis from Kirkland & Ellis for Apple.  With me
 3  at counsel table is Devora Allon.
 4          MS. ALLON:  Good morning, your Honor.
 5          HON. JULIEN X. NEALS:  Good morning.
 6          MR. PRIMIS:  Mary Miller.
 7          MS. MILLER:  Good morning, your Honor.
 8          MR. PRIMIS:  Luke McGuire.
 9          MR. MCGUIRE:  Good morning, your Honor.
10          MR. PRIMIS:  And Winn Allen.
11          MR. ALLEN:  Good morning.
12          MR. PRIMIS:  All from Kirkland.  And we also, of
13  course, have our client here from Apple.
14          HON. JULIEN X. NEALS:  Good morning.
15       For counsel's convenience, if you are more comfortable
16  from the lectern, that is fine.  If you're more comfortable
17  from counsel table, that is fine as well, just make sure to
18  pull the microphones a little bit closer.
19       And for those of you who haven't been in the courtroom
20  previously, you didn't walk into a conservatory.  The plants
21  are here because they are doing some work in the hall.  There
22  is a little sample vote sheet whether we should keep them or
23  not.  So fill it out before you leave.
24       But in all seriousness, I want to thank counsel for the
25  quality of papers we received in this case.
```

 1          And I mean that sincerely.

 2          I practiced for quite a while.  One of the biggest

 3   benefits for the Court is when the parties give you everything

 4   that you need in terms of making a decision.

 5          The thoroughness of the papers was exemplary.  I wanted

 6   to just commend all counsel for that before we start the

 7   argument.

 8          That being said, this is Apple's motion to dismiss.  So,

 9   counsel, how would you like to proceed?

10          MR. PRIMIS:  Good morning, again, your Honor.

11          Craig Primus for Apple.  We are the movement, so we will

12   go first.

13          I hope to give you an outline of what we propose to do

14   today.  We also have a handout of slides, which we think will

15   help guide the argument.  It's principally quotes from cases

16   and the complaint, but it will help guide things along.

17          So with that, if I can have one of my colleagues

18   approach and provide those to the Court.

19          HON. JULIEN X. NEALS:  Absolutely.

20          MR. PRIMIS:  Thank you, your Honor.

21          Thanks for the opportunity to present argument today on

22   Apple's motion to dismiss and also for the kind words about the

23   briefing for both sides.  We really appreciate that.

24          We urge the Court to grant Apple's motion because the

25   government seeks to impose on Apple an antitrust duty to assist

1    third parties that the Supreme Court has repeatedly rejected.

2         Because that conduct is not anticompetitive as a matter

3    of law, all of the counts in the first amended complaint fail

4    as a matter of law.  Anticompetitive conduct is a critical

5    element in every count of the complaint; and for that reason,

6    the complaint should be dismissed in its entirety.

7         Each count of the complaint also fails for the

8    additional reason that the government does not link the

9    challenged conduct to any alleged harm in the smartphone market

10   and, therefore, does not sufficiently plead anticompetitive

11   effects, which is another requirement under Section 2's conduct

12   element.

13        And to make matters worse, the government seeks to

14   advance these novel theories on a threadbare allegation of a

15   so-called monopoly playbook that somehow cuts across every

16   aspect of Apple's business.  That pleading failure doesn't even

17   satisfy Rule 8, let alone the sweeping antitrust theories that

18   fail as a matter of law in any event.  Even if the Court is

19   inclined to let any portion of the government's case proceed,

20   those allegations must be dismissed.

21        So today I am going to be dividing the argument with my

22   partner, Devora Allon, who is at counsel table.  And if the

23   Court would turn to the second slide in the packet, that is

24   where we set out the agenda for our argument today.

25        For my part, I am going to focus on our argument that

1  the refusal to deal doctrine precludes any finding of

2  anticompetitive conduct, including our arguments under *Trinko*,

3  *linkLine* and *Aspen Skiing*.

4      Ms. Allon is going to argue the balance of the motion.

5  First she will cover the government's failure to adequately

6  allege two other key elements of a monopolization claim that

7  Apple's conduct had some kind of anticompetitive effect and

8  that Apple had monolopy power in a relevant market.

9      Next we will address the lack of state standing, which

10  is another basis to dismiss the claims brought by the plaintiff

11  states.  And finally, we will explain why the government's

12  monopoly playbook and future conduct allegations fail to

13  satisfy the pleading requirements of Rule 8.

14      We, of course, welcome questions, and we will reserve

15  some time for rebuttal.

16      If I can ask the Court to turn to the third slide, that

17  is where I am going to start with our first ground for

18  dismissal.

19      With regard to that first ground, for decades, it has

20  been a core element of any monopolization claim that the

21  government must show that Apple has engaged in anticompetitive

22  conduct.  Here, the allegations seeking to establish the

23  supposed anticompetitive conduct fail for a simple and

24  straightforward reason.

25      As the Supreme Court has said for over a century, the

1  antitrust laws allow companies like Apple to choose the parties

2  with whom they deal and the terms and conditions of that

3  dealing.  Before I dive into the case law -- and there are a

4  lot of cases here -- I want to lay out briefly an overview of

5  this argument and the steps that lead to dismissal.

6       First, as the cases I will walk through show, Apple's

7  conduct is deemed not anticompetitive as a matter of law if all

8  Apple is alleged to have done is not provide sufficient levels

9  f access or service when it opens its platform to third

10 parties.  If Apple is not taking affirmative steps to interfere

11 with or dictate how these third parties deal with Apple's

12 competitors, then Apple's unilateral decisions about the extent

13 of the access it provides to iPhone are not anticompetitive and

14 the anticompetitive conduct claim fails as a matter of law for

15 all claims in the case.

16      In this situation, the government can only state a claim

17 if it can establish that it meets the sole exception to refusal

18 to deal.  And that's the *Aspen Skiing* exception.  That

19 exception has at least two elements, and as I will explain

20 below, neither has been alleged here and thus *Aspen Skiing*

21 cannot save this claim.

22      So with that overview, I want to take a look at what the

23 Supreme Court as said about what type of conduct is protected

24 under Section 2 of the Sherman Act.  I would like to start with

25 slide 4 of the packet I gave the Court.

1          First more than 20 years ago now, the Supreme Court said

2     in *Trinko*, which we have quoted there, that as a general matter

3     the Sherman Act does not restrict the long recognized right of

4     a trader or manufacturer engaged in an entirely private

5     business freely to exercise his own independent discretion as

6     to parties with whom he will deal.  Now, the *Trinko* case is

7     quoting the *Colgate* case, which we also cited in our brief, and

8     that dates back to 1919, more than a century ago.

9          *Colgate* stands for that same proposition, and it also

10    says that a business -- and this is a quote.  I don't have it

11    on the slide, but it is a quote -- of course, may announce in

12    advance the circumstances under which he will refuse to sell.

13         So five years after *Trinko*, the Supreme Court came back

14    to this doctrine and affirmed these principles.  That's *Pacific*

15    *Bell vs. LinkLine*, which we do have on the slide.  The Court

16    said there that, again, that as a general rule, businesses are

17    free to choose the parties with whom they will deal as well as

18    the prices, terms, and conditions of that dealing.  And it

19    later reiterated and this is, quote, *Trinko* holds that a

20    defendant with no antitrust duty to deal with its rivals has no

21    duty to deal under the terms and conditions preferred by those

22    rivals.

23         So I want to pause here briefly on the language in

24    *LinkLine* referring to rivals.

25         The government argues that the conduct at issue here,

1    the so-called "dealing," has to be with our rivals in the

2    market that they pled in order for Apple to get this

3    protection.  Put another way, the government says in its brief

4    that this rivals reference in the case law means refusal to

5    deal protections applied only if Apple is refusing to deal with

6    other smartphone manufacturers or Apple's direct rivals in the

7    smartphone market that the government has pled.

8        Now, these are all antitrust cases that we are citing,

9    both parties, so unsurprisingly they involve rivals in some

10   respects and the Courts refer to rivals in some of the

11   opinions.  But no case holds that the protections for refusal

12   to deal only apply where the dispute involves direct rivals in

13   the pled market.  This rivals rule the government relies on is

14   a creation of its own making.  And recent Court of Appeals

15   cases made clear that this limitation doesn't exist.

16       If we take a look at *Meta*, for instance, that was a case

17   dismissed on a 12(b)(6) motion.  Plaintiffs there allege that

18   Facebook had a monopoly and a market for social networking

19   services, but the developers purportedly blocked by Facebook

20   there were not all rival social networking services.

21       Same thing in the *Novell* case that we cited.  That was

22   authored by Justice Gorsuch when he was on the Tenth Circuit.

23       There the plaintiff, Novell, alleged that Microsoft

24   Windows' product monopolized the operating system market by

25   cutting off access to Novell, which made word processing

1    software, not operating systems.  Novell wasn't a direct rival

2    in the operating system market.  It competed with Microsoft's

3    word pressing applications.

4         In both cases the Federal Courts of Appeals affirmed

5    dismissal of the Section 2 claim even where the conduct did not

6    directly involve rivals in the market the plaintiff claimed the

7    defendant had monopolized.  The allegations in the government's

8    complaint against Apple line up with the allegations in cases

9    like *Meta* and *Novell*.

10        But at the end of the day, this dispute over what rivals

11   means doesn't really matter, because the government

12   consistently alleges that these third-party developers compete

13   with Apple in markets like messaging, gaming, smartwatches, and

14   so on; and that Apple views them as potential competitive

15   threats to its purported smartphone monopoly.

16        In that regard I would refer the Court to paragraph 41

17   of the first amended complaint which alleges that the Apple

18   restricts developers that take advantage of technologies that

19   threaten to disrupt, disintermediate, compete with, or erode

20   Apple's monopoly power.  Paragraph 46 makes similar

21   allegations.

22        The government's brief also shows what its allegations

23   are about, are about what Apple is doing to purportedly -- and

24   this is a quote from their brief at page 15 -- to block

25   competitively threatening apps and accessories.  They also

1  argue in their brief -- and this a quote from page 37 -- that

2  Apple discriminates against competitively threatening

3  technologies.  These are the same types of allegations analyzed

4  in *Meta* and *Novell*, and dismissal is likewise warranted here.

5       Now, I want to turn back it to the Supreme Court

6  decisions I started with.

7       The fact that *Meta* and *Novell* and the other cases we

8  cite in our brief applied refusal to deal is not surprising

9  because those decisions are in turn applying principles laid

10  out in the Supreme Court decisions.

11       Each of those decisions rejected claims just like this

12  one at the pleading stage before any discovery had occurred and

13  just on the facts alleged in the complaint.

14       So let's look at the allegations here and compare them

15  to what the Supreme Court rejected in *Trinko*, *LinkLine*, and the

16  *Meta* decision I referenced earlier.

17       In this case, the government's allegations boil down to

18  a complaint that Apple has not given third parties enough

19  access to its platform.  Or should give different access.

20       According to the complaint, one way Apple does this is

21  by not granting developers access to certain Apple APIs.  And

22  the Court will recall from the tech tutorial that APIs are

23  application programming interfaces that allow apps to

24  communicate with iOS and tell the device to perform certain

25  functions.

1       On the next slide, slide 5, we have the allegations that

2   get to the heart of this claim.  And they show that although

3   Apple allows a lot of access to third parties, in the

4   government's view it doesn't provide enough or the kind of

5   access to Apple's API that the government wants.

6       So the first is messages, and we reference paragraphs 84

7   and 85 of the complaint.  The claim is that Apple allows

8   third-party messaging apps on iPhone, but it doesn't provide

9   access to the APIs that would allow third-party developers to

10  offer SMS.

11      Smartwatches, paragraphs 97 and 101, again, the claim is

12  that Apple allows third-part smartwatches to be compatible with

13  iPhone.  It just doesn't allow third-party smartwatches to

14  access APIs for certain advanced actionable notifications.

15      Third is digital wallets, paragraphs 104 and 111.

16  Tap-to-Pay is available to users for various apps on iPhone,

17  but Apple previously did not allow developers access to the

18  near-field communication hardware which you need for Tap-to-Pay

19  in a third-party wallet.

20      And finally, we have an allegation regarding mini

21  programs, access to APIs, paragraph 69.

22      Apple allows mini programs, but previously did not allow

23  access to its in-app payment system APIs.  So in each case the

24  allegation is just another way of saying Apple provided access

25  to a third party, but it should provide more or a different

1    access.

2         If we go to the next slide, we see the other way the

3    government claims Apple doesn't give third parties enough

4    access and that's through Apple's App Store Guidelines.  The

5    government wants Apple to set different terms or conditions for

6    some of the apps that Apple already allows on its platform.

7         So with regard to mini programs, paragraph 69, Apple

8    used to require apps in the United States to display mini

9    programs using a flat, text-only list of mini programs.  That

10   is their allegation.

11        They also complain that Apple used to ban displaying

12   mini programs with icons or tiles, such as descriptive

13   pictures.

14        Cloud streaming games, paragraph 76, the allegation is

15   that for years Apple imposed the onerous requirement that any

16   cloud streaming game or any update be submitted as a standalone

17   app for approval by Apple.

18        These allegations are no different than saying Apple

19   must change its own terms and conditions for how it allows

20   third parties to access and utilize its platform.

21        The government's case is just about giving more or

22   different access to Apple's technology, but we know that type

23   of claim fails as a matter of law and it has been rejected

24   multiple times at the pleading stage.  And it has been rejected

25   because this type of conduct does not satisfy the

1  anticompetitive conduct element of a Section 2 monopolization

2  claim.

3       So on the next slide we have got *Trinko*.  Now, the

4  briefing does tend to focus on the holding in *Trinko* -- and, in

5  fact, that is where I started.

6       But we would urge the Court to focus on the actual facts

7  that were alleged in Trinko.  And we have those facts as

8  described by the Supreme Court.  This is the Court describing

9  the complaint in that case.

10      They said that the complaint alleged that Verizon had

11 filled rivals' orders on a discriminatory basis as part of an

12 anticompetitive scheme.  And they explained what that meant.

13 According to the complaint, Verizon has filled orders of its

14 competitors' customers after filling those for its own local

15 phone service and has failed to fill them in a timely manner.

16 In other words, Verizon is putting itself ahead of its

17 competitors in filling customer orders.

18      The Court went on to say the complaint asserted that the

19 result of Verizon's improper behavior with respect to providing

20 aspect was to deter potential customers of rivals from

21 switching.

22      That is remarkably similar to what the government pleads

23 here.  That Apple allegedly doesn't do enough to support third

24 parties on its platform, therefore, deterring users from

25 switching.

1          And if we go to slide 8, the next page, you can see that

2     in *Trinko* those allegations failed because they only claimed

3     that Verizon had provided -- and this is a quote --

4     insufficient assistance to competitors.  The Court there said,

5     Verizon's alleged insufficient assistance in the provision of

6     service to rivals is not a recognized antitrust claim under

7     this Court's existing refusal to deal precedence.

8          But that is exactly what the government alleges here.

9     Apple allows third parties to do certain things on iPhone, but

10    it doesn't, in some instances, provide all of its APIs to those

11    third parties or guarantee complete parity with Apple products

12    and services.

13         That conduct, as we just saw from the quotes from

14    *Trinko*, is a lawful refusal to deal; and, therefore, cannot

15    satisfy the anticompetitive conduct element.

16         I want to look next at *LinkLine*, which is the next

17    Supreme Court decision in this chain; and we have that one on

18    the next slide, slide 9.

19         In *LinkLine*, the Court picked up on the same point

20    holding that, A firm with no antitrust duty to deal with its

21    rivals at all is under no obligation to provide those rivals

22    with a sufficient level of service.

23         Once again, the government alleges the same scenario

24    here.  Rivals in various parts of Apple's iPhone business have

25    access, but not in the government's view, a sufficient level of

1   service.  And in *LinkLine*, of course, the Supreme Court said as

2   clearly as it could be said, As a general rule, businesses are

3   free to choose the parties with whom they will deal, as well as

4   the prices, terms, and conditions of that dealing.

5          Now, there are numerous other Court of Appeals and

6   District Court decisions that come out the same way and we've

7   cited them in our brief; footnote 3.  But today I want to come

8   back to the DC Circuit's *Meta* decision, which was decided last

9   year, and we talked about that one earlier.

10         *Meta* applied these decision in a very similar context to

11  what we have here; and it affirmed 12(b)(6) dismissal on the

12  same ground, failure to satisfy the anticompetitive conduct

13  element of a Section 2 claim.

14         Now, the Court probably knows that *Meta* is now the

15  corporate parent name for Facebook, which was the social

16  networking service at issue in that case.  The plaintiff states

17  there it challenged Facebook's policies that restricted

18  developer access to Facebook APIs either by, first, prohibiting

19  apps hosted on Facebook that linked or integrated with

20  competing social network services from accessing Facebook APIs;

21  or, two, withholding access to Facebook APIs for any

22  third-party apps that tried to replicate Facebook's core

23  functionality.

24         On next slide, slide 10, we have the DC Circuit opinion

25  and the DC Circuit rejected plaintiff's claim, which is

1    essentially the same claim here.  There, the Court said that to

2    consider Facebook's policy as a violation of Section 2 would be

3    to suppose that a dominant firm must lend its facilities to its

4    potential competitors.  That theory of antitrust law runs into

5    problems under the Supreme Court's *Trinko* opinion.

6         The Court also said that the States basic allegation

7    that Facebook cut off competitors from access to Facebook's

8    immensely valuable network thus amounts to a claim based upon

9    the defendant's refusal to cooperate with its competitors.  And

10   for that reason the Court rejected it.

11        And, finally, I would note that at page 306 of the DC

12   Circuit opinion it specifically noted that the plaintiffs there

13   made the same allegation as the government here, that Facebook

14   used its policies on accessing the Facebook platform to, quote,

15   degrade the functionality and distribution of potential rivals'

16   content.  And the DC Circuit said that is just another way of

17   saying that Facebook refused to deal with its rival on the

18   rivals' preferred terms, which antitrust laws do not require.

19        All of these cases make clear why the government's

20   allegations fail at the pleading stage.

21        They only challenge Apple's unilateral decisions about

22   what access to grant third parties on a platform.

23        Now, I want to emphasize, your Honor, that this is not a

24   case where Apple is doing anything to block third parties in

25   their dealing with others.  That can give rise to liability in

certain cases, and those are the cases the government relies

on, but it is not what the government alleges in this

complaint.

    Here, the government does not allege that Apple is

telling third parties they can or can't do something when

dealing with Apple's competitors.

    For example, we'd refer the Court to paragraphs 9 and 54

of the first amended complaint where the government makes clear

that its allegations are about Apple's policies on iPhone.  The

government never alleges we are restricting or setting policies

for third parties off of iPhone in any respect.  And the case

law makes clear how important that distinction is and why it

requires dismissal.

    So on slide 11, the next one, we have a quote from

Justice Gorsuch, again, back when he was on the Tenth Circuit,

where he said on behalf of that Court Section 2 misconduct

usually involves some assay by the monopolist into the

marketplace.  In other words, reaching out and requiring other

people to do things with other third parties.  And it gives

examples.  He says, To limit the abilities of third parties to

deal with rivals; exclusive dealing.  To require third parties

to purchase a bundle of goods, rather than just the ones they

really want; tying.  Or to defraud regulators or consumers.

And if you are not doing that, it is not a Section 2 claim.

    In the *Meta* case, which we discussed on next slide, we

1    quote that, the Court said here the competitor integration

2    policy limits only how canvas apps on Facebook operate -- these

3    are third parties apps coming on to Facebook -- it limits only

4    how they operate on Facebook.  It leaves app developers

5    entirely free to develop applications for Facebook's

6    competitors.  The DC Circuit held that theory failed as a

7    matter of law, and it is the same situation we have here.

8         The cases the government cites to get around *Trinko*,

9    *LinkLine*, and *Meta*, they all involve defendants that prohibited

10   their customers from accessing a customers' -- a competitors'

11   product to service.  Nothing like that is addressed here or

12   alleged here.  And I want to give some examples.

13        For example, in the *Eastman Kodak* case that the

14   government cites, the defendant there would not sell

15   photocopier components to customers unless they agreed not to

16   have them serviced by someone other than Kodak.  Here,

17   developers are able to create apps for any other smartphone or

18   computer system.

19        In *Lorain Journal*, that is the one where the only

20   newspaper in town refused to sell advertising space to

21   customers who advertised with a competing local radio station.

22   Apple puts no restrictions on app developers who want to put

23   their apps on Android or any other smartphone, and the

24   government does not allege that we do.

25        And in *Chase Manufacturing*, that is the Tenth Circuit

1    case, the defendant refused to sell its insulation product to

2    customers who also bought insulation from a competing supplier.

3    Apple does nothing like that.

4         And finally, I want to address *Microsoft*, which the

5    government relies on extensively to argue that this case should

6    get past the pleading stage.

7         I want to pause on this one just to set the table on why

8    the government leans so heavily on *Microsoft*.

9         In that case, the DC Circuit applied a multi-step

10   framework that includes both burden shifting and balancing to

11   assess whether Microsoft's conduct violated Section 2 of the

12   Sherman Act.

13        In contrast, under *Trinko* and *LinkLine* and *Meta* and

14   *Novell*, a company's unilateral conduct about the level of

15   access it provides to third parties is protected as matter of

16   law and a defendant is not put to the burden of years of

17   litigation over balancing under *Microsoft*.

18        The Supreme Court support considers Apple's conduct to

19   be presumptively lawful and entitled to protection at the

20   pleading stage.

21        HON. JULIEN X. NEALS:  Counsel, I am sorry.  There is

22   apparently some IT issues that we were advised of by IT with

23   regard to the phone call.

24        We're just going to take a brief pause and restart the

25   call.  I think that will just take a couple of moments.

1          MR. PRIMIS:  Okay.  Thank you, your Honor.

2          (Recess taken 11:34 a.m. to 11:38 a.m.)

3          HON. JULIEN X. NEALS:  We will take just a ten-minute

4    recess and just make sure we take the time to get the IT

5    straight.

6          It is 11:38.  We will come back at 11:48.

7          THE COURTROOM DEPUTY:  All rise.

8          (Recess taken 11:38 a.m. to. 11:59 a.m.)

9          THE COURTROOM DEPUTY:  All rise.

10         HON. JULIEN X. NEALS:  Please be seated.

11         MR. PRIMIS:  Thank you, your Honor.

12         I want to return to the point I was making, which is

13   that the law draws a distinction between operating on one's own

14   platform or controlling one's own product and then reaching out

15   into the market to impose restrictions and rules on other third

16   parties that impacts competition.

17         So I talked about *Eastman Kodak*, which was the tying

18   case involving photocopier components; *Lorain Journal*, which is

19   the newspaper, which says you can't advertise with the

20   competing radio station; and *Chase Manufacturing*, which had

21   exclusive dealing on insulation products.  And -- and those are

22   the cases the government relies on to try and get around

23   *Trinko*, *LinkLine,* and *Meta*.  And then I had come to *Microsoft*.

24         And what I was saying about *Microsoft* and the reason why

25   it is important here is that it does set up this multi-step,

burden shifting, balancing framework.  That is where the

government wants to be, and that will result in years of

litigation over these decisions that Apple has made.

We're saying that *Trinko*, *LinkLine*, and *Novell*, which

address a company's unilateral decisions about how to -- how

much access to provide to third parties, is protected as matter

of law, and you don't need to go through years of balancing

under *Microsoft* and that those decisions are made at the

pleading stage.

So with that background, *Microsoft* is just not like this

case.  It couldn't be more different.

The government says it is analogous to Apple, and it is

