# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>                Plaintiffs,<br><br>   v.<br><br>APPLE, INC.,<br><br>                Defendant. | Civil Action No. 24-cv-4055 (JXN)(LDW)<br><br>**OPINION** |

**NEALS**, District Judge:

This matter comes before the Court on Defendant Apple, Inc.'s ("Apple") motion to dismiss Plaintiffs United States of America and the Attorney Generals of twenty States' (collectively, "Plaintiffs")[1] Amended Complaint (ECF No. 51) ("Amended Complaint" or "Am. Compl.") for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 86). Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1337(a). Venue is proper pursuant to 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15 U.S.C. § 22. The Court has carefully considered the parties' submissions, the information presented during the Technology Tutorial on November 6, 2024 (ECF No. 200), and the arguments made during the oral argument on November 20, 2024 (ECF No. 207). For the reasons set forth below, Apple's motion to dismiss (ECF No. 86) is **DENIED**.

---

[1] The Plaintiff States in this case include the states of New Jersey, Arizona, California, Connecticut, Indiana, Massachusetts, Maine, Michigan, Minnesota, Nevada, New Hampshire, New York, North Dakota, Oklahoma, Oregon, Tennessee, Vermont, Wisconsin, Washington, and the District of Columbia.

## I.    **BACKGROUND AND PROCEDURAL HISTORY**[2]

The underlying issue in this case is whether Apple has engaged in anticompetitive practices in violation of federal and state antitrust laws. Apple is a global technology company headquartered in Cupertino, California. (Am. Compl. ¶ 19). The iPhone, Apple's signature product, is currently the dominant smartphone in the United States. (*Id.* at ¶¶ 20, 165, 172, 181). According to the Amended Complaint, Apple maintains a market share of 65 percent in the smartphone market and 70 percent in the performance smartphone market. (*Id.* at ¶ 181).

### A.    **Apple's Technology**

To understand Plaintiffs' theories advanced in the Amended Complaint, the Court first describes the relevant technology. A smartphone is a type of mobile device that utilizes advanced hardware and software components to allow users to "not only make phone calls, but allow users to listen to music, send text messages, take pictures, play games, access software for work, manage their finances, and browse the internet." (*Id.* at ¶¶ 148-49). These functions are provided through software applications, also known as "apps." (*Id.* at ¶ 158). In order for an app to run on a smartphone, it must communicate with the smartphone's operating system ("OS") through application programming interfaces ("APIs"). (*Id.*) Apps that run with a particular smartphone's OS are native apps. (*Id.* at ¶ 159). With respect to Apple, apps that run with Apple's iPhone operating system ("iOS") are considered native. (*Id.*) Third-party developers can also use APIs for the iPhone's iOS to create apps for the iPhone. (*Id.* at ¶ 158). They can use "middleware" software, which "provides similar APIs and functionality across a diverse set of operating systems and devices[,]" to create "cross-platform applications without having to write separate code for individual operating systems or devices." (*Id.* at ¶ 163). However, developers are bound by certain

---

[2] The following factual allegations are taken from the Amended Complaint that are accepted as true. *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010).

policies imposed by Apple that allegedly restrict the developer's ability to standardize the app across different OS. (*Id.* at ¶ 41). Thus, the app must be approved by Apple to be published on Apple's App Store. (*Id.*)

According to Plaintiffs, Apple harms competition by restricting certain cross-platform technologies that would make it easier for consumers and developers to purchase and develop products for devices outside of the Apple ecosystem. (*Id.* at ¶¶ 41-42, 60-118). Plaintiffs allege these restrictions affect five key categories: super apps, cloud-streaming apps, text messaging, smartwatches, and digital wallets. (*Id.*)

### i. Super Apps

A super app is middleware that runs multiple, smaller "mini programs" in one app, effectively consolidating access to different apps, experiences, content and services. (*Id.* at ¶¶ 61, 63). By using a super app, consumers do not have to find an app in an app store, download the app, set up the app, and continually log into the app for each specific activity or function that they need. (*Id.* at ¶¶ 62, 68). Rather, consumers can simply find, download, set up, and log into one app that hosts all the activities and functions that would otherwise require multiple, separate apps. (*Id.*) Super apps work by utilizing standard programming languages that enable the app to be used on "any web browser and on any device," including an iPhone. (*Id.* at ¶ 61). Developers, therefore, do not need to create apps using a specific device's API. (*Id.*) This access and the functionality of super apps make them attractive and valuable to users. (*Id.* at ¶ 62). However, because the same app can be accessed on different devices with low switching costs, super apps may decrease a user's dependence on a specific device's operating system. (*Id.* at ¶¶ 63, 66). For example, a user has more choices when purchasing a new smartphone if the super app they rely on can be run just the same on any smartphone. (*Id.* at ¶ 64).

Plaintiffs allege Apple limits super apps through its App Store Guidelines (*Id.* at ¶ 67). Specifically, Plaintiffs allege that Apple has "effectively blocked" developers from creating apps that host mini programs by (1) requiring apps to display mini programs using text-only lists, (2) preventing apps from categorizing mini programs, and (3) blocking mini programs from accessing Apple's in-app payment system and using other payment systems. (*Id.* at ¶¶ 67-70).

### ii. Cloud Streaming Apps

Cloud streaming apps allow users to "run a computationally intensive program without having to process or store the program on the smartphone itself." (*Id.* at ¶ 72). Rather, the smartphone utilizes "the computing power of a remote server, which runs the program and streams the results back to the phone." (*Id.*) This allows developers "to bring cutting-edge technologies and services to smartphone consumers—including gaming and interactive artificial intelligence services—even if their smartphone includes hardware that is less powerful than an iPhone." (*Id.*) For users, the usage of cloud gaming apps would allow for "rich gaming experiences" without needing powerful and expensive hardware. (*Id.*) For developers, cloud platforms can serve as middleware to develop a single app that works across different smartphone's OS and "provides more and simpler options for offering subscriptions, collecting payments, and distributing software updates." (*Id.* at ¶ 73). Plaintiffs allege that if Apple permitted cloud streaming apps, it could be forced "to compete more vigorously against rivals" and reduce users' need to purchase expensive phones with advanced hardware. (*Id.* at ¶ 79).

According to the Amended Complaint, Apple has prevented third-party developers from offering cloud gaming subscription services as a native app on the iPhone. (*Id.* at ¶ 75). Rather, Apple has imposed upon developers the "onerous requirement" whereby any cloud streaming game or update thereto must "be submitted as a stand-alone app for approval by Apple," which

has "increased the cost of releasing games on the iPhone and limited the number of games" developers can make available to users. (*Id.* at ¶ 76). Apple also requires developers to expend "considerable time and resources re-engineering apps" to meet its "rules and restrictions" for cloud games. (*Id.* at ¶ 78).

