

U.S. Department of Justice

Antitrust Division

---

*Liberty Square Building*
*450 5th Street, N.W.*
*Washington, DC 20530*

December 17, 2025

**VIA ECF**
Honorable Leda Dunn Wettre, U.S.M.J.
U.S. District Court for the District of New Jersey
Martin Luther King Jr. Bldg. & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102

      Re:   *United States of America, et al. v. Apple Inc.*
               No. 2:24-cv-04055 (JXN-LDW)
               Joint Discovery Dispute Letter re Apple's Production of Data Samples
               and Data Dictionaries Pursuant to Local Rule 37.1

Dear Judge Wettre:

      Pursuant to this Court's Orders dated September 17, 2025 and December 2, 2025, Dkt. Nos. 322, 350, the United States and the Plaintiff States (collectively, "Plaintiffs") and Defendant Apple Inc. respectfully submit this joint letter pursuant to Local Rule 37.1 setting forth a discovery dispute concerning Apple's production of data samples and data dictionaries in response to Request Nos. 26, 61, 62, and 63 in Plaintiffs' First Set of Requests for Production (attached hereto).  All other discovery disputes previously raised in Dkt. Nos. 303, 320, and 321 either have been resolved or, for a few outstanding Requests for Production, the parties believe they will imminently reach agreement.[1]  *See* Dkt. No. 322 (Text Order).  The parties have met and conferred over this dispute by videoconference pursuant to Local Rule 37.1.

---

[1] The parties are not seeking the Court's guidance on those Requests at this time but will advise the Court if they are unable to reach agreement.

### Plaintiffs' Position

The Pretrial Scheduling Order requires Apple to produce data samples and data dictionaries for all sources of structured data and data compilations. *See* Dkt. No. 270 at 2. For the past six months, Plaintiffs have repeatedly requested data samples and data dictionaries for responsive databases to allow for an efficient meet-and-confer process. Apple has not produced these materials for any database and cannot commit to any timeline to do so.[2] In fact, Apple—ostensibly one of the most sophisticated technology companies in the world—claims that six months was inadequate for it to even identify the responsive data it keeps in the ordinary course, despite Plaintiffs having months ago identified by Bates number documents referencing relevant databases.

Plaintiffs sought to avoid bringing this dispute to the Court by asking Apple to agree to produce data samples and data dictionaries by January 7, 2026 or to identify a date by which it could commit to produce them. Apple refused. Plaintiffs respectfully request that the Court either order Apple to produce these materials by January 7, 2026 or two weeks after entry of a decision by the Court, whichever is later.

Plaintiffs served their First Set of Requests for Production on June 20, 2025. Those Requests ask Apple to produce financial data (Request No. 26), user data (Request No. 61), iPhone and Apple Watch sales data (Request No. 62), and market research data on consumers, developers, and other groups (Request No. 63). Plaintiffs also sought Apple's production of Data Dictionaries, which the Requests define as "documentation of the organization and structure of the databases or data sets that is sufficient to allow their reasonable use by the Plaintiffs." Ex. 1 at 16 (definition of "Data Dictionaries"). In antitrust cases, these are typical data requests that go to several elements of Plaintiffs' claims, including market definition, monopoly power, and anticompetitive conduct.

Apple served Responses and Objections to Plaintiffs' Requests on July 21, 2025, in which Apple agreed to produce limited financial data and sales data in response to Requests Nos. 26 and 62. Apple merely offered "to meet and confer to discuss a reasonable narrowing" of Requests 61 and 63. In a general meet-and-confer call on August 4, 2025, Plaintiffs attempted without success to obtain information about what data Apple maintained and clear commitments on a framework for iteratively identifying and producing responsive data. On August 15, the parties agreed that data issues were better addressed in dedicated meet-and-confers going forward.

Plaintiffs repeatedly tried to schedule dedicated meetings to discuss data, including by letters dated August 19, August 29, September 19, and October 1, and emails dated October 3, November 17, and November 19. Following up on their Requests, Plaintiffs asked Apple on August 29 to provide data dictionaries and samples of each dataset comparable to samples that had been provided for these types of data during the government's pre-complaint investigation. Plaintiffs requested a selection of at least 100 complete observations to illustrate, to the extent possible, the different values that each

---

[2] If Apple subsequently produces samples or identifies an agreeable timeline, Plaintiffs will seek leave of Court to so advise the Court.

field can take on[3] and their approximate proportions to those in the full datasets. Apple flatly declined. On September 19, Plaintiffs renewed their request for Apple to provide data samples and data dictionaries to facilitate a proposed meet-and-confer later that month. Apple did not produce this material, nor did it respond to proposed dates to meet and confer.