just not.

First off, *Microsoft*, I think we should note, was

decided before *Trinko*.  So that Court didn't have the benefit

of the *Trinko* and *LinkLine* decisions.  *Microsoft* did not argue

that its conduct was protected by refusal to deal.  *Microsoft*

had 95 percent market share of the relevant worldwide market,

which far exceeds Apple's market share.

*Microsoft*'s coercive conduct was fundamentally different

from Apple's alleged conduct here.  *Microsoft* illegally

maintained its monopoly by imposing exclusive dealing

obligations on third parties to thwart specific competitors.

The government alleges nothing like that here.  There is

no allegation that Apple is placing comparable restrictions on

developers' ability to deal with Apple's smartphone rivals.

The government tries to say that some of the allegations at issue in *Microsoft* were restrictions on Microsoft's own platform and, therefore, sufficiently analogous to what we have here.

But the District Court specifically found, and the DC Circuit acknowledged in that case, that these steps were taken in furtherance of Microsoft's plan to impose exclusive dealing obligations on its customers that also wanted to offer products that competed with Microsoft's.

This is exactly how the Third Circuit has described *Microsoft* in the *Dentsply* case.

The Court there said that in *Microsoft* the Court of Appeals for the DC Circuit concluded that, through the use of exclusive contacts with key dealers, a manufacturer foreclosed competitors from a substantial percentage of the available opportunities for product distribution.  That's at a 399 F.3d 190.

And there's similar language in *LePage's*, another Third Circuit case cited in the briefs describing *Microsoft* the same way at 324 F.3d. 158 to 159.

There is no comparable claim of exclusive dealing in this case.  There is no targeting for destruction of a specific competitor.

This case is worlds apart from what was alleged in

1    *Microsoft* and is properly considered under *Trinko*, *LinkLine*,

2    *Meta*, *Novell*, and all of the other cases we have cited.  And

3    under those cases, the allegations in the government's

4    complaint amount to lawful refusals to deal which cannot

5    satisfy the conduct element of a Section 2 monopolization

6    claim.

7         And I would like to pause just for a second and explain

8    why this rule makes sense.

9         Starting from first principles, the antitrust law

10   believe -- law is believed that it is procompetitive to allow

11   companies to innovate and decide their level of interaction

12   with other third parties.  Here, Apple chooses to open up its

13   platform in certain ways.  And in doing so, it enhances the

14   platform for users and provides access to Apple's user base for

15   developers.  Those are all good things, and they are

16   procompetitive.

17        But in doing that, Apple has to balance all kinds of

18   considerations when it opens its platform.  Will it still work

19   well with all of this non-Apple software on the device?  Do we

20   have the resources to make our platform work with all of these

21   third parties?  Is there any user demand for a particular

22   feature that a third-party would like to put on the phone?  Are

23   there privacy risks?  Are there security risks?

24        The antitrust laws give Apple the freedom to make those

25   decisions.

1          As we went through the exclusive dealing cases, we know

2     that what Apple can't do is tell one of these developers or a

3     watchmaker that in order to work on Apple, they are prohibited

4     from working on Android.  But Apple doesn't do that, and it is

5     not alleged to do that.

6          *Trinko* says that Courts are not well-positioned to make

7     these decisions.  Courts are not central planners trying to

8     determine where Apple should apply its resources and how the

9     product is going to work if it opens up in a certain way.  And

10    just recently the District of Colombia District Court in the

11    *Google* decision applied these very principles relying on all of

12    these same cases to reject a very similar claim because the

13    Court was not in a position to determine when and how Google

14    should advance or promote Microsoft's competing product.

15         Now, your Honor, once the Court concludes that the

16    refusal to deal framework applies, the only remaining question

17    is whether the government's claims fit that single, narrow

18    circumstance where refusal to deal may be unlawful.

19         There is a narrow exception to the general protection,

20    to the baseline rule that we just discussed where refusal to

21    deal can satisfy the conduct element of a Sherman Act claim.

22         The government hasn't come close to alleging that here,

23    which means all of their claims fail to show exclusionary

24    conduct as matter of law.

25         So *Aspen Skiing* is a case I am talking about.  The

1  Supreme Court in *Trinko* warned that that *Aspen Skiing* decision

2  is at or near the outer boundary of Section 2 liability.

3        In *Aspen Skiing*, as described by *Trinko*, the Supreme

4  Court found antitrust liability where the defendant had first

5  unilaterally terminated a voluntary, pre-existing, and

6  profitable course of dealing and sacrificed short-term profits

7  to harm long-run competition.

8        The Third Circuit, Courts in this district, Courts in

9  the District of Columbia in the recent *Google* decision I just

10  mentioned and Courts across the country have indicated that

11  these are the bedrock requirements for an *Aspen Skiing* claim.

12  The Third Circuit in the *Host* decision said that a refusal to

13  deal violates Section 2 only if the parties have a history of

14  dealing paired with facts suggesting a willingness to forsake

15  short-term profits to achieve an anticompetitive end.

16        And earlier this year in the *Revlimid* antitrust

17  litigation, Judge Salas thoroughly examined the case law and

18  concluded that refusal to deal allegations cannot survive

19  without, quote, alleging the unilateral termination of a

20  voluntary, and thus, presumably profitable course of dealing

21  suggesting a willingness to forsake short-term profits to

22  achieve an anticompetitive end.  And Judge Mehta reached the

23  same conclusion in the *Google Search* case that I just

24  mentioned.

25        The government has not plausibly alleged that Apple

1  meets these requirements.  This complaint contains no

2  allegation that Apple terminated any existing course of

3  dealing, that Apple ceased dealing with any developer, or that

4  Apple withdrew access to any iPhone feature or API.  There is

5  no allegation that Apple previously allowed app developers to

6  offer any app on the terms the government now prefers but

7  reversed course.

8          And because there is no allegation that Apple ever

9  withdrew any pre-existing and profitable access it had provided

10  to developers, the government cannot possibly allege that as a

11  result of that termination, which didn't happen, Apple

12  sacrificed short-term profits to harm competition.

13          In its opposition, the government did not even attempt

14  to argue that it had pled these *Aspen Skiing* requirements.  The

15  government's theory is that to satisfy *Aspen Skiing*, it doesn't

16  need to satisfy those elements, elements that courts all around

17  the country have said are required.

18          The government's approach is an invitation to legal

19  error, and Judge Salas' thorough opinion in *Revlimid* explains

20  exactly why in rejecting the same argument.

21          We ask this Court to follow the Supreme Court and the

22  Third Circuit and apply the well-established *Aspen Skiing*

23  requirements.

24          Apple's alleged conduct is protected by the antitrust

25  laws as a unilateral refusal to deal, and so the government

1    once again has failed to satisfy the conduct element of the

2    Section 2 claim.

3            In conclusion on this part of the argument, your Honor,

4    I want to address the government's claim that we are seeking

5    some kind of immunity from the antitrust laws.  That is not

6    remotely close to the truth.  There are numerous well-defined

7    bases for Section 2 liability.  The Third Circuit recognized a

8    number of them in the *West Penn Allegheny Health System* case at

9    627 F.3d 109.  Conspiracy to exclude a rival, hiring a rival's

10   employees not to use them, but to deny them to the rival, a

11   hospital coercing providers not to refer patients to a rival,

12   making false statements about a rival to potential investors

13   and customers.  That's the Third Circuit outlining areas, ways

14   in which a company can afoul of Section 2.  None are alleged

15   here.

16           In *Novell* then Judge Gorsuch recognized at Section 2,

17   imposes liability where a defendant, as we discussed, has

18   reached out into the marketplace to do one of a few things.

19   Exclusive dealing, limit ing the ability of third parties to

20   deal with rivals.  It doesn't exist here.  Tie-in.  Requiring

21   third parties to purchase a bundle of goods rather than the

22   ones they really want.  Not alleged here.  Defrauding

23   regulators or consumers.  Not alleged here.

24           Unlike unilateral refusals to deal, these types of

25   actions may satisfy the anticompetitive conduct element.  The

1   problem with the government is they haven't alleged any of

2   these things.  Instead this case lines up squarely with *Trinko,*

3   *LinkLine*, and *Meta*, all dismissed at the pleadings and all of

4   the other decisions that I have covered.

5       This body of case law overwhelmingly supports dismissal,

6   and the government's cases apply to a situation not alleged

7   here.

8       These cases show that the government's allegations

9   amount to nothing more than Apple's lawful decisions about the

10  parties with whom they deal and the terms and conditions of

11  that dealing, all legitimate refusals to deal.

12      These cases also show that unilateral refusals to deal

13  are lawful and do not satisfy the conduct element.  That is why

14  we ask that the Court dismiss all counts for failure to plead

15  anticompetitive conduct, a core element of every count in this

16  complaint.

17      If I may, your Honor, I will turn the podium over to my

18  colleague, my partner, Devora Allon, who will cover the other

19  grounds for dismissal.

20      HON. JULIEN X. NEALS:  Thank you.

21      MS. ALLON:  Good afternoon, your Honors, Devora Allon,

22  from Kirkland & Ellis, for Apple.

23      I would like to pick up right where Mr. Primis left off.

24  Even under the *Microsoft* balancing framework that the

25  government endorses, the government still fails to plead the

1    required elements for Section 2 claim.

2    In *Microsoft*, the Court was clear.  We've quoted this

3    language on slide 15, that to be condemned as exclusionary, a

4    monopolist act must have an anticompetitive effect in the

5    relevant market.  The Court went on to say no less than the

6    case brought by the government, it must demonstrate that the

7    monopolist's conduct harmed competition.

8    The Third Circuit echoed that requirement in the

9    *Dentsply* decision.  And without it, the government can't meet

10   its burden to show the second element of a Section 2 claim, the

11   willful acquisition or maintenance of monopoly power.

12   Here, the only alleged markets are the smartphone and

13   performance smartphone markets, that means the government must

14   plausibly allege anticompetitive effects in those markets.

15   Now, the parties disagree on what exactly the standard is for

16   anticompetitive effects and what the government has to plead

17   now to meet that standard.

18   I am going to address that dispute in a minute, but it

19   doesn't really matter because the government's allegations are

20   insufficient no matter what standard applies.

21   The fundamental problem with the government's

22   allegations is that they don't include facts that link the

23   challenged conduct to the harms to smartphone competition that

24   the complaint alleges.

25   Instead -- and I illustrated this on slide 16 -- the

1  government relies on a series of inferential leaps that lack

2  any factual support.

3       So what the government does is it pleads some challenge

4  conduct.  That is in the blue box at the top left.  And then it

5  pleads some harm to smartphone users.  That's in the blue box

6  on the lower right.  Fewer choices.  Higher prices.  Reduced

7  quality.  But there are no facts in the government's complaint

8  that link Apple's challenge guidelines for super apps or

9  cloud-streaming games or Apple's decisions about third-party

10 API access for messaging apps, smartwatches, or digital wallets

11 to these kinds of harm to smartphone competition.

12      Instead, the government's theory of harm really boils

13 down to speculation about what third-party developers would do

14 if Apple made different design choices and then more

15 speculation about what consumers would do and whether they

16 would switch from iPhone to other phones as a result of those

17 new features.

18      So let me just take cloud-streaming games as an example.

19      The government's theory in its complaint is that if

20 Apple didn't require developers to submit cloud-streaming games

21 for review as a stand-alone app, consumers would buy or switch

22 to smartphones other than iPhone.  Now, that allegation of

23 anticompetitive effects requires multiple implausible

24 inferential leaps.  First, you have to conclude that without

25 Apple's guidelines for individual review of games and

1    individual App Store pages for games, developers would actually

2    offer cloud-streaming games in a single app.  And you have to

3    conclude that despite the lack of allegations in the complaint

4    that anybody besides Microsoft ever actually complained to

5    Apple about that requirement and despite the lack of any

6    allegation that cloud-streaming games have become more

7    prevalent despite the complaint conceding in paragraph 77 that

8    Apple has stopped enforcing these requirements.

9         Second, you have to conclude that developers would make

10   their cloud-streaming games available across platforms, so at

11   least on both iPhone and Android.

12        Third, you have to conclude that those cross-platform

13   streaming games would become popular with a critical mass of

14   consumers.

15        Fourth, you have to conclude that app-related switching

16   costs are meaningful such that consumers' adoption of a

17   cross-platform streaming game surface could facilitate

18   switching.

19        And, fifth, you have to conclude that the availability

20   of cloud-streaming apps in both iPhone and Android would be so

21   valuable and so important to consumers that it would spur a

22   critical mass of them to choose cheaper, less-advanced Android

23   phones over iPhone.

24        The government does not allege any facts supporting that

25   chain of events.

1          And the same is true of the other pillars where, again,

2     the government doesn't link the alleged conduct.  Apple's

3     guidelines for super apps, Apple's decision not to offer SMS

4     capability to third-party messaging apps, Apple's design of its

5     payment infrastructure, and access iPhone's NCF radio,

6     et cetera, to consumer's smartphone purchasing behavior, which

7     is the government's alleged harm in the smartphone markets.

8          There is a particularly instructive decision from the

9     Federal Circuit, *Princo v. ITC.*  Now, that decision involved

10    the patent misuse doctrine, which obviously is a defense to

11    patent infringement.  But in that defense, the infringer argues

12    that the patent owner has impermissibly broadened the physical

13    or temporal scope of a patent and has done so in a manner that

14    has anticompetitive effects.  And so anticompetitive effects

15    are an element of that defense, just like in a Section 2 case.

16         Now, the *Princo* case concerned two different types of

17    patented technology for CDs.  One was called Orange Book and

18    one was called Lagadec.  Princo had licensed the Orange Book

19    technology.  It stopped paying licensing fees.  And it faced a

20    patent infringement lawsuit.  And in defense, it asserted a

21    patent misuse defense.  And it said the license holder had

22    impermissibly tied essential and nonessential patents in its

23    license agreement, and that had prevented the less popular

24    Lagadec technology from competing effectively.  And the Federal

25    Circuit rejected that theory of anticompetitive effects.  We

1    put the language at slide 17.

2          The Court first noted citing *Microsoft*, that suppression

3    of nascent threats can be construed as anticompetitive behavior

4    under certain circumstances, but that the plaintiff still had

5    the burden to show that the hypothesized agreement, that was

6    the challenged conduct in that case, had an actual adverse

7    effect on competition in the relevant market.

8          And the Court then said it wasn't enough that there was

9    some speculative possibility that that other technology could

10   have overcome the barriers to technical feasibility and

11   commercial success and become the basis for competing disc

12   technology and Princo's failure to show otherwise, quote,

13   wholly undermined, end quote, its contention that the agreement

14   had anticompetitive effects.

15         Now, this is a pleading stage problem.  Courts in this

16   district have dismissed cases where the complaint does not

17   plausibly plead how the challenged conduct affected competition

18   in the allegedly monopolized market.  So for example, in the

19   *IDT* case, the theory was that commercial landlords'

20   restrictions on telecom companies' access to their buildings

21   was harming competition in the market for telecom services.

22         Judge Greenaway dismissed the plaintiff's claims because

23   they had, quote, not alleged any facts to permit the Court to

24   find that a restraint in the market for building access has

25   resulted in a restraint in the product market for

1    telecommunication services.  And that's this case, too.

2         The government doesn't have any facts showing that

3    Apple's conduct, with respect to apps or digital wallets or

4    smartwatches, has actually produced the alleged harms in the

5    smartphone market.

6         And then in the *Miller Industries* case just last year,

7    Judge Hillman confronted a series of allegations about alleged

8    harm to competition in the market for rotating wreckers, which

9    is tow trucks, essentially.  And he concluded on a motion to

10   dismiss that the counterclaim plaintiff had not plausibly

11   alleged that the alleged anticompetitive conduct has effected

12   the price of rotating wreckers, restricted the output of the

13   product, or impacted the quality of the product or the

14   servicing of consumer needs.  Again, the same is true here.

15        The government's conclusory references to higher prices,

16   fewer choices, and reduced quality are not enough to show that

17   Apple's challenged conduct has actually affected any smartphone

18   prices, reduced any smartphone output, or decreased the quality

19   of any phones.

20        Now, I do want to briefly return to what the legal

21   standard is for showing anticompetitive effects.

22        The Supreme Court has been quite clear, this is

23   slide 20, that the burden is on the government to show, quote,

24   substantial anticompetitive effects in the relevant market.

25   That is the *NCAA* decision at page 96.

1    The government says it just has to allege conduct that
2  reasonably appears to be a significant contribution to
3  maintaining monopoly power.

4    Now, that language comes from the *Microsoft* decision,
5  but it comes from the portion of the *Microsoft* decision that's
6  talking about Section 2's causation requirement, and that's not
7  what we are talking about here.

8    Our argument is not about whether our conduct has caused
9  us to maintain a smartphone monopoly.  We are still at the
10  conduct element.  And we are looking at the portion of
11  *Microsoft* that comes 20 pages earlier in the decision, it is on
12  slide 21, where the Court said, To be condemned as
13  exclusionary, a monopolist act must have an anticompetitive
14  effect, which applies, no less, in a case brought by the
15  government.

16    And, again, the Third Circuit echoed that requirement in
17  *Dentsply* at page 187, where it said, The exclusionary conduct
18  must have an anticompetitive effect.  So there is no support
19  for the government's lower standard.

20    But, again, it doesn't matter what the test is for
21  effects.  The government's claims fail because without a
22  factual link between the conduct that's challenged and
23  smartphone purchasing behavior, the government hasn't plausibly
24  alleged either actual adverse effects or that Apple's conduct
25  significantly contributed to its maintenance of any smartphone

1    monopoly.

2         The government also argues that the Court has to assess

3    the effects from each challenge aspect of Apple's conduct

4    cumulatively.

5         Now, under the Third Circuit's *un banc* decision in

6    *LePage's*, which the government actually doesn't even cite on

7    this point, it is clear that Courts aggregate the effects of

8    conduct only after concluding that the conduct is exclusionary,

9    which means that if the Court concludes that Apple's conduct is

10   protected as a matter of law under refusal to deal principles,

11   that conduct is not properly aggregated to consider effects and

12   that is entirely consistent with the Fourth Circuit's

13   nonbinding decision that the government relies on in *Duke*

14   *Energy* where the Court explained that zero plus zero still

15   equals zero.

16        But even if the Court does consider the effects

17   cumulatively, it doesn't fix the government's pleading failure.

18        Ultimately, the government's theory is that if not for

19   Apple's conduct with respect to five discreet product design

20   decisions, some cross-platform technologies might exist or

21   might be better.

22        Whether you take that separately or together, that

23   theory depends on speculation about what third-party developers

24   would do and then more speculation about how smartphone

25   consumers would respond to that behavior.

1    And there are no well-pleaded facts from which the Court

2    can actually infer that third parties or consumers would act

3    like the government hypothesizes.  And as a result, the

4    government has failed to plead anticompetitive effects from

5    Apple's conduct in a smartphone market, which is an independent

6    basis for dismissal of the complaint in its entirety.

7    There is another case dispositive flaw with the

8    government's complaint.  And it is that the government has not

9    plausibly alleged that Apple has monopoly power in either the

10    U.S. smartphone or the performance smartphone markets.

11    So one way, of course, to establish monopoly power is by

12    direct evidence.  The Third Circuit has said in the *Mylan*

13    decision, you need super competitive prices and restricted

14    output, and it's extremely rare.

15    And here, at page 18 of their opposition, the government

16    has disclaimed any argument that Apple charges super

17    competitive prices.  I put that quote on slide 18.

18    Now, that precludes a direct evidence case at a minimum.

19    The government says its allegations that Apple's conduct could

20    only be rational if it knew it had monopoly power and that

21    Apple has higher profit margins than its rivals are enough to

22    plead direct evidence.

23    No Court has ever endorsed that theory.

24    The government relies on *Dentsply* and *Microsoft*, but

25    both of those cases required additional evidence of monopoly

power that are not alleged here.  In *Dentsply*, the Court found that the defendant's profit margins had been growing over the years; that's at page 191 of the decision.  The government doesn't allege that here.

*Dentsply* and *Microsoft* both considered evidence that the defendants could set their prices without considering rivals' prices, which the government, again, does not allege here.

And so, none of the government's cases support the suggestion that this Court can disregard the Third Circuit's clear holding in the *Mylan* decision that super competitive prices are necessary to allege direct evidence of monopoly power.

So I think at a minimum the direct evidence theory has to go.

The government has also not plausibly alleged indirect evidence of Apple's monopoly power, which is generally based on a combination of market share and barriers to entry.

So the government alleges Apple has a market share of 65 percent when you look at all smartphones or 7 percent when you look at performance smartphone.  Now, those numbers rest on quite dubious calculations.  They limit the market to the U.S., when we know that smartphone competition is global.  They calculate share based on revenue, rather than units.  But we except those numbers as pled for the purposes of the motion to dismiss.  And even taking the higher, the 70 percent number,

 1    that is insufficient to plead monopoly power in these

 2    circumstances.

 3         The Supreme Court has never found monopoly power less

 4    than 75 percent market share.  We are not saying that a lower

 5    market share forecloses a finding of monopoly power, but as the

 6    Fourth Circuit said it does weigh heavily against such a

 7    finding.

 8         In order for a smaller market share to be sufficient,

 9    the government would have to allege additional factors

10    indicating monopoly power that aren't present here.  And the

11    Third Circuit has told us in *Dentsply* and in *FTC v. AbbVie* what

12    those other factors are.  Things like the size and strength of

13    competing firms, freedom of entry, pricing trends and practices

14    of the industry, ability of consumers to substitute comparable

15    goods and consumer demand.

16         Now, in *Dentsply*, the defendant had a persistently high

17    market share, between 75 percent and 80 percent, and it had

18    endured for over ten years.  In *AbbVie*, the defendant had a

19    market share that ranged from over 60 percent to 71 percent

20    where no other competitor had even 10 percent of the market.

21    Those other factors that supported a finding of monopoly power

22    in *Dentsply* and *AbbVie* are not alleged to be present here.  And

23    they would be implausible had they been alleged given the

24    complaint's own allegations at paragraphs 155 and 186 about the

25    strength of Apple's major competitors, like Samsung and Google.

1    As you can see on slide 27, a finding of monopoly power

2  at the government's alleged market share, without more, without

3  any of those other factors, would quite literally be

4  unprecedented.

5    The government's lead case, *Microsoft*, involved 95

6  percent of a global market.

7    *Dentsply*, like I said, had a market share of 75 to 80

8  percent.

9    And *AbbVie* found over 60 to 71 percent sufficient only

10  because there was no other competitor who even got to 10

11  percent.

12    The government's own allegations in this case about the

13  presence of major competitors, like Samsung and Google, make

14  their allegations of monopoly power even less plausible.

15    The Third Circuit has recognized in the *Columbia Metal*

16  *Culvert* decision at page 27 that the presence of powerful

17  competitors is compelling evidence of countervailing power,

18  which would preclude monopolization.

19    And going to the second part of the indirect theory of

20  monopoly power, the government has not plausibly alleged that

21  Samsung or Google can't expand their own offerings to compete

22  with Apple.

23    They focus on barriers to new entrance and smaller

24  rivals, but Samsung and Google's ability to innovate and

25  increase their own smartphone output prevent Apple from setting