### iii.  Text Messaging

Importantly, mobile phones allow the exchange of Short Message Service ("SMS") text messages between other mobile phones, including smartphones. (*Id.* at ¶¶ 45, 83). Apple Messages ("iMessage") is a native app that allows SMS messages to be exchanged between iPhones and other mobile phones. (*Id.* at ¶ 80, 85). SMS, though, does not support modern messaging features or over the top protocols ("OTT"), like sending large files, editing messages, and reacting with icons, and encryption, typing indicators, read receipts, and disappearing messages. (*Id.* at ¶¶ 83, 84). With respect to iMessage, Plaintiffs allege Apple designates the APIs needed to implement SMS as 'private,'" which prevents third-party developers from combining the "'text-to-anyone' functionality of SMS with the advanced features of OTT messaging." (*Id.* at ¶ 85). Thus, iMessage does not allow text messages to be received by or sent to cross-platform messaging alternatives. (*Id.*) Rather, text messages from cross-platform messaging apps can only be received by or sent from iPhones if all the parties to the text exchange have downloaded the respective cross-platform messaging app. (*Id.*) In contrast, iMessage allows users to send messages to anyone by entering their phone number because it "incorporates SMS and OTT messaging." (*Id.*)

Plaintiffs allege Apple inhibits developers' ability to provide a quality cross-platform messaging app, as compared to iMessage, by (1) preventing developers from combining SMS with OTT, (2) stopping third-party messaging apps from operating in the background, (3) preventing access to video previews before answering a video call, and (4) preventing the use of modern

features on text messages sent from other smartphones. (*Id.* at ¶¶ 85-90). Plaintiffs further allege that Apple has created barriers in communication between iPhones and other smartphones to drive consumers towards the iPhone and to make it harder for current iPhone users to switch smartphones. (*Id.* at ¶ 90).

        iv.  Smartwatches

      Smartwatches are wrist-worn devices that allow users to access apps and perform other functions like responding to notifications, making mobile payments, and tracking health data. (*Id.* at ¶ 95). A smartwatch must be paired with a smartphone to optimize its functionality, so it is imperative when buying a smartwatch that the user's smartphone is capable of pairing. (*Id.*) Third-party smartwatches are compatible with smartphones by requiring users to download an app to their smartphone and then connect the app and watch via Bluetooth. (*Id.* at ¶ 97). Apple Watch, Apple's smart watch, does not have this functionality and can only be paired with an iPhone. (*Id.* at ¶ 96). However, third-party smartwatches conversely, can pair to the iPhone. (*Id.* at ¶ 100).

      Plaintiffs allege that once consumers purchase an Apple Watch, they are less inclined to switch to a different smartphone because the Apple Watch is not compatible with other smartphones. (*Id.* at ¶¶ 94, 96). According to the Amended Complaint, Apple degrades third-party smartwatches' functionality through "its technical and contractual control of critical APIs" by (1) depriving iPhone users with third-party smartwatches of the ability to respond to notifications, (2) inhibiting third-party smartwatches from maintaining reliable connection to the iPhone, and (3) undermining the performance of third-party smartwatches that connect directly with a cellular network (*Id.* at ¶¶ 100-03).

v.  Digital Wallets

Digital wallets are "apps that allow a user to store and use passes and credentials, including credit cards, personal identification, movie tickets, and car keys, in a single app" and can be used for transactions in mobile apps and websites. (*Id.* at ¶ 105). According to the Amended Complaint, if developers could create cross-digital platforms, users would be able to "use the same wallet, with the same cards, IDs, payment histories, peer-to-peer payment contacts, and other information" among different devices, thereby making it easier for users to switch smartphones. (*Id.* at ¶ 109).

Apple Wallet, Apple's proprietary digital wallet, is on the iPhone and it incorporates Apple Pay, Apple's proprietary payment system, to "process[] digital payments on the web, in apps, and at merchant points of sale." (*Id.* at ¶ 107). It utilizes near-field communication ("NFC") hardware to provide tap-to-pay. (*Id.* at ¶ 109). However, Plaintiffs contend that Apple exerts its smartphone monopoly by precluding banks, merchants, and other parties from using NFC to facilitate tap-to-pay and the ability to "develop[] better payment products and services for iPhone users." (*Id.* at ¶¶ 111-12).

Beyond not allowing others to utilize NFC, Apple impedes and undermines the capabilities of digital wallets by restricting others from offering the ability to authenticate digital payment options during online checkouts, thereby limiting third-party wallets' ability "to provide a simple, fast, and comprehensive solution to purchasing." (*Id.* at ¶ 116). Further, Apple blocks other digital wallets from serving as an alternative in-app payment, which prevents these wallets from improving users' experiences by including "use of rewards points in purchasing, digital receipts, returns, loyalty programs, and digital coupons for purchases of relevant subscriptions and digital goods." (*Id.* at ¶ 117).

### B. Procedural History

On March 21, 2024, Plaintiffs initiated this antitrust action against Apple. (*See* ECF No. 1). On June 11, 2024, Plaintiffs filed an Amended Complaint which added Indiana, Massachusetts, Nevada, and Washington as Plaintiffs and a claim for relief under Tennessee state law. (*See generally* Am. Compl.). In total, the Amended Complaint raises seven claims for relief: (1) monopolization of the performance smartphone market in the United States (First Claim for Relief); (2) attempted monopolization of the performance smartphone market in the United States (Second Claim for Relief); (3) monopolization of the smartphone market in the United States (Third Claim for Relief); (4) attempted monopolization of the smartphone market in the United States (Fourth Claim for Relief); (5) violation of the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-1, *et seq.* (Fifth Claim for Relief); (6) violation of the Wisconsin Antitrust Act, Wis. Stat. Ch. § 133.03., *et seq.* (Sixth Claim for Relief); and (7) violation of the Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101, *et seq.* (Seventh Claim for Relief). (*See id.*)

On August 1, 2024, Apple filed a motion to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 86) ("Br."). Plaintiffs opposed the motion (ECF No. 106) ("Opp'n), to which Apple replied. (ECF No. 169) ("Reply"). This matter is now ripe for consideration.[3]

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) governs motions to dismiss for "failure to state a claim upon which relief can be granted." For a complaint to survive dismissal under the Rule, it must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim

---

[3] The Court has also considered Plaintiffs' notice of supplemental authority (ECF No. 255) and Apple's response thereto. (ECF No. 258).

is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (citation modified). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his or] her claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). Restatements of a claim's elements are legal conclusions, and therefore, not entitled to a presumption of truth. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011). The Court, however, "must accept all of the complaint's well-pleaded facts as true[.]" *Fowler*, 578 F.3d at 210. Even if plausibly pled, however, a complaint will not withstand a motion to dismiss if the facts alleged do not state "a legally cognizable cause of action." *Turner v. J.P. Morgan Chase & Co.*, No. 14-7148, 2015 WL 12826480, at *2 (D.N.J. Jan. 23, 2015).

To determine a complaint's sufficiency, the Third Circuit requires a three-part inquiry: (1) the court must first recite the elements that must be pled in order to state a claim; (2) the court must then determine which allegations in the complaint are merely conclusory and therefore need not be given an assumption of truth; and (3) the court must "assume the[ ] veracity" of well-pleaded factual allegations and ascertain whether they plausibly "give rise to an entitlement for relief." *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (citation modified).