Plaintiffs' requests for Apple to produce data samples and data dictionaries are both routine in antitrust litigation and consistent with the Pretrial Scheduling Order, which states: "The parties shall meet and confer in good faith regarding any requests for production of data or data compilations, and, if requested, will produce data samples and data dictionaries (including information sufficient to allow reasonable use of the database) for all sources of structured data or data compilations if reasonably available." Dkt. No. 270 at 2. The Court also ordered the parties to "meet and confer regarding the specific timeline for production based on the number of requests served and the burdens imposed by those requests." *Id.* To date, Apple has not proposed any specific timeline for producing data samples and data dictionaries, as required by the Pretrial Scheduling Order, let alone the requested structured data. *Id.*

Apple first made itself available for a dedicated meet-and-confer over Plaintiffs' data requests on November 24. Even after deducting the 42 days of the government shutdown, Apple did not make itself available to meet and confer for 115 days after the requests were served and 59 days, or nearly two months, after Plaintiffs first requested a dedicated meet-and-confer. At this and subsequent meetings, Plaintiffs sought, but Apple declined to provide, a knowledgeable Apple employee to participate in the discussions to help identify the current storage organization of the requested data. Apple's counsel were unable to answer numerous specific questions about the structure of Apple's data—even though Plaintiffs' correspondence had directed Apple to databases and datasets likely to contain responsive information. Apple's counsel responded that these issues would need to be taken up later with Apple.[4]

In the three meet-and-confers between November 24 and December 5, Apple still could not commit to producing data samples or data dictionaries, with counsel stating that further consultations with Apple were required. On December 12, Apple acknowledged that it would produce some data samples and data dictionaries but continued to be opaque about which materials it will produce or whether those materials will be responsive to all of Plaintiffs' data requests. On December 16, Apple declined to agree to produce data samples and data dictionaries by January 7, 2026, and would not commit to any other date by which it will make those productions. Instead, Apple indicated that it would finally provide field lists for only a limited set of financial and sales databases by December 19 and continue to compile field lists from other data sources—but without any timeline for

---

[3] Fields are often populated with a given value for each observation. For example, Apple survey data may include a field identifying the model of iPhone owned by the customer being surveyed. Such a field may be populated with values like "iPhone X" or "iPhone 13."

[4] On September 11, Plaintiffs also served Interrogatory No. 3, which asks Apple to describe each database maintained by the company containing any data responsive to Plaintiffs' First Set of Requests for Production. Apple served an incomplete response to Interrogatory No. 3 on December 1. Apple has agreed to supplement its response but, as with its production of data samples and data dictionaries, will not commit to any date for doing so.

3

their production. Apple then envisions further engagement with Plaintiffs before providing a timeline for production of data samples. Apple's proposed process will continue to delay its ultimate data production.

Apple's production of data samples and data dictionaries, including information about the structure and organization of its responsive data, is critical to Plaintiffs' understanding of Apple's data and ability to negotiate and narrow their requests for overall production of Apple's data. In light of the schedule set by the Pretrial Scheduling Order and time elapsed since the requests were served on June 20, 2025, it would be reasonable to expect that Apple would have long ago reviewed and provided this material. Apple's failure to identify all responsive databases and produce data samples and data dictionaries six months later, and its refusal to commit to any production date for those basic materials, has hindered the parties' data negotiations and precluded work by Plaintiffs' experts to perform quantitative analyses related to market definition, monopoly power, or Apple's conduct.