```
 1  super competitive prices or restricting smartphone sales; and
 2  that makes the government's conclusory allegations about
 3  barriers to entry more implausible.
 4      And so for those reasons, the government has failed to
 5  plausibly plead monopoly power, whether by direct or indirect
 6  evidence, which also requires dismissal of their complaint in
 7  its entirety.
 8      Now, the plaintiff States and their claims should be
 9  dismissed for the independent reason that they don't have
10  Article III standing, either in their direct sovereign capacity
11  or in their parens patriae capacities.
12      In order to have standing in their sovereign capacities,
13  the States must allege, quote, a tangible interference with
14  their authority to regulate or enforce its laws.  That comes
15  from the Harrison decision from the Fifth Circuit just last
16  year.
17      And Harrison made clear that enforcement of antitrust
18  laws is not itself a tangible interference with a State's
19  ability to enforce its laws sufficient to justify standing.
20  There, the Fifth Circuit clearly held -- this is at page 770 --
21  that a State's interest in enforcing state and federal laws was
22  not itself sufficient to confer standing as long as the State
23  was not, quote, hindered from enforcing its laws directly.
24      The Court went on to say that sovereign injuries
25  conventionally arise when a State has enacted a law, enforced
```

1    against a resident; and the resident has refused to comply.

2    Then and only then, the Court said, it would seem, does a

3    sovereign sustain a cognizable injury at least when it comes to

4    enforceable public rights, but, the Court went on to say,

5    someone violating a law does not by itself injure the

6    government in an Article III way.  Only actual or threatened

7    interference with its authority does.

8         This case is not a situation like the one contemplated

9    by the Fifth Circuit.  There is no allegation that Apple is

10   interfering in any way with the State's abilities to enforce

11   their own laws or refusing to comply with an enforcement order.

12   So the States don't have standing to sue in their sovereign

13   capacity.

14        They also don't have standing to sue under the doctrine

15   of parens patriae, which the Supreme Court made clear in a snap

16   decision, does not involve the States stepping in to represent

17   to interests of particular citizens, who for whatever reason

18   can't represent themselves.

19        The Supreme Court made clear -- this is slide 33, it is

20   page 607 of the decision -- that for the States to have a

21   quasi-sovereign interest sufficient to justify parens patriae

22   standing, they must allege some harm to the State itself that

23   is separate from the interest of particular private parties.

24        But the relevant paragraphs of the complaint here, which

25   are 192 and 193, only say vaguely that the States are bringing

1    claims to, quote, protect the economic wellbeing of their

2    States and residence.  The States' allegations of inflated

3    smartphone prices are entirely derivative of the States'

4    residents' own claims.

5         If the Court want any further confirmation that the

6    Court -- the States are just trying to enforce private economic

7    interests, the Court doesn't have to look any further than the

8    many class actions advancing the same claims that are already

9    pending in this Court.

10        That is exactly the situation the Supreme Court was

11   describing when it went on to say that, quote, if nothing more

12   is involved; i.e., if the state is only a nominal party without

13   a real interest of its own, then it will not have standing

14   under the parens patriae doctrine.

15        So because the plaintiff States lack standing in their

16   sovereign and quasi-sovereign capacities, that provides an

17   independent basis for dismissal of the plaintiffs and their

18   corresponding State claims.

19        One final thing I would like to address.

20        We, obviously, believe that this case should be

21   dismissed in its entirety, but if the Court is inclined to let

22   it proceed at all, the allegations in paragraphs 119 to 125 and

23   136 to 140 should be dismissed for failure to satisfy Rule 8.

24   And to illustrate why I think it is helpful to start with what

25   the government actually alleges is Apple's anticompetitive

1    conduct.

2          So from paragraphs 52 to 118, the complaint alleges that

3    Apple has taken unlawful conduct in five areas:  Super apps,

4    streaming games, messages, smartwatches, and digital wallets.

5    Those five areas are clearly the focus of the government's

6    complaint.

7          Now, those conduct allegations fail to state a claim for

8    the many reasons we've talked about, but they do contain the

9    factual support that Rule 8 requires.  They walk through the

10   particular technology, product, or service that the government

11   is challenging.

12         They describe the purported restriction or conduct that

13   Apple engaged in that the government believes harmed

14   competition.

15         So let's just take super apps as an example.  At

16   paragraph 61, the government defines and describes what a super

17   app is.  At paragraph 62 the government describes the purported

18   harm to users if super apps are restricted.  At paragraph 63

19   and 64, the government explains how increased prevalence of

20   super apps would reduce reliance on iPhone.  And then at

21   paragraph 67 to 70 the government describes the restrictions

22   that it thinks Apple put on super apps requiring apps to

23   display mini programs using the flat text-only list, banning

24   the display of certain icons or tiles and blocking mini

25   programs from accessing certain APIs.

1          Now, those allegations -- again, they are flawed for

2    other reasons, but they do give Apple fair notice of what the

3    government's claim is and the grounds upon which it rests.

4          But then the government says those allegations are just

5    five examples of a much broader monopoly playbook.  And so they

6    want to pull into this case numerous other aspects of Apple's

7    business that stretch far beyond those areas.  And that is

8    where the conclusory allegations in 119 to 125 and 136 to 140

9    come in.

10          So let me start with 119 to 125.

11          As you can see, on slide 35, those paragraphs contain

12    references to over a dozen other products and services where

13    the government says Apple used a similar playbook to build and

14    maintain its smartphone monopoly.

15          But the government does not have any factual support for

16    what Apple did or how it harmed smartphone competition.

17          So what I have done on slide 36 is for each playbook

18    allegation, I listed just some of what is missing.  I will just

19    highlight a few examples.

20          The government alleges Apple underlined third-party

21    location trackable devices that fully function across

22    platforms.  There is no explain in the complaint of how Apple

23    purportedly undermined those devices or any alleged harm that

24    conduct caused.

25          The government alleges that protocols Apple placed

around new eSIM technology may introduce additional friction

for any user who wants to transition from an iPhone to a

different phone while keeping the same phone number.  The

complaint doesn't identify what the problematic protocols are.

It doesn't explain how they might introduce additional friction

or even what that friction is.

Last example, the complaint says Apple uses restrictions

in sales channels to impede the sale and distribution of rival

smartphones, but the government doesn't explain what are the

sales channels that Apple purportedly restricts or how Apple

restricts them, let alone how any of that conduct affected

smartphone competition.

Then we get to 136 to 140.  Those have allegations about

conduct Apple could take in the future, that if possible, are

even more threadbare than the playbook allegations I just

walked through.  It is at slide 37.

At paragraph 137 of this complaint, the government says

Apple has countless products and services, AirPods, iPads,

Music, Apple TV, Photos, Maps, iTunes, CarPlay, AirDrop, Apple

Card and Cash, which, quote, provide future avenues for Apple

to engage in anticompetitive conduct and the ability to

circumvent remedies.

There are no facts in the government's complaint about

what Apple is allegedly doing or might do or how that

unspecified conduct might affect competition.

1            As just one example, I think the government's overreach

2    here is particularly stark where it alleges in paragraph 138

3    that Apple's conduct, quote, affects the flow of speech.  The

4    government says with no factual support that Apple is

5    exercising its role as a TV and movie producer to, quote,

6    control content.

7            There are no facts in the complaint, no allegations of

8    what Apple is doing or how it might affect smartphone

9    competition.  Rule 8 requires more than that.

10           Rule 8 requires a pleading include a short and plain

11   statement of the claim showing that the pleader is entitled to

12   relief, and as the Supreme Court made clear in *Twombly* -- we

13   put this language on 39 -- the purpose of that requirement is

14   to give Apple fair notice of what the claim is and the grounds

15   upon which the rests.

16           Under *Twombly,* the government's obligation to provide

17   the grounds of its entitlement to relief requires more than

18   labels and conclusions.  It requires factual allegations that

19   are enough to raise a right to relief above the speculative

20   level.

21           The allegations in paragraph 119 to 125 and 136 to 140

22   fail under a straightforward application of that standard.

23           The government's only defense to this argument is to say

24   that Rule 12(b)(6) only provides for dismissal of claim and not

25   allegations.  And so this Court can't dismiss just those

1    allegations even if it wanted to.

2         Well, that position has been rejected by this Court

3    multiple times.

4         As we showed on slide 40 in *Stepan v. Pfizer*, your Honor

5    explicitly rejected the plaintiff's argument that Rule 12(b)(6)

6    doesn't allow for an entry of a piecemeal order that dismisses

7    portions of claims.  And your Honor went on in that case to

8    limit the surviving claims to the well-pleaded allegations in

9    the complaint.

10        In the *loanDepot.com* case, slide 41, Judge McNulty

11   reached the same conclusion there actually in the context of

12   Rule 8.

13        So like the government here, the plaintiff in

14   *loanDepot.com* argued that the Court could, quote, only dismiss

15   a count not individual allegations within a count.  And that as

16   long as a count includes one or more legitimate claims, it must

17   be upheld as a whole set, and its allegations should not be

18   split off and analyzed separately.

19        Judge McNulty rejected what he called the "all or

20   nothing approach."  He explained that Courts in this circuit

21   have routinely dismissed subtheories contained within a claim

22   while allowing other subtheories to survive.  That is at page

23   235 of that decision.  He made clear that he, quote, did not

24   agree that bundling of good and bad claims should shield

25   inadequate allegations from scrutiny and permit them to go

1   forward despite the pleading standards of Rule 8.  And he said,

2   in the appropriate case, I will exercise my discretion to

3   dismiss severable components of a single count.  And he went on

4   in that case to dismiss portions of claims that relied on

5   allegations that lacked the factual specificity and

6   plausibility required to survive a motion to dismiss.

7           The government is trying to transform this case into

8   something that it didn't plead, which is a far-reaching suit

9   about the entirety of Apple's business.

10          The government had four and a half years to investigate

11  its case.  And after all of that time, it has come up with no

12  facts supporting its playbook and future conduct allegations.

13          In addition to violating Rule 8, allowing these

14  deficient allegations to remain in the case will have

15  significant consequences for discovery.  It will permit the

16  government to seek discovery from Apple and hundreds of third

17  parties about dozens of products and services with no

18  understanding of how they are relevant to the claims at issue

19  in this case.

20          *Twombly* makes clear this Court can and should prevent

21  that far-reaching and unnecessary discovery.  That is why the

22  Supreme Court said there at page 558, a District Court must

23  retain the power to insist upon some specificity and pleading

24  before allowing a potentially massive factual controversy to

25  proceed.

*United States District Court*
*District of New Jersey*

1        And that's exactly what we are asking the Court to do

2   here.

3        In conclusion, the government's case is foreclosed on

4   multiple grounds by long-standing antitrust law and by basic

5   pleading principles.

6        So, first, we would ask that the Court conclude that the

7   refusal to deal framework articulated in cases like *Trinko*,

8   *LinkLine*, *Novell*, and *Meta* applies here and dismiss the

9   government's complaint in its entirety because the government

10  has not pleaded the requirements of the sole exception to the

11  rule that a company is not required to deal; and, therefore,

12  has failed to allege the exclusionary conduct element of a

13  Section 2 claim.

14       Alternatively, if the Court concludes the rule of reason

15  balancing test applies instead of refusal to deal, we ask that

16  the Court find that the government still has not plausibly

17  alleged the exclusionary conduct element because it has failed

18  to plead facts that link the challenge conduct to the alleged

19  harm in the smartphone market and, therefore, has failed to

20  adequately allege actual anticompetitive effects.  That

21  failure, too, requires dismissal of the government's case in

22  its entirety.

23       If the Court disagrees with us on both of those

24  questions, we ask the Court find that the government has failed

25  to plausibly allege that Apple has monopoly power, whether by

1  direct or indirect evidence.

2      As a result, the government has failed to plausibly

3  allege that the monopoly power element of a Section 2 claim has

4  been met, which also requires dismissal of its entire

5  complaint.

6      If the Court allows any portion of the government's case

7  to continue, we have two independent arguments that would

8  require dismissal of portions of the complaint.

9      First, we would ask that the Court conclude that the

10  plaintiff states lack Article III standing to pursue their

11  claims, which would require dismissal of the States as

12  plaintiffs and the dismissal of the asserted state law claims.

13     Second, we would urge the Court to dismiss the cursory

14  allegations in paragraphs 119 to 125 and 136 to 140 for failure

15  to meet the basic pleading requirements of <u>Rule</u> 8 and *Twombly*.

16     Thank you, your Honor.

17       HON. JULIEN X. NEALS:  Thank you, counsel.

18       MR. LASKEN:  Would you like us to proceed right away,

19  your Honor; or should we take a break?

20       HON. JULIEN X. NEALS:  Did you want a few moments?

21       MR. LASKEN:  That would be wonderful if it is

22  convenient for the Court.

23       HON. JULIEN X. NEALS:  That's fine.

24     With regard to the length of your argument, what do you

25  anticipate?

1        I am just trying to think if we take a break; and then

2   come and go straight through?

3            MR. LASKEN:  Yes, your Honor.

4        I am to guess about an hour.  There was a lot covered

5   there.

6            HON. JULIEN X. NEALS:  What is the parties' desire?

7   Would we like to take more of a substantial break or just push

8   through?  The Court is fine either way.

9            MR. PRIMIS:  We are amenable to a short break, and

10  then come and make a final push to get through.

11           HON. JULIEN X. NEALS:  Great.  It is 12:48.  We will

12  reconvene at 1 o'clock.

13           MR. PRIMIS:  Thank you.

14           MR. LASKEN:  Great.  Thank you, your Honor.

15           THE COURTROOM DEPUTY:  All rise.

16           (Recess taken 12:48 p.m. to 1:06 p.m.)

17           THE COURTROOM DEPUTY:  All rise.

18           MR. LASKEN:  Good afternoon, Judge Neals.  May it

19  please the Court.

20       Jonathan Lasken, counsel for the United States.

21       Your Honor, Apple is litigating against a ghost

22  complaint based on rules of law that don't exist.

23       The number of cases that we're going to talk about, and

24  I will get to all of them, that say what I view as something

25  different than how Apple reads them is quite large.  And we

1    will get there, and we will talk about all of them.

2        But for now, the important point is that I want you to

3    know what Apple can do under antitrust law and what it can't

4    do.

5        Apple can compete on the merits, that is what it has the

6    right to do.

7        What Apple can't do is use monopoly power to stop others

8    from competing on the merits.  Apple can't stop other companies

9    from having good products.  And it can't stop consumers from

10   choosing them if they want to all to protect a lucrative

11   smartphone monopoly.  Apple can't selectively enforce

12   contractual restrictions against developers like App Review

13   rules or APIs to hobble their products.  And as we allege, the

14   purpose of that hobbling is to stop anything that might

15   threaten Apple's smartphone monopoly.

16       The complaint sets that forth in substantial detail.

17   You know, there was a reference to a four-and-a-half year

18   investigation.  Right?  Substantial detail that is well

19   supported by facts from that investigation and often directly

20   quoted from Apple.  It is a straightforward Section 2 violation

21   that should easily survive a motion to dismiss.

22       Now, understanding that the complaint is drafted as

23   strong, and it pleads a claim, Apple sets up a number of straw

24   men knock down.

25       First, Apple tried to redraft our complaint to suggest