## III.  **DISCUSSION**

Apple moves to dismiss the Amended Complaint on multiple grounds. First, Apple contends the monopolization claims fail because the Amended Complaint fails to allege, (i) exclusionary conduct and instead only challenges Apple's lawful refusals to deal; (ii) substantial anticompetitive effects in the smartphone market; or (iii) Apple's maintenance of monopoly power in any relevant market. (*See* Br. at 18-46).[4] Second, Apple argues the attempted monopolization claims fail because the Amended Complaint does not plead Apple's specific intent to monopolize or a dangerous probability of achieving monopoly power. (*See id.* at 46). Third, Apple contends, even if the monopolization and attempted monopolization claims were to survive, the Court must dismiss the "monopoly playbook" allegations that broadly reference other products and services offered by Apple but are unrelated to Plaintiffs' theory of harm. (*See id.* at 46-48). Finally, Apple argues the Plaintiff States lack standing to pursue their claims through either their sovereign capacities or under a *parens patriae* theory. (*See id.* at 40 n.6). Plaintiffs oppose each of these arguments. (*See* Opp'n at 10-40). The Court addresses each argument in turn.

### A.  **The Amended Complaint Adequately Alleges Monopolization Claims Under Section 2 of the Sherman Act (First and Third Claims for Relief).**

"Section 2 of the Sherman Act, in what [the Third Circuit] ha[s] called 'sweeping language,' makes it unlawful to monopolize, attempt to monopolize, or conspire to monopolize, interstate or international commerce."[5] *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306 (3d

---

[4] For sake of clarity, when citing the parties' briefs, the Court cites to the page number listed in the ECF header. If there is no page number listed in the ECF header, the Court cites to the page number listed in the respective document.

[5] Section 2 provides:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

Cir. 2007). A Section 2 monopoly violation consists of two elements: "'(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Queen City Pizza v. Domino's Pizza,* 124 F.3d 430, 437 (3d Cir. 1997) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 n. 19 (1985)). The parties dispute whether Plaintiffs have adequately alleged both elements. (*See* Br. at 18-46; Opp'n at 10-37). The Court addresses each element in turn.

      i.  The Amended Complaint Adequately Alleges Apple Possesses Monopoly Power in the Smartphone and Performance Smartphone Markets.

The first element of a Sherman Act Section 2 claim is "'the possession of monopoly power *in the relevant market.*'" *Queen City Pizza*, 124 F.3d at 437 (quoting *Aspen Skiing*, 472 U.S. at 596 n.19) (emphasis added). Under Section 2, courts must start by defining the relevant market because, "[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965)); *see also Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016) ("[The market definition] analysis is equally applicable to claims made under Section [2] of the Sherman Act, because 'without a definition of that market there is no way to measure the defendant's ability to lessen or destroy competition.'" (quoting *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 383 (S.D.N.Y. 2007))); *see also Queen City Pizza*, 124 F.3d at 435 ("'[A] plaintiff must identify the relevant product and geographic markets and allege that the defendant exercises market power within those markets.'" (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 922 F. Supp.

---

15 U.S.C. § 2.

11

1055, 1060 (E.D. Pa. 1996)). Accordingly, the Court begins its analysis with a discussion of the relevant markets.

### 1.  The Relevant Product and Geographic Markets

Apple argues that Plaintiffs' relevant markets – smartphones and performance smartphones – are not properly defined.[6] (Br. at 41 n.33). Plaintiffs counter that the Amended Complaint adequately pleads United States markets for smartphones and performance smartphones. (Opp'n at 11-13). The Court agrees.

The relevant market must be a market for particular products or services, the "outer boundaries" of which "are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962). "However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Id.* (citing *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 593-95 (1957). The submarket's boundaries "may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

"In most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." *Queen City Pizza*, 124 F.3d at 436 (citing *Eastman Kodak*, 504 U.S. at 482); *see also Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 183 (3d Cir. 2015) (same). As such, courts typically decline to dismiss antitrust claims

---

[6] In its reply brief, Apple states that it "disputes that the complaint defines a proper market but assumes that it has for the purposes of this motion." (Reply at 12 n.3). Since Apples' arguments in its moving brief regarding its lack of monopoly power directly reference the relevant markets identified by Plaintiffs, (*see* Br. at 41, 43), the Court will address whether the Amended Complaint has adequately pled relevant product and geographic markets.

based on failure to plead the relevant market. *Queen City Pizza*, 124 F.3d at 436; *see also Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) ("[S]ince the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial.") (citaiton modified); *Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*, 562 F. Supp. 3d 1073, 1081 (E.D. Cal. 2021) (explaining relevant market allegations are often able "to survive scrutiny under Rule 12(b)(6)" because "relevant market determinations are typically fact-intensive, with actual 'inquiry into the commercial realities faced by consumers'" (quoting *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993))).

However, "there is no *per se* rule prohibiting dismissal on this basis, and plaintiffs have the burden of defining the relevant market." *Bayer Healthcare LLC v. Second Stone Enters. LLC*, No. 24-7618, 2025 WL 1531237, at *6 (D.N.J. May 29, 2025). Dismissal may be appropriate where a plaintiff: (1) "fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand"; or (2) "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Queen City Pizza*, 124 F.3d at 436-37 (collecting cases). Accepting the factual allegations underlying Plaintiffs' monopolization claims as true, the Court must determine whether the alleged markets underlying the Amended Complaint are "implausible." *Hanover 3201 Realty*, 806 F.3d at 183.

Here, Plaintiffs allege two relevant markets – smartphones and performance smartphones – that are differentiated from other types of similar products. (Am. Compl. ¶¶ 164-175). The Amended Complaint defines the smartphone market as distinguishable from "feature phones," which offer "less capable hardware and software options," and other portable devices such as

tablets, smartwatches, and laptop computers, which "lack the combination of function, size, and portability that consumers rely on in a smartphone. (*Id.* at ¶¶ 172-73).

While Apple argues the performance smartphone market is "an invented definition divorced from commercial reality that may not even encompass all iPhone models," (Br. at 43), the Court disagrees. As alleged in the Amended Complaint, the performance smartphone encompasses a narrower product market "that compete[s] with most iPhones and excludes the lowest-end smartphones, which industry participants sometimes refer to as 'entry-level' smartphones." (*Id.* at ¶ 165). As opposed to performance smartphones, entry-level smartphones are made with different quality materials with less durability, maintain "lower-performance components," and "lack features such as an NFC antenna that allows consumers to use their phone to make payments or access passes for public transit." (*Id.* at ¶ 168). Further, consumers usually purchase performance smartphones "for use with post-paid service plans that include promotional discounts to consumers who purchase performance smartphones," as opposed to entry-level smartphones that generally use pre-paid service plans. (*Id.* at ¶ 169).