Plaintiffs respectfully request that the Court order Apple to produce by January 7, 2026 or two weeks from the date of the Court's order: (1) samples of each dataset sought by Plaintiffs' First Set of Requests for Production, including a selection of at least 100 complete observations to illustrate, to the extent possible, the different values that each field can take on and their approximate proportions to those in the full datasets; and (2) documentation of the organization and structure of the databases or data sets sought by Plaintiffs' First Set of Requests for Production which is sufficient to allow their reasonable use by the Plaintiffs. *See, e.g., United States v. City of Hesperia*, No. 19-2298, 2021 WL 5034381, at *15 (C.D. Cal. June 17, 2021) (ordering defendants to identify each database responsive to RFPs and to identify the types of relevant information found therein). *See also Frame-Wilson v. Amazon.com, Inc.*, No. 20-424, 2023 WL 4201679, at *4 (W.D. Wash. June 27, 2023) (ordering antitrust defendant to produce data, dictionaries, and related documentation); *IQVIA, Inc. v. Veeva Sys., Inc.*, No. 17-177, 2018 WL 11693781, at *16 (D.N.J. Nov. 30, 2018), *modified*, No. 17-177, 2022 WL 17990836, at *17 (D.N.J. Dec. 29, 2022) (ordering party in trade secret and antitrust litigation to produce dictionaries and documentation related to requested data).

**Apple's Position**

Apple is fully committed to moving data discovery forward expeditiously. For months, Apple's technical and legal teams have been working to evaluate and respond to Plaintiffs' data requests, including conferring with system administrators and dedicating the engineering hours necessary to generate the materials Plaintiffs are requesting. This process is ongoing and will result in production of appropriate materials before the fact discovery deadline ordered by this Court.

That being said, Plaintiffs' Requests for Production 26, 61, 62, and 63 (the "Data Requests") are broad and ill-defined. Read literally, Plaintiffs' Data Requests would require the production of massive volumes of information, needlessly inflicting unreasonable burdens on Apple. Apple has been working with Plaintiffs to clarify and narrow their requests such that a reasonable set of responsive data can be identified. At no fault of either party, that meet-and-confer process was interrupted by the lengthy government shutdown, but now the parties have resumed discussions and are making progress toward a reasonable approach to data discovery.

The Court should let that process take its ordinary and customary course and reject Plaintiffs' invitation to set arbitrary interim deadlines that are not rooted in the Scheduling Order and will only create unnecessary further disputes. This Court previously rejected Plaintiffs' request to set interim deadlines for data production, and for good reason: such deadlines would short-circuit the meet-and-confer process, compel Apple to guess at what Plaintiffs actually seek, and invite avoidable discovery skirmishes—the very outcome the Court has cautioned against. *See* Sept. 16, 2025 Hr'g Tr. 34:22-24 ("I want you to do a thorough job of meeting and conferring. I don't want you to rush … into more disputes for me to decide."). The better course is for the parties to continue their discussions, narrow the set of requested information, and make the required productions in the ordinary course. Under that approach, to which Apple remains fully committed, productions will occur before the fact discovery deadline.

\*   \*   \*

When the Court issued the Scheduling Order, it rejected Plaintiffs' demand that all data be produced within 60 days of service of a request for production. Dkt. 270 ¶ 6 (rejecting Dkt. 254 at 3). That Order also carved out data productions from the "substantial completion" deadline applicable to documents. *Id.* This allows for the flexibility needed to accommodate the variance in scope, burden, and technical complexity of data productions, in addition to the iterative nature of data-related discovery. Discovery has proceeded under that framework, and nothing material has changed that would warrant a different approach now. The parties are making steady progress working through Plaintiffs' Data Requests, and the necessary information will be produced in advance of the fact-discovery deadline.

Throughout the investigation and litigation phases of this case, Apple has provided extensive information about Apple's data and related databases to facilitate the parties' discussions. For example, two of Plaintiffs' Data Requests seek financial data (RFPs 26 and 62), the majority of which Apple already produced following detailed and thorough discussions during the investigation phase. From October 2021 through January 2023, Apple and Plaintiffs exchanged numerous letters and emails discussing Apple's databases

5

and the available fields and related documentation. There were also multiple discussions with Apple's counsel and with a financial specialist from Apple. As part of those discussions, Apple provided Plaintiffs with additional field lists and definitions and data samples for some of its primary financial databases and additional information about those databases, including from where they pull data. Later, after additional discussions about the data fields, Apple provided sample data extracts from those databases. The parties then continued to discuss and negotiate before finally agreeing on the relevant databases and data fields. Apple then produced voluminous financial datasets covering 2016-2023. As Apple has explained to Plaintiffs, there have not been any significant changes to the fields and definitions for the financial databases since 2023. As such, Plaintiffs can and should rely on the six-year financial data extracts and field lists that they have had in hand for years.