```
 1   we are challenging product designs or force them to make

 2   products for android.  They didn't specifically raise that

 3   today, but we're going to talk about that because that is all

 4   over their briefing, and it is very important.  Part of the

 5   reason it is important is because product designs under Mylan

 6   are not assessed as refusals to deal.  So even Apple's own

 7   argument as to how you should look at the conduct under binding

 8   Third Circuit precedent places it outside of that claim.

 9        Apple tries to redraft our complaint to suggest we are

10   pursuing a refusal to deal with rival smartphone claim.  I just

11   mentioned that to you, we are not pursuing that claim.

12        Nor is this case about Apple's proprietary technology.

13   That argument is like saying someone who makes a TV gets to

14   tell producers what to put in TV shows just because it shows up

15   on a TV screen.  None of those things are part of the complaint

16   we filed.

17        Here is how Apple's conduct gets examined, your Honor.

18   Apple's conduct has to be examined in context.  As with

19   anything, actions that are not per se illegal become illegal if

20   you do them for an illegal purpose.

21        Look, anyone can buy a baseball bat.  That is what

22   Microsoft talks about.  You can use it to play baseball.  You

23   can use it to break a pinata if you want to.  But if you use it

24   to break your neighbor's window, it becomes illegal.  If you

25   use it to hurt someone, it becomes illegal.  The same is true
```

1    here.

2        Apple is advancing broad claims that it can do anything

3    it wants with an API.  It can have any rule it wants.  That's

4    not how antitrust law works.  And it is not true if you use

5    those things to harm competition.

6        So APIs aren't the problem.  It is Apple's selective use

7    of them to degrade products and block innovation is the

8    problem.

9        And the question whether that's happening, whether Apple

10   is using APIs for that purpose, that is a fact question for

11   this Court to decide based on evidence after discovery.

12       Now, Apple's argument also rises and falls on a

13   misreading of *Colgate*.  So I want to go there.

14       I want to start at -- I didn't bring a slide deck,

15   your Honor, but we can use theirs.  So let's go to page 4 of

16   their slide deck.

17       Now, their the first quote -- their first quote, which

18   comes from *Trinko*, that is a quote from *Colgate*, but it is only

19   part of the quote.  So let's talk about *Colgate*.

20       So here is the first thing I want you to know about

21   *Colgate*.  *Colgate* is not a refusal to deal with rivals case, it

22   is outside of that doctrine.  It is about something called

23   resale price maintenance.  And what that is is when a

24   manufacturer essentially forces its distributors to charge a

25   certain price for their products; sometimes in antitrust law,

1  we call that vertical price fixing.

2       So it is about dealing with distributors, that is kind

3  of like Apple's relationship with developers.

4       Now, more importantly, Apple flipped the meaning of

5  *Colgate* on its head by omitting a key part of that quote.  Read

6  in full, *Colgate* says dealing with third parties to create or

7  maintain a monopoly, that is illegal.  There is reason Apple

8  had to change the word "rivals" in all of the cases it is

9  relying on to "third parties" to get to where it needed to go.

10       Here is what it says, quote, in the absence of any

11  purpose to create or maintain a monopoly.  That is what Apple

12  left out.

13       Let me read that again.  In the absence of any purpose

14  to create or maintain a monopoly, the act does not restrict the

15  long-recognized right of the trader or manufacturer engaged in

16  an entirely private business freely to exercise his own

17  independent discretion as the parties with whom he will deal.

18  That is what we pleaded.

19       Apple placed restrictions on developers and users to

20  maintain and create a smartphone monopoly.

21       Under *Colgate*, the very thing Apple admits it did, the

22  very thing Apple tells you is legal is illegal.  It is not

23  protected conduct, and it has been illegal in this country

24  since at least 1919.

25       Now, *Colgate* is clear on its face, but *Lorain Journal*

1   confirms that point.

2        *Lorain Journal* was a case like this one where monopolist

3   tried to claim an unfettered right to deal, just like in

4   *Colgate*.  That claim was rejected in *Lorain Journal*.

5        This is what the Supreme Court said.  Quote, the word

6   "right" is one of the more deceptive of pitfalls.  It is so

7   easy to slip from a qualified meaning under the premise to an

8   unqualified one in the conclusion.

9        That is where Apple is right now, unqualified right to

10  deal.

11       Most rights are qualified.  The right claim by the

12  publisher and the right claim by Apple today is neither

13  absolute nor exempt from regulation.  It's exercise as a

14  purposeful means of monopolizing interstate commerce is

15  prohibited by the Sherman Act.  That is at page 155 of the

16  opinion.

17       That is the law, your Honor.  I will get to the refusal

18  to deal with rivals cases later.  I am not going to not address

19  *Trinko*, but that is the law.

20       And not to beat a dead horse, but that is what we have

21  alleged.  Apple has entered into deals with third parties as a

22  purposeful mean s of monopolizing smartphone markets.  It is

23  illegal.

24       Now, your Honor, Apple also is operating outside of the

25  motion to dismiss standard.  Apple is continually putting facts

1    at issue that aren't yet in evidence before this Court.

2         For example, you heard Apple offer justifications like

3    its need to balance privacy and security against other

4    restrictions to justify its conduct.  Look, if they can prove

5    that at trial, that very well could be a defense.  But they are

6    not appropriate at this stage as a matter of law.  Those are

7    the step 2 justifications that your Honor is aware of from the

8    briefs.

9         And, ultimately, as a matter of fact, these claims are

10   going to be disputed by third-party witnesses, by Apple's own

11   documents, by other evidence, by all of those things that we

12   learned in the four-year investigation.  They will all be

13   disputed.  And your Honor will have a full record, and you can

14   use that record to decide what really is going on.  That is

15   what discovery is for.  That's what trials are for.

16        For now what matters is what we pleaded, and the

17   complaint's allegations have to be accepted as true.  And over

18   and over, Apple's only answer to that is to challenge the

19   facts.

20        Look, at the heart of this motion to dismiss is a

21   dramatic effort to expand refusal to deal with rivals law to

22   give immunity to plainly anticompetitive conduct and

23   substantive defense that Apple hasn't undertaken that conduct.

24        They're wrong on the law and their defense has a time

25   and a place, and that place is trial after discovery and on a

1    full record.  Not today.  And that is why we will ask at the

2    end that this case move forward in the discovery as soon as

3    practical, of course, consistent with the Court's schedule and

4    preferences.

5         So let's turn to the complaint and what it actually

6    pleads.  It has two claims:  Monopolization and attempted

7    monopolization.  I am going to address the monopolization first

8    and then turn to attempted monopolization.

9         To plead a monopolization claim, you have to plead two

10   things; monopoly power and anticompetitive conduct to get and

11   hold onto it.

12        Look, monopoly power isn't 100 percent market share.

13   Courts are clear on that.  Monopoly power is just the ability

14   to control prices or quality, to exclude competition -- or

15   exclude competition in a given market without losing

16   significant customers.

17        And there are two ways to get there, you can plead it

18   through market shares; or you can plead it through what's

19   called direct evidence, which is basically a monopolist acting

20   like a monopolist.

21        We pleaded both of those things.  We pleaded the belt,

22   that is the market share.  We pleaded the suspenders, that is

23   all of the facts that show monopoly power directly and the

24   inferential facts that support shares.

25        Now, before I get into the details, though, I want us to

1    all take a step back.

2          There is nothing illegal about being a monopoly.

3    Nothing.  The question whether Apple has monopoly power is just

4    a question of how much power Apple actually has.

5          Apple is the richest company in the world.  It charges a

6    30 percent tax in perpetuity when a consumer uses someone

7    else's product on the iPhone.  Not a product Apple developed.

8    Not a product Apple maintains.  None of those things.

9          And we are here today based on the idea that it is not

10   plausible that it has monopoly power, but instead it is at the

11   mercy of supposed global behemoths who are a fraction of its

12   size.  The Court is allowed to use common sense, your Honor,

13   that is in the case law.

14         Now, in any event, we wouldn't leave it there.  We

15   pleaded all of the things that are necessary to support the

16   claim directly under the law.

17         So let's start with what the law calls indirect

18   evidence, that is shares route.  For this you need a dominant

19   share of any properly defined market that has entry barriers.

20         Now, Apple has conceded that the sale of premium

21   smartphone and smartphones generally in the United States are

22   relevant markets for the purpose of this motion.  So that means

23   we are looking at shares and barriers in those markets.  Any

24   argument about things in other markets, any argument about why

25   they are not market, those are not relevant arguments given

1    that concession.

2        The complaint pleads that Apple has more than 70 and

3    65 percent shares in those markets respectively; that is in

4    paragraph 181.  And that those markets are protected by

5    significant barriers to entry and expansion; those are in

6    paragraphs 183 to 186.  Those are all allegations that have to

7    be accepted as true in this stage.

8        Now my colleague talked a lot about shares and what the

9    right shares is, but never told you what the actual rule is in

10   Third Circuit, which has been explicitly articulated multiple

11   times.

12       The shares are more than the 55 percent required by

13   *Dentsply*; that is the rule.  There is a number in Third Circuit

14   opinions and if you are significantly more than that number,

15   you meet the shares.

16       And it is more than shares in decisions like *AbbVie* and

17   *Houser* where the shares were 60 to 71 percent and 66 to

18   71 percent.

19       Now, your Honor, they referenced decisions that were

20   decided at summary judgment or trial.  If they want to prove

21   that Samsung and Google can strain them, if that is the

22   argument, that is not a motion to dismiss argument.  That is an

23   argument that they can bring forward evidence of to try to

24   undermine the shares.  But the shares are what they are.  And

25   under the law that makes them a monopolist, at least for now.

1    Now, the entry barriers are also pleaded in detail.

2  Apple raised some arguments about entry barriers in its brief.

3  I didn't actually hear them today, but they left a number

4  completely uncontested.  The uncontested barriers include the

5  difficulty in acquiring chips and special glass, the need for

6  regulatory approval, and restrictions on carriers' ability to

7  sell the phones; those are in paragraphs 183 to 185.

8    And we know the barriers are high.  Amazon and Microsoft

9  tried to enter the markets and they failed, that is a sign that

10  the barriers are high; that is, in paragraphs 186.

11    Now, these pleadings establish monopoly power under

12  Third Circuit precedents like *Broadcom* and *Dentsply*.  Nothing

13  said today here suggests otherwise.  That is enough.  The Court

14  can end its inquiry right there.

15    But I mentioned suspenders.  Let's talk about those.

16  Those are the things you heard described as, well, maybe if

17  this is true or it is not true, that would undermine market pow

18  er.  These are all things that as *Dentsply* tells you become

19  relevant if you are talking about monopoly power at lower

20  shares.  We are not talking about monopoly power at lower

21  shares, but we pleaded them anyway.

22    We pleaded the durability of Apple's share.  That is at

23  paragraph 182.  I think it was said that we didn't plead that

24  they had durable share for ten years.  In fact, we explicitly

25  pleaded that in paragraph 182, that their share has been

1    durable for the last ten years.  We called it a decade.

2         Pricing trends in the industry, the inability of

3    customers to switch to other smartphones, and we also pleaded

4    that Apple has high margins.  Again, what we heard was that we

5    didn't plead that.  It is expressly pleaded in the complaint.

6    These are paragraphs 182, 183, 188, 189.

7         This motion is not directed at the complaint that was

8    filed.  All of those pleadings have to be accepted as true.

9    And they are never actually contested anyway other than to say

10   that they are not there.  We can look at the complaint and see

11   if they are there.  And they further establish monopoly power.

12        Your Honor, my colleague discussed 75 percent as if it

13   was a relevant or important threshold.  It is not.  It is not

14   relevant in this circuit.  The Third Circuit has decided that

15   55 percent is presumptively enough.  It is not relevant in any

16   other circuit either.  There is not a single circuit in this

17   country that requires you to plead 75 percent or more market

18   share to plead monopoly power.  And that case, *Cologne*, the

19   Fourth Circuit case, it also doesn't require that.  If you read

20   the case, the case says the Court correctly denied a motion to

21   dismiss where the pleadings had 70 percent market power --

22   sorry.  Market share.  So that decision itself doesn't support

23   the argument.

24        Look, Apple hasn't cited any cases dismissing a

25   complaint at 65 and 70 percent share.  They're not 70 percent

1    share.  They haven't cited a single one.  They say, Hey, those

2    cases are different, but they can't point you to any because

3    that is not how it works.

4        Now, I mentioned Samsung and Google.  You heard a lot

5    about the idea that Samsung and Google are constraining.

6    You've seen that in the briefs.  The idea here, I guess, is

7    that Samsung and Google are Goliaths and Apple is a David who

8    can't afford a misstep.

9        The complaint pleads otherwise, and it has to be

10   accepted as true.  It pleads specifically that Apple is engaged

11   in illegal conduct that would prevent those companies from

12   increasing their output.

13       Increasing output doesn't literally mean you can make an

14   additional phone.  Making a phone doesn't help.  You have to

15   sell it.  Right?  It pleads repeatedly that they have done

16   things that make it hard for people to switch from the iPhone

17   to other phones.  That is a pleading that those companies can't

18   discipline Apple.

19       And we also plead structural barriers which include the

20   switching costs that would exist even if they didn't do that.

21       And we pleaded statistics from the investigation.  98

22   percent of people who own an iPhone buy another iPhone.  That

23   is in paragraphs 183 to 186.  Those allegations have to be

24   accepted as true.  And when you accept them as true, the rivals

25   aren't constraining Apple.

1        Again, if they have a dispute, if they have facts they

2    want to bring, there is a time for that.  But it is not a

3    motion to dismiss.

4        Now, look, there was some, I think, aspersion -- I'm not

5    sure what to call it -- to the other markets.  I want to

6    address that briefly.

7        There was a claim in the brief that the performance,

8    smartphone market is divorced from reality.  As we pleaded in

9    the complaint, this is how businesses in the industry,

10   including Apple, conduct their own business.

11       So the facts will come in, and the Court can decide that

12   one for itself.  It is not contested today so it doesn't

13   matter, but I wanted to address it.

14       And you heard a discussion about the global market, the

15   phones are competing globally.

16       Now, if you look at the brief, Apple says its global

17   market share is 15 percent.  If Apple's global market share is

18   15 percent, I can't think of a better argument for why the

19   United States is more representative of Apple's power in United

20   States than the global market.

21       Beyond that, the complaint pleads all of the relevant

22   facts for a geographic market, like different distribution

23   channels, pricing, and regulatory frameworks.  Those are in

24   paragraphs 176 to 178.  And the question, the market definition

25   question, to be clear, is not if there is any competition that

1  occurs at a global level.  It is if prices went up a little bit

2  in the United States, would we all leave the United States to

3  go buy iPhones from other countries to get them for less.  That

4  is the question that actually defines market in this case, your

5  Honor.  The fact that there might be some competition somewhere

6  doesn't mean the United States isn't a market.

7        Apple also talked about direct evidence.  Direct

8  evidence is basically evidence that the defendant can act like

9  a monopolist.  Things like they are not worrying about the

10 price of other products when they set their own.  They are not

11 worrying about the quality of other products when they decide

12 their own.  The complaint pleads that Apple can and does behave

13 this way.  It throttles third-party technologies with little

14 concern for whether competitors might adopt them, and no fear

15 of losing their share to rivals, who, if were not a monopolist,

16 would incorporate those technologies and take share away from

17 Apple.

18        It imposes terms on carriers that impede them from

19 distributing the phones of others; that is in paragraph 188.

20 That is similar evidence to the direct evidence that the Third

21 Circuit relied on in *Dentsply* and that other Courts relied on

22 in cases like *Microsoft* and *Remax*.  That is enough, too.  That

23 is a second way we pleaded monopoly power.

24        Apple tried to reference *Dentsply* for this idea that the

25 only way to plead monopoly power is through high prices.

1           That is exactly the opposite of what *Dentsply* says.  I
2   would read it to you, but I will just tell you the page.  On
3   page 191 of the opinion, the Third Circuit explicitly says that
4   the failure to charge a monopoly price provides no succor to
5   the monopolist.  You can violate antitrust law without charging
6   a monopoly price.  You can be a monopolist without charging a
7   monopoly price.

8           Now, having said that, we are not saying that Apple is
9   not charging a monopoly price.  We are just saying we didn't
10  need to rely on it for the purposes of this motion.  When we
11  plead that they have high margins and other things, they are
12  charging a monopoly price.  What we were just doing is saying
13  that this is one dispute that just doesn't need to be
14  addressed.  There's so many other ways here that we have
15  pleaded monopoly power, we just should look at the other ways.

16          So I just want to be clear.  We are not saying they are
17  not charging a monopoly price.  We are just saying for the
18  purposes of this motion we don't need to get there.

19          Now, as I mentioned, the cases that were discussed today
20  were not motion to dismiss cases.  They are cases decided on a
21  full, factual record.

22          In Apple's brief it cites a different case, the *LA Land*
23  case.  So I do want to address that.

24          *LA Land* held, also after trial, by the way, that certain
25  actions were not direct proof because a nonmonopolist could do

1   them.  It wasn't because they weren't prices.  So, for example,

2   you don't have to be a monopolist to prepare a false market

3   survey to stifle a competitor.  That is anticompetitive

4   conduct, but you don't have to be a monopolist to do it.

5   Right?  That's at page 1427 of the opinion.

6        So, your Honor, I want to pause there because I am going

7   to turn to anticompetitive conduct now, but if there is

8   anything else I can address for you, I would be more than happy

9   to do it or answer any questions.

10        HON. JULIEN X. NEALS:  No, counsel.  Please proceed.

11        MR. LASKEN:  Okay.

12        So the second element is anticompetitive conduct.

13        Anticompetitive conduct is just conduct that contributes

14   to a monopolist keeping or maintaining its monopoly by

15   something other than competition on the merits.

16        You also see there short-handed as exclusionary conduct.

17        Apple raises two arguments about this element, and they

18   both should fail.

19        First Apple asserts that the complaint's allegations of

20   harm to smartphone competition are implausible.  Plausibility

21   means, as the Court knows, a reasonable belief that discovery

22   will yield facts supporting a violation.  That is plausibility.

23   The complaint pleads the challenge connection based on Apple's

24   own words and assessments of that connection as well as other

25   well-pled facts.  That is more than enough at this stage.

1          And, second, Apple asked the Court to dismiss the case

2    based on a misunderstanding of refusal to deal with rivals law.

3    That argument fails many times over.  First, a refusal to deal

4    with rivals claim is one theory of anticompetitive harm that a

5    plaintiff can assert.  It doesn't grant Apple the right to deal

6    with third parties on anticompetitive terms.

7          Second, the complaint does not assert a refusal to deal