The Court finds the performance smartphone constitutes a "distinct submarket[] for antitrust purposes," which, in construing the factual allegations in a light most favorable to Plaintiffs, varies in price and quality from entry-level smartphones. *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 28 (D.D.C. 2022) (collecting cases). Other courts have reached a similar conclusion. *See, e.g.*, *International Boxing Club of N.Y., Inc. v. U.S.*, 358 U.S. 242, 250-52 (1959) (affirming the district court's finding that "there exists a separate, identifiable market for championship boxing contests" as opposed to non-championship bouts (citation modified)); *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 994-95 (9th Cir. 1986) (affirming jury's finding that "industry anticipated top-grossing films constitute a distinct product market"); *A.G.*

*Spalding & Bros. v. FTC*, 301 F.2d 585, 598 (3d Cir. 1962) (affirming the FTC's finding that "higher priced and low priced categories [of sporting goods] can be distinguished competitively from each other and that they constitute separate and distinct lines of commerce") (citation modified); *Federal Trade Comm'n v. Lancaster Colony Corp.*, 434 F. Supp. 1088, 1093 (S.D.N.Y. 1977) ("Plainly, low or moderately-priced glassware, intended for everyday use, differs from fine glassware, such as lead crystal, sold at higher prices and marketed through different channels.").

Apple further argues that the proposed geographic market – the United States – "mask[s] the worldwide primacy of Android smartphones." (Opp'n at 43). "[T]he relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks." *Eichorn v. AT&T Corp.*, 248 F.3d 131, 147 (3d Cir. 2001) (citation modified). "Consequently, the geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product." *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991); *see also United States Horticultural Supply v. The Scotts Co.*, 367 F. App'x 305, 311 (3d Cir. 2010) (noting the geographic market is based on buyer behavior). The geographic market "may be local, regional, national or international in origin." *In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 697 (E.D. Pa. 2007). Plaintiffs bear the burden of proving the relevant geographic market. *Tunis Bros.*, 952 F.2d at 726.

Plaintiffs' assertion that the United States serves as the relevant geographic market is supported by factual allegations of consumer behavior. For example, Plaintiffs allege United States users "demand services offered by U.S. retailers when they purchase a smartphone," such as "activating their new device, setting it up, and transferring important content like apps, messages, photos, and video to their new smartphone." (Am. Compl. ¶ 176). In contrast, if a customer

purchases a smartphone abroad, the smartphone may (i) face compatibility issues with the domestic carrier, (ii) lack "the necessary radio technology to take advantage of the carrier's highest speed connections," (iii) limit the customer from accessing support during set up," or (iv) not have valid warranty. (*Id.*) Second, if customers purchase the smartphones through a United States retailer, they will have access to "valuable promotions," whereas the "same promotions and free financing are unavailable to U.S. consumers who purchase their phones in other countries." (*Id.* at ¶ 177). Further, numerous "regulatory requirements" must be met to enter the smartphone market, which effectively bars some smartphone makers from offering smartphones to United States consumers. (*Id.* at ¶ 178). Additionally, Plaintiffs allege Apple sets different prices "for the same smartphone in the United States separately from those in other countries." (*Id.* at ¶ 179). Accordingly, the Court finds the Amended Complaint sets forth plausible allegations that the United States is the relevant geographic market.

### 2.   Monopoly Power in the Relevant Markets

Having found that Plaintiffs have adequately pled relevant markets in the United States, the Court must next determine whether Apple maintains monopoly power in these markets. Apple argues the monopolization claims fail because Plaintiffs have not plausibly alleged possession of monopoly power in either the smartphone or performance smartphone market. (Br. at 41-46). In opposition, Plaintiffs contend the Amended Complaint adequately pleads that Apple possesses monopoly power in the smartphone and performance smartphone markets through both direct and indirect evidence. (Opp'n at 13-18).

"Monopoly power is the ability to control prices and exclude competition in a given market." *Broadcom*, 501 F.3d at 307 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). "If a firm can profitably raise prices without causing competing firms to expand output

and drive down prices, that firm has monopoly power." *Id.* (citing *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005)). The plaintiff bears the burden of proving a defendant maintains monopoly power. *In re Remeron Direct Purchaser Antitrust Litig.*, 367 F. Supp. 2d 675, 679-80 (D.N.J. 2005). Monopoly power may be proven, (1) through "direct evidence of supracompetitive prices and restricted output"; or (2) through indirect evidence of "a dominant share in a relevant market" and "significant entry barriers." *Broadcom*, 501 F.3d at 307 (citation modified); *see also Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 434-35 (3d Cir. 2016).

As monopoly power may be proven through direct *or* indirect evidence, the Court first focuses its analysis on whether Plaintiffs have alleged indirect evidence establishing that Apple has monopoly power over the smartphone and performance smartphone markets.

The parties dispute what percentage of market share must be pled. (*See* Br. at 43-44; Opp'n at 13-14). Apple argues monopoly power has never been found by the Supreme Court with "'less than 75% market share.'" (Br. at 43 (quoting *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 174 (4th Cir. 2014)). Whereas, Plaintiffs assert the Third Circuit has held that "'[a]bsent other pertinent factors, a share significantly larger than 55% has been required to establish[] prima facie market power.'" (Opp'n at 13-14 (quoting *United States v. Dentsply Int'l*, 399 F.3d 181, 187 (3d Cir. 2005)).

Specifically, "[c]ourts within the Third Circuit have held a defendant has significant market share supporting an inference of monopoly power if the defendant possesses sixty percent or more market share in the relevant market." *Royal Mile Co., Inc. v. UPMC*, No. 10-1609, 2013 WL 5436925, at *30 (collecting Third Circuit cases); *see also Federal Trade Comm'n v. AbbVie Inc.*, 976 F.3d 327, 371 (3d Cir. 2020) ("A court can infer market power from a market share

significantly greater than [fifty-five] percent." (citing *Dentsply*, 399 F.3d at 187)). Here, Plaintiffs allege that Apple maintains a market share of 65 percent in the smartphone market and 70 percent in the performance smartphone market. (Am. Compl. ¶ 181). As such, the Court finds that Plaintiffs adequately allege Apple maintains "a dominant share" in both the smartphone and performance smartphone markets. *Broadcom*, 501 F.3d at 307; *see also AbbVie*, 976 F.3d at 371.[7]

The Court next considers whether Plaintiffs have adequately alleged "significant entry barriers" to the smartphone and performance smartphone markets. *Id.* (citation modified). Barriers to entry include "regulatory requirements, high capital costs, or technological obstacles, that prevent new competition from entering a market in response to a monopolist's supracompetitive prices." *Broadcom*, 501 F.3d at 307. "Other germane factors include the size and strength of competing firms, freedom of entry, pricing trends and practices in the industry, ability of consumers to substitute comparable goods, and consumer demand." *Dentsply Int'l*, 399 F.3d at 187 (citation modified).

The Court finds that Plaintiffs have set forth adequate allegations of entry barriers and "[o]ther germane factors" that support Apple's monopoly power. For instance, as "fewer than ten percent of smartphone purchasers in the United States are buying their first smartphone," rivals must encourage iPhone users to use another smartphone when they are seeking to replace or upgrade their phone. (Am. Compl. ¶ 183). The costs associated with switching smartphones leads to an "increasingly impenetrable" barrier, as "[n]early 90 percent of iPhone owners in the United States replace their iPhone with another iPhone." (*Id.*) Additionally, if iPhone users were to purchase an Android smartphone, they "may need to re-learn how to operate their smartphone

---

[7] Apple also argues Plaintiffs should be measuring market share by units sold, rather than revenue. (Br. at 43-44). At this early stage of the matter, before having conducted any factual or expert discovery, the Court finds that Plaintiffs have adequately alleged market share.

using a new interface, transfer large amounts of data (e.g., contacts), purchase new apps, or transfer or buy new subscriptions and accessories." (*Id.* at ¶ 185).