In addition to all the data and information about data that Plaintiffs received during the investigation, the parties have made progress on similar productions in this litigation. In response to Interrogatory 3, Apple provided detailed information regarding the databases or data sets that contain certain of the data responsive to Plaintiffs' Data Requests, including those that contain financial and consumer data. In addition, on December 17, 2025, Apple provided Plaintiffs with field lists for financial databases that contain data responsive to RFPs 26 and 62. And Apple will continue to produce field lists on a rolling basis as the parties work to clarify Plaintiffs' requests. The process is therefore working as this Court intended, allowing the parties to negotiate to produce information responsive to Plaintiffs' requests as soon as practicable but without creating undue burden for either party or bringing unripe disputes to the Court.

To the extent Plaintiffs complain about the pace of further productions, the fault lies with the breadth and imprecision of the data requests at issue. For example, in RFP 61, Plaintiffs request effectively unbounded data "containing information derived from users" for all the Identified Products and Services (*i.e.*, Cloud Streaming Games, Messaging Systems, Digital Wallets or Payments Apps, Platform Apps or Mini Programs, Smartwatches, Browsers, Collaborative Work Environments, and eSIM) including: user characteristics, user relationships, activation data, data on usage of apps, subscriptions, products, or services, and switching data, among others. This exceedingly broad request implicates nearly every aspect of Apple's business and, as written, is limitless. Two examples show why:

- The request seeks data about undefined user "characteristics." That term has never been meaningfully narrowed, leaving Apple to investigate a moving target. Instead, Plaintiffs have seized on a stray reference in historical documents to a legacy system that now acts as a "pass-through" database and is set to be deprecated in less than a year. Upon learning of Plaintiffs' interest, Apple confirmed that the database is no longer relied upon and undertook a diligent search to determine where comparable information is now maintained. Apple is actively evaluating successor systems to identify any discrete customer attributes that could be relevant once Plaintiffs articulate a clear, bounded definition of the "characteristics" they seek.

- Further, Plaintiffs have taken the position that the term "usage" should encompass every conceivable instance in which end users interact with any aspect of Apple's products or services. This undefined concept potentially spans numerous data sources, countless files, and records dating back more than fifteen years. Apple asked Plaintiffs

to cabin "usage" to discrete metrics that are reasonably calculated to lead to admissible evidence. To date, Plaintiffs have not agreed. Absent such narrowing, Apple must analyze each Identified Product and Service, scour the full breadth of the company for structured databases or data sources containing data that could conceivably fall under Plaintiffs' overbroad definition of "usage," and then identify the precise fields within those systems that correspond to Plaintiffs' expansive request. But Apple's data systems include upwards of hundreds of thousands of tables and tens of thousands of fields.

Plaintiffs' other Data Requests are similarly problematic. Although Plaintiffs generally agreed to limit their document requests to iPhone and the Identified Products and Services, in response to RFP 26 Plaintiffs insist that Apple produce worldwide data for all of its products and services, even for those with no relevance in this litigation (e.g., iPad, Apple TV, Apple Music). Likewise, in response to RFP 63, Plaintiffs insist that they are entitled to any surveys done by any analytical group at Apple without regard to the allegations in this case and have refused to provide any information about what information they are seeking from the surveys such that the parties could narrow the scope to surveys that have a nexus to this case.

The overbreadth of Plaintiffs' Data Requests has required the parties to expend considerable resources to narrow the scope of the Data Requests to what is truly relevant to this case. As a result of these discussions, Apple has gained some clarity on the portions of the Data Requests and identified databases that likely house responsive information. Apple will continue to confer with Plaintiffs to clarify and refine their requests and, as necessary, will furnish additional details about other responsive databases and data fields. Imposing arbitrary interim deadlines would do nothing but compel the parties to skip this foundational work, promote confusion rather than clarity, and result in unnecessary disputes being brought to the Court.[5]

Apple has continued to identify new databases during the meet-and-confer process, which is the natural product of an iterative database discovery process. As Plaintiffs clarify the information they seek, Apple can examine its many data systems and locate sources that may hold responsive information. For example, as explained above, RFP 61 seeks data about users' "usage" of Apple devices. After multiple discussions, Plaintiffs clarified they wished to analyze usage at a consumer-specific level and identified a document containing supposedly representative data. Apple promptly examined its data systems, identified a dataset within one of those systems that contains the requested data, and disclosed that data system and dataset to Plaintiffs. Apple is now preparing and will shortly provide a comprehensive field list from the relevant dataset so the parties can assess the data's relevance. This sequence reflects not delay, but a good-faith effort to align Apple's searches with the evolving contours of Plaintiffs' requests.