8    with rivals claim.  Apple is not allowed to rewrite the

9    complaint.  Refusal to deal with rivals cases allege that a

10   monopolist is harming competition by failing to cooperate with

11   its rivals in the monopolized market.  The complaint isn't

12   alleging that Apple harmed competition by failing to cooperate

13   with smartphone rivals like Samsung and Google.

14         Apple's characterization of the conduct itself shows you

15   it can't get there.  More than a dozen times in its brief --

16   and its very clear on the first page of its reply brief -- it

17   claims, We are challenging its unilateral product design

18   decisions.  Product design decision s under the *Mylan* case and

19   other cases in other circuits are assessed under the general

20   test -- now, again, we don't agree that it is a product design

21   case, but that tells you something, that even Apple can't find

22   a way to describe the conduct that would get it to the refusal

23   to deal.

24         And, third, even if the complaint were assessed under

25   refusal to deal with rivals theory, the allegations in the

1   complaint are sufficient to state that claim.

2         Now I want to start with where my colleague ended, which

3   is the idea that all of the antitrust law falls into boxes.

4   And he turned to *LePage's* for that.  Here is what *LePage's* says

5   about Section 2.

6         Anticompetitive conduct can come in too many forms and

7   is too dependent on context for any Court or commentary to have

8   enumerated its varieties.  So there is not a list of boxes.

9   And the way Section 2 works is not -- there is a list of boxes,

10  and if you fall in one, it's illegal and otherwise it is legal.

11  That is not how Section 2 works.

12        Also, in *LePage's,* this section is in sweeping language

13  suggesting the breadth of its coverage -- that is what the

14  Third Circuit view, Section 2 has.  Then it ends by describing

15  Section 2 this way.  Section 2 is the provision of the

16  antitrust laws designed to curb the excess of monopolists and

17  near monopolists.  It is the equivalent in our economic sphere

18  of the guarantees of free and unhampered elections in the

19  political sphere.  Just as democracy can thrive in a free

20  political system unhindered by outside forces, so also could

21  market capitalism survive only if those with market power are

22  kept in check.

23        That is what the Third Circuit says Section 2 is about.

24  It is not about protecting a monopolist's incentives to

25  innovate or giving them wide berth to engage in anticompetitive

1    conduct just because it is included in a deal.

2         And to take that one step further, this exact argument

3    was rejected by the Fourth Circuit in *Duke Energy* where the

4    Court wrote, Section 2 focuses on anticompetitive conduct, not

5    Court-made subcategories of that conduct.  That is what the

6    Court was just asked to do.  Look only at the subcategories.

7    See if it fits in one.  If it doesn't, it must be legal.  That

8    flips Section 2 analysis on its head.  That is at page 354 of

9    that opinion.

10        Now, having cleared that up, I want to turn to a second

11   thing to clear up.  This case is not about whether App Review

12   or private APIs are legal business practices in general.

13   Antitrust cases don't decide issues at the macro level like

14   that.

15        No Court has ever held that all conduct related to API

16   or a platform rule is legal.  They couldn't.  It would conflict

17   with black letter law.

18        Courts decide whether conduct is anticompetitive based

19   on its context.  That is what *LePage's* says.  *LePage's* is the

20   seminal decision in this Circuit, but they are in all of the

21   others -- well, I shouldn't say all of the others.  In many of

22   the others.

23        *Microsoft* says it as one other example.

24        Context depends on facts on the ground.  That is why you

25   see Courts saying over and over again antitrust cases are fact

1    intensive.  This case involves the use of APIs and App Review

2    to undermine competition.  Just like Apple has APIs, a normal

3    person might have a baseball bat.  I gave you the short version

4    of this analogy.  Now, I'm going to give you the long one

5    because I can't get away from the bat.

6           Now, maybe they made that bat for themselves, a

7    proprietary.  They bought wood from a hardware store.  It is

8    not illegal.  They can play basketball with the bat.  It is not

9    illegal.  They can break the pinata with the bat.  It is not

10   illegal.  But when they turn around and use it to break their

11   neighbor's window or hit their neighbor, now it is illegal.  It

12   has nothing to do with who owns the bat.  It has nothing to do

13   with the fact that it is a bat.  It is what you do that gives

14   rise to the violation.  And our complaint has over 70 pages of

15   pleadings about context, context about where these restrictions

16   came from, context about why Apple enacted them, context about

17   what they actually did.

18          Now, I will turn to how that context states a claim.

19          Apple stopped competing on the merits when it

20   selectively weaponized App Review and private APIs to undermine

21   technologies that consumers would want to use with their phones

22   but they also threatened Apple because it made it easier for

23   consumers to choose a different phone.  That is exactly what

24   happened in *United States v. Microsoft*, taking actions in one

25   market to protect the monopoly in another.  Set the rules of

1  your platform to undermine products that work on your platform

2  and others making easier to choose -- and making it easier for

3  others to choose a platform on the merits.  Undermine products

4  like middleware.

5      And how does that break competition?  It forces

6  consumers to consider things other than the merits of the

7  operating system -- or the phone here -- when they are trying

8  to make their choice.

9      As the Court explained in *Microsoft*, quote, if a

10 consumer could have access to the applications he desired,

11 regardless of the operating system he uses, simply by

12 installing a particular browser on his computer, then he would

13 no longer feel compelled to select Windows in order to access

14 those applications.  He could choose an operating system other

15 than Windows based on its quality and its price.

16     Phones have those type of features, too.  We heard a lot

17 about them at technology tutorial.  They have chips.  They have

18 cameras.  They have operating systems which have their own

19 merits.  And, of course, pricing.

20     But as we plead in detail, and even in Apple's own

21 words, they placed obstacles in the way of people choosing

22 phones based on those merits.  So instead of choosing phones

23 based on those features, people are choose phones to avoid

24 dealing with those obstacles.  They don't want to have to pay

25 for a new watch when they switch their phone.  They don't want

1  to have broken texting with their family and friends.  They

2  don't want the hassle of transferring a digital life.

3      And we pleaded in detail how Apple does this.  how Apple

4  uses its control over the iPhone in select instances to force

5  developers to -- how to make decisions to design their

6  products.  How to make decisions to design their products in

7  ways that hobble them or eliminate them entirely.  And those

8  allegations have to be accepted as true at this stage and that

9  is the claim in *Microsoft*.

10     Now, Apple's only response to this claim is to say these

11  allegations implausible.

12     The allegations in Apple's own words and in detailed

13  pleadings.  That is not implausible.  Not close.

14     For example, the complaint pleads direct recognition by

15  Apple that breaking text messaging impacts our phone choices.

16  Paragraph 92 quotes Apple's CEO telling customers to buy an

17  iPhone to compensate for broken text messaging between iPhones

18  and Android phones.  He didn't suggest downloading an

19  alternative text messaging app.  He didn't suggest changing a

20  setting in iMessage, he said if you want to text your mom, buy

21  her an iPhone.  That is a direct connection by Apple in the

22  ordinary course between those two things.

23     Paragraph 91 quotes Apple's senior vice president of

24  software engineering calling broken text messaging, quote, an

25  obstacle to iPhone families giving their kids Android phones.

 1    Direct recognition in the ordinary course by Apple that broken

 2    text messaging effects phone choice.

 3         For super apps, the complaint pleads the connection

 4    based on Apple's own assessment based on its own experience in

 5    another country where super app took hold; that is in

 6    paragraph 66.

 7         For cloud games, the complaint quotes direct

 8    recognition, direct recognition by Apple employees that

 9    suppressing -- between cloud gaming and price competition on

10    smartphone hardware.  Direct connection.  They didn't want to

11    get in a fight over who has the cheapest hardware, so they

12    suppressed cloud games; that is paragraph 71.

13         For wallets, the complaint pleads that -- pleads Apple's

14    assessments that it can use wallets to protect its, quote, most

15    important and successful business iPhone; paragraph 104.

16    Again, direct connection by Apple in the ordinary course

17    between these technologies and phone choice.

18         And Apple recognizes keeping the watch tied to the

19    phone, that may, quote, help prevent iPhone users from

20    switching; that is paragraph 98.

21         It is Apple's own assessment of its own business in the

22    ordinary course that tells us these technologies are connected

23    to phone choice.  Pleading that in Apple's own words, that more

24    than meets the plausibility standard.  And if Apple's words

25    weren't enough, we did plead the market facts, we did plead how

1    it effects your choices.  Things like having to buy a new watch

2    if you switch phones.  It is literary more expensive to buy a

3    different phone because you have to get rid of your Apple Watch

4    and buy a different one.  That is obviously going to effect

5    someone's phone choice; that is in paragraph 96.

6         What more could we have pleaded about this?

7         Look, you can always ask for one more detail or one more

8    allegation, but that is not the standard.  Rule 8(a) requires a

9    short and plain statement for grounds of relief.  Case law

10   requires that statement to be plausible and not conclusory.

11   The 70 pages of detailed allegations, often in Apple's own

12   words, they are very far beyond that.

13        Now, I want to talk about the pleadings of harms to

14   developers and users.  The harm that Apple did in those other

15   areas to protect its smartphone monopoly.

16        So we just talked about the connection, but I want to

17   talk about the harm in those other areas.  And as best I can

18   tell, Apple is not actually challenging those pleadings right

19   now because, as I understand the argument, that we pleaded harm

20   in the wrong markets, that would short of imply, right, that

21   they agree that we pleaded it.  Not that they are agreeing with

22   them, to be clear, just that they agree that we pleaded it.

23        In any event, I want to go through them to complete the

24   picture and so that we can also understand why they are not

25   product design choices.

1          So here is a brief overview and I am just identifying

2     the key ones.  The complaint pleads that Apple made super apps

3     nonviable in the United States by forcing them to incorporate

4     painful user interfaces and preventing users from paying the

5     developer for their work; that is in paragraph 69 to 70.

6          The complaint pleads that Apple made cloud gaming apps

7     nonviable by forcing developers to design their products in

8     ways that would make them difficult for users to use and costly

9     for developers to produce; that's paragraph 76 to 78.

10          The complaint pleads that Apple made third-party text

11     messaging apps worse by forcing them to design their apps

12     without text-to-anyone functionality.  As a result, consumers

13     are forced to use iMessage as their primary text messaging app

14     because the hassles associated with getting every new contact

15     you need into the same text messaging app that you happen to

16     use just make it infeasible to use those other apps as a

17     primary messaging app; that is paragraphs 85 to 86.

18          The complaint pleads that Apple made third-part y

19     digital wallets essentially nonviable by forcing developers to

20     design them without Tap-to-Pay functionality; that is in

21     paragraphs 111 to 117.

22          Again, that is not people choosing the Apple Wallet

23     because it is better; they're using the Apple Wallet because

24     Apple denied them any other choice through a restriction on

25     third parties.

1    The complaint pleads that Apple made third-party

2    smartwatches worse too.  And we pleaded that by saying that

3    they were prevented from being designed to properly respond to

4    notifications or maintain a Bluetooth connection, but Apple

5    lets its own watch do that.

6    So, again, people aren't buying the Apple watch because

7    Apple made it better, even if we may all think that's what is

8    going on.  They are driven to the Apple Watch because Apple

9    made other companies' watches worse; that is in paragraphs 100

10   to 103.

11   Now, as I mentioned in the briefing, Apple claims this

12   is all about Apple's design choices, but that is plainly wrong

13   if we just think about it.

14   Let's talk about the super apps.  One of them prevents

15   super apps from displaying items in a grid, rather than a flat

16   list.  That's not an Apple design decision.

17   How do you know that?  When you open up an iPhone, you

18   are going to see a beautiful grid of icons.  So Apple has

19   decided it is just fine to show a grid of icons on an iPhone.

20   And, in fact, they apparently view that as the best way to

21   display things on the iPhone because that is how they choose to

22   do it themselves.  They just made a different decision for

23   third parties who wanted to make an app that they viewed as

24   threatening.  But Apple can't relabel a restraint as a product

25   feature and declare it immune from antitrust scrutiny.  The

1    Supreme Court already decide that in *Alston*.

2        And, your Honor, the point is even clearer when you

3    recognize that these restrictions come from contract terms.

4    Contract terms are not design decisions, that is not designing

5    a product.  They are contract terms.

6        Now, there is an idea that Apple changed everything and

7    that was raised.  And it is true Apple changed some rules

8    shortly before the case was filed and while it has been

9    pending.

10        As we noted at the tech tutorial, Apple retains numerous

11    switches to flip.  And in the case of the NFC chip, for

12    example, the one that we heard about more recently, we

13    understand that Apple actually has flipped those switches and

14    we look forward to looking -- learning about that in discovery,

15    but they that they have flipped other switches, despite making

16    that API, that will continue to make digital wallets nonviable.

17        So that is, again, something, your Honor, we're going to

18    deal with it after discovery because it happened after we

19    filed, but that is a fact dispute.  We are going to attempt to

20    raise, I suppose, a fact dispute to this Court.

21        Now, beyond that, Apple can undo any changes made

22    anyway.  And it had those rules for years before the case was

23    filed.  And, by the way, ostensively because they were

24    necessary for privacy and security.

25        So Apple, if you buy what they are saying, just changed

1  a bunch of rules voluntarily, not in response to litigation,

2  that were necessary for privacy and security.

3      An, again, I don't know what's behind the curtain

4  because we haven't had discovery, so I am not saying what is.

5  I am just saying these were rules that were supposedly

6  necessary for privacy and security.

7      And beyond that, your Honor, you heard Apple try to

8  counter the complaint through its own factual narrative.  That

9  is, again, inappropriate at this stage.

10      Now, you heard this talked about when you heard the

11  statement that Apple is balancing considerations about privacy,

12  security, and user experience with decisions about what to

13  restrict.  Those are justifications for Apple's conduct.  They

14  are not relevant right now.  They are factual defenses that

15  Apple can present at trial.

16      The complaint only needs to plead the first step of

17  burden shifting.  But, your Honor, we pleaded the opposite.  At

18  this stage the complaint has to be taken as true.  The

19  complaint pleads that Apple deliberately and selectively

20  degrades quality, privacy, and security for its users when it

21  suits Apple's financial interests to do so; that is in

22  paragraph 16.

23      In other words, for Apple, privacy and security is an

24  elastic shield that stretches and contracts to serve its

25  business interests.  And we plead examples of how Apple's

conduct, the specific conduct here does that, in paragraphs 141 and 147, such as making users send unencrypted messages when they might otherwise not need to.  For today, that is not only enough, it is more than enough.

And a final point, your Honor, when this does become an issue, as I told you before, this is not an issue that operates at a macro level.  The question is whether the specific conduct that makes up the course of conduct is justified by privacy and security.  This is not a challenge to Apple's overall business, no matter how much they want it to be.

Now, your Honor, we also heard about a lengthy causal chain; that is on slide 16 of the deck that you received.

This is Apple's factual theory for why we are wrong. This is a fact -- a fact defense being presented through a motion to dismiss.

Beyond that, your Honor, we don't have to plead all of these links; and we certainly don't have to prove them either. We have to plead that Apple and other participants made this connection.  They traversed these links in the ordinary course. And we assume they understand their own businesses.  That is enough to infer the connection.

Now, beyond that, this is also foreclosed as a matter of law requiring this type of proof.

As the *Microsoft* decision explains, if the defendants take actions that make the "but for" world uncertain, such as

1  how many people would adopt an app that Apple killed off, it is

2  the defendant who must be made to -- quote, made to suffer the

3  uncertain consequences of its own undesirable conduct; that is

4  at page 79.

5       You can't eliminate competition and then say the Court

6  or the plaintiffs couldn't exactly reconstruct what would have

7  happened had they never eliminated competition.  That is not

8  our burden here.

9       Now, beyond that, Apple argues that we have to prove as

10  part of these chains that prices would fall or exactly what

11  competition would do if it was restored.  That is not our

12  burden either.

13       The claim here is about a loss of competition.  If we

14  prove that Apple lost competition -- or eliminated competition,

15  we have proved the violation.  We are not a private plaintiff

16  seeking damages.  We don't need to prove how much it cost us.

17  That is where our proof ends.

18       Now, you heard a number of attempts to distinguish

19  *Microsoft*.  And those distinctions, at least as I heard them,

20  they amount to an argument that Apple's conduct is lawful

21  because it found different methods to break competition in the

22  same manner.

23       Antitrust law is not so easily evaded.  As I read to you

24  from *LePage's*, Section 2 was designed to curb the excesses of

25  monopolists and near monopolists.  Minute formalistic details

1   about those excesses, they don't matter.  Apple doesn't get to

2   suppress competition so long as it does it in a different way

3   from what happened in a prior case.

4        Regardless, it is not different.  We heard some talk

5   about setting the rules of the road for its platform.  But

6   Microsoft apparently was only engaged in exclusive dealing.

7   That is just factually inaccurate.  Microsoft's conduct

8   included things like controlling the icons that could be used

9   in Windows, Windows modifying the Start menu.  None of these

10  things are exclusive dealing terms.  Right?  They are things

11  about what you can do in Windows with Windows.  So that is just

12  wrong.

13       You also heard Apple claimed the cases are different

14  because Microsoft had a 95 percent share.  Two points here.

15  First, once monopoly power is established, the share doesn't

16  matter.  So different shares are going to be irrelevant anyway

17  to the effects analysis, and that is what we are talking about

18  in *Microsoft*.  Either you are a monopolist or not.  And if you

19  are, then the question is going to be whether you are engaged

20  on something other than competition on the merits.

21       Second, your Honor, the shares aren't actually that

22  different.  Microsoft share was only 95 percent in a market

23  that excluded Macs.  The market was called the market for,

24  quote, Intel-compatible operating systems.  That was the

25  market.  The analogy here would be something like a market for

1   phones with Apple silicon in them.  I am pretty sure Apple's

2   share of that market is a hundred percent.

3        Now, if you look at the opinion, there was a market that

4   included Macs.  And when you look at that, it dropped to 80

5   percent, pretty close to Apple's share here.

6        And what the DC Circuit said about that, it doesn't

7   matter which market you look in, they are still a monopolist

8   and it is still illegal.

9        Apple also gave some claims that their conduct is

10  different because it is not an outright prohibition.  That, I

11  think, is the point about restraining companies like Netscape

12  through third parties.  Look, being clever about how you