With respect to other smartphone competitors, introducing a new smartphone into the market mandates "considerable investments in acquiring expensive and scarce components such as mobile chips and specialized glass for screens." (*Id.* at ¶ 184). Further, new entrants or those seeking to expand presence in the smartphone and performance markets must negotiate distribution agreements with mobile carrier networks and satisfy their respective "technical requirements" as they sell most smartphones. (*Id.*) Plaintiffs allege the significant barriers are evidenced by other competitors such as Amazon, Microsoft, HTC, and LG's failure to successfully enter the relevant markets. (*Id.* at ¶ 186). *See Bayer Healthcare*, 2025 WL 1531237, at *7 (finding viable allegations of barriers to entry created by Bayer where "third-party sellers [were] unable to sell [their] products").

Notwithstanding, Apple argues that Plaintiffs' theories are undercut by Samsung and Google remaining "powerful competitors to Apple" and the absence of allegations regarding Google or Samsung's inability "to expand their own output to undercut Apple's market share," (Br. at 44-45). The Court finds these are arguments that are better suited for the summary judgment stage.[8] "[A]scertaining market power is fact-intensive and case-specific; thus, market power allegations often survive scrutiny under Rule 12(b)(6)." *Netafirm Irrigation, Inc. v. Jain Irrigation, Inc.*, No. 21-540, 2022 WL 2791201, at *7 (E.D. Cal. July 15, 2022) (citing *Eastman Kodak*, 504

---

[8] In *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11-2725, 2022 WL 874945, at *10 (S.D.N.Y. Mar. 24, 2022), the Court rejected Sabre's argument that the monopolization claim failed because US Airways alleged that two other competitors of Sabre also maintained monopoly power. The court stated: "Sabre does not identify any controlling case law to suggest that an entity cannot be liable under § 2 for exercising the power to control prices or exclude competition in a market because some other entity also exercises the same power in that market." *Id.* Rather, the court expressed "[a]n 'antitrust defendant's unlawful conduct need not be the *sole* cause of the plaintiffs' alleged injuries,' so long as the conduct was a 'substantial or materially contributing factor in producing that injury.'" *Id.* (quoting *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 66 (2d Cir. 2012)).

U.S. at 466-67; *Newcal Indus.*, 513 F.3d at 1052); *cf. In re Copaxone Antitrust Litig.*, No. 22-1232, 2025 WL 961538, at *9 (D.N.J. Feb. 27, 2025) (declining to address indirect evidence of monopoly power arguments as they were "too fact-intensive for resolution" at motion to dismiss stage and "courts generally take this question up at summary judgment or later stages with the benefit of fact and expert discovery" (citing *Mylan Pharms.*, 838 F.3d at 434-35)).

For the reasons stated above, the Court finds that Plaintiffs have sufficiently alleged indirect evidence showing monopoly power in both the smartphone and performance smartphone markets. Accordingly, the Court declines to dismiss the First and Third Claims for Relief on this basis.[9]

### ii. Whether Apple Willfully Acquired or Maintained Monopoly Power

The second element of a Section 2 claim is that the defendant willfully acquired or maintained power. *Queen City Pizza*, 124 F.3d at 437. "As this element makes clear, the acquisition or possession of monopoly power must be accompanied by some anticompetitive conduct on the part of the possessor." *Broadcom*, 501 F.3d at 308 (citing *Verizon Commcn's Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)). Anticompetitive conduct is "generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits." *Id.* "Conduct must do more than merely harm competitors, it must harm the competitive process itself." *Miller Indus. Towing Equip. Inc. v. NRC Indus.*, 659 F. Supp. 3d 451, 466 (D.N.J. 2023) (citing *Broadcom*, 501 F.3d at 308); *see also West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 108 (3d Cir. 2010) ("The line between anticompetitive conduct and vigorous competition is sometimes blurry, but distinguishing between the two is critical, because

---

[9] As the Court finds Plaintiffs have alleged sufficient allegations demonstrating indirect evidence of Apple's monopoly power in the smartphone and performance smartphone markets, the Court declines to address the parties' respective arguments on the alleged direct evidence. The parties can raise these arguments again in subsequent summary judgment filings.

the Sherman Act directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." (citation modified)).

Apple contends the Amended Complaint must be dismissed because Plaintiffs do not challenge exclusionary conduct, but instead Apple's lawful refusals to deal, which are not subject to the narrow exception to this rule set forth in *Aspen Skiing*. (Br. at 18-27). In opposition, Plaintiffs contest the refusal to deal doctrine's applicability because the Amended Complaint does not allege Apple failed to deal with smartphone rivals, but instead focuses on Apple's imposition of "contractual restrictions and rules to control developers and restrict smartphone users in service of its monopoly." (Opp'n at 27-36).

Additionally, Apple argues even if the Court were to find the refusal to deal doctrine inapplicable, the challenged actions lack an anticompetitive effect on the smartphone and performance smartphone markets, and thus fail to satisfy the second element of a Section 2 claim. (Br. at 35-40). In opposition, Plaintiffs contend the Amended Complaint adequately alleges anticompetitive conduct that demonstrates, "Apple wields its control over the platform to (1) impose technical and contractual restrictions that suppress apps and accessories that (2) operate cross-platform and threaten Apple's smartphone monopoly." (Opp'n at 18-27). The Court addresses the respective arguments in turn.

### 1. The Refusal to Deal Doctrine Does Not Apply to the Present Facts

The refusal to deal doctrine was articulated in 2004 by the Supreme Court in *Trinko*, 540 U.S. at 409, and reaffirmed by the Court in *Pacific Bell Telephone Co. v. LinkLine Communications, Inc.*, 555 U.S. 438, 448 (2009). "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *LinkLine*, 555 U.S. at 448 (citing *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)); *see*

*also Trinko*, 540 U.S. at 408 ("[A]s a general matter, the Sherman Act 'does not restrict the long[-]recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" (quoting *Colgate*, 250 U.S. at 307)). The Supreme Court has outlined its logic behind this principle, as follows:

> Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities. Enforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited. Moreover, compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion.

*Trinko*, 540 U.S. at 407-08.