---

[5] Far from presenting a hypothetical situation, this is exactly what happened with the numerous unripe issues Plaintiffs inappropriately raised in their September 10, 2025 submission. Dkt. 320. There, Plaintiffs made the hyperbolic assertion that the parties were "at an impasse over dozens of [Plaintiffs' First Set of] Requests [for Production]." Dkt. 320 at 2. However, over the course of subsequent meet-and-confer sessions, the parties negotiated compromises designed to streamline discovery. Those discussions have borne fruit: the parties have successfully eliminated or narrowed nearly every point of contention related to Plaintiffs' First RFPs.

Apple remains fully committed to moving data discovery forward expeditiously. Apple will continue to meet and confer with Plaintiffs to identify the subset of fields to ultimately be produced and agree on appropriate temporal and subject-matter limits. This approach, which comports with the CMO and reflects the realities and complexity of the data at issue, will best serve the interests of both parties and the orderly administration of the case.

Respectfully submitted,

| | |
|---|---|
| /s/ Jonathan H. Lasken | /s/ Liza M. Walsh |
| Jonathan H. Lasken | Liza M. Walsh |
| Assistant Chief, Civil Conduct Task Force | Douglas E. Arpert |
| United States Department of Justice | WALSH PIZZI O'REILLY FALANGA LLP |
| 450 Fifth Street, NW, Suite 4000 | Three Gateway Center |
| Washington, D.C. 20530 | 100 Mulberry Street, 15th Floor |
| Telephone: (202) 598-6517 | Newark, New Jersey 07102 |
| Email: jonathan.lasken@usdoj.gov | Tel.: (973) 757-1100 |
| | Email: lwalsh@walsh.law |
| MATTHEW J. PLATKIN | Email: darpert@walsh.law |
| Attorney General of New Jersey | |
| | /s/ Craig S. Primis |
| /s/ David H. Reichenberg | Craig S. Primis, P.C. |
| David H. Reichenberg | Winn Allen, P.C. |
| Section Chief, Antitrust | Tracie Bryant, P.C. |
| New Jersey Office of the Attorney General | KIRKLAND & ELLIS LLP |
| 124 Halsey Street, 5th Floor | 1301 Pennsylvania Avenue, N.W. |
| Newark, NJ 07101 | Washington, DC 20004 |
| Tel: (609) 696-5271 | Tel.: (202) 389-5000 |
| Email: David.reichenberg@law.njoag.gov | Email: craig.primis@kirkland.com |
| | Email: winn.allen@kirkland.com |
| | Email: tracie.bryant@kirkland.com |
| *Attorney for Plaintiff State of New Jersey, Arizona, California, Washington D.C., Connecticut, Indiana, Maine, Massachusetts, Michigan, Minnesota, Nevada, New Hampshire, New York, North Dakota, Oklahoma, Oregon, Tennessee, Vermont, Washington, and Wisconsin* | /s/ Devora W. Allon |
| | Devora W. Allon, P.C. |
| | Alexia R. Brancato, P.C. |
| | KIRKLAND & ELLIS LLP |
| | 601 Lexington Avenue |
| | New York, NY 10022 |
| | Tel.: (212) 446-4800 |
| | Email: devora.allon@kirkland.com |
| | Email: alexia.brancato@kirkland.com |
| | |
| | *Attorneys for Defendant Apple Inc.* |

Aaron M. Sheanin
Trial Attorney
United States Department of Justice
Antitrust Division
450 Golden Gate Avenue, Suite 10-0101
San Francisco, CA 94102

*Attorney for Plaintiff United States of America*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA et al., <br><br> *Plaintiff*, <br><br> v. <br><br> APPLE INC. <br><br> *Defendants*. | Case No. 2:24-cv-04055-JXN-LDW |

**CERTIFICATE OF SERVICE**

I hereby certify that the above letter and this Certificate of Service were served upon defendant's counsel, Liza M. Walsh, Esq., Craig S. Primis, Esq., Devora W. Allen, Esq., and K. Winn Allen, Esq., 1301 Pennsylvania Avenue, NW, Washington, D.C., 20004, by CM/ECF on December 17, 2025.

*/s/ Aaron M. Sheanin*
Aaron M. Sheanin
United States Department of Justice
Antitrust Division
*Attorney for Plaintiff United States*