13  restrain competition, not saying out loud what you are doing,

14  that doesn't somehow let you escape antitrust law.  And I guess

15  if you really drill down on this argument, the idea is if

16  Microsoft had directly restrained Netscape by restraining it

17  rather than using some sort of exclusive dealing with third

18  parties, then somehow its conduct would become legal?  Look, I

19  mean, that's, I guess, a distinction, but it makes Apple's

20  conduct actually worse.  The idea that *Microsoft* did something

21  indirectly that Apple did directly, that is not a distinction

22  from Microsoft, your Honor.  At the end of the day, antitrust

23  law prohibits monopolists from suppressing competition on the

24  merits.  It doesn't matter if you do it directly or indirectly.

25  It doesn't matter if you say it out loud while you are doing

1    it.  It doesn't matter if you specifically reference a rival in

2    the contract that does it.  It prohibits a suppression of

3    competition on the merits.  That is what it prohibits.

4         And the conduct alleged here is the same.  It is about

5    interfering with third-party products that make it easier to

6    switch platforms.  For example, Apple forced super apps to

7    design their products in ways that made them less attractive to

8    users and prevented them from getting paid.  That is

9    interference with a third-party product that users would have

10   wanted that would have allowed for more competition on the

11   merits among phones.  That is exactly the same as in *Microsoft*

12   when Microsoft interfered with Netscape to drive people into

13   Internet Explorer -- by the way, rivals.  That was not

14   mentioned -- rivals in an adjacent market.  That case was not a

15   refusal to deal case.

16        Now, I think there was a suggestion that maybe *Microsoft*

17   has been overruled or that *Microsoft* somehow whiffed in its

18   defense and just failed to raise refusal to deal, but it really

19   was a refusal to deal case.

20        Your Honor, *Microsoft* has been cited hundreds of times

21   including repeatedly by the Third Circuit.  No Court has ever

22   come close to suggesting or saying anything like that.  It was

23   affirmed by *Novell*, the very case that my colleagues are

24   relying on as being correctly decided in the very first

25   paragraph.  *Microsoft* is not overruled.  *Microsoft* Court didn't

get it wrong because of *Trinko*.  And by the way, *Trinko* is not

the first refusal to deal case.  Refusal to deal goes back to

*Otter Tail* in 1973, I believe -- '83?  I would have to get the

date.

It goes back to *Aspen Skiing*.  And *Aspen Skiing* predates

*Trinko*.  So it is not as if refusal to deal with rivals law

didn't exist at the time of the *Microsoft* decision.

Now, you heard a lot of talk about effects.  And I will

admit this argument is actually a little bit confusing to me.

I am not sure how much we disagree or don't disagree amongst

each other.

So Apple argued we have to show an actual adverse effect

on competition.  And they're conflating that term with

anticompetitive effect.  Those are not interchangeable terms

under the law.  We, of course, have to prove anticompetitive

effect.  That is what *Microsoft* talks about.  Anticompetitive

effect means harm to the competitive process rather than harm

to an individual competitor.

We don't have to prove an actual adverse effect on

competition, which refers to, for example, a literal price

increase directly tied to a specific action.  As we explained

in our brief, that is one way, one way, not the only way, one

way that you can prove a violation under a different statute

called Section 1 that is about when two companies agree to do

something.  So even under the statute that it is being cited

1    to, it is not the only way to prove effects.

2         It is even more foreign to Section 2.  Section 2 cases

3    are about things like maintaining a monopoly.  They are about

4    conduct that keeps you at the status quo.  How would you prove

5    that some specific action directly increased prices the next

6    day, or something like that.  It is not relevant to this

7    statute.

8         I want to also say the case they talked to you about,

9    that is a 1 case.  And as you can tell just from hearing the

10   discussion of it, it is incredibly different.  It involves

11   patents.  Apple hasn't asserted any patent right that protects

12   its conduct.  Right?  So -- and I think the fact that they are

13   having to rely on Section 1 cases, that tells you what you need

14   to know.

15        Now, there was also an argument about aggregation.

16   There was an argument that *LePage's* says you can't aggregate

17   conduct.  That is not what *LePage's* says.  What *LePage's* did,

18   which is what all Courts do and is what we would certainly

19   recommend that this Court ultimately do is it looks at

20   individual actions and it determines what their -- if they are

21   anticompetitive, what they value is.  And in *LePage's* they were

22   all anticompetitive, so the Court added it up.  But the Court

23   never said anything about whether if one action wasn't

24   anticompetitive in itself, but it contributed to the overall

25   scheme, whether that somehow has to be included.  That is not

1   what *LePage's* says.

2        And cases like *Duke Energy* make that explicitly clear.

3   What *Duke Energy* says -- let's get to the page -- it says you

4   can't -- oh, I will just tell you what it says here.  It says

5   you can't add zero plus zero plus zero and get to zero.  But it

6   does say you can add zero plus one and that may equal more than

7   one.  So it doesn't say -- and we are not contending that if

8   all of the actions we have alleged are all lawful, that that

9   equates to more than zero, but what it says is actions could

10  have a synergistic effect.  That is the law.  *Duke Energy* says

11  it.  There is also an activist decision in the Second Circuit

12  that says it.  That is the law.  Conduct is considered

13  together.  It is not considered in isolation.

14        Now, your Honor, I am going to turn to the dismissal of

15  individual allegations that Apple is raising, but before I do

16  that, I want to pause in case there is any questions or

17  anything additional I can answer for the Court about *Microsoft*

18  or the general standard.

19        HON. JULIEN X. NEALS:  Please continue, counsel.

20        MR. LASKEN:  Okay.  So Apple also asked this Court to

21  dismiss anticompetitive conduct outside of the five examples

22  because he thinks the monopoly playbook is undefined -- or,

23  sorry, because they think the monopoly playbook is undefined

24  and they want to Court to parse the complaint line by line to

25  assess whether an individual allegation is conclusory in

1    isolation.  Now, before I address that argument directly, there

2    is an assumption in there that is just wrong.  This is a quote.

3    Here is my *Duke Energy* quote.  It is a misapplication of

4    antitrust doctrine for a court to treat a plaintiff's

5    allegations of anticompetitive conduct as if they were five

6    completely separate and unrelated lawsuits, effectively tightly

7    compartmentalizing the various factual components and wiping

8    the slate clean after scrutiny of each.

9        That is *Duke Energy* at 355.  That is relying on *Union*

10    *Carbide*, a Supreme Court case.  These are not claims.  These

11    are means by which Apple undermines competition.

12        You can't isolate individual actions in a course of

13    conduct to determine if they state a claim because they are not

14    a claim.  They are means to an end.

15        Now, there is two direct reasons why this fails as well.

16        First, the monopoly playbook is defined.  Second,

17    12(b)(6) doesn't permit motions to dismiss allegations.

18        Now, as to the playbook, paragraphs 58, 59, and 119

19    define the playbook.  Apple is engaged in a scheme to block

20    consumers from being able to choose their smartphones based on

21    their quality and price by undermining third-party products

22    that benefit consumers while also making it easier to switch

23    phones.  They're chipping away at the consumer experience over

24    time in select areas.  That is the playbook.  It is explicitly

25    pleaded.  We don't have to plead it in every paragraph.  That

1    is more than enough to satisfy Rule 8(a).

2         Your Honor, I noted that Apple brought us to some quotes

3    from cases, including -- and rules, including on slide 38.

4    That is the second error that Rule 12(b)(6) and Rule 8, they

5    are about claims.  They are about what you have to state to

6    state a claim.

7         So in slide 38 we have Federal Rule of Civil Procedure

8    Rule 8(a), a pleading that states a claim for relief must

9    contain a short and plain statement of the claim.  This is not

10   about what's required in an individual allegation.  It is about

11   what's required in a claim.

12        Slide 39, *Twombly*, a short and plain statement of the

13   claim showing the pleader is entitled to relief.  The claim

14   here is a violation of Section 2 through a course of conduct.

15   These are not individual claims.

16        And we know that when these rules speak of claims, it is

17   not accidental because Rule 56 talks about dismissing a part of

18   a claim or defense on summary judgment.  It is not an accident

19   that Rule 12 states a claim -- talks about claims.

20        Now, Apple also talked today about dismissing

21   subtheories, and they raised that issue for the first time in

22   their reply brief.  That doesn't apply here.

23        The only case they've directed us to is *loanDepot*, or

24   the only one I am aware of.

25        That is about a plaintiff lumping multiple breach of

1    contract -- sorry, not multiple breach of contract -- multiple

2    tortious interference with contract claims into a single count.

3    The question whether one contract was interfered with, that is

4    easily severable from another.  The concept can't be applied to

5    anticompetitive actions in a course of conduct as I just told

6    you.  It would be error to do that.

7         Finally, your Honor, there is the pragmatic point, the

8    point about narrowing discovery.  This is not going to narrow

9    discovery in any way.  Rule 26(b)(1) allows matters, discovery

10   in matters that are relevant into a claim or defense.  It

11   doesn't tie discovery to the fact of a specific nonconclusory

12   pleading in the complaint.  It is about relevancy.  This case

13   is about a pattern of business behavior.  Discovery is going to

14   be in the pattern and business decisions around things like API

15   and App Review, Apple's decisions to sacrifice profits to avoid

16   the rise of any product that works across phones like this

17   others.  There is not going to be detailed discovery, at least

18   not on our account into the speakers inside an AirPod or

19   something like that.  That is not what this case is about.

20        So having a technology in or out, that is not going to

21   affect the scope of discovery because that is not what this

22   case is about.

23        Finally, a note on the argument, this was raised for the

24   first time in the reply brief.  So I do have some authorities

25   I can direct the Court to with leave if the Court would like

1    them, but if not, I am happy to move on.

2            HON. JULIEN X. NEALS:  You can do it.

3            MR. LASKEN:  Okay.  So *BBL, Incorporated v. City of*

4    *Angola*, 809 F.3d 317 at page 325.  That is a Seventh Circuit

5    decision.  Quote, <u>Rule</u> 12(b)(6) doesn't permit piecemeal

6    dismissals of parts of claims.  The question at this stage is

7    simply whether the complaint includes factual allegations that

8    state plausible claim for relief.

9            *Abraham P. v. Los Angeles Unified School District*, 2017.

10   I know the court reporter is looking at me.

11           Westlaw 4839076 at *6.  This Court's practice is not to

12   dismiss parts of claims at the <u>Rule</u> 12 stage because unlike

13   <u>Rule</u> 56, for example, <u>Rule</u> 12(b)(6) speaks of a motion to

14   dismiss a claim, not part of a claim.

15           And then *In Re: American Express Anti-Steering Rules*

16   *Antitrust Litigation, 343 F. Supp. 3d 94 at page 103,* under

17   Amex's conception of <u>Rule</u> 12, the tail wags the dog.  Amex's

18   proposed rule would permit parties to move to dismiss part of a

19   complaint on the basis that any one of the plaintiff's legal

20   theories are faulty.  The formulation of <u>Rule</u> 12 would warp the

21   doctrine and make it much easier for a defendant to avoid

22   answering a well-pleaded complaint where otherwise necessary.

23           Your Honor, that is how the complaint states a claim

24   under the test that we brought this under, which is under the

25   general balancing test.

1          Now, I want to turn to the refusal to deal with rivals

2     argument.

3          Refusal to deal with rivals is a narrow theory of harm

4     that applies to a specific fact pattern.  It is one way that

5     you can state a claim under Section 2.

6          Here, again, we have Apple litigating against ghosts and

7     asking the Court to imply incorrect rules of law that

8     conflicting with binding precedent.  Its arguments fail for

9     three reasons.

10          First, Apple's own characterization of the complaint's

11     allegations place them outside of refusal to deal with rivals.

12     Second, the complaint has to be assessed as alleged.  And the

13     complaint doesn't allege a refusal to deal with rivals theory.

14     Third, even if the complaint were assessed under a refusal to

15     deal with rivals theory, the allegations, if they're accepted

16     as true, they state a claim.

17          So I want to start with just how the argument fails on

18     its face.  Apple repeatedly claims in its briefs more than a

19     dozen times that this case is about challenging design

20     decisions.  At page 1 of its reply brief, it tells the Court,

21     quote, the Court should recognize this case for what it is, an

22     overreaching theory of liability that seeks to create law and

23     impose judicial oversight over unilateral design decisions.

24          In the Third Circuit and others, challenges to design

25     decisions are assessed under the general Section 2 standard;

1    that is the *Mylan* case.

2         It is error to assess product design cases under refusal

3    to deal with rivals theory, that what's the Court -- Apple is

4    asking the Court to again.

5         Now, again, we disagree with Apple's claim that it's a

6    product design case, as I mentioned earlier.

7         Product design case are about improvements that a

8    company makes to its own product.  So what would a product

9    design case be?  It would be something like Apple harming

10   competition by eliminating the headphone jack.  Right?  Apple

11   harming competition by making the Apple silicon chip.  That is

12   a product design case.

13        But the point here is just that Apple's argument fails

14   on its own terms and that is enough.

15        Now, there is a second problem.  As I mentioned to you,

16   we are chasing ghosts again.  Apple is seeking to dismiss a

17   different claim from the one we pleaded.

18        To understand this, we need to put the refusal to deal

19   with rivals doctrine into context, context that has been

20   omitted here.

21        As the *Duke Energy* Court recently explained, Section 2

22   focuses on anticompetitive conduct, not Court-made

23   subcategories of that conduct.  You can see that same thing in

24   *LePage's* and *Microsoft* when it says you can't have taxonomy,

25   you can't identify every version of this.  We are focused on

1    anticompetitive conduct.

2        Now, over time Courts identified a few subcategories,

3    that is what we are talk about; exclusive dealing, predatory

4    pricing.  Right?

5        And they may tests for them and Courts apply those tests

6    if the plaintiff alleges a theory of harm that -- that is their

7    theory of harm or if the conduct that is alleged fits neatly

8    within that category.

9        Courts reject attempts like Apple to apply these -- to

10   apply the subcategory of allegations that don't fit neatly

11   within it.  *Duke Energy* is a case like that.  *Broadcom*, a

12   Third Circuit decision that Apple didn't address is a case like

13   that.

14       So refusal to deal with rivals, like exclusive dealing,

15   like predatory pricing, it's a subcategory.  It is one theory

16   under which harm can be alleged.

17       So let's talk about what is in this theory and why the

18   complaint is outside of it.

19       So, again, our case, like the *Microsoft* case, is about

20   taking actions in one market to protect your monopoly in

21   another.  Refusal to deal with rivals claims are different.

22   They assert that a monopolist monopolized a market by fail ing

23   to cooperate with its competitors in that market; that is

24   *Trinko* at 407 talks about that.

25       They identified the rare instances -- and this is why

1    they're narrow and this is why they're hard.  Right?

2         They identify the rare instances when a monopolist has

3    to lend a helping hand to its competitors seeking to challenge

4    its monopoly by letting them share its infrastructure or copy

5    its innovations.

6         That is not what we alleged.  We didn't allege a failure

7    by Apple to cooperate with smartphone rivals.  So a refusal to

8    deal here claim might go something like this.  We heard all

9    about the Apple silicon chip.  So a refusal to deal claim might

10   say Apple is monopolizing smartphone markets by failing to

11   license or sell or give the designs to Samsung and Google for

12   that chip so that they can make better phones and better

13   compete with Apple.  I think they are going to disagree on

14   whether that would help their phones be better, but that's what

15   the claim would look like.  Right?

16        What is different here?

17        Take cloud games.  How could restraining a cloud game

18   app be refusing to deal with a rival?  Apple doesn't sell a

19   cloud gaming app.  There is literally no rivalry at all.  The

20   fact that Apple happens to make a competing product in some

21   other market or impacted, it market doesn't matter.  It didn't

22   matter in *Microsoft* that Microsoft made Internet Explorer in

23   the market with Netscape, which was being suppressed.  It

24   doesn't matter here.

25        If you have any doubt, you can just look at what was

asserted in the seminal cases, *Otter Tail*, *Aspen Skiing*, which

recognized the claim, *Trinko* and *LinkLine* which pulled it back.

Now, I talked about *Colgate* at the outset, but notice I

didn't mention *Colgate* and that is because *Colgate* is not a

refusal to deal with rivals case.  It is not relevant to the

question of what's in the box.

So what were the cases about?

*Otter Tail* was about a monopolist of the sale of power

to towns who refused to share its power lines with people who

wanted to compete with it to sell power to towns.

*Aspen Skiing* was about competing ski resorts.  The

monopolist wouldn't share its slopes with its competitor who

was small and needed extra slopes to have the ticket be

attractive so they could compete with the skiing monopoly.

*Trinko* was about competing phone companies and sharing

the monopolist's phone lines.

And *LinkLine* was about competing internet service

providers.

None of these cases are about monopolists taking actions

with respect to third parties to protect their monopoly.  And

by the way, that long footnote in their brief, with the

exception of one that is not a refusal to deal rivals case, not

relevant here, they are all the same.  It is all about people

not cooperating in the market that is being monopolized.

And that is why Apple had to repeatedly edit the text of

1    cases in its brief.  It had to bracket out "rivals" and replace

2    it with "third parties" to make this argument.  It is not what

3    this doctrine is about.  It is a different theory.  It's a

4    different context.  It's a different claim.  And had we brought

5    it, it would have been a different case.

6         Now, Apple tried to rely on *LinkLine* to tell you that

7    refusal to deal across market, that is still a refusal to deal.

8    That doesn't provide support for the idea that refusal to deal

9    with rivals applies outside of a monopolized market.

10        Now, an important fact about the cases that was omitted

11   is that in those cases the monopolist was compelled to deal by

12   statute.  So what happened is that in 1996, Congress passed an

13   act called the Telecommunications Act that required phone

14   providers to deal with their rivals.  That is what happened.

15   They were never going to deal.  They were going to refuse to

16   deal, but Congress passed a law that says you have to deal.  So

17   people started challenging the terms.

18        As *Trinko* explains, the sharing obligation imposed by --

19   this is a quote -- by the 1996 act created something brand new.

20   Quote, the wholesale market for leasing network elements; that

21   is at page 410.

22        This wasn't a cross-market case where you had people

23   making one product here and another there.  You had a statute

24   that created a unique market structure.  That is not some

25   statement from the Supreme Court that meant to overrule

*Colgate*, meant to overrule all sorts of cases, right, that involved with dealing with people in other markets.

What is an exclusive dealing provision?  You are dealing with someone.  Right?  It is a term of dealing with a third party.

What were the bundled discounts in *LePage's*?  They are terms on which monopolists sells products its to people. Right?

All of those cases are wrong if you buy this argument that refusal to deal with rivals law -- or I shouldn't -- I mean -- well, that the argument that you are allowed to put any term you want into a contract with a third party because your right to deal lets you do that.

Now, *Novell* also doesn't support the claim.  In the very first paragraph, *Novell* expressly validates *Microsoft* and *Microsoft* involved an adjacent market, as I just talked about, with rivals.