Nevertheless, the *Trinko* Court recognized "'[t]he high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified.'" *Id.* at 408 (quoting *Aspen Skiing*, 472 U.S. at 601). The *Trinko* Court identified *Aspen Skiing* as "[t]he leading case for § 2 liability based on refusal to cooperate with a rival," *id.*, which upheld a jury verdict for the plaintiff, "reasoning that '[t]he jury may well have concluded that [the defendant] elected to forgo these short-run benefits because it was more interested in reducing competition . . . over the long run by harming its smaller competitor.'" *Id.* at 409 (quoting *Aspen Skiing*, 472 U.S. at 608). Notably, however, the *Trinko* Court delineated *Aspen Skiing* as being "at or near the outer boundary of § 2 liability." *Id.* This principle was upheld in *LinkLine* and the Court reacknowledged "[t]here [we]re also limited circumstances in which a firm's unilateral refusal to deal with its rivals can give rise to antitrust liability." 555 U.S. at 448 (citing *Aspen Skiing*, 472 U.S. at 608-11).

The Court finds the refusal to deal doctrine does not apply to Apple's alleged conduct in this case because Plaintiffs do not allege Apple is failing to deal with its smartphone rivals, but

rather that Apple's conduct is imposing restrictions on developers and smartphone users. Courts across the country have refused to extend the refusal to deal doctrine to such conduct. *See, e.g.*, *Eastman Kodak*, 504 U.S. at 463 n.8 (holding that "sale of parts to third parties on condition that they buy service from kodak" is not a unilateral refusal to deal); *Lorain J. Co. v. United States*, 342 U.S. 143, 152 (1951) (holding newspaper that prevented advertisers from dealing with competing radio stations violated Section 2); *Host Int'l Inc. v. Marketplace, PHL, LLC*, 32 F.4th 242, 250 n.7 (3d Cir. 2022) (acknowledging that "refusing to deal can sometimes establish a Section 2 claim[,]" but "only among competitors, and only if the parties have a history of dealing paired with facts suggesting a willingness to forsake short-term profits to achieve an anticompetitive end") (citation modified); *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1173 (10th Cir. 2023) (recognizing that the "refusal-to-deal framework applies to narrow situations" and refusing to extend it); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (Gorsuch, J.) (contrasting unilateral refusal to deal with actionable conduct that "limit[s] the abilities of third parties to deal with rivals"); *Ceiling & Interior Sys. Supply, Inc. v. USG Interiors, Inc.*, 878 F. Supp. 1389, 1396 (W.D. Wash. 1993) ("[T]he refusal to deal with third parties conditioned on failure to purchase other goods or services, however, is not a unilateral refusal." (citing *Eastman Kodak*, 504 U.S. at 463 n.8)), *aff'd*, 37 F.3d 1504 (9th Cir. 1994); *United States v. Google LLC*, No. 23-108, 2025 WL 1132012, at *43 (E.D. Va. Apr. 17, 2025) (rejecting application of refusal to deal framework to Google's conduct that effectively "compelled its [ad] publisher customers to use [Google's services]").

Affording all reasonable inferences to Plaintiffs, the Court denies Apple's motion to dismiss the Amended Complaint on this basis.

## 2. The Amended Complaint Alleges Various Forms of Anticompetitive Conduct.

The "willful acquisition or maintenance" element invokes a burden-shifting framework to determine whether there is anticompetitive conduct. *United States v. Google LLC*, 747 F. Supp. 3d 1, 106 (D.C.C. 2024). In *Mylan Pharmaceuticals*, the Third Circuit described the burden-shifting framework as follows:

> [T]he party seeking to impose liability must initially provide evidence of the anticompetitive nature of a defendant's conduct. Once established, the defendant then has the burden of proffering nonpretextual procompetitive justifications for its conduct, and the plaintiff may then either rebut those justifications or demonstrate that the anticompetitive harm outweighs the procompetitive benefit.

838 F.3d at 438 (citation modified). "However, to survive dismissal[,] Plaintiffs are required only to establish a *prima facie* case." *In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1033 (N.D. Cal. 2008).

Courts have found technological barriers to constitute anticompetitive conduct. *See Microsoft*, 253 F.3d at 64; *CoStar Group, Inc. v. Commercial Real Estate Exchange, Inc.*, No. 23-55662, 2025 WL 1730270, at *11 (9th Cir. June 23, 2025). In *Microsoft*, Microsoft imposed contractual restrictions and "technological shackles" on developers and others that stopped them from distributing internet browsers that competed with Internet Explorer, Microsoft's browser. *Id.* at 64-65. The restrictions included prohibiting removal of desktop icons, restricting modifications of the "initial boot sequence" of Windows, and preventing manufacturers from altering the desktop in certain ways. *Id.* at 61-62. "Because Microsoft's conduct, through something other than competition on the merits, has the effect of significantly reducing usage of rivals' products and hence protecting its own operating system monopoly," it was deemed anticompetitive. *Id.* at 65.

In *CoStar Group*, the Ninth Circuit recently found that allegations of technological barriers that impeded CREXi from competing constituted anticompetitive conduct. 2025 WL 1730270, at

*11. CREXi alleged that CoStar's LoopLink service, which powers brokers' personal websites, blocked competitors from accessing the broker's listing information that was otherwise available to the public on the brokers' personal websites. *Id.* CREXi alleged that "only after brokers contract[ed] with CoStar and build CoStar-powered websites that the brokers realize that they cannot transmit their own listing information and photographs to other listing companies via their own publicly available websites." *Id.* The Ninth Circuit found these technological barriers "'inhibit the free transfer of information from brokers to companies that compete with CoStar' and "'prevent competition in the marketplace.'" *Id.* (quoting *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008)).

The Amended Complaint sets forth several allegations of technological barricades that constitute anticompetitive conduct.[10] With respect to super apps, the Amended Complaint alleges Apple imposes exclusionary requirements, such as "requiring apps in the United States to display mini programs using a flat, text-only list of mini programs" and banning apps from "categorizing mini programs," which discourages developers from creating apps. (Am. Compl. at ¶ 69). Apple also prevents developers from collecting payments. (*Id.* at ¶ 70). For cloud streaming apps, Apple "effectively prevent[s] third-party developers from offering cloud gaming subscription services as a native app on the iPhone," (*id.* at ¶ 75), as it requires any cloud streaming game or update thereto to "be submitted as a stand-alone app for approval by Apple," which has increased the cost of

---

[10] In its brief, Apple argues any alleged exclusionary conduct must be considered separately when determining if there is anticompetitive in nature. (Br. at 33- 34). However, the Supreme Court has stated that "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). Similarly, the Third Circuit has stated that "courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation." *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003). While the Court addresses each of the examples alleged in the Amended Complaint, the Court will look at the anticompetitive nature of Apple's alleged conduct in total in its analysis.

releasing games on the iPhone and limiting the number of games developers can make available to users. (*Id.* at ¶ 76).

The Amended Complaint also alleges Apple imposes technological limitations to prevent developers from offering key features to iPhone users that are accessible on iMessage, Apple Watch, and Apple Wallet. (*See id.* at ¶¶ 80-118). With respect to iMessage, Plaintiffs allege "Apple designates the APIs needed to implement SMS as 'private,'" which prevents third-party developers from combining the "'text-to-anyone' functionality of SMS with the advanced features of OTT messaging." (*Id.* at ¶ 85). In contrast, iMessage allows users to send messages to anyone by entering their phone number because it "incorporates SMS and OTT messaging." (*Id.*)

Additionally, Plaintiffs allege Apple Watches are only compatible with the iPhone. (*Id.* at ¶ 96). Plaintiffs assert that Apple degrades the functionality of third-party cross-platform smartwatches through "its technical and contractual control of critical APIs" by preventing iPhone users from being able to respond to notifications on their third-party smartwatches, obstructing iPhone users from maintaining a reliable connection with the iPhone, and undermining third-party smartwatches' performance that connect directly with a cellular network. (*Id.* at ¶¶ 100-03).