And while it's true that *Novell* involved APIs, that is where the similarities end.  It is not the what, it's the how. It is the context.

Now, Novell made WordPerfect.  Novell was about code that WordPerfect could have written for itself and that would have appeared in something like Word, but then it wanted Microsoft to be forced to write for it in the form of an API. That is just nothing like this case.  We are not talking about

1    anything developers can do for themselves that they want Apple

2    to do for them.  These are restrictions.

3        And then there is the case history of *Novell*.  *Novell*

4    actually involved a claim about *Microsoft* monopolizing

5    applications markets, that was the lead claim, in which Word

6    and WordPerfect were rivals by terminating a prior course of

7    dealing.  That claim was time barred, so they tried to pivot to

8    a *Microsoft* theory.  That maneuver failed, but not on the

9    pleadings.  There was an eight-week trial.  And at the trial

10   they failed to show that they were middleware.  They failed to

11   show there was harm to operating competition.  So even there,

12   the Court didn't rewrite the pleadings to put refusal to deal

13   with rivals law into the case.

14       And, your Honor, if you take this argument to its

15   logical end, that rivalry anywhere somehow makes refusal to

16   deal rivals law apply, think about the absurd results that

17   would follow.

18       What if Apple and a cloud game are making T-shirts and

19   they are competing to sell the T-shirts?  Does that mean that

20   every time that there is a restriction on a cloud game, it is

21   refusal to deal with rivals because there are rivals somewhere?

22       Now, Apple also talked about *Meta*.  And Apple claims

23   *Meta* controls because it involves the same theory of the case

24   here, withholding API access.

25       Now, first of all, cloud games and super apps don't

1    involve API apps.  But leaving that aside, Apple is just wrong

2    about *Meta*.

3         So in slide 12, your Honor, they gave the Court a quote

4    from *Meta* about a policy that they claimed proves that this

5    case is a refusal to deal.  This is what the DC Circuit said

6    about the analysis of that policy.  It said, The District Court

7    correctly analyzed the policy under cases discussing exclusive

8    dealing.

9         Apple is just wrong.  The DC Circuit didn't analyze this

10   as a refusal to deal.  It did the exact opposite of what Apple

11   is saying it did.  It proves the point that not every API

12   restriction, not every decision to give or not give access is a

13   refusal to deal.

14        Now, *Meta* challenged multiple API restrictions to be

15   clear.  And the only ones that were analyzed as refusals to

16   deal there were the ones called core functionality

17   restrictions.  Those were ones that were designed to block

18   Facebook's rivals from duplicating Facebook's core monopoly

19   products.

20        We are back to the theory it was conduct that was

21   designed to not share with your rivals for the monopoly

22   products.  So that is a refusal to deal and that holding

23   doesn't track here.  We are not asserting that Apple violated

24   antitrust law by withholding API access to stop other

25   smartphone companies from duplicating its core products, like

1    iPhone or iOS.  That is not the claim.

2            And by the way, your Honor, in *Meta*, the Court went on

3    to point out -- excuse me -- that there were other facts that

4    if pleaded, facts about the importance of the app to being

5    cross-market -- or sorry -- cross-platform, working on multiple

6    platforms, if they had pleaded more about the fact that that

7    harmed competition, they would have stated a claim.

8            We pleaded 70 pages of facts about how these things

9    matter to competition and why it matters that they are

10   cross-platformed.  So *Meta* doesn't support Apple.

11           If anything, it establishes that API restrictions can be

12   unlawful; and if they are having cross-platform defects and you

13   say that in a complaint, you stated a claim.

14           Now, your Honor, there is an additional point to note

15   about *Trinko* and *LinkLine*.  As I mentioned to you, in those

16   cases the monopolist was not dealing voluntarily.

17           The monopolist was compelled to deal because the

18   Telecommunications Act forced them to do that.

19           The Third Circuit has pointed out that that difference

20   matters.  In *Broadcom* the Third Circuit held that a monopolist

21   refusing to license its intellectual property on fair terms was

22   not a refusal to deal.

23           Why did it hold that?  Because the monopolist had agreed

24   to license the technology voluntarily.  The monopolist chose to

25   deal.  Once you choose deal, you can no longer claim that the

1  terms of those deals fall under a doctrine about refusing to

2  deal.  At that point, the terms are subject to antitrust

3  scrutiny like any other.  And the Court distinguished *Trinko*

4  explaining it didn't apply to voluntary dealing.  Right?

5       The question in *Trinko* was something who was never going

6  to deal, if they were going to refuse to deal, if a statute

7  comes along and says you have to deal, does antitrust law give

8  the plaintiff the right to then say the terms of that compelled

9  dealing are unfair when they would have always refused to deal

10 to begin with?  The answer to that is no.

11      That has nothing to do with a situation where a

12 monopolist voluntarily decides to deal.

13      And that dealing by regulation, that is not this case.

14 Apple is not dealing with developers because regulation compels

15 it to do so.  Apple's begging developers to deal with it.  And

16 it's selling its products based on what they do for Apple.

17 That's the "there's an app for that" campaign.  It doesn't have

18 a product without these deals.  It is not refusing to deal.  It

19 doesn't get to put anticompetitive terms into the deals.

20      So having addressed all of that, there was some

21 discussion about why refusal to deal, why does this box exist?

22 Isn't it important to apply it cross markets?

23      If you read *Trinko* and understand why it was applied, it

24 actually becomes very clear that it doesn't work across

25 markets.

1          So the first consideration in *Trinko* was something

2     called free writing.  Free writing is what happens when a

3     competitor can copy the monopolist's work rather than doing its

4     own.  That gives the monopolist and the competitor less reason

5     to invest.  For example, if Apple had to make the Apple silicon

6     chip available to rivals, to Google, to Samsung after it made

7     it, would it have the same reason, the same incentive to create

8     the chip?  Maybe not.  Right?

9          What incentives are there for its rivals if they know

10    they can copy it after its made?

11         If you change that to our case, if you change it to

12    nonrivals here, it doesn't apply.  Take sharing an API with a

13    digital wallet maker to let them Tap-to-Pay.  Regardless of the

14    sharing, the wallet maker is not going to write a phone

15    operating system API.  There is no incentive loss for them to

16    do that.  They don't make a phone.  Assuming Apple needs to

17    compete on the merits, it is going to be incentivized to make

18    that API anyway, which by the way, this is why APIs are made.

19    The primary reason for an API is to share it with developers to

20    get to write for your platform.

21         Apple needs the API because it is going to have to allow

22    its users to make digital payments.  Otherwise, you will have

23    smartphones with that functionality who are going to chip away

24    at Apple.

25         Again, if they are competing on the merits.

1    The second consideration is increased opportunities for

2    collusion.

3    This one, again, is obvious.  Publishing an API is not

4    going to increase the opportunity for collusion.  That involves

5    Apple putting documentation on the Internet.  It doesn't give

6    an additional opportunity for Apple in a watch maker to sit

7    down and agree to watch prices.  Nor does removing a rule and

8    App Review.  There is no additional or new interaction between

9    Apple and a rival that is going to lead the price fixing or

10   otherwise if you undo the illegal conduct.

11   But having Apple and smartphone rivals sit down and talk

12   in depth about the prices for the Apple silicon chip and how to

13   put that into a phone, forcing them to do that, that obviously

14   gives rise to connection where there wouldn't be one,

15   discussions about prices for a product, that is the collusion

16   concern.

17   That only applies in the monopolized market.

18   The third consideration is administerability of remedy.

19   This, again, applies to private cases about monopolize d

20   markets.  In those cases, where the monolopist was never going

21   to deal, the Court would be forced to fashion the remedy out of

22   whole cloth because there was nothing to benchmark against

23   because there was never any deal.  In other settings there is

24   plenty to benchmark against.  Apple deals with developers all

25   of the time.  There is no benchmarking problem when you get out

1   of that monopolized market in which they refused to deal.

2        That is before the fact that you get to this is a

3   government case.  That provides an array of options for relief

4   for the Court that don't involve being a central planner.

5        Now, your Honor, for the reasons I just discussed, this

6   case doesn't involve a refusal to deal with rivals claim,

7   whether you use our characterization of the conduct or whether

8   you use Apple's.  But the complaint states a claim, even if the

9   Court were to analyze it this way.

10       First, Apple concedes in its reply brief that *Otter Tail*

11  establishes a refusal to deal where the monopolist deals with

12  some people but not others, regardless of prior course of

13  dealing or other evidence.

14       Now, Apple makes the naked assertion that the complaint

15  doesn't contain these allegations.  We are back to the ghosts.

16  Apple can't win dismissal by claiming allegations aren't in the

17  complaint when they are.  The complaint pleads discriminatory

18  dealing repeatedly, including in paragraphs 41 and 119, which

19  discussed Apple's selective use of App Review and private APIs

20  to kill off competitively threatening apps and accessories

21  while treating others differently.  And they confirmed that for

22  you at the tech tutorial.  They deal with lots of people.

23  Right?

24       Those uncontested pleadings must be accepted as true and

25  they match *Otter Tail.*  That is a binding Supreme Court

1   precedent, that is enough.

2        But we have alleged more than that.  We have alleged

3   that the proper test for -- sorry.

4        The proper test for refusal do deal with rivals claim is

5   found in the *Viamedia* opinion, that a Seventh Circuit opinion.

6   It asks whether the refusal is predatory and it looks at a

7   number of factors, and you can find those pleadings discussed

8   in our brief at pages 37 to 38.

9        Apple tries to avoid that test by turning to the Ninth

10  Circuit's ridged test and it claims that you can only make out

11  a refusal to deal claim if a monopolist terminated an exact

12  prior course of dealing and that the only conceivable purpose

13  was sacrificing short-term profit for long-term gain.

14       Now, I didn't hear that test articulated that way here

15  and that maybe is important, maybe it's not.  Right?

16       But what is important about the test in the brief is

17  that it conflicts with *Broadcom*.

18       *Broadcom* involved only generalized dealing.  It doesn't

19  involve the termination of an exact prior course of dealing and

20  it never referenced an only conceivable purpose standard.

21       And I should say in *Broadcom*, the Court after saying it

22  wasn't a refusal to deal went on to say even if it was, this

23  was is how the test would be met.  So that's how you get that

24  analysis alongside the -- what's in the box.

25       *Host*, which Apple also purports to rely on, never

1    references an only conceivable purpose requirement.  And

2    *Revlimid*, which is a District Court decision in this District

3    that conflicts with the weight of authority in this District,

4    while it does limit it to two factors, it reads them far more

5    broadly than Apple.

6         *Revlimid* finds that proof of generalized dealing

7    satisfies the prior course of dealing element.  That is how

8    *Revlimid* deals with *Broadcom*.  So *Revlimid* doesn't help Apple

9    either.

10        Now to be clear, we do think the right approach is the

11   majority approach in this District because we do think that the

12   other opinion is in conflict with *Otter Tail* and *Aspen Skiing*.

13        But having said that, even if you apply the two-prong

14   test, which Apple is asking you to do, even if you are looking

15   for prior course of dealing in profit sacrifice, as we said in

16   our brief, we've alleged those things.  Apple has a prior

17   course of dealing.  Apple, quote, made, quote, an important

18   change in a pattern of distribution -- excuse me -- that had

19   originated in a competitive market.  That is a quote from *Aspen*

20   *Skiing*.  That is a Supreme Court case.  That is what a prior

21   course of dealing is.

22        Apple invited third-party developers to create app for

23   the iPhone.  It begged them to create apps for the iPhone.  It

24   tried to do it without them and it couldn't.  And then it sold

25   the phone to consumers based on those contributions; that is in

1  paragraphs 38 and 39.  Then Apple changed its course and

2  imposed tight controls on app creation and distribution when

3  competitive threats arose; that is in paragraphs 22, 67, and

4  101.

5        And Apple also changed course with APIs.  They turned

6  from public APIs to private ones with respect to smartwatches.

7        And the short-term profits Apple sacrificed, they are

8  staggered and they are all over the complaint; paragraphs 40,

9  51, 62, 70 to 71, 80, 131, 133.  As one example, Apple gave up

10  its 30 percent commission on super apps and cloud games in

11  order to suppress a competition among phones.  That is a profit

12  sacrifice.

13        Now, Apple tried to claim that is conjecture.  It is not

14  conjecture, your Honor.  As they pointed out, we have a

15  four-year investigation.  We are not guessing on what happened.

16  But for today what matters is it is a well-pleaded allegation.

17  And, of course, we will prove it at trial.

18        But again, today, what matters is it is a well-pleaded

19  allegation.

20        So even under the two-part test, the claim is pled.

21  That is enough, too.

22        Now, your Honor, I didn't actually hear anything about

23  attempted monopolization today, but because it is in the

24  briefs, I'm going to address it very quickly.

25        So attempted monopolization has three elements and Apple

1    is contesting one, specific intent to monopolize.  The other

2    two, dangerous probability of success and anticompetitive

3    conduct are not contested so I am not going to address those.

4        Now, the way Apple put this argument in its brief can't

5    explain better what is going on here.  I'm going to read you

6    from reply brief at page 14.

7        They say we haven't pleaded anticompetitive intent

8    because, quote, Apple -- we pleaded -- the complaint's

9    allegations plead that Apple sought to make the iPhone more

10   attractive to consumers.

11       We didn't plead that.  That is not the complaint in this

12   case.  We didn't plead that they tried to make the iPhone more

13   attractive.  That is their factual defense.  That is their

14   defense at trial, and they can raise that defense about the

15   conduct, but not here.

16       What governs here what we pleaded.  Then they say, Or

17   purported sacrificed short-terms profits from apps Apple viewed

18   as inconsistent with platform privacy and security.

19       We didn't plead that they sacrificed profits to protect

20   private and security.  That is not the complaint in this case,

21   your Honor.  That is their defense.  That is their fact

22   defense, and they're entitled to that was defense and nobody

23   wants to stop them from putting on that defense, but that is

24   for trial.

25       To dismiss the case on the pleadings because of that,

1   because those allegations are most reasonably viewed as

2   predominantly motivated by legitimate business aims, it is not

3   what we pleaded.  Right?  It is just not what we pleaded.  That

4   is not a basis to dismiss the complaint.

5        So we are -- again, we are back to litigating against

6   ghosts.  The complaint we filed didn't accuse Apple of

7   violating antitrust law by making the iPhone attractive to

8   consumers.

9        Now in the interest of time, I am just going to discuss

10  one example of the actual intent evidence.  It is in

11  paragraph 71 of the complaint and it is about cloud gaming.

12       In that paragraph it says, Apple was trying to avoid a

13  world where, quote, all that matters is who has the cheapest

14  hardware.

15       And they are talking about suppressing cloud games here.

16  That is a literal statement of an intent to block price

17  competition over phones by undermining cloud games.  Hardware,

18  cheapest hardware.  They don't want to get in a fight over who

19  has the cheapest hardware.  Right?  It is hard to imagine a

20  more direct statement of intent than that.

21       In addition, as we explained in our brief, intent can be

22  inferred from the conduct anyway.

23       Thank you, your Honor.  I am going to turn things over

24  to Ms. Pitt to address the States' standing issue.

25            MS. PITT:  Good afternoon, your Honors, and may it

1    please the Court.

2        My name is Isabella Pitt, Deputy Attorney General for

3    the New Jersey Attorney General's Office, appearing for the

4    20 plaintiff States, acting by and through their respective

5    Attorney General's Office in this matter.

6        I will address how the States have alleged a

7    sufficiently quasi-sovereign interest and my colleague,

8    Giancarlo Piccinini, will address why the *Harrison* decision is

9    in opposite.

10        New Jersey and the other plaintiff States are

11    participating in this case because we have to parens patriae

12    standing to sue Apple.

13        In a three-sentence footnote in their brief in support

14    of this motion to dismiss, Apple argues otherwise, wrongly

15    suggesting the States lack standing to participate.  But the

16    plaintiff States have asserted a quasi-sovereign interest

17    sufficient to establish parens patriae standing here.

18        As Apple's counsel noted, we have done that on

19    paragraphs 192 and 193 of the complaint where we explained that

20    the States are further fulfilling their duty to protect their

21    States' populations from anticompetitive conduct that distorts

22    market fairness and harms consumers with higher prices, few er

23    choices, and stickier products as is alleged in the complaint.

24        The leading case on parens patriae standing is the

25    Supreme Court's decision in *Alfred L. Snapp & Son*.  According

1    to that case, the States have standing if we assert a

2    sufficiently concrete quasi-sovereign interest, the injury to

3    which affects a substantial segment of our population.

4         As the *Microsoft* Court made clear, it is beyond dispute

5    that the federal antitrust laws provide statutory authorization

6    for claims brought by a State in its parens patriae capacity.

7    More specifically, the Clayton Act expressly permits State

8    Attorneys General to bring a civil action in the name of such

9    state as parens patriae on behalf of natural persons residing

10   in such state.  And the Clayton Act further authorizes State

11   Attorneys General to seek injunctive relief in those suits to

12   remedy a threatened loss or damage by a violation of the

13   antitrust laws.

14        Thus, a State may proceed in a parens patriae capacity

15   where, as here, the case in substance implicates the State's

16   interest in economic supervision.

17        As the Eastern District of Pennsylvania noted only two

18   years ago in *In Re:  Generic Pharms Pricing Antitrust*

19   *Litigation*, the State's interest in economic supervision is

20   independent of the benefit that might accrue to any particular

21   individual.

22        Meaning, it is irrelevant that a private action has been

23   filed here.  Or private actions.  Because the Attorney Generals

24   are the chief legal officers of their respective states and

25   they stand to ensure that the benefits of the federal system,

1  including the federal antitrust laws, are not denied to the

2  general population.

3       A State's interest in preventing harm to its citizens by

4  antitrust violations is a prime instance of the interest that

5  the parens patriae can vindicate.  Consistent with these

6  standards, States have a well-recognized quasi-sovereign

7  interest in ensuring that our citizens are not denied the

8  benefit of lower prices that would result from the market

9  participant's adherence to fair marketplace regulations and

10  insuring that those who sell products to their citizens abide

11  by the federal antitrust system.

12       As the complaint makes clear, this is not a case of

13  simple individual consumer grievances.  Rather, it strikes at

14  the heart of the plaintiff States' quasi-sovereign interest in

15  protecting the economic wellbeing of our citizens and ensuring

16  fair market competition in our economies against Apple's

17  violations of federal and state antitrust laws.

18       Apple's anticompetitive conduct has resulted in concrete

19  and demonstrable injuries to substantial seg ments of the

20  plaintiff States' population.  With a market share of greater

21  than 70 percent and 250 million devices in the United States,

22  the sheer scale of Apple's market penetration truly underscores