Moreover, Apple maintains the Apple Wallet on iPhones and utilizes Apple Pay to "process[] digital payments on the web, in apps, and at merchant points of sale." (*Id.* at ¶¶ 104, 107). Apple Wallet utilizes NFC hardware to provide tap-to-pay but prohibits developers from accessing NFC hardware to incorporate tap-to-pay in cross-platform digital wallets. (*Id.* at ¶¶ 109, 111-12). Further, Apple Wallet is the only app that can use NFC to facilitate tap-to-pay, thereby precluding banks, merchants, and other parties, from "developing better payment products and services for iPhone users." (*Id.* at ¶ 112). Plaintiffs also allege Apple's restrictions undermine other digital wallets from (i) offering the ability to authenticate digital payment options during online

checkouts, thereby limiting third-party wallets' ability "to provide a simple, fast, and comprehensive solution to purchasing" (*id.* at ¶ 116); and (ii) serving as an alternative in-app payment, which prevents these wallets from enhancing users' experiences by including "use of rewards points in purchasing, digital receipts, returns, loyalty programs, and digital coupons for purchases of relevant subscriptions and digital goods." (*Id.* at ¶ 117).

At the pleadings stage, allegations of this nature, which indicate that Apple acts in a manner to protect its monopoly power in the smartphone and performance smartphone market, are sufficient to establish a *prima facie* case under the burden-shifting framework. *See Mylan Pharms.*, 838 F.3d at 437 (citation modified); *In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d at 1033.

To the extent Apple argues it can limit access to its "own propriety technology available to third parties," (Br. at 34), the Court finds this contention is a factual dispute that must be resolved through discovery, not this stage of the litigation where factual disputes are construed in favor of Plaintiffs. *See Black Box Corp. v. Avaya, Inc.*, No. 07-6161, 2008 WL 4117844, at *13 (D.N.J. Aug. 29, 2008) ("Avaya's argument that [t]here obviously are good business reasons for [Avaya] to limit access to its maintenance software . . . is contrary to the allegations in the Complaint and is not properly resolved at this stage of the litigation.") (citation modified).

Accordingly, the Court denies Apple's motion to dismiss the monopolization claims.[11]

---

[11] Apple urges the Court to dismiss Plaintiffs' "monopoly playbook" allegations because there is "no apparent or alleged connection to [Plaintiffs'] theory of harm." (Br. at 46-48). The Court recognizes that "[c]ourts in this circuit have routinely dismissed sub-theories contained within a claim while allowing other sub-theories to survive." *loanDepot.com v. CrossCountry Mortg., Inc.*, 399 F. Supp. 3d 226, 235-36 (D.N.J. 2019) (collecting cases); *see also Stepan Co. v. Pfizer, Inc.*, No. 23-1676, 2024 WL 3199834, at *2 (D.N.J. June 26, 2024) (rejecting the plaintiff's argument that Rule 12(b)(6) "does not allow for entry of a 'piecemeal order' that dismisses portions of claims"). However, the allegations relating to other anticompetitive conduct Apple purportedly engages in advances Plaintiffs' theory of Apple's anticompetitive course of conduct. (*See* Am. Compl. ¶¶ 58-59, 119-25). At this stage of the proceedings, the Court declines to dismiss these allegations.

## B. **The Amended Complaint Adequately Alleges Claims for Attempted Monopolization (Second and Fourth Claims for Relief).**

In addition to the monopolization claims, Plaintiffs allege that Apple violated Section 2 of the Sherman Act by attempting to monopolize the smartphone and performance smartphone markets. (Am. Compl. ¶¶ 205-10, 218-23). To prevail on a claim under Section 2 for attempted monopolization, a plaintiff must prove: "'(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *Philadelphia Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 339 (3d Cir. 2018) (quoting *Mylan Pharms.*, 838 F.3d at 433). "Liability hinges on whether valid business reasons, as part of the ordinary competitive process, can explain the defendant's actions that resulted in a dangerous probability of achieving monopoly power." *Id.* at 339 (citing *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 393 (3d Cir. 2016). "'[I]n a traditional § 2 claim, a plaintiff would have to point to specific, egregious conduct that evinced a predatory motivation and a specific intent to monopolize.'" *Id.* at 341 (quoting *Avaya*, 838 F.3d at 406).

Apple argues the attempted monopolization claims fail because Plaintiffs did not plead any facts evidencing a specific intent to monopolize. (Br. at 46). "Th[e] [Supreme Court] and other courts have been careful to avoid constructions of § 2 [of the Sherman Act] which might chill competition, rather than foster it." *Spectrum Sports*, 506 U.S. at 458. In order to establish the required intent under Section 2, a plaintiff must plead "something more than an intent to compete vigorously[.]" *Id.* at 459. The intent element is satisfied if monopoly power is deliberately used "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman Kodak*, 504 U.S. at 482-83).

The Court finds the Amended Complaint pleads allegations supporting Apple's specific intent to monopolize the smartphone and performance smartphone markets. The Amended

Complaint includes numerous statements allegedly made by Apple executives regarding the barriers set in place to maintain its monopoly. (*See, e.g.*, Am. Compl. ¶ 65 (alleging an Apple manager stated, "allowing super apps to become 'the main gateway where people play games, book a car, make payments, etc.' would 'let the barbarians in at the gate.' Why? Because when a super app offers popular mini programs, 'iOS stickiness goes down'"); *id.* at ¶ 71 (alleging "Apple blocked cloud gaming apps that would have given users access to desirable apps and content without needing to pay for expensive Apple hardware" as it feared a world where 'all that matters is who has the cheapest hardware' and consumers could 'buy[] a [expletive] Android for 25 bux at a garage sale and . . . have a solid cloud computing device' that 'works fine'"); *id.* at ¶ 91 (alleging "Apple's Senior Vice President of Software Engineering explained that supporting [over the top] messaging in [iMessage] 'would simply serve to remove [an] obstacle to iPhone families giving their kids Android phones'"); *id.* (alleging Apple's Senior Vice President of Worldwide Marketing "forwarded an email to CEO Tim Cook making the same point: 'moving iMessage to Android will hurt us more than help us'"). At this stage, these allegations are sufficient to demonstrate Apple's specific intent to monopolize the smartphone and performance smartphone markets. *See BanxCorp v. Bankrate Inc.*, No. 07-3398, 2011 WL 6934836, at *23 (D.N.J. Dec. 30, 2011) (holding that specific intent was demonstrated where statements by Bankrate's Chief Executive Officer acknowledged there were barriers to competition enabling Bankrate to increase prices without losing customers).