23  the widespread impact of its conduct on the plaintiffs' States'

24  economies and the economic health of our citizens.

25       Apple's conduct has led to inflated prices, restrictions

1   on consumer choice, and barriers to switching to less expensive

2   alternative technologies.  These are not isolated incidents.

3   They represent a systemic pattern of behavior with far reaching

4   consequences for our markets and residents' economic health.

5       Accordingly, the plaintiff States are not simply nominal

6   parties in this case.  They are exercising their legitimate

7   authority to protect their citizens from anticompetitive

8   conduct that distorts market fairness and harms consumers.

9   Apple's conduct, as detailed at length in the complaint, does

10  not adhere to fair market practices and federal and state

11  antitrust laws, thus directly implicating the plaintiff States'

12  well-established quasi-sovereign interest in supervising our

13  economies and ensuring our citizen's economic wellbeing.

14      Apple's suggestion to the contrary fights clearly

15  established law authorizing the suit and the Court should

16  reject it.

17      In closing, the plaintiff States presence in this case

18  is fundamental as our participation underscores the critical

19  need to uphold antitrust laws at all levels of government as a

20  safeguard.

21      The quasi-sovereign interests we represent, the tangible

22  harms endured by our economies and residence, and unequivocal

23  authority under federal law substantiate our standing in this

24  case, a case that reflects each of our States' commitments to

25  protecting the marketplace and competition.

1       And with the Court's permission, I will now yield the

2  podium to my colleague, Giancarlo Piccinini to address the

3  *Harrison* case.

4       HON. JULIEN X. NEALS:  Thank you, counsel.

5       MR. PICCININI:  Good afternoon, your Honor.  Giancarlo

6  Piccinini, Deputy Attorney General, on behalf of the State of

7  New Jersey and plaintiff States.

8       Apple relies on *Harrison v. Jefferson Parish School*

9  *Board* to argue that the plaintiff States lack standing in this

10  case, but Apple is wrong about that for two principle reasons.

11      First, *Harrison* is inapposite both factually and

12  procedurally.  And, second, Apple misstates the law of parens

13  patriae and, specifically, the law of state standing in doing

14  so.

15      And for both of those reasons, the Court should reject

16  its attempt to use *Harrison* as a basis to exclude the States

17  from this action.

18      First, *Harrison* is distinguishable both on its own facts

19  and procedurally.  That case involved a suit brought in state

20  court by two students against the local school board after the

21  school board disciplined those students for brandishing BB guns

22  during virtual class back during the pandemic.  The school

23  board removed the case to federal court, and Louisiana then

24  intervened.  After the students settled out of the case,

25  leaving only the Louisiana as a plaintiff in an action against

1  a state subordinate in federal court.  This case, by contrast,

2  could not be further from *Harrison*.

3      This is a government enforcement action brought pursuant

4  to a statutory cause of action, authorized by Congress, to

5  vindicate the federal antitrust laws against a respondent that

6  has been accused of violating those laws.

7      That leads to my second point, that Apple misunderstands

8  the law of parens patriae standing and asserts that the States

9  need to assert a sovereign interest in order to justify parens

10  patriae standing here.  That mistakes two separate theories of

11  standing for States and here only one theory is applicable.

12      The reason:  Congress said so.  15 U.S.C. Section 15(c)

13  says that States can proceed in their capacity as parens

14  patriae on behalf of natural persons residing in such States.

15      Here, the States have alleged a sufficient

16  quasi-sovereign interest to justify its parens patriae

17  standing.  Here the States need not assert a sovereign interest

18  and that is because a sovereign interest is only applicable in

19  suits that are sovereign suits.  In fact, the Court in *Harrison*

20  recounts the differences between those two theories of

21  standing, and here only one is applicable.

22      So Apple's urgings the contrary, that the State need

23  assert some impairment of a right to enforce its laws is

24  completely inapposite in a case like this where the States are

25  proceeding in their capacity as parens patriae.

1        And so, further, in *Harrison*, the Court notes that a

2   quasi-sovereign interest is one that emanates outside of the

3   State's sovereign authority.  Further underscoring the fact

4   that Apple is wrong about the need to assert a sovereign

5   interest in this case to establish standing for the plaintiff

6   States.

7        I won't rehash or reargue why we have asserted a

8   sufficient quasi-sovereign interest here.  The point being that

9   that is all the States need to show, in addition to the

10  irreducible constitutional minimum for Article III standing,

11  which the plaintiff States have alleged in spades in the

12  complaint.

13       The Court should reject Apple's attempt to invoke

14  *Harrison* as grounds to exclude the plaintiff States, a

15  Fifth Circuit decision that is being misinterpreted and

16  misapplied in this matter.

17       And with the Court's permission, I will yield the podium

18  to the Department of Justice to conclude today's presentations.

19       HON. JULIEN X. NEALS:  Thank you.

20       MR. LASKEN:  Thank you, your Honor.

21        Apple's motion should be denied because it seeks

22  dismissal by disputing facts and challenging the viability of

23  claims that were not brought all under rules of law that don't

24  exist.

25       No Court has ever held that to be illegal, conduct has

1    to fit in a box.

2        By the way, *Microsoft* is not an exclusive dealing case.

3    There were -- it was a course of conduct and certain pieces of

4    it were exclusive dealing.  There was an exclusive deal with

5    Apple.  So when the Third Circuit is talking about that, they

6    are talking about parts of the case, right, different elements

7    that were that.

8        But nobody said that when *Microsoft* told people you

9    can't change the Start menu, that that is exclusive dealing.

10   That is not what the case is about.

11       Refusal to deal with rivals law, it applies to cases

12   about rivals and on a 12(b)(6) motion, the allegations in the

13   complaint are taken as true.  If Apple wants to dispute the

14   words of its executives, there is a time and a place for that

15   and it is trial.

16       Look, antitrust law can be complex and today has

17   certainly demonstrated that, but it is also quite simple.

18       Antitrust law requires Apple, or any company, to compete

19   only on the merits of its products every day, all day.  That is

20   what it requires.

21       If Apple stopped doing that to win sales in another way,

22   as in *Microsoft*, by suppressing cross-platform technologies, it

23   violates Section 2.  Or if Apple keeps competing on the merits

24   but adds strategies that contributed to winning sales in

25   another way, it still violates Section 2.

1          Your Honor, Apple has no right to monopolize a market

2    through conduct, other than competition on the merits, so long

3    as it comes as part of a deal.  The right that Apple claims to

4    be exercising, that has been a the literal definition of

5    illegal conduct since *Colgate* in 1919.

6          Take the allegations of the complaint as true, that is

7    what we would ask the Court to do.  Stack them up against cases

8    like *Dentsply* and *LePage's* -- and by the way, *Dentsply* tells

9    you that for a monopoly maintenance claim, that thing that you

10   were -- that was suggested that we have the wrong standard, it

11   literally says the standard for proving a monopoly maintenance

12   claim is reasonable probability that it contributed to -- I

13   don't have it in front of me, but maintaining a monopoly.  It

14   doesn't talk about actual price increases.

15         So take the allegations as true.  Stack it up against

16   cases like *Dentsply* and *LePage's* and *Microsoft*.  You will see

17   the complaint easily states a claim.

18         For those reasons and the reasons in our briefs,

19   your Honor, we would ask that Apple's motion be denied.  And we

20   would ask that the Court move forward into discovery as soon as

21   practicable, in light of the ongoing harm to Americans and

22   American businesses whose products are being suppressed,

23   consistent, of course, with the Court's schedule and

24   preferences.

25         Thank you, your Honor.

1          HON. JULIEN X. NEALS:  Thank you, Mr. Lasken.

2          MR. LASKEN:  And I should say, if there are questions,

3    I am happy to answer them.

4          HON. JULIEN X. NEALS:  I am going to hear from your

5    adversary first.

6          MR. PRIMIS:  Thank you, your Honor.  You have been

7    very generous with your time, so my colleague and I will be

8    brief in response.

9          Mr. Lasken -- I am going to address, again, the refusal

10   to deal point, and Ms. Allon will cover the other points.

11         Mr. Lasken said something that caught my attention as he

12   was arguing.  He said, Apple is being clever.  They shouldn't

13   get away with this because they are being clever.

14         He said that after going through all of the cases that I

15   addressed and distinguished when I was arguing, cases like

16   *Lorain Journal* and *Kodak*, which had exclusive dealing

17   arrangements that prohibited customers from dealing with direct

18   competitors.

19         Again, none of which exists here.

20         Mr. Lasken addressed the *Microsoft* case and he

21   acknowledged it is different.  It is quite different than here,

22   but Apple shouldn't get away with it because they are being

23   clever.

24         There is no "being clever" doctrine of antitrust law.

25   There is no huge exception to the refusal to deal doctrine that

1    I described because the government believes someone is being

2    clever.  It is not a catch-all.  The reason I showed the quotes

3    and the specific conduct from *Trinko* is because I think if you

4    match it up in the transcript, it will line up exactly with

5    what Mr. Lasken said, about discriminating against competitors,

6    about putting yourself first, about doing all of these things

7    in a way that makes it more difficult to switch.  That is all

8    in *Trinko*.  It is all in *Novell*.  And I don't believe

9    Mr. Lasken addressed any of that.

10            With regard to the point about having to be a rival and

11    the specific market that the government pled, the government is

12    setting up a scenario -- well, first, I would just say Apple

13    does have rivals in watches, in messages.  It has its own

14    operating system which they claim would be jeopardized by super

15    apps.  Wallets.  All of these things.  So the doctrine applies

16    to that.

17            But even taking a step back and saying if they are right

18    about what it means to have to, you know, have a rival in the

19    pled market for this doctrine to apply -- and I think

20    Mr. Lasken acknowledged what I am about to say.

21            If Samsung came to Apple, a smartphone maker came to

22    Apple and said, Boy, we would like you to change your App Store

23    Guidelines because it would really help super apps and mini

24    programs, that would make it easier for people to leave Apple

25    and come over to Samsung, would you do that for us?  That would

1    not last five minutes in Court.  And I think Mr. Lasken

2    acknowledged that.  It would be rejected under *Trinko* and all

3    of the cases I described.

4         But what they are saying is that if an app developer or

5    if the government comes in and says, hey, we would like you to

6    do these things for Samsung and Google to facilitate switching

7    to their product, all of a sudden instead of getting the

8    benefit of *Trinko* and *LinkLine*, now we are subject to years of

9    litigation under a *Microsoft* balancing test when the conduct is

10   exactly the same.  And if you recall, this is conduct at Judge

11   Gorsuch, when he was on the Court in *Novell*, he said this type

12   of conduct is almost never harmful to consumers.

13        So for those reasons, we think the government has not

14   made the appropriate showing to show the refusal to deal

15   doctrine doesn't apply here.

16        And with that, I will hand it over to Ms. Allon.

17          MS. ALLON:  Thank you, your Honor.  I'll just address

18   two of our arguments briefly.

19        First is effects.  To the effect -- to the extent the

20   government is suggesting it does not need to show

21   anticompetitive effects at the pleading stage, that is wrong.

22   Effects is not just a Section 1 requirement.  *Microsoft* and

23   *Dentsply* were both Section 2 case s that required

24   anticompetitive effects.

25        The government does not cite any cases suggesting that

1  the analysis operates differently in a Section 1 and Section 2

2  case.

3         Mr. Lasken quoted from page 79 of *Microsoft* about what

4  the Court can infer.  Again, that is a discussion of causation.

5  It has nothing to do with effects.  It is certainly not

6  purporting to set out a pleading standard or in any way trump

7  Rule 8.

8         We know what the Court can infer.  The government is

9  entitled to the benefit of all plausible inferences, but it

10 needs facts to plausibly justify its inferential leaps.

11        And on that slide 16 with the chain, I gave the

12 government the benefit of all plausible inferences.  And even

13 so, we have speculative steps.  We are guessing at what both

14 developers and consumers would do.  And the government has not

15 provided facts that allow this Court to draw the kinds of

16 inferences the government needs to get from the alleged conduct

17 to the alleged harm.

18        So we would suggest that this Court should follow

19 guidance from decisions like *IDT* and *Miller,* which confirm that

20 this is a pleading-stage issue and dismiss the government's

21 complaint on that basis.

22        On *Twombly*, the government does not have a real response

23 as to why the allegations in paragraphs 119 to 125 and 136 to

24 140 should survive.

25        Your Honor's decision in *Stepan, Judge McNulty's*

1    *decision in loanDepot* made clear that this is a proper ask on a

2    motion to dismiss.  It wasn't raised for the first time in

3    reply.  We cited both of those cases at page 39 of our opening

4    brief.

5         But regardless, all of the cases Mr. Lasken cited to the

6    contrary are outside of this district.  There are three cases

7    that have addressed this issue in the District of New Jersey.

8    *Stepan*, *loanDepot*, and *Lincoln Harbor LLC v. Hartz Mountain*

9    *Industries,* that's 517 F.Supp 293, all came out the same way.

10   They all confirmed that it is within this Court's discretion to

11   limit the claims that stay in the case to well-pleaded

12   allegations.

13        The government cannot satisfy Rule 8 by making vague

14   references to dozens and -- of products -- of products and

15   services just because the government alleges some playbook for

16   how Apple purportedly engages in anticompetitive conduct.

17        Two weeks ago, the United States told this Court it will

18   need to understand the how, the what, and the why.  What

19   technologies Apple restricts, how it restricts them, whether

20   through APIs they are private or contractual means, and why

21   that matters for smartphone competition.  I couldn't agree

22   more.  That is what Rule 8 requires.

23        And the lack of any alleged facts going to those points

24   is particularly egregious given the four-year investigation,

25   the millions of documents that the government received from

1    Apple, the 15 depositions the government took.  There is no

2    excuse for the government's failure to include real, concrete

3    allegations, if it has them, as to these dozens of other

4    products and services.

5          And, finally, let me just discuss the point about

6    discovery and whether it can be effectively managed with these

7    allegations in the case.

8          In its additional disclosures, which the government

9    served on August 23rd of this year, the government listed 111

10   third parties, including many whose only connection is to these

11   additional products and services.  So, for example, the

12   government listed Ford and General Motors of the CarPlay

13   allegations, Peloton about the fitness apps, the *New York Times*

14   and the *Financial Times* about subscription news services.

15         As a practical matter, the parties and third parties

16   will not be able to efficiently conduct discovery on issues

17   like CarPlay, fitness apps, or subscription services because

18   the complaint gives no indication about what the government

19   thinks is relevant to this case.

20         So dismissing those conclusory allegations now, which

21   are legally deficient under Rule 8, will avoid miring the

22   Court's and the parties in prolonged discovery disputes about

23   what requests are fairly inbounds and which are not, which is

24   exactly what *Twombly* was designed to achieve.

25         The government wants to pursue a case it did not plead

1  under antitrust laws that do not exist.  On issue after issue,

2  the government asks this Court to ignore binding precedent from

3  the Supreme Court in *Trinko*, *LinkLine*, *NCAA*, and *Twombly*, and

4  the Third Circuit in *Host*, *Mylan*, and *Dentsply*.

5      This Court should not be the first to entertain the

6  government's sweeping new theories of antitrust law and

7  complete disregard of federal pleading standards.  We would ask

8  for the government's case to be dismissed in its entirety with

9  prejudice.

10     Thank you, your Honor.

11       HON. JULIEN X. NEALS:  Thank you, Counsel.

12     You look eager, Mr. Lasken.  Did you have anything you

13 want to add?

14       MR. LASKEN:  Well, there was a lot of what I would

15 agree, so I will -- I will keep it short, your Honor.

16     So, first, it was said that I would agree with the idea

17 that if Samsung came to Apple and said change your App Store

18 rules to help some cross-platform app, that that would be

19 lawful.  I don't agree that that is lawful.  That's not the

20 question.  The question isn't who is doing the asking.  Right?

21     The question is -- you know, we have got some cleverness

22 again -- right?

23     The question is what is the effect of the restriction on

24 competition.  Right?  The theory in refusal to deal with rivals

25 case is you are not sharing it with me.

1        Samsung in that hypothetical, they're not asking Apple

2   to share something with Samsung.  They are saying stop

3   restraining other people.  Right?

4        So the fact that Samsung asks doesn't make it legal or

5   not.  That is a hypothetical that is just outside the bounds.

6   The theory is I am Samsung -- I need you to share -- there is

7   no lines in this case -- I need you to share your phone lines

8   with me so I can compete with you.  I need you to share your

9   chip so I can copy it and compete with you.

10        It is not Apple's infrastructure.  It is not what those

11   cases are about, so I don't agree with that.

12        Now, on the initial disclosures point, this is a little

13   bit of a government antitrust thing.  We always get

14   interrogatory and complaints when people don't tell us everyone

15   we've ever talked to.  So we were trying to be helpful and tell

16   them basically everyone we've talked to.  Right?  If we didn't

17   do that, we would get a complaint that our disclosures were too

18   narrow.  Right?

19        Just because someone is on disclosures doesn't mean

20   they're going to be in the case.  We even offered to give them

21   an early preliminary witness list, so they would know exactly

22   who is going to be at issue.  They didn't want that.  Right?

23        So they are lots of ways -- and we have an excellent

24   magistrate judge who we have been in front of already who can

25   handle this.

1          You know, there are a lot of ways we can keep discovery

2   reasonable without violating the basic premise of Rule 12(b)(6)

3   that we assess complaints to see whether they state a claim,

4   which, by the way, is how we read your Honor's opinion, but it

5   seems odd for us to get in a fight over that in front of you,

6   your Honor.

7          But any way, that is all I wanted to say.

8          Thank you, you Honor.

9          HON. JULIEN X. NEALS:  Thank you.

10          Counsel actually addressed pretty much every question

11   that I had, to be very candid with you.

12          We are really going to put a lot of effort into this to

13   have a decision to you by January.  That is being realistic

14   with the fact that we are up against the holidays right now.

15   You are not our only case.  You cited one of my other ones,

16   *IQVIA*, which is a citation by opinion.  If anyone who has read

17   anything about *IQVIA*, you know that one is quite interesting as

18   well.

19          Again, thank you, counsel, for your thorough argument,

20   and we will also be conferring with her Honor as well with

21   regard to discovery.

22          Our pretty much hope is that once we get to January,

23   during that month, you will have a discussion as well.

24          So I thank you all.  And I thank the MDL-interested

25   group for attending as well.

1              And have a good Thanksgiving, all.  Thank you, again.

2              THE COURTROOM DEPUTY:  All rise.

3    (Whereupon the proceedings are adjourned at 2:55 p.m.)

4                        *          *          *

5              FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE

6

7              I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10   /S/ Melissa A. Mormile RDR, CCR, CRCR        11/20/2024

11   Official Court Reporter                      Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*United States District Court*
*District of New Jersey*