Further, in a footnote, Apple argues Plaintiffs fail to "allege a dangerous probability that Apple can exclude Google, Samsung, and its other rivals to achieve a monopoly power." (Br. at 46 n.8). The Court disagrees. When considering the dangerous probability of achieving monopoly power, courts "may consider factors such as 'significant market share coupled with anticompetitive

practices, barriers to entry, the strength of competition, the probable development of the industry, and the elasticity of consumer demand' to determine whether dangerous probability was alleged in the pleadings." *Philadelphia Taxi Ass'n*, 886 F.3d at 342 (quoting *Broadcom*, 501 F.3d at 318). As discussed *supra*, the Amended Complaint alleges Apple maintains a market share of 65 percent in the smartphone market and 70 percent in the performance smartphone market, imposed several barriers to entry, and has engaged in anticompetitive conduct. At this stage, the Court finds Plaintiffs have sufficiently alleged a dangerous probability of achieving monopoly power. *Cf. Broadcom*, 501 F.3d at 318 (determining whether there is a dangerous probability of achieving monopoly power is a "particularly fact-intensive inquiry" that "courts typically should not resolve this question at the pleading stage unless it is clear on the face of the complaint that the dangerous probability standard cannot be met as a matter of law") (citation modified).

As such, at this stage of the proceedings, Plaintiffs have sufficiently alleged attempted monopolization clams. Therefore, the Court denies Apple's motion to dismiss the Second and Fourth Claims for Relief for failure to plead Apple's specific intent to monopolize and dangerous probability of achieving monopoly power.

C. **The Plaintiff States' Have Established *Parens Patriae* Standing to Bring Their Claims.**

Finally, the Court considers Apple's assertion that the Plaintiff States lack standing to pursue their claims in the Amended Complaint, through either their sovereign capacities or under a *parens patriae* theory. (*See* Br. at 40 n.6). In opposition, the Plaintiff States contend the Amended Complaint establishes *parens patriae* standing. (*See* Opp'n at 39-40). The Court agrees.

While the Court recognizes that "'States are not normal litigants for the purposes of invoking federal jurisdiction[,]'" certain circumstances permitted them to do so. *Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 769 (5th Cir. 2023) (quoting *Massachusetts v. EPA*, 549

U.S. 497, 518 (2007)). "[S]tates have at least four types of interests that, if injured, satisfy standing's first requirement: sovereign, quasi-sovereign, proprietary, or private." *Id.* (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601-02 (1982)). States may also sue in multiple capacities, "on behalf of themselves or in the interest of their residents in a *parens patriae* capacity." *Id.*

In *parens patriae* capacity, a State brings an action to "prevent or repair harm to its 'quasi[-] sovereign interests[,]'" *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 258 (1972), which "consist of a set of interests that the State has in the well-being of its populace," *Snapp*, 458 U.S. at 602; *see also Maryland v. Louisiana*, 451 U.S. 725, 737 (1981) (explaining that, as *parens patriae*, the State "act[s] as the representative of its citizens . . . where the injury alleged affects the general population of [the] State in a substantial way"). In *Snapp*, the Supreme Court identified the following quasi-sovereign interests: "First, a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system." 458 U.S. at 607.

Courts have found states have *parens patriae* standing to seek protection for antitrust violations. *See, e.g.*, *New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 150-52 (D.C.C. 2002) (finding "significant[] hamper[ing] [of] competition" by a monopolist is enough for Article III standing) (citation modified); *In re Ins. Antitrust Litig.*, 938 F.2d 919, 927 (9th Cir. 1991) ("The state's interest in preventing harm to its citizens by antitrust violations is, indeed, a prime instance of the interest that the *parens patriae* can vindicate by obtaining . . . an injunction.") (citing modified), *rev'd in part on other grounds sub nom.*, *Hartford Fire Ins. Co. v. Cal.*, 509 U.S. 764 (1993); *Pennsylvania v. Russell Stover Candies, Inc.*, No. 93-1972, 1993 WL 145264, at *8 (E.D.

Pa. May 6, 1993) ("[A] state may . . . seek injunctive relief for harm to its general economy that is caused by a violation of federal antitrust law.").

Apple's reliance on *Harrison v. Jefferson Parish School Board* is misplaced. (*See* Br. at 40 n. 6). In *Harrison*, the Fifth Circuit held that Louisiana did not have *parens patriae* standing to sue Jefferson Parish School Board ("JPSB"), a board for a school district located in Louisiana, for allegedly discriminating against two students. 78 F.4th at 768, 772-74. Unlike the "classic example of suits vindicating sovereign interests [such as] those involving public nuisances and economic interests," the Court explained Louisiana was "not asserting a separate injury such as being denied its full participation in the federal system, nor d[id] it allege injury to its citizens['] health or economic well-being in a way that also implicates its own interests." *Id.* at 772-73 (citation modified). Rather, Louisiana's interest was "wholly derivative of the interests of JPSB's students." *Id.* at 773. Since Louisiana failed to show it suffered an injury to a quasi-sovereign interest, the court found it lacked standing to maintain its suit in federal court. *Id.* at 774.

In contrast, the Plaintiff States have properly pleaded sufficient injury to their quasi-sovereign interests in the economic well-being of their respective states. The Plaintiff States articulate their quasi-sovereign interest in "seek[ing] to enjoin Apple's anticompetitive conduct that entrenches its monopoly over, and drives up prices within, U.S. smartphone markets." (Opp'n at 39). The Amended Complaint alleges Apple's conduct has affected the "States' general economies and substantial segments of their residents who use smartphones[.]" (*See, e.g.*, Am. Compl. ¶ 39 (noting Apple's iPhone base totals "more than 250 million devices in the United States" and market share is "over 70 percent of the performance smartphone market and over 65 percent of the broader smartphone market"); *id.* at ¶ 198 ("Apple engages in, and its activities substantially affect, interstate trade and commerce . . . [and] provides a range of products and

services that are marketed, distributed, and offered to consumers throughout the United States, in the plaintiff States, across state lines, and internationally."); *id.* at ¶ 201 ("Apple has willfully monopolized the performance smartphone market in the United States through an exclusionary course of conduct and . . . anticompetitive acts[.]")). *See Microsoft*, 209 F. Supp. 2d at 151-52 (finding *parens patriae* standing where "[m]illions of citizens of, and hundreds, if not thousands, of enterprises in each of the United States and the District of Columbia utilize PCs running on Microsoft software").

The Plaintiff States' interest fits squarely within the Supreme Court's articulation of the state's interest in *Snapp* in "securing observance of the terms under which it participates in the federal system . . . [and] ensuring that the State and its residents are not excluded from the benefits that are to flow from [such] participation." 458 U.S. at 607-08. States have an "interest in the removal of barriers to the participation by its residents in the free flow of interstate commerce." *Id.* at 608. Accordingly, the Court finds the Plaintiff States have established their standing to sue *parens patriae* at this stage.

## IV.    CONCLUSION

For the reasons set forth above, Apple's motion to dismiss (ECF No. 86) is **DENIED**. An appropriate Order accompanies this Opinion.

DATED: _____                             _____
                                              JULIEN XAVIER NEALS