# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>            Plaintiffs,<br><br>v.<br><br>APPLE INC.,<br><br>            Defendant. | Case No. 2:24-cv-04055<br><br>Hon. Julien X. Neals, U.S.D.J.<br>Hon. Leda D. Wettre, U.S.M.J.<br><br><br>**RETURN DATE:  May 4, 2026** |
| IN RE: APPLE INC. SMARTPHONE ANTITRUST LITIGATION | Case No. 2:24-MD-3113<br><br>MDL No. 3113<br><br>Hon. Julien X. Neals, U.S.D.J.<br>Hon. Leda D. Wettre, U.S.M.J.<br><br>*Document filed electronically* |

## APPLE INC.'S NOTICE OF MOTION FOR ISSUANCE OF A LETTER OF REQUEST UNDER THE HAGUE EVIDENCE CONVENTION TO SAMSUNG ELECTRONICS CO., LTD. IN THE REPUBLIC OF KOREA

TO: All Counsel

**COUNSEL**:

**PLEASE TAKE NOTICE** that Defendant Apple Inc. ("Apple"), by and through its undersigned counsel, shall move before the Honorable Leda D. Wettre, U.S.M.J., at a date and time to be determined by the Court, at the Martin Luther King Building & United States Courthouse, 50 Walnut Street, Newark, New Jersey 07102, for an Order issuing a Request for International Judicial Assistance pursuant to 28

U.S.C. § 1781 and Chapter I of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, March 18, 1970, T.I.A.S. No 7444, 23 U.S.T. 25555 to Samsung Electronics Co., Ltd. in the Republic of Korea.

**PLEASE TAKE FURTHER NOTICE** that in support of this Motion, Apple will rely on its Memorandum in Support of Apple Inc.'s Motion for Issuance of a Letter of Request Under the Hague Evidence Convention to Samsung Electronics Co., Ltd. in the Republic of Korea, the Declaration of Julian Kleinbrodt with Exhibits A–C annexed thereto, and any additional replies or submissions made hereafter.

**PLEASE TAKE FURTHER NOTICE** that a proposed form of order is submitted herewith.

**PLEASE TAKE FURTHER NOTICE** that Apple will appear for argument on this Motion or provide any other information if requested by the Court.

**PLEASE TAKE FURTHER NOTICE** that a Certification attesting to the date and manner of service is also submitted herewith.

Dated: April 6, 2026

Respectfully submitted,

Cynthia E. Richman (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street. N.W.
Washington, DC 20036
Tel.:   (202) 955-8500
Email: crichman@gibsondunn.com

Daniel G. Swanson (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel.:   (213) 219-7000
Email: dswanson@gibsondunn.com

Joseph R. Rose (*pro hac vice*)
Julian W. Kleinbrodt (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Tel.:   (415) 393-8200
Email: jrose@gibsondunn.com
          jkleinbrodt@gibsondunn.com

Connor S. Sullivan (*pro hac vice*)
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Tel.:   (415) 351-4000
Email: cssullivan@gibsondunn.com

By:*/s/ Liza M. Walsh*
Liza M. Walsh
Douglas E. Arpert
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
Tel.:   (973) 757-1100
Email:  LWalsh@walsh.law
          DArpert@walsh.law

*Counsel for Defendant Apple Inc.*

- 3 -

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 6, 2026, a copy of the foregoing

was served on all counsel of record via the Court's electronic filing system.


*/s/ Liza M. Walsh*
Liza M. Walsh

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>              Plaintiffs,<br><br>v.<br><br>APPLE INC.,<br><br>              Defendant. | Case No. 2:24-cv-04055<br><br>Hon. Julien X. Neals, U.S.D.J.<br>Hon. Leda D. Wettre, U.S.M.J. |
| IN RE: APPLE INC. SMARTPHONE ANTITRUST LITIGATION | Case No. 2:24-MD-3113<br><br>MDL No. 3113<br><br>Hon. Julien X. Neals, U.S.D.J.<br>Hon. Leda D. Wettre, U.S.M.J. |

**APPLE INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR ISSUANCE OF A LETTER OF REQUEST UNDER THE HAGUE EVIDENCE CONVENTION TO SAMSUNG ELECTRONICS CO., LTD. IN THE REPUBLIC OF KOREA**

WALSH PIZZI O'REILLY FALANGA LLP
100 Mulberry Street, 15th Floor
Newark, NJ 07102

GIBSON, DUNN & CRUTCHER LLP
1700 M. Street, N.W.
Washington, D.C. 20036

## **TABLE OF CONTENTS**

**INTRODUCTION**................................................................................................1

**BACKGROUND** ...............................................................................................2

**LEGAL STANDARD** .......................................................................................5

**ARGUMENT**....................................................................................................7

    A.     The Requested Evidence Is Important To The Litigation ..............................7

    B.     The Letter Of Request Is Reasonably Specific And Tailored......................11

    C.     No Adequate Alternative Means Exist To Obtain The Information .............13

    D.     Issuance Promotes U.S. Interests And Does Not Undermine Korea's
         Interests......................................................................................................15

**CONCLUSION**...............................................................................................**18**

# TABLE OF AUTHORITIES

## Cases

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
278 F.R.D. 51 (E.D.N.Y. 2010) ...................................................................................16

*Arcelik A.S. v. E.I. DuPont de Nemours & Co.*,
856 F. App'x 392 (3d Cir. 2021) ...............................................6, 7, 13, 16, 17

*AstraZeneca LP v. Breath Ltd.*,
2011 WL 1421800 (D.N.J. Mar. 31, 2011) ...............................................................7

*In re Auto. Refinishing Paint Antitrust Litig.*,
358 F.3d 288 (3d Cir. 2004) .................................................................................5, 6

*In re Baycol Prods. Litig.*,
348 F. Supp. 2d 1058 (D. Minn. 2004).....................................................................11

*Behrens v. Arconic, Inc.*,
2020 WL 1250956 (E.D. Pa. Mar. 13, 2020) ...........................................................16

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007) ......................................................................................9

*Cameron v. Apple*,
19-cv-03074 ......................................................................................................10, 14

*El Paso Disposal, LP v. Ecube Labs Co.*,
792 F. Supp. 3d 703 (W.D. Tex. 2025) ....................................................................13

*Gerling Int'l Ins. Co. v. C.I.R.*,
839 F.2d 131 (3d Cir. 1988) .....................................................................................15

*Gucci Am., Inc. v. Curveal Fashion*,
2010 WL 808639 (S.D.N.Y. Mar. 8, 2010).............................................................13

*Ingenico Inc. v. Ioengine, LLC*,
No. 18-826, 2021 WL 765757 (D. Del. Feb. 26, 2021) ..........................................17

*Lincoln Adventures, LLC v. Those Certain Underwriters at Lloyd's
London Members of Syndicates*,
2020 WL 13158012 (D.N.J. Oct. 14, 2020) .............................................................13

*Liqwd, Inc. v. L'Oréal USA, Inc.*,
2018 WL 11189616 (D. Del. Nov. 16, 2018)..............................................................5

*In re Mercedes-Benz Emissions Litig.*,
2020 WL 487288 (D.N.J. Jan. 30, 2020)..................................................................10

*Milliken & Co. v. Bank of China*,
758 F. Supp. 2d 238 (S.D.N.Y. 2010) ......................................................................17

*Moretti v. Hertz Corp.*,
   2018 WL 4693473 (D. Del. Sept. 30, 2018)......................................................11

*Netherby Ltd. v. Jones Apparel Grp., Inc.*,
   2005 WL 1214345 (S.D.N.Y. May 18, 2005) ......................................................6

*Ney v. Owens-Illinois, Inc.*,
   2016 WL 7116015 (E.D. Pa. Dec. 6, 2016)........................................................11

*Pronova BioPharma Norge AS v. Teva Pharms. USA, Inc.*,
   708 F. Supp. 2d 450 (D. Del. 2010)....................................................................6

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) ...............................................................................8

*Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for the S.
   Dist. of Iowa*,
   482 U.S. 522 (1987)..............................................................4, 5, 6, 7, 15, 17

*Strauss v. Credit Lyonnais, S.A.*,
   249 F.R.D. 429 (E.D.N.Y. 2008)................................................................11, 15

*TQ Delta, LLC v. Samsung Elecs. Am., Inc.*,
   2021 WL 6049908 (D.N.J. Dec. 20, 2021)........................................................14

*Tulip Computs. Int'l B.V. v. Dell Comput. Corp.*,
   254 F. Supp. 2d 469 (D. Del. 2003)........................................................5, 11, 12

*In re Valsartan, Losartan, and Irbesartan Prods. Liab. Litig.*,
   2021 WL 6010575 (D.N.J. Dec. 20, 2021)........................................................16

**Other Authorities**

Hague Evidence Convention, 23 U.S.T. 2555......................................................17

Samsung Electronics Co., Ltd., 2025 Half-Year Business 5, 15 (2025),
   available at https://perma.cc/7N6P-24WV;......................................................10

*South Korea (Republic of Korea) Judicial Assistance Information*,
   U.S. Dep't of State, https://perma.cc/QC25-A3TG (last accessed
   Apr. 5, 2026)........................................................................................................5

*Transfer Content with Samsung Smart Switch*, available at
   https://perma.cc/2LLY-7ZCT (last accessed Apr. 5, 2026) ...............................9

**INTRODUCTION**

Apple Inc. ("Apple") respectfully requests that this Court issue the accompanying Letter of Request under the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Evidence Convention") to Samsung Electronics Co., Ltd. ("Samsung Electronics") in the Republic of Korea. Apple's Letter of Request seeks internal business reports, market analyses, and data regarding Samsung's smartphone, smartwatch, and app store businesses. Apple has already subpoenaed Samsung Electronics' domestic subsidiary, Samsung Electronics America, Inc. ("Samsung America" or "SEA"), but Samsung America has objected to all of Apple's document requests on the basis that it will not produce documents purportedly in the sole possession, custody, or control of Samsung Electronics.

All parties agree that Samsung is a major competitor in the alleged smartphone and smartwatch markets.[1] Indeed, Plaintiffs claim it is the principal purported victim of Apple's alleged conduct, and the Department of Justice filed this case in this Court at least in part because Samsung's "U.S. headquarters is located in this district." Gov't Compl. ¶ 158. Evidence from Samsung is squarely relevant to almost every disputed issue in this litigation: how to define the alleged markets, the extent of

---

[1] "Samsung" refers collectively to Samsung Electronics and Samsung America.

Apple's power in those markets, whether Apple's conduct is exclusionary, and whether Apple's conduct has had substantial anticompetitive effects. And Samsung Electronics, Samsung's parent entity headquartered in the Republic of Korea, may be the exclusive custodian for some of the highly relevant evidence sought from Samsung.

Apple's proposed Letter of Request meets all the relevant criteria courts apply when issuing such letters under the Hague Convention: It seeks evidence central to the issues in this case and will promote the interests of the United States without undermining those of the Republic of Korea. The Court should grant the motion and issue the letter.

## BACKGROUND

Apple's request arises in related actions pending in this District, *United States v. Apple Inc.*, No. 2:24-cv-04055, brought by the United States and a number of state governments ("Government Plaintiffs"); and the related private actions, *In re Apple Inc. Smartphone Antitrust Litigation*, MDL No. 3113 (D.N.J.) (the "MDL"), a consolidated multi-district litigation including class-action claims by Direct and Indirect iPhone Purchaser Plaintiffs and an Apple Watch Plaintiff (collectively, "MDL Plaintiffs"; together with Government Plaintiffs "Plaintiffs"). Put briefly, Plaintiffs allege that Apple's rules governing app distribution, the level of third-party access to various application programming interfaces ("APIs") that it provides, and

2

its technical design choices have suppressed competing innovations and thereby foreclosed competition from rivals in alleged performance smartphone, smartphone, iOS-connected smartwatch, and smartwatch markets. *United States v. Apple Inc.*, 2:24-cv-04055, Dkt. 51 ("Gov't Compl.") ¶¶ 57–60, 126, 185–186; *In re Apple Inc. Smartphone Antitrust Litigation*, MDL No. 3113, Dkt. 87 ("DPP Compl.") ¶¶ 24, 163–166; MDL No. 3113, Dkt. 109 ("IIPP Compl.") ¶¶ 40, 130–134, 169–171; MDL No. 3113, Dkt. 86 ("Watch Compl.") ¶¶ 32, 42–49, 163–166, 197–198, 242.

All four complaints agree that Samsung—a public company based in the Republic of Korea—is a principal rival with respect to these market dynamics. The Government identifies Samsung as Apple's "closest smartphone competitor." Gov't Compl. ¶¶ 18, 23. The iPhone Purchaser Plaintiffs likewise describe Samsung as Apple's "closest smartphone competitor," DPP Compl. ¶ 26; IIPP Compl. ¶ 41, and "the world's leading smartphone manufacturer," Watch Compl. ¶ 5. And Watch Plaintiff alleges that Samsung—also a "leading" maker of smartwatches, *id.* ¶ 24— "stopped making smartwatches that connect to the iPhone" in 2021, *id.* ¶ 5, and explicitly alleges that Samsung was "harmed" by Apple's alleged conduct, *id.* ¶ 86.

Through the Letter of Request, Apple seeks targeted categories of Samsung Electronics' documents and data bearing directly on Plaintiffs' claims and Apple's defenses. The materials sought include reports, research, and analyses regarding Samsung's smartphone and smartwatch businesses—including product

3

specifications, pricing, sales, competitive assessments, market shares, consumer demand, and consumer switching to and from iPhone and Apple Watch.  *See* Kleinbrodt Decl. Ex. A, Letter of Request, Ex. 1 at Nos. 11–17, 34–35.  Apple also seeks evidence concerning Samsung's Galaxy Store app marketplace (including developer agreements and terms, license agreements, and app-review guidelines and tools) and documents concerning key products and features implicated by Plaintiffs' theories (including Samsung Pay and other digital-wallet offerings, messaging, cloud gaming and streaming, companion apps, and policies regarding "super" apps and mini-programs).  *See id.*, at Nos. 18–33, 36–37.

Samsung America has represented in other litigation that it does not have possession, custody, or control of certain categories of documents held by Samsung Electronics.  *See infra* § C.  Samsung America has maintained a similar position in this litigation, objecting on a wholesale basis (while refusing to provide any support) that Apple's subpoena "seeks documents or information that are not in [Samsung America's] possession, custody, or control."  Kleinbrodt Decl. Ex. C at 3; *see also id. passim* (making similar objections to each request).  To the extent Apple nevertheless is able to obtain the materials sought by its Letter of Request from Samsung America, Apple will not seek further, duplicative production from Samsung Electronics.  Given the "time consuming" nature of discovery under the Hague Evidence Convention, *Société Nationale Industrielle Aérospatiale v. U.S.*

4

*Dist. Ct. for the S. Dist. of Iowa*, 482 U.S. 522, 542 (1987), Apple moves for issuance of the Letter of Request in parallel with its subpoena to Samsung America in light of the discovery timeline in this case.

## LEGAL STANDARD

The Hague Evidence Convention provides a process for courts to "facilitate the gathering of evidence" from sources abroad. *Société Nationale*, 482 U.S. at 541; *see In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 299 (3d Cir. 2004). The Hague Evidence Convention serves as an "alternative" route to discovery in place of the Federal Rules of Civil Procedure. *Tulip Computs. Int'l B.V. v. Dell Comput. Corp.*, 254 F. Supp. 2d 469, 472 (D. Del. 2003) (quoting *Société Nationale*, 482 U.S. at 538). "When discovery is sought from a non-party in a foreign jurisdiction, application of the Hague [Evidence] Convention, which encompasses principles of international comity, is virtually compulsory" because it "provides the only means of compelling discovery." *Liqwd, Inc. v. L'Oréal USA, Inc.*, 2018 WL 11189616, at *2, 6 (D. Del. Nov. 16, 2018) (alteration in original) (quoting *Tulip Computs.*, 254 F. Supp. 2d at 474). Both the United States and the Republic of Korea are signatories to the Hague Convention and bound by its provisions as "Contracting States." *See South Korea (Republic of Korea) Judicial Assistance Information*, U.S. Dep't of State, https://perma.cc/QC25-A3TG (last accessed Apr. 5, 2026).

"Letters of Request are one method of taking evidence pursuant to the

5

Convention." *Pronova BioPharma Norge AS v. Teva Pharms. USA, Inc.*, 708 F. Supp. 2d 450, 452 (D. Del. 2010). Letters of Request "are available whenever they will facilitate the gathering of evidence by the means authorized in the Convention." *Société Nationale*, 482 U.S. at 541. Accordingly, "[c]ourts routinely issue such letters where the movant makes a reasonable showing that the evidence sought may be material or may lead to the discovery of material evidence." *Netherby Ltd. v. Jones Apparel Grp., Inc.*, 2005 WL 1214345, at *1 (S.D.N.Y. May 18, 2005).

In considering whether to issue a request under the Hague Evidence Convention, courts look to the "particular facts" of "each case," "sovereign interests," and the "likelihood that such resort will prove effective." *In re Auto Refinishing*, 358 F.3d at 300 (quoting *Société Nationale*, 482 U.S. at 544). Courts operationalize that analysis through five "comity" factors: "(1) the importance to the . . . litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." *Arcelik A.S. v. E.I. DuPont de Nemours & Co.*, 856 F. App'x 392, 397 (3d Cir. 2021) (citing *Société Nationale*, 482 U.S. at 544 n.28).

## ARGUMENT

The comity factors favor issuing the Letter of Request: The evidence sought is critical to core issues in this litigation; the requests are reasonably specific and tailored; the information is not otherwise obtainable; and issuance advances U.S. interests without undermining Korea's sovereign interests.

## A.    The Requested Evidence Is Important To The Litigation

The first comity factor asks whether the "documents or other information requested" abroad are important to the litigation. *Société Nationale*, 482 U.S. at 544 n.28.   Requests under the Hague Evidence Convention are granted where the evidence sought is "highly relevant to [a defendant's] defenses." *Arcelik*, 856 F. App'x at 397 (internal quotation marks omitted); *see, e.g.*, *AstraZeneca LP v. Breath Ltd.*, 2011 WL 1421800, at *13 (D.N.J. Mar. 31, 2011) ("[T]his factor weighs in favor of disclosure where the evidence sought is directly relevant to the claims in the litigation.").

Samsung is uniquely and obviously relevant to this case.  The Government and iPhone Purchaser Plaintiffs allege Apple's conduct has left "only two companies (Google and Samsung)" as "meaningful competitors" to Apple in the alleged "premium smartphone market."  Gov't Compl. ¶ 127; DPP Compl. ¶ 164; IIPP Compl. ¶ 267.  Those allegations rest on a theory that Apple has worked to prevent consumers from buying Android phones or switching from iPhone to Android—

7

making evidence from a leading Android competitor, Samsung, directly relevant to core disputed issues. Gov't Compl. ¶¶ 127, 186; IIPP Compl. ¶¶ 167, 224; DPP Compl. ¶¶ 164, 231. Watch Plaintiff likewise alleges that a significant effect of Apple's alleged conduct has been to deter competitors like Samsung—a "leading" manufacturer of smartphones and smartwatches—from producing smartwatches that connect to iPhone. Watch Compl. ¶¶ 2, 5, 24, 189. Indeed, Samsung America has acknowledged its relevance to this case, deeming itself to be Apple's "rival." *United States v. Apple Inc.*, 2:24-cv-04055, Dkt. 123 at 2.

The evidence sought from Samsung Electronics bears directly on numerous elements of Plaintiffs' cases. For example, all Plaintiffs must identify and prove the markets relevant to their claims. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436–37 (3d Cir. 1997). Evidence from Samsung Electronics— including analyses of consumer smartphone purchasing decisions and switching behavior, smartphone pricing, and market dynamics, *see* Kleinbrodt Decl. Ex. A, Letter of Request, Ex. 1 at Nos. 11–14, 34–35—will help demonstrate whether Plaintiffs' alleged "performance smartphone" market is appropriate. And Watch Plaintiff alleges a purported "iOS-connected smartwatch" market, which Samsung exited despite being a "leading" smartwatch maker in 2021. Watch Compl. ¶¶ 5, 24–25, 189, 212–213. Evidence from Samsung Electronics is important to determine whether that alleged market is viable too. *See* Kleinbrodt Decl. Ex. A,

8

Letter of Request, Ex. 1 at Nos. 15–17, 34–35.

Evidence from Samsung Electronics is also relevant to the issue of Apple's purported monopoly power in an alleged smartphone market, however defined. *See, e.g., Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) (monopoly power requires proof that a competing firm cannot expand output to drive down prices). For example, Apple is entitled to test Plaintiffs' allegations about limited consumer switching. *See* IIPP Compl. ¶ 221, 223; *see also, e.g.,* Gov't Compl. ¶¶ 183, 185; Watch Compl. ¶¶ 2, 5, 189; DPP Compl. ¶¶ 228, 230. Discovery from Samsung will enable Apple to test those allegations based on Samsung's own information about consumers who switch away from Apple—for example, Samsung expressly markets a "Smart Switch" product that allows users to "seamlessly transfer all content" from an Apple iPhone to a new Samsung smartphone. *Transfer Content with Samsung Smart Switch*, Samsung.com, available at https://perma.cc/2LLY-7ZCT (last accessed Apr. 5, 2026).

Samsung Electronics also has documents relevant to the Court's assessment of the challenged conduct. Take digital wallets as one example: The Government and iPhone Purchaser Plaintiffs compare Apple's policy of charging issuing banks a fee of 0.15 percent for transactions conducted through Apple Wallet with Samsung's policy of not charging a fee to banks for transactions through Samsung's digital wallet. *See* Gov't Compl. ¶ 113; DPP Compl. ¶ 146; IIPP Compl. ¶ 146. Apple is

entitled to obtain evidence from Samsung Electronics to test that allegation. *See* Kleinbrodt Decl. Ex. A, Letter of Request, Ex. 1 at Nos. 26, 28, 36.

In past litigation, Samsung America has represented that some documents could only be obtained from Samsung Electronics, the locus of some corporate decision-making. *See* Samsung Electronics Co., Ltd., 2025 Half-Year Business 5, 15 (2025), available at https://perma.cc/7N6P-24WV; *see also Cameron v. Apple*, 19-cv-03074, Samsung Electronics America, Inc.'s Opp. to Apple Inc.'s Mot. to Compel, Dkt. 103 at 1 (refusing to produce documents about Samsung's Galaxy Store because "the Galaxy Store is developed and managed by [Samsung America]'s parent company, Korean entity Samsung Electronics Co., Ltd."). Samsung America has taken a similar stance in this litigation. *See supra* at 4. While Apple maintains that Samsung America should produce materials that it possesses or can obtain, Apple must pursue this evidence from Samsung Electronics to the extent this highly relevant evidence cannot be obtained from Samsung America through domestic discovery mechanisms. *See also infra* § C.

In short, Apple's Letter of Request pursues precisely the kind of foreign evidence considered "important to the litigation" under factor one: evidence that goes to the core disputed merits issues and provides contemporaneous, real-world context about competition, switching, and market structure from a rival that Plaintiffs place at the center of their theories. *See, e.g., In re Mercedes-Benz*

10

*Emissions Litig.*, 2020 WL 487288, at \*6 (D.N.J. Jan. 30, 2020) ("[T]his factor weighs in favor of disclosure where the evidence is directly relevant to the claims in the litigation." (internal quotation marks omitted)); *Ney v. Owens-Illinois, Inc.*, 2016 WL 7116015, at \*4 (E.D. Pa. Dec. 6, 2016) (similar); *Moretti v. Hertz Corp.*, 2018 WL 4693473, at \*6 & n.6 (D. Del. Sept. 30, 2018) (similar).

**B.       The Letter Of Request Is Reasonably Specific And Tailored**

Courts find this factor satisfied whenever there is a close nexus between the requests being made and the issues in the case. *Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 441 (E.D.N.Y. 2008) (request should be "sufficiently focused on the vital issues in th[e] case"). Courts typically do not scrutinize the breadth or narrowness of particular requests; instead, they review the requests only to determine the "relevancy" of materials sought. *See, e.g.*, *Tulip Computs.*, 254 F. Supp. 2d at 475 ("If Dell's document requests are overly broad under the law of the Netherlands, . . . then the requests will presumably be narrowed by the appropriate judicial authorities in the Netherlands before any documents are produced."); *In re Baycol Prods. Litig.*, 348 F. Supp. 2d 1058, 1061 (D. Minn. 2004) (arguments as to the scope of the Letter of Request are not "a basis for quashing the Letter of Request" and are best "left to the appropriate Italian tribunal").

In any case, Apple's requests seek appropriately narrow categories of documents that are all closely tied to the theories and defenses across each of the

11

four complaints in this litigation.  For example:

- Document Requests 11–14 and 34–35 seek, *e.g.*, Samsung Electronics' market research, reports, sales, financial statements, and contracts related to its Smartphone business.  Kleinbrodt Decl. Ex. A, Letter of Request, Ex. 1.

- Document Requests 15–17 and 34–35 seek, *e.g.*, Samsung Electronics' market research, reports, sales, and financial statements related to its Wearables business.  Kleinbrodt Decl. Ex. A, Letter of Request, Ex. 1.

- Document Requests 18–33 and 36–37 seek, *e.g.*, Samsung Electronics' App Review guidelines, developer agreements, and license agreements concerning the Samsung Galaxy Store and reports concerning Samsung Pay, Samsung Gaming Hub, Digital Wallets, Smartphone games, Smartphone messaging apps, Super Apps and Mini Programs.  Kleinbrodt Decl. Ex. A, Letter of Request, Ex. 1.

Each of Apple's requests is tailored to seek specific categories of documents directly relevant to the issues in this litigation.  And even if Samsung Electronics thinks otherwise, it will have a full opportunity to make that argument in the Republic of Korea's courts.  *See, e.g.*, *Tulip Computs.*, 254 F. Supp. 2d at 475 ("[T]he requests will presumably be narrowed by the appropriate judicial authorities in the Netherlands . . . .").

## C.      No Adequate Alternative Means Exist To Obtain The Information

Courts also consider two closely related factors that cases identify as the third and fourth comity factors. The third factor asks whether the documents to be disclosed and the people who will produce them are located abroad or in the United States. *See, e.g., Lincoln Adventures, LLC v. Those Certain Underwriters at Lloyd's London Members of Syndicates*, 2020 WL 13158012, at *9 (D.N.J. Oct. 14, 2020). The fourth comity factor asks "whether the information sought in discovery can easily be obtained elsewhere." *Id.* (internal quotation marks omitted). Where the documents in question cannot be easily obtained through alternative means, both the third and fourth factors "weigh[] in favor of issuing [the Letter of Request] regardless of where the information originated." *El Paso Disposal, LP v. Ecube Labs Co.*, 792 F. Supp. 3d 703, 710 (W.D. Tex. 2025); *see also Arcelik*, 856 F. App'x at 399; *Gucci Am., Inc. v. Curveal Fashion*, 2010 WL 808639, at *3 (S.D.N.Y. Mar. 8, 2010) ("If the information cannot be easily obtained through alternative means, this factor is said to counterbalance the previous factor—the [origin of information]—and weighs in favor of disclosure." (citation modified)). Because the information sought from Samsung Electronics cannot be easily obtained elsewhere, both the third and fourth factors favor issuance of the Letter of Request.

Apple seeks from Samsung Electronics only information and documents that cannot be easily obtained elsewhere. Plaintiffs and Apple have issued subpoenas to

13

Samsung America, and Apple's subpoena to Samsung America naturally requests documents concerning similar issues to the proposed Letter of Request to Samsung Electronics. *See* Kleinbrodt Decl. Ex. B. To the extent that Samsung America produces all of the documents also sought in the Letter of Request, Apple will not pursue those same documents from Samsung Electronics. But in other contexts, Samsung America has represented that it does not have custody or control of the *same* documents as Samsung Electronics, and it has refused to voluntarily collect and produce documents held by its foreign parent. *See, e.g.*, *TQ Delta, LLC v. Samsung Elecs. Am., Inc.*, 2021 WL 6049908, at *3–4 (D.N.J. Dec. 20, 2021) (concluding Samsung America lacked control over certain documents related to products implementing specifications issued by Multimedia over Coax Alliance held by Samsung Electronics); *Cameron v. Apple*, 19-cv-03074, Samsung Electronics America, Inc.'s Opp. to Apple Inc.'s Mot. to Compel, Dkt. 103 at 22 (asserting in response to discovery requests related to app approval in the Samsung Galaxy Store that "[Samsung America] did not have further responsive documents, and that if such documents existed they would likely reside with [Samsung Electronics] in Korea, not [Samsung America]"). Samsung America has made similar representations in response to Apple's subpoena in this matter, including lodging a boilerplate objection 65 times in its Objections and Responses that at least some of the

14

documents and information sought are not within its possession, custody, or control.[2]

*See* Kleinbrodt Decl. Ex. C *passim*.

Accordingly, Apple has no "easily" available alternative means to obtain documents that are in the control of Samsung Electronics—but not Samsung America—and both the third and fourth factors favor issuance of the Letter of Request.

**D.  Issuance Promotes U.S. Interests And Does Not Undermine Korea's Interests**

The fifth comity factor—"the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located," *Société Nationale*, 482 U.S. at 544 n.28—is "the most important" factor in the comity analysis, *Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 443

---

[2] Apple does not concede that these assertions are accurate, and Samsung America calls them into question by flatly refusing to provide any documents "related to the nature and extent of SEA's ability to request, access, or obtain Documents or information from SEC or any other Samsung entity." *See* Kleinbrodt Decl. Ex. C at 33–34. Nor does Apple concede that these assertions are a defense to production of the documents and information sought by Apple's subpoena to Samsung America in this case, and Apple reserves all rights to compel full compliance with that subpoena. *See, e.g.*, *Gerling Int'l Ins. Co. v. C.I.R.*, 839 F.2d 131, 141 (3d Cir. 1988) ("Where the relationship is thus such that the agent-subsidiary can secure documents of the principal-parent to meet its own business needs and documents helpful for use in the litigation, the courts will not permit the agent-subsidiary to deny control for purposes of discovery . . . .").

15

(E.D.N.Y. 2008) (citations and quotations omitted).  *See also In re Valsartan, Losartan, and Irbesartan Prods. Liab. Litig.*, 2021 WL 6010575, at *12–13 (D.N.J. Dec. 20, 2021) (fifth factor "carries the greatest weight" because it requires weighing the relative harm to each nation's important interests).

This factor weighs decisively in favor of issuing the Letter of Request.  The United States has a "very important interest" in ensuring parties can exercise their "discovery rights and [their] right to prepare a defense," particularly in federal court litigation governed by the Federal Rules' broad discovery regime.  *Arcelik*, 856 F. App'x at 399–400 (citation modified).  That interest is especially acute here, because litigation under "domestic antitrust laws" carries "clear implications of national importance."  *Behrens v. Arconic, Inc.*, 2020 WL 1250956, at *8 (E.D. Pa. Mar. 13, 2020); *see also In re Air Cargo Shipping Servs. Antitrust Litig.*, 278 F.R.D. 51, 54 (E.D.N.Y. 2010) (finding the fifth factor favored production because the case "involve[d] violations of antitrust laws whose enforcement is essential to the country's interests in a competitive economy").

Furthermore, the United States—one of the plaintiffs in this litigation—has an important sovereign interest in "ensur[ing] a fair and transparent legal adjudication of the liability" of defendants for conduct affecting the United States. *Valsartan*, 2021 WL 6010575, at *12.  That interest is undermined when relevant evidence is unavailable, because "[t]he fair adjudication of commercial interests

16

. . . requires full discovery." *Milliken & Co. v. Bank of China*, 758 F. Supp. 2d 238, 249 (S.D.N.Y. 2010); *see also Ingenico Inc. v. Ioengine, LLC*, No. 18-826, 2021 WL 765757, at *3 (D. Del. Feb. 26, 2021) (preventing necessary foreign discovery undermines a party's ability to litigate on the merits by impairing its "important interests in developing its claims and defenses"). Issuance of the Letter of Request will promote the interests of the United States by ensuring that the Court and parties possess the evidence necessary to adjudicate the claims and defenses in this litigation on a complete record.

And issuance of the Letter of Request will not undermine the Republic of Korea's interests. If issued, Apple's requests will proceed through the Hague Evidence Convention—an international treaty mechanism to which the Republic of Korea agreed—which is designed to facilitate orderly evidence-gathering while respecting foreign sovereignty. *See* Hague Evidence Convention, 23 U.S.T. 2555; *Société Nationale*, 482 U.S. at 533. And when a U.S. court issues a Letter of Request under the Hague Evidence Convention, it "commits the issue [of] whether compliance with the request would undermine important interests of the state where the information is located to the courts or other authorities of that state." *Arcelik*, 856 F. App'x at 400 (quoting Restatement (Third) of Foreign Relations Law § 473 reporters' note 5 (A.L.I. 1987)).

## CONCLUSION

Apple requests that the Court issue the proposed Letter of Request attached hereto as Exhibit A to the Declaration of J. Kleinbrodt. Apple further requests that, after the Court has executed the Letter of Request, the Clerk of this Court authenticate the Court's signature under the seal of this Court, and return the original signed and sealed executed Letter, as well as two certified copies of the signed and sealed executed Letter, to Apple's counsel, Liza Walsh, for delivery to the proper authority in the Republic of Korea. Apple makes these specific requests to comply with the requirements for service in the Republic of Korea. Upon granting this motion, Apple will prepare certified translated copies of the Letter of Request and related Exhibit that will be submitted together with the Court's signed Letter of Request to the appropriate authorities in the Republic of Korea.

Dated:  April 6, 2026                    Respectfully submitted,

                                         */s/ Liza M. Walsh*

Cynthia E. Richman (*pro hac vice*)      Liza M. Walsh
GIBSON, DUNN & CRUTCHER LLP              Douglas E. Arpert
1700 M Street, N.W.                      WALSH PIZZI O'REILLY FALANGA LLP
Washington, D.C. 20036                   Three Gateway Center
Tel.:    (202) 955-8500                  100 Mulberry Street, 15th Floor
Email:  crichman@gibsondunn.com          Newark, NJ 07102
                                         Tel.:    (973) 757-1100
Daniel G. Swanson (*pro hac vice*)       Email:  LWalsh@walsh.law
GIBSON, DUNN & CRUTCHER LLP                      DArpert@walsh.law
333 South Grand Avenue
Los Angeles, CA 90071
Tel.:    (213) 219-7000

18

Email:  dswanson@gibsondunn.com

Joseph R. Rose (*pro hac vice*)
Julian W. Kleinbrodt (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Tel.:    (415) 393-8200
Email:  jrose@gibsondunn.com
        jkleinbrodt@gibsondunn.com

Connor S. Sullivan (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Tel.:    (415) 351-4000
Email:  cssullivan@gibsondunn.com        *Counsel for Defendant Apple Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2026, counsel of record have been served by electronic mail, pursuant to agreement of the parties, with a true and correct copy of the foregoing.

/s/ Liza M. Walsh
Liza M. Walsh

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>APPLE INC.,<br><br>    Defendant. | Case No. 2:24-cv-04055<br><br>Hon. Julien X. Neals, U.S.D.J.<br>Hon. Leda D. Wettre, U.S.M.J. |
| IN RE: APPLE INC. SMARTPHONE ANTITRUST LITIGATION | Case No. 2:24-MD-3113<br><br>MDL No. 3113<br><br>Hon. Julien X. Neals, U.S.D.J.<br>Hon. Leda D. Wettre, U.S.M.J. |

**DECLARATION OF JULIAN KLEINBRODT IN SUPPORT OF APPLE INC.'S MOTION FOR ISSUANCE OF A LETTER OF REQUEST UNDER THE HAGUE EVIDENCE CONVENTION TO SAMSUNG ELECTRONICS CO., LTD. IN THE REPUBLIC OF KOREA**

Gibson, Dunn & Crutcher LLP

I hereby declare as follows:

1.      I am an attorney licensed to practice in the State of California, and have been admitted *pro hac vice* to practice before this Court pursuant to Case Management Order #1 (ECF 7).  I am a partner at the law firm Gibson, Dunn & Crutcher LLP, counsel of record for Defendant Apple Inc. ("Apple") in this case.  I submit this declaration in support of Apple's Motion for Issuance of A Letter of Request to Samsung Electronics Co., Ltd. pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, March 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444, and 28 U.S.C. § 1781.

2.      Attached hereto as **Exhibit A** is Apple's Request for International Judicial Assistance Pursuant to 28 U.S.C. § 1781 and Chapter I of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, March 18, 1970, T.I.A.S. No 7444, 28 U.S.T. 2555, including Exhibit 1 thereto.

3.      Attached hereto as **Exhibit B** is a true and correct copy of Apple Inc.'s subpoena to Samsung Electronics America, Inc., served in *United States v. Apple Inc.*, No. 2:24-cv-04055-JXN-LDW (D.N.J.) and *In re: Apple Smartphone Antitrust Litigation*, No. 2:24-md-03113-JXN-LDW (D.N.J.) on January 30, 2026.

4.      Attached hereto as **Exhibit C** is a true and correct copy of the Objections and Responses from Samsung Electronics America, Inc. served on February 25, 2026 in response to Apple Inc.'s subpoena.

DATED:  April 6, 2026                    GIBSON, DUNN & CRUTCHER LLP


By: /s/ Julian Kleinbrodt
Julian Kleinbrodt
*Attorney for Apple Inc.*

# Exhibit A

# LETTER OF REQUEST

**Hague Convention of 18 March 1970 on the
Taking of Evidence Abroad in Civil or Commercial Matters**

| 1. | Sender | The Honorable Leda D. Wettre<br>United States Magistrate Judge<br>United States District Court for the District of New Jersey<br>MLK Jr. Federal Building<br>50 Walnut Street, Courtroom MLK 3C<br>Newark, NJ 07102<br>United States of America<br><br>This letter will be sent to the Republic of Korea central authority by the representatives of the defendant, with the Requesting Authority's permission. |
|---|---|---|
| 2. | Central Authority of the Requested State | National Court Administration<br>Attn: Director of International Affairs<br>Seocho-daero 219<br>Seoghu-gu<br>SEOUL 06590<br>Republic of Korea |
| 3. | Person to whom the executed request is to be returned | Cynthia E. Richman<br>GIBSON, DUNN & CRUTCHER LLP<br>1700 M Street, N.W.<br>Washington, D.C.  20036-4504<br>United States of America |
| 4. | **Specification of the date by which the requesting authority requires receipt of the response to the Letter of Request** | |
| | Date | June 30, 2026<br><br>In the event it is not possible to execute the letters by the date indicated, the Requesting Authority requests that the authorities of the Republic of Korea execute the letters as expeditiously as possible, and it will be receptive to evidence taken even after the date indicated. |
| | Reason for urgency | |

**In conformity with Article 3 of the Convention, the undersigned applicant has the honour to submit the following request:**

| 5. *a* | Requesting authority (Art. 3(a)) | The Honorable Leda D. Wettre<br>United States Magistrate Judge<br>United States District Court for the District of New Jersey<br>MLK Jr. Federal Building<br>50 Walnut Street, Courtroom MLK 3C<br>Newark, NJ 07102<br>United States of America |
|---|---|---|

| | | |
|---|---|---|
| b | **To the Competent Authority of (Art. 3(a))** | Republic of Korea |
| c | **Names of the case and any identifying number** | 1. United States of America, et al. v. Apple Inc., Case No. 2:24-CV-04055 (D.N.J.)<br>2. In re: Apple Inc. Smartphone Antitrust Litigation, No. 2:24-md-3113 (D.N.J.) |

| 6. | **Names and addresses of the parties and their representatives (including representatives in the Requested State) (Art. 3(b))** | |
|---|---|---|
| a | **Plaintiff** | 1. United States of America; New Jersey; Arizona; California; Washington D.C.; Connecticut; Indiana; Maine; Massachusetts; Michigan; Minnesota; Nevada; New Hampshire; New York; North Dakota; Oklahoma; Oregon; Tennessee; Vermont; Washington; and Wisconsin<br><br>2. Shoshi Goldfus; Deanna Siano; James Collins; Deborah Collins; Joseph Giamanco; Eric Loewen; Alton Peacock; Jared Schermer; Thomas Bane; Pashen Bennett; Jemiah Duff; Miguel Gomez; Kiana Brown; Kenneth Hill; Jeffrey Burke; Charle Derr; Thomas Gorczynski; Susan Marie; David Love; Dana Bein; Joshua Hodges; David McNeal; Ken Leinbach; Nicole Arends; Nancy Cox; Andrea Mathieu; David Burleigh; Kori Lodi; and Joshua Roy |
| | **Representatives** | Jonathan H. Lasken<br>Assistant Chief, Civil Conduct Task Force<br>United States Department of Justice<br>450 Fifth Street, NW, Suite 4000<br>Washington, D.C. 20530 USA<br>Telephone: (202) 598-6517<br>Email: jonathan.lasken@usdoj.gov<br><br>MATTHEW J. PLATKIN<br>Attorney General of New Jersey<br>David H. Reichenberg<br>Section Chief, Antitrust<br>New Jersey Office of the Attorney General<br>124 Halsey Street, 5th Floor<br>Newark, NJ 07101 USA<br>Tel: (609) 696-4686<br>Email: David.reichenberg@law.njoag.gov<br><br>FRAZAR THOMAS<br>Seeger Weiss LLP<br>325 Chestnut Street<br>Suite 917<br>Philadelphia, PA 19106 USA<br>Tel: (973) 639-9100<br>Email: fthomas@seegerweiss.com<br><br>DANIEL EPSTEIN<br>Korein Tillery LLC<br>205 North Michigan Avenue<br>Suite 1950<br>Chicago, IL 60601 USA<br>Tel: (312) 641-9750 |

|   |   |   |
|---|---|---|
| | | Email: depstein@koreintillery.com<br><br>STANLEY KING<br>Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins, IP.C.<br>1000 Haddonfield-Berlin Road<br>Suite 203<br>Voorhees, NJ 08043 USA<br>Tel: (856) 596-4100<br>Email: sking@lawjw.com |
| *b* | **Defendant** | Apple Inc.<br>One Apple Park Way<br>Cupertino, CA 95014 USA |
| | **Representatives** | Cynthia E. Richman (pro hac vice)<br>GIBSON, DUNN & CRUTCHER LLP<br>1700 M Street, N.W. USA<br>Washington, DC 20036<br>Tel.: (202) 955-8500<br>Email: crichman@gibsondunn.com<br><br>Daniel G. Swanson (pro hac vice)<br>GIBSON, DUNN & CRUTCHER LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071 USA<br>Tel.: (213) 219-7000<br>Email: dswanson@gibsondunn.com<br><br>Joseph R. Rose (pro hac vice)<br>Julian W. Kleinbrodt (pro hac vice)<br>GIBSON, DUNN & CRUTCHER LLP<br>One Embarcadero Center, Suite 2600<br>San Francisco, CA 94111 USA<br>Tel.: (415) 393-8200<br>Email: jrose@gibsondunn.com<br>        jkleinbrodt@gibsondunn.com<br><br>Connor S. Sullivan (pro hac vice)<br>GIBSON, DUNN & CRUTCHER LLP<br>200 Park Avenue<br>New York, NY 10166<br>Tel.: (415) 351-4000<br>Email: cssullivan@gibsondunn.com |
| *c* | **Other parties** | |
| | **Representatives** | Not applicable |

|   |   |   |
|---|---|---|
| 7. *a* | **Nature of the proceedings (divorce, paternity, breach of contract, product liability, etc.) (Art. 3(c))** | Federal and state antitrust claims. |
| *b* | **Summary of complaint** | 1. Plaintiffs United States of America and the Attorney Generals of twenty States (collectively, the "Government Plaintiffs"), allege that Apple has engaged in anticompetitive practices in violation of federal and state antitrust laws. Specifically, Plaintiffs allege that Apple's product design and other decisions regarding third-party access to its products |

constitute unlawful conduct that maintains—or, alternatively, attempts to maintain—monopolies on smartphones and "performance smartphones" in violation of Section 2 of the Sherman Act and three states' antitrust statutes. The complaint alleges that Apple harms competition by two mechanisms: (1) "set[ting] the conditions for apps it allows on the Apple App Store through its App Store Review Guidelines," and (2) by deciding which iPhone features and application programming interfaces ("APIs") to make available to app developers. The complaint points to five purported "examples" of Apple using one or both of those mechanisms to regulate access by third-party technologies. First, the complaint alleges that Apple hampered the development of "super apps" by limiting the ways in which developers can categorize and display mini programs in the App Store and by limiting developers' access to Apple's in-app payment system. Second, the complaint challenges Apple's prior decision to allow streaming games on its platform only if those games were submitted as standalone apps for Apple's review. Third, the complaint claims that Apple does not enable third-party messaging apps to send and receive text messages on iPhone using the short message service ("SMS") protocol, to run in the background while the app is closed or, sometimes, to access iPhone's camera. Fourth, the complaint alleges that Apple does not allow third-party smartwatches paired with an iPhone to respond to iPhone notifications, maintain a Bluetooth connection in some circumstances, or receive messages using their own cellular connections without disabling iMessage. Fifth, the complaint criticizes Apple's decision to allegedly not allow other digital wallet apps to access the iPhone's near-field communication antenna to enable tap-to-pay or to serve as alternatives to certain Apple payment methods. The complaint asserts that Apple has "deployed a similar playbook" with respect to other third-party apps and services. The complaint alleges that Apple's alleged conduct has prevented "rivals," including Samsung, from competing in the smartphone and "performance smartphone" markets.

2. Plaintiffs in In re: Apple Inc. Smartphone Antitrust Litigation, No. 2:24-md-3113 (D.N.J.), consist of three groups: the Direct iPhone Purchaser Plaintiffs, the Indirect iPhone Purchaser Plaintiffs, and Watch Plaintiff ("MDL Plaintiffs"). The Direct and Indirect iPhone Purchaser Plaintiffs bring claims under Section 2 of the Sherman Act and various state laws, alleging that Apple leverages its alleged control over developers in several aftermarkets ("super" apps, "cloud-streaming" apps, messaging apps, smartwatches, and digital wallets) in order to maintain a monopoly over smartphones, for which Apple purportedly charges supracompetitive prices. Watch Plaintiff brings claims under Sections 1 and 2 of the Sherman Act and state laws, claiming that Apple monopolizes an alleged iOS-connected smartwatch market, enabling it to charge supracompetitive prices for Apple Watch. According to Watch Plaintiff, Apple accomplishes this through three principal means: (1) by allegedly depriving smartwatch competitors of key technologies by refusing to license to them Apple's private messaging-, notification-, and wallet-related APIs; (2) by declining to cooperate with rival watchmakers by delaying approval of their apps needed for pairing the smartwatch and smartphone and refusing to authorize certain apps that advertise or promote competitor smartwatches; and

| | | (3) by designing or updating its own iOS software in ways that limit interoperability for competitor smartwatches. |
|---|---|---|
| c | **Summary of defence and counterclaim*** | Concerning Plaintiffs' antitrust claims, Apple argues that Apple competes on the merits, that its conduct is and was pro-competitive, and that it has neither intended to, attempted to, nor in fact monopolized the smartphone market.  Apple has also articulated 10 affirmative defenses in response to the Government Plaintiffs' claims, including that, at all times, Apple's conduct was reasonable and its actions were undertaken in good faith to advance legitimate business interests; that Plaintiffs' claims are barred insofar as they make claims or seek remedies that conflict with Apple's rights under intellectual property law, that Plaintiffs lack standing to assert any or all of their claims, and that Plaintiffs have failed to allege any plausible harm to competition or consumers.  Apple also argues that the MDL Plaintiffs' claims should be dismissed for failure to state a cognizable antitrust claim. |
| d | **Other necessary information or documents*** | |

| | | |
|---|---|---|
| 8. a | **Evidence to be obtained or other judicial act to be performed (Art. 3(d))** | The documents listed in Exhibit 1 to be produced by Samsung Electronics Co., Ltd.<br><br>The mailing address of Samsung Electronics Co., Ltd. is as follows:<br><br>Samsung Electronics Co., Ltd.,<br>129 Samseong-ro, Yeongtong-gu Suwon, Gyeonggi, 16677 Republic of Korea<br><br>The documents should be furnished as electronic copies. |
| b | **Purpose of the evidence or judicial act sought** | The evidence sought pertains to (1) Samsung's competition with Apple in the smartphone, "performance smartphone," and smartwatch markets and (2) its practices regarding the five categories where Plaintiffs claim Apple limits third party access.  With respect to Samsung's competition with Apple, the evidence is expected to show that Samsung competes vigorously with Apple and that Apple is not a monopolist. While the complaint distorts the ultra-competitive nature of the modern smartphone and smartwatch markets by focusing narrowly on Apple, it ignores the extent to which major smartphone and smartwatch manufacturers, like Samsung, compete effectively with Apple in the United States and globally.  Evidence of Samsung's robust competition with Apple in the smartphone market is expected to show that Apple lacks the power to charge supra-competitive prices or to restrict smartphone output, meaning it cannot exercise monopoly power.  The evidence sought with respect to the five categories of conduct is expected to show that any consumer or developer unhappy with Apple's design choices with respect to those categories could have simply switched to another device, including a Samsung device.  Evidence regarding Samsung's pricing, sales, and marketing strategies will also undermine MDL Plaintiffs' contentions that Apple charges supracompetitive prices.<br><br>This request is made in connection with an antitrust lawsuit brought by the United States Department of Justice and 16 |

|  |  | other state and district attorneys general. The Requesting Authority seeks specific, relevant records held by a third party located in the Republic of Korea that are material to the fair adjudication of the lawsuit and not reasonably obtainable from the defendant alone. Accordingly, the Requesting Authority believes it is in the interest of justice to allow the defendant to obtain the documents requested in this letter. |
|---|---|---|
| 9. | **Identity and address of any person to be examined (Art. 3(e))** | Not applicable |
| 10. | **Questions to be put to the persons to be examined or statement of the subject matter about which they are to be examined (Art. 3(f)** | Not applicable |
| 11. | **Documents or other property to be inspected (Art. 3(g))** | Exhibit 1 lists the documents to be produced. The Court has reviewed the list of documents and finds that they relate to the subject-matter of the lawsuit and call for evidence that may be material to the case. |
| 12. | **Any requirement that the evidence be given on oath or affirmation and any special form to be used (Art. 3(h))** | Not applicable |
| 13. | **Special methods or procedure to be followed (e.g., oral or in writing, verbatim transcript or summary, cross-examination, etc.) (Arts 3(i) and 9)** | Not applicable |
| 14. | **Request for notification of the time and place for the execution of the Request and identity and address of any person to be notified (Art. 7)** | Cynthia E. Richman<br>GIBSON, DUNN & CRUTCHER LLP<br>1700 M Street, N.W.<br>Washington, D.C. 20036-4504<br>United States of America |
| 15. | **Request for attendance or participation of judicial personnel of the requesting authority at the execution of the Letter of Request (Art. 8)** | Not applicable |
| 16. | **Specification of privilege or duty to refuse to give evidence under the law of the Requesting State (Art. 11(b))** | Attorney-Client Privilege, if applicable. |

| 17. | The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by: | The defendant will bear the reimbursable costs associated with this request in accordance with the provisions of the Convention. Please contact the defendant's counsel at GIBSON, DUNN & CRUTCHER LLP, 1700 M Street, N.W., Washington, D.C. 20036-4504, United States of America, to make any necessary financial arrangements. |
|---|---|---|

| Date of request | |
|---|---|
| Signature and seal of the requesting authority | |

**Exhibit 1: DOCUMENTS REQUIRED TO BE PRODUCED**

1. Organizational charts showing the parent, subsidiary, and affiliate structure of Samsung Electronics Co., Ltd. ("SEC" and collectively with its parents, subsidiaries, and affiliates, "You").

2. Organizational charts showing names, roles, and reporting relationships of Senior Personnel[1] responsible for Your Smartphone, Wearable, App Marketplace, and/or Apps businesses.

3. Your policies on Document preservation and retention.

4. Policies governing information or document exchange between SEC and Samsung Electronics America, Inc. ("SEA").

5. Charters or bylaws regarding information or document exchange between SEC and SEA.

6. Internal reports between SEC and SEA concerning document production or litigation support from 2020 to 2025.

7. List of SEC's IT systems, shared platforms, or databases accessible by SEA.

8. Organizational charts showing overlapping or shared officers, directors, employees, or reporting lines between SEA and SEC.

9. Documents showing SEA's role as agent, representative, or intermediary for SEC in the United States.

10. List of litigation or arbitration in the United States that SEC initiated or defended.

11. List of Smartphone models produced or sold by You from 2020 to 2025, including detailed specifications and prices.

12. Reports concerning Your Smartphone business from 2020 to 2025.

13. Financial statements and audit reports relating to Your Smartphones from 2020 to 2025.

14. Contracts between You and U.S. wireless carriers and retailers related to Smartphones, from 2020 to 2025.

---

[1] "Senior Personnel" shall mean any current or former officer or employee of Samsung who holds, or held at any time relevant to this subpoena, a senior executive, officer, or managerial position, including but not limited to: (a) members of Your executive leadership or "C-suite" (including the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, Chief Technology Officer, Chief Information Officer, Chief Legal Officer, and any equivalent positions); (b) Presidents; (c) Executive Vice Presidents, Senior Vice Presidents, and Vice Presidents; (d) Directors; and (e) General Managers, as well as any other employee with comparable authority, responsibility, or decision-making power over corporate strategy, operations, finances, product development, data, or compliance

15. List of Wearable models produced or sold by You from 2020 to 2025, including detailed specifications and prices.

16. Reports concerning Your Wearables business from 2020 to 2025.

17. Financial statements and audit reports relating to Your Wearables from 2020 to 2025.

18. App Review guidelines concerning the Samsung Galaxy Store.

19. Model developer agreement concerning the Samsung Galaxy Store.

20. Terms and conditions for developers' use of the Samsung Galaxy Store.

21. Model license agreement concerning the Samsung Galaxy Store.

22. Terms and conditions for consumers' use of the Samsung Galaxy Store.

23. Reports concerning Samsung Galaxy Store from 2020 to 2025.

24. List of technical support You offer to App developers concerning development of Apps for the Samsung Galaxy Store.

25. List of tools You use in Your App Review process.

26. Reports concerning Samsung Pay from 2020 to 2025.

27. Reports concerning Samsung Gaming Hub from 2020 to 2025.

28. Reports concerning Digital Wallets from 2020 to 2025.

29. Reports concerning Smartphone games from 2020 to 2025.

30. Reports concerning Smartphone messaging apps from 2020 to 2025.

31. Reports concerning the adoption of RCS messaging by users of Your Smartphones from 2020 to 2025.

32. Your policies concerning Super Apps or Mini-Programs.

33. Reports concerning Super Apps or Mini-Programs from 2020 to 2025.

34. Market research related to Smartphones or Wearables.

35. Sales reports worldwide for all Your Smartphone and Wearables models from 2020 to 2025.

2

36. Reports concerning all Super Apps, Cloud Streaming Apps, Messaging Apps, Companion Apps, and Digital Wallets downloaded by users of Your Smartphones from 2020 to 2025.

37. Reports concerning all Apps on Your Galaxy Store from 2020 to 2025.

38. Documents produced by You to the United States Government, a United States court, or any litigants in *United States et al. v. Apple*, No. 2:24-cv-04055, the Investigation, *In re Apple Inc. Smartphone Antitrust Litigation*, No. 24-MD-3113 (D.N.J.), *United States v. Google LLC*, No. 20-cv-3010 (D.D.C), *In re Apple iPhone Antitrust Litigation*, No. 11-cv-06714 (N.D. Cal.), and *Epic Games v. Apple, Inc.*, No. 20-cv-5640 (N.D. Cal.).

39. Emails with third parties regarding government antitrust litigation against Apple.

40. Reports containing analysis of Apple's policies from 2020 to 2025.

# Exhibit B

# GIBSON DUNN

Cynthia Richman
Partner
T: +1 202.955.8234
M: +1 202.701.3424
crichman@gibsondunn.com

January 30, 2026

Samsung Electronics America, Inc.
700 Sylvan Ave.,
Englewood Cliffs, NJ 07632

Re:    *United States v. Apple Inc.*, No. 2:24-cv-04055-JXN-LDW (D.N.J.);
       *In re: Apple Inc. Smartphone Antitrust Litigation*, No. 2:24-md-3113-JXN-LDW (D.N.J.)

Counsel:

Attached please find a subpoena issued to Samsung Electronics America, Inc. in connection with the above-referenced matters.  The subpoena must be responded to within thirty days, as specified in the subpoena.  For administrative clarity, two subpoena forms—one for *United States v. Apple Inc.*, No. 2:24-cv-04055-JXN-LDW (D.N.J.) ("DOJ Action") and another for *In re: Apple Smartphone Antitrust Litigation*, No. 2:24-md-03113-JXN-LDW (D.N.J.) ("MDL")—are enclosed to indicate that the subpoena is being issued in both actions, but Apple requires only one response.  Accompanying the subpoena, you will find a Schedule A, which includes document requests as well as applicable definitions and instructions for compliance.  As described in the instructions and as directed by the Court's scheduling orders in both matters, you are requested, among other things, to stamp each document with a production number and to produce documents in accordance with the ESI Protocol entered in the DOJ Action and the Discovery Confidentiality Order entered in both matters.  *See* DOJ Action Pretrial Scheduling Order, ECF No. 270, at 4; MDL Scheduling and Case Management Order, ECF 142 at 11 (the MDL court has not yet entered a separate ESI order).  For your convenience, a copy of the ESI Protocol in the DOJ Action is attached to Schedule A of the subpoena as Exhibit E, and copies of the Discovery Confidentiality Orders in the DOJ Action and MDL are attached as Exhibits F and G, respectively.

Thank you for your prompt attention to this matter.

Sincerely,

/s/ *Cynthia E. Richman*

Cynthia E. Richman

cc:    All Counsel of Record

**Gibson, Dunn & Crutcher LLP**
1700 M Street, N.W.  |  Washington, D.C. 20036-4504  |  T: 202.955.8500  |  F: 202.467.0539  |  gibsondunn.com

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Jersey ▾

| | |
|---|---|
| United States of America, et al. *Plaintiff* | ) ) ) |
| v. Apple Inc. | ) Civil Action No. 2:24-cv-04055 (JXN-LDW) ) ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:         Samsung Electronics America, Inc.
            700 Sylvan Ave., Englewood Cliffs, NJ 07632

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Schedule A (attached)

| Place: Gibson, Dunn & Crutcher LLP 200 Park Ave. New York, NY 10166 | Date and Time: 03/02/2026 11:59 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    01/30/2026

| CLERK OF COURT | OR | |
|---|---|---|
| _____ *Signature of Clerk or Deputy Clerk* | | /s/ Cynthia E. Richman _____ *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*     Apple Inc.
_____, who issues or requests this subpoena, are:

Cynthia E. Richman, Gibson, Dunn & Crutcher LLP, 1700 M Street, N.W.  Washington, DC 20036, crichman@gibsondunn.com, (202) 955-8234

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 2:24-cv-04055 (JXN-LDW)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

   **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Jersey

| | |
|---|---|
| In re: Apple Inc. Smartphone Antitrust Litigation | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  2:24-md-3113 (JXN-LDW) |
| | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                 Samsung Electronics America, Inc.
               700 Sylvan Ave., Englewood Cliffs, NJ 07632
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Schedule A (attached)

| Place: Gibson, Dunn & Crutcher LLP<br>200 Park Ave.<br>New York, NY 10166 | Date and Time:<br><br>03/02/2026 11:59 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    01/30/2026

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| | | /s/ Cynthia E. Richman |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Apple Inc.
_____ , who issues or requests this subpoena, are:
Cynthia E. Richman, Gibson, Dunn & Crutcher LLP, 1700 M Street, N.W.  Washington, DC 20036, crichman@gibsondunn.com, (202) 955-8234

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 2:24-md-3113 (JXN-LDW)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**SCHEDULE A**

**DEFINITIONS**

Unless otherwise defined, all words and phrases used herein shall be accorded their usual meaning and shall be interpreted in their common, ordinary sense. As used in the below requests for production of Documents ("Requests") and the Definitions and Instructions, the words set forth below shall be defined as follows:

1.      "Alleged Conduct" shall mean all (and any component of) the conduct alleged to be unlawful in the Complaints, including any alleged monopolization or attempted monopolization by Apple of any alleged relevant markets. Alleged Conduct includes but is not limited to:

a.      Any alleged restrictions that Apple has placed on third-party developers' ability to offer Apps for download in the Apple App Store or in any other App Marketplace;

b.      Any alleged restrictions Apple has placed on third-party developers' access to iPhone features and development tools, including APIs and SDKs;

c.      Any alleged restrictions Apple has placed on third-party access to Apple's In-App Purchase or alternatives to In-App Purchase;

d.      Any alleged restrictions Apple has placed on products, services, Apps, or technology that allegedly facilitate users' ability to switch between the iPhone and non-Apple Smartphones, or vice versa, including those described in the Complaints as middleware;

e.      Any alleged restrictions Apple has placed on interoperability concerning Smartphones or policies or practices that allegedly make it harder for consumers to switch between competing Smartphones; and

f.      Any alleged restrictions Apple has placed on Super Apps, Cloud Streaming Apps, Messaging Apps, Wearables, and Digital Wallets.

2.      "API" shall mean an application programming interface and shall have the same meaning as used in the Complaints, including without limitation Paragraphs 158 through 163 of the DOJ Complaint.

3.      "Apple" shall mean Apple Inc. and its predecessors, wholly owned or controlled subsidiaries or affiliates, successors, parents, departments, divisions and any organization or entity managed or controlled by Apple Inc.

4.      "App" or "Application" shall be defined as in the Complaints, including in Paragraphs 158 through 163 of the DOJ Complaint.

5.      "App Marketplace" shall mean any online storefront where Apps are offered for download or purchase, including the Apple App Store, Amazon Appstore, Amazon Underground, Android Market, Aptoide, BlackBerry World, Chrome Web Store, Epic Games Store, GetJar, Google Play Store, Microsoft Store, Origin, Samsung Galaxy Store, Steam, Windows Phone Store, AltStore, TutuApp, and online storefronts distributing games and digital content for Xbox, PlayStation, and Nintendo.

6.      "App Review" shall mean Apple's or any other Person's processes of reviewing Apps or App updates for potential inclusion on App Marketplaces.

7.      "Business" shall be defined as all actual or potential operations, services, products, technologies, activities, and business opportunities conducted by or pursued by or on behalf of Samsung.

8.      "Cloud Streaming App" shall be defined as in the Complaints, including in Paragraphs 10 and 71 through 79 of the DOJ Complaint.

2

9.    "Communication" shall mean any exchange or transmission of words or ideas to another Person or entity, whether accomplished Person to Person, by telephone, in writing, via electronic mail or text message, via social media, or through any other medium, and shall include discussions, conversations, negotiations, conferences, meetings, speeches, memoranda, letters, correspondence, notes, blogs, postings, statements, and questions.

10.    "Companion App" shall be defined as in the Complaints, including in Paragraphs 33 through 34 of the Smartwatch Complaint.

11.    "Complaints" shall mean the DOJ Complaint and any MDL Complaint.

12.    "Contactless Card" means any debit, credit, or other payment card accessing an account issued by an issuer and offered on a Payment Network that allows users to make purchases at point of sale by tapping or holding their card over a payment terminal.

13.    "Data Dictionary" shall mean documentation of the organization and structure of the databases or data sets that is sufficient to allow their reasonable use by Apple, including, for each table of information: (a) the name of the table; (b) a general description of the information contained within it; (c) the size in both number of records and megabytes; (d) a list of fields available for each record; (e) the format, including variable type and length, of each field; (f) a definition for each field as it is used by You, including the meanings of all codes that can appear as field values; (g) the fields that are primary keys for the purpose of identifying a unique observation; (h) the fields that are foreign keys for the purpose of joining tables; and (i) an indication of which fields are populated.  A database schema is an example of a Data Dictionary.

14.    "Digital Wallet" shall be defined as in the Complaints, including in Paragraphs 10 and 104 through 118 of the DOJ Complaint.

3

15.    "Document" shall have the full meaning ascribed to it under Rule 34 and Rule 45 of the Federal Rules of Civil Procedure and shall include Communications; memoranda; records; Reports; books; records, and summaries of personal conversations or interviews; diaries; presentations; slide decks; graphs; charts; spreadsheets; diagrams; tables; photographs; recordings; tapes; microfilms; minutes; records and summaries of meetings or conferences; press releases; blog posts; stenographic handwritten or any other notes; work papers; checks, front and back; check vouchers, check stubs, or receipts; tape data sheets or data processing cards or discs; or any other written, recorded, transcribed, punched, taped, filmed, or graphic matter, however produced or reproduced; and any paper or writing of whatever description, including information contained in any computer although not yet printed out. The term "Document" further includes all copies where the copy is not identical to the original.

16.    "DOJ Complaint" shall mean the First Amended Complaint or any future amended complaints against Apple filed by the United States Department of Justice, several states, and the District of Columbia in the United States District Court for the District of New Jersey on June 11, 2024 (Case No. 2:24-cv-04055, Dkt. No. 51), which is attached hereto as Exhibit A.

17.    "Government Action" means *United States of America v. Apple, Inc.*, No. 2:24-cv-4055-JXN-LDW (D.N.J.).

18.    "Identified Product or Service" means each product or service within one or more of the following categories: Cloud Streaming Apps, Super Apps, Messaging Apps, Digital Wallets, and Wearables.

19.    "In-App Purchase" shall mean the purchase of a product, feature, service, or functionality for a fee that occurs within an App.

4

20.    "Including," "included," "includes," and "include" shall not be construed as limiting any Request, and shall mean the same as "including, but not limited to."

21.    "Investigation" shall mean the pre-DOJ Complaint investigation into Apple's Alleged Conduct, conducted by the United States Department of Justice, several states, and the District of Columbia.

22.    "MDL" means *In re Apple Inc. Smartphone Antitrust Litigation*, 24-md-3113-JXN-LDW.

23.    "MDL Complaint" shall mean any of the consolidated complaints in any actions coordinated as part of *In re Apple Inc. Smartphone Antitrust Litigation*, No. 24-MD-3113 (D.N.J.), including the Direct iPhone Purchaser Plaintiffs' Consolidated Class Action Complaint (Dkt. No. 87) filed on July 30, 2025, attached hereto as Exhibit B; the Indirect iPhone Purchaser Plaintiffs' Corrected Consolidated Class Action Complaint (Dkt. No. 109) filed on September 11, 2025, attached hereto as Exhibit C; and the Direct Apple Watch Purchaser Plaintiffs' First Amended Class Action Complaint (Dkt. No. 86) filed on July 30, 2025 ("Smartwatch Complaint"), attached hereto as Exhibit D.

24.    "Messaging App" shall be defined as in the Complaints, including in Paragraphs 10 and 80 through 93 of the DOJ Complaint, and shall include without limitation Samsung Messages, Beeper, BlueChat, Discord, Facebook Messenger, Google Messages, KakaoTalk, Line, Microsoft Messaging, Signal, Skype, Slack, Snapchat, Teams, Telegram, Texts, Viber, WhatsApp, and Apple's Messages App.

25.    "Mini-Program" shall have the same meaning as used in the Complaints, including in Paragraphs 60 through 70 of the DOJ Complaint.

5

26.     "Multimedia Messaging Service" or "MMS" shall be defined as in the Complaints, including in Paragraph 83 and Footnote 1 of the DOJ Complaint.

27.     "Payment Network(s)" means any one or more of Visa, MasterCard, Discover, American Express, or any other similar network permitting businesses and/or consumers to engage in financial transactions using a credit, debit, or prepaid card.

28.     "Person" shall mean any natural individual, partnership, corporation, company, association, organization, joint venture, government, agency, or entity.

29.     "QR Code-Based Payments" means contactless payments at point of sale that are facilitated using Quick Response Codes (i.e., QR codes).

30.     "Report" shall mean any written reports, research, papers, memoranda, presentations, reviews, statistical compilations, or other analyses.

31.     "Rich Communication Services" or "RCS" shall have the same meaning as used in the Complaints, including in Paragraph 89 of the DOJ Complaint.

32.     "Samsung," "You," and "Your" shall mean Samsung Electronics America, Inc. ("SEA"); its parent company, Samsung Electronics Co., Ltd. ("SEC"); and each of SEA's and SEC's officers, directors, employees, representatives, consultants, agents, accountants, and any other Person acting on their behalf; as well as SEA's and SEC's predecessors, successors, and subsidiaries, including, without limitation, Harman International Industries, Samsung Display, Samsung SDI, Samsung Electro-Mechanics, Samsung Semiconductor, Samsung Research, Samsung SDS, Samsung Networks, Samsung Foundry, and Samsung Austin Semiconductor; and any Person that SEA or SEC manages or controls.

33.     "Senior Personnel" shall mean any current or former officer or employee of Samsung who holds, or held at any time relevant to this subpoena, a senior executive, officer, or

6

managerial position, including but not limited to: (a) members of Your executive leadership or "C-suite" (including the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, Chief Technology Officer, Chief Information Officer, Chief Legal Officer, and any equivalent positions); (b) Presidents; (c) Executive Vice Presidents, Senior Vice Presidents, and Vice Presidents; (d) Directors; and (e) General Managers, as well as any other employee with comparable authority, responsibility, or decision-making power over corporate strategy, operations, finances, product development, data, or compliance.

34.    "SDK" shall mean Apple's Software Development Kit.

35.    "Short Message Service" or "SMS" shall be defined as in the Complaints, including in Paragraphs 45 and 82 through 83 of the DOJ Complaint.

36.    "Smartphone" shall be defined as in the Complaints, including in Paragraphs 148 through 163 of the DOJ Complaint.

37.    "Super App" shall be defined as in the Complaints, including in Paragraphs 10 and 60 through 70 of the DOJ Complaint.

38.    "Threat Model" shall mean with respect to the privacy and security of hardware, operating systems, software, data centers, servers, or services, any formal or informal assessments, analyses, Reports, summaries, assumptions, studies, or other understandings about attacker characteristics, goals, capabilities, limitations, or assets. Threat Models also include Documents and information reflecting assumptions (including the bases for such assumptions) and understandings about the security posture of a system, hardware, or software, including possible threats, vulnerabilities, potential mitigations, and tradeoffs.

39.    "Trade In" shall mean a transaction pursuant to which a Person transfers ownership of a previously owned product to a seller, manufacturer, carrier, retailer, or its agent, and, in

7

exchange, receives a credit, discount, payment, or other consideration that is applied toward, or reduces the amount payable for, the purchase of a new product.

40.    "Virtual Card" shall mean any digital version of a credit or debit card that is designed to be stored and used within Digital Wallets or online payment systems.

41.    "Wearables" shall have the same meaning as used in the Complaints, including in Paragraphs 21, 131, 202, 208, 214, and 221 of the DOJ Complaint, and shall include any "Smartwatch" as that term is used in the Complaints, including in Paragraphs 10 and 94 through 103 of the DOJ Complaint.

42.    "Web Browsers" shall have the same meaning as used in the Complaints, including in Paragraphs 43, 120, and 163 of the DOJ Complaint.

43.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Requests all Documents, materials, or responses that might otherwise be construed to be outside of their scope.

44.    The terms "any," "each," and "all" are mutually interchangeable and are meant to encompass each other.

45.    The terms "concerning," "reflecting," "regarding," and "related to" mean in whole or in part, concerning, reflecting, regarding, related to, relating to, in connection with, involving, supporting, addressing, analyzing, constituting, containing, commenting on, discussing, describing, identifying, referring to, reporting on, stating, dealing with, or in any way pertaining or bearing a logical connection to.

46.    The use of the singular form of any word includes the plural and vice versa as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of their scope.

8

47.     The use of the feminine form of any word includes the masculine form and vice versa as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of their scope.

48.     The past tense shall be construed to include the present tense and vice versa as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of their scope.

**INSTRUCTIONS**

1.     All Documents should be produced in electronic form in accordance with the Electronically Stored Information ("ESI") Protocol attached hereto as Exhibit E.

2.     For purposes of interpreting or construing the scope of these Requests, the terms used shall be given the most expansive and inclusive interpretation, unless specifically limited in the Request.

3.     All Documents requested herein must be produced in their entirety, with all attachments and enclosures.

4.     In responding to these Requests, You shall produce all Documents in Your possession, custody, or control, and all Documents reasonably available to You, including those in the possession, custody, or control of any Person acting on Your behalf.

5.     These Requests shall not be deemed to call for identical hash duplicates (e.g., MD5, SHA 256, or other industry standard) of Documents.  "Identical" means precisely the same in all respects; for example, a Document with handwritten notes or editing marks shall not be deemed identical to one without such notes or marks.  Additionally, for Documents with attachments, the hash value shall be generated based on the parent/child Document grouping.  Otherwise identical Documents with unique family members are not identical, and both must be produced.  You shall

9

produce as a separate Document any Document that contains any notation, addition, insertion, or marking of any kind that renders it not entirely identical to a version of that Document without such marks.

6. If there are no Documents responsive to a category in these Requests, You shall so state in writing.

7. If You object to a portion of any Request, You shall state the legal and factual basis for Your objection with specificity and respond to all parts of the Request to which You do not object.

8. If You encounter any ambiguity in the Requests, in a definition, or in an instruction relevant to the Requests, explain what You find to be ambiguous and what construction You used in providing Your response. If You contend that You do not understand the definition of any term or phrase used in a Request, You shall explain in detail what it is that You do not understand about the term or phrase at issue, and You shall respond to that part of the Request that You do understand.

9. If You object to any Request on the grounds that responding is unduly burdensome, describe the undue burden.

10. If You contend that any part of a Request is overbroad, You shall explain in detail why it is that You consider that part of the Request to be overbroad, and You shall produce Documents in response to the remainder of the Request that You do not consider to be overbroad.

11. In producing Documents responsive to these Requests, You must Bates stamp them in a manner that clearly identifies that each such Document has been produced by You.

12. If any requested Document is withheld on the basis of any claim of privilege, You must set forth the information necessary for Apple to ascertain whether the privilege properly

10

applies, including all information identified in Section VI of the ESI Protocol attached hereto as Exhibit E.

13.    All productions shall be governed, as applicable, by the Discovery Confidentiality Orders attached hereto as Exhibits F and G.

14.    If any portion of any Document responsive to these Requests is withheld under claim of privilege, all non-privileged portions must be produced with the portion(s) claimed to be privileged redacted and logged in a privilege log pursuant to the preceding instructions.

15.    Unless otherwise specified in the Requests, in searching for and producing Documents responsive to these Requests, You shall use a reasonable time period to be agreed upon with Apple in advance of productions.

16.    Specified date ranges are inclusive.  Unless otherwise stated, a year includes all days of that year from and including January 1 to and including December 31.

17.    To the extent required by the Federal Rules of Civil Procedure and applicable case law, these Requests are continuing and require further and supplemental production if additional Documents are received, generated, or discovered after the time of the original production.  If after responding to these Requests, You obtain or become aware of any additional Documents that are directly or indirectly responsive to any part of any of these Requests, You shall promptly produce any additional responsive Documents.

18.    Apple serves these Requests without prejudice to its right to serve additional requests for production of Documents or other requests or subpoenas.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST FOR PRODUCTION NO. 1:**  All Documents responsive to Requests for production of Documents served by any party in the Government Action or the MDL.

**REQUEST FOR PRODUCTION NO. 2:**   Documents sufficient to show Your corporate structure, including any corporate parents, subsidiaries, joint ventures, boards of directors, and related or affiliated entities.

**REQUEST FOR PRODUCTION NO. 3:**   Organization charts, to the extent they exist, or Documents otherwise sufficient to identify the Senior Personnel responsible for Your Smartphones, Wearables, App Marketplace, and/or Apps, their roles with respect to those products and services, and their reporting relationships.

**REQUEST FOR PRODUCTION NO. 4:**   All Documents related to the nature and extent of SEA's ability to request, access, or obtain Documents or information from SEC or any other Samsung entity, including:

a. Policies, agreements, guidelines, or practices governing Document sharing, data access, or information exchange between SEA and SEC;

b. Corporate governance or internal control Documents (including charters, bylaws, compliance manuals, delegation-of-authority Documents, or similar materials) addressing SEA's authority or rights to obtain Documents or information from SEC;

c. Communications, instructions, or directives from SEC to SEA concerning Document production, litigation support, or regulatory inquiries;

d. Descriptions of IT systems, shared platforms, or databases accessible by SEA that contain SEC Documents or data;

e. Documents regarding any instances in which SEA has obtained, requested, received, produced, transmitted, or shared Documents or information from or to SEC for business, regulatory, compliance, or litigation-related purposes;

12

f.  Organizational charts, reporting structures, or similar Documents reflecting overlapping or shared officers, directors, employees, or reporting lines between SEA and SEC; and

g.  Documents concerning SEA's role as agent, representative, or intermediary for SEC in the United States, including any authority granted to SEA to act on SEC's behalf in commercial, regulatory, compliance, or legal matters.

**REQUEST FOR PRODUCTION NO. 5:**  Documents sufficient to show each instance where SEC initiated, defended, or otherwise participated in any litigation or arbitration in the United States.

**REQUEST FOR PRODUCTION NO. 6:**  Documents sufficient to show all Smartphone models produced or sold by You since January 1, 2010, including specifications, features, launch date, price at launch, and discontinuation date.

**REQUEST FOR PRODUCTION NO. 7:**  All Documents related to price, price-setting, terms of sale (including rebates, fees, promotions, discounts, and financing), licensing terms or conditions, pricing plans, price lists, and pricing strategies for Your Smartphones.

**REQUEST FOR PRODUCTION NO. 8:**  All Documents after January 1, 2010 related to competition concerning Smartphones offered by You or any other Smartphone manufacturer, including:

a.  Relative quality or features, including technology, performance, privacy, security, user experience, brand strength, customizability, ability to integrate with or interoperate with other hardware or software, network effects, and cost;

b.  Entry, expansion, exit, scale, and repositioning;

13

c.  Market segmentation by geography, type of consumer, Smartphone type, Smartphone features, sales channel, or Smartphone price or price band;

d.  Competitive positioning and differentiation;

e.  Sales volumes, revenue, and profitability;

f.  Installed base;

g.  Market shares, segment shares, or relative sales or volume shares; and

h.  Competitive threats, disintermediation, and commoditization.

**REQUEST FOR PRODUCTION NO. 9:** All Documents related to any actual or potential barriers or impediments to entry, output expansion, or repositioning related to Smartphones and mobile operating systems.

**REQUEST FOR PRODUCTION NO. 10:** All regularly or specially prepared business Reports, strategic plans, competitive plans, marketing plans, promotional plans, competitive assessments or benchmarking analyses prepared by or for You concerning Your strategies, objectives, research, development, investments, roadmaps, marketing, innovations, and features for Your Smartphones.

**REQUEST FOR PRODUCTION NO. 11:** All Documents concerning the security and privacy architecture, safeguards, vulnerabilities, and data protection features of Your Smartphones, including changes to such features over time.

**REQUEST FOR PRODUCTION NO. 12:** All financial statements, budgets, profit and loss statements, cost Reports, profitability Reports, annual Reports, regulatory Reports, and any other financial Reports (reflecting or relating to revenues, costs, margins, and/or profitability) regularly prepared by or for You on any periodic basis concerning Your Smartphones.

14

**REQUEST FOR PRODUCTION NO. 13:** All studies, analyses, Reports and other Documents concerning how any Identified Product or Service may affect users' Smartphone purchasing decisions, including user satisfaction, Smartphone switching, consumer perceptions and attitudes, preferences, usage, purchase intentions, and all other related metrics, key performance indicators, and measures.

**REQUEST FOR PRODUCTION NO. 14:** All studies, Reports, and analyses concerning the customer lifetime value of Smartphone consumers, including any studies estimating or measuring the customer lifetime value of users of Your Smartphones, and any analyses comparing customer lifetime value across different Smartphone brands.

**REQUEST FOR PRODUCTION NO. 15:** All studies, analyses, Reports, and other Documents discussing factors affecting consumer demand for any Smartphone model or brand, including the Smartphone's price, features, or quality (including quantity, price, and quality of available Apps, hardware accessories, or other complementary products and services); usage of any Identified Product or Service; and metrics, key performance indicators, and measures related to consumer demand for any Smartphone brand or model.

**REQUEST FOR PRODUCTION NO. 16:** All Documents related to any factors affecting the ability or incentive for developers or third parties to create Apps usable with a particular Smartphone, including the size and characteristics of the installed base of users of a particular Smartphone or type of Smartphone, the ease of developing Apps for a particular Smartphone's operating system, the costs, fees, or commissions charged by the Smartphone provider, features offered by the Smartphone, technological restrictions imposed by the Smartphone provider or operating system, and any other terms of dealing.

15

**REQUEST FOR PRODUCTION NO. 17:** Documents sufficient to show Your plans, strategies, and analyses relating to the sale of used or refurbished Smartphones, including acquisition strategies for any re-seller, Smartphone Trade In values, incentives or credits offered to the Person trading in the device, and the countries where used or refurbished Smartphones are sourced and sold.

**REQUEST FOR PRODUCTION NO. 18:** All Documents and data related to any Smartphone's usable life, the length of time over which consumers use it, the number and type of consumers that use it, its quality and value at any point in time, and all related metrics or key performance indicators.

**REQUEST FOR PRODUCTION NO. 19:** From 2007 to the present, all contracts between You, U.S. wireless carriers, or any other retailer relating to Your Smartphones, and all Documents from 2015 onwards related to the negotiations of those contracts or to carrier or retailer sales or promotions.

**REQUEST FOR PRODUCTION NO. 20:** All Documents related to consumer views about the privacy, security, user experience, or quality of Smartphones, including how consumers' views:

a. are affected by Smartphone manufacturers' product decisions and marketing strategies and campaigns;

b. are affected by the product decisions and marketing strategies and campaigns related to any Identified Product or Service;

c. compare to actual differences in Smartphone privacy, security, and quality; and

d. affect Smartphone demand, purchase intentions, switching, and consumer satisfaction.

**REQUEST FOR PRODUCTION NO. 21:** All Documents related to user switching between Smartphones or any models thereof (e.g., switching between Your Smartphones and iPhone and vice versa, switching between Your Smartphones and other Android Smartphones and vice versa, switching between models of Your Smartphones, etc.), including:

a.   the ease or difficulty of switching;

b.   the costs of switching;

c.   the relationship between the cost or difficulty and likelihood of switching;

d.   customer loyalty or churn;

e.   tools and support services available for switching;

f.   the duration of time between switching (e.g., how long a user has used an iPhone before switching to a non-Apple Smartphone);

g.   consumer views about switching;

h.   the availability and performance of complementary products and services (such as the Identified Products or Services), including any changes thereto;

i.   any connection between eSIM, cloud storage Apps, and Web Browsers and user switching;

j.   relative ease or difficulty of switching depending on users' brand of Smartphone;

k.   the ability of any Identified Product or Service to facilitate or impede switching; and

l.   any products, services, initiatives, or partnerships that facilitate switching (including from iPhone to Your Smartphones, and vice versa).

**REQUEST FOR PRODUCTION NO. 22:** All studies, analyses, investigations, and Reports related to fraudulent, malicious, misleading, or deceptive activity, code, content, information, or patterns within or related to the use of Your Smartphones or any App Marketplaces

17

available on Your Smartphones, including any threat assessment or Threat Model, in whatever form it may exist, and Your response(s) (if any) to such threats.

**REQUEST FOR PRODUCTION NO. 23:** Documents sufficient to show all Wearable models produced or sold by You from 2015 onwards, including specifications, features, launch date, price at launch, and discontinuation date.

**REQUEST FOR PRODUCTION NO. 24:** All Documents related to price, price-setting, terms of sale (including rebates, fees, promotions, discounts, and financing), licensing terms or conditions, pricing plans, price lists, and pricing strategies for Your Wearables.

**REQUEST FOR PRODUCTION NO. 25:** All financial statements, budgets, profit and loss statements, cost Reports, profitability Reports, annual Reports, regulatory Reports, and any other financial Reports (reflecting or relating to revenues, costs, margins, and/or profitability) regularly prepared by or for You on any periodic basis concerning Your Wearables.

**REQUEST FOR PRODUCTION NO. 26:** All Documents after January 1, 2010 related to competition concerning Wearables offered by You or any Person, including:

a. Relative quality or features, including technology, performance, privacy, security, user experience, brand strength, customizability, ability to integrate with or interoperate with other hardware or software, network effects, and cost;

b. Entry, expansion, exit, scale, and repositioning;

c. Market segmentation by geography, type of consumer, Wearable type, Wearable features, sales channel, compatibility with a certain Smartphone or mobile operating system, or Wearable price or price band;

d. Competitive positioning and differentiation;

e. Sales volumes, revenue, and profitability;

18

f.  Installed base;

g.  Market shares, segment shares, or relative sales or volume shares; and

h.  Competitive threats, disintermediation, and commoditization.

**REQUEST FOR PRODUCTION NO. 27:** All Documents related to any actual or potential barriers or impediments to entry, output expansion, or repositioning related to Wearables and Wearable operating systems.

**REQUEST FOR PRODUCTION NO. 28:** All regularly or specially prepared business Reports, strategic plans, competitive plans, marketing plans, promotional plans, competitive assessments or benchmarking analyses prepared by or for You concerning Your strategies, objectives, research, development, investments, roadmaps, marketing, innovations, and features for Your Wearables.

**REQUEST FOR PRODUCTION NO. 29:** All studies, analyses, and Reports, related to how the features, functionality, and interoperability of Wearables may affect users' Wearables purchasing decisions, including Documents related to user satisfaction, switching, consumer perceptions and attitudes, preferences, usage, purchase intentions, and all other relevant metrics, key performance indicators, and measures.

**REQUEST FOR PRODUCTION NO. 30:** All Documents, including studies, analyses, or Reports, discussing factors affecting consumer demand for Wearables, such as a Wearable's price, features, or quality (including quantity, price, and quality of available Apps, hardware accessories, or other complementary products and services); and Documents related to metrics, key performance indicators, and measures related to consumer demand for a Wearable.

**REQUEST FOR PRODUCTION NO. 31:** All Documents related to user switching between Wearables or any models thereof (e.g., switching between Your Wearables and the Apple

19

Watch and vice versa, switching between Your Wearables and other non-Apple Wearables and vice versa, switching between models of Your Wearables, or switching from one of Your Wearables to another of Your Wearables, etc.), including Documents related to the following topics as they concern switching between Wearables:

    a.   the ease or difficulty of switching;

    b.   the costs of switching;

    c.   the relationship between the cost or difficulty and likelihood of switching;

    d.   customer loyalty or churn;

    e.   tools and support services available for switching;

    f.   the duration of time between switching (e.g., how long a user has used an Apple Watch before switching to a non-Apple Wearable);

    g.   consumer views about switching;

    h.   the availability and performance of complementary products and services (such as the Identified Products or Services), including any changes thereto;

    i.   relative ease or difficulty of switching depending on users' brand of Smartphone; and

    j.   any products, services, initiatives, or partnerships that facilitate switching (including from Apple Watch to Your Wearables, and vice versa).

**REQUEST FOR PRODUCTION NO. 32:** All Documents related to the choice of operating system for Your Wearables, including the decision to switch from Tizen OS to Wear OS for Samsung Smartwatches.

**REQUEST FOR PRODUCTION NO. 33:** All Documents concerning Your decision of whether to make Your Wearables compatible with any Smartphone (including iPhone), including decisions to enable or disable connectivity between Your Wearables and any Smartphone

20

(including iPhone), any decisions to discontinue any model or line of Wearables compatible with any Smartphone (including iPhone), and the rationale for such decisions.

**REQUEST FOR PRODUCTION NO. 34:** All Documents concerning the ability of Your Wearables to connect to, stay connected to, exchange data with, or otherwise interact with Smartphones through Bluetooth or Wi-Fi.

**REQUEST FOR PRODUCTION NO. 35:** All Documents concerning any security or data privacy risks associated with the use of Your Wearables, including any comparisons of those risks when Your Wearables are paired with an iPhone versus a non-Apple Smartphone.

**REQUEST FOR PRODUCTION NO. 36:** Documents sufficient to identify all Companion Apps compatible with Your Smartphones, including concerning such Apps' access to APIs and ability to run in the background.

**REQUEST FOR PRODUCTION NO. 37:** All Documents concerning the ability of Wearables to receive, manage, or respond to notifications or text messages (including SMS, MMS, RCS, or iMessages) when paired with Smartphones.

**REQUEST FOR PRODUCTION NO. 38:** All agreements, guidelines, policies, and procedures concerning the Samsung Galaxy Store, including any App Review guidelines, developer agreements, terms and conditions, license agreements, and consumer terms of use, as well as all Documents concerning any changes to such agreements, guidelines, policies, and procedures.

**REQUEST FOR PRODUCTION NO. 39:** Documents sufficient to show the commission and revenue share rates and other fees You have charged to App developers during each calendar quarter during the period since You launched the Samsung Galaxy Store, including all headline, effective and average rates, all commission and revenue share rates and fees

21

applicable to specified categories of transactions, and all commission and revenue share rates and fees You have negotiated individually with App developers.

**REQUEST FOR PRODUCTION NO. 40:** Documents sufficient to describe any features, SDKs, APIs, or other technical support You offer to App developers to support development of Apps for the Samsung Galaxy Store, and the terms and conditions governing App developers' use of such tools and technologies.

**REQUEST FOR PRODUCTION NO. 41:** Documents sufficient to show for Your App Review process on the Samsung Galaxy Store (a) the percentage of Apps reviewed through human (manual) review versus automated or algorithmic review for each month since January 1, 2010; and (b) the types of tools used by You in Your App Review process, including software, machine learning systems, internal platforms, and third-party services.

**REQUEST FOR PRODUCTION NO. 42:** All Documents concerning comparisons between Your approach to App Review on the Samsung Galaxy Store and any other App Marketplace provider's approach to App Review, including with respect to security and privacy.

**REQUEST FOR PRODUCTION NO. 43:** All Documents concerning the Alleged Conduct, including those relating to any adverse impact on consumers, App developers, or You or Your Business.

**REQUEST FOR PRODUCTION NO. 44:** All Documents concerning Your efforts, plans, strategies, and decisions to develop or offer Samsung Pay, including regarding (a) the launch of Samsung Pay; (b) decisions about the devices and/or App Marketplaces on which to make Samsung Pay available or not available; (c) offering Samsung Pay on iPhone, Apple Watch, or the Apple App Store; and (d) making Samsung Pay usable across different mobile and non-mobile platforms.

22

**REQUEST FOR PRODUCTION NO. 45:** All Documents concerning Digital Wallets on Your Smartphones, including (a) the APIs or other capabilities concerning Digital Wallets or near-field communication access that You made available to third parties; (b) policies or practices concerning access to near-field communication or methods of authentication of digital payment options on online checkout pages; (c) restrictions placed on any third-party access to APIs or capabilities concerning Digital Wallets or near-field communication access; and (d) any privacy or security risks concerning Digital Wallets.

**REQUEST FOR PRODUCTION NO. 46:** All Documents concerning competition between Digital Wallets and other forms of payment, including "chip" or traditional "swipe" payment cards, Apple Pay, Google Pay, Samsung Pay, Contactless Cards, Virtual Cards, QR Code-Based Payments, or cash.

**REQUEST FOR PRODUCTION NO. 47:** All Documents concerning (a) analyses, studies, consumer surveys, Reports and assessments of the use of Smartphones for gaming (including relative strengths and weaknesses) compared to consoles, laptop and desktop computers, tablets, and other devices for gaming; (b) Your efforts to attract or retain game developers; (c) Your investments in or development of software or hardware features to enhance gaming; (d) consumer use of and preferences regarding Cloud Streaming Apps; and (e) Your efforts, plans, strategies, and decisions to develop or offer Samsung Gaming Hub (https://www.samsung.com/us/apps/gaming-hub/), including regarding (i) the launch of Samsung Gaming Hub; (ii) decisions about the devices and App Marketplaces (including the Apple App Store) on which to make Samsung Gaming Hub available or not available; and (iii) making Samsung Gaming Hub available across different mobile and non-mobile platforms.

23

**REQUEST FOR PRODUCTION NO. 48:** All Documents concerning Your past or present policies or practices concerning Messaging Apps relating to (a) the development, launch, and offering of Samsung Messages, as well as (b) the cross-platform availability, default settings, presets, restrictions, and functionality of Messaging Apps.

**REQUEST FOR PRODUCTION NO. 49:** All Documents, including studies, Reports, and analyses, concerning adoption of RCS messaging by users of Your Smartphones since 2012.

**REQUEST FOR PRODUCTION NO. 50:** All Documents concerning competition between Messaging Apps, between Messaging Apps and other forms of instant message communication such as SMS, MMS, RCS, and email, and between the SMS, MMS, and RCS messaging protocols.

**REQUEST FOR PRODUCTION NO. 51:** All Documents concerning Your past or present policies or practices concerning Super Apps or Mini-Programs.

**REQUEST FOR PRODUCTION NO. 52:** All Documents concerning the security or data privacy risks associated with the use of Super Apps or Mini-Programs.

**REQUEST FOR PRODUCTION NO. 53:** Each database or data set, as well as any associated Data Dictionaries and documentation, relating to studies, Reports, and analyses of consumers, developers, or other groups related to Smartphones or Wearables. These include surveys, polls, focus groups, market research, market segmentations, online anthropologies, A/B testing or other experiments, and choice modeling. They exclude databases and data solely related to purely cosmetic hardware changes.

**REQUEST FOR PRODUCTION NO. 54:** Each database or data set, as well as any associated Data Dictionaries and documentation, relating to Your Smartphones after January 1, 2010, containing information derived from users in the United States, Australia, Brazil, Canada,

24

China, France, Germany, India, Indonesia, Japan, Malaysia, Mexico, Norway, Russia, Singapore, South Korea, Thailand, and/or United Kingdom, that contains information relating to:

a. relationships between or among Your other users, such as family plans;

b. specific devices used (e.g., Smartphone model, year, and storage);

c. ownership, activation, or deactivation of Your devices;

d. ownership, activation, deactivation, or usage of third-party devices;

e. switching to, from, or among devices;

f. purchase, download, removal, or usage of Your and third-party Super Apps, Cloud Streaming Apps, Messaging Apps, Companion Apps, Digital Wallets, Browsers, and Cross-Platform Cloud Storage Apps;

g. aggregate App purchase, download, removal, or usage; and

h. to the extent reasonably accessible without undue burden, unique identifiers sufficient to link the user across data sets produced in response to these Requests.

**REQUEST FOR PRODUCTION NO. 55:** Monthly aggregated, structured, machine-readable data sufficient to reflect all sales, Trade Ins, and returns of Smartphones and Wearables, during the period from January 1, 2015 to present, broken out by calendar month and sales channel, including offline sales through Samsung retail stores, online sales through Samsung's website, sales through wireless carriers broken out by carrier, and sales to other resellers including third-party retailers, including Documents or data evidencing:

a. the geographic scope (by city and state) of sales reflected, and, where applicable, identification of whether sales occurred online, whether through Samsung.com or another retailer, or in physical retail locations;

25

b. data fields sufficient to uniquely identify product name, type, characteristics and technical specifications (e.g., "Samsung Galaxy S25 Ultra");

c. the total number of units sold and returned, including the condition of devices sold (e.g., new, used, refurbished), and net units sold;

d. the average gross list price per unit and average net realized price per unit;

e. the total gross or list revenue per unit, before discounts or adjustments;

f. the total value of all discounts, rebates, promotions, bundles, credits, free goods, financing or pay-over-time adjustments, and other price adjustments applied, exclusive of Trade In value;

g. the total amount of taxes, customs, tariffs, duties, or other governmental fees collected;

h. the total net revenue received (after discounts and adjustments);

i. the total revenue attributable to Trade In transactions, including the total number of transactions that included a Trade In and the total Trade In value credited to buyers;

j. the total cost of goods sold during the month, including manufacturing cost, acquisition cost, and any other cost fields associated with the products sold, including total shipping and handling costs, and identification of whether shipping costs are included in other reported revenue fields;

k. the total gross profit retained by Samsung;

l. identification of any wireless carriers associated with devices sold, aggregated by carrier within each sales channel where applicable;

m. plan type associated with devices sold (e.g., prepaid, postpaid), aggregated by plan type within each sales channel;

26

n.  the total number of returns processed and the associated value of returned products; and

o.  any fields sufficient to link monthly sales of Smartphones and Wearables to the purchase of related or complementary products.

**REQUEST FOR PRODUCTION NO. 56:** Documents sufficient to identify any Super Apps, Cloud Streaming Apps, Messaging Apps, Companion Apps, Digital Wallets, Browsers, or Cross-Platform Cloud Storage Apps downloaded by users of Your Smartphones, and for each of those Apps, for each country or country storefront in which that App was available, on a monthly basis (unless otherwise indicated):

a.  the number of downloads;

b.  the total amount paid for such downloads;

c.  the number of daily, weekly, and monthly active users;

d.  the average number of times per user per day the App is accessed by users;

e.  the average amount of money spent per user on In-App Purchases (differentiating between one-time purchases and subscriptions); and

f.  the average number of In-App Purchases per user (differentiating between one-time purchases and subscriptions).

**REQUEST FOR PRODUCTION NO. 57:** Documents sufficient to show, for each Super App, Cloud Streaming App, Messaging App, Companion App, Digital Wallet, Browser, or Cross-Platform Cloud Storage App on Your Galaxy Store, on a monthly basis and differentiated by country:

a.  the App's name and App ID;

b.  the App's genre (e.g. games, social media);

27

c.  the App's developer, developer ID, and developer country of origin;

d.  each country or country storefront in which the App was available;

e.  the number of original downloads of the App;

f.  the App's billings, separately by paid downloads and In-App Purchases;

g.  commissions (gross and net) paid to You for transactions for the App; and

h.  the App's number of monthly active users.

**REQUEST FOR PRODUCTION NO. 58:** All Documents reflecting or concerning Your Communications with any third party (including any third party's counsel) regarding government antitrust litigation against Apple, or regulation, legislation, or public debate relating to Apple's policies or practices.

**REQUEST FOR PRODUCTION NO. 59:** All Documents produced by You to any party in *Epic Games, Inc. v. Google LLC, et al.*, No. 3:20-cv-05671-JD (N.D. Cal.), *In re Apple iPhone Antitrust Litigation*, No. 11-cv-06714 (N.D. Cal.), and *Epic Games v. Apple, Inc.*, No. 20-cv-5640 (N.D. Cal.), including all Documents produced in any state government investigation preceding such litigation; all transcripts of depositions and trial testimony by any of Your employees taken in that litigation; and all sealed filings by You in the litigation.

28

# EXHIBIT A

PHILIP R. SELLINGER
United States Attorney
By: J. ANDREW RUYMAN
Assistant U.S. Attorney
402 East State Street, Room 430
Trenton, NJ 08608
Telephone: 609-989-0563

JONATHAN S. KANTER
Assistant Attorney General
DOHA G. MEKKI
Principal Deputy Assistant Attorney General
HETAL J. DOSHI
MICHAEL B. KADES
Deputy Assistant Attorneys General
By: JONATHAN LASKEN
Assistant Chief, Civil Conduct Task Force
United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 8600
Washington, DC 20530
Telephone: 202-598-6517

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

**UNITED STATES OF AMERICA**
U.S. Department of Justice, Antitrust Division
450 Fifth Street NW, Suite 8600
Washington, DC 20530

No. 2:24-cv-04055 (JXN-LDW)

**STATE OF NEW JERSEY**
124 Halsey Street, 5th Floor
Newark, NJ 07102

**STATE OF ARIZONA**
2005 N. Central Avenue
Phoenix, AZ 85004

**STATE OF CALIFORNIA**
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102

**DISTRICT OF COLUMBIA**
400 6th Street NW, 10th Floor
Washington, DC 20001

**STATE OF CONNECTICUT**
165 Capitol Avenue
Hartford, CT 06106

**STATE OF INDIANA**
302 West Washington Street

1

Indianapolis, Indiana 46204

**COMMONWEALTH OF**
**MASSACHUSETTS**
One Ashburton Place, 18th Floor
Boston, MA 02108

**STATE OF MAINE**
6 State House Station
Augusta, ME 04333

**STATE OF MICHIGAN**
525 W Ottawa Street
Lansing, MI 48933

**STATE OF MINNESOTA**
445 Minnesota Street, Suite 1400
Saint Paul, MN 55101

**STATE OF NEVADA**
100 North Carson Street
Carson City, Nevada 89701

**STATE OF NEW HAMPSHIRE**
33 Capitol Street
Concord, NH 03301

**STATE OF NEW YORK**
28 Liberty Street
New York, NY 10005

**STATE OF NORTH DAKOTA**
1720 Burlington Drive, Suite C
Bismarck, ND 58504

**STATE OF OKLAHOMA**
15 West 6th Street, Suite 1000
Tulsa, OK 74119

**STATE OF OREGON**
100 SW Market Street
Portland, OR 97201

**STATE OF TENNESSEE**
Post Office Box 20207
Nashville, TN 37202

**STATE OF VERMONT**
109 State Street
Montpelier, VT 05609

**STATE OF WISCONSIN**
Post Office Box 7857
Madison, WI 53707

**STATE OF WASHINGTON**
800 Fifth Avenue, Suite 2000
Seattle, WA 98104

     *Plaintiffs*,

  v.

**APPLE INC.**
One Apple Park Way
Cupertino, CA 95014

     *Defendant*.

## FIRST AMENDED COMPLAINT

In 2010, a top Apple executive emailed Apple's then-CEO about an ad for the new Kindle e-reader. The ad began with a woman who was using her iPhone to buy and read books on the Kindle app. She then switches to an Android smartphone and continues to read her books using the same Kindle app. The executive wrote to Jobs: one "***message that can't be missed is that it is easy to switch from iPhone to Android. Not fun to watch.***" Jobs was clear in his response: Apple would "force" developers to use its payment system to lock in both developers and users on its platform. Over many years, Apple has repeatedly responded to competitive threats like this one by making it harder or more expensive for its users and developers to leave than by making it more attractive for them to stay.

3

For many years, Apple has built a dominant iPhone platform and ecosystem that has driven the company's astronomical valuation. At the same time, it has long understood that disruptive technologies and innovative apps, products, and services threatened that dominance by making users less reliant on the iPhone or making it easier to switch to a non-Apple smartphone. Rather than respond to competitive threats by offering lower smartphone prices to consumers or better monetization for developers, Apple would meet competitive threats by imposing a series of shapeshifting rules and restrictions in its App Store guidelines and developer agreements that would allow Apple to extract higher fees, thwart innovation, offer a less secure or degraded user experience, and throttle competitive alternatives. It has deployed this playbook across many technologies, products, and services, including super apps, text messaging, smartwatches, and digital wallets, among many others.

Apple's conduct also stifles new paradigms that threaten Apple's smartphone dominance, including the cloud, which could make it easier for users to enjoy high-end functionality on a lower priced smartphone—or make users device-agnostic altogether. As one Apple manager recently observed, "*Imagine buying a [expletive] Android for 25 bux at a garage sale and it works fine . . . . And you have a solid cloud computing device. Imagine how many cases like that there are.*" Simply put, Apple feared the disintermediation of its iPhone platform and undertook a course of conduct that locked in users and developers while protecting its profits.

Critically, Apple's anticompetitive conduct not only limits competition in the smartphone market, but also reverberates through the industries that are affected by these restrictions, including financial services, fitness, gaming, social media, news media, entertainment, and more. Unless Apple's anticompetitive and exclusionary conduct is stopped, it will likely extend and entrench its iPhone monopoly to other markets and parts of the economy. For example, Apple is

4

rapidly expanding its influence and growing its power in the automotive, content creation and entertainment, and financial services industries–and often by doing so in exclusionary ways that further reinforce and deepen the competitive moat around the iPhone.

This case is about freeing smartphone markets from Apple's anticompetitive and exclusionary conduct and restoring competition to lower smartphone prices for consumers, reducing fees for developers, and preserving innovation for the future. The United States and the States and Commonwealths of New Jersey, Arizona, California, Connecticut, Indiana, Maine, Massachusetts, Michigan, Minnesota, Nevada, New Hampshire, New York, North Dakota, Oklahoma, Oregon, Tennessee, Vermont, Washington, Wisconsin, and the District of Columbia, acting by and through their respective Attorneys General, bring this case to address Apple's anticompetitive and exclusionary conduct and alleviate harm to competition.

## I.     Introduction

1.      The Apple Computer Company, as it was then called, was founded in 1976 to make and market personal computers. From its inception, Apple had a knack for expensive, high-end design and niche marketing relative to its competitors. But it struggled to compete against rivals that offered lower prices and more programs. After two decades, Apple struggled to compete against Windows personal computers and by the late 1990s, it was on the brink of bankruptcy.

2.      Apple's fortunes changed around the time it launched the iPod in 2001. Innovative design and savvy marketing had not been enough to drive a successful business strategy. This time, the confluence of several factors made it a smash success. Apple's iTunes application allowed iPod users to organize their song library and update their iPod. A path-clearing antitrust enforcement case, brought by the United States and state attorneys general, against Microsoft opened the market and constrained Microsoft's ability to prohibit companies

5

like Apple from offering iTunes on Windows PCs. Licensing agreements with the major music labels allowed Apple to offer iPod/iTunes users a wide selection of music for a fee-per-download. The iPod experience gave Apple a recipe for the future: a high-end device, a large number of platform participants (i.e., music labels and consumers), and a digital storefront. More importantly, it gave Apple a playbook: drive as many consumers and third-party participants to the platform as possible and offer a wide selection of content, products, and services created by those third parties to consumers. This structure put Apple in the driver's seat to generate substantial revenues through device sales in the first instance and subsequently the ancillary fees that it derives from sitting between consumers on the one hand and the products and services they love on the other.

3.    Apple's experience with the iPod set the stage for Apple's most successful product yet. In 2007, Apple launched the iPhone, a smartphone that offered high-end hardware and software applications, called "apps," built atop a mobile operating system that mimicked the functionality and ease of use of a computer. Apple initially offered only a small number of apps that it created for the iPhone. But Apple quickly realized the enormous value that a broader community of entrepreneurial, innovative developers could drive to its users and the iPhone platform more broadly. So Apple invited and capitalized on the work of these third parties while maintaining control and monetizing that work for itself. The value of third parties' work served an important purpose for Apple. Indeed, as early as 2010, then-CEO Steve Jobs discussed how to "further lock customers into our ecosystem" and "make Apple['s] ecosystem even more sticky." Three years later, Apple executives were still strategizing how to "get people hooked to the ecosystem."

6

4.      That strategy paid off. Over more than 15 years, Apple has built and sustained the most dominant smartphone platform and ecosystem in the United States by attracting third-party developers of all kinds to create apps that users could download on their smartphones through a digital storefront called the App Store. As developers created more and better products, content, apps, and services, more people bought iPhones, which incentivized even more third parties to develop apps for the iPhone. Today, the iPhone's ecosystem includes products, apps, content, accessories, and services that are offered by content creators, newspaper publishers, banks, advertisers, social media companies, airlines, productivity developers, retailers and other merchants, and others. As Apple's power grew, its leverage over third parties reinforced its tight control over how third parties innovate and monetize on and off the smartphone in ways that were anticompetitive and exclusionary.

5.      Today, Apple charges as much as $1,599 for an iPhone and earns high margins on each one, more than double those of others in the industry. When developers imagine a new product or service for iPhone consumers, Apple demands up to 30 percent of the price of an app whose content, product, or service it did not create. Then when a consumer wants to buy some additional service within that app, Apple extracts up to another 30 percent, again for a service Apple does not create or develop. When customers buy a coffee or pay for groceries, Apple charges a fee for every "tap-to-pay" transaction, imposing its own form of an interchange fee on banks and a significant new cost for using credit cards. When users run an internet search, Google gives Apple a significant cut of the advertising revenue that an iPhone user's searches generate.

6.      Apple keenly understands that while a community of developers and accessory makers is indispensable to the success of the iPhone, they also pose an existential threat to its

7

extraordinary profits by empowering consumers to "think different" and choose perfectly functional, less-expensive alternative smartphones.

7. Apple's smartphone business model, at its core, is one that invites as many participants, including iPhone users and third-party developers, to join its platform as possible while using contractual terms to force these participants to pay substantial fees. At the same time, Apple restricts its platform participants' ability to negotiate or compete down its fees through alternative app stores, in-app payment processors, and more.

8. In order to protect that model, Apple reduces competition in the markets for performance smartphones and smartphones generally. It does this by delaying, degrading, or outright blocking technologies that would increase competition in the smartphone markets by decreasing barriers to switching to another smartphone, among other things. The suppressed technologies would provide a high-quality user experience on any smartphone, which would, in turn, require smartphones to compete on their merits.

9. Apple suppresses such innovation through a web of contractual restrictions that it selectively enforces through its control of app distribution and its "app review" process, as well as by denying access to key points of connection between apps and the iPhone's operating system (called Application Programming Interfaces or "APIs"). Apple can enforce these restrictions due to its position as an intermediary between product creators such as developers on the one hand and users on the other.

10. This complaint highlights five examples of Apple using these mechanisms to suppress technologies that would have increased competition among smartphones. Suppressing these technologies does not reflect competition on the merits. Rather, to protect its smartphone monopoly—and the extraordinary profits that monopoly generates—Apple repeatedly chooses to

make its products worse for consumers to prevent competition from emerging. These examples below individually and collectively have contributed to Apple's ability to secure, grow, and maintain its smartphone monopoly by increasing switching costs for users, which leads to higher prices and less innovation for users and developers. Apple has used one or both mechanisms (control of app distribution or control of APIs) to suppress the following technologies, among others:

- Super apps provide a user with broad functionality in a single app. Super apps can improve smartphone competition by providing a consistent user experience that can be ported across devices. Suppressing super apps harms all smartphone users— including Apple users—by denying them access to high quality experiences and it harms developers by preventing them from innovating and selling products.

- Cloud streaming game apps provide users with a way to play computing intensive games in the cloud. Cloud streaming games (and cloud streaming in general) can improve smartphone competition by decreasing the importance of expensive hardware for accomplishing high compute tasks on a smartphone. Suppressing cloud streaming games harms users by denying them the ability to play high-compute games, and it harms developers by preventing them from selling such games to users.

- Messaging apps are apps that allow users to communicate with friends, family, and other contacts. Messaging apps that work equally well across all smartphones can improve competition among smartphones by allowing users to switch phones without changing the way they communicate with friends, family, and others. Apple makes third-party messaging apps on the iPhone worse generally and relative to Apple Messages, Apple's own messaging app, by prohibiting third-party apps from sending

9

or receiving carrier-based messages. By doing so, Apple is knowingly and deliberately degrading quality, privacy, and security for its users and others who do not have iPhones. Apple also harms developers by artificially constraining the size of their user base.

- Smartwatches are an expensive accessory that typically must be paired to a smartphone. Smartwatches that can be paired with different smartphones allow users to retain their investment in a smartwatch when switching phones thereby decreasing the literal cost associated with switching from one smartphone to another, among other things. By suppressing key functions of third-party smartwatches—including the ability to respond to notifications and messages and to maintain consistent connections with the iPhone—Apple has denied users access to high performing smartwatches with preferred styling, better user interfaces and services, or better batteries, and it has harmed smartwatch developers by decreasing their ability to innovate and sell products.

- Digital wallets are an increasingly important way that smartphones are used and are a product in which users develop a great deal of comfort and trust as they typically contain users' most sensitive information. Digital wallets that work across smartphone platforms allow users to move from one smartphone brand to another with decreased frictions, among other things. Apple has denied users access to digital wallets that would have provided a wide variety of enhanced features and denied digital wallet developers—often banks—the opportunity to provide advanced digital payments services to their own customers.

11.     By maintaining its monopoly over smartphones, Apple is able to harm consumers in a wide variety of additional ways. For example, by denying iPhone users the ability to choose their trusted banking apps as their digital wallet, Apple retains full control both over the consumer and also over the stream of income generated by forcing users to use only Apple-authorized products in the digital wallet. Apple also prohibits the creation and use of alternative app stores curated to reflect a consumer's preferences with respect to security, privacy, or other values. These and many other features would be beneficial to consumers and empower them to make choices about what smartphone to buy and what apps and products to patronize. But allowing consumers to make that choice is an obstacle to Apple's ability to maintain its monopoly.

12.     Of course, this is not the story Apple presents to the world. For decades, Apple branded itself a nimble, innovative upstart. In 1998, Apple co-founder Steve Jobs criticized Microsoft's monopoly and "dirty tactics" in operating systems to target Apple, which prompted the company "to go to the Department of Justice" in hopes of getting Microsoft "to play fair." But even at that time, Apple did not face the same types of restrictions it imposes on third parties today; Apple users could use their iPod with a Windows computer, and Microsoft did not charge Apple a 30 percent fee for each song downloaded from Apple's iTunes store. Similarly, when Apple brought the iPhone to market in 2007, it benefited from competition among component makers and wireless carriers.

13.     While Apple's anticompetitive conduct arguably has benefited its shareholders—to the tune of over $77 billion in stock buybacks in its 2023 fiscal year alone—it comes at a great cost to consumers. Some of those costs are immediate and obvious, and they directly affect Apple's own customers: Apple inflates the price for buying and using iPhones while preventing

11

the development of features like alternative app stores, innovative super apps, cloud-streaming games, and secure texting.

14. Other costs of Apple's anticompetitive conduct may be less obvious in the immediate term. But they are no less harmful and even more widespread, affecting all smartphone consumers. Apple's smartphone monopoly means that it is not economically viable to invest in building some apps, like digital wallets, because they cannot reach iPhone users. This means that innovations fueled by an interest in building the best, most user-focused product that would exist in a more competitive market never get off the ground. What's more, Apple itself has less incentive to innovate because it has insulated itself from competition. As Apple's executives openly acknowledge: "In looking at it with hindsight, I think going forward we need to set a stake in the ground for what features we think are 'good enough' for the consumer. I would argue we're already doing \*more\* than what would have been good enough. But we find it very hard to regress our product features YOY [year over year]." Existing features "**would have been good enough today if we hadn't introduced [them] already**," and "anything new and especially expensive needs to be rigorously challenged before it's allowed into the consumer phone." Thus, it is not surprising that Apple spent more than twice as much on stock buybacks and dividends as it did on research and development.

15. Moreover, Apple has demonstrated its ability to use its smartphone monopoly to impose fee structures and manipulate app review to inhibit aggrieved parties from taking advantage of regulatory and judicial solutions imposed on Apple that attempt to narrowly remedy harm from its conduct.

16. Apple wraps itself in a cloak of privacy, security, and consumer preferences to justify its anticompetitive conduct. Indeed, it spends billions on marketing and branding to

12

promote the self-serving premise that only Apple can safeguard consumers' privacy and security interests. Apple selectively compromises privacy and security interests when doing so is in Apple's own financial interest—such as degrading the security of text messages, offering governments and certain companies the chance to access more private and secure versions of app stores, or accepting billions of dollars each year for choosing Google as its default search engine when more private options are available. In the end, Apple deploys privacy and security justifications as an elastic shield that can stretch or contract to serve Apple's financial and business interests.

17.     Smartphones have so revolutionized American life that it can be hard to imagine a world beyond the one that Apple, a self-interested monopolist, deems "good enough." But under our system of antitrust laws, "good enough" is, quite simply, not enough. Consumers, competition, and the competitive process—not Apple alone—should decide what options consumers should have. And competition, not Apple's self-interested business strategies, should be the catalyst for innovation essential to our daily lives, not only in the smartphone market but in closely related industries like personal entertainment, automotive infotainment, and even more innovations that have not yet been imagined. Competition is what will ensure that Apple's conduct and business decisions do not thwart the *next* Apple.

18.     Protecting competition and the innovation that competition inevitably ushers in for consumers, developers, publishers, content creators, and device manufacturers is why Plaintiffs bring this lawsuit under Section 2 of the Sherman Act to challenge Apple's maintenance of its monopoly over smartphone markets, which affect hundreds of millions of Americans every day. Plaintiffs bring this case to rid smartphone markets of Apple's

13

monopolization and exclusionary conduct and to ensure that the next generation of innovators

can upend the technological world as we know it with new and transformative technologies.

**TABLE OF CONTENTS**

I.  Introduction.................................................................................................... 5

II.  Defendant Apple ......................................................................................... 17

    A.  Apple launched the iPod, iTunes, and the iTunes Store against the backdrop of *United States v. Microsoft*.................................................. 19

    B.  Apple invited third-party investment on the iPhone and then imposed tight controls on app creation and app distribution........................................ 22

III.  Smartphones Are Platforms ........................................................................ 25

IV.  Apple Unlawfully Maintains Its Monopoly Power....................................... 27

    A.  Apple harms competition by imposing contractual restrictions, fees, and taxes on app creation and distribution.................................................... 27

        i.  Super Apps: Apple prevented apps from threatening its smartphone monopoly by undermining mini programs that reduce user dependence on the iPhone................................................................................. 30

        ii.  Cloud Streaming Apps: Apple prevented developers from offering cloud gaming apps that reduce dependence on the iPhone's expensive hardware .................................................................................... 33

    B.  Apple uses APIs and other critical access points in the smartphone ecosystem to control the behavior and innovation of third parties in order to insulate itself from competition ........................................................... 36

        i.  Messaging: Apple protects its smartphone monopoly by degrading and undermining cross-platform messaging apps and rival smartphones ....... 36

        ii.  Smartwatches: Apple protects its smartphone monopoly by impeding the development of cross-platform smartwatches ......................................... 40

        iii.  Digital Wallets: Apple restricts cross-platform digital wallets on the iPhone, reinforcing barriers to consumers switching to rival smartphones .................................................................................... 43

    C.  Apple's "moat" around its smartphone monopoly is wide and deep: it uses a similar playbook to maintain its monopoly through many other products and services.................................................................................................. 47

V.  Anticompetitive Effects ............................................................................... 50

    A.  Apple's conduct harms the competitive process.................................... 50

    B.  Apple has every incentive to use its monopoly playbook in the future................ 55

VI.  Privacy, Security, and Other Alleged Countervailing Factors Do Not Justify Apple's Anticompetitive Conduct.............................................................. 56

VII.  The Smartphone Industry............................................................................ 58

A. Background ........................................................................................... 58

B. Smartphone Hardware ........................................................................... 59

C. Smartphone Operating Systems, Applications, and Other Software .... 61

D. Relevant Markets .................................................................................. 63

   i.    Performance smartphones are a relevant product market ......... 64

   ii.   Smartphones are a broader relevant product market ................ 65

   iii.  The United States is a relevant geographic market for performance
         smartphones and smartphones ................................................. 66

E. Apple has monopoly power in the smartphone and performance smartphone
   markets .................................................................................................. 67

VIII.  Jurisdiction, Venue, and Commerce ............................................................... 71

IX.    Violations Alleged ........................................................................................... 72

A. First Claim for Relief: Monopolization of the Performance Smartphone Market in
   the United States in Violation of Sherman Act § 2 ............................... 72

B. Second Claim for Relief, in the Alternative: Attempted Monopolization of the
   Performance Smartphone Market in the United States in Violation of Sherman
   Act § 2 ................................................................................................... 73

C. Third Claim for Relief: Monopolization of the Smartphone Market in the United
   States in Violation of Sherman Act § 2 ................................................ 74

D. Fourth Claim for Relief, in the Alternative: Attempted Monopolization of the
   Smartphone Market in the United States in Violation of Sherman Act § 2 .......... 75

E. Fifth Claim for Relief: Violation of the New Jersey Antitrust Act (Monopoly
   Maintenance) ......................................................................................... 76

F. Sixth Claim for Relief: Violations of Wisconsin State Law ................. 77

G. Seventh Claim for Relief: Violations of Tennessee State Law ............ 77

X.     Request for Relief ........................................................................................... 78

## II.     Defendant Apple

19.     Apple is a global technology company with headquarters in Cupertino, California. Apple is one of the world's most valuable public companies with a market capitalization over $2.5 trillion. In fiscal year 2023, Apple generated annual net revenues of $383 billion and net income of $97 billion. Apple's net income exceeds any other company in the Fortune 500 and the gross domestic products of more than 100 countries.

20.     The iPhone, Apple's signature product, is the primary driver of Apple's growth and profitability, routinely commanding profit margins of more than 30 percent on devices alone—significantly higher than its smartphone competitors. iPhone sales have made up a majority of Apple's annual revenue every year since 2012.

21.     Apple increasingly extracts revenue from iPhone users beyond the initial smartphone sale. For example, Apple offers iPhone upgrades, apps and in-app payments, paid digital subscription services (e.g., Apple's music streaming, TV, news, gaming, fitness, and cloud storage subscriptions), accessories (e.g., tracking devices, headphones, chargers, iPhone cases), and more. Apple refers to these offerings as "Services" and "Wearables, Home, and Accessories," respectively. In fiscal year 2023, these offerings accounted for nearly one-third of Apple's total revenue, or four times what Apple earned from selling Mac computers. Some of the largest drivers of revenue within these categories are Apple's smartwatch, the Apple Watch, and Apple's App Store, where iPhone users purchase and download apps. In recent years, Services have accounted for an increasing share of Apple's revenues, while the iPhone has remained the primary gateway through which U.S. consumers access these services.

22.     Apple's U.S. market share by revenue is over 70 percent in the performance smartphone market—a more expensive segment of the broader smartphone market where

Apple's own executives recognize the company competes—and over 65 percent for all smartphones. These market shares have remained remarkably durable over the last decade.

23.     Apple's smartphone market shares understate Apple's dominance and likely growth in key demographics, including among younger American consumers. For example, one-third of all iPhone users in the United States were born after 1996, as compared to just 10 percent for Samsung, Apple's closest smartphone competitor. Surveys show that as many as 88 percent of U.S. teenagers expect to purchase an iPhone for their next smartphone. iPhone users also tend to come from higher income households. Because smartphone users generally use a single smartphone to access related products and services, locking up key user groups allows Apple to capture greater spending on iPhone-related products and services, realize higher margins per user as compared to its smartphone rivals, and exercise greater control over developers and other smartphone ecosystem participants.

24.     In fiscal year 2023, Apple spent $30 billion on research and development. By comparison, Apple spent $77 billion on stock buybacks during the same year.

25.     Apple was founded in 1976. During its first 25 years, the company focused in large part on producing and marketing personal computers. Although the market for personal computers expanded over the next several decades, Apple struggled to gain customer adoption for its higher-priced products relative to its lower-cost competitors, including IBM and Microsoft. In the late 1990s, Apple significantly restructured the company and embarked on a new strategy focused not just on selling personal computers, but also consumer devices like the iPod, which led to the development of the iPhone.

18

A. **Apple launched the iPod, iTunes, and the iTunes Store against the backdrop of *United States v. Microsoft***

26. When Apple began developing mobile consumer devices, it did so against the backdrop of *United States v. Microsoft*, which created new opportunities for innovation in areas that would become critical to the success of Apple's consumer devices and the company itself. For example, the iPod did not achieve widespread adoption until Apple developed a cross-platform version of the iPod and iTunes for Microsoft's Windows operating system, at the time the dominant operating system for personal computers. In the absence of the consent decree in *United States v. Microsoft*, it would have been more difficult for Apple to achieve this success and ultimately launch the iPhone.

27. On May 18, 1998, the Justice Department and the attorneys general of 19 states and the District of Columbia filed *United States v. Microsoft*, an antitrust lawsuit against Microsoft alleging that the company had violated Section 2 of the Sherman Act by monopolizing the market for Intel-compatible personal computer operating systems. At trial, the government successfully established that Microsoft took steps to undermine the competitive threats posed by "middleware," such as web browsers like Netscape, after recognizing that if users could use middleware to access a variety of content and services via remote servers, over the internet, they might be less reliant on Windows.

28. Microsoft also took steps to undermine cross-platform technologies like QuickTime, a software architecture developed by Apple to play multimedia content (e.g., music and videos) on Apple's Mac computers and Microsoft's Windows PCs. In particular, Apple's then-Senior Vice President of Software Engineering testified that Microsoft "[wrote] steps into its operating system to ensure that a QuickTime file will not operate reliably on Windows," "trick[ed] the user into believing that QuickTime technology is part of the problem actually

19

caused by the Windows operating system," and "introduced greater technical incompatibilities between QuickTime and Microsoft products."

29. In April 2000, the trial court ultimately found that Microsoft's conduct violated Section 2 of the Sherman Act. An appeals court upheld the district court's findings of liability regarding middleware.

30. In January 2001, Apple introduced iTunes, software built on Apple's QuickTime architecture, and advertised it as "Jukebox Software" for organizing and listening to music. The initial version of iTunes was only compatible with Apple's Mac computers.

31. Later that same year, Apple debuted the iPod, a portable digital audio player that worked alongside iTunes to "let[] you put your entire music collection in your pocket and listen to it wherever you go." Like iTunes, the initial iPod was only compatible with Mac computers.

32. On November 1, 2002, the trial court accepted a proposed consent decree in *United States v. Microsoft*. Among other things, the consent decree prohibited Microsoft from retaliating against companies for developing or distributing products such as browsers and media players. The consent decree also required Microsoft to make various APIs available to third-party developers, including Apple.

33. Following that consent decree in October 2003, Apple launched a cross-platform version of iTunes that was compatible with the Windows operating system. As a result, a much larger group of users could finally use the iPod and iTunes, including the iTunes Store. The iTunes Store allowed users to buy and download music and play it on their iTunes computer application or on the iPod. Apple benefited substantially from this new customer base. In the first two years after launching the iPod, Apple sold a few hundred thousand devices. The year after launching a Windows-compatible version of iTunes and gaining access to millions more

customers, Apple sold millions of devices. Apple went on to sell hundreds of millions of iPod

devices over the next two decades. Moreover, iTunes became the market leader in online music

services. At an event in 2007, Apple's then-CEO said of the iPod, "it didn't just change the way

we all listened to music, it changed the entire music industry." At the same event, he announced

that the company would change its name from Apple Computer, Inc. to Apple, Inc. in light of its

shifting focus to consumer electronics rather than computers.

34. The ubiquity of iPod and iTunes on Windows, in part because of a successful

antitrust enforcement action against Microsoft, contributed to the development and success of

Apple's next flagship product—the iPhone. But after launching the iPhone, Apple began stifling

the development of cross-platform technologies on the iPhone, just as Microsoft tried to stifle

cross-platform technologies on Windows.

35. In January 2007, Apple debuted the first-generation iPhone, describing the device

as "an iPod, a phone, and an internet communicator," and touting the fact that users could

"sync[] content from a user's iTunes library on their PC or Mac." Apple marketed the iPhone as

a smartphone that was easy to use. Reflecting on the company's learning from the iPod, Apple's

then-CEO announced, "iTunes is going to sync all your media to your iPhone—but also a ton of

data. Contacts, calendars, photos, notes, bookmarks, email accounts."

36. The original iPhone cost approximately $299—approximately $450 in 2024

dollars adjusted for inflation—with a two-year contract with a phone carrier.

37. At launch, nearly all native apps for the iPhone were created by Apple. There

were only about a dozen apps overall, including Calendar, Camera, Clock, Contacts, iPod,

Messages, Notes, Phone, Photos, Safari, Stocks, Voice Memos, and Weather.

38.     Within a year of launching the iPhone, Apple invited third-party developers to create native apps for the iPhone. Apple released its first software development kit—essentially the digital tools for building native apps on Apple's operating system (iOS)—to encourage and enable third-party developers to create native apps for the iPhone. Apple also offered developers ways to earn money by selling apps and later in-app purchases and subscriptions. By 2009, Apple was running marketing campaigns highlighting the value that third-party apps provide to iPhone users with the trademarked slogan: "There's an app for that."

39.     Apple's decision to invite third-party participation on its iPhone platform benefited Apple, too. The proliferation of third-party apps generated billions of dollars in profits for Apple and an iPhone user base of more than 250 million devices in the United States. Apple's market shares—over 70 percent of the performance smartphone market and over 65 percent of the broader smartphone market—likely understate its monopoly power today.

40.     While Apple profits from third-party developers that increase the iPhone's value to users, Apple executives understand that third-party products and services can, in their own words, be "fundamentally disruptive" to its smartphone monopoly, decreasing users' dependence on Apple and the iPhone and increasing competitive pressure on Apple. Apple therefore willingly sacrifices the short-term benefits it would gain from improved products and services developed by third parties when necessary to maintain its monopoly.

**B.     Apple invited third-party investment on the iPhone and then imposed tight controls on app creation and app distribution**

41.     Apple controls how developers distribute and create apps for iPhone users. For example, developers can only distribute native iPhone apps through Apple's App Store, which is the only way for users to download native iOS apps. Limiting distribution to the Apple App Store enables Apple to exert monopoly power over developers by imposing contractual

22

restrictions and rules that limit the behavior of non-Apple apps and services. Specifically, Apple sets the conditions for apps it allows on the Apple App Store through its App Store Review Guidelines. Under these guidelines, Apple has sole discretion to review and approve all apps and app updates. Apple selectively exercises that discretion to its own benefit, deviating from or changing its guidelines when it suits Apple's interests and allowing Apple executives to control app reviews and decide whether to approve individual apps or updates. Apple often enforces its App Store rules arbitrarily. And it frequently uses App Store rules and restrictions to penalize and restrict developers that take advantage of technologies that threaten to disrupt, disintermediate, compete with, or erode Apple's monopoly power.

42. Apple also controls app creation by deciding which APIs are available to developers when they make third-party apps. For example, developers cannot provide native apps on the iPhone unless they enter into Apple's non-negotiable Developer Program License Agreement (DPLA). That agreement requires developers to use public APIs only "in the manner prescribed by Apple." It also prohibits third-party apps from using APIs that Apple designates as "private." Apple selectively designates APIs as public or private to benefit Apple, limiting the functionality developers can offer to iPhone users even when the same functionality is available in Apple's own apps, or even select third-party apps. Similar to Apple's App Store restrictions, Apple uses its DPLA to impose restrictions that penalize and restrict developers that take advantage of technologies that threaten to disrupt, disintermediate, compete with, or erode Apple's monopoly power.

43. Developers cannot avoid Apple's control of app distribution and app creation by making web apps—apps created using standard programming languages for web-based content and available over the internet—as an alternative to native apps. Many iPhone users do not look

23

for or know how to find web apps, causing web apps to constitute only a small fraction of app usage. Apple recognizes that web apps are not a good alternative to native apps for developers. As one Apple executive acknowledged, "[d]evelopers can't make much money on the web." Regardless, Apple can still control the functionality of web apps because Apple requires all web browsers on the iPhone to use WebKit, Apple's browser engine—the key software components that third-party browsers use to display web content.

44. Nor can developers rely on alternative app stores even though this would benefit developers and users. For example, developers cannot offer iPhone users an app store that only offers apps curated for use by children, which would provide opportunities to improve privacy, security, and child safety. By contrast, Apple allows certain enterprise and public sector customers to offer versions of app stores with more curated apps to better protect privacy and security.

45. Apple's control over both app distribution and app creation gives Apple tremendous power. For example, Apple designates as "private" the APIs needed to send Short Message Service, or SMS, text messages, which is a protocol used by mobile carriers since the early 1990s to allow users to send basic text messages to other mobile phone numbers using their own mobile phone numbers. Developers have no technical means to access these private APIs, but even if they did, doing so would breach their developer agreement with Apple, and therefore put the developer at risk of losing the ability to distribute apps through the App Store. For example, Apple prohibits third-party iPhone apps from sending or receiving SMS text messages even though this functionality is available through Apple Messages. Likewise, Apple can control the functionality of third-party apps and accessories through its control of app distribution

24

because if an app includes functionality that Apple does not like, Apple can and does exercise its discretion to simply block the app from the App Store.

46. Apple's dominance is such that neither app developers nor iPhone users can benefit from lower cost or higher quality means of distributing apps or purchasing and providing digital products and services. Instead, Apple guarantees that it continues to benefit from the contributions of third-party developers and other platform participants while also protecting itself from the competitive threats and pressure those participants pose to Apple's smartphone monopoly.

47. This complaint focuses on Apple's use of its dominance to impose contracts and rules that restrict the behavior and design decisions of companies *other* than Apple.

## III. Smartphones Are Platforms

48. Smartphones combine the functionality of a traditional mobile phone with advanced hardware and software components. This cluster of services and features results in a distinct product for consumers and developers. For example, smartphones not only make phone calls, but also allow users to listen to music, send text messages, take pictures, play games, access software for work, manage their finances, and browse the internet.

49. Smartphones are platforms. Platforms bring together different groups that benefit from each other's participation on the platform. A food delivery app, for example, is a multi-sided platform that brings together restaurants, couriers, and consumers. A two-sided platform, for example, may bring together service providers on the one hand and consumers on the other. The technology and economics of a smartphone platform are fundamentally different from the technology and economics of a simultaneous transaction platform, such as a credit card, because smartphone platforms compete over device features and pricing in ways that do not directly relate to app store transactions. Whereas credit card transactions reflect a single simultaneous

25

action that requires both sides of the transaction for either side to exist, consumers value smartphone platforms for a variety of reasons separate from their ability to facilitate a simultaneous transaction. Consumers care about non-transactional components of the phone, such as its camera and processing speed, and they care about non-transactional components of apps, such as their features and functionality.

50. The economics of a smartphone platform are such that the platform's value to users—and in turn to the platform operator—increase when new apps and new features are added to the platform. In order to create these economic benefits for itself and its users, Apple has opened its smartphone platform to third-party developers, whose countless inventions and innovations have created enormous value. Apple has willingly opened the platform to third-party developers to capture this value even though there is no extensive regulatory framework requiring it to do so or overseeing how it interacts with those third parties. In this way, smartphone platforms are very different from other platforms, like landline telephone networks, whose value-adding features were built primarily by the platform operator and which were only opened to third parties when the platform operator was required to do so by regulation. When a third-party developer for the iPhone creates a valuable new feature, consumers benefit and consumer demand goes up for Apple's products, increasing the economic value of the iPhone to Apple. This has played out hundreds of thousands of times for the iPhone, resulting in an enormously valuable smartphone platform reflecting the combined contributions of millions of developers.

51. In contrast, limiting the features and functionality created by third-party developers—and therefore available to iPhone users—makes the iPhone worse and deprives Apple of the economic value it would gain as the platform operator. It makes no economic sense

26

for Apple to sacrifice the profits it would earn from new features and functionality unless it has some other compensating reason to do so, such as protecting its monopoly profits.

**IV.     Apple Unlawfully Maintains Its Monopoly Power**

**A.     Apple harms competition by imposing contractual restrictions, fees, and taxes on app creation and distribution**

52.     Apple's internal documents show that, soon after the iPhone's introduction and notwithstanding its success, the company began to fear that disintermediation of its platform and the commoditization of the iPhone would threaten Apple's substantial profits from iPhone sales and related revenue streams.

53.     Accordingly, Apple exercised its control of app creation and app distribution in key cases to cement the iPhone and App Store as the primary gateway to apps, products, and services. Apple often claims these rules and restrictions are necessary to protect user privacy or security, but Apple's documents tell a different story. In reality, Apple imposes certain restrictions to benefit its bottom line by thwarting direct and disruptive competition for its iPhone platform fees and/or for the importance of the iPhone platform itself.

54.     Three aspects of Apple's efforts to protect and exploit its smartphone monopoly are worth noting. First, Apple exercises its control over app distribution and app creation to dictate how developers innovate for the iPhone, enforcing rules and contractual restrictions that stop or delay developers from innovating in ways that threaten Apple's power. In so doing, Apple influences the direction of innovation both on and off the iPhone.

55.     Second, Apple drives iPhone users away from products and services that compete with or threaten Apple. In doing so, Apple increases the cost and friction of switching from the iPhone to another smartphone and generates extraordinary profits through subscription services

(like Apple's proprietary music, gaming, cloud storage, and news services), advertisements within the App Store, and accessories like headphones and smartwatches.

56. Third, Apple uses these restrictions to extract monopoly rents from third parties in a variety of ways, including app fees and revenue-share requirements. For most of the last 15 years, Apple collected a tax in the form of a 30 percent commission on the price of any app downloaded from the App Store, a 30 percent tax on in-app purchases, and fees to access the tools needed to develop iPhone native apps in the first place. While Apple has reduced the tax it collects from a subset of developers, Apple still extracts 30 percent from many app makers. Apple also generates substantial and increasing revenue by charging developers to help users find their apps in the App Store—something that, for years, Apple told developers was part of the reason they paid a 30 percent tax in the first place. For example, Apple will sell keyword searches for an app to someone other than the owner of the app. Apple is able to command these rents from companies of all sizes, including some of the largest and most sophisticated companies in the world.

57. As Apple exercised its control of app distribution and app creation, Apple slowed its own iPhone innovation and extracted more revenue and profit from its existing customers through subscriptions, advertising, and cloud services. These services increase the cost of switching from the iPhone to another smartphone because many of these services—including its proprietary gaming, cloud storage, and news service—are exclusive to the Apple ecosystem, causing significant frictions for iPhone users who try to use alternative services on another smartphone. Moreover, Apple's conduct demonstrates that Apple recognized the importance of digital products and services for the success of the iPhone while at the same time it restricted the

28

development and growth of non-iPhone products and services—especially those that might make it easier for users to switch from the iPhone to another smartphone.

58.     Each step in Apple's course of conduct built and reinforced the moat around its smartphone monopoly. The cumulative effect of this course of conduct has been to maintain and entrench Apple's smartphone monopoly at the expense of the users, developers, and other third parties who helped make the iPhone what it is today. Despite major technological changes over the years, Apple's power to control app creation and distribution and extract fees from developers has remained largely the same, unconstrained by competitive pressures or market forces. That this conduct is impervious to competition reflects the success of Apple's efforts to create and maintain its smartphone monopoly, the strength of that monopoly, and the durability of Apple's power.

59.     Apple's monopoly maintenance has taken many forms and continues to evolve today; however, Apple's anticompetitive and exclusionary course of conduct is exemplified by its contractual rules and restrictions targeting several products and services: super apps, cloud streaming apps, messaging apps, smartwatches, and digital wallets. By stifling these technologies, and many others, Apple reinforces the moat around its smartphone monopoly not by making its products more attractive to users, but by discouraging innovation that threatens Apple's smartphone monopoly or the disintermediation of the iPhone. Apple continues to expand and shift the scope and categories of anticompetitive conduct such that the cumulative anticompetitive effect of Apple's conduct is even more powerful than that of each exclusionary act standing alone.

i.   **Super Apps: Apple prevented apps from threatening its smartphone monopoly by undermining mini programs that reduce user dependence on the iPhone**

60.    For years, Apple denied its users access to super apps because it viewed them as "fundamentally disruptive" to "existing app distribution and development paradigms" and ultimately Apple's monopoly power. Apple feared super apps because it recognized that as they become popular, "demand for iPhone is reduced." So, Apple used its control over app distribution and app creation to effectively prohibit developers from offering super apps instead of competing on the merits.

61.    A super app is an app that can serve as a platform for smaller "mini" programs developed using programming languages such as HTML5 and JavaScript. By using programming languages standard in most web pages, mini programs are cross platform, meaning they work the same on any web browser and on any device. Developers can therefore write a single mini program that works whether users have an iPhone or another smartphone.

62.    Super apps can provide significant benefits to users. For example, a super app that incorporates a multitude of mini programs might allow users to easily discover and access a wide variety of content and services without setting up and logging into multiple apps, not unlike how Netflix and Hulu allow users to find and watch thousands of movies and television shows in a single app. As one Apple executive put it, "who doesn't want faster, easier to discover apps that do everything a full app does?" Restricting super apps makes users worse off and sacrifices the short-term profitability of iPhones for Apple.

63.    Super apps also reduce user dependence on the iPhone, including the iOS operating system and Apple's App Store. This is because a super app is a kind of middleware

30

that can host apps, services, and experiences without requiring developers to use the iPhone's APIs or code.

64. As users interact with a super app, they rely less on the smartphone's proprietary software and more on the app itself. Eventually, users become more willing to choose a different smartphone because they can access the same interface, apps, and content they desire on any smartphone where the super app is also present. Moreover, developers can write mini programs that run on the super app without having to write separate apps for iPhones and other smartphones. This lowers barriers to entry for smartphone rivals, decreases Apple's control over third-party developers, and reduces switching costs.

65. Apple recognizes that super apps with mini programs would threaten its monopoly. As one Apple manager put it, allowing super apps to become "the main gateway where people play games, book a car, make payments, etc." would "let the barbarians in at the gate." Why? Because when a super app offers popular mini programs, "iOS stickiness goes down."

66. Apple's fear of super apps is based on first-hand experience with enormously popular super apps in Asia. Apple does not want U.S. companies and U.S. users to benefit from similar innovations. For example, in a Board of Directors presentation, Apple highlighted the "[u]ndifferentiated user experience on [a] super platform" as a "major headwind" to growing iPhone sales in countries with popular super apps due to the "[l]ow stickiness" and "[l]ow switching cost." For the same reasons, a super app created by a U.S. company would pose a similar threat to Apple's smartphone dominance in the United States. Apple noted as a risk in 2017 that a potential super app created by a specific U.S. company would "replace[ ] usage of native OS and apps resulting in commoditization of smartphone hardware."

31

67. Apple did not respond to the risk that super apps might disrupt its monopoly by innovating. Instead, Apple exerted its control over app distribution to stifle others' innovation. Apple created, strategically broadened, and aggressively enforced its App Store Guidelines to effectively block apps from hosting mini programs. Apple's conduct disincentivized investments in mini program development and caused U.S. companies to abandon or limit support for the technology in the United States.

68. In particular, part of what makes super apps valuable to consumers is that finding and using mini programs is easier than using an app store and navigating many separate apps, passwords, and set-up processes. Instead of making mini program discovery easy for users, however, Apple made it nearly impossible.

69. Since at least 2017, Apple has arbitrarily imposed exclusionary requirements that unnecessarily and unjustifiably restrict mini programs and super apps. For example, Apple required apps in the United States to display mini programs using a flat, text-only list of mini programs. Apple also banned displaying mini programs with icons or tiles, such as descriptive pictures of the content or service offered by the mini program. Apple also banned apps from categorizing mini programs, such as by displaying recently played games or more games by the same developer. These restrictions throttle the popularity of mini programs and ultimately make the iPhone worse because it discourages developers from creating apps and other content that would be attractive to iPhone users.

70. Apple also selectively enforced its contractual rules with developers to prevent developers from monetizing mini programs, hurting both users and developers. For example, Apple blocked mini programs from accessing the APIs needed to implement Apple's in-app payment (IAP) system—even if developers were willing to pay Apple's monopoly tax. Similarly,

32

Apple blocked developers' ability to use in-app payment methods other than directly using IAP. For instance, super apps could create a virtual currency for consumers to use in mini programs, but Apple blocked this too. Apple, however, allows other, less-threatening apps to do so.

> **ii.    Cloud Streaming Apps: Apple prevented developers from offering cloud gaming apps that reduce dependence on the iPhone's expensive hardware**

71.    For years, Apple blocked cloud gaming apps that would have given users access to desirable apps and content without needing to pay for expensive Apple hardware because this would threaten its monopoly power. In Apple's own words, it feared a world where "all that matters is who has the cheapest hardware" and consumers could "buy[] a [expletive] Android for 25 bux at a garage sale and . . . have a solid cloud computing device" that "works fine." Apple's conduct made its own product worse because consumers missed out on apps and content. This conduct also cost Apple substantial revenues from third-party developers. At the same time, Apple also made other smartphones worse by stifling the growth of these cross-platform apps on other smartphones. Importantly, Apple prevented the emergence of technologies that could lower the price that consumers pay for iPhones.

72.    Cloud streaming apps let users run a computationally intensive program without having to process or store the program on the smartphone itself. Instead, a user's smartphone leverages the computing power of a remote server, which runs the program and streams the result back to the phone. Cloud streaming allows developers to bring cutting-edge technologies and services to smartphone consumers—including gaming and interactive artificial intelligence services—even if their smartphone includes hardware that is less powerful than an iPhone.

73.    Cloud streaming has significant benefits for users. For example, Apple has promoted the iPhone 15 by promising that its hardware is powerful enough to enable "next-level

33

performance and mobile gaming." But powerful hardware is unnecessary if games are played via cloud streaming apps. For a cloud game, the user experiences and plays the game on the smartphone, but the game is run by hardware and software in remote computing centers ("the cloud"). Thus, cloud gaming apps deliver rich gaming experiences on smartphones without the need for users to purchase powerful, expensive hardware. As a result, users with access to cloud streamed games may be more willing to switch from an iPhone to a smartphone with less expensive hardware because both smartphones can run desirable games equally well.

74. Cloud streaming also has significant advantages for developers. For example, instead of re-writing the same game for multiple operating systems, cloud platforms can act as middleware that allow developers to create a single app that works across iOS, Android, and other operating systems. Cloud streaming provides more and simpler options for offering subscriptions, collecting payments, and distributing software updates as well. All of this helps game developers reach economies of scale and profitability they might not achieve without offering cloud gaming apps and reduces their dependence on iOS and Apple's App Store.

75. Apple wielded its power over app distribution to effectively prevent third-party developers from offering cloud gaming subscription services as a native app on the iPhone. Even today, none are currently available on the iPhone.

76. For years, Apple imposed the onerous requirement that any cloud streaming game—or any update to a cloud streaming game—be submitted as a stand-alone app for approval by Apple. Having to submit individual cloud streaming games for review by Apple increased the cost of releasing games on the iPhone and limited the number of games a developer could make available to iPhone users. For example, the highest quality games, referred to as AAA games, typically require daily or even hourly updates across different platforms. If these

34

updates need to be individually approved by Apple, developers must either delay their software updates across all platforms or only update their games on non-iOS platforms, potentially making the iOS version of the game incompatible with other versions on other platforms until Apple approves the update. Neither option is tenable for players or developers.

77. Until recently, Apple would have required users to download cloud streaming software separately for each individual game, install identical app updates for each game individually, and make repeated trips to Apple's App Store to find and download games. Apple's conduct made cloud streaming apps so unattractive to users that no developer designed one for the iPhone.

78. Apple undermines cloud gaming apps in other ways too, such as by requiring cloud games to use Apple's proprietary payment system and necessitating game overhauls and payment redesigns specifically for the iPhone. Apple's rules and restrictions effectively force developers to create a separate iOS-specific version of their app instead of creating a single cloud-based version that is compatible with several operating systems, including iOS. As a result, developers expend considerable time and resources re-engineering apps to bring cross-platform apps like multiplayer games to the iPhone.

79. Cloud streaming apps broadly speaking—not just gaming—could force Apple to compete more vigorously against rivals. As one Apple manager recognized, cloud streaming eliminates "a big reason for high-performance local compute" and thus eliminates one of the iPhone's advantages over other smartphones because then "all that matters is who has the cheapest hardware." Accordingly, it reduces the need for users to buy expensive phones with advanced hardware. This problem does not "stop at high-end gaming," but applies to "a number of high-compute requirement applications."

35

**B. Apple uses APIs and other critical access points in the smartphone ecosystem to control the behavior and innovation of third parties in order to insulate itself from competition**

      **i. Messaging: Apple protects its smartphone monopoly by degrading and undermining cross-platform messaging apps and rival smartphones**

80. Apple undermines cross-platform messaging to reinforce "obstacle[s] to iPhone families giving their kids Android phones." Apple could have made a better cross-platform messaging experience itself by creating iMessage for Android but concluded that doing so "will hurt us more than help us." Apple therefore continues to impede innovation in smartphone messaging, even though doing so sacrifices the profits Apple would earn from increasing the value of the iPhone to users, because it helps build and maintain its monopoly power.

81. Messaging apps allow smartphone users to communicate with friends, family, and other contacts and are often the primary way users interact with their smartphones. In Apple's own words, messaging apps are "a central artery through which the full range of customer experience flows."

82. Smartphone messaging apps operate using "protocols," which are the systems that enable communication and determine the features available when users interact with each other via messaging apps.

83. One important protocol used by messaging apps is SMS.[1] SMS offers a broad user network, but limited functionality. For example, all mobile phones can receive SMS messages, but SMS does not support modern messaging features, such as large files, edited messages, or reactions like a "thumbs up" or a heart.

---

[1] Following industry practice, throughout this complaint, "SMS" refers to both SMS and MMS ("multimedia messaging service"). MMS is a companion protocol to SMS that allows for group messages and messages with basic multimedia content, such as small file sharing.

36

84.     Many messaging apps—such as WhatsApp, Facebook Messenger, and Signal—use proprietary, internet-based protocols, which are sometimes referred to as OTT ("over the top") protocols. OTT messaging typically involves more secure and advanced features, such as encryption, typing indicators, read receipts, the ability to share rich media, and disappearing or ephemeral messages. While all mobile phones can send and receive SMS messages, OTT only works between users who sign up for and communicate through the same messaging app. As a result, a user cannot send an OTT message to a friend unless the friend also uses the same messaging app.

85.     Apple makes third-party messaging apps on the iPhone worse generally and relative to Apple Messages, Apple's own messaging app. By doing so, Apple is knowingly and deliberately degrading quality, privacy, and security for its users. For example, Apple designates the APIs needed to implement SMS as "private," meaning third-party developers have no technical means of accessing them and are prohibited from doing so under Apple's contractual agreements with developers. As a result, third-party messaging apps cannot combine the "text to anyone" functionality of SMS with the advanced features of OTT messaging. Instead, if a user wants to send somebody a message in a third-party messaging app, they must first confirm whether the person they want to talk to has the same messaging app and, if not, convince that person to download and use a new messaging app. By contrast, if an Apple Messages user wants to send somebody a message, they just type their phone number into the "To:" field and send the message because Apple Messages incorporates SMS and OTT messaging.

86.     Apple prohibits third-party developers from incorporating other important features into their messaging apps as well. For example, third-party messaging apps cannot continue operating in the background when the app is closed, which impairs functionality like

37

message delivery confirmation. And when users receive video calls, third-party messaging apps cannot access the iPhone camera to allow users to preview their appearance on video before answering a call. Apple Messages incorporates these features.

87.     If third-party messaging apps could incorporate these features, they would be more valuable and attractive to users, and the iPhone would be more valuable to Apple in the short term. For example, by incorporating SMS, users would avoid the hassle of convincing someone to download a separate app before sending them a message. Third-party messaging apps could also offer the ability to schedule SMS messages to be sent in the future, suggest replies, and support robust multi-device use on smartphones, tablets, and computers—as they have already done on Android.

88.     Moreover, messaging apps benefit from significant network effects—as more people use the app, there are more people to communicate with through the app, which makes the app more valuable and in turn attracts even more users. Incorporating SMS would help third-party messaging apps grow their network and attract more users. Instead, Apple limits the reach of third-party messaging apps and reinforces network effects that benefit Apple.

89.     Recently, Apple has stated that it plans to incorporate more advanced features for cross-platform messaging in Apple Messages by adopting a 2019 version of the RCS protocol (which combines aspects of SMS and OTT). Apple has not done so yet, and regardless it would not cure Apple's efforts to undermine third-party messaging apps because third-party messaging apps will still be prohibited from incorporating RCS just as they are prohibited from incorporating SMS. Moreover, the RCS standard will continue to improve over time, and if Apple does not support later versions of RCS, cross-platform messaging using RCS could soon be broken on iPhones anyway.

90.     In addition to degrading the quality of third-party messaging apps, Apple affirmatively undermines the quality of rival smartphones. For example, if an iPhone user messages a non-iPhone user in Apple Messages—the default messaging app on an iPhone—then the text appears to the iPhone user as a green bubble and incorporates limited functionality: the conversation is not encrypted, videos are pixelated and grainy, and users cannot edit messages or see typing indicators. This signals to users that rival smartphones are lower quality because the experience of messaging friends and family who do not own iPhones is worse—even though Apple, not the rival smartphone, is the cause of that degraded user experience. Many non-iPhone users also experience social stigma, exclusion, and blame for "breaking" chats where other participants own iPhones. This effect is particularly powerful for certain demographics, like teenagers—where the iPhone's share is 85 percent, according to one survey. This social pressure reinforces switching costs and drives users to continue buying iPhones—solidifying Apple's smartphone dominance not because Apple has made its smartphone better, but because it has made communicating with other smartphones worse.

91.     Apple recognizes that its conduct harms users and makes it more difficult to switch smartphones. For example, in 2013, Apple's Senior Vice President of Software Engineering explained that supporting cross-platform OTT messaging in Apple Messages "would simply serve to remove [an] obstacle to iPhone families giving their kids Android phones." In March 2016, Apple's Senior Vice President of Worldwide Marketing forwarded an email to CEO Tim Cook making the same point: "moving iMessage to Android will hurt us more than help us."

39

92. In 2022, Apple's CEO Tim Cook was asked whether Apple would fix iPhone-to-Android messaging. "It's tough," the questioner implored Mr. Cook, "not to make it personal but I can't send my mom certain videos." Mr. Cook's response? "Buy your mom an iPhone."

93. Recently, Apple blocked a third-party developer from fixing the broken cross-platform messaging experience in Apple Messages and providing end-to-end encryption for messages between Apple Messages and Android users. By rejecting solutions that would allow for cross-platform encryption, Apple continues to make iPhone users' less secure than they could otherwise be.

### ii. Smartwatches: Apple protects its smartphone monopoly by impeding the development of cross-platform smartwatches

94. Apple uses smartwatches, a costly accessory, to prevent iPhone customers from choosing other phones. Having copied the idea of a smartwatch from third-party developers, Apple now prevents those developers from innovating and limits the Apple Watch to the iPhone to prevent a negative "impact to iPhone sales."

95. Smartwatches are wrist-worn devices with an interactive display and accompanying apps that let users perform a variety of functions, including monitoring health data, responding to messages and notifications, performing mobile payments, and, of course, telling time. Smartwatches must generally be paired with a smartphone to operate and unlock their full functionality, such as receiving and responding to emails and text messages or answering phone calls. Because of the significant cost of buying a smartwatch, users are less willing to choose a smartphone if it is not compatible with their smartwatch.

96. Apple's smartwatch—Apple Watch—is only compatible with the iPhone. So, if Apple can steer a user towards buying an Apple Watch, it becomes more costly for that

40

user to purchase a different kind of smartphone because doing so requires the user to abandon their costly Apple Watch and purchase a new, Android-compatible smartwatch.

97. By contrast, cross-platform smartwatches can reduce iPhone users' dependence on Apple's proprietary hardware and software. If a user purchases a third-party smartwatch that is compatible with the iPhone and other smartphones, they can switch from the iPhone to another smartphone (or vice versa) by simply downloading the companion app on their new phone and connecting to their smartwatch via Bluetooth. Moreover, as users interact with a smartwatch, e.g., by accessing apps from their smartwatch instead of their smartphone, users rely less on a smartphone's proprietary software and more on the smartwatch itself. This also makes it easier for users to switch from an iPhone to a different smartphone.

98. Apple recognizes that driving users to purchase an Apple Watch, rather than a third-party cross-platform smartwatch, helps drive iPhone sales and reinforce the moat around its smartphone monopoly. For example, in a 2019 email the Vice President of Product Marketing for Apple Watch acknowledged that Apple Watch "may help prevent iPhone customers from switching." Surveys have reached similar conclusions: many users say the other devices linked to their iPhone are the reason they do not switch to Android.

99. Apple also recognizes that making Apple Watch compatible with Android would "remove[an] iPhone differentiator."

100. Apple uses its control of the iPhone, including its technical and contractual control of critical APIs, to degrade the functionality of third-party cross-platform smartwatches in at least three significant ways: First, Apple deprives iPhone users with third-party smartwatches of the ability to respond to notifications. Second, Apple inhibits third-party smartwatches from maintaining a reliable connection with the iPhone. And third, Apple

undermines the performance of third-party smartwatches that connect directly with a cellular network. In doing so, Apple constrains user choice and crushes innovation that might help fill in the moat around Apple's smartphone monopoly.

101. The ability to respond to notifications, e.g., new messages or app alerts, directly from a smartwatch is one of the top considerations for smartwatch purchasers—and one of the most used product features when it is available. According to Apple's own market research, the ability to "[s]end and receive text messages from social and messaging apps" is a critical feature for a smartwatch. In 2013, when Apple started offering users the ability to connect their iPhones with third-party smartwatches, Apple provided third-party smartwatch developers with access to various APIs related to the Apple Notification Center Service, Calendar, Contacts, and Geolocation. The following year, Apple introduced the Apple Watch and began limiting third-party access to new and improved APIs for smartwatch functionality. For example, Apple prevents third-party smartwatches from accessing APIs related to more advanced Actionable Notifications, so iPhone users cannot respond to notifications using a third-party smartwatch. Instead, Apple provides third-party smartwatches access to more limited APIs that do not allow users to respond to a message, accept a calendar invite, or take other actions available on Apple Watch.

102. A reliable Bluetooth connection is essential for a smartwatch to connect wirelessly with a smartphone, and thereby function as a companion to the user's smartphone and unlock its full functionality. But Apple prohibits third-party smartwatch developers from maintaining a connection even if a user accidentally turns off Bluetooth in the iPhone's control center. Apple gives its own Apple Watch that functionality, however, because Apple recognizes that users frequently disable Bluetooth on their iPhone without realizing that doing so

42

disconnects their watch. As a result, iPhone users have a worse experience when they try to use a third-party smartwatch with their iPhone. Apple also requires users to turn on "Background App Refresh" and disable the battery-saving "Low Power Mode" in their iPhone settings for third-party smartwatches to remain consistently connected to their companion app, which is necessary to allow a user's iPhone and their smartwatch to update and share data about the weather or exercise tracking, even though Apple does not impose similar requirements for Apple Watch.

103. Cellular-enabled smartwatches incorporate the ability to connect directly to a cellular network, allowing users to make calls, send messages, and download data even if their smartwatch is not paired to a smartphone. Cellular-enabled smartwatches are popular with consumers, making up approximately 20 percent of Apple Watch sales. Apple Watch users can use the same phone number for their smartphone and smartwatch when connected to the cellular network. As a result, messages are delivered to both the user's smartphone and smartwatch, providing an integrated messaging experience. Although it is technologically feasible for Apple to allow an iPhone user with a third-party smartwatch to do the same, Apple instead requires these users to disable Apple's iMessage service on the iPhone in order to use the same phone number for both devices. This is a non-starter for most iPhone users. In practice, iPhone users with a third-party smartwatch must maintain separate phone numbers for the two devices, worsening their user experience, and may miss out on receiving messages sent to their primary iPhone number.

> iii. **Digital Wallets: Apple restricts cross-platform digital wallets on the iPhone, reinforcing barriers to consumers switching to rival smartphones**

104. Apple recognizes that paying for products and services with a digital wallet will eventually become "something people do every day of their lives." But Apple has used its

control over app creation, including its technical and contractual control over API access, to effectively block third-party developers from creating digital wallets on the iPhone with tap-to-pay functionality, which is an important feature of a digital wallet for smartphones. As a result, Apple maintains complete control over how users make tap-to-pay payments with their iPhone. Apple also deprives users of the benefits and innovations third-party wallets would provide so that it can protect "Apple's most important and successful business, iPhone."

105.    Digital wallets are apps that allow a user to store and use passes and credentials, including credit cards, personal identification, movie tickets, and car keys, in a single app. For example, digital wallets allow users to make in-person payments by tapping their device on a payment terminal rather than tapping or swiping a physical credit card. Digital wallets can also be used for transactions in mobile apps and mobile websites.

106.    Absent Apple's conduct, cross-platform digital wallets could also be used to manage and pay for subscriptions and in-app purchases.

107.    Apple Wallet is Apple's proprietary digital wallet on the iPhone. Apple Wallet incorporates Apple's proprietary payment system Apple Pay, which processes digital payments on the web, in apps, and at merchant points of sale.

108.    Today, Apple Wallet offers users a way to make these payments using their iPhone. But Apple envisions that Apple Wallet will ultimately supplant multiple functions of physical wallets to become a single app for shopping, digital keys, transit, identification, travel, entertainment, and more. As users rely on Apple Wallet for payments and beyond, it "drive[s] more sales of iPhone and increase[s] stickiness to the Apple ecosystem" because Apple Wallet is only available on the iPhone. Thus, switching to a different smartphone requires leaving behind

44

the familiarity of an everyday app, setting up a new digital wallet, and potentially losing access to certain credentials and personal data stored in Apple Wallet.

109. Cross-platform digital wallets would offer an easier, more seamless, and potentially more secure way for users to switch from the iPhone to another smartphone. For example, if third-party developers could create cross-platform wallets, users transitioning away from the iPhone could continue to use the same wallet, with the same cards, IDs, payment histories, peer-to-peer payment contacts, and other information, making it easier to switch smartphones. And because many users already use apps created by their preferred financial institutions, if these financial institutions offered digital wallets, then users would have access to new apps and technologies without needing to share their private financial data with additional third parties, including Apple. In the short term, these improved features would make the iPhone more attractive to users and profitable for Apple.

110. Accordingly, the absence of cross-platform digital wallets with tap-to-pay capability on the iPhone makes it harder for iPhone users to purchase a different smartphone.

111. The most important function for attracting users to a digital wallet for smartphones is the ability to offer tap-to-pay, i.e., the ability to make in-person payments by tapping your smartphone on a payment terminal. Apple uses its control over app creation and API access to selectively prohibit developers from accessing the near-field communication (NFC) hardware needed to provide tap-to-pay through a digital wallet app.

112. Apple Wallet is the only app on the iPhone that can use NFC to facilitate tap-to-pay. While Apple actively encourages banks, merchants, and other parties to participate in Apple Wallet, Apple simultaneously exerts its smartphone monopoly to block these same partners from developing better payment products and services for iPhone users.

45

113.    Apple also uses its smartphone monopoly to extract payments from banks, which need to access customers that use digital wallets on iPhones. Since Apple first launched Apple Pay—long before it achieved meaningful adoption—Apple has charged issuing banks 15 basis points (0.15 percent) for each credit card transaction mediated by Apple Pay. Payment apps from Samsung and Google are free to issuing banks. Apple's fees are a significant expense for issuing banks and cut into funding for features and benefits that banks might otherwise offer smartphone users. The volume of impacted transactions is large and growing. A U.S. Consumer Financial Protection Bureau report estimates that Apple Pay facilitated nearly $200 billion in transactions in the United States in 2022. And the report goes on to explain that "analysts estimate that the value of digital wallet tap-to-pay transactions will grow by over 150 percent by 2028."

114.    Multiple app developers have sought direct NFC access for their payment or wallet apps. Yet Apple prohibits these developers from incorporating tap-to-pay functionality in their apps for fear that doing so would "be one way to disable [A]pple [P]ay trivially," leading to the "proliferation of other payment apps" that might operate cross-platform and ultimately undermine Apple's smartphone monopoly.

115.    There is no technical limitation on providing NFC access to developers seeking to offer third-party wallets. For example, Apple allows merchants to use the iPhone's NFC antenna to *accept* tap-to-pay payments from consumers. Apple also acknowledges it is technically feasible to enable an iPhone user to set another app (e.g., a bank's app) as the default payment app, and Apple intends to allow this functionality in Europe.

116.    Apple further impedes the adoption of digital wallets by restricting others from offering the same ability to authenticate digital payment options on online checkout pages. By

46

limiting the ability of third-party wallets to provide a simple, fast, and comprehensive solution to online purchasing, Apple further undermines the viability of such wallets.

117. Apple also blocks other digital wallets from serving as an alternative to Apple's in-app payment (IAP). This prevents these wallets from increasing their attractiveness and improving the overall user experience on the iPhone by offering consumer experiences that may include use of rewards points in purchasing, digital receipts, returns, loyalty programs, and digital coupons for purchases of relevant subscriptions and digital goods. Apple even prohibits developers on its App Store from notifying users in the developer's app that cheaper prices for services are available using alternative digital wallets or direct payments.

118. Apple's conduct reflects its knowing degradation of the experience of its own users by blocking them from accessing wallets that would have better or different features. In so doing, Apple cements reliance on the iPhone and also imposes fees on a large and critical slice of all digital wallet NFC transactions, which the U.S. Consumer Financial Protection Bureau estimates will grow to $451 billion by 2028.

## C. Apple's "moat" around its smartphone monopoly is wide and deep: it uses a similar playbook to maintain its monopoly through many other products and services

119. The exclusionary and anticompetitive acts described above are part of Apple's ongoing course of conduct to build and maintain its smartphone monopoly. They are hardly exhaustive. Rather, they exemplify the innovation Apple has stifled and Apple's overall strategy of using its power over app distribution and app creation to selectively block threatening innovations.

120. Apple has deployed a similar playbook for a much broader range of third-party apps and services as well, many of which present technologies that function as middleware,

47

facilitate switching, reduce the need for expensive hardware, or disintermediate Apple's iPhone by enabling the development of cross-platform technologies. For instance, Apple has undermined third-party location trackable devices that fully function across platforms. Apple has impaired third-party, cross-platform video communications apps while steering users to its own video communication app, FaceTime. Apple has limited the capabilities of third-party iOS web browsers, including by requiring that they use Apple's browser engine, WebKit. Protocols that Apple has placed around new "eSIM" technology may introduce additional frictions for any user who seeks to transition from an iPhone to a different phone while maintaining the same phone number. Apple has impeded cross-platform cloud storage apps in order to steer iPhone users into iCloud, making data transfer between different devices more difficult. Apple uses restrictions in sales channels to impede the sale and distribution of rival smartphones. And Apple has worsened its users' experience by making it difficult for iPhone users to use superior voice and AI assistants and steering users to use Siri as a voice assistant.

121. Ultimately, the strategies Apple has employed to date are not the only ones Apple can use to achieve its anticompetitive and lucrative ends. As technology evolves, Apple continues to evolve and shift its anticompetitive behavior to protect its monopoly power. For example, in recent years, Apple has increasingly moved into offering its own subscription services, including news, games, video, music, cloud storage, and fitness subscriptions that could be used to keep users tethered to the platform. These subscription services and other ancillary fees are a significant part of Apple's net revenue. These subscriptions services can also increase switching costs among iPhone users. If an Apple user can only access their subscription service on an iPhone, they may experience significant costs, time, lost content, and other frictions if they attempt to switch to a non-Apple smartphone or subscription service.

122.    These subscription services can also increase Apple's power over content creators and newspapers, among others, by exerting control over how audiences access their work, decreasing traffic to their websites and apps, and positioning Apple as the middleman or tollbooth operator in the relationship between creators and users. In so doing, Apple takes on outsize importance and control in the creative economy, which may diminish incentives to fund, make, and distribute artistic expression.

123.    In addition, when one road is closed to Apple, Apple has demonstrated its ability to find new roads to the same or worse ends. For example, Apple was recently ordered to stop blocking link-outs by third parties to their websites where users could buy the third party's product cheaper. In response, Apple reportedly allowed link-outs to websites but now charges for purchases made on the web even if they are not an immediate result of a click from a link in a native iPhone app.

124.    Apple has also attempted to undermine cross-platform technologies like digital car keys in ways that benefit Apple but harm consumers. For example, Apple has required developers to add digital keys developed for their own apps to Apple Wallet as well. The default status of Apple Wallet steers users to the Apple Wallet rather than allowing third parties to present digital car keys only in their own cross-platform app, increasing dependence on Apple and the iPhone whenever they use their car. At the same time, it decreases the incentives of automakers to innovate because automakers are forced to share data with Apple and prevented from differentiating themselves as they could absent Apple's conduct.

125.    Apple's threatened dominance over the automotive industry goes well beyond the Apple Wallet and Apple's demands on car makers to allow innovative products and services on the iPhone. Apple's smartphone dominance extends to CarPlay, an Apple infotainment system

that enables a car's central display to serve as a display for the iPhone and enables the driver to use the iPhone to control maps and entertainment in the car. Like the smartphone market, infotainment systems are increasingly considered must-have capabilities in newer vehicles. After leveraging its smartphone dominance to car infotainment systems, Apple has told automakers that the next generation of Apple CarPlay will take over all of the screens, sensors, and gauges in a car, forcing users to experience driving as an iPhone-centric experience if they want to use any of the features provided by CarPlay. Here too, Apple leverages its iPhone user base to exert more power over its trading partners, including American carmakers, in future innovation. By applying the same playbook of restrictions to CarPlay, Apple further locks-in the power of the iPhone by preventing the development of other disintermediating technologies that interoperate with the phone but reside off device.

## V.    Anticompetitive Effects

### A.    Apple's conduct harms the competitive process

126.    As described above, Apple protects its monopoly power in smartphones and performance smartphones by using its control over app distribution and app creation to suppress or delay apps, innovations, and technologies that would reduce user switching costs or simply allow users to discover, purchase, and use their own apps and content without having to rely on Apple. As a result, Apple faces less competition from rival smartphones and less competitive pressure from innovative, cross-platform technologies not because Apple makes its own products better but because it makes other products worse. With the benefit of less competition, Apple extracts extraordinary profits and regulates innovation to serve its interests. This leaves all smartphone users worse off, with fewer choices, higher prices and fees, lower quality smartphones, apps, and accessories, and less innovation from Apple and others. Left unchallenged, Apple will continue to use and strengthen its smartphone monopoly to dictate how

50

companies can create and distribute apps in the future so that they cannot threaten Apple's smartphone monopolies.

127. Apple's conduct has resulted in less choice for smartphone users. Today, only two companies (Google and Samsung) remain as meaningful competitors to Apple in the premium smartphone market.

128. Even when users consider these alternatives, Apple's conduct has increased the technical, behavioral, monetary, and other costs of switching from an iPhone to an alternative smartphone. This undermines competition and entrenches Apple's monopoly power.
For example, according to user surveys, one of the biggest reasons iPhone users do not switch to rival smartphones today is to avoid the problems Apple has created for cross-platform messaging. Likewise, Apple exercised its control over app distribution and app creation to impede the development and growth of super apps, depriving users of technology that would have facilitated switching by decreasing user's dependence on Apple and the iPhone. Apple took a similar approach to cloud streaming apps, delaying or suppressing technology that would have made it easier for users to switch to cheaper smartphones. Apple also used its control over app creation, including its control over critical APIs, to impose technical and contractual restrictions on messaging apps, third-party smartwatches, and digital wallets, undermining cross-platform technologies that would have helped users overcome switching costs and friction and ultimately increased smartphone competition.

129. Apple's conduct has delayed or suppressed the emergence of cross-platform technologies that would put competitive pressure on Apple's ability to extract extraordinary profits from users and developers. For example, if developers could distribute their programs through super apps or cloud streaming apps, rather than the App Store, it would put competitive

51

pressure on Apple's ability to control app distribution and app creation as well as the taxes Apple imposes on developers who want to distribute apps to iPhone users. Similarly, third-party digital wallets, or other apps with tap-to-pay functionality, would benefit users and developers by putting more competitive pressure on Apple as well. For example, digital wallets could eventually provide developers an alternative way to process payments and manage customer relationships, forcing Apple to compete more aggressively by lowering fees and improving quality, which would ultimately benefit users. Instead, Apple continues to exert its power over customers and financial institutions when users pay for something with their phone—in the App Store, in an app, or increasingly in the physical world with tap-to-pay.

130. Apple's conduct has harmed users in other ways. For example, third-party digital wallets would reduce Apple's ability to charge banks high fees when users make payments using Apple Wallet, which ultimately cost consumers through higher prices or other reductions in quality. Alternative digital wallets could also provide smartphone users better rewards, e.g., cash back, as well as a more private, secure payment experience from a user's preferred financial institution rather than being forced to go through Apple. But these tap-to-pay digital wallet products and services do not exist today because of Apple.

131. Apple's conduct has made its own products worse, sacrificing the short-term profits Apple could earn from improving the iPhone in order to preserve the long-term value of maintaining its monopoly. In a competitive market, Apple would compete aggressively to support the development of popular apps and accessories for iPhone users, which would in turn make iPhones more attractive to users and more valuable. But Apple takes steps to delay or suppress cross-platform technologies that it recognizes would be popular with users, such as super apps and cloud streaming apps, because of the threat they pose to Apple's smartphone

monopolies. As a result, several developers have abandoned plans to develop super apps and cloud-based gaming apps even after making substantial investments in bringing them to market. Apple's conduct may have also slowed the development of innovative, high-compute apps related to education, artificial intelligence, and productivity as well. Apple has also impeded innovation by third-party smartwatches such that manufacturers have limited the functionality of their smartwatches for iPhone users, suspended support for iPhone compatibility because of Apple's restrictions, or canceled development of cross-platform smartwatches altogether. At least one company's canceled smartwatch formed part of its overall wearables strategy, including future development of virtual-reality technology. Similarly, Apple degrades third-party messaging apps, even though it makes cross-platform messaging less private and less secure for iPhone users, because doing so raises switching costs.

132. Apple's conduct has harmed other smartphone users, too. Because of the resources and risks required to maintain different features across different smartphones, many potential super app, mini program, and other developers do not implement features prohibited by Apple even on other smartphones. For example, prospective digital wallet providers, including U.S. banks, have abandoned the development of digital-wallet apps for either Apple or other smartphones. Another company decided not to offer users an innovative digital car key in part because Apple required that company to add any features related to the key into Apple Wallet rather than allowing that company to put its key solely in its own app. Other developers have shrunk, shuttered, or abandoned plans to launch super apps, cloud-streamed gaming apps, smartwatches, and other apps. As a result, all smartphone users enjoy lower quality smartphones, less innovation, and less choice.

133.     Apple's documents and conduct show that Apple is motivated by the anticompetitive purpose of building or maintaining monopoly power in the relevant markets. For example, Apple sacrificed substantial revenues it could have earned from super apps, mini programs, cloud streaming apps, and other third-party apps and accessories. In particular, mobile gaming already accounts for a large and growing portion of Apple's revenue. Popular cloud streamed gaming apps would offer iPhone users access to popular services (including games) and in turn generate significant revenue for Apple through subscriptions and in-app purchases. Instead, Apple preferred the long-term benefit of reduced smartphone competition to the revenue it would generate from cloud gaming, super apps, and mini programs or the quality (and consumer demand) increase that would flow from this innovation. Apple has also used its control over app distribution and app creation to selectively undermine cross-platform technologies, not because this helps protect users but because it helps protect Apple.

134.     The harms to smartphone competition caused by Apple's conduct are amplified by Apple's decision to grant itself exclusive distribution rights to iPhone users through the Apple App Store. If Apple allowed users to access apps in other ways, users could choose an app store that did not restrict super apps or mini programs, even if Apple ran its App Store the same way it does today. Apple does not allow that choice, however, because if it did developers could write their programs for any smartphone rather than specifically for iOS, just as internet browsers and Apple's QuickTime allowed developers to write programs that worked on a variety of operating systems not just Windows. That would lower users' switching costs and reduce users' and developers' dependence on Apple and the iPhone.

135.     Apple's smartphone monopoly gives it many levers to maintain its power even in the face of interventions focused on eliminating or disciplining specific anticompetitive

practices. This is because Apple's iPhone monopoly, secured by its anticompetitive conduct, grants it the power to set the rules by which most smartphone users buy digital and hardware products, and by which developers are allowed to sell these same products to users. If Apple is forced to change some of these rules, it has the power to adopt new rules, restrictions, or features that reinforce Apple's monopoly and harm competition in other ways. For example, Apple has stated plans to adopt RCS due to market and international regulatory pressure. But Apple continues to contractually restrict third parties from accessing other APIs and features that would enable cross-platform messaging apps. In another instance, Apple was enjoined from enforcing certain anti-steering provisions in its agreements with developers. In response, Apple simply created a different set of onerous restrictions on app developers to achieve a similar result. In other cases, Apple has used its control over app distribution to force companies to comply with Apple's policies that may contradict local laws by delaying the review of the offending companies' apps.

**B.      Apple has every incentive to use its monopoly playbook in the future**

136.     Apple's conduct does not just impact the past and present but poses significant risk to the development of new innovations. Apple may use its smartphone monopoly playbook to acquire or maintain power over next-frontier devices and technologies. As Apple grows its dominance, Apple may continue delaying or stifling the innovations of cross-platform companies, in order to lock users into Apple devices.

137.     Apple has countless products and services—AirPods, iPads, Music, Apple TV, photos, maps, iTunes, CarPlay, AirDrop, Apple Card, and Cash. These provide future avenues for Apple to engage in anticompetitive conduct and the ability to circumvent remedies. Appropriate forward-looking remedies are necessary to ensure that Apple cannot use these products and services to further entrench its monopoly power.

55

138.     Apple's conduct extends beyond just monopoly profits and even affects the flow

of speech. For example, Apple is rapidly expanding its role as a TV and movie producer and has

exercised that role to control content.

139.     Apple has also attempted to use its monopoly to collect user data and stifle

innovation in the automotive industry by, among other things, impeding the development of

digital key technologies by requiring them to be offered in Apple's proprietary wallet product

and creating new single points of power over emerging uses of the iPhone. These acts further

reinforce Apple's power in the iPhone by locking in Apple's services and excluding other

alternative technologies that have the potential to disintermediate Apple's iPhone.

140.     Finally, Apple's monopolization of smartphone markets gives it tremendous

power over the lives of millions of Americans. Today, Apple uses that power to undermine rival

smartphones, suppress innovative technologies, and stymie consumer choice. Tomorrow, Apple

may use its power to force its own users (and their data) to become its next profitable product.

**VI.     Privacy, Security, and Other Alleged Countervailing Factors Do Not Justify Apple's Anticompetitive Conduct**

141.     There are no valid, procompetitive benefits of Apple's exclusionary conduct that

would outweigh its anticompetitive effects. Apple's moat building has not resulted in lower

prices, higher output, improved innovation, or a better user experience for smartphone users.

142.     Apple markets itself on the basis of privacy and security to differentiate itself

from what competition is left in the smartphone market. But this does not justify Apple's

monopolistic and anticompetitive conduct. Apple imposes contractual restraints on app creation

and distribution, imposes hefty fees on many types of smartphone interactions, and conditionally

restricts API access on its smartphone platform simply because it can. There are limited if any

competitive constraints on this conduct. As a point of comparison, Apple does not engage in

56

such conduct on its Mac laptops and computers. It gives developers the freedom to distribute software directly to consumers on Mac without going through an Apple-controlled app store and without paying Apple app store fees. This still provides a safe and secure experience for Mac users, demonstrating that Apple's control over app distribution and creation on the iPhone is substantially more restrictive than necessary to protect user privacy and security.

143.    In fact, many alternative technologies that Apple's conduct suppresses would enhance user security and privacy. For example, Apple's conduct targeting digital wallets forces users to share information with Apple even if they would prefer to share that information solely with their bank, medical provider, or other trusted third party. In particular, when an iPhone user provisions a credit or debit card into Apple Wallet, Apple intervenes in a process that could otherwise occur directly between the user and card issuer introducing an additional point of failure for privacy and security. Likewise, super apps or alternative app stores could offer users and their families a more curated selection of apps that better protect user privacy and security. Indeed, Apple allows enterprise and public sector customers to offer more curated app stores on employee iPhones because it better protects privacy and security.

144.    Apple is also willing to make the iPhone less secure and less private if that helps maintain its monopoly power. For example, text messages sent from iPhones to Android phones are unencrypted as a result of Apple's conduct. If Apple wanted to, Apple could allow iPhone users to send encrypted messages to Android users while still using iMessage on their iPhone, which would instantly improve the privacy and security of iPhone and other smartphone users.

145.    Similarly, Apple is willing to sacrifice user privacy and security in other ways so long as doing so benefits Apple. For example, Apple allows developers to distribute apps through its App Store that collect vast amounts of personal and sensitive data about users—

57

including children—at the expense of its users' privacy and security. Apple also enters agreements to share in the revenue generated from advertising that relies on harvesting users' personal data. For example, Apple accepts massive payments from Google to set its search engine as the default in the Safari web browser even though Apple recognizes that other search engines better protect user privacy.

146.    Finally, Apple selectively enforces its rules and contractual restrictions for app distribution and app creation. For example, when it benefits Apple to do so, Apple permits developers to introduce mini programs, stream content from the cloud, use virtual currency, and receive special permissions or access APIs not automatically available to everyone.

147.    Ultimately, Apple chooses to make the iPhone private and secure when doing so benefits Apple; Apple chooses alternative courses when those courses help Apple protect its monopoly power. Apple's conduct underscores the pretextual nature of any claim that Apple's conduct is justified by protecting user privacy or security.

## VII.    The Smartphone Industry

### A.    Background

148.    Mobile phones are portable devices that enable communications over radio frequencies instead of telephone landlines. These signals are transmitted by equipment covering distinct geographic areas, or "cells," which is why mobile phones were called cell phones. The first commercial cell phones became available in the 1980s. Since then, improvements in both cell phone components and wireless technology have made it possible to transfer large volumes of data around the globe in a short period. As a result, mobile phones began to offer a wider array of features and the adoption of mobile phones dramatically increased. Today, nearly all American adults own a mobile phone.

149.     Smartphones combine the functionality of a traditional mobile phone with advanced hardware and software components. Smartphones not only make phone calls, but allow users to listen to music, send text messages, take pictures, play games, access software for work, manage their finances, and browse the internet. Consumers choose between smartphones based, in part, on their functionality. Today, smartphone functionality is driven in large part, though not exclusively, by a combination of hardware and software components. Thus, in a competitive market, smartphone manufacturers would compete and innovate to provide the best functionality.

150.     Although consumers could replace some smartphone functionality with separate devices such as by always carrying a camera and laptop, they generally prefer to access this combination of functionality as part of a single device. Thus, phones with some but not all of these features are not reasonable substitutes for smartphones. For example, a Canon or Nikon camera is not a substitute for an Apple or Samsung smartphone notwithstanding that both these products are capable of taking digital pictures.

**B.     Smartphone Hardware**

151.     A smartphone's hardware includes the frame and screen. Higher performing smartphones are typically constructed from better materials like glass and metal instead of plastic, manufactured to higher standards that make them more durable (e.g., water and dust proof), and have higher quality displays.

152.     A smartphone's hardware also includes the semiconductor chipsets that run the smartphone: central processing of software instructions, graphics, video, display, memory, data storage, and connection to wireless networks. Chipsets that offer superior performance—faster processing and network connections, better graphics, more storage—are costly. As a result, smartphone manufacturers typically include them only in more expensive performance smartphones.

59

153. Smartphone hardware includes other important components like cameras, and position and motion sensors. Performance smartphones typically have higher quality cameras, better battery life, wireless charging, and advanced biometrics such as face scanning.

154. Smartphones also contain several types of antennas that allow the phone to communicate with other smartphones, accessories, or other devices using standard communication protocols such as Wi-Fi, Bluetooth, and Near-Field Communications (NFC).

    a. Wi-Fi is a wireless networking technology that uses radio waves to provide wireless high-speed Internet access through mobile devices, computers, printers, and other equipment. "Wi-Fi," in particular, refers to IEEE 802.11 standards that define the protocols that enable communications with current Wi-Fi-enabled wireless devices such as wireless routers and access points.

    b. Bluetooth is a wireless standard that allows smartphones to use shortwave radios to communicate with accessories like headphones and smartwatches. An industry-wide Bluetooth standard specifies technological requirements to ensure that all Bluetooth devices can recognize and interact with each other. A typical Bluetooth signal has a range of about 30 feet.

    c. Near Field Communication (NFC) allows smartphones to interact with NFC-enabled devices like a credit card terminal at a coffee shop. NFC relies on short-range wireless technologies, including radio signals, to communicate and share information. To operate, two NFC-enabled devices must typically be within four centimeters or less of one another.

155. Three device manufacturers, Apple, Samsung, and Google, account for approximately 94 percent of all smartphones by revenue in the United States. Apple and

Samsung alone account for approximately 90 percent of all smartphone revenues in the United

States.

156.    Cloud-based technologies are run using hardware and software in remote

computing centers ("the cloud") rather than by hardware and software on a smartphone. The user

experiences the technology on the phone but the complex computing that generates the rich

experience and that executes the user's commands happens in the cloud. Thus, cloud apps can

deliver rich experiences on smartphones with less capable hardware than iPhones currently

contain.

**C.      Smartphone Operating Systems, Applications, and Other Software**

157.    In addition to hardware, smartphones include various software components that

make a smartphone more attractive to users.

158.    The most important software component is a smartphone's operating system, the

foundational software that manages both the hardware and other software programs on the

device. All iPhones are preloaded with Apple's proprietary, exclusive iPhone operating system

called iOS. The only other significant mobile operating system in the United States is Google's

Android, which works with smartphones manufactured by Samsung, whose U.S. headquarters is

located in this district, Google, Motorola, and smaller players. Software applications, known as

"apps," are programs that perform specific tasks at the smartphone user's request, such as

sending messages, playing music, or web browsing. Apps depend on a smartphone's operating

system to function. For example, to make a video call, apps must communicate with a

smartphone's operating system to access various hardware components on the phone, such as the

camera, microphone, and speaker. Apps communicate with a smartphone's operating system

through application programming interfaces (APIs).

61

159.     Apps that work with a particular smartphone operating system are called native apps. Thus, Apple's native iOS apps work with iPhone and native Android apps work with Android smartphones.

160.     Most app developers do not view Android as a substitute for iOS or iOS as a substitute for Android. The overwhelming majority of users choose a single phone and do not "multi-home" by carrying an Android phone and the iPhone at the same time. Thus, a developer cannot reach iPhone users on Android or Android users on iPhones. Due to the lack of user multi-homing, most developers create native apps for both iOS and Android to reach the greatest number of smartphone users. For example, a food delivery or ride-sharing app cannot develop an app just for Android phones or just for the iPhone. Developing for both platforms is often necessary for developers to reach the scale they need to be viable.

161.     It is also important to develop apps for the iPhone and other smartphone platforms because most apps are increasingly "social" in nature and require users on one platform to reach users on the other. For example, the developer of a dating app must enable its users on iPhones to meet users on Android and vice-versa. A money-sharing app must enable users on Android devices to send money to users on iPhones and vice versa.

162.     App developers typically provide a similar user experience for native apps on iPhones and Android smartphones to minimize the resources and risks of maintaining different features across different smartphones. Even so, developers must program native apps to work with a specific operating system and so they do not always interoperate or synchronize across different operating systems.

163.     Middleware is software that provides similar APIs and functionality across a diverse set of operating systems and devices. This allows developers to create cross-platform

62

applications without having to write separate code for individual operating systems or devices because developers can rely on the APIs exposed by the middleware rather than APIs that only work on specific operating systems or devices. Apple has long understood how middleware can help promote competition and its myriad benefits, including increased innovation and output, by increasing scale and interoperability. As Apple's then-Senior Vice President of Software Engineering testified during the government's landmark monopolization case in *United States v. Microsoft*: "Because we have created QuickTime for both Windows and Macintosh computers, developers can write a single version of a content product that will run on both Macintosh and Windows, without the additional expense of 'porting' the product to different operating systems." In the context of smartphones, examples of middleware include internet browsers, internet or cloud-based apps, super apps, and smartwatches, among other products and services. While not meeting the technical definition of middleware, certain other products and services may nonetheless have the same economic impact as middleware, such as eliminating the added expense of porting a product or experience across hardware or operating systems. For the purposes of this complaint middleware refers to both technical middleware and to products and services that, while not technically middleware, have the same economic effect.

### D. Relevant Markets

164. All smartphones compete against each other in a broad relevant market. But industry participants, including Apple, assess competition among smartphones in narrower markets that are best understood as submarkets of the larger all-smartphone market. Because Apple chooses not to compete to sell new smartphones in the entry-level tier, the most relevant market to assess its conduct is a narrower submarket that excludes this tier. Regardless of how the market is drawn, however, Apple's conduct is unlawful.

### i.   Performance smartphones are a relevant product market

165.   Performance smartphones are a narrower relevant product market within the broader smartphone market. This narrower market includes those smartphones that compete with most iPhones and excludes the lowest-end smartphones, which industry participants sometimes refer to as "entry-level" smartphones.

166.   Industry participants recognize performance smartphones as distinct and frequently group smartphones into tiers that include entry-level smartphones and higher tiers such as "premium" or "flagship."

167.   Apple has also long recognized a distinction between these higher-end smartphones and lower-end, entry-level smartphones. Apple's own documents indicate it does not view entry-level smartphones as competing with the iPhone and other performance smartphones.

168.   Performance smartphones have distinct characteristics and uses as compared to other smartphones. For example, entry-level smartphones are generally made with lower-quality materials and are less durable (e.g., plastic instead of metal and glass). They have lower-performance components such as slower processors and lower-capacity storage, which prevent users from running more intensive applications or storing large volumes of pictures and data on the device. Entry-level smartphones often lack features such as an NFC antenna that allows consumers to use their phone to make payments or access passes for public transit.

169.   Consumers typically purchase performance smartphones under different terms than entry-level smartphones. Consumers generally use entry-level smartphones along with pre-paid service plans. By contrast, consumers usually purchase performance smartphones for use with post-paid service plans that include promotional discounts to consumers who purchase performance smartphones.

64

170.    Because of these differences, among others, between entry-level smartphones and performance smartphones, entry-level smartphones are not reasonable substitutes for performance smartphones.

171.    Moreover, competition from non-performance smartphones is not sufficient today to prevent Apple from exercising monopoly power in the performance smartphone market.

### ii.    Smartphones are a broader relevant product market

172.    Smartphones are a relevant product market. Smartphones are distinct from phones that offer less capable hardware and software options than smartphones. These other phones, sometimes called "feature phones," may offer basic web browsing in addition to calling and messaging options, but do not offer the breadth of access to the internet or third-party apps as smartphones. Similarly, these phones often have lower-quality hardware, such as poorer displays, less capable cameras, and rely on physical keyboards instead of smartphone touch screens. Thus, these phones are not reasonable substitutes for smartphones.

173.    Smartphones are also distinct from other portable devices, such as tablets, smartwatches, and laptop computers. These devices lack the combination of function, size, and portability that consumers rely on in a smartphone, even if they offer some similar capabilities. Thus, none of these other products are reasonable substitutes for smartphones.

174.    Apple, other participants in the market, and the public recognize that smartphones are distinct from feature phones and other portable devices.

175.    Competition from feature phones, or other alternatives, is not sufficient to prevent Apple from exercising monopoly power in the smartphone market.

### iii. The United States is a relevant geographic market for performance smartphones and smartphones

176. The United States is a relevant geographic market for the sale of performance smartphones and smartphones. Users in the United States demand services offered by U.S. retailers when they purchase a smartphone. For example, consumers who purchase a smartphone from their mobile carrier can get assistance with activating their new device, setting it up, and transferring important content like apps, messages, photos, and video to their new smartphone. A smartphone purchased abroad for use in the United States might be incompatible with the consumer's domestic carrier, may not have the necessary radio technology to take advantage of the carrier's highest speed connections, the carrier might not be able to offer support during setup or subsequently, or the phone's warranty may be invalid.

177. Consumers must also purchase smartphones through a U.S. retailer if they want to take advantage of valuable promotions offered by their mobile carrier. These same promotions and free financing are unavailable to U.S. consumers who purchase their phones in other countries.

178. Finally, potential new smartphone entrants to the U.S. market must also comply with telecommunications regulations and satisfy other legal requirements. No extensive regulatory framework governs how Apple operates its platform with respect to developers, but there are a number of regulatory requirements that must be met in order to enter the smartphone market. For example, some smartphone makers are effectively barred from offering their smartphones to U.S. consumers.

179. Consumers in the United States could not avoid or defeat an increase in the price of performance smartphones or smartphones by purchasing and importing smartphones from abroad. This allows Apple to set prices for the same smartphone in the United States separately

from those in other countries. For example, Apple lowered the price of the iPhone 11 in China relative to the United States because Apple faced greater competition in China. This additional competition arises in part because a popular super app put competitive pressure on Apple and made it easier for users to switch from an iPhone to a rival smartphone. As a result, Apple is unable to command the same prices for the iPhone in China than they do in the United States due to less competition.

**E.     Apple has monopoly power in the smartphone and performance smartphone markets**

180.    Apple has monopoly power in the smartphone and performance smartphone markets because it has the power to control prices or exclude competition in each of them. Apple also enjoys substantial and durable market shares in these markets. Moreover, Apple's market shares likely underestimate Apple's power because they are protected by significant barriers to entry, network effects, and switching costs. Apple recognizes and exploits these barriers to entry, network effects, and switching costs to protect itself from competition from rival platforms and innovations, products, and services that may diminish consumer reliance on the iPhone. Apple's power will likely increase over time.

181.    In the U.S. market for performance smartphones, where Apple views itself as competing, Apple estimates its market share exceeds 70 percent. These estimates likely understate Apple's market share today. For example, Apple's share among key demographics, including younger audiences and higher-income households, is even larger. Even in the broadest market consisting of all smartphones—including many smartphones that Apple and industry participants do not view as competing with Apple's iPhones and other higher-end phones— Apple's share is more than 65 percent by revenue. Similarly, even if consumers choose one phone over another, the vast majority of developers consider iPhones and Android devices as

67

complements because developers must build apps that run on both platforms due to the lack of user multi-homing. In effect, the lack of multi-homing among users necessitates multi-homing among developers. This market reality increases the power that Apple is able to exercise over developers that seek to reach users on smartphones—especially performance smartphones that run sophisticated apps.

182.    Apple's high market shares are durable. Over the last decade, Apple increased its share of smartphones sold in the United States most years. Through the same period, Apple collected more than half the revenue for all smartphones sold in the United States.

183.    Apple's monopoly power in the relevant markets is protected by substantial barriers to entry and expansion. For example, since fewer than ten percent of smartphone purchasers in the United States are buying their first smartphone, there are fewer new customers available for Apple's rivals. Instead, rivals must encourage existing iPhone users to switch from using an iPhone to using another smartphone when they replace or upgrade their phone. As a result, switching costs—many created or exacerbated by Apple—impose substantial barriers to entry and expansion for rival smartphones. This barrier is increasingly impenetrable. Nearly 90 percent of iPhone owners in the United States replace their iPhone with another iPhone. At least one U.S. carrier estimates that as high as 98 percent of iPhone users on its network replace or upgrade their iPhone in a given quarter by buying another iPhone. The increased switching costs that consumers experience because of Apple's conduct underpins these exceedingly high retention rates.

184.    Apple's monopoly power in the relevant markets is protected by other barriers to entry, expansion, or repositioning as well. For example, introducing a new smartphone requires considerable investments in acquiring expensive and scarce components such as mobile chips

and specialized glass for screens. Other significant barriers to entry include product design, software development, regulatory approval, manufacturing, marketing, and customer service. Because most smartphones are bought through mobile carriers including Verizon, which has its operations headquarters in this district, new entrants or those seeking to expand or reposition must meet the carriers' technical requirements to access the major carrier networks in the United States. New entrants and smaller rivals must also negotiate distribution agreements and persuade carriers and other retailers to promote their products to consumers. As explained above, rival smartphones must also overcome the substantial network effects generated by interactions between users, developers, and others who interact with the iPhone.

185. Apple's iPhone platform is protected by several additional barriers to entry and expansion, including strong network and scale effects and high switching costs and frictions. For example, if an iPhone user wants to buy an Android smartphone, they are likely to face significant financial, technological, and behavioral obstacles to switching. The user may need to re-learn how to operate their smartphone using a new interface, transfer large amounts of data (e.g., contacts), purchase new apps, or transfer or buy new subscriptions and accessories. These switching costs and frictions are even higher when software applications, APIs, and other functionality do not help the different devices and operating systems communicate and interoperate. These switching costs and frictions increase the "stickiness" of the iPhone, making users more beholden to the smartphone manufacturer and platform operator.

186. Many prominent, well-financed companies have tried and failed to successfully enter the relevant markets because of these entry barriers. Past failures include Amazon (which released its Fire mobile phone in 2014 but could not profitably sustain its business and exited the following year); Microsoft (which discontinued its mobile business in 2017); HTC (which exited

the market by selling its smartphone business to Google in September 2017); and LG (which exited the smartphone market in 2021). Today, only Samsung and Google remain as meaningful competitors in the U.S. performance smartphone market. Barriers are so high that Google is a distant third to Apple and Samsung despite the fact that Google controls development of the Android operating system.

187. Apple's monopoly power is separately demonstrated by direct indicia. For example, Apple can and does profitably forego innovation without fear of losing customers to competitors. For example, Apple's vice president of iPhone marketing explained in February 2020: "In looking at it with hindsight, I think going forward we need to set a stake in the ground for what features we think are 'good enough' for the consumer. I would argue were [sic] already doing *more* than what would have been good enough." After identifying old features that "would have been good enough today if we hadn't introduced [updated features] already," she explained, "anything new and especially expensive needs to be rigorously challenged before it's allowed into the consumer phone."

188. Apple's profits and profit margins, for nearly every aspect of the iPhone, are further evidence of Apple's monopoly power. For example, Apple's per-unit smartphone profit margins are far more than its next most profitable rival. Apple charges carriers considerably more than its rivals to buy and resell its smartphones to the public and employs contract clauses that may impede the ability of carriers to promote rival smartphones, a harmful exercise of monopoly power that is hidden to most consumers. Apple extracts fees from developers—as much as 30 percent when users purchase apps or make in-app payments. Apple also extracts a 0.15 percent commission from banks on credit card transactions through its digital wallet, while none of its smartphone competitors with digital wallets charge any fee. Apple predicts that it will

70

collect nearly $1 billion in worldwide revenue on Apple Pay fees by 2025. A recent report by the

U.S. Consumer Financial Protection Bureau suggest these revenues will only increase, as

"analysts expect the value of digital wallet tap-to-pay transactions will grow by over 150 percent

by 2028."

189.    Apple increasingly charges developers additional fees to promote their apps in the

App Store as well. In fact, this is one of the fastest-growing parts of Apple's services business,

with revenue "increasing by more than a third to $4.4B in FY 2022."

190.    These indicia of Apple's monopoly power are direct evidence of its monopoly

power in the relevant markets.

## VIII.   Jurisdiction, Venue, and Commerce

191.    The United States brings this action pursuant to Section 4 of the Sherman Act, 15

U.S.C § 4, to prevent and restrain Apple's violations of Section 2 of the Sherman Act, 15 U.S.C.

§ 2.

192.    The Attorneys General assert these claims based on their independent authority to

bring this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and common law, to

obtain injunctive and other equitable relief based upon Apple's anticompetitive practices in

violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

193.    The Attorneys General are the chief legal officers of their respective states. They

have authority to bring actions to protect the economic wellbeing of their states and residents,

and to seek injunctive relief to remedy and protect against harm resulting from violations of the

antitrust laws.

194.    Apple's actions and course of conduct are ongoing and are likely to continue or

recur, including through other practices with the same purpose or effect.

71

195.    Apple's actions complained of herein have harmed, and continue to harm, competition, consumers, and the general welfare and economies of the Plaintiff States. This Court has subject matter jurisdiction over this action under Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

196.    The Court has personal jurisdiction over Apple, and venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391, because Apple transacts business and is found within this District.

197.    Apple is a corporation headquartered in Cupertino, California. Apple is one of the largest publicly traded companies in the world, generating hundreds of billions of dollars from the sale of smartphones, computers, tablets, and related services and accessories.

198.    Apple engages in, and its activities substantially affect, interstate trade and commerce. Apple provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States, in the plaintiff States, across state lines, and internationally.

## IX.    Violations Alleged

### A.    First Claim for Relief: Monopolization of the Performance Smartphone Market in the United States in Violation of Sherman Act § 2

199.    Plaintiffs incorporate the allegations of paragraphs 1 through 198 above.

200.    Performance smartphones in the United States is a relevant antitrust market, and Apple has monopoly power in that market.

201.    Apple has willfully monopolized the performance smartphone market in the United States through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased, maintained, or protected its performance smartphone monopoly.

72

202.    Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

203.    While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process. Apple's anticompetitive acts have had harmful effects on competition and consumers.

204.    Apple's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Apple's anticompetitive and unlawful conduct.

**B.      Second Claim for Relief, in the Alternative: Attempted Monopolization of the Performance Smartphone Market in the United States in Violation of Sherman Act § 2**

205.    Plaintiffs incorporate the allegations of paragraphs 1 through 204 above.

206.    Performance smartphones in the United States is a relevant antitrust market, and Apple has attempted to monopolize that market.

207.    Apple has attempted to monopolize the performance smartphone market in the United States through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased Apple's market power in the performance smartphone market.

73

208.     Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

209.     While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

210.     In undertaking this course of conduct, Apple has acted with specific intent to monopolize, and to destroy effective competition in, the performance smartphone market in the United States. There is a dangerous probability that, unless restrained, Apple will succeed in monopolizing the performance smartphone market in the United States, in violation of Section 2 of the Sherman Act.

### C.     Third Claim for Relief: Monopolization of the Smartphone Market in the United States in Violation of Sherman Act § 2

211.     Plaintiffs incorporate the allegations of paragraphs 1 through 210 above.

212.     Smartphones in the United States is a relevant antitrust market, and Apple has monopoly power in that market.

213.     Apple has willfully monopolized the smartphone market in the United States through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased, maintained, or protected its smartphone monopoly.

214.    Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

215.    While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

216.    Apple's anticompetitive acts have had harmful effects on competition and consumers.

217.    Apple's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Apple's anticompetitive and unlawful conduct.

**D.    Fourth Claim for Relief, in the Alternative: Attempted Monopolization of the Smartphone Market in the United States in Violation of Sherman Act § 2**

218.    Plaintiffs incorporate the allegations of paragraphs 1 through 217 above.

219.    Smartphones in the United States is a relevant antitrust market, and Apple has attempted to monopolize that market.

220.    Apple has attempted to monopolize the smartphone market in the United States through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased Apple's market power in the smartphone market.

75

221.    Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

222.    While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

223.    In undertaking this course of conduct, Apple has acted with specific intent to monopolize, and to destroy effective competition in, the smartphone market in the United States. There is a dangerous probability that, unless restrained, Apple will succeed in monopolizing the smartphone market in the United States, in violation of Section 2 of the Sherman Act.

**E.      Fifth Claim for Relief: Violation of the New Jersey Antitrust Act (Monopoly Maintenance)**

224.    Plaintiff State of New Jersey repeats and realleges and incorporates by reference each and every preceding paragraph and allegation of this Complaint as if fully set forth herein.

225.    The New Jersey Antitrust Act, N.J.S.A. 56:9-4(a), states: "It shall be unlawful for any person to monopolize, or attempt to monopolize, or to combine or conspire with any person or persons, to monopolize trade or commerce in any relevant market within this State."

226.    In the operation of its business, Apple engaged in numerous commercial practices that violate the New Jersey Antitrust Act, N.J.S.A. 56:9-1 to -19, including

monopolizing or attempting to monopolize trade or commerce in the smartphone market and the performance smartphone market within the State of New Jersey, in violation of N.J.S.A. 56:9-4.

227. Each violation of the New Jersey Antitrust Act by Apple constitutes a separate unlawful practice and violation, under N.J.S.A. 56:9-16.

228. Plaintiff State of New Jersey seeks all remedies available under the New Jersey Antitrust Act, N.J.S.A. 56:9-1 to -19, including, without limitation, the following: (a) injunctive and other equitable relief, pursuant to N.J.S.A. 56:9-7 and N.J.S.A.56:9-10(a); and (b) other remedies as the Court may deem appropriate and the interests of justice may require.

**F.      Sixth Claim for Relief: Violations of Wisconsin State Law**

229. Plaintiff State of Wisconsin repeats and re-alleges and incorporates by reference every paragraph and allegation in this Complaint as if fully set forth herein.

230. The aforementioned practices by Apple violate Wisconsin's Antitrust Act, Wis. Stat. Ch. § 133.03 et seq. These violations substantially affect the people of Wisconsin and have impacts within the State of Wisconsin.

231. Plaintiff State of Wisconsin, through its Attorney General and under its antitrust enforcement authority in Wis. Stat. Ch. 133, is entitled to all remedies available under Wis. Stat. §§ 133.03, 133.16, 133.17, and 133.18.

**G.      Seventh Claim for Relief: Violations of Tennessee State Law**

232. Plaintiff State of Tennessee repeats and re-alleges and incorporates by reference every paragraph and allegation in this Complaint as if fully set forth herein.

233. The aforementioned practices by Apple violate the Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-102, as revised, which states: "It is unlawful for any corporation or person to monopolize, attempt to monopolize, conspire to monopolize, or maintain a monopoly over any part of trade or commerce affecting this state."

77

234. Apple has sold phones in the relevant product markets in Tennessee and to Tennesseans. Apple's anticompetitive conduct in these markets has substantially affected trade and commerce in Tennessee and harmed Tennessee consumers.

235. Plaintiff State of Tennessee, through its Attorney General, seeks all remedies available under the Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-106, as revised, including the following: (a) injunctive or other equitable relief; reasonable attorney fees, costs, and expenses, pursuant to Tenn. Code Ann. § 47-25-106(b); and (b) other legal and equitable remedies as the court may deem appropriate and the interest of justice may require.

## X. Request for Relief

236. To remedy these illegal acts, Plaintiffs request that the Court:

1. Adjudge and decree that Apple has acted unlawfully to monopolize, or, in the alternative, attempt to monopolize, the smartphone market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

2. Adjudge and decree that Apple has acted unlawfully to monopolize, or, in the alternative, attempt to monopolize, the performance smartphone market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, the New Jersey Antitrust Act, N.J.S.A. 56:9-1 to -19, Wisconsin's Antitrust Act, Wis. Stat. Ch. § 133.03 et seq.;

3. Enter relief as needed to cure any anticompetitive harm;

4. Enjoin Apple from continuing to engage in the anticompetitive practices described herein and from engaging in any other practices with same purpose or effect as the challenged practices, including but not limited to:

    a.  preventing Apple from using its control of app distribution to undermine cross-platform technologies such as super apps and cloud streaming apps, among others;

    b.  preventing Apple from using private APIs to undermine cross-platform technologies like messaging, smartwatches, and digital wallets, among others; and

    c.  preventing Apple from using the terms and conditions of its contracts with developers, accessory makers, consumers, or others to obtain, maintain, extend, or entrench a monopoly.

5.  Enter any other preliminary or permanent relief necessary and appropriate to restore competitive conditions in the markets affected by Apple's unlawful conduct;

6.  Enter any additional relief the Court finds just and proper; and

7.  Award each Plaintiff, as applicable, an amount equal to its costs, including reasonable attorneys' fees, incurred in bringing this action.

Dated: June 11, 2024

Respectfully,

**FOR PLAINTIFF UNITED STATES OF AMERICA:**

| | |
|---|---|
| JONATHAN S. KANTER<br>Assistant Attorney General for Antitrust | PHILIP R. SELLINGER<br>United States Attorney |
| DOHA G. MEKKI<br>Principal Deputy Assistant Attorney General<br>for Antitrust | s/ J. Andrew Ruymann<br>By: J. ANDREW RUYMANN*<br>Assistant United States Attorney<br>U.S. Attorney's Office |

HETAL J. DOSHI
Deputy Assistant Attorney General for
Antitrust

MICHAEL B. KADES
Deputy Assistant Attorney General for
Antitrust

RYAN DANKS
Director of Civil Enforcement

MIRIAM R. VISHIO
Deputy Director of Civil Enforcement

ERIC D. DUNN
Counsel to the Assistant Attorney General

DANIEL S. GUARNERA
Chief, Civil Conduct Task Force

JACKLIN CHOU LEM
Civil Chief, San Francisco Office

KATE M. RIGGS
Assistant Chief, Civil Conduct Task Force

402 East State Street, Room 430
Trenton, NJ 08608
Telephone: 609-989-0563
Email: John.Ruymann@usdoj.gov

s/ Jonathan Lasken
By: JONATHAN LASKEN*
Assistant Chief, Civil Conduct Task Force

LORRAINE VAN KIRK
    *Senior Litigation Counsel*

s/ Jennifer Hane
By: JENNIFER HANE
SEAN CARMAN
PAM COLE
JAMES ROBERT DUNCAN III
JEREMY C. KEENEY
ANDREW L. KLINE
PATRICK M. KUHLMANN
MATTHEW C. MANDELBERG
NOLAN J. MAYTHER
MICHAEL MIKAWA
SARAH OLDFIELD
MICHAEL A. RABKIN
AARON M. SHEANIN
MICAH D. STEIN
JESSICA JOHNSTON TATICCHI
    *Trial Attorneys*

United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 8600
Washington, DC 20530
Telephone: 202-598-6517
Email: Jonathan.Lasken@usdoj.gov

Attorneys for the United States

*Attorneys of Record

80

**FOR PLAINTIFF STATE OF NEW JERSEY:**

MATTHEW J. PLATKIN
Attorney General of New Jersey

By: *Isabella Pitt*

Isabella R. Pitt (NJ Bar No. 071002013)
Deputy Attorney General
Assistant Section Chief of Antitrust
New Jersey Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: 973-648-3070
Isabella.Pitt@law.njoag.gov

*Attorney for Plaintiff State of New Jersey*


**FOR PLAINTIFF STATE OF CALIFORNIA:**

ROB BONTA
Attorney General of California

*Brian Wang*

PAULA L. BLIZZARD, Senior Assistant Attorney General for Antitrust
MICHAEL JORGENSON, Supervising Deputy Attorney General
CARI JEFFRIES, Deputy Attorney General
ROBERT MCNARY, Deputy Attorney General
BRIAN WANG, Deputy Attorney General
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
Phone: 415-510-3487
Email: Brian.Wang@doj.ca.gov

Attorneys for Plaintiff State of California

**FOR PLAINTIFF STATE OF ARIZONA:**

KRISTIN K. MAYES
Attorney General of Arizona

VINNY VENKAT
Assistant Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: 602-542-7757
Email: vinny.venkat@azag.gov

Attorneys for Plaintiff State of Arizona


**FOR PLAINTIFF STATE THE DISTRICT OF COLUMBIA:**

BRIAN L. SCHWALB
ATTORNEY GENERAL

JENNIFER C. JONES
Deputy Attorney General
Public Advocacy Division

BETH MELLEN
WILLIAM F. STEPHENS
Assistant Deputy Attorneys General
Public Advocacy Division


ADAM GITLIN
Chief, Antitrust and Nonprofit Enforcement Section
Public Advocacy Division
ELIZABETH G. ARTHUR
Assistant Attorney General
Public Advocacy Division
400 6th Street NW, 10th Floor
Washington, D.C. 20001
Tel.: 202-442-9864
Email: elizabeth.arthur@dc.gov


Attorneys for Plaintiff State the District of Columbia

82

**FOR PLAINTIFF STATE OF CONNECTICUT**:

WILLIAM TONG
Attorney General of Connecticut

NICOLE DEMERS
Deputy Associate Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: 860-808-5030
Email: nicole.demers@ct.gov

RAHUL A. DARWAR
Assistant Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
Telephone: 860-808-5030
Email: rahul.darwar@ct.gov

Attorneys for Plaintiff State of Connecticut

**FOR PLAINTIFF STATE OF INDIANA**:

THEODORE E. ROKITA
Attorney General of Indiana

MATTHEW MICHALOSKI
Deputy Attorney General
SCOTT L. BARNHART
Chief Counsel and Director, Consumer Protection Division
JESSE MOORE
Deputy Attorney General
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
Matthew.Michaloski@atg.in.gov
Scott.Barnhart@atg.in.gov
Jesse.Moore@atg.in.gov

83

Attorneys for Plaintiff State of Indiana
*Pro hac vice* application forthcoming


**FOR PLAINTIFF STATE OF MAINE**:

AARON M. FREY
Attorney General of Maine

CHRISTINA M. MOYLAN
Assistant Attorney General
MICHAEL DEVINE
Assistant Attorney General
Consumer Protection Division
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006
Telephone: 207-626-8800
Email: christina.moylan@maine.gov
        michael.devine@maine.gov


Attorneys for Plaintiff State of Maine


**FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS**

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

WILLIAM T. MATLACK (MA Bar No. 552109)
Assistant Attorney General
Chief, Antitrust Division
Tel: (617) 963-2414
Email: William.Matlack@mass.gov
KATHERINE W. KREMS (MA Bar No. 710455)
Assistant Attorney General, Antitrust Division
Tel: (617) 963-2189
Email: Katherine.Krems@mass.gov
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108


Attorneys for Plaintiff Commonwealth of Massachusetts
*Pro hac vice* application forthcoming

**FOR PLAINTIFF PEOPLE OF THE STATE OF MICHIGAN**:

DANA NESSEL
Attorney General of Michigan


JASON R. EVANS
Division Chief
Corporate Oversight Division
EvansJ@michigan.gov


SCOTT A. MERTENS
Section Head
Corporate Oversight Division
MertensS@michigan.gov


JONATHAN S. COMISH
Assistant Attorney General
Corporate Oversight Division
ComishJ@michigan.gov


LEANN D. SCOTT
Assistant Attorney General
Corporate Oversight Division
ScottL21@michigan.gov


Michigan Department of Attorney General
525 W Ottawa St.
Lansing, MI 48933
Telephone: 517-335-7622


Attorneys for Plaintiff People of the State of Michigan

85

**FOR PLAINTIFF STATE OF MINNESOTA:**

KEITH ELLISON
Attorney General of Minnesota

JESSICA WHITNEY
Deputy Attorney General

JAMES W. CANADAY
Deputy Attorney General

_____
JUSTIN MOOR
Assistant Attorney General
Atty. Reg. No. 0397596

ELIZABETH R. ODETTE
Manager, Antitrust Division
Atty. Reg. No. 0340698

ERIN E. CONTI
Assistant Attorney General
Atty. Reg. No. 0395304

445 Minnesota Street, Suite 1400
Saint Paul, MN 55101-2130
Telephone: 651-724-9627
Telephone: 651-728-7208
Telephone: 651-757-1287
justin.moor@ag.state.mn.us
Elizabeth.odette@ag.state.mn.us
erin.conti@ag.state.mn.us


Attorneys for Plaintiff State of Minnesota

**FOR PLAINTIFF STATE OF NEVADA:**

AARON D. FORD
Attorney General of Nevada

Raquel Fulghum
Deputy Attorney General
Samantha Feeley
Deputy Attorney General
State of Nevada,
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
Telephone: 775-684-1100
Email: rfulghum@ag.nv.gov

Attorneys for Plaintiff State of Nevada
*Pro hac vice* application forthcoming


**FOR PLAINTIFF STATE OF NEW HAMPSHIRE**:

By its attorney,

JOHN M. FORMELLA
Attorney General

ALEXANDRA C. SOSNOWSKI
Assistant Attorney General
Consumer Protection and Antitrust Bureau
New Hampshire Department of Justice
Office of the Attorney General
One Granite Place South
Concord, NH 03301
Telephone: 603-271-2678
Email: Alexandra.C.Sosnowski@doj.nh.gov

Attorneys for Plaintiff State of New Hampshire

**FOR PLAINTIFF STATE OF NEW YORK**:

LETITIA JAMES
Attorney General of New York

Christopher D'Angelo
Chief Deputy Attorney General
Economic Justice Division

Elinor R. Hoffmann
Chief, Antitrust Bureau

Amy McFarlane
Deputy Chief, Antitrust Bureau

Bryan Bloom
Senior Enforcement Counsel
Antitrust Bureau

New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: 212-416-8598
Email: Bryan.Bloom@ag.ny.gov

Attorneys for Plaintiff State of New York

**FOR PLAINTIFF STATE OF NORTH DAKOTA**:

DREW H. WRIGLEY
Attorney General
State of North Dakota

Elin S. Alm
Assistant Attorney General
Christopher G. Lindblad
Assistant Attorney General

Consumer Protection and Antitrust Division
Office of Attorney General
1720 Burlington Drive, Suite C

Bismarck, ND 58504-7736
Telephone: 701-328-5570
ealm@nd.gov
clindblad@nd.gov

Attorneys for Plaintiff State of North Dakota

**FOR PLAINTIFF STATE OF OKLAHOMA**:

GENTNER DRUMMOND
Attorney General of Oklahoma

CALEB J. SMITH
Assistant Attorney General
Consumer Protection Unit
Office of the Oklahoma Attorney General
15 West 6th Street
Suite 1000
Tulsa, OK 74119
Telephone: 918-581-2230
Email: caleb.smith@oag.ok.gov

Attorneys for Plaintiff State of Oklahoma

**FOR PLAINTIFF STATE OF OREGON**:

ELLEN F. ROSENBLUM
Attorney General of Oregon

TIMOTHY D. SMITH
Senior Assistant Attorney General
Antitrust and False Claims Unit
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: 503-934-4400
Email: tim.smith@doj.state.or.us

Attorneys for Plaintiff State of Oregon

**FOR PLAINTIFF STATE OF TENNESSEE**

JONATHAN SKRMETTI
Attorney General and Reporter

J. DAVID MCDOWELL
Deputy, Consumer Protection Division
ETHAN BOWERS
Senior Assistant Attorney General
AUSTIN C. OSTIGUY
HAMILTON M. MILWEE
Assistant Attorneys General

Office of the Attorney General and Reporter
P.O Box 20207
Nashville, TN 37202
Telephone: 615-741-8722
Email: David.McDowell@ag.tn.gov
Ethan.Bowers@ag.tn.gov
Austin.Ostiguy@ag.tn.gov
Hamilton.Milwee@ag.tn.gov

Attorneys for Plaintiff State of Tennessee

**FOR PLAINTIFF STATE OF WASHINGTON**:

ROBERT W. FERGUSON
Attorney General of Washington

/s/
LUMINITA NODIT
Assistant Attorney General
Antitrust Division
Washington Attorney's General Office
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Telephone: 206-254-0568
Email: lumi.nodit@atg.wa.gov

Attorneys for Plaintiff State of Washington
*Pro hac vice* application forthcoming

90

**FOR PLAINTIFF STATE OF WISCONSIN:**

JOSHUA L. KAUL
Attorney General


GWENDOLYN J. LINDSAY COOLEY
*pro hac vice* application forthcoming
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608 261-5810
608 266-2250 Fax
antitrust@doj.state.wi.us
Attorneys for Plaintiff State of Wisconsin

**FOR PLAINTIFF STATE OF VERMONT:**

Charity R. Clark
Attorney General of Vermont


JILL S. ABRAMS
Assistant Attorney General
109 State Street
Montpelier, Vermont
Telephone: 802-828-1106
Email: jill.abrams@vermont.gov

Attorneys for Plaintiff State of Vermont

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| | : |
| IN RE: APPLE INC. SMARTPHONE ANTITRUST LITIGATION | : |
| | : Civil Action No. 2:24-md-03113 (JXN) |
| | : (LDW) |
| *This Document Relates to:* | : |
| | : |
| *ALL DIRECT PURCHASER ACTIONS* | : MDL No. 3113 |
| | : |

## DIRECT PURCHASER PLAINTIFFS' <u>CONSOLIDATED CLASS ACTION COMPLAINT</u>

**TABLE OF CONTENTS**

| SECTION | PAGE |
|---|---|

I.    INTRODUCTION ................................................................................................. 1

II.   PARTIES ............................................................................................................ 9

    A.    Plaintiffs............................................................................................................. 9

    B.    Defendant Apple ............................................................................................... 10

III.  JURISDICTION AND VENUE ........................................................................ 12

IV.   RELEVANT FACTS......................................................................................... 14

    A.    Apple launches the iPod, iTunes, and the iTunes Store. ................................... 14

    B.    Apple invites third-party investment on the iPhone and then imposes tight
        self-preferencing controls on app creation and app distribution......................... 16

V.    THE ECONOMICS OF THE SMARTPHONE PLATFORM .................................... 22

VI.   APPLE UNLAWFULLY MAINTAINS ITS MONOPOLY POWER .......................... 25

    A.    Apple harms competition by imposing contractual restrictions, fees, and taxes
        on app creation and distribution.......................................................................... 25

        1.    Super Apps: Apple prevents apps from threatening its smartphone
            monopoly by undermining programs that reduce user dependence
            on the iPhone........................................................................................... 28

        2.    Cloud Streaming Apps: Apple prevents developers from offering
            cloud gaming apps that reduce dependence on the iPhone's expensive
            hardware. ................................................................................................. 32

    B.    Apple uses APIs and other critical access points in the smartphone ecosystem
        to control the behavior and innovation of third parties in order to insulate
        itself from competition......................................................................................... 35

        1.    Messaging: Apple protects its smartphone monopoly by degrading and
            undermining cross-platform messaging apps and rival smartphones. .... 35

        2.    Smartwatches: Apple protects its smartphone monopoly by impeding
            the development of cross-platform smartwatches.................................... 40

        3.    Digital Wallets: Apple restricts cross-platform digital wallets on
            the iPhone, reinforcing barriers to consumers switching to rival
            smartphones............................................................................................. 44

    C.    Apple's "moat" around its smartphone monopoly is wide and deep: it uses a
        similar playbook to maintain its monopoly through many other products and
        services. ............................................................................................................... 49

VII.  ANTICOMPETITIVE EFFECTS........................................................................ 52

    A.    Apple's conduct harms the competitive process and injures iPhone
        purchasers........................................................................................................... 52

B.     Apple has every incentive to use its monopoly playbook in the future. ............. 57

VIII.   PRIVACY, SECURITY, AND OTHER ALLGED COUNTERVAILING FACTORS DO NOT JUSTIFY APPLE'S ANTICOMPETITIVE CONDUCT............ 58

IX.    THE SMARTPHONE INDUSTRY AND RELEVANT MARKETS .......................... 60

    A.     Background. .............................................................................................. 61

    B.     Smartphone Hardware........................................................................... 62

    C.     Smartphone Operating Systems, Applications, and Other Software.................. 63

    D.     Relevant Markets ................................................................................... 65

        1.     Performance smartphones are a relevant product market. ...................... 66

        2.     Smartphones are a broader relevant product market.............................. 67

        3.     The United States is a relevant geographic market for performance smartphones and smartphones. ............................................................... 68

    E.     Apple has monopoly power in the smartphone and performance smartphone markets. ................................................................................ 69

X.     CLASS ACTION ALLEGATIONS ................................................................... 75

XI.    STANDING AND ANTITRUST INJURY ...................................................... 77

XII.   CLAIMS ..................................................................................................... 78

    A.     First Claim for Relief: Monopolization of the Performance Smartphone Market in the United States in Violation of Sherman Act § 2. ........................... 78

    B.     Second Claim for Relief, in the Alternative to the First Claim for Relief: Attempted Monopolization of the Performance Smartphone Market in the United States in Violation of Sherman Act § 2.................................................. 79

    C.     Third Claim for Relief: Monopolization of the Smartphone Market in the United States in Violation of Sherman Act § 2................................................... 80

    D.     Fourth Claim for Relief, in the Alternative to the Third Claim for Relief: Attempted Monopolization of the Smartphone Market in the United States in Violation of Sherman Act § 2 ...................................................................... 82

    E.     Fifth Claim of Relief, Violation of the Unfair Competition Law Cal. Bus. & Prof. Code § 17200 et seq................................................................................. 83

XIII.  REQUEST FOR RELIEF ................................................................................ 85

ii

Plaintiffs Deanna Siano, Shoshi Goldfus, Deborah Collins, and James Collins ("Plaintiffs") bring this class action on behalf of themselves and all other similarly situated direct purchasers against Apple Inc. ("Apple"). Plaintiffs bring this case to address Apple's anticompetitive and exclusionary conduct and alleviate harm to competition and consumers. Plaintiffs allege as follows based on personal knowledge as to themselves and on information and belief as to all others.

## I.    INTRODUCTION

1.    After initially gaining a loyal following for the iPhone after it became the first phone of its type ever developed, Apple realized it could not sustain that loyalty once the competition caught up with its once revolutionary technology. Rather than competing on the merits, Apple used anticompetitive techniques to lock consumers and developers into its ecosystem, thwart nascent competitive threats, and build a "moat" around the iPhone that would ensure monopoly profits for years to come. The United States Department of Justice ("DOJ") and 20 States and territories have rightly brought suit to vindicate their sovereign law-enforcement interests and stop Apple's wrongful conduct in an amended complaint that this Court recently upheld against a motion to dismiss. Plaintiffs in this suit seek to vindicate the interests of the millions of consumers who have overpaid for iPhones they purchased from Apple, missed out on the innovation and improved user experiences that competition would have made possible, and face ongoing harm unless this Court enjoins Apple's monopolistic conduct in the performance smartphone and smartphone markets.

2.    After struggling for direction in the 1990s, Apple revived its fortunes by launching the iPod digital music player in 2001. Apple developed an application, iTunes, which allowed iPod users to purchase digital copies of songs, organize their song library, and update their iPod devices. This meant that listeners no longer needed to carry hard media to listen to music on the go, and sleek iPods quickly displaced bulkier devices like portable cassette tape or compact disk players. Apple secured licensing agreements with the major labels, allowing it to offer iPod/iTunes users a wide selection of

1

music on a fee-per-download basis. Aided by an earlier antitrust consent decree that prohibited Microsoft Corporation from interfering with distribution of iTunes on the Windows operating system as well as Apple's own Macintosh computers, the iPod experience gave Apple a recipe for the future: a high-end device, a large number of platform participants (*i.e.*, music labels and consumers), and a digital storefront.

3.      Apple saw the success of the iPod and used it to launch a business strategy that would propel it to dominance over the next two decades: drive as many consumers and third-party participants to the platform as possible and offer a wide selection of content, products, and services created by those third parties to consumers. This structure put Apple in the driver's seat to generate substantial revenues through device sales in the first instance and, in the second instance, subsequent ancillary fees that it derives from sitting between consumers on the one hand and the products and services they love on the other. This strategy also laid the foundation for Apple to launch its most successful product yet.

4.      In 2007, Apple launched the iPhone, a smartphone that offered high-end hardware and software apps built atop a mobile operating system that mimicked the functionality and ease of use of a computer. Apple initially offered only a small number of apps that it created for the iPhone. But Apple quickly realized the enormous value that a broader community of entrepreneurial, innovative developers could drive for its users and the iPhone platform more broadly. So Apple invited and capitalized on the work of these third parties' efforts while maintaining control and monetizing that work for itself. The value of third parties' work furthered an important purpose for Apple. As early as 2010, then-CEO Steve Jobs ("Jobs") discussed how to "further lock customers into our ecosystem" and "make Apple['s] ecosystem even more sticky." Three years later, Apple executives were still strategizing how to "get people hooked to the ecosystem."

5.      That strategy paid off. Apple built and sustained the most dominant smartphone platform and ecosystem in the United States by attracting third-party developers of all kinds to create

2

apps that users could download on their smartphones through a digital storefront called the App Store. As developers created more and better products, content, apps, and services, more people bought iPhones, which incentivized even more third parties to develop apps for the iPhone. Today, the iPhone's ecosystem includes products, apps, content, accessories, and services that are offered by content creators, newspaper publishers, banks, advertisers, social media companies, airlines, productivity developers, retailers and other merchants, and others. As Apple's power grew, its leverage over third parties reinforced its tight control over how third parties innovate and monetize on and off the smartphone in ways that were anticompetitive and exclusionary.[1]

**Apple's Ecosystem: Hardware, Software Infrastructure, Apple & Third-Party Apps**



6.      Today, Apple charges as much as $1,599 for an iPhone and earns high margins on each one, more than double those of others in the industry. When developers create a new product or service for iPhone consumers, Apple demands up to 30 percent of the price of that app, whose content, product, or service it did not create. Then when a consumer wants to buy some additional service within that

---

[1] Graphic taken from *Investigation of Competition in Digital Markets*, H.R. Rep. 117-8, at 330 (2020).

app, Apple extracts up to another 30 percent, again for something it does not create or develop. And when customers buy a coffee or pay for groceries using their iPhone, Apple charges a fee for every "tap-to-pay" transaction, imposing its own form of an interchange fee on banks and a significant new cost for using credit cards. When users run an internet search, Google gives Apple a significant cut of the advertising revenue that an iPhone user's searches generate.

7. Apple's smartphone business model, at its core, is one that invites as many participants, including iPhone users and third-party developers, to join its platform as possible while using contractual terms to force these participants to pay substantial fees. But Apple understands that while a community of developers and accessory makers is indispensable to the success of the iPhone, they also pose an existential threat to its extraordinary profits by empowering consumers to "think different" and choose perfectly functional, less-expensive alternative smartphones.

8. In order to protect its model, Apple reduces competition in the markets for performance smartphones and smartphones generally. It does this by delaying, degrading, or outright blocking technologies that would increase competition in the smartphone markets by decreasing barriers to switching to another smartphone, among other things. The suppressed technologies would provide a high-quality user experience on any smartphone, which would, in turn, require smartphones to compete on their merits.

9. Apple suppresses such innovation through a web of contractual restrictions that it selectively enforces through its control of app distribution and its "app review" process, as well as by denying access to key points of connection between apps and the iPhone's operating system (called Application Programming Interfaces or "APIs"). Apple can enforce these restrictions due to its dominant place in the market and its position as an intermediary between product creators such as developers on the one hand and users on the other.

10.     This complaint focuses on five examples of Apple using these mechanisms to suppress technologies that would have increased competition among smartphones. Suppressing these technologies does not reflect competition on the merits. Rather, to protect its smartphone monopoly—and the extraordinary profits that monopoly generates—Apple repeatedly chooses to make its products worse for consumers to prevent competition from emerging. These examples below individually and collectively have contributed to Apple's ability to secure, grow, and maintain its smartphone monopoly by increasing switching costs for users, which leads to higher prices and less innovation for users and developers. Apple has used its anticompetitive strategies to suppress the following technologies, among others:

- Super apps provide a user with broad functionality in a single app. Super apps can function by providing a consistent user experience that can be ported across devices. Suppressing super apps harms all smartphone users, including Apple users, by denying them access to high quality experiences and it harms developers by preventing them from innovating and selling products.

- Cloud streaming game apps provide users with a way to play computing intensive games in the cloud. Cloud streaming games (and cloud streaming in general) can improve smartphone competition by decreasing the importance of expensive hardware for accomplishing high computing tasks on a smartphone and saving money for ever greater amounts of internal storage. Suppressing cloud streaming games harms users by denying them the ability to play high-compute games, and it harms developers by preventing them from selling such games to users.

- Messaging apps are apps that allow users to communicate with friends, family, and other contacts. Messaging apps that work equally well across all smartphones can improve competition among smartphones by allowing users to switch phones without changing the

5

way they communicate with friends, family, and others. Apple makes third-party messaging apps on the iPhone worse generally and relative to Apple Messages, Apple's own messaging app, by prohibiting third-party apps from sending or receiving carrier-based messages. By doing so, Apple is knowingly and deliberately degrading quality, privacy, and security for its users and others who do not have iPhones. Apple also harms developers by artificially constraining the size of their user base.

- Smartwatches are an expensive accessory that typically must be paired to a smartphone. Smartwatches that can be paired with different smartphones allow users to retain their investment in a smartwatch when switching phones thereby decreasing the literal cost associated with switching from one smartphone to another, among other things. By suppressing key functions of third-party smartwatches—including ability to respond to notifications and messages and to maintain consistent connections with the iPhone—Apple has denied users access to high performing smartwatches with preferred styling, better user interfaces and services, or better batteries, and it has harmed smartwatch developers by decreasing their ability to innovate and sell products.

- Digital wallets are an increasingly important way that smartphones are used and are a product in which users develop a great deal of comfort and trust as they typically contain users' most sensitive information. Digital wallets that work across smartphone platforms allow users to move from one smartphone brand to another with decreased frictions, among other things. Apple has denied users access to digital wallets that would have provided a wide variety of enhanced features and denied digital wallet developers—often banks—the opportunity to provide advanced digital payments services to their own customers.

11.    By maintaining its monopoly over smartphones, Apple is able to harm consumers in a wide variety of additional ways. For example, by denying iPhone users the ability to choose their

6

trusted banking apps as their digital wallet, Apple retains full control both over the consumer and also over the stream of income generated by forcing users to use only Apple- authorized products in the digital wallet. Apple also prohibits the creation and use of alternative app stores curated to reflect a consumer's preferences with respect to security, privacy, or other values. These and many other features would be beneficial to consumers and empower them to make choices about what smartphone to buy and what apps and products to patronize. But allowing consumers to make that choice is an obstacle to Apple's ability to maintain its monopoly.

12. Apple wraps itself in a cloak of privacy, security, and alleged consumer preferences to justify its anticompetitive conduct. Indeed, it spends billions on marketing and branding in order to promote the self-serving premise that only Apple can safeguard consumers' privacy and security interests. Apple selectively compromises privacy and security interests when doing so is in Apple's own financial interest—such as degrading the security of text messages, offering governments and certain companies the chance to access more private and secure versions of app stores, or accepting billions of dollars each year for choosing Google as its default search engine when more private options are available. In the end, Apple deploys privacy and security justifications as an elastic shield that can stretch or contract to serve Apple's financial and business interests.

13. Of course, this is not the story Apple presents to the world. For decades, Apple branded itself as a nimble, innovative upstart. In 1998, Apple co-founder Jobs criticized Microsoft's monopoly and "dirty tactics" in operating systems to target Apple, which prompted the company "to go to the DOJ" in hopes of getting Microsoft "to play fair." But even at that time, Apple did not face the same types of restrictions that it imposes on third parties today; Apple consumers could use their iPod with a Windows computer, and Microsoft did not charge Apple a 30 percent fee for each song downloaded from Apple's iTunes store. Indeed, users could download iTunes and use it on their computers (including computers running Microsoft Windows) without owning an iPod at all. Similarly, when

Apple brought the iPhone to market in 2007, it benefited from competition among component makers and wireless carriers.

14.     The most immediate and obvious costs of Apple's anticompetitive conduct directly affect Apple's own customers: Apple inflates the price for buying and using iPhones while preventing the development of features like alternative app stores, innovative super apps, cloud-streaming games, and secure texting that would drive consumer value, innovation, and improved user experience. Plaintiffs and other direct purchasers of iPhones from Apple have overpaid because of the anticompetitive harms of Apple's behavior, will continue to experience those harms unless this Court stops Apple's monopolistic conduct through an injunction, and deserve to recover their full treble damages allowed under the law.

15.     Because Apple's conduct harms the competitive process, the harms from that conduct flow even more widely, affecting all smartphone consumers. Apple's smartphone monopoly means that it is not economically viable to invest in building some apps, like digital wallets, because they cannot reach iPhone users. This means that innovations fueled by an interest in building the best, most user-focused product that would exist in a more competitive market never get off the ground. Indeed, Apple itself has less incentive to innovate due to the reduced competitive pressures it faces. Moreover, Apple has demonstrated its ability to use its smartphone monopoly to impose fee structures and manipulate app review to inhibit aggrieved parties from taking advantage of regulatory and judicial solutions imposed on Apple that attempt to narrowly remedy harm from its conduct. So punishing and restraining the conduct in this case will not only benefit the members of the proposed Class, but also further the interests of all smartphone purchasers as well as developers and others harmed by Apple's behavior.

16.     Apple's executives openly acknowledge the way that Apple's conduct dulls its incentive to innovate: "In looking at it with hindsight, I think going forward we need to set a stake in

8

the ground for what features we think are 'good enough' for the consumer. I would argue we're already doing \*more\* than what would have been good enough. But we find it very hard to regress our product features YOY [year over year]." Existing features "would have been good enough today if we hadn't introduced [them] already," and "anything new and especially expensive needs to be rigorously challenged before it's allowed into the consumer phone." Thus, it is not surprising that Apple spent more than twice as much on stock buybacks and dividends as it did on research and development.

17.     Smartphones have so revolutionized American life that it can be hard to imagine a world beyond the one that Apple, a self-interested monopolist, deems "good enough." But under our system of antitrust laws, "good enough" is, quite simply, not enough. Consumers, competition, and the competitive process—not Apple alone—should decide what options consumers should have. And competition, not Apple's self-interested business strategies, should be the catalyst for innovation essential to our daily lives. Competition is what will ensure that Apple's conduct and business decisions do not thwart the next Apple to arrive on the scene. Plaintiffs therefore bring this case to rid smartphone markets of Apple's exclusionary conduct, secure just compensation for the consumers most directly impacted by that conduct, and ensure that the next generation of innovators can upend the technological world as we know it with new and transformative technologies.

II.     **PARTIES**

    A.     **Plaintiffs**

18.     Plaintiff Shoshi Goldfus is a resident of Philadelphia, Pennsylvania. Plaintiff Goldfus purchased an iPhone 14 directly from Apple on October 7, 2022 at Apple's Cherry Hill retail store, located at 2000 Route 38 in Cherry Hill, New Jersey.

19.     Plaintiff Deanna Siano is a resident of Clifton, New Jersey who purchased an iPhone directly from Apple in August 2023.

9

20.     Plaintiff James Collins is a resident of Fresno, California. Mr. Collins purchased an iPhone 13 Pro directly from Apple on September 24, 2021 at Apple's California Fashion Fair retail store, located at 645 E. Shaw Avenue E-07 in Fresno, California.

21.     Plaintiff Deborah (Daisy) Collins lives in Fontana-on-Geneva Lake, Wisconsin and is a prior resident of DuPage County, Illinois. Ms. Collins purchased an iPhone 15 Pro directly from Apple on October 15, 2023 at Apple's Oakbrook retail store located at 70 Oakbrook Center in Oak Brook, Illinois.

### B.     Defendant Apple

22.     Apple is a global technology company with headquarters in Cupertino, California. Apple is one of the world's most valuable public companies with a market capitalization over $2.5 trillion. In its 2023 fiscal year, Apple generated annual net revenues of $383 billion and net income of $97 billion. Apple's net income exceeds any other company in the Fortune 500 and the gross domestic products of more than 100 countries.

23.     Apple's iPhone forms the core of its business and has done so for over a decade. Sales of iPhone devices have accounted for a majority of Apple's revenue in every year since 2012, and the devices regularly carry profit margins in excess of 30%. These margins far exceed those of competing devices, and they have been essential to Apple's financial performance in recent years. For example, in the years 2017-2019, iPhone sales dominated Apple's revenue:

10

## Annual Revenue by Segment



24.     Each iPhone sale guarantees revenue streams well beyond the initial purchase price. For example, Apple offers iPhone upgrades, apps and in-app payments, paid digital subscription services (*e.g.*, Apple's music streaming, TV, news, gaming, fitness, and cloud storage subscriptions), accessories (*e.g.*, tracking devices, headphones, chargers, iPhone cases), and more. Apple refers to these offerings as "Services" and "Wearables, Home, and Accessories," respectively. In fiscal year 2023, these offerings accounted for nearly one-third of Apple's total revenue, or four times what Apple earned from selling Mac computers. Some of the largest drivers of revenue within these categories are Apple's smartwatch, the Apple Watch, and Apple's App Store, where iPhone users purchase and download apps. In recent years, Services have accounted for an increasing share of Apple's revenues, while the iPhone has remained the primary gateway through which U.S. consumers access these services. Apple's United States market share by revenue is over 70 percent in the performance smartphone market—a more expensive segment of the broader smartphone market where Apple's own executives recognize the company competes—and over 65 percent for all smartphones. These market shares have remained remarkably durable over the last decade.

25. Industry observers have credited Apple's present and future valuation to its successful focus on growing the Services business. Apple itself has attributed the growth of Services as a driver of its profits from sales and a significant factor supporting Apple's overall margins as hardware sales slowed or declined. Apple has consistently credited the App Store, licensing sales, and AppleCare, among others, for the success of Services. Apple's monopolization of the performance smartphone and smartphone markets thus helps it cultivate the "walled garden" that sustains its broad extraction of monopoly rents.

26. Apple's smartphone market shares understate its dominance and likely growth in key demographics, including among younger American consumers. For example, one-third of all iPhone users in the United States were born after 1996, as compared to just 10 percent for Samsung, Apple's closest smartphone competitor. Surveys show that as many as 88 percent of U.S. teenagers expect to purchase an iPhone for their next smartphone. iPhone users also tend to come from higher income households. Because smartphone users generally use a single smartphone to access related products and services, locking up key user groups allows Apple to capture greater spending on iPhone-related products and services, realize higher margins per user as compared to its smartphone rivals, and exercise greater control over developers and other smartphone ecosystem participants.

27. In its fiscal year 2023, Apple spent $30 billion on research and development. By comparison, Apple spent $77 billion on stock buybacks during the same year.

## III. JURISDICTION AND VENUE

28. Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C §§ 15 & 26, for violations of Section 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiffs also bring claims under the laws of California.

29. This Court has jurisdiction over Plaintiffs' federal antitrust claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337(a).

30.     This Court has jurisdiction over Plaintiffs' claims pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(a)(2) and 28 U.S.C. § 1332(d)(2)(b), because the proposed classes consist of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and at least one Class member is of diverse citizenship from Apple.

31.     This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

32.     The Court has personal jurisdiction over Apple, and venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391, because Apple transacts business and is found within this District, purposefully directed its business activity toward this District, has substantial contacts with this District, and caused harm within this District.

33.     Apple is a corporation headquartered in Cupertino, California. Apple is one of the largest publicly traded companies in the world, generating hundreds of billions of dollars from the sale of smartphones, computers, tablets, and related services and accessories.

34.     Apple engages in, and its activities substantially affect, interstate trade and commerce. Apple provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States, including the states in which Plaintiffs and the Class reside, across state lines, and internationally. Apple's conduct also has significant intrastate effects as it has sold large numbers of iPhones in each state.

35.     Apple's actions complained of herein have harmed, and continue to harm, Plaintiffs and the proposed classes.

## IV.   RELEVANT FACTS

### A.   Apple launches the iPod, iTunes, and the iTunes Store.

36.   In January 2001, Apple introduced iTunes, software built on Apple's QuickTime architecture, and advertised it as "Jukebox Software" for organizing and listening to music. The initial version of iTunes was only compatible with Apple's Mac computers.

37.   Later that same year, Apple debuted the iPod, a portable digital audio player that worked alongside iTunes to "let[] you put your entire music collection in your pocket and listen to it wherever you go." Like iTunes, the initial iPod was only compatible with Mac computers.

38.   On November 1, 2002, the United States District Court for the District of Columbia accepted a proposed consent decree in *United States v. Microsoft Corp.*, Civil Action No. 98-1232 & 98-1233 (TPJ) (D.D.C.). Among other things, the consent decree prohibited Microsoft from retaliating against companies for developing or distributing products such as browsers and media players. The consent decree also required Microsoft to make various APIs available to third- party developers, including Apple.

39.   Following that consent decree in October 2003, Apple launched a cross-platform version of iTunes that was compatible with the Windows operating system. As a result, a much larger group of users could finally use the iPod and iTunes, including the iTunes Store. The iTunes Store allowed users to buy and download music and play it on their iTunes computer application or on the iPod. Apple benefited substantially from this new customer base. In the first two years after launching the iPod, Apple sold a few hundred thousand devices. The year after launching a Windows-compatible version of iTunes and gaining access to millions more customers, Apple sold millions of devices. Apple went on to sell hundreds of millions of iPod devices over the next two decades. Moreover, iTunes became the market leader in online music services. At an event in 2007, Apple's then-CEO, Steve Jobs, said of the iPod, "it didn't just change the way we all listened to music, it changed the entire music

14

industry." At the same event, he announced that the company would change its name from Apple Computer, Inc. to Apple, Inc. in light of its shifting focus to consumer electronics rather than computers.

40.     The ubiquity of iPod and iTunes on Windows, which occurred in part because of a successful antitrust enforcement action against Microsoft, contributed to the development and success of Apple's next flagship product—the iPhone. But after launching the iPhone, Apple began stifling the development of cross-platform technologies on the iPhone.

41.     In January 2007, Apple debuted the first-generation iPhone, describing the device as "an iPod, a phone, and an internet communicator," and touting the fact that users could "sync[] content from a user's iTunes library on their PC or Mac." Apple marketed the iPhone as a smartphone that was easy to use. Reflecting on the company's learning from the iPod, Jobs announced, "iTunes is going to sync all your media to your iPhone—but also a ton of data. Contacts, calendars, photos, notes, bookmarks, email accounts."

42.     The pricing for the original iPhone started at $499, or approximately $733 when adjusted for inflation. After the novelty of the device subsided, for the following two models—the iPhone 3G (released in 2008) and the iPhone 3GS (released in 2009)—Apple charged $199 for a base model (or approximately $291 and $293, respectively, adjusting for inflation).

43.     The iPhone wasn't the first "smartphone"—that distinction is typically granted to Research in Motion ("RIM"), which launched the Blackberry in 2002. The year the iPhone launched RIM sold 9 million blackberries. But the iPhone improved substantially on the Blackberry, which was marketed predominantly to business people rather than consumers. The iPhone had its now ubiquitous touchscreen, a camera, and a consumer-friendly interface that allowed it to make inroads with the consumer market that Blackberry had not tried to, or couldn't, reach.

15

44.     At launch, nearly all native apps (*i.e.* those developed for a specific product) for the iPhone were created by Apple. There were only about a dozen apps overall, including Calendar, Camera, Clock, Contacts, iPod, Messages, Notes, Phone, Photos, Safari, Stocks, Voice Memos, and Weather. Within a year of launching the iPhone, Apple invited third-party developers to create native apps for the iPhone. Apple released its first software development kit—essentially the digital tools for building native apps on Apple's operating system (iOS)—to encourage and enable third-party developers to create native apps for the iPhone. Apple also offered developers ways to earn money by selling apps and later in-app purchases and subscriptions. By 2009, Apple was running marketing campaigns highlighting the value that third-party apps provide to iPhone users with the trademarked slogan: "There's an app for that."

45.     Apple's decision to invite third-party participation on its iPhone platform benefited Apple, too. The proliferation of third-party apps generated billions of dollars in profits for Apple and an iPhone user base of more than 250 million devices in the United States. Apple's market shares—over 70 percent of the performance smartphone market and over 65 percent of the broader smartphone market—likely understate its monopoly power today.

46.     While Apple profits from third-party developers that increase the iPhone's value to users, Apple executives understand that third-party products and services can, in their own words, be "fundamentally disruptive" to its smartphone monopoly, decreasing users' dependence on Apple and the iPhone, and increasing competitive pressure on Apple. Apple therefore willingly sacrifices the short-term benefits it would gain from improved products and services developed by third parties when necessary to maintain its monopoly.

**B.      Apple invites third-party investment on the iPhone and then imposes tight self-preferencing controls on app creation and app distribution.**

16

47.     Apple controls how developers distribute and create apps for iPhone users. For example, in the United States, developers can only distribute native iPhone apps through Apple's App Store, which is the only way for users to download native iOS apps. Limiting distribution to the Apple App Store enables Apple to exert monopoly power over developers by imposing contractual restrictions and rules that limit the behavior of non-Apple apps and services. Specifically, Apple sets the conditions for apps it allows on the Apple App Store through its App Store Review Guidelines. Under these guidelines, Apple has sole discretion to review and approve all apps and app updates. Apple selectively exercises that discretion to its own benefit, deviating from or changing its guidelines when it suits Apple's interests and allowing Apple executives to control app reviews and decide whether to approve individual apps or updates. Apple often enforces its App Store rules arbitrarily. And it frequently uses App Store rules and restrictions to penalize and restrict developers that take advantage of technologies that threaten to disrupt, disintermediate, compete with, or erode Apple's monopoly power.

48.     Apple also controls app creation by deciding which APIs are available to developers when they make third-party apps. For example, developers cannot provide native apps on the iPhone unless they enter into Apple's non-negotiable Developer Program License Agreement ("DPLA"). That agreement requires developers to use public APIs only "in the manner prescribed by Apple." It also prohibits third-party apps from using APIs that Apple designates as "private." Apple selectively designates APIs as public or private to benefit Apple, limiting the functionality developers can offer to iPhone users even when the same functionality is available in Apple's own apps, or even select third-party apps. Similar to Apple's App Store restrictions, Apple uses its DPLA to impose restrictions that penalize and restrict developers that take advantage of technologies that threaten to disrupt, disintermediate, compete with, or erode Apple's monopoly power. Apple can abuse its control over

17

App Store rules and the DPLA because it knows developers have no viable alternative to offering apps to Apple's huge and valuable base of United States iPhone users.

49. Developers cannot avoid Apple's control of app distribution and app creation by making web apps—apps created using standard programming languages for web-based content and available over the internet—as an alternative to native apps. Many iPhone users do not look for or know how to find web apps, causing web apps to constitute only a small fraction of app usage. Apple recognizes that web apps are not a good alternative to native apps for developers. As one Apple executive acknowledged, "[d]evelopers can't make much money on the web." Regardless, Apple can still control the functionality of web apps because Apple requires all web browsers on the iPhone to use WebKit, Apple's browser engine—the key software components that third-party browsers use to display web content.

50. Nor can developers rely on alternative app stores even though this would benefit developers and users. For example, developers cannot offer iPhone users an app store that only offers apps curated for use by children, which would provide opportunities to improve privacy, security, and child safety. By contrast, Apple allows certain enterprise and public sector customers to offer versions of app stores with more curated apps to better protect privacy and security.

51. In 2024, the European Union ("EU") forced Apple to allow third-party app stores on iPhones within the EU. But when Epic sought to develop and launch its own app store (the Epic Games Store) for iOS in the EU, Apple terminated Epic Games' developer account under its DPLA. Only after public backlash over Apple's abuse of its position did Apple reinstate Epic's developer account.

52. Most recently, in *Epic Games, Inc. v. Apple Inc.* (N.D. Cal. No. 20-cv-05640), the Court found that Apple violated the injunction it had issued previously by imposing on Epic Games a 27% "commission" on off-app purchases made through the Apple App Store (which could result in higher prices to consumers). As the Court explained, Apple attempted to justify this commission as

compensation for the values of services provided by the Apple ecosystem and platform technology. The Court rejected Apple's arguments in an opinion issued on April 30, 2025: "In stark contrast to Apple's initial in-court testimony, contemporaneous business documents reveal that Apple knew exactly what it was doing and at every turn chose the most anticompetitive option. To hide the truth, Vice-President of Finance, Alex Roman ['Roman'], outright lied under oath. Internally, Phillip Schiller ['Schiller', Apple's Senior Vice-President of Worldwide Marketing (and now an Apple Fellow)] had advocated that Apple comply with the Injunction, but Tim Cook ['Cook', Apple's CEO] ignored Schiller and instead allowed Chief Financial Officer Luca Maestri and his finance team to convince him otherwise." Not only did the Court order Apple to immediately stop enforcing commissions on the sales in question, but it referred Roman to the DOJ for possible perjury charges. These rulings are now on appeal.

53.     Apple's complete control over both app distribution and app creation gives Apple tremendous power. For example, Apple designates as "private" the APIs needed to send Short Message Service, or SMS, text messages, which is a protocol used by mobile carriers since the early 1990s to allow users to send basic text messages to other mobile phone numbers using their own mobile phone numbers. Developers have no technical means to access these private APIs, but even if they did, doing so would breach their developer agreement with Apple, and therefore put the developer at risk of losing the ability to distribute apps through the App Store. For example, Apple prohibits third-party iPhone apps from sending or receiving SMS text messages even though this functionality is available through Apple Messages. Likewise, Apple can control the functionality of third-party apps and accessories through its control of app distribution because if an app includes functionality that Apple does not like, Apple can and does exercise its discretion to simply block the app from the App Store.

19

54.     Apple restricts competitor apps in ways it does not restrict itself. For example, Apple has prohibited third-party music from being used with Siri, prevented third-party messaging apps from becoming Siri defaults, and copied third-party apps (often referred to as "Sherlocking").

55.     Apple's dominance is such that neither app developers nor iPhone users can benefit from lower cost or higher quality means of distributing apps or purchasing and providing digital products and services. Instead, Apple guarantees that it continues to benefit from the contributions of third-party developers and other platform participants while also protecting itself from the competitive threats and pressure those participants pose to Apple's smartphone monopoly.

56.     These policies hurt consumers. As one developer has explained, "[T]he more money Apple takes from developers, the fewer resources developers have. When developers have to cut costs, they stop updating apps, skimp on customer support, put off hiring a graphic designer, etc. They decide not to make apps at all that they might have made were it easier to be profitable."

57.     Apple's own documents corroborate this conclusion. Apple's senior executives have acknowledged that the requirement to use Apple's in-app payment ("IAP") system stifles competition and limits the apps available to Apple's customers. In one email conversation with other senior leaders at Apple about whether to require use of Apple's in-app IAP for e-Book purchases, Jobs said that "I think this is all pretty simple—iBooks is going to be the only bookstore on iOS devices. We need to hold our heads high. One can read books bought elsewhere, just not buy/rent/subscribe from iOS without paying us, which we acknowledge is prohibitive for many things."

58.     Indeed, Apple has run the App Store like an erratic despot. The introductory section of its App Store Guidelines states that Apple can create new rules at any time and explains "[w]e will reject apps for any content or behavior that we believe is over the line. What line, you ask? Well as a Supreme Court Justice once said, 'I'll know it when I see it.' And we think that you will also know it when you cross it." One developer has gone on record that "[i]t's complete tyranny, and the rules are

20

often interpreted differently by different reviewers because they're intentionally left vague. So we live in constant fear we may have violated these vague rules, and that the next update to our applications will be blocked by Apple. There are countless examples where developers large and small have been denied access to publish their applications without explanation for days or even weeks at a time. It's insufferable." Another developer described Apple's Guidelines as being "arbitrarily interpreted," and a third called it "opaque and arbitrary."

59.     Some of Apple's own ex-employees agree with this assessment. Phillip Shoemaker ("Shoemaker"), former director of app review for the App Store, concurred that the App Store rules were often "arbitrary" and "arguable," and that "Apple has struggled with using the App Store as a weapon against competitors." He noted that "Apple has complete and unprecedented power over their customers' devices. The decisions they make with regards to third-party apps needs to be above reproach, and currently are not."

60.     This is the antithesis of innovation. Apple pilfers ideas developed by others, claims them as its own and then boots the inventors from its App Store in order to avoid competition. Consumers suffer as a result. Through its control over the iPhone and the iOS ecosystem it runs on, Apple has come to dominate the performance smartphone and smartphone markets. It uses its dominance to impose contracts and rules that restrict the behavior and design decisions of companies *other* than Apple and thereby injures its own customers.

61.     This dominance has allowed Apple to extract enormous profits. As one press report related:

> Apple said Monday [January 10, 2022] that it paid developers $60 billion in 2021, or $260 billion total since the App Store launched in 2008. It's a figure that suggests App Store sales continue to grow at a rapid clip. By comparison, Apple said in 2019 it had paid developers a total of $155 billion since 2008. And at the end of 2020, it said it had paid $200 billion, an increase of $45 billion. Monday's figures show a jump of $60 billion.

\*\*\*

If Apple's commissions were uniformly at 30%, it grossed $85.71 billion in App Store sales in 2021 at the highest, based on CNBC analysis. If Apple's commissions were all 15%, it would come in lower, at $70.58 billion. Last year, CNBC analysis suggested that Apple's App Store grossed more than $64 billion in 2020, based on a 30% commission rate. . . .

## V. THE ECONOMICS OF THE SMARTPHONE PLATFORM

62. Smartphones combine the functionality of a traditional mobile phone with advanced hardware and software components. This cluster of services and features results in a distinct product for consumers and developers. For example, smartphones not only make phone calls, but also allow users to listen to music, send text messages, take pictures, play games, access software for work, manage their finances, and browse the internet.

63. Smartphones are a type of platform. In general, Platforms bring together different groups that benefit from each other's participation on the platform. A food delivery app, for example, brings together restaurants, couriers, and consumers. The technology and economics of a smartphone platform are, however, fundamentally different from the technology and economics of a simultaneous transaction platform, such as a credit card, because smartphone platforms compete over device features and pricing in ways that do not directly relate to app store transactions. Whereas credit card transactions reflect a single simultaneous action that requires both sides of the transaction for either side to exist, consumers value smartphone platforms for a variety of reasons separate from their ability to facilitate a simultaneous transaction. Consumers care about non-transactional components of the phone, such as its camera and processing speed, and they care about non-transactional components of apps, such as their features and functionality.

64. The economics of a smartphone platform are such that the platform's value to users—and in turn to the platform operator—increase when new apps and new features are added to the platform. In order to create these economic benefits for itself and its users, Apple has opened its

22

smartphone platform to third-party developers, whose countless inventions and innovations have created enormous value. Apple has willingly opened the platform to third-party developers to capture this value even though there is no extensive regulatory framework requiring it to do so or overseeing how it interacts with those third parties. In this way, smartphone platforms are very different from other platforms, like landline telephone networks, whose value-adding features were built primarily by the platform operator and which were only opened to third parties when the platform operator was required to do so by regulation. When a third-party developer for the iPhone creates a valuable new feature, consumers benefit and consumer demand goes up for Apple's products, increasing the economic value of the iPhone to Apple. This has played out hundreds of thousands of times for the iPhone, resulting in an enormously valuable smartphone platform reflecting the combined contributions of millions of developers.

65.     Apple pre-installs dozens of Apple apps in its iPhones. Several of these apps are set as defaults and are "operating system apps" that are "integrated into the phone's core operating system and part of the combined experience of iOS and iPhone." Apple does not pre-install any third-party apps, and until the September 2020 release of iOS 14, it did not allow consumers to select third-party web browser or email apps as defaults. Regulators in Europe have noted that "pre-installation of apps can create a so-called status-quo bias. Consumers are more likely to use the apps that are pre-installed on their smartphones." Consumers are likely to download apps that compete with pre-installed apps only when there is an obvious quality difference, and even then, lower-quality pre-installed apps will still enjoy an advantage over third party apps.

66.     Likewise, it has been noted that "private APIs have the potential to give Apple apps a competitive advantage," and that "Apple has for a long time favored its own services through APIs." As an example, when someone using an Apple device clicks on a website link, the webpage opens in Apple's Safari browser. Until the September 2020 release of iOS 14, Apple did not allow consumers

23

to select third party web browsers as a default. This was unique to iOS. No other mobile device operating system had a similar limitation.

67.   Siri, Apple's voice assistant, illustrates the issues. It has been described by one developer as a "closed" intelligent virtual assistant that limits the types of voice interactions voice app developers have access to. The app developer explained that Sirikit, which allows iOS apps to work with Siri, relies on a preordained list of basic interactions that third parties can use, such as messaging, calling, payments, etc. This very limited set of interactions makes it impossible to launch an app for the third party's services, including applications that compete with an Apple service. Among many users of Siri, it is regarded as stunningly deficient, compared, for example, to Amazon's Alexa.

68.   As another example, Apple's policies require alternative browser apps for iOS to use its WebKit browser engine. Consequently, all competing web browser companies must rebuild their product to make it available for iOS users. Additionally, browser engines are used in other applications that link to web content, such as email applications. According to the DOJ's Complaint, market participants are on record as saying that these guidelines cost significant internal resources and create a hurdle for market entry on iOS. These requirements also make alternative browsers on iOS less differentiated from Safari. Market participants have also noted that because Apple requires the use of WebKit, as opposed to allowing developers their own option, WebKit has become slower to innovate and adopt industry standards.

69.   This reconfirms a key point made above. Apple is often not an innovator, but instead pilfers good ideas from independent developers and then evicts them from its App Store. Jobs once said of Apple that "[w]e have always been shameless about stealing great ideas." He was right. The *Washington Post* has reported that "Developers have come to accept that, without warning, Apple can make their work obsolete by announcing a new app or feature that uses or incorporates their ideas. Some apps have simply buckled under the pressure, in some cases shutting down. They generally don't

sue Apple because of the difficulty and expense in fighting the tech giant—and the consequences they might face from being dependent on the platform."

70.     Similarly, Blix, the developer of an e-mail management app, has said that "Apple frequently takes other companies' innovative features, adds those ideas to Apple's own software products without permission, and then either ejects the original third-party application from the App Store (as it did with Blix's software) or causes the third-party software developer to close its doors entirely." This theme was echoed by the developer Match Group, which said that Apple has a history of "closely monitoring the success of apps in the App Store, only to copy the most successful of them and incorporate them in new iPhones" as a pre-installed app.

71.     Shoemaker again confirms this practice. He has stated that during his time at Apple, an app developer proposed an innovative method of wirelessly synching iPhones and Macs. The proposed app complied with Apple's guidelines, but was nonetheless rejected from the App Store.  Apple then stole the rejected app's feature for its own use.

72.     In sum, limiting the features and functionality created by third-party developers—and therefore available to iPhone users—makes the iPhone worse and deprives Apple of the economic value it would gain as the platform operator. It makes no economic sense for Apple to sacrifice the profits it would earn from new features and functionality unless it has some other compensating reason to do so, such as protecting its monopoly profits. Such monopoly profits, and the manner in which Apple obtains them, harm consumers, Plaintiffs, and the Class.

## VI.     APPLE UNLAWFULLY MAINTAINS ITS MONOPOLY POWER

### A.     Apple harms competition by imposing contractual restrictions, fees, and taxes on app creation and distribution.

73.     According to the DOJ's Complaint, recently disclosed statements from Apple's internal documents show that, soon after the iPhone's introduction and notwithstanding its success, the

company began to fear that disintermediation of its platform and the commoditization of the iPhone would threaten Apple's substantial profits from iPhone sales and related revenue streams.

74. Accordingly, Apple exercised its control of app creation and app distribution in key cases to cement the iPhone and App Store as the primary gateway to apps, products, and services. Apple often claims these rules and restrictions are necessary to protect user privacy or security, but Apple's internal discussions tell a different story. In reality, Apple imposes certain restrictions to benefit its bottom line by thwarting direct and disruptive competition for its iPhone platform fees and/or for the importance of the iPhone platform itself. In this way, Apple acts both as an umpire and player, blocking or impairing competition.

75. Three aspects of Apple's efforts to protect and exploit its smartphone monopoly are worth noting. *First*, Apple exercises its control over app distribution and app creation to dictate how developers innovate for the iPhone, enforcing rules and contractual restrictions that stop or delay developers from innovating in ways that threaten Apple's power. In so doing, Apple artificially restricts innovation both on and off the iPhone.

76. *Second*, Apple drives iPhone users away from products and services that compete with or threaten Apple. In doing so, Apple increases the cost and friction of switching from the iPhone to another smartphone and generates extraordinary profits through subscription services (like Apple's proprietary music, gaming, cloud storage, and news services), advertisements within the App Store, and accessories like headphones and smartwatches.

77. *Third*, Apple uses these restrictions to extract monopoly rents from third parties in a variety of ways, including app fees and revenue-share requirements. For most of the last 15 years, Apple collected a tax in the form of a 30 percent commission on the price of any app downloaded from the App Store, a 30 percent tax on in-app purchases, and fees to access the tools needed to develop iPhone native apps in the first place. While Apple has reduced the tax it collects from a subset of

26

developers, Apple still extracts 30 percent from many app makers. Apple also generates substantial and increasing revenue by charging developers to help users find their apps in the App Store—something that, for years, Apple told developers was part of the reason they paid a 30 percent tax in the first place. For example, Apple will sell keyword searches for an app to someone other than the owner of the app. Apple is able to command these rents from companies of all sizes, including some of the largest and most sophisticated companies in the world. In fact, Apple has recently settled litigation for approximately $100 million over its monopoly rents in app fees from the 30 percent commission in a suit brought by app developers.

78.     As Apple exercised its control of app distribution and app creation, it slowed its own iPhone innovation and extracted more revenue and profit from its existing customers through subscriptions, advertising, and cloud services. These services increase the cost of switching from the iPhone to another smartphone because many of these services—including its proprietary gaming, cloud storage, and news service—are exclusive to the Apple ecosystem, causing significant frictions for iPhone users who try to use alternative services on another smartphone. Moreover, Apple's conduct demonstrates that Apple recognized the importance of digital products and services for the success of the iPhone while at the same time it restricted the development and growth of non-iPhone products and services—especially those that might make it easier for users to switch from the iPhone to another smartphone.

79.     Each step in Apple's course of conduct built and reinforced the moat around its smartphone monopoly. The cumulative effect of this course of conduct has been to maintain and entrench Apple's smartphone monopoly at the expense of the users, developers, and other third parties who helped make the iPhone what it is today. Despite major technological changes over the years, Apple's power to control app creation and distribution and extract fees from developers has remained largely the same, unconstrained by competitive pressures or market forces. The fact that this conduct

27

is impervious to competition reflects the success of Apple's efforts to create and maintain its smartphone monopoly, the strength of that monopoly, and the durability of Apple's power.

80.     Apple's monopoly maintenance has taken many forms and continues to evolve today; however, Apple's anticompetitive and exclusionary course of conduct is exemplified by its contractual rules and restrictions targeting several products and services: super apps, cloud streaming apps, messaging apps, smartwatches, and digital wallets. By stifling these technologies, and many others, Apple reinforces the moat around its smartphone monopoly not by making its products more attractive to users, but by discouraging innovation that threatens Apple's smartphone monopoly or the disintermediation of the iPhone. Apple continues to expand and shift the scope and categories of anticompetitive conduct such that the cumulative anticompetitive effect of Apple's conduct is even more powerful than that of each exclusionary act standing alone.

81.     Apple has intentionally designed the iPhone to unnecessarily limit or degrade interoperability with other platforms.

### 1.     Super Apps: Apple prevents apps from threatening its smartphone monopoly by undermining programs that reduce user dependence on the iPhone.

82.     For years, Apple denied its users access to a class of apps that facilitate functionality across different platforms—often called "super apps"—because it viewed them as "fundamentally disruptive" to "existing app distribution and development paradigms" and ultimately Apple's monopoly power. Apple feared super apps because it recognized that as they become popular, "demand for iPhone is reduced." So, Apple used its control over app distribution and app creation to effectively prohibit developers from offering super apps instead of competing on the merits.

83.     A super app is an app that can serve as a platform for smaller "mini" programs developed using programming languages such as HTML5 and JavaScript. By using programming languages standard in most web pages, mini programs are cross-platform, meaning they work the same

on any web browser and on any device. Developers can therefore write a single mini program that works whether users have an iPhone or another smartphone.

84.    Super apps can provide significant benefits to users. For example, a super app that incorporates a multitude of mini programs might allow users to easily discover and access a wide variety of content and services without setting up and logging into multiple apps, not unlike how Netflix and Hulu allow users to find and watch thousands of movies and television shows in a single app. As one Apple executive put it, "who doesn't want faster, easier to discover apps that do everything a full app does?" Restricting super apps makes users worse off and sacrifices the short-term profitability of iPhones for Apple.

85.    Super apps also reduce user dependence on the iPhone, including the iOS operating system and Apple's App Store. This is because a super app is a kind of middleware that can host apps, services, and experiences without requiring developers to use the iPhone's APIs or code.

86.    As users interact with a super app, they rely less on the smartphone's proprietary software and more on the app itself. Eventually, users become more willing to choose a different smartphone because they can access the same interface, apps, and content they desire on any smartphone where the super app is also present. Moreover, developers can write mini programs that run on the super app without having to write separate apps for iPhones and other smartphones. This lowers barriers to entry for smartphone rivals, decreases Apple's control over third-party developers, and reduces switching costs.

87.    Apple recognizes that super apps with mini programs would threaten its monopoly. According to the DOJ's Complaint, as one Apple manager observed, allowing super apps to become "the main gateway where people play games, book a car, make payments, etc." would "let the barbarians in at the gate." Why? Because when a super app offers popular mini programs, "iOS stickiness goes down." In other words, the introduction and proliferation of super apps would make

29

users less dependent on iPhones and in turn pressure Apple to compete head-to-head with other smartphones.

88.     Apple's fear of super apps is based on first-hand experience with enormously popular super apps in Asia. Apple does not want U.S. companies and U.S. users to benefit from similar innovations. For example, according to the DOJ's Complaint, in a Board of Directors presentation, Apple highlighted the "[u]ndifferentiated user experience on [a] super platform" as a "major headwind" to growing iPhone sales in countries with popular super apps due to the "[l]ow stickiness" and "[l]ow switching cost." For the same reasons, a super app created by a U.S. company would pose a similar threat to Apple's smartphone dominance in the United States. Apple noted as a risk in 2017 that a potential super app created by a specific U.S. company would "replace[ ] usage of native OS and apps resulting in commoditization of smartphone hardware."

89.     Apple did not respond to the risk that super apps might disrupt its monopoly by innovating. Instead, Apple exerted its control over app distribution to stifle others' innovation. Apple created, strategically broadened, and aggressively enforced its App Store Guidelines to effectively block apps from hosting mini programs. Apple's conduct disincentivized investments in mini program development and caused U.S. companies to abandon or limit support for the technology in the United States.

90.     In particular, part of what makes super apps valuable to consumers is that finding and using mini programs is easier than using an app store and navigating many separate apps, passwords, and set-up processes. Instead of making mini program discovery easy for users, however, Apple made it nearly impossible.

91.     Since at least 2017, Apple has arbitrarily imposed exclusionary requirements that unnecessarily and unjustifiably restrict mini programs and super apps. For example, Apple required apps in the United States to display mini programs using a flat, text-only list of mini programs. Apple

also banned displaying mini programs with icons or tiles, such as descriptive pictures of the content or service offered by the mini program. Apple also banned apps from categorizing mini programs, such as by displaying recently played games or more games by the same developer. These restrictions throttle the popularity of mini programs and ultimately make the iPhone worse because it discourages developers from creating apps and other content that would be attractive to iPhone users.

92. Apple also selectively enforced its contractual rules with developers to prevent developers from monetizing mini programs, hurting both users and developers. For example, Apple blocked mini programs from accessing the APIs needed to implement Apple's IAP system—even if developers were willing to pay Apple's monopoly tax. Similarly, Apple blocked developers' ability to use in-app payment methods other than directly using IAP. For instance, super apps could create a virtual currency for consumers to use in mini programs, but Apple blocked this too. Apple, however, allows other, less-threatening apps to do so.

93. Apple has thus leveraged its power over the App Store to require developers to implement IAP or risk being excluded. Then-Apple CEO Jobs once explained, "there will be some roadkill because of it. I don't feel guilty" when he was confronted with developer complaints about Apple's commission and requirement to use IAP.

94. An example of Apple's anticompetitive treatment is its longstanding efforts to undermine WeChat, a Chinese SuperApp that functions as an instant messaging app that has high penetration among Chinese internet users. In the United States, it is estimated that four million people use this messaging platform. WeChat permits the use of sub-apps or plug-ins that extend its features and obviate the need to create separate iOS and Android versions of the app. Apple has had numerous ongoing disputes with it.

95. In 2017, for example, WeChat introduced a "reward the author" feature that permitted users to transfer money to creators of popular articles that appeared on the SuperApp. Apple asserted

31

that these transfers were "in app transactions" and were subject to its 30% commission. WeChat was initially forced to disable the feature for iOS users. In 2018, Apple backed down and exempted such payments from its commission.

96.     That did not end the disputes, however. While WeChat does not formally support in-app purchases through third-party means on iOS, it permits mini program developers (such as game developers) to contact their users through in-app WeChat messages and tell them to make a payment through WeChat Pay, for which WeChat did not charge a commission. Last year, Apple insisted that WeChat prevent game developers from contacting users in this manner by disabling completely in-game messaging. WeChat refused this demand and Apple threatened to ban it from being used on iPhone 16, introduced in the fall of last year. In order to reach a resolution of this dispute, it has been rumored that Apple has insisted upon a sharing agreement with WeChat for mini program revenues. As of mid-2025, the details concerning this requirement have not been disclosed.

        **2.     Cloud Streaming Apps: Apple prevents developers from offering cloud gaming apps that reduce dependence on the iPhone's expensive hardware.**

97.     For years, Apple blocked cloud gaming apps that would have given users access to desirable apps and content without needing to pay for expensive Apple hardware because this would threaten its monopoly power. In Apple's own words, it feared a world where "all that matters is who has the cheapest hardware" and consumers could "buy[] a [expletive] Android for 25 bux at a garage sale and . . . have a solid cloud computing device" that "works fine." Apple's conduct made its own product worse because consumers missed out on apps and content.

98.     This conduct also cost Apple substantial revenues from third-party developers. At the same time, Apple also made other smartphones worse by stifling the growth of these cross-platform apps on other smartphones. Importantly, Apple prevented the emergence of technologies that could lower the price that consumers pay for iPhones.

32

99.     Cloud streaming apps let users run a computationally intensive program without having to process or store the program on the smartphone itself. Instead, a user's smartphone leverages the computing power of a remote server, which runs the program and streams the result back to the phone. Cloud streaming allows developers to bring cutting-edge technologies and services to smartphone consumers—including gaming and interactive artificial intelligence services—even if their smartphone includes hardware that is less powerful than an iPhone.

100.    Cloud streaming has significant benefits for users. For example, Apple has promoted the iPhone 15 by promising that its hardware is powerful enough to enable "next-level performance and mobile gaming." But powerful hardware is unnecessary if games are played via cloud streaming apps. For a cloud game, the user experiences and plays the game on the smartphone, but the game is run by hardware and software in remote computing centers ("the cloud"). Thus, cloud gaming apps deliver rich gaming experiences on smartphones without the need for users to purchase powerful, expensive hardware. As a result, users with access to cloud streamed games may be more willing to switch from an iPhone to a smartphone with less expensive hardware because both smartphones can run desirable games equally well.

101.    Cloud streaming also has significant advantages for developers. For example, instead of re-writing the same game for multiple operating systems, cloud platforms can act as middleware that allow developers to create a single app that works across iOS, Android, and other operating systems. Cloud streaming provides more and simpler options for offering subscriptions, collecting payments, and distributing software updates as well. All of this helps game developers reach economies of scale and profitability they might not achieve without offering cloud gaming apps and reduces their dependence on iOS and Apple's App Store.

102.    Apple wielded its power over app distribution to effectively prevent third-party developers from offering cloud gaming subscription services as a native app on the iPhone. Even today, no cloud streaming games are available on the iPhone.

103.    For years, Apple imposed the onerous requirement that any cloud streaming game—or any update to a cloud streaming game—be submitted as a stand-alone app for approval by Apple. Having to submit individual cloud streaming games for review by Apple increased the cost of releasing games on the iPhone and limited the number of games a developer could make available to iPhone users. For example, the highest quality games, referred to as AAA games, typically require daily or even hourly updates across different platforms. If these updates need to be individually approved by Apple, developers must either delay their software updates across all platforms or only update their games on non-iOS platforms, potentially making the iOS version of the game incompatible with other versions on other platforms until Apple approves the update. Neither option is tenable for players or developers.

104.    Until recently, Apple required users to download cloud streaming software separately for each individual game, install identical app updates for each game individually, and make repeated trips to Apple's App Store to find and download games. Apple's conduct made cloud streaming apps so unattractive to users that no developer designed one for the iPhone. On January 24, 2024, it formally rescinded this policy in response to pressure placed upon it by the European Commission.

105.    What did not change, however, was Apple imposing a tariff on apps sold on the Apple App Store through non-Apple payment programs. As reflected in the discussion above, and as summarized by the Court in the Northern District of California in the *Epic Games v. Apple* litigation, which involved streamed games:

> To summarize: *One*, after trial, the Court found that Apple's 30 percent commission "allowed it to reap supracompetitive operating margins" and was not tied to the value of its intellectual property, and thus, was anticompetitive. Apple's response: charge a *27 percent*

34

*commission* (again tied to nothing) on off-app purchases, where it had previously charged nothing, and extend the commission for a period of seven days after the consumer linked-out of the app. Apple's goal: maintain its anticompetitive revenue stream. *Two*, the Court had prohibited Apple from denying developers the ability to communicate with, and direct consumers to, other purchasing mechanisms. Apple's response: impose *new* barriers and new requirements to increase friction and increase breakage rates with full page "scare" screens, static URLs, and generic statements. Apple's goal: to dissuade customer usage of alternative purchase opportunities and maintain its anticompetitive revenue stream. In the end, Apple sought to maintain a revenue stream worth billions in direct defiance of this Court's Injunction. (Emphases in original).

The Court's ruling is currently on appeal.

106. Apple undermines cloud gaming apps in other ways too, such as by requiring cloud games to use Apple's proprietary payment system and necessitating game overhauls and payment redesigns specifically for the iPhone. Apple's rules and restrictions effectively force developers to create a separate iOS-specific version of their app instead of creating a single cloud-based version that is compatible with several operating systems, including iOS. As a result, developers expend considerable time and resources re-engineering apps to bring cross-platform apps like multiplayer games to the iPhone.

107. Cloud streaming apps broadly speaking—not just gaming—could force Apple to compete more vigorously against rivals. As one Apple manager recognized, cloud streaming eliminates "a big reason for high-performance local compute" and thus eliminates one of the iPhone's advantages over other smartphones because then "all that matters is who has the cheapest hardware." Accordingly, it reduces the need for users to buy expensive phones with advanced hardware. This problem does not "stop at high-end gaming," but applies to "a number of high-compute requirement applications."

    **B.**     **Apple uses APIs and other critical access points in the smartphone ecosystem to control the behavior and innovation of third parties in order to insulate itself from competition.**

        **1.**     **Messaging: Apple protects its smartphone monopoly by degrading and undermining cross-platform messaging apps and rival smartphones.**

108.    Apple undermines cross-platform messaging to reinforce "obstacle[s] to iPhone families giving their kids Android phones." Apple could have made a better cross-platform messaging experience itself by creating iMessage for Android but concluded that doing so "will hurt us more than help us." Apple therefore continues to impede innovation in smartphone messaging, even though doing so sacrifices the value of the iPhone to users, because it helps build and maintain its monopoly power.

109.    Messaging apps allow smartphone users to communicate with friends, family, and other contacts and are often the primary way users interact with their smartphones. In Apple's own words, messaging apps are "a central artery through which the full range of customer experience flows."

110.    Smartphone messaging apps operate using "protocols," which are the systems that enable communication and determine the features available when users interact with each other via messaging apps.

111.    One important protocol used by messaging apps is SMS.[2] SMS offers a broad user network, but limited functionality. For example, all mobile phones can receive SMS messages, but SMS does not support modern messaging features, such as large files, edited messages, or reactions like a "thumbs up" or a heart.

112.    Many messaging apps—such as WhatsApp, Facebook Messenger, and Signal— use proprietary, internet-based protocols, which are sometimes referred to as OTT ("over the top") protocols. OTT messaging typically involves more secure and advanced features, such as encryption, typing indicators, read receipts, the ability to share rich media, and disappearing or ephemeral messages. While all mobile phones can send and receive SMS messages, OTT only works between

---

[2] Following industry practice, throughout this complaint, "SMS" refers to both SMS and MMS ("multimedia messaging service"). MMS is a companion protocol to SMS that allows for group messages and messages with basic multimedia content, such as small file sharing.

36

users who sign up for and communicate through the same messaging app. As a result, a user cannot send an OTT message to a friend unless the friend also uses the same messaging app.

113.    Apple makes third-party messaging apps on the iPhone worse generally and relative to Apple Messages, Apple's own messaging app that combines SMS functionality with Apple's OTT messaging system, iMessage. By doing so, Apple is knowingly and deliberately degrading quality, privacy, and security for its users. For example, Apple designates the APIs needed to implement SMS as "private," meaning third-party developers have no technical means of accessing them and are prohibited from doing so under Apple's contractual agreements with developers. As a result, third-party messaging apps cannot combine the "text to anyone" functionality of SMS with the advanced features of OTT messaging. Instead, if a user wants to send somebody a message in a third-party messaging app, they must first confirm whether the person they want to talk to has the same messaging app and, if not, convince that person to download and use a new messaging app. By contrast, if an Apple Messages user wants to send somebody a message, they just type their phone number into the "To:" field and send the message because Apple Messages incorporates SMS and OTT messaging.

114.    It has long been technically possible for non-iOS devices to connect to and integrate with the iPhone Messages app and/or the iMessage platform. In his deposition in the *Epic Games v. Apple* trial, Apple Senior VP Eddy Cue acknowledged that Apple could have enabled "crosscompatibility with the iOS platform so that users of both platforms would have been able to exchange messages with one another seamlessly," but Apple decided against doing so.

115.    Apple prohibits third-party developers from incorporating other important features into their messaging apps as well. For example, third-party messaging apps cannot continue operating in the background when the app is closed, which impairs functionality like message delivery confirmation. And when users receive video calls, third-party messaging apps cannot access the iPhone

camera to allow users to preview their appearance on video before answering a call. Apple Messages incorporates these features.

116.    If third-party messaging apps could incorporate these features, they would be more valuable and attractive to users, and the iPhone would be more valuable to Apple in the short term. For example, by incorporating SMS, users would avoid the hassle of convincing someone to download a separate app before sending them a message. Third-party messaging apps could also offer the ability to schedule SMS messages to be sent in the future, suggest replies, and support robust multi-device use on smartphones, tablets, and computers—as they have already done on Android.

117.    Moreover, messaging apps benefit from significant network effects—as more people use the app, there are more people to communicate with through the app, which makes the app more valuable and in turn attracts even more users. Incorporating SMS would help third- party messaging apps grow their network and attract more users. Instead, Apple limits the reach of third-party messaging apps and reinforces network effects that benefit Apple.

118.    For a very long while, Apple refused to let iPhone users accept messages from Android phone users by utilizing a version of the Rich Communication Services ("RCS") protocol. In the fall of 2023, with the advent of iOS 18 and potentially as a result of the lawsuit filed by the DOJ and the 20 states, Apple adopted its version of the RCS protocol. The rollout has not been fully successful. Some iPhone users have complained that RCS messages sometimes take longer to receive. RCS group messages can break if one person tries sending it a message as an SMS message, which can happen if one loses one's internet connection. To date, RCS messages between owners of the Apple and Android phones who exchange communications over RCS do not enjoy end-to-end encryption, unlike chats in Apple's messages app, which uses an E2EE protection system. The Federal Bureau of Investigation told such users in December of 2024 to stop exchanging such messages, noting that they were subject to being hacked by the Chinese government. And Android users who send messages to Apple iPhone

38

users are still treated like second class citizens whose messages appear in green bubbles rather than blue ones.

119.    Over and above the problems Apple has had in implementing RCS generally, it is in the process of introducing changes in other countries that it will not make available to iPhone users in the United States. For example, it is introducing new APIs in iOS 26 (currently in Beta testing, with a planned launch in September of 2025) that allow developers to implement support for making cellular phone calls and sending and receiving RCS messages in third-party apps. As happens often with iPhone users in the United States, Apple is again treating them like second-class customers.

120.    In addition to degrading the quality of third-party messaging apps, Apple affirmatively undermines the quality of rival smartphones. For example, if an iPhone user messages a non-iPhone user in Apple Messages—the default messaging app on an iPhone—then the text appears to the iPhone user as a green bubble (as opposed to a blue bubble in which messages from iPhones appear) and incorporates limited functionality: the conversation is not encrypted, videos are pixelated and grainy, and users cannot edit messages or see typing indicators. Before 2024, Apple also did not properly display emoji reactions in text messages from and to non-iPhone users. This signals to users that rival smartphones are lower quality because the experience of messaging friends and family who do not own iPhones is worse—even though Apple, not the rival smartphone, is the cause of that degraded user experience. Many non-iPhone users also experience social stigma, exclusion, and blame for "breaking" chats where other participants own iPhones. This effect is particularly powerful for certain demographics, like teenagers—where the iPhone's share is 85 percent, according to one survey. This social pressure reinforces switching costs and drives users to continue buying iPhones—solidifying Apple's smartphone dominance not because Apple has made its smartphone better, but because it has made communicating with other smartphones worse.

39

121.    Apple recognizes that its conduct harms users and makes it more difficult to switch smartphones. For example, in 2013, Craig Federighi, Apple's Senior Vice President of Software Engineering explained that supporting cross-platform OTT messaging in Apple Messages "would simply serve to remove [an] obstacle to iPhone families giving their kids Android phones." In March 2016, Schiller forwarded an email to Cook making the same point: "moving iMessage to Android will hurt us more than help us."

122.    In 2022, Apple's Cook was asked whether Apple would fix iPhone-to- Android messaging. "It's tough," the questioner implored Cook "not to make it personal but I can't send my mom certain videos." Cook's response? "Buy your mom an iPhone."

123.    Recently, Apple blocked a third-party developer from fixing the broken cross- platform messaging experience in Apple Messages and providing end-to-end encryption for messages between Apple Messages and Android users. By rejecting solutions that would allow for cross-platform encryption, Apple continues to make iPhone users' less secure than they could otherwise be.

### 2.    Smartwatches: Apple protects its smartphone monopoly by impeding the development of cross-platform smartwatches.

124.    Apple uses smartwatches, a costly accessory, to prevent iPhone customers from choosing other phones. Having copied the idea of a smartwatch from third-party developers, Apple now prevents those developers from innovating and limits the Apple Watch to the iPhone to prevent a negative "impact to iPhone sales."

125.    Smartwatches are wrist-worn devices with an interactive display and accompanying apps that let users perform a variety of functions, including monitoring health data, responding to messages and notifications, performing mobile payments, and, of course, telling time. Smartwatches must generally be paired with a smartphone to operate and unlock their full functionality, such as receiving and responding to emails and text messages or answering phone calls. Because of the

significant cost of buying a smartwatch, users are less willing to choose a smartphone if it is not compatible with their smartwatch.

126. Apple's smartwatch—Apple Watch—is only compatible with the iPhone. So, if Apple can steer a user towards buying an Apple Watch, it becomes more costly for that user to purchase a different kind of smartphone because doing so requires the user to abandon their costly Apple Watch and purchase a new, Android-compatible smartwatch.

127. By contrast, cross-platform smartwatches can reduce iPhone users' dependence on Apple's proprietary hardware and software. If a user purchases a third-party smartwatch that is compatible with the iPhone and other smartphones, they can switch from the iPhone to another smartphone (or vice versa) by simply downloading the companion app on their new phone and connecting to their smartwatch via Bluetooth. Moreover, as users interact with a smartwatch, *e.g.*, by accessing apps from their smartwatch instead of their smartphone, users rely less on a smartphone's proprietary software and more on the smartwatch itself. This also makes it easier for users to switch from an iPhone to a different smartphone.

128. Apple recognizes that driving users to purchase an Apple Watch, rather than a third-party cross-platform smartwatch, helps drive iPhone sales and reinforce the moat around its smartphone monopoly. For example, in a 2019 email the Vice-President of Product Marketing for Apple Watch acknowledged that Apple Watch "may help prevent iPhone customers from switching." Surveys have reached similar conclusions: many users say the other devices linked to their iPhone are the reason they do not switch to Android.

129. Consumers complain that the Apple Watch's exclusive compatibility with iPhone means they cannot switch to an Android phone. In the Apple Watch Reddit forum, one consumer created a post titled, "Prefer an Android phone but love my Apple watch," noting they "prefer [their] android phone," but "us[e] an iPhone" because they otherwise lose Apple Watch functionality like

41

"notifications, music controls etc." Another commentator in the same thread echoed this complaint: "Agree. Love using android and trying out different phones. But apple watch is years ahead of wear os. I have tried many things to get them to work together or even just get apple watch to reliable catch text messages, but no dice. I just did a digits line with T-Mobile so I have two sims with essentially the same phone number. One in iPhone and one in android daily driver. My apple watch (which is already cellular btw) still won't play nice. Apple intentionally makes this a no go. And there is no messaging platform with SMS support you can add on all devices. Argh."

130.    Apple also recognizes that making Apple Watch compatible with Android would "remove [an] iPhone differentiator."

131.    Apple uses its control of the iPhone, including its technical and contractual control of critical APIs, to degrade the functionality of third-party cross-platform smartwatches in at least three significant ways: First, Apple deprives iPhone users with third-party smartwatches of the ability to respond to notifications. Second, Apple inhibits third-party smartwatches from maintaining a reliable connection with the iPhone. And third, Apple undermines the performance of third-party smartwatches that connect directly with a cellular network. In doing so, Apple constrains user choice and crushes innovation that might help fill in the moat around Apple's smartphone monopoly.

132.    The ability to respond to notifications like new messages or app alerts directly from a smartwatch is one of the top considerations for smartwatch purchasers—and one of the most used product features when it is available. According to Apple's own market research, the ability to "[s]end and receive text messages from social and messaging apps" is a critical feature for a smartwatch. In 2013, when Apple started offering users the ability to connect their iPhones with third-party smartwatches, Apple provided third-party smartwatch developers with access to various APIs related to the Apple Notification Center Service, Calendar, Contacts, and Geolocation. The following year, Apple introduced the Apple Watch and began limiting third- party access to new and improved APIs

42

for smartwatch functionality. For example, Apple prevents third-party smartwatches from accessing APIs related to more advanced Actionable Notifications, so iPhone users cannot respond to notifications using a third-party smartwatch. Instead, Apple provides third-party smartwatches access to more limited APIs that do not allow users to respond to a message, accept a calendar invite, or take other actions available on Apple Watch.

133.    A reliable Bluetooth connection is essential for a smartwatch to connect wirelessly with a smartphone and thereby function as a companion to the user's smartphone to unlock its full functionality. But Apple prohibits third-party smartwatch developers from maintaining a connection even if a user accidentally turns off Bluetooth in the iPhone's control center. Apple gives its own Apple Watch that functionality, however, because Apple recognizes that users frequently disable Bluetooth on their iPhone without realizing that doing so disconnects their watch. As a result, iPhone users have a worse experience when they try to use a third-party smartwatch with their iPhone. Apple also requires users to turn on "Background App Refresh" and disable the battery-saving "Low Power Mode" in their iPhone settings for third- party smartwatches to remain consistently connected to their companion app, which is necessary to allow a user's iPhone and their smartwatch to update and share data about the weather or exercise tracking, even though Apple does not impose similar requirements for Apple Watch.

134.    Cellular-enabled smartwatches incorporate the ability to connect directly to a cellular network, allowing users to make calls, send messages, and download data even if their smartwatch is not paired to a smartphone. Cellular-enabled smartwatches are popular with consumers, making up approximately 20 percent of Apple Watch sales. Apple Watch users can use the same phone number for their smartphone and smartwatch when connected to the cellular network. As a result, messages are delivered to both the user's smartphone and smartwatch, providing an integrated messaging experience. Although it is technologically feasible for Apple to allow an iPhone user with a third-party

smartwatch to do the same, Apple instead requires these users to disable Apple's iMessage service on the iPhone in order to use the same phone number for both devices. This is an unacceptable non-starter for most iPhone users. In practice, iPhone users with a third-party smartwatch must maintain separate phone numbers for the two devices, worsening their user experience, and may miss out on receiving messages sent to their primary iPhone number.

135.    This conclusion is supported by Eric Migicovsky ("Migicovsky"), the creator of the Pebble watch, a third-party alternative to the Apple watch. He has identified multiple ways in which his competing watch is harmed by Apple's policies, including: (a) inability to send text messages or iMessages; (b) inability to reply to notifications; (c) lack of interoperability with other iOS apps; (d) inability to detect if a user is using his or her iPhone; (e) difficulty in loading side apps; (f) limits on interoperability with the Apple app store; (g) getting a Javascript engine to run on Pebble; and (g) problems of using iOS's "developer mode" to work on the Pebble watch.

136.    As Migicovsky noted, "Apple systematically makes it nearly impossible for 3rd party wearable developers to build a smartwatch experience comparable to Apple Watch experience… they're clearly using their market power to lock consumers into their walled ecosystem. This causes there to be less competition, which increases prices and reduces innovation."

      **3.     Digital Wallets: Apple restricts cross-platform digital wallets on the iPhone, reinforcing barriers to consumers switching to rival smartphones.**

137.    Apple recognizes that paying for products and services with a digital wallet will eventually become "something people do every day of their lives." But Apple has used its control over app creation, including its technical and contractual control over API access, to effectively block third-party developers from creating digital wallets on the iPhone with tap-to- pay functionality, which is an important feature of a digital wallet for smartphones. As a result, Apple maintains complete control over how users make tap-to-pay payments with their iPhone. Apple also deprives users of the benefits

and innovations third-party wallets would provide so that it can protect "Apple's most important and successful business, iPhone."

138.   Digital wallets are apps that allow a user to store and use passes and credentials, including credit cards, personal identification, movie tickets, and car keys, in a single app. For example, digital wallets allow users to make in-person payments by tapping their device on a payment terminal rather than tapping or swiping a physical credit card. Digital wallets can also be used for transactions in mobile apps and mobile websites.

139.   Absent Apple's conduct, cross-platform digital wallets could also be used to manage and pay for subscriptions and in-app purchases.

140.   Apple Wallet is Apple's proprietary digital wallet on the iPhone. Apple Wallet incorporates Apple's proprietary payment system Apple Pay, which processes digital payments on the web, in apps, and at merchant points of sale.

141.   Today, Apple Wallet offers users a way to make these payments using their iPhone. But Apple envisions that Apple Wallet will ultimately supplant multiple functions of physical wallets to become a single app for shopping, digital keys, transit, identification, travel, entertainment, and more. As users rely on Apple Wallet for payments and beyond, it "drive[s] more sales of iPhone and increase[s] stickiness to the Apple ecosystem" because Apple Wallet is only available on the iPhone. Thus, switching to a different smartphone requires leaving behind the familiarity of an everyday app, setting up a new digital wallet, and potentially losing access to certain credentials and personal data stored in Apple Wallet.

142.   Cross-platform digital wallets would offer an easier, more seamless, and potentially more secure way for users to switch from the iPhone to another smartphone. For example, if third-party developers could create cross-platform wallets, users transitioning away from the iPhone could continue to use the same wallet, with the same cards, IDs, payment histories, peer-to-peer payment

45

contacts, and other information, making it easier to switch smartphones. And because many users already use apps created by their preferred financial institutions, if these financial institutions offered digital wallets, then users would have access to new apps and technologies without needing to share their private financial data with additional third parties, including Apple. In the short term, these improved features would make the iPhone more attractive to users and profitable for Apple.

143.    Accordingly, the absence of cross-platform digital wallets with tap-to-pay capability on the iPhone makes it harder for iPhone users to purchase a different smartphone.

144.    The most important function for attracting users to a digital wallet for smartphones is the ability to offer tap-to-pay, *i.e.*, the ability to make in-person payments by tapping your smartphone on a payment terminal. Apple uses its control over app creation and API access to selectively prohibit developers from accessing the near-field communication ("NFC") hardware needed to provide tap-to-pay through a digital wallet app.

145.    Apple Wallet is the only app on the iPhone that can use NFC to facilitate tap-to- pay. While Apple actively encourages banks, merchants, and other parties to participate in Apple Wallet, Apple simultaneously exerts its smartphone monopoly to block these same partners from developing better payment products and services for iPhone users.

146.    Apple also uses its smartphone monopoly to extract payments from banks, which need to access customers that use digital wallets on iPhones. Since Apple first launched Apple Pay—long before it achieved meaningful adoption—Apple has charged issuing banks 15 basis points (0.15 percent) for each credit card transaction mediated by Apple Pay. Payment apps from Samsung and Google are free to issuing banks. Apple's fees are a significant expense for issuing banks and cut into funding for features and benefits that banks might otherwise offer smartphone users. The volume of impacted transactions is large and growing. A U.S. Consumer Financial Protection Bureau report estimates that Apple Pay facilitated nearly $200 billion in transactions in the United States in 2022.

And the report goes on to explain that "analysts estimate that the value of digital wallet tap-to-pay transactions will grow by over 150 percent by 2028."

147. Multiple app developers had sought direct NFC access for their payment or wallet apps. Yet Apple prohibits these developers from incorporating tap-to-pay functionality in their apps for fear that doing so would "be one way to disable [A]pple [P]ay trivially," leading to the "proliferation of other payment apps" that might operate cross-platform and ultimately undermine Apple's smartphone monopoly.

148. There is no technical limitation on providing NFC access to developers seeking to offer third-party wallets. For example, Apple allows merchants to use the iPhone's NFC antenna to accept tap-to-pay payments from consumers. Apple also acknowledges it is technically feasible to enable an iPhone user to set another app (e.g., a bank's app) as the default payment app, and Apple intends to allow this functionality in Europe.

149. Apple further impeded the adoption of digital wallets by restricting others from offering the same ability to authenticate digital payment options on online checkout pages. By limiting the ability of third-party wallets to provide a simple, fast, and comprehensive solution to online purchasing, Apple further undermines the viability of such wallets.

150. Apple also blocked other digital wallets from serving as an alternative to Apple's in-app payment in app payment. This prevents these wallets from increasing their attractiveness and improving the overall user experience on the iPhone by offering consumer experiences that may include use of rewards points in purchasing, digital receipts, returns, loyalty programs, and digital coupons for purchases of relevant subscriptions and digital goods. Apple even prohibits developers on its App Store from notifying users in the developer's app that cheaper prices for services are available using alternative digital wallets or direct payments.

47

151. Apple's conduct reflects its knowing degradation of the experience of its own users by blocking them from accessing wallets that would have better or different features. In so doing, Apple cements reliance on the iPhone and also imposes fees on a large and critical slice of all digital wallet NFC transactions, which the U.S. Consumer Financial Protection Bureau estimates will grow to $451 billion by 2028.

152. In 2024, Apple announced that it was modifying access by third parties to the Apple Wallet in response to regulatory threats by the EU. It then extended this benefit to consumers and developers in the United States with the introduction of iOS 18.1 in October of 2024. This was a voluntary decision by Apple and can be retracted at Apple's whim.

153. Moreover, even after Apple opened the NFC chip to third parties, it has exercised tight control over banks and developers who wish to make use of that access. It has created new APIs for both the NFC and its associated Secure Element ("SE"). In order to obtain these, Apple developers must enter into commercial agreements with Apple, satisfy its eligibility requirements, and pay associated fees. The exact fee structure in the United States has not been publicly disclosed as of this date, but a useful point of comparison is what Apple did in Brazil with respect to third party access to the NFC and SE. Since 2020, Brazilians have used Pix, a free and instant pay ecosystem. Banking institutions and associations who utilized Pix and sought access to the NFC were charged 0.17% per transaction. Those institutions filed a complaint with CADE, Brazil's antitrust regulator, saying that Apple's requirements created a barrier to competition. CADE held an initial public hearing and opened a preliminary antitrust probe in April of 2025 into what it viewed as Apple's monopoly in the proximity payment system.

C. **Apple's "moat" around its smartphone monopoly is wide and deep: it uses a similar playbook to maintain its monopoly through many other products and services.**

154. The exclusionary and anticompetitive acts described above are part of Apple's ongoing course of conduct to build and maintain its smartphone monopoly. They are hardly exhaustive. Rather, they exemplify the innovation Apple has stifled and Apple's overall strategy of using its power over app distribution and app creation to selectively block threatening innovations.

155. Apple has repeatedly been accused of anticompetitive conduct:

- Apple has been the subject of investigations by a variety of international competition authorities for antitrust violations and anticompetitive practices;

- Apple has faced a variety of private antitrust lawsuits in the United States, including relating to its practices with respect to offering apps in the app store;

- In 2010, Apple resolved an antitrust action with the DOJ involving allegations that it conspired with other technology companies to reduce or eliminate competition for employees through non-solicitation or "no poach" agreements—Apple later agreed to pay $415 million in a joint settlement agreement to resolve a class action filed by impacted employees;

- In 2012, the DOJ and attorneys general of 33 states sued Apple for an alleged conspiracy to fix prices in the eBooks market—Apple was ultimately found to have violated state and federal antitrust laws and paid $450 million as a consequence; and

- In 2021, Apple agreed to pay $100 million to resolve claims by certain software developers who accused the company of monopolizing the market for app development and charging developers excessive commissions on app sales.

156. Apple has deployed a similar playbook for a much broader range of third-party apps and services as well, many of which present technologies that function as middleware, facilitate

49

switching, reduce the need for expensive hardware, or disintermediate Apple's iPhone by enabling the development of cross-platform technologies. For instance, Apple has undermined third-party location trackable devices that fully function across platforms. Apple has impaired third-party, cross-platform video communications apps while steering users to its own video communication app, FaceTime. Apple has limited the capabilities of third-party iOS web browsers, including by requiring that they use Apple's browser engine, WebKit. Protocols that Apple has placed around new "eSIM" technology may introduce additional frictions for any user who seeks to transition from an iPhone to a different phone while maintaining the same phone number. Apple has impeded cross-platform cloud storage apps in order to steer iPhone users into iCloud, making data transfer between different devices more difficult. Apple uses restrictions in sales channels to impede the sale and distribution of rival smartphones. And Apple has worsened its users' experience by making it difficult for iPhone users to use superior voice and AI assistants and steering users to use Siri as a voice assistant.

157.    Ultimately, the strategies Apple has employed to date are not the only ones Apple can use to achieve its anticompetitive and lucrative ends. As technology evolves, Apple continues to evolve and shift its anticompetitive behavior to protect its monopoly power. For example, in recent years, Apple has increasingly moved into offering its own subscription services, including news, games, video, music, cloud storage, and fitness subscriptions that could be used to keep users tethered to the platform. These subscription services and other ancillary fees are a significant part of Apple's net revenue. These subscriptions services can also increase switching costs among iPhone users. If an Apple user can only access their subscription service on an iPhone, they may experience significant costs, time, lost content, and other frictions if they attempt to switch to a non-Apple smartphone or subscription service.

158.    These subscription services can also increase Apple's power over content creators and newspapers, among others, by exerting control over how audiences access their work, decreasing traffic

to their websites and apps, and positioning Apple as the middleman or tollbooth operator in the relationship between creators and users. In so doing, Apple takes on outsize importance and control in the creative economy, which may diminish incentives to fund, make, and distribute artistic expression.

159.    In addition, when one road is closed to Apple, Apple has demonstrated its ability to find new roads to the same or worse ends. For example, Apple was recently ordered to stop blocking link-outs by third parties to their websites where users could buy the third party's product cheaper. In response, Apple reportedly allowed link-outs to websites but now charges for purchases made on the web even if they are not an immediate result of a click from a link in a native iPhone app.

160.    Apple has also attempted to undermine cross-platform technologies like digital car keys in ways that benefit Apple but harm consumers. For example, Apple has required developers to add digital keys developed for their own apps to Apple Wallet as well. The default status of Apple Wallet steers users to the Apple Wallet rather than allowing third parties to present digital car keys only in their own cross-platform app, increasing dependence on Apple and the iPhone whenever they use their car. At the same time, it decreases the incentives of automakers to innovate because automakers are forced to share data with Apple and prevented from differentiating themselves as they could absent Apple's conduct.

161.    Apple's threatened dominance over the automotive industry goes well beyond the Apple Wallet and Apple's demands on car makers to allow innovative products and services on the iPhone. Apple's smartphone dominance extends to CarPlay, an Apple infotainment system that enables a car's central display to serve as a display for the iPhone and enables the driver to use the iPhone to control maps and entertainment in the car. Like the smartphone market, infotainment systems are increasingly considered must-have capabilities in newer vehicles. Indeed, in 2022, Apple engineering manager Emily Schubert revealed that 98% of new cars in the United States come with CarPlay installed—and that a reported 79% of U.S. buyers would only buy a car if it supported CarPlay.

162.     After leveraging its smartphone dominance to car infotainment systems, Apple has told automakers that the next generation of Apple CarPlay will take over all of the screens, sensors, and gauges in a car, forcing users to experience driving as an iPhone-centric experience if they want to use any of the features provided by CarPlay. Here too, Apple leverages its iPhone user base to exert more power over its trading partners, including American carmakers, in future innovation. By applying the same playbook of restrictions to CarPlay, Apple further locks-in the power of the iPhone by preventing the development of other disintermediating technologies that interoperate with the phone but reside off device.

## VII.   ANTICOMPETITIVE EFFECTS

### A.     Apple's conduct harms the competitive process and injures iPhone purchasers.

163.     As described above, Apple protects its monopoly power in smartphones and performance smartphones by using its control over app distribution and app creation to suppress or delay apps, innovations, and technologies that would reduce user switching costs or simply allow users to discover, purchase, and use their own apps and content without having to rely on Apple. As a result, Apple faces less competition from rival smartphones and less competitive pressure from innovative, cross-platform technologies not because Apple makes its own products better but because it makes other products worse. With the benefit of less competition, Apple extracts extraordinary profits and regulates innovation to serve its interests. This leaves all smartphone users worse off, with fewer choices, higher prices and fees, lower quality smartphones, apps, and accessories, and less innovation from Apple and others. Left unchallenged, Apple will continue to use and strengthen its smartphone monopoly to dictate how companies can create and distribute apps in the future so that they cannot threaten Apple's smartphone monopolies.

164. Apple's conduct has resulted in less choice for smartphone users. Today, only two companies (Google and Samsung) remain as meaningful competitors to Apple in the premium smartphone market.

165. Even when users consider these alternatives, Apple's conduct has increased the technical, behavioral, monetary, and other costs of switching from an iPhone to an alternative smartphone. This undermines competition and entrenches Apple's monopoly power. For example, according to user surveys, one of the biggest reasons iPhone users do not switch to rival smartphones today is to avoid the problems Apple has created for cross-platform messaging. Likewise, Apple exercised its control over app distribution and app creation to impede the development and growth of super apps, depriving users of technology that would have facilitated switching by decreasing user's dependence on Apple and the iPhone. Apple took a similar approach to cloud streaming apps, delaying or suppressing technology that would have made it easier for users to switch to cheaper smartphones. Apple also used its control over app creation, including its control over critical APIs, to impose technical and contractual restrictions on messaging apps, third-party smartwatches, and digital wallets, undermining cross-platform technologies that would have helped users overcome switching costs and friction and ultimately increased smartphone competition.

166. Apple's conduct has delayed or suppressed the emergence of cross-platform technologies that would put competitive pressure on Apple's ability to extract extraordinary profits from users and developers. For example, if developers could distribute their programs through super apps or cloud streaming apps, rather than the App Store, it would put competitive pressure on Apple's ability to control app distribution and app creation as well as the taxes Apple imposes on developers who want to distribute apps to iPhone users. Similarly, third-party digital wallets, or other apps with tap-to-pay functionality, would benefit users and developers by putting more competitive pressure on Apple as well. For example, digital wallets could eventually provide developers an alternative way to

process payments and manage customer relationships, forcing Apple to compete more aggressively by lowering fees and improving quality, which would ultimately benefit users. Instead, Apple continues to exert its power over customers and financial institutions when users pay for something with their phone—in the App Store, in an app, or increasingly in the physical world with tap-to-pay.

167.     Apple's conduct has harmed users in other ways. For example, third-party digital wallets would reduce Apple's ability to charge banks high fees when users make payments using Apple Wallet, which ultimately cost consumers through higher prices or other reductions in quality. Alternative digital wallets could also provide smartphone users better rewards, e.g., cash back, as well as a more private, secure payment experience from a user's preferred financial institution rather than being forced to go through Apple. But these tap-to-pay digital wallet products and services do not exist today because of Apple.

168.     Apple's conduct has also made its own products worse, sacrificing the short-term profits Apple could earn from improving the iPhone in order to preserve the long-term value of maintaining its monopoly. In a competitive market, Apple would compete aggressively to support the development of popular apps and accessories for iPhone users, which would in turn make iPhones more attractive to users and more valuable. But Apple takes steps to delay or suppress cross-platform technologies that it recognizes would be popular with users, such as super apps and cloud streaming apps, because of the threat they pose to Apple's smartphone monopolies. As a result, several developers have abandoned plans to develop super apps and cloud-based gaming apps even after making substantial investments in bringing them to market. Apple's conduct may have also slowed the development of innovative, high-compute apps related to education, artificial intelligence, and productivity as well. Apple has also impeded innovation by third-party smartwatches such that manufacturers have limited the functionality of their smartwatches for iPhone users, suspended support for iPhone compatibility because of Apple's restrictions, or canceled development of cross-platform

54

smartwatches altogether. At least one company's canceled smartwatch formed part of its overall wearables strategy, including future development of virtual-reality technology. Similarly, Apple degrades third-party messaging apps, even though it makes cross-platform messaging less private and less secure for iPhone users, because doing so raises switching costs.

169.    Apple's conduct has harmed other smartphone users, too. Because of the resources and risks required to maintain different features across different smartphones, many potential super app, mini program, and other developers do not implement features prohibited by Apple even on other smartphones. For example, prospective digital wallet providers, including U.S. banks, have abandoned the development of digital-wallet apps for either Apple or other smartphones. Another company decided not to offer users an innovative digital car key in part because Apple required that company to add any features related to the key into Apple Wallet rather than allowing that company to put its key solely in its own app. Other developers have shrunk, shuttered, or abandoned plans to launch super apps, cloud-streamed gaming apps, smartwatches, and other apps. As a result, all smartphone users enjoy lower quality smartphones, less innovation, and less choice.

170.    According to the DOJ's Complaint, Apple's documents and conduct show that Apple is motivated by the anticompetitive purpose of building or maintaining monopoly power in the relevant markets. For example, Apple sacrificed substantial revenues it could have earned from super apps, mini programs, cloud streaming apps, and other third-party apps and accessories. In particular, mobile gaming already accounts for a large and growing portion of Apple's revenue. Popular cloud streamed gaming apps would offer iPhone users access to popular services (including games) and in turn generate significant revenue for Apple through subscriptions and in-app purchases. Instead, Apple preferred the long-term benefit of reduced smartphone competition to the revenue it would generate from cloud gaming, super apps, and mini programs or the quality (and consumer demand) increase that would flow from this innovation. Apple has also used its control over app distribution and app creation

55

to selectively undermine cross-platform technologies, not because this helps protect users but because it helps protect Apple.

171. The harms to smartphone competition caused by Apple's conduct are amplified by Apple's decision to grant itself exclusive distribution rights to iPhone users through the Apple App Store. If Apple allowed users to access apps in other ways, users could choose an app store that did not restrict super apps or mini programs, even if Apple ran its App Store the same way it does today. Apple does not allow that choice, however, because if it did developers could write their programs for any smartphone rather than specifically for iOS, just as internet browsers and Apple's QuickTime allowed developers to write programs that worked on a variety of operating systems not just Windows. That would lower users' switching costs and reduce users' and developers' dependence on Apple and the iPhone.

172. Apple's smartphone monopoly gives it many levers to maintain its power even in the face of interventions focused on eliminating or disciplining specific anticompetitive practices. This is because Apple's iPhone monopoly, secured by its anticompetitive conduct, grants it the power to set the rules by which most smartphone users buy digital and hardware products, and by which developers are allowed to sell these same products to users. If Apple is forced to change some of these rules, it has the power to adopt new rules, restrictions, or features that reinforce Apple's monopoly and harm competition in other ways. For example, Apple has stated plans to adopt RCS due to market and international regulatory pressure. But Apple continues to contractually restrict third parties from accessing other APIs and features that would enable cross-platform messaging apps. In another instance, Apple was enjoined from enforcing certain anti-steering provisions in its agreements with developers. In response, Apple simply created a different set of onerous restrictions on app developers to achieve a similar result. In other cases, Apple has used its control over app distribution to force

companies to comply with Apple's policies that may contradict local laws by delaying the review of the offending companies' apps.

173.    Apple's conduct has therefore harmed Plaintiffs and other iPhone purchasers in myriad ways. iPhone prices have increased dramatically and now, on an inflation-adjusted basis, far exceed the prices that iPhones commanded when Apple initially sought to displace BlackBerry devices and other pre-smartphone devices. Those price increases reflect Apple's acquisition and maintenance of monopoly power, and the difference between the prices Plaintiffs and other purchasers of iPhones from Apple paid and what they would have paid had Apple competed on the merits instead of engaging in anticompetitive conduct represent "overcharges"—monies that should have remained in purchasers' pockets but instead went to Apple's coffers.

174.    In addition to overcharges, iPhone purchasers have suffered from reduced choice, slower innovation, and a degraded user experience relative to what they would have enjoyed in a competitive market. All of these harms together and separately reflect precisely the type of injuries that the antitrust laws were intended to prevent, and iPhone purchasers are therefore entitled to treble damages and injunctive relief to remedy past harms and prevent future injuries from Apple's conduct.

**B.    Apple has every incentive to use its monopoly playbook in the future.**

175.    Apple's conduct does not just impact the past and present but poses significant risk to the development of new innovations. Apple may use its smartphone monopoly playbook to acquire or maintain power over next-frontier devices and technologies. As Apple grows its dominance, Apple may continue delaying or stifling the innovations of cross-platform companies, in order to lock users into Apple devices.

176.    Apple has countless products and services—AirPods, iPads, Music, Apple TV, photos, maps, iTunes, CarPlay, AirDrop, Apple Card, and Cash. These provide future avenues for Apple to engage in anticompetitive conduct and the ability to circumvent remedies. Appropriate forward-

57

looking remedies are necessary to ensure that Apple cannot use these products and services to further entrench its monopoly power.

177. Apple's conduct extends beyond just monopoly profits and even affects the flow of speech. For example, Apple is rapidly expanding its role as a TV and movie producer and has exercised that role to control content.

178. Apple has also attempted to use its monopoly to collect user data and stifle innovation in the automotive industry by, among other things, impeding the development of digital key technologies by requiring them to be offered in Apple's proprietary wallet product and creating new single points of power over emerging uses of the iPhone. These acts further reinforce Apple's power in the iPhone by locking in Apple's services and excluding other alternative technologies that have the potential to disintermediate Apple's iPhone.

179. Finally, Apple's monopolization of smartphone markets gives it tremendous power over the lives of millions of Americans. Today, Apple uses that power to undermine rival smartphones, suppress innovative technologies, and stymie consumer choice. Tomorrow, Apple may use its power to force its own users (and their data) to become its next profitable product.

## VIII. PRIVACY, SECURITY, AND OTHER ALLGED COUNTERVAILING FACTORS DO NOT JUSTIFY APPLE'S ANTICOMPETITIVE CONDUCT

180. There are no valid, procompetitive benefits of Apple's exclusionary conduct that would outweigh its anticompetitive effects. Apple's moat building has not resulted in lower prices, higher output, improved innovation, or a better user experience for smartphone users.

181. Apple markets itself on the basis of privacy and security to differentiate itself from what competition is left in the smartphone market. But this does not justify Apple's monopolistic and anticompetitive conduct. Apple imposes contractual restraints on app creation and distribution, imposes hefty fees on many types of smartphone interactions, and conditionally restricts API access

on its smartphone platform simply because it can. There are limited if any competitive constraints on this conduct. As a point of comparison, Apple does not engage in such conduct on its Mac laptops and computers. It gives developers the freedom to distribute software directly to consumers on Mac without going through an Apple-controlled app store and without paying Apple app store fees. This still provides a safe and secure experience for Mac users, demonstrating that Apple's control over app distribution and creation on the iPhone is substantially more restrictive than necessary to protect user privacy and security.

182.    In fact, many alternative technologies that Apple's conduct suppresses would enhance user security and privacy. For example, Apple's conduct targeting digital wallets forces users to share information with Apple even if they would prefer to share that information solely with their bank, medical provider, or other trusted third party. In particular, when an iPhone user provisions a credit or debit card into Apple Wallet, Apple intervenes in a process that could otherwise occur directly between the user and card issuer introducing an additional point of failure for privacy and security. Likewise, super apps or alternative app stores could offer users and their families a more curated selection of apps that better protect user privacy and security. Indeed, Apple allows enterprise and public sector customers to offer more curated app stores on employee iPhones because it better protects privacy and security.

183.    Apple is also willing to make the iPhone less secure and less private if that helps maintain its monopoly power. For example, text messages sent from iPhones to Android phones are unencrypted as a result of Apple's conduct. If Apple wanted to, Apple could allow iPhone users to send encrypted messages to Android users while still using iMessage on their iPhone, which would instantly improve the privacy and security of iPhone and other smartphone users.

184.    Similarly, Apple is willing to sacrifice user privacy and security in other ways so long as doing so benefits Apple. For example, Apple allows developers to distribute apps through its App

59

Store that collect vast amounts of personal and sensitive data about users—including children—at the expense of its users' privacy and security.

185.    Apple also enters agreements to share in the revenue generated from advertising that relies on harvesting users' personal data. For example, Apple accepts massive payments from Google to set its search engine as the default in the Safari web browser—as of 2023, Google paid Apple 36% of its search advertising from revenue from Safari—even though Apple recognizes that other search engines better protect user privacy.

186.    Finally, Apple selectively enforces its rules and contractual restrictions for app distribution and app creation. For example, when it benefits Apple to do so, Apple permits developers to introduce mini programs, stream content from the cloud, use virtual currency, and receive special permissions or access APIs not automatically available to everyone.

187.    Ultimately, Apple chooses to make the iPhone private and secure when doing so benefits Apple; Apple chooses alternative courses when those courses help Apple protect its monopoly power. Apple's conduct underscores the pretextual nature of any claim that Apple's conduct is justified by protecting user privacy or security.

188.    Apple also monitors a user's data for its own purposes even when it promises not to do so. Two Mysk software researchers have noted this fact. As they point out, this information obtained from Apple device users includes "what a user does in these apps, what they view, when they view it, and for how long." Apple claims that none of this information is logged and is subject to privacy protection techniques. But the Mysk researchers state that the data that is saved includes a permanent, immutable identification number known as a directory services identifier or "DSID." As the Mysk analysts go on to note, this number "can personally identify a user," because it "is associated with their name, email and any data in their iCloud account."

## IX.    THE SMARTPHONE INDUSTRY AND RELEVANT MARKETS

A.    **Background.**

189.    Mobile phones are portable devices that enable communications over radio frequencies instead of telephone landlines. These signals are transmitted by equipment covering distinct geographic areas, or "cells," which is why mobile phones were called cell phones. The first commercial cell phones became available in the 1980s. Since then, improvements in both cell phone components and wireless technology have made it possible to transfer large volumes of data around the globe in a short period. As a result, mobile phones began to offer a wider array of features and the adoption of mobile phones dramatically increased. Today, nearly all American adults—about 97%—own a mobile phone.

190.    Smartphones combine the functionality of a traditional mobile phone with advanced hardware and software components. Smartphones not only make phone calls, but allow users to listen to music, send text messages, take pictures, play games, access software for work, manage their finances, and browse the internet. Consumers choose between smartphones based, in part, on their functionality. Today, smartphone functionality is driven in large part, though not exclusively, by a combination of hardware and software components. Thus, in a competitive market, smartphone manufacturers would compete and innovate to provide the best functionality.

191.    Although consumers could replace some smartphone functionality with separate devices such as by always carrying a camera and laptop, they generally prefer to access this combination of functionality as part of a single device. Thus, phones with some but not all of these features are not reasonable substitutes for smartphones. For example, a Canon or Nikon camera is not a substitute for an Apple or Samsung smartphone, notwithstanding that both these products are capable of taking digital pictures.

192.    Smartphones can be purchased directly from manufacturers, like Apple or Samsung. They can also be purchased or leased through third-party cellular service carriers, such as Verizon or AT&T. Finally, they can be purchased from third-party retailers (*e.g.*, Wal-Mart and Best Buy).

61

193.     In the United States, 20% or more of all iPhone purchases are direct through Apple, either in its retail spaces or online. Approximately 60-75% of all U.S. iPhone purchases are completed through a third-party cellular service carrier, like Verizon or AT&T, with the remainder purchased through third-party retailers, like Wal-Mart and Best Buy.

**B.     Smartphone Hardware.**

194.     A smartphone's hardware includes any element that is physical, like its frame and screen. Higher performing smartphones are typically constructed from better materials like glass and metal instead of plastic, manufactured to higher standards that make them more durable (e.g., water and dust proof), and have higher quality displays.

195.     A smartphone's hardware also includes the semiconductor chipsets that run the smartphone: central processing of software instructions, graphics, video, display, memory, data storage, and connection to wireless networks. Chipsets that offer superior performance—faster processing and network connections, better graphics, more storage—are costly. As a result, smartphone manufacturers typically include them only in more expensive performance smartphones.

196.     Smartphone hardware includes other important components like cameras, and position and motion sensors. Performance smartphones typically have higher quality cameras, better battery life, wireless charging, and advanced biometrics such as face scanning.

197.     Smartphones also contain several types of antennas that allow the phone to communicate with other smartphones, accessories, or other devices using standard communication protocols such as Wi-Fi, Bluetooth, and NFC.

- Wi-Fi is a wireless networking technology that uses radio waves to provide wireless high-speed Internet access through mobile devices, computers, printers, and other equipment. "Wi-Fi," in particular, refers to IEEE 802.11 standards that define the protocols that enable communications with current Wi-Fi-enabled wireless devices such as wireless routers and access points.

- Bluetooth is a wireless standard that allows smartphones to use shortwave radios to communicate with accessories like headphones and smartwatches. An industry- wide Bluetooth standard specifies technological requirements to ensure that all Bluetooth devices can recognize and interact with each other. A typical Bluetooth signal has a range of about 30 feet.

- NFC allows smartphones to interact with NFC-enabled devices like a credit card terminal at a coffee shop. NFC relies on short- range wireless technologies, including radio signals, to communicate and share information. To operate, two NFC-enabled devices must typically be within four centimeters or less of one another.

198. Three device manufacturers, Apple, Samsung, and Google, account for approximately 94 percent of all smartphones by revenue in the United States. Apple and Samsung alone account for approximately 90 percent of all smartphone revenues in the United States.

199. Cloud-based technologies are run using hardware and software in remote computing centers ("the cloud") rather than by hardware and software on a smartphone. The user experiences the technology on the phone but the complex computing that generates the rich experience and that executes the user's commands happens in the cloud. Thus, cloud apps can deliver rich experiences on smartphones with less capable hardware than iPhones currently contain.

### C. Smartphone Operating Systems, Applications, and Other Software.

200. In addition to hardware, smartphones include various software components that make a smartphone more attractive to users. Software drives the workings of a smartphone; it tells the hardware what to do and how to do it.

201. The most important software component is a smartphone's operating system, the foundational software that manages both the hardware and other software programs on the device. All iPhones are preloaded with Apple's proprietary, exclusive iPhone operating system called iOS. The only other significant mobile operating system in the United States is Google's Android, which works with smartphones manufactured by Samsung, whose U.S. headquarters is located in this district, Google, Motorola, and smaller players. Software applications, known as "apps," are programs that

63

perform specific tasks at the smartphone user's request, such as sending messages, playing music, or web browsing. Apps depend on a smartphone's operating system to function. For example, to make a video call, apps must communicate with a smartphone's operating system to access various hardware components on the phone, such as the camera, microphone, and speaker. Apps communicate with a smartphone's operating system through application programming interfaces (APIs).

202.   Apps that work with a particular smartphone operating system are called native apps. Thus, Apple's native iOS apps work with iPhone and native Android apps work with Android smartphones.

203.   Most app developers do not view Android as a substitute for iOS or iOS as a substitute for Android. The overwhelming majority of users choose a single phone and do not "multi-home" by carrying an Android phone and the iPhone at the same time. Thus, a developer cannot reach iPhone users on Android or Android users on iPhones. Due to the lack of user multi-homing, most developers create native apps for both iOS and Android to reach the greatest number of smartphone users. For example, a food delivery or ride-sharing app cannot develop an app just for Android phones or just for the iPhone. Developing for both platforms is often necessary for developers to reach the scale they need to be viable.

204.   It is also important to develop apps for the iPhone and other smartphone platforms because most apps are increasingly "social" in nature and require users on one platform to reach users on the other. For example, the developer of a dating app must enable its users on iPhones to meet users on Android and vice-versa. A money-sharing app must enable users on Android devices to send money to users on iPhones and vice versa.

205.   App developers typically provide a similar user experience for native apps on iPhones and Android smartphones to minimize the resources and risks of maintaining different features across

64

different smartphones. Even so, developers must program native apps to work with a specific operating system and so they do not always interoperate or synchronize across different operating systems.

206.    Middleware is software that provides similar APIs and functionality across a diverse set of operating systems and devices. This allows developers to create cross-platform applications without having to write separate code for individual operating systems or devices because developers can rely on the APIs exposed by the middleware rather than APIs that only work on specific operating systems or devices. Apple has long understood how middleware can help promote competition and its myriad benefits, including increased innovation and output, by increasing scale and interoperability. As Avadis Tevanian, Apple's then-Senior Vice President of Software Engineering testified during the government's landmark monopolization case in *United States v. Microsoft*: "Because we have created QuickTime for both Windows and Macintosh computers, developers can write a single version of a content product that will run on both Macintosh and Windows, without the additional expense of 'porting' the product to different operating systems." In the context of smartphones, examples of middleware include internet browsers, internet or cloud-based apps, super apps, and smartwatches, among other products and services. While not meeting the technical definition of middleware, certain other products and services may nonetheless have the same economic impact as middleware, such as eliminating the added expense of porting a product or experience across hardware or operating systems. For the purposes of this complaint middleware refers to both technical middleware and to products and services that, while not technically middleware, have the same economic effect.

**D.    Relevant Markets**

207.    Apple has monopoly power in the market for performance smartphones. The market for performance smartphones is an appropriate product market because market participants, including Apple, do not consider entry level smartphones competitors to performance smartphones. All smartphones compete against each other in a broad relevant market. But industry participants,

including Apple, assess competition among smartphones in narrower markets that are best understood as submarkets of the larger all-smartphone market. Because Apple chooses not to compete to sell new smartphones in the entry-level tier, the most relevant market to assess its conduct is a narrower market that excludes this tier. Regardless of how the market is drawn, however, Apple's conduct is unlawful.

### 1.   Performance smartphones are a relevant product market.

208.    Performance smartphones are a narrower relevant product market within the broader smartphone market. This narrower market includes those smartphones that compete with most iPhones and excludes the lowest-end smartphones, which industry participants sometimes refer to as "entry-level" smartphones.

209.    Industry participants recognize performance smartphones as distinct and frequently group smartphones into tiers that include entry-level smartphones and higher tiers such as "premium" or "flagship."

210.    Apple has also long recognized a distinction between these higher-end smartphones and lower-end, entry-level smartphones. According to the DOJ's Complaint, Apple's own documents indicate it does not view entry-level smartphones as competing with the iPhone and other performance smartphones.

211.    Performance smartphones have distinct characteristics and uses as compared to other smartphones. For example, entry-level smartphones are generally made with lower-quality materials and are less durable (*e.g.*, plastic instead of metal and glass). They have lower-performance components such as slower processors and lower-capacity storage, which prevent users from running more intensive applications or storing large volumes of pictures and data on the device. Entry-level smartphones often lack features such as an NFC antenna that allows consumers to use their phone to make payments or access passes for public transit.

212.    Consumers often purchase performance smartphones under different terms than entry-level smartphones. Consumers generally use entry-level smartphones along with pre-paid service plans. By contrast, consumers usually purchase performance smartphones for use with post-paid service plans (often including promotional discounts to consumers who purchase performance smartphones).

213.    Because of these differences, among others, between entry-level smartphones and performance smartphones, entry-level smartphones are not reasonable substitutes for performance smartphones.

214.    Moreover, competition from non-performance smartphones is not sufficient today to prevent Apple from exercising monopoly power in the performance smartphone market.

**2.      Smartphones are a broader relevant product market.**

215.    Smartphones are a relevant product market. Smartphones are distinct from phones that offer less capable hardware and software options than smartphones. These other phones, sometimes called "feature phones," may offer basic web browsing in addition to calling and messaging options, but do not offer the breadth of access to the internet or third-party apps as smartphones. Similarly, these phones often have lower-quality hardware, such as poorer displays, less capable cameras, and rely on physical keyboards instead of smartphone touch screens. Thus, these phones are not reasonable substitutes for smartphones.

216.    Smartphones are also distinct from other portable devices, such as tablets, smartwatches, and laptop computers. These devices lack the combination of function, size, and portability that consumers rely on in a smartphone, even if they offer some similar capabilities. Thus, none of these other products are reasonable substitutes for smartphones.

217.    Apple, other participants in the market, and the public recognize that smartphones are distinct from feature phones and other portable devices.

67

218.    Competition from feature phones, or other alternatives, is not sufficient to prevent Apple from exercising monopoly power in the smartphone market.

### 3.    The United States is a relevant geographic market for performance smartphones and smartphones.

219.    The United States is a relevant geographic market for the sale of performance smartphones and smartphones. Users in the United States demand services offered by U.S. telecommunications companies when they purchase a smartphone. While Apple sells smartphones worldwide, its users are still geographically limited. Most consumers in the market for performance smartphones uses their phones in the U.S. Consumers who purchase a smartphone require a service plan with a U.S. telecommunications company in order to connect the phone to cellular and mobile networks.

220.    Finally, potential new smartphone entrants to the U.S. market must also comply with telecommunications regulations and satisfy other legal requirements. No extensive regulatory framework governs how Apple operates its platform with respect to developers, but there are a number of regulatory requirements that must be met in order to enter the smartphone market. For example, some international smartphone makers are effectively barred from offering their smartphones to U.S. consumers.

221.    Consumers in the United States could not avoid or defeat an increase in the price of performance smartphones or smartphones by purchasing and importing smartphones from abroad. This allows Apple to set prices for the same smartphone in the United States separately from those in other countries. For example, Apple lowered the price of the iPhone 11 in China relative to the United States because Apple faced greater competition in China. This additional competition arises in part because a popular super app put competitive pressure on Apple and made it easier for users to switch from an

iPhone to a rival smartphone. As a result, Apple is unable to command the same prices for the iPhone in China than they do in the United States due to less competition.

**E.      Apple has monopoly power in the smartphone and performance smartphone markets.**

222.    Apple has monopoly power in the smartphone and performance smartphone markets because it has the power to control prices or exclude competition in each of them. Apple also enjoys substantial and durable market shares in these markets. Moreover, Apple's market shares likely underestimate Apple's power because they are protected by significant barriers to entry, network effects, and switching costs. Apple recognizes and exploits these barriers to entry, network effects, and switching costs to protect itself from competition from rival platforms and innovations, products, and services that may diminish consumer reliance on the iPhone. Apple's power will likely increase over time.

223.    Apple has the ability to set prices without regard to competition. The price of an iPhone has increased significantly over the years. When released in June 2010, an iPhone 4 cost $199. The iPhone 15—released in 2023—started at $799 for a base model, $899 for a Plus model, $999 for "X" and "Pro" models, and $1,199 for a "Pro Max" model. The chart below shows the pricing of various iPhone models from 2007 to the present.



70

224.   Most recently, in March of 2025, Apple replaced its base model of the iPhone---the iPhone SE, introduced in 2022, which had a starting price of $429—with the iPhone 16e, which has a higher starting price of $599. There is thus no longer an economy variant of the iPhone that customers can buy.

225.   In the U.S. market for performance smartphones, where Apple views itself as competing, Apple estimated that its market share exceeds 70 percent. These estimates likely understate Apple's market share today. For example, Apple's share among key demographics, including younger audiences and higher-income households, is even larger. Even in the broadest market consisting of all smartphones—including many smartphones that Apple and industry participants do not view as competing with Apple's iPhones and other higher-end phones—Apple's share is more than 65 percent by revenue. And as existing iPhone users get increasingly locked in, new smartphone buyers find other smartphones less and less viable as substitutes for iPhones because purchasing an iPhone allows them to interact more seamlessly with their friends and family who already have iPhones. This snowballing effect means, for example, that nearly 90% of teenagers expect their first smartphone purchases to be iPhones, thus ensuring that the next generation of users will similarly become locked into Apple's ecosystem. So any theoretical cross-elasticity of demand between iPhones and other smartphones does not suffice to prevent Apple from imposing monopolistic prices on iPhone purchasers.

226.   Similarly, even if consumers choose one phone over another, the vast majority of developers consider iPhones and Android devices as complements because developers must build apps that run on both platforms due to the lack of user multi-homing. In effect, the lack of multi-homing among users necessitates multi-homing among developers. This market reality increases the power that Apple is able to exercise over developers that seek to reach users on smartphones—especially performance smartphones that run sophisticated apps. Apple's power over developers, in turn, further locks in iPhone purchasers to Apple's ecosystem by limiting users' ability to transfer their apps and

71

data to non-Apple devices, making it difficult for users to switch away from Apple devices to avoid monopolistic overcharges.

227.    Apple's high market shares are durable. Over the last decade, Apple increased its share of smartphones sold in the United States most years. Through the same period, Apple collected more than half the revenue for all smartphones sold in the United States.

228.    Apple's monopoly power in the relevant markets is protected by substantial barriers to entry and expansion. For example, since fewer than ten percent of smartphone purchasers in the United States are buying their first smartphone, there are fewer new customers available for Apple's rivals. Instead, rivals must encourage existing iPhone users to switch from using an iPhone to using another smartphone when they replace or upgrade their phone. As a result, switching costs—many created or exacerbated by Apple—impose substantial barriers to entry and expansion for rival smartphones. This barrier is increasingly impenetrable. Nearly 90 percent of iPhone owners in the United States replace their iPhone with another iPhone. At least one U.S. carrier estimates that as high as 98 percent of iPhone users on its network replace or upgrade their iPhone in a given quarter by buying another iPhone. The increased switching costs that consumers experience because of Apple's conduct underpins these exceedingly high retention rates.

229.    Apple's monopoly power in the relevant markets is protected by other barriers to entry, expansion, or repositioning as well. For example, introducing a new smartphone requires considerable investments in acquiring expensive and scarce components such as mobile chips and specialized glass for screens. Other significant barriers to entry include product design, software development, regulatory approval, manufacturing, marketing, and customer service. Because smartphones are bought through mobile carriers including Verizon, which has its operations headquarters in this district, new entrants or those seeking to expand or reposition must meet the carriers' technical requirements to access the major carrier networks in the United States. New entrants and smaller rivals must also

72

negotiate distribution agreements and persuade carriers and other retailers to promote their products to consumers. As explained above, rival smartphones must also overcome the substantial network effects generated by interactions between users, developers, and others who interact with the iPhone.

230. Apple's iPhone platform is protected by several additional barriers to entry and expansion, including strong network and scale effects and high switching costs and frictions. For example, if an iPhone user wants to buy an Android smartphone, they are likely to face significant financial, technological, and behavioral obstacles to switching. The user may need to re-learn how to operate their smartphone using a new interface, transfer large amounts of data (e.g., contacts), purchase new apps, or transfer or buy new subscriptions and accessories. These switching costs and frictions are even higher when software applications, APIs, and other functionality do not help the different devices and operating systems communicate and interoperate. These switching costs and frictions increase the "stickiness" of the iPhone, making users more beholden to the smartphone manufacturer and platform operator.

231. Many prominent, well-financed companies have tried and failed to successfully enter the relevant markets because of these entry barriers. Past failures include Amazon (which released its Fire mobile phone in 2014 but could not profitably sustain its business and exited the following year); Microsoft (which discontinued its mobile business in 2017); HTC (which exited the market by selling its smartphone business to Google in September 2017); and LG (which exited the smartphone market in 2021). Today, only Samsung and Google remain as meaningful competitors in the U.S. performance smartphone market. Barriers are so high that Google is a distant third to Apple and Samsung despite the fact that Google controls development of the Android operating system.

232. Apple's monopoly power is separately demonstrated by direct indicia. Apple can and does profitably forego innovation without fear of losing customers to competitors. For example, Apple's vice president of iPhone marketing explained in February 2020: "In looking at it with

73

hindsight, I think going forward we need to set a stake in the ground for what features we think are 'good enough' for the consumer. I would argue were [*sic*] already doing \*more\* than what would have been good enough." After identifying old features that "would have been good enough today if we hadn't introduced [updated features] already," she explained, "anything new and especially expensive needs to be rigorously challenged before it's allowed into the consumer phone."

233.    Apple's profits and profit margins, for nearly every aspect of the iPhone, are further evidence of Apple's monopoly power. For example, Apple's per-unit smartphone profit margins are far more than its next most profitable rival. Apple charges carriers considerably more than its rivals to buy and resell its smartphones to the public and employs contract clauses that may impede the ability of carriers to promote rival smartphones, a harmful exercise of monopoly power that is hidden to most consumers. Apple extracts fees from developers—as much as 30 percent when users purchase apps or make in-app payments. Apple also extracts a 0.15 percent commission from banks on credit card transactions through its digital wallet, while none of its smartphone competitors with digital wallets charge any fee. Apple predicts that it will collect nearly $1 billion in worldwide revenue on Apple Pay fees by 2025. A recent report by the U.S. Consumer Financial Protection Bureau suggests these revenues will only increase, as "analysts expect the value of digital wallet tap-to-pay transactions will grow by over 150 percent by 2028."

234.    Apple increasingly charges developers additional fees to promote their apps in the App Store as well. In fact, this is one of the fastest-growing parts of Apple's services business, with revenue "increasing by more than a third to $4.4B in FY 2022."

235.    These indicia of Apple's monopoly power are direct evidence of its monopoly power in the relevant markets.

## X.    CLASS ACTION ALLEGATIONS

236.    Plaintiffs bring this action on behalf of themselves and as a class action under Fed. R. Civ. P. 23(b)(2) (for injunctive relief) and (b)(3) (for damages) on behalf of all persons and entities who fall within the definition of the following Class:

237.    **National Class:** All iPhone purchasers, either individuals or entities, who purchased iPhones directly from Apple anytime between March 22, 2020 and the present. The National Class excludes the Defendant and any of its current or former parents, subsidiaries, affiliates, officers, directors, and employees. The National Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

238.    Plaintiff Collins also brings this action on behalf of himself and as a class action under Fed. R. Civ. P. 23(b)(2) (for injunctive relief) and (b)(3) (for damages) on behalf of all persons and entities who fall within the definition of the following Subclass:

239.    **California Subclass**: All iPhone purchasers, either individuals or entities, who purchased iPhones directly from Apple in California anytime between March 22, 2020 and the present. The California Subclass excludes the Defendant and any of its current or former parents, subsidiaries, affiliates, officers, directors, and employees. The California Subclass also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

240.    Apple has sold iPhones to members of the National Class and California Subclass (together, the "Classes") across the nation during the relevant period. Defendant, due to its monopoly position, has charged supracompetitive prices for that product.

241.    Due to the nature of the trade and commerce involved, the Classes consist of millions of members. The exact number and their identities are known to Apple through its Apple ID system, which it uses, *inter alia*, to keep track of purchasers of Apple devices.

75

242. The Classes are so numerous that joinder of all members is impracticable.

243. There are questions of law and fact common to the Classes, including:

- Whether Defendant has unlawfully monopolized or attempted to monopolize either of the relevant markets asserted herein, including by way of the contractual terms, policies, practices, mandates, and restraints described herein;

- Whether competition in the relevant markets has been restrained and harmed by Apple's conspiracy, monopolization, or attempted monopolization, of these markets;

- Whether consumers and members of the Class have been damaged by Defendant's conduct;

- The amount of any damages; and

- The nature and scope of injunctive relief necessary to restore a competitive market.

244. Plaintiffs, the National Class, and the California Subclass were, during the Class period, direct purchasers of iPhones. Plaintiffs' respective claims are typical of the Class that they seek to represent, and the named Plaintiffs will fairly and adequately protect the interests of the Classes that they seek to represent.

245. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

246. Given the high cost of establishing that Defendant's monopoly or attempted monopolization has violated the antitrust laws (including, but not limited to, substantial expert witness costs and attorneys' fees), a class action is the only economically feasible means for any class member to enforce their statutory rights.

247. The prosecution of separate actions by individual members of the Classes would also create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

76

248.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

249.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Classes are readily ascertainable and each is one for which records exist. Prosecution as a class action will eliminate the possibility of duplicative litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This class action presents no difficulties in management that would preclude maintenance as a class action.

## XI.    STANDING AND ANTITRUST INJURY

250.    During the Class Period, Plaintiffs and members of the Classes directly purchased iPhones directly from Defendant—either through Defendant's retail stores or from Defendant's online store. Because of Defendant's anticompetitive conduct, Plaintiffs and members of the Classes were forced to pay more for iPhones than they would have if Defendant had not monopolized or attempted to monopolize the market for smartphones in the United States. Defendant therefore has caused Plaintiffs and Class members to suffer overcharge damages. Because of Defendant's continuing conduct in using its market power, contractual restrictions, fees, API restrictions, and other means to monopolize the relevant markets, Plaintiffs and members of the Classes are reasonably likely to incur future overcharges for iPhones. Both the actual harm and the threat of future harm are cognizable antitrust injuries directly caused by Defendant's violation of the antitrust laws, including its monopolization or attempted monopolization of the relevant markets, as alleged herein.

251.    Defendant, through its unlawful conduct alleged herein, increased prices, reduced choice for purchasers, and caused antitrust injury to purchasers in the form of overcharges. Plaintiffs

77

and members of the Classes have sustained, and continue to sustain, significant losses in the form of artificially inflated prices caused by Defendant's anticompetitive activity. The full amount of such overcharge damages will be calculated after discovery and upon proof at trial. Unless Defendant's anticompetitive conduct is stopped, Plaintiffs and the Classes will incur future overcharges in their direct purchases of iPhones.

## XII.   CLAIMS

### A.   First Claim for Relief: Monopolization of the Performance Smartphone Market in the United States in Violation of Sherman Act § 2.

252.   Plaintiffs, on behalf of themselves and the National Class that they represent, incorporate the allegations of paragraphs 1 through 251 above.

253.   Performance smartphones in the United States is a relevant antitrust market, and Apple has monopoly power in that market.

254.   Apple has willfully monopolized the performance smartphone market in the United States through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased, maintained, or protected its performance smartphone monopoly.

255.   Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies being impeded, and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

256.   While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition

and the competitive process. Apple's anticompetitive acts have had harmful effects on competition and consumers.

257.    Apple's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Apple's anticompetitive and unlawful conduct.

258.    Plaintiffs and the National Class have suffered injury flowing from the anticompetitive effects of Apple's conduct, including measurable damages in an amount to be calculated at trial, and face an ongoing threat of new injuries absent an injunction restraining Apple's monopolization of the performance smartphone market.

259.    Plaintiffs and the National Class seek all remedies available under the Clayton Act, including, without limitation, the following: (a) injunctive and other equitable relief pursuant to Clayton Act Section 16, 15 U.S.C. § 26; (b) treble damages pursuant to Clayton Act Section 4, 15 U.S.C. § 15; and other remedies as the Court may deem appropriate and the interests of justice may require.

### B. Second Claim for Relief, in the Alternative to the First Claim for Relief: Attempted Monopolization of the Performance Smartphone Market in the United States in Violation of Sherman Act § 2

260.    Plaintiffs, on behalf of themselves and the National Class that they represent, incorporate the allegations of paragraphs 1 through 251 above.

261.    Performance smartphones in the United States is a relevant antitrust market, and Apple has attempted to monopolize that market.

262.    Apple has attempted to monopolize the performance smartphone market in the United States through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased Apple's market power in the performance smartphone market.

79

263. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded, and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

264. While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

265. In undertaking this course of conduct, Apple has acted with specific intent to monopolize, and to destroy effective competition in, the performance smartphone market in the United States. There is a dangerous probability that, unless restrained, Apple will succeed in monopolizing the performance smartphone market in the United States, in violation of Section 2 of the Sherman Act.

266. Plaintiffs and the National Class have suffered injury flowing from the anticompetitive effects of Apple's conduct, including measurable damages in an amount to be calculated at trial, and face an ongoing threat of new injuries absent an injunction restraining Apple's attempted monopolization of the performance smartphone market.

267. Plaintiffs and the National Class seek all remedies available under the Clayton Act, including, without limitation, the following: (a) injunctive and other equitable relief pursuant to Clayton Act Section 16, 15 U.S.C. § 26; (b) treble damages pursuant to Clayton Act Section 4, 15 U.S.C. § 15; and other remedies as the Court may deem appropriate and the interests of justice may require.

C. **Third Claim for Relief: Monopolization of the Smartphone Market in the United States in Violation of Sherman Act § 2**

268. Plaintiffs, on behalf of themselves and the National Class that they represent, incorporate the allegations of paragraphs 1 through 251 above.

269. Smartphones in the United States is a relevant antitrust market, and Apple has monopoly power in that market.

270. Apple has willfully monopolized the smartphone market in the United States through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased, maintained, or protected its smartphone monopoly.

271. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded, and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

272. While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

273. Apple's anticompetitive acts have had harmful effects on competition and consumers.

274. Apple's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Apple's anticompetitive and unlawful conduct.

275. Plaintiffs and the National Class have suffered injury flowing from the anticompetitive effects of Apple's conduct, including measurable damages in an amount to be calculated at trial, and face an ongoing threat of new injuries absent an injunction restraining Apple's monopolization of the smartphone market.

276. Plaintiffs and the National Class seek all remedies available under the Clayton Act, including, without limitation, the following: (a) injunctive and other equitable relief pursuant to Clayton Act Section 16, 15 U.S.C. § 26; (b) treble damages pursuant to Clayton Act Section 4, 15 U.S.C. § 15; and other remedies as the Court may deem appropriate and the interests of justice may require.

**D.  Fourth Claim for Relief, in the Alternative to the Third Claim for Relief: Attempted Monopolization of the Smartphone Market in the United States in Violation of Sherman Act § 2**

277. Plaintiffs, on behalf of themselves and the National Class that they represent, incorporate the allegations of paragraphs 1 through 251 above.

278. Smartphones in the United States is a relevant antitrust market, and Apple has attempted to monopolize that market.

279. Apple has attempted to monopolize the smartphone market in the United States through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased Apple's market power in the smartphone market.

280. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded, and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

281. While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

282. In undertaking this course of conduct, Apple has acted with specific intent to monopolize, and to destroy effective competition in, the smartphone market in the United States. There is a dangerous probability that, unless restrained, Apple will succeed in monopolizing the smartphone market in the United States, in violation of Section 2 of the Sherman Act.

283. Plaintiffs and the National Class have suffered injury flowing from the anticompetitive effects of Apple's conduct, including measurable damages in an amount to be calculated at trial, and face an ongoing threat of new injuries absent an injunction restraining Apple's attempted monopolization of the smartphone market.

284. Plaintiffs and the National Class seek all remedies available under the Clayton Act, including, without limitation, the following: (a) injunctive and other equitable relief pursuant to Clayton Act Section 16, 15 U.S.C. § 26; (b) treble damages pursuant to Clayton Act Section 4, 15 U.S.C. § 15; and other remedies as the Court may deem appropriate and the interests of justice may require.

**E.      Fifth Claim of Relief, Violation of the Unfair Competition Law Cal. Bus. & Prof. Code § 17200 et seq**

285. Apple's conduct, as described above, violates California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL"), which prohibits any unlawful, unfair, or fraudulent business act or practice. Apple has engaged in, and continues to engage in, acts that violate the unlawful and unfair prongs of the UCL.

286. Plaintiffs incorporate the allegations of paragraphs 1 through 251 above and bring this claim on behalf of themselves and the National Class that they represent.

287. Plaintiff Collins, in the alternative, brings this claim on behalf of the California Subclass. Plaintiff Collins, on behalf of himself and the California Subclass that he represents, incorporates the allegations of paragraphs 1 through 251 above.

288.    Plaintiffs in the National Class and California Subclass have standing to bring this claim because they suffered an injury in fact and lost money as a result of Apple's unlawful and unfair competition. On information and belief, Apple's decisions to engage in the anti-competitive conduct alleged in this complaint occurred entirely or almost entirely in California, where its headquarters are located. As a direct result of Apple's anti-competitive conduct, Plaintiffs in the National Class and California Subclass paid supra-competitive and artificially inflated prices for iPhones. Plaintiffs in the National Class and California Subclass lost money or property as a result of Apple's unfair competition.

289.    The injuries to Plaintiffs in the National Class and California Subclass are substantial and greatly outweigh any benefits to consumers or competition from Apple's conduct. Plaintiffs in the National Class and California Subclass could not have reasonably avoided the injuries inflicted upon them by Apple.

290.    Apple's conduct violates the Sherman Act and thus constitutes unlawful conduct under § 17200.

291.    Apple's conduct is unfair within the meaning of the UCL. Apple's conduct violates the Sherman Act, offends the nation's antitrust laws and public policies, and significantly threatens and harms competition. Apple wrongfully acquired and maintained monopoly power in the relevant markets through the conduct alleged herein. Apple's conduct deprives consumers of innovation in technology and creates barriers that prevent consumers from accessing more seamless cross-platform technology. Apple's conduct is immoral, unethical, oppressive, and unscrupulous.

292.    Plaintiffs in the National Class and California Subclass seek injunctive relief under the UCL.

293.    Apple has been unjustly enriched as a result of its wrongful conduct, unfair competition, and unfair business practices. Under Business and Professions Code § 17203, Plaintiffs in the National Class and California Subclass are entitled to full restitution and/or disgorgement of all revenues,

earnings, profits, compensation, and benefits that may have been obtained by Apple as a result of such business acts or practices.

294.    The illegal conduct alleged herein is continuing and there is no indication that Apple will not continue such activity into the future.

295.    Plaintiffs in the National Class and the California Subclass, on behalf of the general public of the State of California and pursuant to § 17203 and *McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017), seek a court order for public declaratory and injunctive relief to enjoin Apple from such future misconduct, and any other such order that may be necessary to prevent future harm and financial injury to members of the general public who have not yet transacted with Apple but are likely to in the future. The general public is in need of protection from Apple's ongoing and continuing violations of the UCL. Such relief will create a public benefit. Plaintiffs in the National Class and California Subclass thus bring this action for public declaratory and public injunctive relief as a private attorney general and to vindicate and enforce important rights affecting the public interest. Plaintiffs in the National Class and California Subclass are therefore entitled to an award of attorneys' fees and costs under Cal. Code of Civ. P. § 1021.5 for bringing this action for public declaratory and injunctive relief.

## XIII.   REQUEST FOR RELIEF

296.    To remedy these illegal acts, Plaintiffs request that the Court:

297.    Adjudge that this litigation may be maintained as a class action under Fed. R. Civ. P. 23, and that Plaintiffs be the named representatives of the Classes in which they are a member;

298.    Adjudge and decree that Apple has acted unlawfully to monopolize, or, in the alternative, attempt to monopolize, the smartphone market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

85

299. Adjudge and decree that Apple has acted unlawfully to monopolize, or, in the alternative, attempt to monopolize, the performance smartphone market in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

300. Enter judgment for Plaintiffs and members of the Classes against Defendant for three times the amount of damages sustained by Plaintiffs and the members of the Classes as allowed by law and for such equitable relief as the Court deems necessary to cure any anticompetitive harm, together with the costs of this action, including reasonable attorneys' fees, pursuant to Section 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and the UCL;

301. Award Plaintiffs and the Classes pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

302. Enjoin Apple from continuing to engage in the anticompetitive practices described herein and from engaging in any other practices with same purpose or effect as the challenged practices, including but not limited to:

    a) preventing Apple from using its control of app distribution to undermine cross-platform technologies such as super apps and cloud streaming apps, among others;

    b) preventing Apple from using private APIs to undermine cross-platform technologies like messaging, smartwatches, and digital wallets, among others; and

    c) preventing Apple from using the terms and conditions of its contracts with developers, accessory makers, consumers, or others to obtain, maintain, extend, or entrench a monopoly; and

303. Enter any additional relief the Court finds just and proper.

## JURY TRIAL DEMANDED

Plaintiffs request a jury trial on all matters so triable.

Dated: July 30, 2025

Respectfully submitted,

   */s/ James E. Cecchi*

William Christopher Carmody
Shawn J. Rabin
SUSMAN GODFREY LLP
One Manhattan West, 50th Floor
New York, NY 10001-8602
Tel: (212) 336-8330
Email: bcarmody@susmangodfrey.com
Email: srabin@susmangodfrey.com

James E. Cecchi
CARELLA, BYRNE, CECCHI,
BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Tel: 973-994-1700
Email: jcecchi@carellabyrne.com

Christopher A. Seeger
SEEGER WEISS, LLP
55 Challenger Road
Ridgefield Park, NJ 07660
Tel: 973-639-9100
Email: cseeger@seegerweiss.com

Steven W. Berman
HAGENS BERMAN SOBOL
SHAPIRO, LLP
1301 Second Avenue
Suite 2000
Seattle, WA 98101
Tel: 206-623-7292
Email: steve@hbsslaw.com

Dena Sharp
GIRARD SHARP LLP
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: 415-981-4800
Email: dsharp@girardsharp.com

Melinda R. Coolidge
HAUSFELD LLP
888 16th Street, NW Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Email: mcoolidge@hausfeld.com

*Co-Lead Interim Class Counsel for Direct Purchasers' Track*

Joseph J. DePalma
LITE DEPALMA GREENBERG
& AFANADOR, LLC
570 Broad Street, Suite 1201
Newark, NJ 07102
Tel: (973) 623-3000
Email: jdepalma@litedepalma.com

Michael Critchley Sr.
CRITCHLEY, KINUM & LURIA, LLC
75 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 422-9200
Email: mcritchley@critchleylaw.com

*Trial Counsel/Direct Purchasers' Track*

*Liaison Counsel for Direct Purchasers' Track*

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is related to the following civil actions:

*In re: Apple Inc. Smartphone Antitrust Litigation*, No. 2:24-md-3113

*United States, et al. v. Apple Inc.*, No. 2:24-cv-4055

I hereby certify that the following statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


Date:  July 30, 2025

        CARELLA, BYRNE, CECCHI,
BRODY & AGNELLO, P.C.

*/s/ James E. Cecchi*
James E. Cecchi
5 Becker Farm Road
Roseland, NJ 07068
Tel: 973-994-1700
Email: jcecchi@carellabyrne.com

# EXHIBIT C

**JAVERBAUM WURGAFT HICKS**
**KAHN WIKSTROM & SININS, P.C.**
1000 Haddonfield-Berlin Road, Suite 203
Voorhees, NJ 08043
Phone: 856.596.4100
BY: Stanley O. King, Esq.
Attorney ID No.: 034131996
**Attorney for Indirect Purchaser Plaintiffs**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE APPLE INC. SMARTPHONE ANTITRUST LITIGATION | Civil Action No. 2:24-md-03113<br><br>Hon. Julien Xavier Neals |

## INDIRECT IPHONE PURCHASER PLAINTIFFS'
## CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................1

II.    BACKGROUND ....................................................................................5

III.   DEFENDANT APPLE ........................................................................16

IV.   PLAINTIFFS.......................................................................................19

V.    FACTUAL ALLEGATIONS.............................................................27

     A.   Apple Launches iPhone and Leverages Third-Party Developers to Enhance the Platform........................................................................27

     B.   Apple Invited Third-Party Investment for Apps to Run on the iPhone and Then Imposed Tight Controls on App Creation and App Distribution..........................................................................29

VI.   SMARTPHONES AS PLATFORMS .............................................33

VII.  APPLE UNLAWFULLY MAINTAINS ITS MONOPOLY POWER...35

     A.   Apple Harms Competition by Imposing Contractual Restrictions, Fees, and Taxes on App Creation and Distribution..........................35

          1.   Super Apps: Apple prevented apps from threatening its smartphone monopoly by undermining mini programs that reduce user dependence on the iPhone.................................39

          2.   Cloud-Streaming Apps: Apple prevented developers from offering cloud gaming apps that reduce dependence on the iPhone's expensive hardware. ..........................................44

     B.   Apple Uses APIs and Other Critical Access Points in the Smartphone Ecosystem to Control the Behavior and Innovation of Third Parties in Order to Insulate Itself from Competition. ......................................48

          1.   Messaging: Apple protects its smartphone monopoly by degrading and undermining cross-platform messaging apps and rival smartphones. ..................................................48

          2.   Smartwatches: Apple protects its smartphone monopoly by impeding the development of cross-platform smartwatches. .......54

          3.   Digital Wallets: Apple restricts cross-platform digital wallets on the iPhone, reinforcing barriers to consumers switching to rival smartphones. ..................................................59

     C.   Apple Uses a Similar Playbook To Maintain Its Monopoly Through Many Other Products and Services.....................................66

CONSOLIDATED CLASS ACTION COMPLAINT

i

VIII.   ANTICOMPETITIVE EFFECTS .............................................................72

    A.   Apple's Conduct Harms the Competitive Process. .............................72

    B.   Apple Has Every Incentive to Use Its Monopoly Playbook
       in the Future.........................................................................................79

IX.   PRIVACY, SECURITY, AND OTHER ALLEGED
    COUNTERVAILING FACTORS DO NOT JUSTIFY APPLE'S
    ANTICOMPETITIVE CONDUCT ............................................................80

X.   THE SMARTPHONE INDUSTRY ...........................................................83

    A.   Background ...........................................................................................83

    B.   Smartphone Hardware .........................................................................84

    C.   Smartphone Operating Systems, Applications, and Other
       Software.................................................................................................87

    D.   Relevant Markets..................................................................................90

       1.   Performance smartphones are a narrower relevant product
          market.........................................................................................90

       2.   Smartphones are a broader relevant product market...................91

       3.   The United States is a relevant geographic market for
          smartphones. ..............................................................................92

    E.   Apple Has Monopoly Power in the Smartphone and Performance
       Smartphone Market. ..............................................................................94

XI.   JURISDICTION, VENUE, AND COMMERCE.....................................100

XII.   CLASS ALLEGATIONS ..........................................................................101

XIII.   STANDING AND ANTITRUST INJURY ..............................................104

XIV.   VIOLATIONS ALLEGED ........................................................................106

XV.   REQUEST FOR RELIEF..........................................................................193

XVI.   JURY DEMAND.......................................................................................194

## I.  INTRODUCTION

1.     In 2007, Defendant Apple Inc. ("Apple") revolutionized communication, information, and entertainment when it developed the iPhone. Then, Apple's cutting-edge technology gave it an advantage over competitors. More recently, Apple has wielded its market power to thwart and frustrate technology that threatens its lucrative iPhone empire.

2.     For consumers, including members of the proposed Classes (defined below), what began as innovation has been the ultimate double-edged sword. Apple uses a "lock in" strategy to ensure that the costs of switching to competing technology are artificially high, and Apple has erected a gauntlet of interoperability obstacles that make interacting with non-Apple smartphones cumbersome in important respects.

3.     Apple's continued dominance of the smartphone market has come at a tremendous cost to consumers. Apple launched the first-generation iPhone in 2007 at an MSRP of $499, or approximately $790 in 2025 dollars adjusted for inflation. Current models of the iPhone sell for $1000 or more—much higher than the increase from general inflation. Prices of iPhones have remained stubbornly high, even with the entry of other competitors in the smartphone market.

4.     To maintain its dominance, Apple uses its "lock in" strategy to retain consumers. As prominent investor Warren Buffett explained, "You are very, very,

CONSOLIDATED CLASS ACTION COMPLAINT

1

very locked in, at least psychologically and mentally, to the product you are using. [The iPhone] is a very sticky product." But the "lock in" is more than psychological.

5. To leave an ecosystem, customers face switching costs equivalent to both the value provided by the product being replaced and also the beneficial interactions it had with other products and customers. Customers will only leave if the value provided by the replacement product exceeds the switching cost. The more synergy between products, the greater the switching costs and the harder it is to leave. As a result, consumers become locked into an ecosystem as they buy more of its constituent products and face higher switching costs. This effect helps companies like Apple create inelastic demand, in which customers demand similar quantities of a good even at higher prices.

6. Apple's "lock in" scheme is part of a carefully crafted campaign to make the product "sticky" by design. As early as 2010, Steve Jobs discussed how to "further lock customers into our ecosystem" and "make Apple['s] ecosystem even more sticky." Three years later, Apple executives were still strategizing how to "get people hooked to the ecosystem."

7. The problem Apple had, as articulated by one executive, is that consumers could buy "a [expletive] Android for 25 bux at a garage sale and it works fine . . . And you have a solid cloud computing device. Imagine how many cases like that there are."

CONSOLIDATED CLASS ACTION COMPLAINT

2

8.     Apple's iPhone monopoly dwarfs any other aspect of Apple's revenues. In addition to charging monopolist prices on iPhones themselves, Apple further monetizes its monopoly by charging for related services, apps, and features. Apple creates a captive audience of its products and services by integrating successful third-party technology into the Apple ecosystem.

9.     The five "pillars" of Apple's "lock in" strategy are as follows:

10.     **Frustrating Super Apps.** A "super app" would threaten Apple's iPhone empire by facilitating switching between smartphones. Super apps serve as a platform for smaller "mini" programs developed using standard programming languages that enable cross-platform use. Apple ensures that no competing technology will emerge with functionality that allows consumers to switch between smartphone platforms. Apple achieves this through programming and contracts. These restrictions have no procompetitive purpose.

11.     **Suppressing Competing Cloud-Streaming Services.** Cloud-based gaming and streaming services would allow consumers to enjoy games and digital content without being locked into a device. Apple has blocked the development of cloud-streaming apps and services that would allow consumers to enjoy high-quality video games and other cloud-based applications, requiring consumers to pay for its expensive iPhone rather than stream this digital content. This restriction has no procompetitive justification.

12.     **Diminishing Cross-Platform Messaging Communication.** Apple degrades the quality of messaging between iPhones and competing smartphones such as Android, making the quality of cross-platform messaging worse and less innovative, so that its customers have to keep buying iPhones. In late 2024, Apple finally adopted RCS—the modern industry standard—for cross-platform texts with Android, but only adopted some RCS features for such messages.

13.     **Diminishing the Functionality of Non-Apple Smartwatches.** Apple locks in its users, in part, by blocking interoperability between its Apple Watch and other smartphones like Android. This imposes another economic cost on users who have Apple Watches and are thinking of switching to another smartphone.

14.     **Limiting Third Party Digital Wallets.** If iPhone users could use "tap-to-pay" technology similar to Apple Pay from a third-party app, another barrier to switching smartphones would fall. Apple prevents third-party apps from offering this tap-to-pay functionality, inhibiting the creation of cross-platform third-party digital wallets.

15.     Apple's scheme impairs competition and diminishes the value of its iPhone technology to consumers. Consumers pay increasing prices for generations of iPhones that have reduced interoperability with other smartphones and for diminished ability to access services and information through third-party apps, devices, and other technologies.

CONSOLIDATED CLASS ACTION COMPLAINT

4

16.     Apple's scheme is manifestly anticompetitive because it results in more expensive and less functional iPhones. Apple maintains its dominance and inflated prices through its "lock in" scheme.

17.     Without its anticompetitive "lock in" scheme, Apple would lose market power to innovative competitors, and competing smartphone manufacturers would restrain Apple's ability to continue to price its iPhones at such high margins.

18.     Apple's margins are twice that of competing smartphone manufacturers, even fifteen years after the iPhone was introduced. Morgan Stanley recently estimated Apple's profit margins on the iPhone device alone at 30-35 percent. Apple pads its profits by extracting up to 30 percent from app developers and third-party services within its platform. Apple also reaps fees from purchases through Apple Pay, internet searches, and other downstream features that its captive users utilize.

19.     Plaintiffs and other iPhone purchasers are injured by paying supracompetitive prices for their iPhones. Plaintiffs, who made indirect purchases of iPhones, seek to represent a class of indirect purchasers under Section 2 of the Sherman Act and state competition and consumer laws.

## II.     BACKGROUND

20.     Apple is based in Cupertino, California, and has been manufacturing computers since 1976.

CONSOLIDATED CLASS ACTION COMPLAINT

21.     Although a behemoth today, Apple's fortunes have historically turned based on changes in consumer preference and competition from lower-priced computer manufacturers.

22.     Apple's fortunes changed with the launch of the iPod in 2001. Apple's iTunes application allowed iPod users to organize their song library and update their iPod. A path-clearing antitrust enforcement case against Microsoft, brought by the United States and state attorneys general, opened the market and constrained Microsoft's ability to prohibit companies like Apple from offering iTunes on Windows PCs. Licensing agreements with the major music labels allowed Apple to offer iPod/iTunes users a wide selection of music for a fee per download. The iPod experience gave Apple a recipe for the future: a premium device, a large number of platform participants (*i.e.*, music labels and consumers), and a digital storefront. More importantly, it gave Apple a playbook: drive as many consumers and third-party participants as possible onto the platform and offer a wide selection of content, products, and services to consumers, created by those third parties, but stringently controlled and curated by Apple. This structure put Apple in the driver's seat to generate substantial revenues through device sales in the first instance and subsequently the ancillary fees that it derives from sitting between consumers on the one hand and the products and services they love on the other.

CONSOLIDATED CLASS ACTION COMPLAINT

6

23.     Apple's experience with the iPod set the stage for Apple's most successful product yet. In 2007, Apple launched the iPhone, a smartphone that offered high-end hardware and software applications, called "apps," built atop a mobile operating system that mimicked the functionality and ease of use of a computer. Apple initially offered only a small number of apps that it created for the iPhone. But Apple quickly realized the enormous value that a broader community of entrepreneurial, innovative developers could bring to its users and the iPhone platform more broadly. So Apple invited and capitalized on the work of these third parties while maintaining control and monetizing that work for itself. The value of third parties' work served an important purpose for Apple. Indeed, as early as 2010, then-CEO Steve Jobs discussed how to "further lock customers into our ecosystem" and "make Apple['s] ecosystem even more sticky."[1] Three years later, Apple executives were still strategizing how to "get people hooked to the ecosystem."[2]

24.     That strategy paid off. Over more than 15 years, Apple has built and sustained the most dominant smartphone platform and ecosystem in the United States by attracting third-party developers of all kinds to create apps that users could download on their smartphones through a digital storefront called the App Store. As developers created more and better products, content, apps, and services, more

---

[1] *United States v. Apple Inc.*, No. 2:24-cv-04055-JXN-LDW (D.N.J.), ECF No. 51 (hereinafter, "Government Complaint") ¶ 3.

[2] *Id.*

people bought iPhones, which incentivized even more third parties to develop apps for the iPhone. Today, the iPhone's ecosystem includes products, apps, content, accessories, and services that are offered by content creators, newspaper publishers, banks, advertisers, social media companies, airlines, productivity developers, retailers and other merchants, and others. As Apple's power grew, its leverage over third parties reinforced its tight control over how third parties innovate and monetize on and off the smartphone in ways that are anticompetitive and exclusionary.

25.    Today, Apple charges as much as $1,599 for an iPhone and earns high margins on each one, more than double those of others in the industry. In addition to this supracompetitive pricing, when developers imagine a new product or service for iPhone consumers, Apple also demands up to 30 percent of the price of an app whose content, product, or service it did not create. Then, when a consumer wants to buy some additional service within that app, Apple extracts up to another 30 percent, again for a service Apple does not create or develop. When users run an internet search, Google gives Apple a significant cut of the advertising revenue that an iPhone user's searches generate.

26.    Apple keenly understands that while a community of developers and accessory makers is indispensable to the success of the iPhone, they also pose an existential threat to its extraordinary profits by empowering consumers to "think

CONSOLIDATED CLASS ACTION COMPLAINT

8

different" and choose perfectly functional, less expensive and potentially more innovative and attractive alternative smartphones.

27. Apple's smartphone business model, at its core, is one that invites as many participants, including iPhone users and third-party developers, to join its platform as possible while using contractual terms to extract substantial remuneration from them. At the same time, Apple restricts its platform participants' ability to negotiate or compete down its prices through alternative app stores, in-app payment processors, and more.

28. To protect that model, Apple reduces competition in the market for smartphones. It does this by delaying, degrading, or outright blocking technologies that would facilitate competition in the smartphone markets via decreasing barriers to switching to another smartphone, among other things. The suppressed technologies would provide a high-quality user experience on any smartphone, which would, in turn, require smartphones to compete on their merits.

29. Apple suppresses such innovation through a web of contractual restrictions that it selectively enforces through its control of app distribution and its "app review" process, as well as by denying access to key points of connection between apps and the iPhone's operating system (called Application Programming Interfaces or "APIs"). Apple can enforce these restrictions due to its position as an intermediary between users and product creators, such as developers.

CONSOLIDATED CLASS ACTION COMPLAINT

9

30.     This complaint highlights five examples of Apple using these mechanisms to suppress technologies that would have increased competition among smartphones. Suppressing these technologies does not reflect competition on the merits. Rather, to protect its smartphone monopoly—and the extraordinary profits that monopoly generates—Apple repeatedly chooses to make its products worse for consumers to prevent competition from emerging. These examples below individually and collectively have contributed to Apple's ability to secure, grow, and maintain its smartphone monopoly by increasing switching costs for users, which leads to higher prices, fewer choices, reduced quality-adjusted output, and less innovation for users and developers. Apple has used one or both mechanisms (control of app distribution or control of APIs) to suppress the following technologies, among others:

- Super apps provide a user with broad functionality in a single app. Super apps can improve smartphone competition by providing a consistent user experience that can be ported across devices. Suppressing super apps harms all smartphone users—including Apple users—by denying them access to high quality experiences and harming developers by preventing them from innovating and selling products.

CONSOLIDATED CLASS ACTION COMPLAINT

10

- Cloud-streaming game apps provide users with a way to play computing-intensive games in the cloud. Cloud-streaming games (and cloud-streaming in general) can improve smartphone competition by decreasing the importance of expensive hardware for accomplishing high-compute tasks on a smartphone. Suppressing cloud-streaming games harms users by denying them the ability to play high-compute games (those which require significant amount of processing capabilities), and it harms developers by preventing them from selling such games to users.

- Messaging apps allow users to communicate with friends, family, and other contacts. Messaging apps that work equally well across all smartphones can improve competition among smartphones by allowing users to switch phones without changing the way they communicate with friends, family, and others. Apple makes third-party messaging apps on the iPhone worse generally and relative to Apple Messages, Apple's own messaging app, by prohibiting third-party apps from sending or receiving carrier-based messages. By doing so, Apple is knowingly and deliberately degrading quality, privacy, and

CONSOLIDATED CLASS ACTION COMPLAINT

security for its users and others who do not have iPhones. Apple also harms developers by artificially constraining the size of their user base.

- Smartwatches are an expensive accessory that typically must be paired to a smartphone. Smartwatches that can be paired with different smartphones allow users to retain their investment in a smartwatch when switching phones, thereby decreasing the literal cost associated with switching from one smartphone to another, among other things. By suppressing key functions of third-party smartwatches—including the ability to respond to notifications and messages and to maintain consistent connections with the iPhone—Apple has denied users access to high performing smartwatches with preferred styling, better user interfaces and services, or better batteries, and it has harmed smartwatch developers by decreasing their ability to innovate and sell products.

- Digital wallets are an increasingly important way that smartphones are used and are a product in which users develop a great deal of comfort and trust as they typically contain users' most sensitive information. Digital wallets that work across

CONSOLIDATED CLASS ACTION COMPLAINT

12

smartphone platforms allow users to move from one smartphone brand to another with decreased frictions, among other things. Apple has denied users access to digital wallets that would have provided a wide variety of enhanced features and denied digital wallet developers—often banks but also including other smartphone manufacturers—the opportunity to provide advanced digital payments services to their own customers.

31. By maintaining its monopoly over smartphones, Apple harms consumers in a wide variety of additional ways. For example, by denying iPhone users the ability to choose their trusted banking apps as their digital wallet, Apple retains full control both over the consumer and also over the stream of income generated, by forcing users to use only Apple-authorized products in the digital wallet. Apple also prohibits the creation and use of alternative app stores curated to reflect a consumer's preferences with respect to security, privacy, or other values. These and many other features would be beneficial to consumers and empower them to make choices about what smartphone to buy and what apps and products to patronize. But allowing consumers to make that choice is an obstacle to Apple's ability to maintain its monopoly.

32. Of course, this is not the story Apple presents to the world. For decades, Apple branded itself a nimble, innovative upstart. In 1998, Apple co-founder Steve

CONSOLIDATED CLASS ACTION COMPLAINT

13

Jobs criticized Microsoft's monopoly and "dirty tactics" in operating systems to target Apple, which prompted the company "to go to the Department of Justice" in hopes of getting Microsoft "to play fair."[3] But even at that time, Apple did not face the same types of restrictions it imposes on third parties today; Apple users could use their iPod with a Windows computer, and Microsoft did not charge Apple a 30 percent fee for each song downloaded from Apple's iTunes store. Similarly, when Apple brought the iPhone to market in 2007, it benefited from competition among component makers and wireless carriers.

33.     While Apple's anticompetitive conduct arguably has benefited its shareholders—to the tune of over $77 billion in stock buybacks in its 2023 fiscal year, and over $100 billion in fiscal year 2024—it comes at a great cost to consumers. Some of those costs are immediate and obvious, and they directly affect Apple's own customers: Apple inflates the price for buying and using iPhones while preventing the development of features like alternative app stores, innovative super apps, cloud-streaming games, secure texting, and digital wallet options.

34.     Other costs of Apple's anticompetitive conduct may be less obvious in the immediate term. But they are no less harmful and even more widespread, affecting all smartphone consumers. Apple's smartphone monopoly means that it is not economically viable to invest in building some apps, like digital wallets, because

---

[3] Government Complaint ¶ 12.

they cannot reach iPhone users. This means that innovations fueled by an interest in building the best, most user-focused product that would exist in a more competitive market never get off the ground. What's more, Apple itself has less incentive to innovate because it has insulated itself from competition. As Apple's executives openly acknowledge: "In looking at it with hindsight, I think going forward we need to set a stake in the ground for what features we think are 'good enough' for the consumer. I would argue we're already doing *more* than what would have been good enough. But we find it very hard to regress our product features YOY [year over year]." Existing features "would have been good enough today if we hadn't introduced [them] already," and "anything new and especially expensive needs to be rigorously challenged before it's allowed into the consumer phone."[4] Thus, it is not surprising that Apple spent more than twice as much on stock buybacks and dividends as it did on research and development.

35.    Apple wraps itself in a cloak of privacy, security, and consumer preferences to justify its anticompetitive conduct. Indeed, it spends billions on marketing and branding to promote the self-serving premise that only Apple can safeguard consumers' privacy and security interests. Apple selectively compromises privacy and security interests when doing so is in Apple's own financial interest—such as degrading the security of text messages, offering governments and certain

---

[4] Government Complaint ¶ 14.

companies the chance to access more private and secure versions of app stores, or accepting billions of dollars each year for choosing Google as its default search engine when more private options are available. In the end, Apple deploys privacy and security justifications as an elastic shield that can stretch or contract to serve Apple's financial and business interests.

## III.  DEFENDANT APPLE

36.     Apple is a global technology company with headquarters in Cupertino, California. Apple is one of the world's most valuable public companies with a current market capitalization exceeding $3.1 trillion. In fiscal year 2023, Apple generated annual net revenues of $383 billion and net income of $97 billion. Apple's net income exceeds any other company in the Fortune 500 and the gross domestic products of more than 100 countries.

37.     The iPhone, Apple's signature product, is the primary driver of Apple's growth and profitability, routinely commanding profit margins exceeding 30 percent on devices alone—significantly higher than its smartphone competitors. iPhone sales have comprised a majority of Apple's annual revenue every year since 2012.[5]

38.     Apple increasingly extracts revenue from iPhone users beyond the initial smartphone sale. For example, Apple offers iPhone upgrades, apps and in-app payments, paid digital subscription services (*e.g.*, Apple's music streaming, TV,

---

[5] Government Complaint ¶ 20.

CONSOLIDATED CLASS ACTION COMPLAINT

news, gaming, fitness, and cloud storage subscriptions), accessories (*e.g.*, tracking devices, headphones, chargers, iPhone cases), and more. Apple refers to these offerings as "Services" and "Wearables, Home, and Accessories," respectively. In fiscal year 2023, these offerings accounted for nearly one-third of Apple's total revenue, or four times what Apple earned from selling Mac computers. Some of the largest drivers of revenue within these categories are Apple's smartwatch and Apple's App Store, where iPhone users purchase and download apps. Recently, Services have accounted for an increasing share of Apple's revenues, while the iPhone remains the primary gateway for U.S. consumers to access these services.

39.     In 2019, the House Judiciary Committee—led by the Subcommittee on Antitrust, Commercial, and Administrative Law—announced an investigation into competition in digital markets. The resulting Majority Staff Report, published in 2020, detailed Apple's revenue streams as follows:



***Annual Revenue by Segment***

CONSOLIDATED CLASS ACTION COMPLAINT

17

40.     Apple's U.S. market share by revenue is over 70 percent in the performance smartphone market—a more expensive segment of the broader smartphone market where Apple's own executives recognize the company competes—and over 65 percent for all smartphones.[6] These market shares have remained remarkably durable over the last decade. Apple itself has attributed the growth of Services as a driver of its profits from sales and a significant factor buttressing Apple's overall margins as hardware sales slowed or declined. Apple has consistently credited the App Store, licensing sales, and AppleCare, among others, for the success of Services. Apple's monopolization of the performance smartphone and smartphone markets thus helps it cultivate the "walled garden" that sustains its broad extraction of monopoly rents.

41.     Apple's smartphone market shares understate Apple's dominance and likely growth in key demographics, including among younger American consumers. For example, one-third of all iPhone users in the United States were born after 1996, as compared to just 10 percent for Samsung, Apple's closest smartphone competitor. Surveys show that as many as 88 percent of U.S. teenagers expect to purchase an iPhone for their next smartphone.[7] iPhone users also tend to come from higher income households. Because smartphone users generally use a single smartphone to

---

[6] Government Complaint ¶ 22.
[7] Government Complaint ¶ 23.

access related products and services, locking up key user groups allows Apple to capture greater spending on iPhone-related products and services, realize higher margins per user as compared to its smartphone rivals, and exercise greater control over developers and other smartphone ecosystem participants.

42.   In fiscal year 2023, Apple spent $30 billion on research and development. By comparison, Apple spent $77 billion on stock buybacks that year. Apple again spent roughly $31 billion on research and development in fiscal year 2024, but its stock buyback ballooned to over $100 billion that year.

## IV.   PLAINTIFFS

43.   Plaintiff Erik Loewen is a resident of San Francisco, California. Plaintiff Loewen indirectly purchased iPhones in California in September 2022 and September 2024 (and directly purchased an iPhone in California in November 2020). As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Loewen paid supracompetitive prices for his iPhones. Plaintiff Loewen has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

44.   Plaintiff Sharla Hilburn is a resident of Las Cruces, New Mexico. Plaintiff Hilburn indirectly purchased an iPhone in California in October 2023. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Hilburn paid a supracompetitive price for her iPhone. Plaintiff Hilburn has

been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

45. Plaintiff Alton Peacock is a resident of Tampa, Florida. Plaintiff Peacock indirectly purchased an iPhone in Florida in November 2020. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Peacock paid a supracompetitive price for his iPhone. Plaintiff Peacock has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

46. Plaintiff Jared Schermer is a resident of New York, New York. Plaintiff Schermer indirectly purchased an iPhone in New York in September 2023. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Schermer paid a supracompetitive price for his iPhone. Plaintiff Schermer has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

47. Plaintiff Thomas Bane is a resident of Brooklyn, New York. Plaintiff Bane indirectly purchased an iPhone in New York in November 2022. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Bane paid a supracompetitive price for his iPhone. Plaintiff Bane has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

48.     Plaintiff Pashen Bennett is a resident of Pittsburgh, Pennsylvania. Plaintiff Bennett indirectly purchased an iPhone in Pennsylvania in 2024. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Bennett paid a supracompetitive price for her iPhone. Plaintiff Bennett has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

49.     Plaintiff Jemiah Duff is a resident of Buffalo Grove, Illinois. Plaintiff Duff indirectly purchased an iPhone in Illinois in November 2024. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Duff paid a supracompetitive price for his iPhone. Plaintiff Duff has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

50.     Plaintiff Miguel Gomez a resident of Chicago, Illinois. Plaintiff Gomez indirectly purchased an iPhone in Illinois in September 2024. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Gomez paid a supracompetitive price for his iPhone. Plaintiff Gomez has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

51.     Plaintiff Kiana Brown is a resident of Charlotte, North Carolina. Plaintiff Brown indirectly purchased iPhones in North Carolina in March 2022 and

December 2023. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Brown paid supracompetitive prices for her iPhones. Plaintiff Brown has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

52. Plaintiff Kenneth Hill is a resident of Saline, Michigan. Plaintiff Hill indirectly purchased an iPhone in Michigan in October 2021. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Hill paid a supracompetitive price for his iPhone. Plaintiff Hill has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

53. Plaintiff Jeffrey Burke is a resident of Michigan. Plaintiff Burke indirectly purchased an iPhone in Michigan in October 2021. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Burke paid a supracompetitive price for his iPhone. Plaintiff Burke has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

54. Plaintiff Charles Derr is a resident of Philadelphia, Pennsylvania. Plaintiff Derr indirectly purchased an iPhone in New Jersey in November 2024. As a result of the anticompetitive and monopolistic practices alleged in this Complaint,

CONSOLIDATED CLASS ACTION COMPLAINT

22

Plaintiff Derr paid a supracompetitive price for his iPhone. Plaintiff Derr has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

55. Plaintiff Thomas P. Gorczynski is a resident of Cherry Hill, New Jersey. Plaintiff Gorczynski indirectly purchased an iPhone in New Jersey in March 2022. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Gorczynski paid a supracompetitive price for his iPhone. Plaintiff Gorczynski has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

56. Plaintiff Susan Marie is a resident of Phoenix, Arizona. Plaintiff Marie indirectly purchased an iPhone in Arizona in January 2023. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Marie paid a supracompetitive price for her iPhone. Plaintiff Marie has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

57. Plaintiff David Love is a resident of Whites Creek, Tennessee. Plaintiff Love indirectly purchased an iPhone in Tennessee in January 2023. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Love paid a supracompetitive price for his iPhone. Plaintiff Love has been injured

by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

58.     Plaintiff Dana Bein is a resident of Cambridge, Massachusetts. Plaintiff Bein indirectly purchased an iPhone in Massachusetts in January 2021. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Bein paid a supracompetitive price for her iPhone. Plaintiff Bein has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

59.     Plaintiff Joshua Hodges is a resident of Salem, Missouri. Plaintiff Hodges indirectly purchased two iPhones in Missouri in November 2022. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Hodges paid supracompetitive prices for his iPhones. Plaintiff Hodges has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

60.     Plaintiff David McNeal is a resident of Maryland. Plaintiff McNeal indirectly purchased an iPhone in Maryland in 2024. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff McNeal paid a supracompetitive price for his iPhone. Plaintiff McNeal has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

61.     Plaintiff Ken Leinbach is a resident of Milwaukee, Wisconsin. Plaintiff Leinbach indirectly purchased an iPhone in Wisconsin in March 2023. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Leinbach paid a supracompetitive price for his iPhone. Plaintiff Leinbach has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

62.     Plaintiff Nicole Arends is a resident of Danbury, Wisconsin. Plaintiff Arends indirectly purchased an iPhone in Minnesota in April 2023. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Arends paid a supracompetitive price for her iPhone. Plaintiff Arends has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

63.     Plaintiff Nancy Cox is a resident of Salem, Oregon. Plaintiff Cox indirectly purchased an iPhone in Oregon in February 2022. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Cox paid a supracompetitive price for her iPhone. Plaintiff Cox has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

64.     Plaintiff Andrea Mathieu is a resident of Greenwich, Connecticut. Plaintiff Mathieu indirectly purchased an iPhone in Connecticut in June 2024. As a

result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Mathieu paid a supracompetitive price for her iPhone. Plaintiff Mathieu has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

65. Plaintiff David Burleigh is a resident of Millcreek, Utah. Plaintiff Burleigh indirectly purchased an iPhone in Utah in September 2022. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Burleigh paid a supracompetitive price for his iPhone. Plaintiff Burleigh has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

66. Plaintiff Kori Lodi is a resident of Hooksett, New Hampshire. Plaintiff Lodi indirectly purchased an iPhone in New Hampshire in May 2021. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Lodi paid a supracompetitive price for her iPhone. Plaintiff Lodi has been injured by the reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

67. Plaintiff Joshua Roy is a resident of Bath, Maine. Plaintiff Roy indirectly purchased an iPhone in Maine in January 2023. As a result of the anticompetitive and monopolistic practices alleged in this Complaint, Plaintiff Roy paid a supracompetitive price for his iPhone. Plaintiff Roy has been injured by the

reductions in consumer choice, quality, and innovation brought about by Apple's anticompetitive and monopolistic practices.

## V.   FACTUAL ALLEGATIONS

### A.   Apple Launches iPhone and Leverages Third-Party Developers to Enhance the Platform.

68.   In January 2007, Apple debuted the first-generation iPhone, describing the device as "an iPod, a phone, and an internet communicator," and touting the fact that users could "sync[ ] content from a user's iTunes library on their PC or Mac." Apple marketed the iPhone as a smartphone that was easy to use. Reflecting on the company's learning from the iPod, Apple's then-CEO announced, "iTunes is going to sync all your media to your iPhone—but also a ton of data. Contacts, calendars, photos, notes, bookmarks, email accounts."[8]

69.   The original iPhone cost approximately $499—approximately $790 in 2025 dollars adjusted for inflation—with a two-year contract with a phone carrier.

70.   At launch, nearly all native apps for the iPhone were created by Apple. There were only about a dozen apps, including Calendar, Camera, Clock, Contacts, iPod, Messages, Notes, Phone, Photos, Safari, Stocks, Voice Memos, and Weather.

71.   Within a year of launching the iPhone, Apple invited third-party developers to create native apps for the iPhone. Apple released its first software

---

[8] Government Complaint ¶ 35.

CONSOLIDATED CLASS ACTION COMPLAINT

27

development kit—essentially the digital tools for building native apps on Apple's operating system (iOS)—to encourage and enable third-party developers to create native apps for the iPhone. Apple also offered developers ways to earn money by selling apps and later in-app purchases and subscriptions. By 2009, Apple was running marketing campaigns highlighting the value that third-party apps provide to iPhone users with the trademarked slogan: "There's an app for that."

72.     Apple's decision to invite third-party participation on its iPhone platform benefited Apple, too. The proliferation of third-party apps generated billions of dollars in profits for Apple and an iPhone user base of more than 250 million devices in the United States. Apple's market shares—over 70 percent in the performance smartphone market and over 65 percent of the broader smartphone market—likely understate its monopoly power today, particularly because Apple's share among key demographics, including younger audiences and higher-income households, is even larger.

73.     While Apple profits from third-party developers that increase the iPhone's value to users, Apple executives understand that third-party products and services can, in their own words, be "fundamentally disruptive" to Apple's smartphone monopoly, decreasing users' dependence on Apple and the iPhone and increasing competitive pressure on Apple.[9] Apple therefore willingly sacrifices the

---

[9] Government Complaint ¶ 40.

short-term benefits it would gain from improved products and services developed by third parties when necessary to maintain its monopoly.

**B.** **Apple Invited Third-Party Investment for Apps to Run on the iPhone and Then Imposed Tight Controls on App Creation and App Distribution.**

74. Apple controls how developers distribute and create apps for iPhone users. For example, developers can only distribute native iPhone apps through Apple's App Store, which is the only way for users to download native iOS apps. Limiting distribution to the Apple App Store enables Apple to exert monopoly power over developers by imposing contractual restrictions and rules that limit the behavior of non-Apple apps and services. Specifically, Apple sets the conditions for apps it allows on the Apple App Store through its App Store Review Guidelines. Under these guidelines, Apple has sole discretion to review and approve all apps and app updates. Apple selectively exercises that discretion to its own benefit, deviating from or changing its guidelines when it suits Apple's interests and allowing Apple executives to control app reviews and decide whether to approve individual apps or updates. Apple often enforces its App Store rules arbitrarily. And it frequently uses App Store rules and restrictions to penalize and restrict developers that take advantage of technologies that threaten to disrupt, disintermediate, compete with, or erode Apple's monopoly power.

75. Apple also controls app creation by deciding which APIs are available to developers when they make third-party apps. For example, developers cannot provide native apps on the iPhone unless they enter into Apple's non-negotiable Developer Program License Agreement (DPLA). That agreement requires developers to use public APIs only "in the manner prescribed by Apple." It also prohibits third-party apps from using APIs that Apple designates as "private." Apple selectively designates APIs as public or private to benefit Apple, limiting the functionality developers can offer to iPhone users even when the same functionality is available in Apple's own apps, or even select third-party apps. Similar to Apple's App Store restrictions, Apple uses its DPLA to impose restrictions that penalize and restrict developers who take advantage of technologies that threaten to disrupt, disintermediate, compete with, or erode Apple's monopoly power.

76. Developers cannot avoid Apple's control of app distribution and app creation by making web apps—apps created using standard programming languages for web-based content and available over the internet—as an alternative to native apps. Many iPhone users do not look for or know how to find web apps, causing web apps to constitute only a small fraction of app usage. Apple recognizes that web apps are not a good alternative to native apps for developers. As one Apple executive acknowledged, "[d]evelopers can't make much money on the web."[10] Regardless,

---

[10] Government Complaint ¶ 43.

Apple can still control the functionality of web apps because Apple requires all web browsers on the iPhone to use WebKit, Apple's browser engine—the key software components that third-party browsers use to display web content.

77. Nor can developers rely on or develop alternative app stores, even though this would benefit developers and users. For example, developers cannot offer iPhone users an app store that only offers apps curated for use by children, which would provide opportunities to improve privacy, security, and child safety. By contrast, through its Apple Developer Enterprise Program, Apple allows certain enterprise and public sector customers to develop and deploy proprietary, internal-use versions of app stores to offer more curated apps to better protect privacy and security.

78. Apple's restrictive app policies are not global. In response to antitrust scrutiny from the European Commission, Apple recently loosened its restrictions on alternative app distribution ("sideloading") for European consumers, as well as removing several other unnecessary restrictions on third-party developers. Nor are these recent changes limited to software. Against strong resistance from Apple, the European Commission also mandated all mobile device makers to use the USB-C standard by the end of 2024, which required Apple to discontinue use of its proprietary Lightning connectors. Apple did so, beginning with the release of the

iPhone 15 in September 2023. Rather than limiting that switch to iPhones in Europe, Apple opted to convert to USB-C on all iPhones going forward.

79.     Apple's control over both app distribution and app creation gives Apple tremendous power. For example, Apple designates as "private" the APIs needed to send Short Message Service, or SMS, text messages, which is a protocol used by mobile carriers since the early 1990s to allow users to send basic text messages to other mobile phone numbers using their own mobile phone numbers. Developers have no technical means to access these private APIs, but even if they did, doing so would breach their developer agreement with Apple, and therefore put the developer at risk of losing the ability to distribute apps through the App Store. For example, Apple prohibits third-party iPhone apps from sending or receiving SMS[11] text messages even though this functionality is available through Apple Messages. Likewise, Apple can control the functionality of third-party apps and accessories through its control of app distribution because if an app includes functionality that Apple does not like, Apple can and does exercise its discretion to simply block the app from the App Store.

80.     In addition to the artificially high prices for iPhone devices themselves that Plaintiffs paid here, Apple's dominance is such that iPhone users cannot benefit

---

[11] Following industry practice, throughout this complaint, "SMS" refers to both SMS and MMS ("multimedia messaging service"). MMS is a companion protocol to SMS that allows for group messages and messages with basic multimedia content, such as small file sharing.

CONSOLIDATED CLASS ACTION COMPLAINT

from lower cost or higher quality means of distributing apps or of purchasing and providing digital products and services. Instead, Apple guarantees that it continues to benefit from the contributions of third-party developers and other platform participants while also protecting itself from the competitive threats and pressure those participants pose to Apple's smartphone monopoly.

## VI.   SMARTPHONES AS PLATFORMS

81.    Smartphones combine the functionality and portability of a traditional mobile phone with the advanced hardware and software components typical of a desktop computer. This cluster of services and features results in a distinct product for consumers and developers. For example, smartphones not only make phone calls, but also allow users to listen to music, send text messages, take pictures, play games, access software for work, manage their finances, and browse the internet.

82.    Two-sided platforms bring together service providers on the one hand and consumers on the other. Platforms bring together different groups that benefit from each other's participation on the platform, a phenomenon known as indirect network effects. A transaction platform such as a credit card, for example, brings together vendors and customers. Customers benefit when more vendors accept their credit card, and vendors benefit when more customers use a credit card the vendor accepts.

83.     The economics of a smartphone platform are such that the platform's value to users—and in turn to the platform operator—increase when new apps and new features are added to the platform. To create these economic benefits for itself and its users, Apple has opened its smartphone platform to third-party developers, whose countless inventions and innovations have created enormous value. When a third-party developer for the iPhone creates a valuable new feature, consumers benefit and consumer demand goes up for Apple's products, increasing the economic value of the iPhone to Apple. In turn, increased consumer demand then makes the iPhone platform more valuable for developers, who are further incentivized to invest in developing iPhone apps. This has played out hundreds of thousands of times for the iPhone, resulting in an enormously valuable smartphone platform reflecting the combined contributions of millions of developers.

84.     In contrast, limiting the features and functionality created by third-party developers—and therefore available to iPhone users—makes the iPhone worse and deprives Apple of the economic value it would gain as the platform operator. It makes no economic sense for Apple to sacrifice the profits it would earn from new features and functionality unless it has some other compensating reason to do so, such as protecting its monopoly profits.

## VII.   APPLE UNLAWFULLY MAINTAINS ITS MONOPOLY POWER

85.   Apple's monopoly power in both the performance smartphone market and the broader smartphone market enables Apple to demand supracompetitive prices for iPhones. There are also several aftermarkets to the smartphone product markets—including super apps, cloud-streaming apps, messaging apps, smartwatches, and digital wallets— in which Apple perpetuates anticompetitive conduct for the purpose of driving up iPhone costs. Apple's conduct in these aftermarkets artificially raises the switching cost in the smartphone markets, which creates a vicious cycle that "locks in" consumers. Thus, while Apple dominates the smartphone markets and therein imposes monopolist prices, it is within these aftermarkets—where Apple may or may not also have monopoly power—that Apple's challenged anticompetitive conduct primarily occurs. These anticompetitive acts in the various aftermarkets thereby comprise the pillars of Apple's underlying "lock in" scheme.

### A.   Apple Harms Competition by Imposing Contractual Restrictions, Fees, and Taxes on App Creation and Distribution.

86.   Soon after the iPhone's introduction and notwithstanding its success, the company began to fear that disintermediation of its platform and the commoditization of the iPhone would threaten Apple's substantial profits from iPhone sales and related revenue streams. Indeed, while the proposed Damages Class here seeks to recover the overcharges unlawfully paid on the price of iPhones as a

result of the "lock in" scheme, Apple has likely also inflated other revenue streams throughout these aftermarkets.

87. Accordingly, Apple exercised its control of app creation and app distribution in key cases to cement the iPhone and App Store as the primary gateway to apps, products, and services. Apple often claims these rules and restrictions are necessary to protect user privacy or security, but Apple's documents tell a different story. In reality, Apple imposes certain restrictions to benefit its bottom line by thwarting direct and disruptive competition for its iPhone platform fees and/or for the importance of the iPhone platform itself.

88. Three aspects of Apple's efforts to protect and exploit its smartphone monopoly are worth emphasizing:

   a. *First*, Apple exercises its control over app distribution and app creation to dictate how developers innovate for the iPhone, enforcing rules and contractual restrictions that stop or delay developers from innovating in ways that threaten Apple's power. In so doing, Apple influences the direction of innovation both on and off the iPhone.

   b. *Second*, Apple drives iPhone users away from products and services that compete with or threaten Apple. Apple thereby increases the cost and friction of switching from the iPhone to

another smartphone and generates extraordinary profits through subscription services (like Apple's proprietary music, gaming, cloud storage, and news services), advertisements within the App Store, and accessories like headphones and smartwatches.

c. *Third*, Apple uses these restrictions to extract monopoly rents from third parties in a variety of ways, including app fees and revenue-share requirements. For most of the last 15 years, Apple collected a tax in the form of a 30 percent commission on the price of any app downloaded from the App Store, a 30 percent tax on in-app purchases, and fees to access the tools needed to develop iPhone native apps in the first place. While Apple has reduced the tax it collects in certain instances, Apple still extracts 30 percent (or nearly 30 percent) from many app transactions.

Each of these anticompetitive acts were undertaken by Apple as part of its "lock in" scheme to artificially inflate iPhone prices.

89. As Apple exercised its control of app distribution and app creation, Apple slowed its own iPhone innovation and extracted more revenue and profit from its existing customers through subscriptions, advertising, and cloud services. These services increase the cost of switching from the iPhone to another smartphone because many of these services—including its proprietary gaming, cloud storage,

and news service—are exclusive to the Apple ecosystem, causing significant frictions for iPhone users who try to use alternative services on another smartphone. Moreover, Apple's conduct demonstrates that Apple recognized the importance of digital products and services for the success of the iPhone while at the same time it restricted the development and growth of non-iPhone products and services— especially those that might make it easier for users to switch from the iPhone to another smartphone.

90.    Each step in Apple's course of conduct built and reinforced its smartphone monopoly. The cumulative effect of this course of conduct has been to maintain and entrench Apple's smartphone monopoly at the expense of consumers such as Plaintiffs. Despite major technological changes over the years, Apple's power to control app creation and distribution and extract supracompetitive rents has remained largely the same, unconstrained by competitive pressures or market forces. That this conduct is impervious to competition reflects the success of Apple's efforts to create and maintain its smartphone monopoly, the strength of that monopoly, and the durability of Apple's power.

91.    Apple's monopoly maintenance has taken many forms and continues to evolve today; however, Apple's anticompetitive and exclusionary course of conduct is exemplified by its contractual rules and restrictions targeting several products and services: super apps, cloud-streaming apps, messaging apps, smartwatches, and

digital wallets. By stifling these technologies, and many others, Apple reinforces its smartphone monopoly not by making its products more attractive to users, but by discouraging innovation that threatens Apple's smartphone monopoly or the disintermediation of the iPhone. Apple continues to expand and shift the scope and categories of anticompetitive conduct such that the cumulative anticompetitive effect of Apple's conduct is even more powerful than that of each exclusionary act standing alone.

    **1.    Super Apps: Apple prevented apps from threatening its smartphone monopoly by undermining mini programs that reduce user dependence on the iPhone.**

92.    For years, Apple denied its users access to super apps because it viewed them as "fundamentally disruptive" to "existing app distribution and development paradigms" and ultimately Apple's monopoly power. Apple feared super apps because it recognized that as they become popular, "demand for iPhone is reduced."[12] So, Apple used its control over app distribution and app creation to effectively prohibit developers from offering super apps instead of competing on the merits.

93.    A super app is an app that can serve as a platform for smaller "mini" programs developed using programming languages such as HTML5 and JavaScript. By using programming languages standard in most web pages, mini programs are

---

[12] Government Complaint ¶ 60.

cross-platform, meaning they work the same on any web browser and on any device. Developers can therefore write a single mini program that works whether users have an iPhone or another smartphone.

94. Super apps can provide significant benefits to users. For example, a super app that incorporates a multitude of mini programs might allow users to easily discover and access a wide variety of content and services without setting up and logging into multiple apps, not unlike how Netflix and Hulu allow users to find and watch thousands of movies and television shows in a single app. As one Apple executive put it, "Who doesn't want faster, easier to discover apps that do everything a full app does?" Restricting super apps makes users worse off and contributes to Apple's strategy to lock in iPhone users.

95. Super apps also reduce user dependence on the iPhone, including the iOS operating system and Apple's App Store. This is because a super app is a kind of middleware that can host apps, services, and experiences without requiring developers to use the iPhone's APIs or code.

96. As users interact with a super app, they rely less on the smartphone's proprietary software and more on the app itself. Eventually, users become more willing to choose a different smartphone because they can access the same interface, apps, and content they desire on any smartphone where the super app is also present. Moreover, developers can write mini programs that run on the super app without

having to write separate apps for iPhones and other smartphones. This lowers barriers to entry for smartphone rivals, decreases Apple's control over third-party developers, and reduces switching costs.

97.    Apple recognizes that super apps with mini programs would threaten its monopoly. As one Apple manager put it, allowing super apps to become "the main gateway where people play games, book a car, make payments, etc." would "let the barbarians in at the gate." Why? Because when a super app offers popular mini programs, "iOS stickiness goes down."[13]

98.    Apple's fear of super apps is based on first-hand experience with enormously popular super apps in Asia. In particular, the Chinese super app WeChat boasts over 1.3 billion monthly active users. WeChat's mini programs have become intrinsic to Chinese daily life for everything from ordering food, watching videos, shopping online, to peer-to-peer payments. Because WeChat is so ubiquitous for Chinese consumers, this creates a natural "escape route" for smartphone users to avoid being locked in to a specific smartphone operating system, as one's same WeChat account can be accessed on either Apple or Android smartphones.

99.    Apple does not want American users to benefit from similar innovations. For example, in a Board of Directors presentation, Apple employees highlighted the "[u]ndifferentiated user experience on [a] super platform" as a

---

[13] Government Complaint ¶ 65.

CONSOLIDATED CLASS ACTION COMPLAINT

"major headwind" to growing iPhone sales in countries with popular super apps due to the "[l]ow stickiness" and "[l]ow switching cost." For the same reasons, a super app created by a U.S. company would pose a similar threat to Apple's smartphone dominance in the United States. Apple noted as a risk in 2017 that a potential super app created by a specific U.S. company would "replace[ ] usage of native OS and apps resulting in commoditization of smartphone hardware."[14]

100.  Apple did not respond to the risk that super apps might disrupt its monopoly by innovating. Instead, Apple exerted its control over app distribution to stifle others' innovation. Apple created, strategically broadened, and aggressively enforced its App Store Guidelines to effectively block apps from hosting mini programs. Apple's conduct disincentivized investments in mini program development and caused U.S. companies to abandon or limit support for the technology in the United States.

101.  In particular, part of what makes super apps valuable to consumers is that finding and using mini programs is easier than using an app store and navigating many separate apps, passwords, and set-up processes. Instead of making mini program discovery easy for users, Apple made it nearly impossible.

102.  Since at least 2017, Apple has arbitrarily imposed exclusionary requirements that unnecessarily and unjustifiably restrict mini programs and super

---

[14] Government Complaint ¶ 66.

CONSOLIDATED CLASS ACTION COMPLAINT

42

apps. For example, Apple required apps in the United States to display mini programs using a flat, text-only list of mini programs. Apple also banned displaying mini programs with icons or tiles, such as descriptive pictures of the content or service offered by the mini program. Apple further banned apps from categorizing mini programs, such as by displaying recently played games or more games by the same developer. These restrictions throttle the popularity of mini programs and ultimately make the iPhone worse because they discourage developers from creating apps and other content that would be attractive to iPhone users. Apple degrades the value of the iPhone by thwarting mini programs to maintain its monopoly power.

103. Apple also selectively enforced its contractual rules with developers to prevent developers from monetizing mini programs, hurting both users and developers. For example, until recently, Apple blocked mini programs from accessing the APIs needed to implement Apple's in-app payment (IAP) system— even if developers were willing to pay Apple's monopoly tax. Similarly, Apple blocked developers' ability to use in-app payment methods other than directly using IAP. For instance, super apps could create a virtual currency for consumers to use in mini programs, but Apple blocked this too. Yet Apple allows other, less-threatening apps to do so. Apple has also taken efforts to prevent developers from using in-app links or chat features as a means of steering payments off of Apple's IAP system.

## 2. Cloud-Streaming Apps: Apple prevented developers from offering cloud gaming apps that reduce dependence on the iPhone's expensive hardware.

104. For years, Apple blocked cloud gaming apps that would have given users access to desirable apps and content without needing to pay for expensive Apple hardware because this would threaten its monopoly power. In Apple's own words, it feared a world where "all that matters is who has the cheapest hardware" and consumers could "buy[] a [expletive] Android for 25 bux at a garage sale and . . . have a solid cloud computing device" that "works fine."[15] Apple's conduct made its own product worse because consumers missed out on apps and content. This conduct also cost Apple substantial revenues from third-party developers. At the same time, Apple also made other smartphones worse by stifling the growth of these cross-platform apps on other smartphones. Importantly, Apple prevented the emergence of technologies that could lower the price that consumers pay for iPhones.

105. Cloud-streaming apps let users run a computationally intensive program without having to process or store the program on the smartphone itself. Instead, a user's smartphone leverages the computing power of a remote server, which runs the program and streams the result back to the phone. Cloud-streaming allows developers to bring cutting-edge technologies and services to smartphone

---

[15] Government Complaint ¶ 71.

CONSOLIDATED CLASS ACTION COMPLAINT

44

consumers—including gaming and interactive artificial intelligence services—even if their smartphone includes hardware that is less powerful than an iPhone.

106.    Cloud streaming has significant benefits for users. For example, Apple promoted the iPhone 15 by promising that its hardware is powerful enough to enable "next-level performance and mobile gaming." But powerful hardware is unnecessary if games are played via cloud-streaming apps. For a cloud game, the user experiences and plays the game on the smartphone, but the game is run by hardware and software in remote computing centers ("the cloud"). Thus, cloud-gaming apps deliver rich gaming experiences on smartphones without the need for users to purchase powerful, expensive hardware. As a result, users with access to cloud-streamed games may be more willing to switch from an iPhone to a smartphone with less expensive hardware because both smartphones can run desirable games equally well.

107.    Cloud streaming also has significant advantages for developers. For example, instead of rewriting the same game for multiple operating systems, cloud platforms can act as middleware that allows developers to create a single app that works across iOS, Android, and other operating systems. Cloud streaming provides more and simpler options for offering subscriptions, collecting payments, and distributing software updates as well. All of this helps game developers reach economies of scale and profitability they might not achieve without offering cloud-gaming apps and reduces their dependence on iOS and Apple's App Store.

108.   Apple wielded its power over app distribution to effectively prevent third-party developers from offering cloud-gaming subscription services as a native app on the iPhone for years. In early 2024, in response to European Union legislation that forced Apple to open the iPhone platform to third-party app stores, the company announced changes to its app review policy regarding streaming games. Specifically, Apple made so-called retro game emulators available worldwide and allowed developers to release their own game streaming services. To date, it appears that most popular services are opting out, but Antstream Arcade, a collection of 1,300 retro games, became the first and only cloud-gaming subscription available on the App Store in June 2024, after the commencement of this litigation. This policy change by Apple of course does nothing to address the harm to consumers caused by many years of conduct that effectively blocked any cloud-gaming services from the App Store. Moreover, according to Microsoft, Apple's cloud-gaming guidelines "still represent an obstacle to Cloud Gaming native apps" and "Apple's IAP commission fee is set at a level that is neither economically sustainable or justifiable. [ ] As observed by [the UK's Competition and Markets Authority] in its Mobile Ecosystem market study, the 30 percent fee imposed by Apple on IAPs is the result of a lack of competition in the distribution of native iOS apps."

109.   For years, Apple imposed the onerous requirement that any cloud-streaming game—or any update to a cloud-streaming game—be submitted as a

stand-alone app for approval by Apple. Having to submit individual cloud-streaming games for review by Apple increased the cost of releasing games on the iPhone and limited the number of games a developer could make available to iPhone users. For example, the highest quality games, referred to as AAA games, typically require daily or even hourly updates across different platforms. If these updates need to be individually approved by Apple, developers must either delay their software updates across all platforms or only update their games on non-iOS platforms, potentially making the iOS version of the game incompatible with other versions on other platforms until Apple approves the update. Neither option is tenable for players or developers.

110. Until recently, Apple would have required users to download cloud-streaming software separately for each individual game, install identical app updates for each game individually, and make repeated trips to Apple's App Store to find and download games. Apple's conduct made cloud-streaming apps so unattractive to users that no developer designed one for the iPhone until very recently.

111. Apple undermines cloud-gaming apps in other ways too, such as by requiring cloud games to use Apple's proprietary payment system and necessitating game overhauls and payment redesigns specifically for the iPhone. Apple's rules and restrictions effectively force developers to create a separate iOS-specific version of their app instead of creating a single cloud-based version that is compatible with

several operating systems, including iOS. As a result, developers expend considerable time and resources re-engineering apps to bring cross-platform apps like multiplayer games to the iPhone.

112. Cloud-streaming apps broadly speaking—not just gaming—could force Apple to compete more vigorously against rivals. As one Apple manager recognized, cloud streaming eliminates "a big reason for high-performance local compute" and thus eliminates one of the iPhone's advantages over other smartphones because then "all that matters is who has the cheapest hardware." Accordingly, it reduces the need for users to buy expensive phones with advanced hardware. This problem does not "stop at high-end gaming," but applies to "a number of high-compute requirement applications."[16]

**B. Apple Uses APIs and Other Critical Access Points in the Smartphone Ecosystem to Control the Behavior and Innovation of Third Parties in Order to Insulate Itself from Competition.**

**1. Messaging: Apple protects its smartphone monopoly by degrading and undermining cross-platform messaging apps and rival smartphones.**

113. Apple undermines cross-platform messaging to reinforce "obstacle[s] to iPhone families giving their kids Android phones." Apple could have made a better cross-platform messaging experience itself by creating iMessage for Android,

---

[16] Government Complaint ¶ 79.

but concluded that doing so "will hurt us more than help us."[17] Apple therefore continues to impede innovation in smartphone messaging, even though doing so sacrifices the profits Apple would earn from increasing the value of the iPhone to users, because it helps build and maintain its monopoly power.

114.  Messaging apps allow smartphone users to communicate with friends, family, and other contacts and are often the primary way users interact with their smartphones. In Apple's own words, messaging apps are "a central artery through which the full range of customer experience flows."[18]

115.  Smartphone messaging apps operate using "protocols," which are the systems that enable communication and determine the features available when users interact with each other via messaging apps.

116.  One important protocol used by messaging apps is SMS. SMS offers a broad user network, but limited functionality. For example, all mobile phones can receive SMS messages, but SMS does not support modern messaging features, such as large files, edited messages, or reactions like a "thumbs up" or a heart.

117.  Many messaging apps—such as WhatsApp, Facebook Messenger, and Signal—use proprietary, internet-based protocols, which are sometimes referred to as OTT ("over the top") protocols. OTT messaging typically involves more secure

---

[17] Government Complaint ¶ 80.
[18] Government Complaint ¶ 81.

and advanced features, such as encryption, typing indicators, read receipts, the ability to share rich media, and disappearing or ephemeral messages. While all mobile phones can send and receive SMS messages, OTT only works between users who sign up for and communicate through the same messaging app. As a result, a user cannot send an OTT message to a friend unless the friend also uses the same messaging app.

118. Apple makes third-party messaging apps on the iPhone worse generally and relative to Apple Messages, Apple's own messaging app. By doing so, Apple is knowingly and deliberately degrading quality, privacy, and security for its users. For example, Apple designates the APIs needed to implement SMS as "private," meaning third-party developers have no technical means of accessing them and are prohibited from doing so under Apple's contractual agreements with developers. As a result, third-party messaging apps cannot combine the "text to anyone" functionality of SMS with the advanced features of OTT messaging. Instead, if a user wants to send somebody a message in a third-party messaging app, they must first confirm whether the person they want to talk to has the same messaging app and, if not, convince that person to download and use a new messaging app. By contrast, if an Apple Messages user wants to send somebody a message, they just type their phone number into the "To:" field and send the message because Apple Messages incorporates SMS and OTT messaging.

119. Apple prohibits third-party developers from incorporating other important features into their messaging apps as well. For example, third-party messaging apps cannot continue operating in the background when the app is closed, which impairs functionality like message delivery confirmation. And when users receive video calls, third-party messaging apps cannot access the iPhone camera to allow users to preview their appearance on video before answering a call. Apple Messages incorporates these features.

120. If third-party messaging apps could incorporate these features, they would be more valuable and attractive to users, and the iPhone would be more valuable to Apple in the short term. For example, by incorporating SMS, users would avoid the hassle of convincing someone to download a separate app before sending them a message. Third-party messaging apps could also offer the ability to schedule SMS messages to be sent in the future, suggest replies, and support robust multi-device use on smartphones, tablets, and computers—as they already do on Android.

121. Moreover, messaging apps benefit from significant network effects: as more people use the app, there are more people to communicate with through the app, which makes the app more valuable and in turn attracts even more users. Incorporating SMS would help third-party messaging apps grow their network and attract more users. Instead, Apple limits the reach of third-party messaging apps and reinforces network effects that benefit Apple.

122.  With the release of iOS 18 in September 2024, Apple added support for RCS in messages between iPhone and Android users. This change includes certain improvements such as high-resolution media, typing indicators, and read receipts when texting between any phones that support RCS, but such texting chats still miss many features that Apple includes for iMessage messaging, including the ability to send messages at a scheduled time and animated text effects. Moreover, Apple is apparently only supporting the basic RCS standard, which does not include complete encryption of messages between iOS and Android. Regardless, these delayed remedial measures do not cure Apple's efforts to undermine third-party messaging apps because third-party messaging apps will still be prohibited from incorporating RCS just as they are prohibited from incorporating SMS. Moreover, the RCS standard will continue to improve over time, and if Apple does not support later versions of RCS, cross-platform messaging using RCS could soon be broken on iPhones anyway.

123.  In addition to degrading the quality of third-party messaging apps, Apple affirmatively undermines the quality of rival smartphones. For example, if an iPhone user messages a non-iPhone user in Apple Messages—the default messaging app on an iPhone—then the text appears to the iPhone user as a green bubble and incorporates limited functionality: the conversation is not encrypted, videos are pixelated and grainy, and users cannot edit messages or see typing indicators. This

CONSOLIDATED CLASS ACTION COMPLAINT

signals to users that rival smartphones are lower quality because the experience of messaging friends and family who do not own iPhones is worse—even though Apple, not the rival smartphone, is the cause of that degraded user experience. Many non-iPhone users also experience social stigma, exclusion, and blame for "breaking" chats where other participants own iPhones. This effect is particularly powerful for certain demographics, like teenagers—where the iPhone's share exceeds 85 percent, according to one survey. And, while Apple has made some changes in the last year that reduce this degraded experience for non-iPhone users, the "green bubble" stigma still persists, including because Apple continues to maintain certain limitations on non-iPhone users, like failing to include cross-platform end-to-end encryption. This social pressure reinforces switching costs and drives users to continue buying iPhones—solidifying Apple's smartphone dominance not because Apple has made its smartphone better, but because it has made communicating with other smartphones worse.

124. Apple recognizes that its conduct harms users and makes it more difficult to switch smartphones. For example, in 2013, Apple's Senior Vice President of Software Engineering explained that supporting cross-platform OTT messaging in Apple Messages "would simply serve to remove [an] obstacle to iPhone families giving their kids Android phones." In March 2016, Apple's Senior Vice President

of Worldwide Marketing forwarded an email to CEO Tim Cook making the same point: "moving iMessage to Android will hurt us more than help us."[19]

125.   In 2022, Apple's CEO Tim Cook was asked whether Apple would fix iPhone-to-Android messaging. "It's tough," the questioner implored Mr. Cook, "not to make it personal but I can't send my mom certain videos." Mr. Cook's response? "Buy your mom an iPhone."[20]

126.   Recently, Apple blocked a third-party developer from fixing the broken cross-platform messaging experience in Apple Messages and providing end-to-end encryption for messages between Apple Messages and Android users. By rejecting solutions that would allow for cross-platform encryption, Apple continues to make iPhone users' less secure than they could otherwise be.

### 2.     Smartwatches: Apple protects its smartphone monopoly by impeding the development of cross-platform smartwatches.

127.   Apple uses smartwatches, a costly accessory, to prevent iPhone customers from choosing other phones. Having copied the idea of a smartwatch from third-party developers, with the release of iOS 18 in September 2024, Apple added support for RCS in messages between iPhone and Android users. This change includes certain improvements such as high-resolution media, typing indicators, and read receipts when texting between any phones that support RCS. But such texting

---

[19] Government Complaint ¶ 91.
[20] Government Complaint ¶ 92.

chats still miss many features that Apple includes for iMessage messaging, including the ability to send messages at a scheduled time and animated text effects. Moreover, Apple is apparently only supporting the basic RCS standard, which does not include complete encryption of messages between iOS and Android. Apple prevents those developers from innovating and limits the Apple Watch to the iPhone to prevent erosion in iPhone sales.

128. Smartwatches are wrist-worn devices with an interactive display and accompanying apps that let users perform a variety of functions, including monitoring health data, responding to messages and notifications, performing mobile payments, and, of course, telling time. Smartwatches must generally be paired with a smartphone to operate and unlock their full functionality, such as receiving and responding to emails and text messages or answering phone calls. Because of the significant cost of buying a smartwatch, users are less willing to choose a smartphone if it is not compatible with their smartwatch.

129. Apple's smartwatch—Apple Watch—is only compatible with the iPhone. So, if Apple can steer a user towards buying an Apple Watch, it becomes more costly for that user to purchase a different kind of smartphone because doing so requires the user to abandon their costly Apple Watch and purchase a new, Android-compatible smartwatch.

CONSOLIDATED CLASS ACTION COMPLAINT

55

130. By contrast, cross-platform smartwatches can reduce iPhone users' dependence on Apple's proprietary hardware and software. If a user purchases a third-party smartwatch that is compatible with the iPhone and other smartphones, they can switch from the iPhone to another smartphone (or vice versa) by simply downloading the companion app on their new phone and connecting to their smartwatch via Bluetooth. Moreover, as users interact with a smartwatch, *e.g.*, by accessing apps from their smartwatch instead of their smartphone, users rely less on a smartphone's proprietary software and more on the smartwatch itself. This also makes it easier for users to switch from an iPhone to a different smartphone.

131. Apple recognizes that driving users to purchase an Apple Watch, rather than a third-party cross-platform smartwatch, helps drive iPhone sales and reinforce the moat around its smartphone monopoly. For example, in a 2019 email, the Vice President of Product Marketing for Apple Watch acknowledged that Apple Watch "may help prevent iPhone customers from switching." Surveys have reached similar conclusions: many users say the other devices linked to their iPhone are the reason they do not switch to Android.

132. Apple also recognizes that making Apple Watch compatible with Android would "remove [an] iPhone differentiator."[21]

---

[21] Government Complaint ¶ 99.

CONSOLIDATED CLASS ACTION COMPLAINT

56

133. Apple uses its control of the iPhone, including its technical and contractual control of critical APIs, to degrade the functionality of third-party cross-platform smartwatches in at least three significant ways: First, Apple deprives iPhone users with third-party smartwatches of the ability to respond to notifications. Second, Apple inhibits third-party smartwatches from maintaining a reliable connection with the iPhone. And third, Apple undermines the performance of third-party smartwatches that connect directly with a cellular network. In doing so, Apple constrains user choice and crushes innovation that might help fill in the moat around Apple's smartphone monopoly.

134. The ability to respond to notifications, *e.g.*, new messages or app alerts, directly from a smartwatch is one of the top considerations for smartwatch purchasers—and one of the most used product features when it is available. According to Apple's own market research, the ability to "[s]end and receive text messages from social and messaging apps" is a critical feature for a smartwatch.[22] In 2013, when Apple started offering users the ability to connect their iPhones with third-party smartwatches, Apple provided third-party smartwatch developers with access to various APIs related to the Apple Notification Center Service, Calendar, Contacts, and Geolocation. The following year, Apple introduced the Apple Watch and began limiting third-party access to new and improved APIs for smartwatch

---

[22] Government Complaint ¶ 101.

CONSOLIDATED CLASS ACTION COMPLAINT

functionality. For example, Apple prevents third-party smartwatches from accessing APIs related to more advanced Actionable Notifications, so iPhone users cannot respond to notifications using a third-party smartwatch. Instead, Apple provides third-party smartwatches access to more limited APIs that do not allow users to respond to a message, accept a calendar invite, or take other actions available on Apple Watch.

135. A reliable Bluetooth connection is essential for a smartwatch to connect wirelessly with a smartphone and thereby function as a companion to the user's smartphone and unlock its full functionality. But Apple prohibits third-party smartwatch developers from maintaining a connection even if a user accidentally turns off Bluetooth in the iPhone's control center. Apple gives its own Apple Watch that functionality, however, because Apple recognizes that users frequently disable Bluetooth on their iPhone without realizing that doing so disconnects their watch. As a result, iPhone users have a worse experience when they try to use a third-party smartwatch with their iPhone. Apple also requires users to turn on "Background App Refresh" and disable the battery-saving "Low Power Mode" in their iPhone settings for third-party smartwatches to remain consistently connected to their companion app, which is necessary to allow a user's iPhone and their smartwatch to update and share data about the weather or exercise tracking, even though Apple does not impose similar requirements for Apple Watch.

136. Cellular-enabled smartwatches incorporate the ability to connect directly to a cellular network, allowing users to make calls, send messages, and download data even if their smartwatch is not paired to a smartphone. Cellular-enabled smartwatches are popular with consumers, making up approximately 20 percent of Apple Watch sales. Apple Watch users can use the same phone number for their smartphone and smartwatch when connected to the cellular network. As a result, messages are delivered to both the user's smartphone and smartwatch, providing an integrated messaging experience. Although it is technologically feasible for Apple to allow an iPhone user with a third-party smartwatch to do the same, Apple instead requires these users to disable Apple's iMessage service on the iPhone in order to use the same phone number for both devices. This is a non-starter for most iPhone users. In practice, iPhone users with a third-party smartwatch must maintain separate phone numbers for the two devices, worsening the user experience and potentially missing messages sent to their primary iPhone number.

    **3.    Digital Wallets: Apple restricts cross-platform digital wallets on the iPhone, reinforcing barriers to consumers switching to rival smartphones.**

137. Apple recognizes that using a digital wallet will eventually become "something people do every day of their lives." But Apple has used its control over app creation, including its technical and contractual control over API access, to effectively block third-party developers from creating digital wallets on the iPhone

with tap-to-pay functionality, which is an important feature of a digital wallet for smartphones. As a result, Apple maintains complete control over how users make tap-to-pay payments with their iPhone. Apple also deprives users of the benefits and innovations third-party wallets would provide so that it can protect "Apple's most important and successful business, iPhone."[23]

138. Digital wallets are apps that allow a user to store and use passes and credentials, including credit cards, personal identification, movie tickets, and car keys, in a single app. For example, digital wallets allow users to make in-person payments by tapping their device on a payment terminal. Digital wallets can also be used for transactions in mobile apps and mobile websites.

139. Absent Apple's conduct, cross-platform digital wallets could also be used to manage and pay for subscriptions and in-app purchases.

140. Apple Wallet is Apple's proprietary digital wallet on the iPhone. Apple Wallet incorporates Apple's proprietary payment system Apple Pay, which processes digital payments on the web, in apps, and at merchant points of sale.

141. Today, Apple Wallet offers users a way to make these payments using their iPhone. But Apple envisions that Apple Wallet will ultimately supplant multiple functions of physical wallets to become a single app for shopping, digital keys, transit, identification, travel, entertainment, and more. As users rely on Apple

---

[23] Government Complaint ¶ 104.

Wallet for payments and beyond, it "drive[s] more sales of iPhone and increase[s] stickiness to the Apple ecosystem" because Apple Wallet is only available on the iPhone.[24] Thus, switching to a different smartphone requires leaving behind the familiarity of an everyday app, setting up a new digital wallet, and potentially losing access to certain credentials and personal data stored in Apple Wallet.

142. Cross-platform digital wallets would offer an easier, more seamless, and potentially more secure way for users to switch from the iPhone to another smartphone. For example, if third-party developers could create cross-platform wallets, users transitioning away from the iPhone could continue to use the same wallet, with the same cards, IDs, payment histories, peer-to-peer payment contacts, and other information, making it easier to switch smartphones. And because many users already use apps created by their preferred financial institutions, if these financial institutions offered digital wallets or could at least offer their services through third-party digital wallets, then users would have access to new apps and technologies without needing to share their private financial data with additional third parties, including Apple. In the short term, these improved features would make the iPhone more attractive to users and profitable for Apple.

---

[24] Government Complaint ¶ 108.

CONSOLIDATED CLASS ACTION COMPLAINT

143.   Accordingly, the absence of cross-platform digital wallets with tap-to-pay capability on the iPhone makes it harder for iPhone users to purchase a different smartphone.

144.   The most important function for attracting users to a digital wallet for smartphones is the ability to offer tap-to-pay, *i.e.*, the ability to make in-person payments by tapping your smartphone on a payment terminal. Apple uses its control over app creation and API access to selectively prohibit developers from accessing the near-field communication (NFC) hardware needed to provide tap-to-pay through a digital wallet app.

145.   Apple Wallet is the only app on the iPhone that can use NFC to facilitate tap-to-pay. While Apple actively encourages banks, merchants, and other parties to participate in Apple Wallet, Apple simultaneously exerts its smartphone monopoly to block these same partners from developing better payment products and services for iPhone users.

146.   Apple also uses its smartphone monopoly to extract payments from banks, which need to access customers who use digital wallets on iPhones. Since Apple first launched Apple Pay—long before it achieved meaningful adoption—Apple has charged issuing banks 15 basis points (0.15 percent) for each credit card transaction mediated by Apple Pay. Payment apps from Samsung and Google are free to issuing banks. Apple's fees are a significant expense for issuing banks and

CONSOLIDATED CLASS ACTION COMPLAINT

62

cut into funding for features and benefits that banks might otherwise offer smartphone users. The volume of impacted transactions is large and growing. A U.S. Consumer Financial Protection Bureau report estimates that Apple Pay facilitated nearly $200 billion in transactions in the United States in 2022. And the report goes on to explain that "analysts estimate that the value of digital wallet tap-to-pay transactions will grow by over 150 percent by 2028."[25]

147.   Apple's harm to consumers in this context is more than the monetary cost from transaction fees. Payments via NFC utilize a tokenization procedure that is more secure than swiping a payment card or tapping the payment card. Apple's NFC access restrictions force users to choose between using Apple Pay or a less secure, non-Apple payment method, via their payment card.

148.   Multiple app developers have sought direct NFC access for their payment or wallet apps. Yet Apple prohibits these developers from incorporating tap-to-pay functionality in their apps for fear that doing so would "be one way to disable [A]pple [P]ay trivially," leading to the "proliferation of other payment apps" that might operate cross-platform and undermine Apple's smartphone monopoly.[26]

149.   There is no technical limitation on providing NFC access to developers seeking to offer third-party wallets. For example, Apple allows merchants to use the

---

[25] Government Complaint ¶ 113.
[26] Government Complaint ¶ 114.

iPhone's NFC antenna to accept tap-to-pay payments from consumers. Apple also acknowledges it is technically feasible to enable an iPhone user to set another app (*e.g.*, a bank's app) as the default payment app, and Apple has announced its intention to allow this functionality in Europe after drawing antitrust scrutiny there.

150.   In 2024, Apple announced that it was modifying access by third parties to Apple Wallet in response to regulatory threats by the EU. It then extended this benefit to consumers and developers in the United States with the introduction of iOS 18.1 in October of 2024. This was a voluntary decision by Apple and can be retracted at Apple's whim.

151.   Moreover, even after Apple opened the NFC chip to third parties, it has exercised tight control over banks and developers who wish to make use of that access. It has created new APIs for both the NFC and its associated Secure Element ("SE"). To obtain this access, Apple developers must enter into commercial agreements with Apple, satisfy its eligibility requirements, and pay associated fees. The exact fee structure in the United States has not been publicly disclosed as of this date, but a useful point of comparison is what Apple did in Brazil with respect to third party access to the NFC and SE. Since 2020, Brazilians have used Pix, a free and instant pay ecosystem. Banking institutions and associations who utilized Pix and sought access to the NFC were charged 0.17% per transaction. Those institutions filed a complaint with CADE, Brazil's antitrust regulator, saying that Apple's

requirements created a barrier to competition. CADE held an initial public hearing and opened a preliminary antitrust probe in April of 2025 into what it viewed as Apple's monopoly in the proximity payment system.

152. Apple further impedes the adoption of digital wallets by restricting others from offering the same ability to authenticate digital payment options on online checkout pages. By limiting the ability of third-party wallets to provide a simple, fast, and comprehensive solution to online purchasing, Apple further undermines the viability of such wallets.

153. Apple also blocks other digital wallets from serving as an alternative to Apple's in-app payment (IAP). This prevents these wallets from increasing their attractiveness and improving the overall user experience on the iPhone by offering consumer experiences that may include use of rewards points in purchasing, digital receipts, returns, loyalty programs, and digital coupons for purchases of relevant subscriptions and digital goods. Apple even prohibits developers on its App Store from notifying users in the developer's app that cheaper prices for services are available using alternative digital wallets or direct payments.

154. Apple's senior executives have acknowledged that the requirement to use Apple's IAP system stifles competition and limits the apps available to Apple's customers. In one email conversation with other senior leaders at Apple about whether to require use of Apple's in-app IAP for e-Book purchases, Jobs said that

"I think this is all pretty simple—iBooks is going to be the only bookstore on iOS devices. We need to hold our heads high. One can read books bought elsewhere, just not buy/rent/subscribe from iOS without paying us, which we acknowledge is prohibitive for many things."

155.   Apple's conduct reflects its knowing degradation of the experience of its own users by blocking them from accessing wallets that would have better or different features. Apple thereby cements reliance on the iPhone while also imposing fees on a large and critical slice of all digital wallet NFC transactions, which the U.S. Consumer Financial Protection Bureau estimates will grow to $451 billion by 2028.

## C.   Apple Uses a Similar Playbook To Maintain Its Monopoly Through Many Other Products and Services.

156.   The exclusionary and anticompetitive acts described above are part of Apple's ongoing course of conduct to build and maintain its smartphone monopoly. They are hardly exhaustive. Rather, they exemplify the innovation Apple has stifled and the overall strategy for Apple to use its power over app distribution and app creation to selectively block threatening innovations.

157.   Apple has deployed a similar playbook for a much broader range of third-party apps and services as well, many of which present technologies that function as middleware, facilitate switching, reduce the need for expensive hardware, or disintermediate Apple's iPhone by enabling the development of cross-platform technologies. For instance, Apple has undermined third-party location

CONSOLIDATED CLASS ACTION COMPLAINT

trackable devices that fully function across platforms. Apple has impaired third-party, cross-platform video communications apps while steering users to its own video communication app, FaceTime. Apple has limited the capabilities of third-party iOS web browsers, including by requiring that they use Apple's browser engine, WebKit. Protocols that Apple has placed around new "eSIM" technology may introduce additional frictions for any user who seeks to transition from an iPhone to a different phone while maintaining the same phone number. Apple has impeded cross-platform cloud-storage apps in order to steer iPhone users into iCloud, making data transfer between different devices more difficult. Apple uses restrictions in sales channels to impede the sale and distribution of rival smartphones. Apple imposes technologically unnecessary restrictions on the iPhone's ability to utilize NFC technology to "tap-to-share" contact information, photos, and videos with non-iPhone users. And Apple has worsened its users' experience by making it difficult for iPhone users to use superior voice and AI assistants, including Amazon's Alexa, and steering users to use Siri as a voice assistant. Market participants have also noted that because Apple requires the use of WebKit, as opposed to allowing developers their own option, WebKit has become slower to innovate and adopt industry standards.

158. Ultimately, the strategies Apple has employed to date are not the only ones Apple can use to achieve its anticompetitive and lucrative "lock in" scheme.

CONSOLIDATED CLASS ACTION COMPLAINT

67

As technology evolves, Apple continues to evolve and shift its anticompetitive behavior to protect its monopoly power. For example, in recent years, Apple has increasingly moved into offering its own subscription services, including news, games, video, music, cloud storage, and fitness subscriptions that could be used to keep users tethered to the platform. These subscription services and other ancillary fees are a significant part of Apple's net revenue and add substantially to a user's cost of an iPhone. These subscription services can also increase switching costs among iPhone users. If an Apple user can only access their subscription service on an iPhone, they may experience significant costs, time, lost content, and other frictions if they attempt to switch to a non-Apple smartphone or subscription service.

159. These subscription services can also increase Apple's power over content creators and newspapers, among others, by exerting control over how audiences access their work, decreasing traffic to their websites and apps, and positioning Apple as the middleman or tollbooth operator in the relationship between creators and users. In so doing, Apple takes on outsize importance and control in the creative economy, which may diminish incentives to fund, make, and distribute artistic expression.

160. Apple entrenches its dominance over competitor services and apps by restricting competitor apps in ways it does not restrict itself. For example, Apple has historically prevented third-party messaging apps from becoming Siri defaults.

Apple also copies features of third-party apps to its own preloaded products, often referred to as "Sherlocking." The term "Sherlocking" is derived from an incident where Apple launched a search product called Sherlock. A third-party developer launched a competing product with more capabilities known as Watson. Apple then released an updated version of its Sherlock application with many of the same features as Watson and preloaded it on every iPhone through its operating system. Third-party developers are thus inherently disadvantaged when it comes to developing apps for iPhones, because Apple can simply copy and preload any desirable features, foreclosing or even outright eliminating competition for those features and apps.

161. Since this namesake Sherlocking incident, Apple has also been known to simply steal innovative aspects of rival apps before shutting them down. For instance, Blix, the developer of an e-mail management app, has said that "Apple frequently takes other companies' innovative features, adds those ideas to Apple's own software products without permission, and then either ejects the original third-party application from the App Store (as it did with Blix's software) or causes the third-party software developer to close its doors entirely." This theme was echoed by the developer Match Group, which said that Apple has a history of "closely monitoring the success of apps in the App Store, only to copy the most successful of them and incorporate them in new iPhones" as a pre-installed app. Apple has largely

escaped any repercussions associated with Sherlocking because app developers are hesitant to sue the tech giant and fear the consequences of a lawsuit given that many depend on Apple's platform.

162. Apple has also simply shut down rival apps when they threaten this "lock in" scheme. Apple once removed 11 of the 17 most downloaded apps that helped parents limit their children's time on Apple devices, which compete with Apple's own parental control app. Apple had claimed these apps could violate user privacy and security. A month later, Apple abruptly reversed this policy, but small businesses who developed these apps lost millions of dollars following Apple's purge, some of which completely shut down as a result. Apple's rival screen time control tools require the whole family to own iPhones, cementing Apple's dominance over more-beneficial tools from third-party apps to control children's access to iPhones.

163. In addition, when one road is closed to Apple, Apple has demonstrated its ability to find new roads to the same or worse ends. For example, Apple was recently ordered to stop blocking link-outs by third parties to their websites where users could buy the third party's product cheaper. In response, Apple allowed link-outs to websites but now charges for purchases made on the web even if they are not an immediate result of a click from a link in a native iPhone app.

164. Apple has also attempted to undermine cross-platform technologies like digital car keys in ways that benefit Apple but harm consumers. For example, Apple has required developers to add digital keys developed for their own apps to Apple Wallet as well. The default status of Apple Wallet steers users to the Apple Wallet rather than allowing third parties to present digital car keys only in their own cross-platform app, increasing dependence on Apple and the iPhone whenever they use their car. At the same time, it decreases the incentives of automakers to innovate because automakers are forced to share data with Apple and prevented from differentiating themselves as they could absent Apple's conduct.

165. Apple's threatened dominance over the automotive industry goes well beyond the Apple Wallet and Apple's demands on car makers to allow innovative products and services on the iPhone. Apple's smartphone dominance extends to CarPlay, an Apple infotainment system that enables a car's central display to serve as a display for the iPhone and enables the driver to use the iPhone to control maps and entertainment in the car. Like the smartphone market, infotainment systems are increasingly considered must-have capabilities in newer vehicles. After leveraging its smartphone dominance to car infotainment systems, Apple has told automakers that the next generation of Apple CarPlay will take over all of the screens, sensors, and gauges in a car, forcing users to experience driving as an iPhone-centric experience if they want to use any of the features provided by CarPlay. Here too,

CONSOLIDATED CLASS ACTION COMPLAINT

71

Apple leverages its iPhone user base to exert more power over its trading partners, including American carmakers, in future innovation. By applying the same playbook of restrictions to CarPlay, Apple further locks-in the power of the iPhone by preventing the development of other disintermediating technologies that interoperate with the phone but reside off device.

## VIII. ANTICOMPETITIVE EFFECTS

### A. Apple's Conduct Harms the Competitive Process.

166. As described above, Apple protects its monopoly power in smartphones by using its control over app distribution and app creation to suppress or delay apps, innovations, and technologies that would reduce user switching costs or simply allow users to discover, purchase, and use their own apps and content without having to rely on Apple—together, the "lock in" scheme. As a result, Apple faces less competition from rival smartphones and less competitive pressure from innovative, cross-platform technologies, not because Apple makes its own products better, but because it makes other products worse. With the benefit of less competition, Apple extracts extraordinary profits and regulates innovation to serve its interests. This leaves all smartphone users worse off, with fewer choices; higher prices and fees; lower quality smartphones, apps, and accessories; and less innovation from Apple and others. Left unchallenged, Apple will continue to use and strengthen its

smartphone monopoly to dictate how companies can create and distribute apps in the future so that they cannot threaten Apple's smartphone monopoly.

167. Apple's conduct has resulted in less choice for smartphone users. Today, only two companies (Google and Samsung) remain as meaningful competitors to Apple in the performance smartphone market.

168. Even when users consider these alternatives, Apple's conduct has increased the technical, behavioral, monetary, and other costs of switching from an iPhone to an alternative smartphone. This undermines competition and entrenches Apple's monopoly power. A survey conducted by the United Kingdom Competition and Markets Authority concluded, "iOS users in particular perceive that switching could impose [ ] costs, and, because of concerns around transferring data and apps after switching, a large proportion of iOS users are deterred from switching operating system. We find this perception is weaker among Android users."

169. Through its "lock in" scheme, Apple preserves and expands its monopoly power and the resulting overcharges paid by Plaintiffs and the Class on their iPhones. According to user surveys, one of the biggest reasons iPhone users do not switch to rival smartphones today is to avoid the problems Apple has created for cross-platform messaging. Likewise, Apple exercised its control over app distribution and app creation to impede the development and growth of super apps, depriving users of technology that would have facilitated switching by decreasing

user's dependence on Apple and the iPhone. Apple took a similar approach to cloud-streaming apps, delaying or suppressing technology that would have made it easier for users to switch to cheaper smartphones. Apple also used its control over app creation, including its control over critical APIs, to impose technical and contractual restrictions on messaging apps, third-party smartwatches, and digital wallets, undermining cross-platform technologies that would have helped users overcome switching costs and friction and ultimately increased smartphone competition.

170. Each "pillar" of the "lock in" scheme contributes to the ultimate overcharge paid in the relevant markets. Absent Apple's contractual and technological conduct in the aftermarkets described above, consumer demand for iPhones would weaken. Absent this conduct, the barriers to entry for competition in the smartphone foremarkets would also be reduced. For both of these reasons, absent Apple's anticompetitive conduct, there would be increased competition for smartphones and performance smartphones, as well as downward pressure on the price of iPhones purchased by Plaintiffs and the Damages Class.

171. Apple's conduct has also delayed or suppressed the emergence of cross-platform technologies that would put competitive pressure on Apple's ability to extract extraordinary profits, including the iPhone overcharges described above. For example, if developers could distribute their programs through super apps or cloud-streaming apps, rather than the App Store, it would put competitive pressure on

Apple's ability to control app distribution and app creation, as well as the taxes Apple imposes on developers who want to distribute apps to iPhone users. Similarly, third-party digital wallets, or other apps with tap-to-pay functionality, would benefit users and developers by putting more competitive pressure on Apple as well. For example, digital wallets could eventually provide developers an alternative way to process payments and manage customer relationships, forcing Apple to compete more aggressively by lowering fees and improving quality, which would ultimately benefit users. Instead, Apple continues to exert its power over customers and financial institutions when users pay for something with their phone—in the App Store, in an app, or increasingly in the physical world with tap-to-pay.

172. Apple's conduct has harmed users in other ways. For example, third-party digital wallets could provide smartphone users better rewards, *e.g.*, cash back, as well as a more private, secure payment experience from a user's preferred financial institution rather than being forced to decide between using Apple Pay or using the less-secure physical card for transactions. But these tap-to-pay digital wallet products and services do not exist today because of Apple.

173. Apple's conduct has made its own products worse, sacrificing the short-term profits Apple could earn from improving the iPhone in order to preserve the long-term value of maintaining its monopoly. In a competitive market, Apple would compete aggressively to support the development of popular apps and accessories

CONSOLIDATED CLASS ACTION COMPLAINT

for iPhone users, which would in turn make iPhones more attractive to users and more valuable. But Apple takes steps to delay or suppress cross-platform technologies that it recognizes would be popular with users, such as super apps and cloud-streaming apps, because of the threat they pose to Apple's smartphone monopolies. As a result, several developers have abandoned plans to develop super apps and cloud-based gaming apps even after making substantial investments in bringing them to market. Apple's conduct may have also slowed the development of innovative, high-compute apps related to education, artificial intelligence, and productivity as well. Apple has also impeded innovation by third-party smartwatches such that manufacturers have limited the functionality of their smartwatches for iPhone users, suspended support for iPhone compatibility because of Apple's restrictions, or canceled development of cross-platform smartwatches altogether. At least one company's canceled smartwatch formed part of its overall wearables strategy, including future development of virtual-reality technology. Similarly, Apple degrades third-party messaging apps, even though it makes cross-platform messaging less private and less secure for iPhone users, because doing so raises switching costs.

174. Apple's conduct has harmed other smartphone users, too. Because of the resources and risks required to maintain different features across different smartphones, many potential super app, mini program, and other developers do not

implement features prohibited by Apple even on other smartphones. For example, prospective digital wallet providers, including U.S. banks, have abandoned the development of digital-wallet apps for either Apple or other smartphones. Another company decided not to offer users an innovative digital car key in part because Apple required that company to add any features related to the key into Apple Wallet rather than allowing that company to put its key solely in its own app. Other developers have shrunk, shuttered, or abandoned plans to launch super apps, cloud-streamed gaming apps, smartwatches, and other apps. As a result, all smartphone users enjoy lower quality smartphones, less innovation, less quality-adjusted output, and less choice.

175. Apple's documents and conduct show that Apple is motivated by the anticompetitive purpose of building or maintaining monopoly power in the relevant markets. For example, Apple sacrificed substantial revenues it could have earned from the aftermarkets discussed above—including super apps and mini programs, cloud-streaming apps, and other third-party apps and accessories. In particular, mobile gaming already accounts for a large and growing portion of Apple's revenue. Popular cloud-streamed gaming apps would offer iPhone users access to popular services (including games) and in turn generate significant revenue for Apple through subscriptions and in-app purchases. Instead, Apple preferred the long-term benefit of reduced smartphone competition over the revenue it would generate from

cloud gaming and super apps and mini programs, or the quality (and consumer demand) increase that would flow from these innovations. Apple has also used its control over app distribution and app creation to selectively undermine cross-platform technologies, not because this helps protect users but because it helps protect Apple.

176. The harms to smartphone competition caused by Apple's "lock in" scheme are amplified by Apple's decision to grant itself exclusive distribution rights to iPhone users through the Apple App Store. If Apple allowed users to access apps in other ways, users could choose an app store that did not restrict super apps or mini programs, even if Apple ran its App Store the same way it does today. Apple does not allow that choice, however, because if it did developers could write their programs for any smartphone rather than specifically for iOS, just as internet browsers and Apple's QuickTime allowed developers to write programs that worked on a variety of operating systems, not just Windows. That would lower users' switching costs and reduce users' and developers' dependence on Apple and the iPhone.

177. Apple's smartphone monopoly gives it many levers to maintain its power even in the face of interventions focused on eliminating or disciplining specific anticompetitive practices. This is because Apple's iPhone monopoly, secured by its anticompetitive conduct, grants it the power to set the rules by which

CONSOLIDATED CLASS ACTION COMPLAINT

78

most smartphone users buy digital and hardware products, and by which developers are allowed to sell these same products to users. If Apple is forced to change some of these rules, it has the power to adopt new rules, restrictions, or features that reinforce Apple's monopoly and harm competition in other ways. But Apple continues to contractually restrict third parties from accessing other APIs and features that would enable cross platform messaging apps. In another instance, Apple was enjoined from enforcing certain anti-steering provisions in its agreements with developers. In response, Apple simply created a different set of onerous restrictions on app developers to achieve a similar result. In other cases, Apple has used its control over app distribution to force companies to comply with Apple's policies that may contradict local laws by delaying the review of the offending companies' apps.

178.   Apple's "lock in" scheme involves several "pillars" of anticompetitive conduct across several different aftermarkets. But each pillar of the scheme serves a single purpose: drive up prices and reduce competition in the relevant markets for Apple's flagship product, iPhone.

**B.     Apple Has Every Incentive to Use Its Monopoly Playbook in the Future.**

179.   Apple's conduct does not just impact the past and present but poses significant risk to the development of new innovations. Apple may use its smartphone monopoly playbook to acquire or maintain power over next-frontier

CONSOLIDATED CLASS ACTION COMPLAINT

devices and technologies. As Apple grows its dominance, Apple may continue delaying or stifling the innovations of cross-platform companies, in order to lock users into Apple devices.

## IX.   PRIVACY, SECURITY, AND OTHER ALLEGED COUNTERVAILING FACTORS DO NOT JUSTIFY APPLE'S ANTICOMPETITIVE CONDUCT

180.   There are no valid, procompetitive benefits of Apple's exclusionary conduct that would outweigh its anticompetitive effects. Apple's conduct has not resulted in lower prices, higher quality-adjusted output, improved innovation, or a better user experience for smartphone users.

181.   Apple markets itself on the basis of privacy and security to differentiate itself from what competition is left in the smartphone market. But this does not justify Apple's monopolistic and anticompetitive conduct. Apple imposes contractual restraints on app creation and distribution, imposes hefty fees on many types of smartphone interactions, and conditionally restricts API access on its smartphone platform simply because it can. There are limited if any competitive constraints on this conduct. As a point of comparison, Apple does not engage in such conduct on its Mac laptops and computers. It gives developers the freedom to distribute software directly to consumers on Mac without going through an Apple-controlled app store and without paying Apple app store fees. This still provides a safe and secure experience for Mac users, demonstrating that Apple's control over

app distribution and creation on the iPhone is substantially more restrictive than necessary to protect user privacy and security.

182. In fact, many alternative technologies that Apple's conduct suppresses would enhance user security and privacy. For example, Apple's conduct targeting digital wallets forces users to share information with Apple even if they would prefer to share that information solely with their bank, medical provider, or other trusted third party. In particular, when an iPhone user adds a credit or debit card into Apple Wallet, Apple intervenes in a process that could otherwise occur directly between the user and card issuer introducing an additional point of failure for privacy and security. Likewise, super apps or alternative app stores could offer users and their families a more curated selection of apps that better protect user privacy and security. Indeed, Apple allows enterprise and public sector customers to offer more curated app stores on employee iPhones because it better protects privacy and security.

183. Apple is also willing to make the iPhone less secure and less private if that helps maintain its monopoly power. For example, text messages sent from iPhones to Android phones are unencrypted as a result of Apple's conduct. If Apple wanted to, Apple could allow iPhone users to send encrypted messages to Android users while still using iMessage on their iPhone, which would instantly improve the privacy and security of iPhone and other smartphone users.

184. Similarly, Apple is willing to sacrifice user privacy and security in other ways so long as doing so benefits Apple. For example, Apple allows developers to distribute apps through its App Store that collect vast amounts of personal and sensitive data about users—including children—at the expense of its users' privacy and security. Apple does so while offering governments and certain companies the chance to access more private and secure versions of app stores. Apple also enters agreements to share in the revenue generated from advertising that relies on harvesting users' personal data. For example, Apple accepts massive payments from Google to set its search engine as the default in the Safari web browser even though Apple recognizes that other search engines better protect user privacy.

185. Until the September 2020 release of iOS 14, Apple did not allow consumers to select third party web browsers as a default. This was unique to iOS. No other mobile device operating system had a similar limitation.

186. Finally, Apple selectively enforces its rules and contractual restrictions for app distribution and app creation. For example, when it benefits Apple to do so, Apple permits developers to introduce mini programs, stream content from the cloud, use virtual currency, and receive special permissions or access APIs not automatically available to everyone.

187. Ultimately, Apple chooses to make the iPhone private and secure when doing so benefits Apple; Apple chooses alternative courses when those courses help

Apple protect its monopoly power. Apple's conduct underscores the pretextual nature of any claim that its conduct is justified by protecting user privacy or security.

## X.      THE SMARTPHONE INDUSTRY

### A.   Background

188.   Mobile phones are portable devices that enable communications over radio frequencies instead of telephone landlines. These signals are transmitted by equipment covering distinct geographic areas, or "cells," which is why mobile phones were called cell phones. The first commercial cell phones became available in the 1980s. Since then, improvements in both cell phone components and wireless technology have made it possible to transfer large volumes of data around the globe in a short period. As a result, mobile phones began to offer a wider array of features and the adoption of mobile phones dramatically increased. Today, nearly all American adults own a mobile phone.

189.   Smartphones combine the functionality of a traditional mobile phone with advanced hardware and software components. Smartphones not only make phone calls, but also allow users to listen to music, send text messages, take pictures, play games, access software for work, manage their finances, and browse the internet. Consumers choose between smartphones based, in part, on their functionality. Today, smartphone functionality is driven in large part, though not exclusively, by a combination of hardware and software components. Thus, in a

CONSOLIDATED CLASS ACTION COMPLAINT

competitive market, smartphone manufacturers would compete and innovate to provide the best functionality.

190. Although consumers could replace some smartphone functionality with separate devices, such as by always carrying a camera and laptop, they generally prefer to access this combination of functionality as part of a single device. Thus, phones with some but not all of these features are not reasonable substitutes for smartphones. For example, a Canon or Nikon camera is not a substitute for an Apple or Samsung smartphone notwithstanding that both these products are capable of taking digital pictures.

## B. Smartphone Hardware

191. A smartphone's hardware includes the frame and screen. Higher performing smartphones are typically constructed from better materials like glass and metal instead of plastic, manufactured to higher standards that make them more durable (*e.g.*, water and dust proof), and have higher quality displays.

192. A smartphone's hardware also includes the semiconductor chipsets that run the smartphone: central processing of software instructions, graphics, video, display, memory, data storage, and connection to wireless networks. Chipsets that offer superior performance—faster processing and network connections, better graphics, more storage—are costly.

193. Smartphone hardware includes other important components like cameras and position and motion sensors.

   a. Smartphones also contain several types of antennas that allow the phone to communicate with other smartphones, accessories, or other devices using standard communication protocols such as Wi-Fi, Bluetooth, and Near-Field Communications (NFC).

   b. Wi-Fi is a wireless networking technology that uses radio waves to provide wireless high-speed Internet access through mobile devices, computers, printers, and other equipment. "Wi-Fi," in particular, refers to IEEE 802.11 standards that define the protocols that enable communications with current Wi-Fi-enabled wireless devices such as wireless routers and access points.

   c. Bluetooth is a wireless standard that allows smartphones to use shortwave radios to communicate with accessories like headphones and smartwatches. An industrywide Bluetooth standard specifies technological requirements to ensure that all Bluetooth devices can recognize and interact with each other. A typical Bluetooth signal has a range of about 30 feet.

CONSOLIDATED CLASS ACTION COMPLAINT

85

d. Near Field Communication (NFC) allows smartphones to interact with NFC-enabled devices like a credit card terminal at a coffee shop. NFC relies on short-range wireless technologies, including radio signals, to communicate and share information. To operate, two NFC-enabled devices must typically be within four centimeters or less of one another.

194. Three device manufacturers, Apple, Samsung, and Google, account for approximately 94 percent of all smartphones by revenue in the United States. Apple and Samsung alone account for approximately 90 percent of all smartphone revenues in the United States.[27]

195. In the United States, 20% or more of all iPhone purchases are directly through Apple, either in its retail spaces or online. Approximately 60-75% of all U.S. iPhone purchases are completed through a third-party wireless carrier, like Verizon or AT&T, with the remainder purchased through third-party retailers, like Wal-Mart and Best Buy.

196. Cloud-based technologies are run using hardware and software in remote computing centers rather than by hardware and software on a smartphone. The user experiences the technology on the phone but the complex computing that generates the rich experience and that executes the user's commands happens in the

---

[27] Government Complaint ¶ 155.

CONSOLIDATED CLASS ACTION COMPLAINT

86

cloud. Thus, cloud apps can deliver rich experiences on smartphones with less capable hardware than iPhones currently contain.

### C.     Smartphone Operating Systems, Applications, and Other Software

197. In addition to hardware, smartphones include various software components that make a smartphone more attractive to users.

198. The most important software component is a smartphone's operating system, the foundational software that manages both the hardware and other software programs on the device. All iPhones are preloaded with Apple's proprietary, exclusive iPhone operating system called iOS. The only other significant mobile operating system in the United States is Google's Android, which works with smartphones manufactured by Samsung, Google, Motorola, and smaller players. Software applications, known as "apps," are programs that perform specific tasks at the smartphone user's request, such as sending messages, playing music, or web browsing. Apps depend on a smartphone's operating system to function. For example, to make a video call, apps must communicate with a smartphone's operating system to access various hardware components on the phone, such as the camera, microphone, and speaker. Apps communicate with a smartphone's operating system through APIs.

199. Apps that work with a particular smartphone operating system are called native apps. Thus, Apple's native iOS apps work with iPhone and native Android apps work with Android smartphones.

200. Android and iOS are not substitutes in the eyes of app developers. Most app developers view Android and iOS as distinct sales channels by which to reach customers, rather than as substitutes for one another. Indeed, the vast majority of iOS apps are also available as Android apps. The overwhelming majority of users choose a single phone and do not "multi-home" by carrying an Android phone and the iPhone at the same time. Thus, a developer cannot reach iPhone users on Android or Android users on iPhones with a single app. Due to the lack of user multi-homing, most developers create native apps for both iOS and Android to reach the greatest number of smartphone users. For example, a food delivery or ride-sharing app cannot develop an app just for Android phones or just for the iPhone. Developing for both platforms is often necessary for developers to reach the scale they need to be viable.

201. It is also important to develop apps for the iPhone and other smartphone platforms because most apps are increasingly "social" in nature and require users on one platform to reach users on the other. For example, the developer of a dating app must enable its users on iPhones to meet users on Android and vice-versa. A money-

sharing app must enable users on Android devices to send money to users on iPhones and vice versa.

202.   App developers typically provide a similar user experience for native apps on iPhones and Android smartphones to minimize the resources and risks of maintaining different features across different smartphones. Even so, developers must program native apps to work with a specific operating system, and so they do not always interoperate or synchronize across different operating systems.

203.   Middleware is software that provides similar APIs and functionality across a diverse set of operating systems and devices. This allows developers to create cross-platform applications without having to write separate code for individual operating systems or devices because developers can rely on the APIs exposed by the middleware rather than APIs that only work on specific operating systems or devices. Apple has long understood how middleware can help promote competition and its myriad benefits, including increased innovation and output, by increasing scale and interoperability. As Apple's then-Senior Vice President of Software Engineering testified during United States v. Microsoft: "Because we have created QuickTime for both Windows and Macintosh computers, developers can write a single version of a content product that will run on both Macintosh and Windows, without the additional expense of 'porting' the product to different operating systems." In the context of smartphones, examples of middleware include

internet browsers, internet or cloud-based apps, super apps, and smartwatches, among other products and services. While not meeting the technical definition of middleware, certain other products and services may nonetheless have the same economic impact as middleware, such as eliminating the added expense of porting a product or experience across hardware or operating systems. For the purposes of this complaint, middleware refers to both technical middleware and to products and services that, while not technically middleware, have the same economic effect.

### D.   Relevant Markets

204.   All smartphones compete against each other in a broad relevant market. But industry participants, including Apple, assess competition among smartphones in narrower markets that are best understood as submarkets of the larger all-smartphone market. Because Apple chooses not to compete to sell new smartphones in the entry-level tier, the most relevant market to assess its conduct is a narrower submarket that excludes this entry-level tier. Regardless of how the market is drawn, however, Apple's conduct is unlawful.

#### 1.   Performance smartphones are a narrower relevant product market.

205.   Performance smartphones are a narrower relevant product market within the broader smartphone market. This narrower market includes those smartphones that compete with most iPhones and excludes the lowest-end

smartphones, which industry participants sometimes refer to as "entry-level" smartphones.

206. Performance smartphones have distinct characteristics and uses as compared to other smartphones. For example, entry-level smartphones are generally made with lower-quality materials and are less durable (*e.g.*, plastic instead of metal and glass). They have lower performance components, such as slower processors and lower-capacity storage, which prevent users from running more intensive applications or storing large volumes of pictures and data on the device. Entry-level smartphones often lack features such as an NFC antenna that allows consumers to use their phone to make payments or access passes for public transit.

207. Because of these differences, among others, between entry-level smartphones and performance smartphones, entry-level smartphones are not reasonable substitutes for performance smartphones.

208. Moreover, competition from non-performance smartphones is not sufficient today to prevent Apple from exercising monopoly power in the performance smartphone market.

### 2. Smartphones are a broader relevant product market.

209. Smartphones are a broader relevant product market. Smartphones are distinct from phones that offer less capable hardware and software options than smartphones. These other phones, sometimes called "feature phones," may offer

basic web browsing in addition to calling and messaging options, but do not offer the breadth of access to the internet or third-party apps as smartphones. Similarly, these phones often have lower-quality hardware, such as poorer displays, less capable cameras, and rely on physical keyboards instead of smartphone touch screens. Thus, these phones are not reasonable substitutes for smartphones.

210. Smartphones are also distinct from other portable devices, such as tablets, smartwatches, and laptop computers. These devices lack the combination of function, size, and portability that consumers rely on in a smartphone, even if they offer some similar capabilities. Thus, none of these other products are reasonable substitutes for smartphones.

211. Apple, other participants in the market, and the public recognize that smartphones are distinct from feature phones and other portable devices.

212. Competition from feature phones, or other alternatives, is not sufficient to prevent Apple from exercising monopoly power in the smartphone market.

### 3. The United States is a relevant geographic market for smartphones.

213. The United States is a relevant geographic market for the sale of smartphones. A smartphone purchased abroad for use in the United States might be incompatible with the consumer's domestic carrier, may not have the necessary radio technology to take advantage of the carrier's highest speed connections, the carrier

CONSOLIDATED CLASS ACTION COMPLAINT

might not be able to offer support during setup or subsequently, or the phone's warranty may be invalid.

214. Potential new smartphone entrants to the U.S. market must also comply with telecommunications regulations and satisfy other legal requirements. No extensive regulatory framework governs how Apple operates its platform with respect to developers, but there are a number of regulatory requirements that must be met in order to enter the smartphone market. For example, some smartphone makers are effectively barred from offering their smartphones to U.S. consumers.

215. Consumers in the United States could not avoid or defeat an increase in the price of smartphones by purchasing and importing smartphones from abroad. This allows Apple to set prices for the same smartphone in the United States separately from those in other countries. For example, Apple lowered the price of the iPhone 11 in China relative to the United States because Apple faced greater competition in China. This additional competition arises in part because a popular super app put competitive pressure on Apple and made it easier for users to switch from an iPhone to a rival smartphone. As a result, Apple is unable to command the same prices for the iPhone in China as they do in the United States due to less competition.

**E.      Apple Has Monopoly Power in the Smartphone and Performance Smartphone Market.**

216.   Apple has monopoly power in both the performance smartphone market and the broader smartphone market because it has the power to control prices or exclude competition. Apple enjoys substantial and durable market shares in these markets. Apple's power will likely increase over time.

217.   There are also significant barriers to entry in the relevant markets. For example, because smartphones are frequently bought through wireless carriers like Verizon and T-Mobile, new entrants or those seeking to expand or reposition must meet the carrier's technical requirements to access the major carrier networks in the United States. New entrants and smaller rivals must also negotiate distribution agreements and persuade carriers and other retailers to promote their products to consumers. Rival smartphone manufacturers must also overcome the substantial network effects generated by interactions between users, developers, and others who interact with the iPhone. Apple recognizes and exploits these barriers to entry to protect itself from competition from rival platforms and innovations, products, and services that may diminish consumer reliance on the iPhone.

218.   In the U.S. market for performance smartphones, where Apple views itself as competing, Apple's market share likely exceeds 70 percent.[28] These

---

[28] Government Complaint ¶ 181.

CONSOLIDATED CLASS ACTION COMPLAINT

94

estimates likely understate Apple's market share today, given that Apple's share among key demographics (including younger audiences and higher-income households) is even larger. Even in the broader market consisting of all smartphones—including many smartphones that Apple and industry participants do not view as competing with Apple's iPhones and other higher-end phones—Apple's share is more than 65 percent by revenue.

219. Even if consumers choose one phone over another, the vast majority of developers consider iPhones and Android devices as complements because developers must build apps that run on both platforms due to the lack of user multi-homing. In effect, the lack of multi-homing among users necessitates multi-homing among developers. This market reality increases the power that Apple is able to exercise over developers that seek to reach users on smartphones. In turn, Apple's power over developers (who sell products in several of the various aftermarkets described above) strengthens the "lock in" scheme that results in anticompetitive overcharges on iPhones purchased by end-user consumers.

220. Apple's high market shares are durable. Over the last decade, Apple increased its share of smartphones sold in the United States in most years. Through the same period, Apple collected more than half the revenue for all smartphones sold in the United States.

221. Apple's monopoly power in the relevant markets is protected by several substantial barriers to entry and expansion. First, since fewer than ten percent of smartphone purchasers in the United States are buying their first smartphone, there are fewer new customers available for Apple's rivals. Instead, rivals must encourage existing iPhone users to switch from using an iPhone to using another smartphone when they replace or upgrade their phone. As a result, switching costs—many created or exacerbated by Apple—impose substantial barriers to entry and expansion for rival smartphones. This barrier is increasingly impenetrable. Nearly 90 percent of iPhone owners in the United States replace their iPhone with another iPhone. The increased switching costs that consumers experience because of Apple's conduct underpins these exceedingly high retention rates.

222. Second, introducing a new smartphone requires considerable investments in acquiring expensive and scarce components such as mobile chips and specialized glass for screens. Other significant barriers to entry include product design, software development, regulatory approval, manufacturing, marketing, and customer service. As explained above, rival smartphones must also overcome the substantial network effects generated by interactions between users, developers, and others who interact with the iPhone.

223. Third, Apple's monopoly power is also protected by strong network and scale effects, including high switching costs and frictions. For example, if an

CONSOLIDATED CLASS ACTION COMPLAINT

iPhone user wants to buy an Android smartphone, they are likely to face significant financial, technological, and behavioral obstacles to switching. The user may need to re-learn how to operate their smartphone using a new interface, transfer large amounts of data (*e.g.*, contacts), purchase new apps, or transfer or buy new subscriptions and accessories. These switching costs and frictions are even higher when software applications, APIs, and other functionality do not help the different devices and operating systems communicate and interoperate. These switching costs and frictions increase the "stickiness" of the iPhone, making users more beholden to the smartphone manufacturer and platform operator.

224. Many prominent, well-financed companies have tried and failed to successfully enter the relevant markets because of these entry barriers. Past failures include Amazon (which released its Fire mobile phone in 2014 but could not profitably sustain its business and exited the following year); Microsoft (which discontinued its mobile business in 2017); HTC (which exited the market by selling its smartphone business to Google in September 2017); and LG (which exited the smartphone market in 2021). Today, only Samsung and Google remain as meaningful competitors in the U.S. smartphone market. Barriers are so high that Google is a distant third to Apple and Samsung, despite the fact that Google controls the development of the Android operating system.

225. Apple's monopoly power is separately demonstrated by direct indicia. First, Apple continuously raises the price of iPhones well above the rate that would be expected given competition. The ability to charge supracompetitive prices is itself direct evidence of market power. Second, Apple can and does profitably forego innovation without fear of losing customers to competitors. For example, Apple's vice president of iPhone marketing explained in February 2020: "In looking at it with hindsight, I think going forward we need to set a stake in the ground for what features we think are 'good enough' for the consumer. I would argue were [sic] already doing *more* than what would have been good enough." After identifying old features that "would have been good enough today if we hadn't introduced [updated features] already," she explained, "anything new and especially expensive needs to be rigorously challenged before it's allowed into the consumer phone."[29]

226. Apple's profits and profit margins, for nearly every aspect of the iPhone, are further evidence of Apple's monopoly power. For example, Apple's per-unit smartphone profit margins are far more than its next most profitable rival. Apple charges carriers considerably more than its rivals to buy and resell its smartphones to the public and employs contract clauses that may impede the ability of carriers to promote rival smartphones, a harmful exercise of monopoly power that is hidden to most consumers. Apple extracts fees—as much as 30 percent when users purchase

---

[29] Government Complaint ¶ 187.

apps, make in-app payments, or even make payments through external links. Apple also extracts a 0.15 percent commission on credit card transactions through its digital wallet, while none of its smartphone competitors with digital wallets charge any fee. Apple predicts that it will collect nearly $1 billion in worldwide revenue on Apple Pay fees by 2025. A recent report by the U.S. Consumer Financial Protection Bureau suggests these revenues will only increase, as "analysts expect the value of digital wallet tap-to-pay transactions will grow by over 150 percent by 2028."[30] These separate and distinct overcharges occur in the respective aftermarkets and are not included in the damages sought here; Apple's ability to consistently demand monopoly prices in each of these aftermarkets is, however, indicative of its market power in the relevant foremarkets for smartphones.

227. Apple increasingly charges developers additional fees to promote their apps in the App Store as well. In fact, this is one of the fastest-growing parts of Apple's services business, with revenue "increasing by more than a third to $4.4B in FY 2022." Once again, Apple's ability to extract overcharges out of aftermarket participants indicates that Apple has monopoly power in the relevant markets.

228. These indicia of Apple's monopoly power are direct evidence of its monopoly power in the relevant markets.

---

[30] Government Complaint ¶ 188.

CONSOLIDATED CLASS ACTION COMPLAINT

## XI. JURISDICTION, VENUE, AND COMMERCE

229. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs allege violations of federal law, namely, the Sherman Act.

230. This Court has personal jurisdiction over Defendant Apple, which is headquartered in this District. Apple has engaged in sufficient minimum contacts with the United States, this judicial district, and this State, and it has intentionally availed itself of the laws of the United States and this State by conducting a substantial amount of business throughout the State.

231. This judicial district is a proper venue because Apple resides in this District and transacts affairs in this District. A substantial part of the events giving rise to Plaintiff's claims occurred in this District.

232. Apple engages in, and its activities substantially affect, interstate trade and commerce. Apple provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States, across state lines, and internationally.

233. Apple's anticompetitive conduct occurred in party, trade, and commerce within the Class States set forth below. During the class period, Apple has shipped iPhones into each Class State and sold iPhones to retailer customers in

CONSOLIDATED CLASS ACTION COMPLAINT

each jurisdiction. Apple's anticompetitive conduct has resulted in consumers and members of the class in each Class State paying artificially inflated iPhone prices.

## XII.  CLASS ALLEGATIONS

234.  Plaintiffs bring this proposed class action for damages and injunctive relief pursuant to Fed. R. Civ. P. 23(b)(1), (2), and (3).

235.  Plaintiffs bring this action on their own behalf and on behalf of the following classes:

> **Damages Class**: All persons and entities who purchased a new iPhone indirectly and not for resale between March 23, 2020 to Present (the "Class Period") in the following states and territories: Alabama, Arizona, Arkansas, California, Colorado Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin (collectively, the "Class States").

> **Nationwide Class**: All persons and entities who purchased a new iPhone indirectly and not for resale between March 23, 2020 to Present (the "Class Period") in the United States.

236.  Excluded from the proposed classes are Defendant; Defendant's affiliates and subsidiaries; Defendant's current employees, officers, directors, agents, and representatives; the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members; counsel to Plaintiffs

and the proposed classes, as well as counsel's employees; and all federal governmental entities.

237. **Numerosity**: The exact number of the members of the proposed classes is unknown and is not available to the Plaintiffs at this time, but upon information and belief, the classes will consist of tens of millions of members such that individual joinder in this case is impracticable.

238. **Commonality**: Numerous questions of law and fact are common to the claims of the Plaintiffs and members of the proposed classes. These include, but are not limited to:

a. Whether there is a relevant antitrust product market for smartphones and also for performance smartphone;

b. Whether Apple has unlawfully monopolized the smartphone and performance smartphone markets;

c. Whether purchasers and users of smartphones have been harmed, including by way of having paid more for smartphones than they would have but for Apple's allegedly anticompetitive conduct;

d. Whether Plaintiffs and members of the proposed classes are entitled to declaratory or injunctive relief to halt Apple's unlawful practices, and to their attorneys' fees, costs, and expenses; and

e. Whether Plaintiffs and members of the proposed classes are entitled to any damages or restitution incidental to the declaratory or injunctive relief they seek, or otherwise, and to their attorneys' fees, costs, and expenses related to any recovery of such monetary relief.

239. **Typicality**: Plaintiffs' claims are typical of the claims of the members of the proposed classes. The factual and legal bases of Apple's liability are the same and resulted in injury to Plaintiffs and all of the other members of the proposed classes.

240. **Adequate representation**: Plaintiffs will represent and protect the interests of the proposed classes both fairly and adequately. Plaintiffs have retained counsel competent and experienced in complex class action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed classes, and Plaintiffs' interests do not conflict with the interests of the proposed classes they seek to represent.

241. **Prevention of inconsistent or varying adjudications**: If prosecution of myriad individual actions for the conduct complained of were undertaken, there may be inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for Apple. Certification of Plaintiffs' proposed classes would prevent these undesirable outcomes.

242.  **Injunctive and declaratory relief**: By way of its conduct described in this complaint, Apple has acted on grounds that apply generally to the proposed classes. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the classes as a whole.

243.  **Predominance and superiority**: This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed classes could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

## XIII.  STANDING AND ANTITRUST INJURY

244.  Plaintiffs purchased iPhones at a price that was inflated as a result of Apple's anticompetitive and monopolistic practices, as alleged herein. Apple therefore caused Plaintiffs to suffer overcharge damages.

245.  Charging supracompetitive prices to purchasers like Plaintiffs was the purpose and direct effect of Apple's alleged monopolization conduct.

246.  Although Plaintiffs and Members of the Class purchased iPhones indirectly, the direct purchasers (wireless carriers and other retail outlets) passed all or virtually all of the overcharge on to Plaintiffs and Members of the Class. Indeed, retailers tend to list new iPhones at the identical price sold by Apple to direct purchasers with only minor deviations, if any. This is unsurprising given that Apple utilizes a minimum advertised price retail strategy on iPhones which ensures that price increases imposed by Apple on direct purchasers are also adopted by wireless carriers and other retail outlets who sell iPhones to Class Members.

247.  The same iPhones sold by Apple to telecommunications companies and other retail outlets are purchased by Plaintiffs and members of the class in largely unaltered form.

248.  Wireless carriers and retail outlets make profits off the related wireless telecommunications services that are required to make the iPhones work, and not the iPhones themselves.

249.  Because Apple continues to engage in the anticompetitive practices alleged in this Complaint, Plaintiffs are reasonably likely to incur future overcharges when they purchase additional and/or replacement smartphones. Plaintiffs have standing as purchasers of products and services sold at inflated prices. Both the

actual harm and the threat of future harm are cognizable antitrust injuries directly caused by Defendant's violations of state and federal antitrust laws. The full amount of overcharge damages will be calculated after discovery and upon proof at trial.

250. Plaintiffs and the Class are incurring ongoing harm that cannot be remedied by monetary damages. Plaintiffs and the Class are harmed by the reduction of competition in the relevant markets in that Plaintiffs experience reduced choice and are denied the option of accessing super apps and other features as a direct result of Apple's anticompetitive conduct. In addition, Plaintiffs and Members of the Class are impaired in their ability to freely switch from Apple to Android phones and will continue to be so impaired until Apple's anticompetitive conduct ceases.

## XIV. VIOLATIONS ALLEGED

### FEDERAL LAW CLAIMS

**COUNT I
MONOPOLIZATION OF THE
SMARTPHONE MARKET
IN THE UNITED STATES IN VIOLATION OF
SHERMAN ACT § 2**

251. Plaintiffs incorporate the allegations above as if set forth fully herein.

252. Smartphones in the United States is a relevant antitrust market, and Apple has monopoly power in that market.

253. Apple has willfully monopolized and illegally maintained its monopoly of the smartphone market in the United States through an exclusionary course of

conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased, maintained, or protected its smartphone monopoly.

254. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

255. While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

256. Apple's anticompetitive acts have had harmful effects on competition and consumers.

257. Apple's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Apple's anticompetitive and unlawful conduct.

258. Plaintiffs and members of the Nationwide Class are entitled to injunctive relief against Apple, preventing the violations alleged herein.

# COUNT II
# ATTEMPTED MONOPOLIZATION OF THE
# SMARTPHONE MARKET
# IN THE UNITED STATES IN VIOLATION OF
# SHERMAN ACT § 2

259. Plaintiffs incorporate the allegations above as if set forth fully herein.

260. Smartphones in the United States is a relevant antitrust market, and Apple has attempted to monopolize that market.

261. Apple has attempted to monopolize the smartphone market in the United States through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased Apple's market power in the smartphone market.

262. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

263. While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

264. In undertaking this course of conduct, Apple has acted with specific intent to monopolize, and to destroy effective competition in, the smartphone market in the United States. There is a dangerous probability that, unless restrained, Apple will succeed in monopolizing the smartphone market in the United States, in violation of Section 2 of the Sherman Act.

265. Plaintiffs and members of the Nationwide Class are entitled to injunctive relief against Apple, preventing future violations like those alleged herein.

### COUNT III
### MONOPOLIZATION OF THE
### PERFORMANCE SMARTPHONE MARKET
### IN THE UNITED STATES IN VIOLATION OF
### SHERMAN ACT § 2

266. Plaintiffs incorporate the allegations above as if set forth fully herein.

267. Performance Smartphones in the United States is a relevant antitrust market, and Apple has monopoly power in that market.

268. Apple has willfully monopolized and illegally maintained its monopoly of the performance smartphone market in the United States through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's

CONSOLIDATED CLASS ACTION COMPLAINT

109

actions individually and collectively increased, maintained, or protected its performance smartphone monopoly.

269. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

270. While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

271. Apple's anticompetitive acts have had harmful effects on competition and consumers.

272. Apple's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Apple's anticompetitive and unlawful conduct.

273. Plaintiffs and members of the Nationwide Class are entitled to injunctive relief against Apple, preventing the violations alleged herein.

# COUNT IV
## ATTEMPTED MONOPOLIZATION OF THE PERFORMANCE SMARTPHONE MARKET IN THE UNITED STATES IN VIOLATION OF SHERMAN ACT § 2

274. Plaintiffs incorporate the allegations above as if set forth fully herein.

275. Performance Smartphones in the United States is a relevant antitrust market, and Apple has attempted to monopolize that market.

276. Apple has attempted to monopolize the performance smartphone market in the United States through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased Apple's market power in the performance smartphone market.

277. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

278. While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

279. In undertaking this course of conduct, Apple has acted with specific intent to monopolize, and to destroy effective competition in, the performance smartphone market in the United States. There is a dangerous probability that, unless restrained, Apple will succeed in monopolizing the performance smartphone market in the United States, in violation of Section 2 of the Sherman Act.

280. Plaintiffs and members of the Nationwide Class are entitled to injunctive relief against Apple, preventing future violations like those alleged herein.

**STATE LAW CLAIMS**

**COUNT V**
**UNJUST ENRICHMENT UNDER STATE LAW[31]**

281. Plaintiffs incorporate the allegations above as if set forth fully herein.

282. To the extent required, this claim is pleaded in the alternative to the other claims set forth herein.

283. Apple directly benefitted from monopoly profits on the sale of iPhones resulting from the unlawful and inequitable acts alleged in this Complaint.

---

[31] Unjust enrichment claims are not alleged under the laws of Ohio.

284. Apple's financial benefit resulting from its unlawful and inequitable acts is traceable to overpayments for iPhones by Plaintiffs and Members of the Nationwide Class.

285. Plaintiffs and Members of the Nationwide Class have conferred upon Apple an economic benefit—profits from unlawful overcharges and monopoly profits—to the economic detriment of Plaintiffs and Class Members. The economic benefit of overcharges and monopoly profits derived by Apple through charging supracompetitive and artificially inflated prices for iPhones is a direct and proximate result of Apple's unlawful conduct.

286. The economic benefits derived by Apple rightfully belong to Plaintiff and Members of the Nationwide Class, as they paid anticompetitive and monopolistic prices for iPhones.

287. It would be inequitable under unjust enrichment principles under the laws of all or nearly all states and territories in the United States and the District of Columbia for Defendants to be permitted to retain any of the overcharges for iPhones derived from Apple's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint. Plaintiff and Members of the Nationwide Class assert claims under all such states' laws.

288. Apple is aware of and appreciates the benefits bestowed upon them by Plaintiffs and Members of the Nationwide Class.

CONSOLIDATED CLASS ACTION COMPLAINT

289. Defendants should be compelled to disgorge in a common fund, for the benefit of Plaintiffs and Members of the Nationwide Class, all unlawful or inequitable proceeds they received.

## COUNT VI
## ALABAMA CODE §§ 6-5-60 *ET SEQ.*

290. Plaintiffs incorporate the allegations above as if set forth fully herein.

291. By reason of the conduct alleged herein, Apple violated Alabama Code §§ 6-5-60 *et seq.*

292. Title 6 of the Alabama Code regulates civil practice. Chapter 5 Article 5 thereof generally prohibits trusts, combines, or monopolies. Alabama Code §§ 6-5-60 *et seq.*

293. Certain members of the Damages Class purchased iPhones within the State of Alabama during the Class Period. But for Apple's conduct set forth herein, the price of iPhones would have been lower.

294. Under Alabama law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Alabama Code based on the facts alleged in the Complaint. Alabama Code §§ 6-5-60 *et seq.*

295. Apple had and still has monopoly power in both the smartphone and the performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

296. Apple has willfully monopolized and illegally maintained its monopoly of the smartphone market and the performance smartphone market in the State of Alabama through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased, maintained, or protected its performance smartphone monopoly and smartphone monopoly.

297. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

298. While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

299. Apple's anticompetitive acts have had harmful effects on competition and consumers.

300. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Alabama.

301. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

302. Apple's iPhones were sold throughout the state of Alabama. During the Class Period, Apple's illegal conduct substantially affected Alabama commerce.

303. Classmembers who reside in Alabama were injured and are threatened with injury with respect to purchases of iPhones in Alabama in that they paid and will pay supra-competitive prices for iPhones due to Apple's unlawful conduct, and are entitled to all forms of relief available under Alabama Code §§ 6-5-60 *et seq*.

## COUNT VII
## ARIZONA UNIFORM STATE ANTITRUST ACT
## ARIZ. REV. STAT. §§ 44-1401, 1403 *ET SEQ.*

304. Plaintiffs incorporate the allegations above as if set forth fully herein.

305. Certain members of the Damages Class have purchased and continue to purchase iPhones within the State of Arizona throughout the Class Period.

306. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

307. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Arizona.

308. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Arizona's trade and commerce.

309. Apple's conduct was willful.

310. As a direct and proximate result of Apple's conduct, members of the Damages Class who purchased their iPhone in Arizona were measurably injured and damaged in an amount to be determined at trial.

## COUNT VIII
## ARKANSAS DECEPTIVE TRADE PRACTICES ACT
### ARK. CODE ANN. § 4-88-101, 107 *ET SEQ.*

311. Plaintiffs incorporate the allegations above as if set forth fully herein.

312. Certain members of the Damages class have purchased iPhones within the State of Arkansas throughout the Class Period and continuing today.

313. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

314. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Arkansas.

CONSOLIDATED CLASS ACTION COMPLAINT

117

315. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant market as alleged herein.

316. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Arkansas' trade and commerce.

317. Apple's conduct was willful.

318. As a direct and proximate result of Apple's conduct, members of the Damages Class who purchased their iPhone in Arkansas were measurably injured and damaged in an amount to be determined at trial.

## COUNT IX
## ARKANSAS DECEPTIVE TRADE PRACTICES ACT
## ARK. CODE ANN. § 4-75-301, 302 *ET SEQ.*

319. Plaintiffs incorporate the allegations above as if set forth fully herein.

320. Certain members of the Damages Class purchased iPhones within the State of Arkansas throughout the Class Period and continuing today.

321. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

322. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone relevant market through its use of illegal exclusionary tactics within the State of Arkansas.

323. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

324. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Arkansas' trade and commerce.

325. Apple's conduct was willful.

326. As a direct and proximate result of Apple's conduct, members of the Damages Class who purchased their iPhone in Arkansas were measurably injured and damaged in an amount to be determined at trial.

## COUNT X
## CALIFORNIA BUSINESS & PROFESSIONAL CODE § 17200

327. Plaintiffs incorporate the allegations above as if set forth fully herein.

328. Certain members of the Damages Class purchased iPhones within the State of California, and within the United States and its states, territories, and the District of Columbia throughout the Class Period and continuing today.

329. California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, prohibits any "unlawful, unfair or fraudulent business act or practice." Each of those adjectives—unlawful, unfair, or fraudulent—encompass a distinct and separate theory of liability. Courts have interpreted the terms "act" and "practice" broadly, such that even singular acts are sufficient to constitute a UCL claim.

330. To state a claim under the unlawful prong of the UCL, a plaintiff must plead: (1) a predicate violation, and (2) an accompanying economic injury caused by the violation.

331. Here, Apple has willfully monopolized and illegally maintained its monopoly of the smartphone and performance smartphone markets in the State of California through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased, maintained, or protected its performance smartphone monopoly and smartphone monopoly. Apple monopolized or illegally attempted to retain its monopoly of the iPhone through the use of illegal exclusionary tactics within the State of California.

332. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product market. This monopoly power applies to the United States, which is the relevant geographic market.

333. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant market through its use of illegal exclusionary tactics within the State of California.

334. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

335. Apple's conduct was willful.

CONSOLIDATED CLASS ACTION COMPLAINT

120

336. Additionally and alternatively, Apple has attempted to monopolize the smartphone market in the State of California through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased Apple's market power in the smartphone and performance smartphone markets. In undertaking this course of conduct, Apple has acted with specific intent to monopolize, and to destroy effective competition in, the smartphone market in the State of California. There is a dangerous probability that, unless restrained, Apple will succeed in monopolizing the smartphone and performance smartphone markets in the State of California.

337. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

338. While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

CONSOLIDATED CLASS ACTION COMPLAINT

339. Apple's conduct was unfair, unconscionable, or deceptive and substantially affected California trade and commerce.

340. Accordingly, this conduct is "unlawful" under Section 2 of the Sherman Act, Section 5 of the Federal Trade Commission Act, and the various state antitrust, unfair competition, and consumer protection statutes alleged herein.

341. Certain members of the Damages Class purchased iPhones within the State of California throughout the Class Period and continuing today.

342. All Members of the Damages Class—including those who purchased their iPhones in California and in each other jurisdiction included in the Damages Class—have suffered economic injury as a result of Apple's conduct. But for Apple's conduct alleged herein, the price Plaintiffs would have paid for iPhones would have been lower. As a direct and proximate result of Apple's conduct, members of the Damages Class were measurably injured and damaged in an amount to be determined at trial. Members of the Damages Class continue to be injured and will continue to be injured by Apple's unlawful conduct.

343. Members of the Nationwide Class lost money because they paid inflated prices for iPhones. Members of the Nationwide Class seek the full extent of restitution available under the UCL for Apple's conduct alleged herein.

CONSOLIDATED CLASS ACTION COMPLAINT

344. California has a strong interest in applying its unfair competition law on a nationwide basis. Apple is based in California, and the "lock in" scheme described above was designed and implemented in California.

345. Applying California's Unfair Competition Law to a nationwide class does not contravene the policy of states that have declined to repeal the U.S. Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), because the UCL does not carry with it the treble damages remedy that the Cartwright Act and other antitrust statutes have. Every state has a public policy condemning monopolies or monopolistic conduct, even if they do not provide a remedy under antitrust laws for indirect purchasers, as the restriction against monopolies has deep common law roots.[32]

346. Plaintiffs, members of the Nationwide Class, and members of the Damages Class are entitled to equitable remedies for Apple's violation of the UCL, including restitution for the overcharges they paid as a result of Apple's conduct. Plaintiffs lack an adequate remedy at law for Apple's conduct.

## COUNT XI
## CALIFORNIA COMMON LAW

347. Plaintiffs incorporate the allegations above as if set forth fully herein.

---

[32] William L. Letwin, *The English Common Law Concerning Monopolies*, 21 U. Chi. L. Rev. 355, 358 (addressing Rotuli Parliamentorum, 50 Edw. III, No. 33 (1376)).

CONSOLIDATED CLASS ACTION COMPLAINT

123

348. California law recognizes a common law tort remedy for economic loss when that remedy is "clearly supported by public policy."[33]

349. California courts,[34] courts of sister states,[35] and common law courts of centuries past[36] recognize monopolization as contrary to public policy and actionable under the common law.

350. California recognizes common law tort duties related to creation and abuse of monopolies. Apple's unlawful and unfair "lock in" scheme created or maintained a monopoly. Additionally, Apple used its monopoly to unlawfully inflate prices to Plaintiffs and members of the classes.

---

[33] *See Kurtz-Ahlers, LLC v. Bank of America, N.A.*, 48 Cal. App. 5th 952, 959 (Cal. Ct. App. 2020).

[34] Law barring unions from closed-membership arrangements when operating in a closed shop arise from a concern that "monopoly of the supply of labor by means of closed shop agreements . . . affects the fundamental right to work for a living." *James v. Marinship Corp.*, 25 Cal. 2d 721, 731 (1944) (internal citations omitted). Similarly, sexual orientation discrimination by a public utility company was proscribed as misusing a monopsony, as homosexual employees precluded from working at the utility company could not turn around and work for a competitor. *See Gay Law Students Ass'n v. Pac. Tel. & Tel. Co.*, 24 Cal. 3d 458, 470-71 (1979). *C.f.* Cal. Pub. Util. Code § 709.5(a) ("It is the intent of the Legislature that all telecommunications markets subject to commission jurisdiction be opened to competition not later than January 1, 1997. The commission shall take steps to ensure that competition in telecommunications markets is fair and that the state's universal service policy is observed.").

[35] *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1276 (D. Kan. 2018) (declining to dismiss the class plaintiffs' unilateral monopolization claims under the laws of Alabama, Alaska, Arizona, Arkansas, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Massachusetts, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Dakota, Utah, Vermont, West Virginia, or Wisconsin).

[36] *See Davenant v. Hurdis*, 72 E.R. 769 (K.B. 1599); *see also The Case of Monopolies*, 77 Eng. Rep. 1260 (Q.B. 1602).

CONSOLIDATED CLASS ACTION COMPLAINT

351. As a direct and proximate result of Apple's anticompetitive, monopolistic "lock in" scheme, members of the Damages Class who purchased their iPhone in California were measurably injured and damaged in an amount to be determined at trial.

## COUNT XII
## COLO. REV. STAT. §§ 6-4-101, 104 *ET SEQ.*

352. Plaintiffs incorporate the allegations above as if set forth fully herein.

353. Certain members of the Damages Class purchased iPhones within the State of Colorado since June 7, 2023, and continuing today.

354. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

355. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Colorado.

356. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

357. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Colorado's trade and commerce.

358. Apple's conduct was willful.

359. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in Colorado since June 7, 2023 were measurably injured and damaged in an amount to be determined at trial.

## COUNT XIII
## CONN. GEN. STAT. ANN. §§ 35-24 *ET SEQ.*

360. Plaintiffs incorporate the allegations above as if set forth fully herein.

361. Certain members of the Damages Class purchased iPhones within the State of Connecticut throughout the Class Period and continuing today.

362. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

363. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Connecticut.

364. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

365. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Connecticut trade and commerce.

366. Apple's conduct was willful.

CONSOLIDATED CLASS ACTION COMPLAINT

126

367. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in Connecticut were measurably injured and damaged in an amount to be determined at trial.

## COUNT XIV
## DISTRICT OF COLUMBIA CODE ANN. §§ 28-4501 *ET SEQ.*

368. Plaintiffs incorporate the allegations above as if set forth fully herein.

369. Apple violated District of Columbia Code § 28-4503, which provides that "[i]t shall be unlawful for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce, all or any part of which is within the District of Columbia."

370. Certain members of the Damages Class purchased iPhones within the District of Columbia throughout the Class Period and continuing today.

371. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

372. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the District of Columbia.

373. Apple has willfully monopolized and illegally maintained its monopoly of the smartphone and performance smartphone market in the District of Columbia through an exclusionary course of conduct and the anticompetitive acts described

CONSOLIDATED CLASS ACTION COMPLAINT

127

herein. Each of Apple's actions individually and collectively increased, maintained, or protected its performance smartphone monopoly and smartphone monopoly.

374. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

375. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected District of Columbia trade and commerce.

376. Apple's conduct was willful.

377. Members of the Damages Class who purchased their iPhones in the District of Columbia were injured and are threatened with further injury with respect to purchases of iPhones in the District of Columbia in that they paid and will pay supra-competitive prices for iPhones due to Apple's unlawful conduct, and such Class members are entitled to all forms of relief, including actual damages, treble damages, and interest, reasonable attorneys' fees and costs.

## COUNT XV
## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### FLA. STAT. §§ 501.201 *ET SEQ.*

378. Plaintiffs incorporate the allegations above as if set forth fully herein.

379. Certain members of the Damages Class purchased iPhones within the State of Florida throughout the Class Period and continuing today.

CONSOLIDATED CLASS ACTION COMPLAINT

380. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

381. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Florida.

382. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

383. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Florida trade and commerce.

384. Apple's conduct was willful.

385. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in Florida were measurably injured and damaged in an amount to be determined at trial.

## COUNT XVI
## FLORIDA ANTITRUST ACT
## FLA. STAT. §§ 542.19 *ET SEQ.*

386. Plaintiffs incorporate the allegations above as if set forth fully herein.

387. Certain members of the Damages Class purchased iPhones within the State of Florida throughout the Class Period and continuing today.

CONSOLIDATED CLASS ACTION COMPLAINT

388. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

389. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Florida.

390. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

391. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Florida trade and commerce.

392. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in Florida were measurably injured and damaged in an amount to be determined at trial.

### COUNT XVII
### HAWAII ANTITRUST ACT
### HAW. REV. STAT. §§ 480-1, 2, 4 *ET SEQ.*

393. Plaintiffs incorporate the allegations above as if set forth fully herein.

394. Certain members of the Damages Class purchased iPhones within the State of Hawaii throughout the Class Period and continuing today.

CONSOLIDATED CLASS ACTION COMPLAINT

130

395. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

396. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Hawaii.

397. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

398. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Hawaii trade and commerce.

399. Apple's conduct was willful.

400. By reason of the conduct alleged herein, Apple has violated Haw. Rev. Stat. §§ 480-1, 2, 4 *et seq*. Specifically, Apple has violated Haw. Rev. Stat. § 480-9 which states that "[n]o person shall monopolize, or attempt to monopolize, or combine or conspire with any other person to monopolize any part of the trade or commerce in any commodity in any section of the State." Apple's violations of Hawaii law were and are flagrant.

401. As a direct and proximate result of Apple's unlawful conduct, members of the Damages Class who purchased their iPhone in Hawaii have been injured in

CONSOLIDATED CLASS ACTION COMPLAINT

131

their business or property and are threatened with further injury in that they paid and will pay supra-competitive prices for iPhones due to Apple's unlawful conduct.

## COUNT XVIII
## ILLINOIS ANTITRUST ACT
## 740 ILL. COMP. STAT. ANN. 10/3(1) *ET SEQ.*
## 815 ILL. COMP. STAT. ANN. 505/2 *ET SEQ.*

402. Plaintiffs incorporate the allegations above as if set forth fully herein.

403. Certain members of the Damages Class purchased iPhones within the State of Illinois throughout the Class Period and continuing today.

404. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

405. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Illinois.

406. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

407. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Illinois trade and commerce.

408. Apple's conduct was willful.

409. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in Illinois were measurably injured and damaged in an amount to be determined at trial.

## COUNT XIX
## IOWA CODE §§ 553.1, 5 *ET SEQ.*

410. Plaintiffs incorporate the allegations above as if set forth fully herein.

411. Certain members of the Damages Class purchased iPhones within the State of Iowa throughout the Class Period and continuing today.

412. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

413. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Iowa.

414. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

415. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Iowa trade and commerce.

416. Apple's conduct was willful or flagrant.

417. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in Iowa were measurably injured and damaged in an amount to be determined at trial.

## COUNT XX
## KANSAS STAT. ANN. §§ 50-101, 132 *ET SEQ.*

418. Plaintiffs incorporate the allegations above as if set forth fully herein.

419. Certain members of the Damages Class purchased iPhones within the State of Kansas throughout the Class Period and continuing today.

420. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

421. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Kansas.

422. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

423. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Kansas trade and commerce.

424. Apple's conduct was willful.

425. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in Kansas were measurably injured and damaged in an amount to be determined at trial.

## COUNT XXI
## MAINE MONOPOLIES AND PROFITEERING LAW
### ME. REV. STAT. TIT. 10, §§ 1101, 1102 *ET SEQ.*

426. Plaintiffs incorporate the allegations above as if set forth fully herein.

427. Certain members of the Damages Class purchased iPhones within the State of Maine throughout the Class Period and continuing today.

428. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

429. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Maine.

430. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

431. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Maine trade and commerce.

432. Apple's conduct was willful.

433. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in Maine were measurably injured and damaged in an amount to be determined at trial.

## COUNT XXII
## MD. CODE ANN., COM. LAW §§ 11-201, 204 *ET SEQ.*

434. Plaintiffs incorporate the allegations above as if set forth fully herein.

435. Certain members of the Damages Class purchased iPhones within the State of Maryland throughout the Class Period and continuing today.

436. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

437. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Maryland.

438. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

439. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Maryland trade and commerce.

440. Apple's conduct was willful.

441. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in Maryland were measurably injured and damaged in an amount to be determined at trial.

## COUNT XXIII
## MASSACHUSETTS CONSUMER PROTECTION LAW
## MASS. GEN. LAWS CHAPTER 93A

442. Plaintiffs incorporate the allegations above as if set forth fully herein.

443. By reason of the conduct alleged herein, Apple has violated the Massachusetts Consumer Protection Law, Mass. Gen. Laws Chapter 93A.

444. Certain members of the Damages Class purchased iPhones within the Commonwealth of Massachusetts during the Class Period. But for Apple's conduct set forth herein, the price of iPhones would have been lower.

445. Apple has willfully monopolized and illegally maintained its monopoly of the smartphone and performance smartphone markets in the Commonwealth of Massachusetts through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased, maintained, or protected its performance smartphone monopoly and smartphone monopoly.

446. Additionally and alternatively, Apple has attempted to monopolize the smartphone and performance smartphone markets in the Commonwealth of Massachusetts through an exclusionary course of conduct and the anticompetitive

CONSOLIDATED CLASS ACTION COMPLAINT

137

acts described herein. Each of Apple's actions individually and collectively increased Apple's market power in the smartphone and performance smartphone markets. In undertaking this course of conduct, Apple has acted with specific intent to monopolize, and to destroy effective competition in, the smartphone and performance smartphone markets in the Commonwealth of Massachusetts. There is a dangerous probability that, unless restrained, Apple will succeed in monopolizing the relevant markets in the Commonwealth of Massachusetts, in violation of Mass. Gen. Laws Chapter 93A.

447. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts, but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change, consistent with Apple's past conduct.

448. While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

CONSOLIDATED CLASS ACTION COMPLAINT

449. Apple's unlawful conduct substantially affected trade and commerce within the Commonwealth of Massachusetts. That conduct was also unfair, immoral, unethical, and caused substantial injury to competitors and class members.

450. Apple concealed, suppressed, or omitted to disclose material facts to members of the Damages Class who purchased their iPhone in Massachusetts concerning Apple's unlawful activities and artificially inflated prices for iPhones. They concealed, suppressed, or omitted facts that would have been important to members of the Damages Class as they related to the cost of products they purchased.

451. As a direct and proximate result of Apple's unlawful conduct, members of the Damages Class who purchased their iPhones in Massachusetts have been injured in their business or property and are threatened with further injury in that they paid and will pay supra-competitive prices for iPhones due to Apple's unlawful conduct.

452. Plaintiffs are hereby providing Apple notice, on behalf of the Damages Class, of Apple's violations of Massachusetts law. If Apple does not provide the relief demanded on behalf of the Damages Class, Plaintiffs will seek to amend their Complaint to seek all relief available under Chapter 93A. For the avoidance of doubt, at this time, Plaintiffs do not seek recovery or other relief available per Chapter 93A.

## COUNT XXIV
## MICHIGAN COMP. LAWS ANN. §§ 445.771 *ET SEQ.*

453. Plaintiffs incorporate the allegations above as if set forth fully herein.

CONSOLIDATED CLASS ACTION COMPLAINT

139

454. Certain members of the Damages Class purchased iPhones within the State of Michigan throughout the Class Period and continuing today.

455. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

456. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Michigan.

457. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

458. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Michigan trade and commerce.

459. Apple's conduct was willful.

460. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in Michigan were measurably injured and damaged in an amount to be determined at trial.

## COUNT XXV
## MINNESOTA ANN. STAT. §§ 325D.49, 52 *ET SEQ.*

461. Plaintiffs incorporate the allegations above as if set forth fully herein.

462. Certain members of the Damages Class purchased iPhones within the State of Minnesota throughout the Class Period and continuing today.

CONSOLIDATED CLASS ACTION COMPLAINT

140

463. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

464. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Minnesota.

465. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

466. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Minnesota trade and commerce.

467. Apple's conduct was willful.

468. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in Michigan were measurably injured and damaged in an amount to be determined at trial.

**COUNT XXVI**
**MISSISSIPPI CODE ANN. §§ 75-21-1, 3 *ET SEQ.***

469. Plaintiffs incorporate the allegations above as if set forth fully herein.

470. Certain members of the Damages Class purchased iPhones within the State of Mississippi throughout the Class Period and continuing today.

CONSOLIDATED CLASS ACTION COMPLAINT

141

471.   Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

472.   Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Mississippi.

473.   There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

474.   Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Mississippi trade and commerce.

475.   Apple's conduct was willful.

476.   Apple violated Section 75-21-3 of the Mississippi Code, which prohibits contracts that "monopolize or attempt to monopolize the production, control or sale of any commodity, or the prosecution, management or control of any kind, class or description of business."

477.   As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhones in Mississippi were measurably injured and damaged in an amount to be determined at trial. Apple's conduct was accomplished at least in part by transactions lying wholly within Mississippi.

## COUNT XXVII
## RESTRAINT OF TRADE UNDER MISSOURI LAW
## MO. STAT. §§ 416.031 *ET SEQ.*

478. Plaintiffs incorporate the allegations above as if set forth fully herein.

479. Certain members of the Damages Class purchased iPhones within the State of Missouri throughout the Class Period and continuing today.

480. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

481. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Missouri.

482. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

483. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Missouri trade and commerce.

484. Apple's conduct was willful.

485. Apple violated Section 416.031 of the Missouri Code, which renders unlawful conduct including, but not limited to: (1) "[e]very contract, combination or conspiracy in restraint of trade or commerce"; and (2) "monopoliz[ation], attempt to monopolize, or conspir[acy] to monopolize trade or commerce."

CONSOLIDATED CLASS ACTION COMPLAINT

143

486. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhones in Missouri were measurably injured and damaged in an amount to be determined at trial. Apple's conduct was accomplished at least in part by transactions lying wholly within Missouri.

## COUNT XXVIII
## MISSOURI MERCHANDISING PRACTICES ACT
## MO. STAT. §§ 407.010 *ET SEQ.*

487. Plaintiffs incorporate the allegations above as if set forth fully herein.

488. Certain members of the Damages Class purchased iPhones within the State of Missouri throughout the Class Period and continuing today.

489. Missouri Class members purchased iPhones for personal, family, or household purposes.

490. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

491. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Missouri.

492. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

CONSOLIDATED CLASS ACTION COMPLAINT

493. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Missouri trade and commerce.

494. Apple's conduct was willful.

495. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in Missouri were measurably injured and damaged in an amount to be determined at trial.

## COUNT XXIX
## MONTANA UNFAIR TRADE PRACTICES
## AND CONSUMER PROTECTION ACT
## MONT. CODE §§ 30-14-101, 103 *ET SEQ.*

496. Plaintiffs incorporate the allegations above as if set forth fully herein.

497. By reason of the conduct alleged herein, Apple has violated Mont. Code §§ 30-14-101, 103 *et seq.*

498. Certain members of the Damages Class purchased iPhones within the State of Montana during the Class Period. But for Apple's conduct set forth herein, the price of iPhones would have been lower.

499. Under Montana law, indirect purchasers have standing to maintain an action under the Montana Unfair Trade Practices and Consumer Protection Act based on the facts alleged in this Complaint. *See, e.g.*, Mont. Code § 30-14-201.

500. Apple violated Montana Code § 30-14-205, which provides that "[i]t is unlawful for a person or group of persons, directly or indirectly: [. . .] (g) [to] create a monopoly in the manufacture, sale, or transportation of an article of commerce."

501. Apple has willfully monopolized and illegally maintained its monopoly of the smartphone and performance smartphone markets in the State of Montana through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased, maintained, or protected its performance smartphone monopoly and smartphone monopoly.

502. Additionally and alternatively, Apple has attempted to monopolize the smartphone and performance smartphone markets in the State of Montana through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased Apple's market power in the smartphone and performance smartphone markets. In undertaking this course of conduct, Apple has acted with specific intent to monopolize, and to destroy effective competition in, the smartphone and performance smartphone markets in the State of Montana. There is a dangerous probability that, unless restrained, Apple will succeed in monopolizing the relevant markets in the State of Montana.

503. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of

impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

504. While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

505. Apple's iPhones were sold throughout the State of Montana. During the Class Period, Apple's illegal conduct substantially affected Montana commerce.

506. Members of the Damages Class who purchased their iPhones in Montana were injured and are threatened with injury with respect to purchases of iPhones in Montana in that they paid and will pay supra-competitive prices for iPhones due to Apple's unlawful conduct. Members of the Damages Class who purchased their iPhones in Montana are entitled to all forms of relief available under the Montana Unfair Trade Practices and Consumer Protection Act.

## COUNT XXX
### NEB. REV. STAT. §§ 59-801, 802 *ET SEQ.*

507. Plaintiffs incorporate the allegations above as if set forth fully herein.

508. Certain members of the Damages Class purchased iPhones within the State of Nebraska throughout the Class Period and continuing today.

509. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

510. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Nebraska.

511. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

512. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Nebraska trade and commerce.

513. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in Nebraska were measurably injured and damaged in an amount to be determined at trial.

## COUNT XXXI
## NEB. REV. STAT. §§ 59-1604 *ET SEQ.*

514. Plaintiffs incorporate the allegations above as if set forth fully herein.

515. Certain members of the Damages Class purchased iPhones within the State of Nebraska throughout the Class Period and continuing today.

516. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

517. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Nebraska.

518. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

519. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Nebraska trade and commerce.

520. Apple's conduct is widespread, pervasive, and has an impact on the public interest.

521. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in Nebraska were measurably injured and damaged in an amount to be determined at trial.

## COUNT XXXII
## NEVADA REV. STAT. ANN. §§ 598A.010, 060 *ET SEQ.*

522. Plaintiffs incorporate the allegations above as if set forth fully herein.

523. Certain members of the Damages Class purchased iPhones within the State of Nevada throughout the Class Period and continuing today.

524. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

525. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Nevada.

526. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

527. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Nevada trade and commerce.

528. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in Nevada were measurably injured and damaged in an amount to be determined at trial.

529. In accordance with the requirements of § 598A.210(3), notice of this action will be mailed to the Nevada Attorney General by Plaintiffs.

## COUNT XXXIII
## N.H. REV. STAT. ANN. §§ 356.1, 3 *ET SEQ.*

530. Plaintiffs incorporate the allegations above as if set forth fully herein.

531. Certain members of the Damages Class purchased iPhones within the State of New Hampshire throughout the Class Period and continuing today.

532. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

533. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of New Hampshire.

CONSOLIDATED CLASS ACTION COMPLAINT

150

534. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

535. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected New Hampshire trade and commerce.

536. Apple's conduct was willful.

537. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in New Hampshire were measurably injured and damaged in an amount to be determined at trial.

## COUNT XXXIV
### N.H. STAT. ANN. § 358A, *ET SEQ.*

538. Plaintiffs incorporate the allegations above as if set forth fully herein.

539. Certain members of the Damages Class purchased iPhones within the State of New Hampshire throughout the Class Period and continuing today.

540. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

541. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of New Hampshire.

542. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

CONSOLIDATED CLASS ACTION COMPLAINT

151

543. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected New Hampshire trade and commerce.

544. Apple's conduct was willful.

545. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in New Hampshire were measurably injured and damaged in an amount to be determined at trial.

## COUNT XXXV
## NEW JERSEY ANTITRUST ACT,
## N.J. STAT. ANN. §§ 56.9-1, 4 *ET SEQ.*

546. Plaintiffs incorporate the allegations above as if set forth fully herein.

547. By reason of the conduct alleged herein, Apple violated N.J. Stat. Ann. §56.9-1, 4 *et seq.*

548. Plaintiff Sidney Rossi and members of the Damages Class purchased iPhones within the State of New Jersey throughout the Class Period and continuing today.

549. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

550. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of New Jersey.

CONSOLIDATED CLASS ACTION COMPLAINT

551. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

552. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

553. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected New Jersey trade and commerce.

554. Apple's unlawful conduct had the following effects: (1) iPhone price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) iPhone prices were raised, maintained, and stabilized at artificially high levels throughout New Jersey; (3) Plaintiff Sidney Rossi and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff Sidney Rossi and members of the Damages Class paid supra-competitive, artificially inflated prices for iPhones.

555. As a direct and proximate result of Apple's anticompetitive conduct, Plaintiff Sidney Rossi and members of the Damages Class who purchased their iPhone in New Jersey were measurably injured and damaged in an amount to be determined at trial.

## COUNT XXXVI
## NEW JERSEY CONSUMER FRAUD ACT,
## N.J. STAT. ANN. § 56.8-2 *ET SEQ.*

556. Plaintiffs incorporate the allegations above as if set forth fully herein.

557. Apple has engaged in unfair or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56.8-2 *et seq.*

558. Plaintiff Sidney Rossi and members of the Damages Class purchased iPhones within the State of New Jersey throughout the Class Period and continuing today for personal, family, or household purposes, or resided in New Jersey when they purchased iPhones in New Jersey for personal, family or household purposes.

559. Apple concealed, suppressed, and omitted to disclose material facts to Plaintiff Sidney Rossi and members of the Damages Class concerning Apple's unlawful monopolistic activities and artificially raised prices for iPhones. The concealed, suppressed, and omitted facts would have been important to Plaintiff Sidney Rossi and members of the Damages Class as they related to the iPhones that they purchased.

560. During the Class Period, Apple's illegal conduct substantially affected New Jersey commerce and consumers.

561. As a direct and proximate result of Apple's unlawful conduct, Plaintiff Sidney Rossi and members of the Damages Class were injured and are threatened further injury. Accordingly, Plaintiff Sidney Rossi and members of the Damages Class seek all available relief under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §56.8-2 *et seq.*

## COUNT XXXVII
## NEW MEXICO ANTITRUST ACT,
## N.M. STAT. ANN. §§ 57-1-1 *ET SEQ.*

562. Plaintiffs incorporate the allegations above as if set forth fully herein.

563. By reason of the conduct alleged herein, Apple violated N.M. Stat. Ann. §§ 57-1-1 *et seq.*

564. Members of the Damages Class purchased iPhones within the State of New Mexico throughout the Class Period and continuing today.

565. Apple had and still has monopoly power in the smartphone and performance smartphone relevant market. This monopoly power applies to the United States, which is the relevant geographic market.

566. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of New Mexico.

567. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

568. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

569. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected New Mexico trade and commerce.

570. Apple's unlawful conduct had the following effects: (1) iPhone price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) iPhone prices were raised, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Members of the Damages Class were deprived of free and open competition; and (4) Members of the Damages Class paid supra-competitive, artificially inflated prices for iPhones.

571. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in New Mexico were measurably injured and damaged in an amount to be determined at trial.

## COUNT XXXVIII
## NEW MEXICO STAT. ANN. § 57-12-1 *ET SEQ.*

572. Plaintiffs incorporate the allegations above as if set forth fully herein.

573. Apple has engaged in unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-3 *et seq.*

574. Members of the Damages Class purchased iPhones within the State of New Mexico throughout the Class Period and continuing today.

575. Apple deceived or misled consumers in New Mexico in connection with its sale of iPhones through its use of illegal exclusionary tactics and misrepresentations within the State of New Mexico.

576. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected New Mexico trade and commerce.

577. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in New Mexico were measurably injured and damaged in an amount to be determined at trial.

# COUNT XXXIX
# DONNELLY ACT,
# N.Y. GEN. BUS. LAW §§ 340 *ET SEQ.*

578.   Plaintiffs incorporate the allegations above as if set forth fully herein.

579.   By reason of the conduct alleged herein, Apple violated N.Y. Gen. Bus. Law §§ 340 *et seq.*

580.   Plaintiff Jared Schermer and certain members of the Damages Class purchased iPhones within the State of New York throughout the Class Period and continuing today.

581.   Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

582.   Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of New York.

583.   Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of

impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

584.  There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

585.  Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected New York trade and commerce.

586.  Apple's conduct was willful.

587.  Apple's unlawful conduct had the following effects: (1) iPhone price competition was restrained, suppressed, and eliminated throughout New York; (2) iPhone prices were raised, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff Jared Schermer and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff Jared Schermer and members of the Damages Class paid supra-competitive, artificially inflated prices for iPhones.

588.  As a direct and proximate result of Apple's anticompetitive conduct, Plaintiff Jared Schermer and members of the Damages Class who purchased their iPhone in New York were measurably injured and damaged in an amount to be determined at trial.

## COUNT XL
## DONNELLY ACT,
## N.Y. GEN. BUS. LAW §§ 349 *ET SEQ.*

589. Plaintiffs incorporate the allegations above as if set forth fully herein.

590. Apple has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law §§ 349 *et seq.*

591. Plaintiff Jared Schermer and members of the Damages Class purchased iPhones within the State of New York throughout the Class Period and continuing today.

592. Apple deceived or materially misled consumers in New York in connection with its sale of iPhones through the use of illegal exclusionary tactics within the State of New York.

593. Apple made public statements about the prices of iPhones that Apple knew would be seen by New York consumers. Such statements either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for iPhones. Apple alone possessed material information that was relevant to consumers, but failed to provide information.

594. Because of Apple's unlawful trade practices in New York, Plaintiff Jared Schermer and members of the Damages Class were misled, in a deceptive manner, to believe that they were paying a fair price for iPhones or that the price

increases for iPhones were for valid business reasons; and similarly situated consumers were potentially affected by Apple's conduct.

595. Apple knew that their unlawful trade practices with respect to pricing for iPhones would have an impact on New York consumers and not just Apple's direct customers.

596. Apple knew that their unlawful trade practices with respect to pricing iPhones would have a broad impact, causing customers who purchased iPhones to be injured by paying more for iPhones than they would have paid in the absence of Apple's unlawful trade acts and practices.

597. The conduct of Apple described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest in New York for an honest marketplace in which economic activity is conducted in a competitive manner.

598. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

599. Apple's conduct was unfair, unconscionable, materially misleading, or deceptive, and substantially affected New York trade, commerce and consumers.

600. As a direct and proximate result of Apple's anticompetitive conduct, Plaintiff Jared Schermer and members of the Damages Class who purchased their

iPhone in New York were measurably injured and damaged in an amount to be determined at trial.

## COUNT XLI
## NORTH CAROLINA GEN. STAT. §§ 75-1, 2.1 *ET SEQ.*

601. Plaintiffs incorporate the allegations above as if set forth fully herein.

602. Certain members of the Damages Class purchased iPhones within the State of North Carolina throughout the Class Period and continuing today.

603. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

604. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of North Carolina.

605. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

606. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected North Carolina trade and commerce.

607. Apple's conduct was willful.

608. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in North Carolina were measurably injured and damaged in an amount to be determined at trial.

CONSOLIDATED CLASS ACTION COMPLAINT

162

## COUNT XLII
## NORTH DAKOTA CENTURY CODE § 51-08.1-01, 03 *ET SEQ.*

609.  Plaintiffs incorporate the allegations above as if set forth fully herein.

610.  Certain members of the Damages Class purchased iPhones within the State of North Dakota throughout the Class Period and continuing today.

611.  Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

612.  Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of North Dakota.

613.  There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

614.  Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected North Dakota trade and commerce.

615.  Apple's conduct was willful.

616.  As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in North Dakota were measurably injured and damaged in an amount to be determined at trial.

## COUNT XLIII
## OREGON ANTITRUST STATUTE,
### O.R.S. §§ 646.705, .730 *ET SEQ.*

617. Plaintiffs incorporate the allegations above as if set forth fully herein.

618. By reason of the conduct alleged herein, Apple violated O.R.S. §§ 646.705, 730 *et seq.*

619. Plaintiff Nancy Cox and members of the Damages Class purchased iPhones within the State of Oregon throughout the Class Period and continuing today.

620. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

621. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Oregon.

622. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of

impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

623. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

624. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Oregon trade and commerce.

625. Apple's unlawful conduct had the following effects: (1) iPhone price competition was restrained, suppressed, and eliminated throughout Oregon; (2) iPhone prices were raised, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiff Nancy Cox and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff Nancy Cox and members of the Damages Class paid supra-competitive, artificially inflated prices for iPhones.

626. As a direct and proximate result of Apple's anticompetitive conduct, Plaintiff Nancy Cox and members of the Damages Class who purchased an iPhone in Oregon were measurably injured and damaged in an amount to be determined at trial.

## COUNT XLIV
### OREGON UNLAWFUL TRADE PRACTICES ACT,
### O.R.S. §§ 646.605, .607 *ET SEQ.*

627. Plaintiffs incorporate the allegations above as if set forth fully herein.

CONSOLIDATED CLASS ACTION COMPLAINT

628.    Apple has engaged in unlawful trade practices in violation of O.R.S. §§ 646.605, .607 *et seq.*

629.    Plaintiff Nancy Cox and members of the Damages Class purchased iPhones within the State of Oregon throughout the Class Period and continuing today.

630.    Apple deceived or materially misled consumers in Oregon in connection with its sale of iPhones through the use of deceptive trade practices within the State of Oregon.

631.    There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

632.    Apple's conduct was unfair, unconscionable, materially misleading, or deceptive, and substantially affected Oregon trade and commerce.

633.    As a direct and proximate result of Apple's unfair and deceptive conduct, Plaintiff Nancy Cox and members of the Damages Class who purchased their iPhone in Oregon were measurably injured and damaged in an amount to be determined at trial.

**COUNT XLV**
**PENNSYLVANIA UNFAIR TRADE PRACTICES**
**AND CONSUMER PROTECTION LAW,**
**PA. STAT. ANN. §§ 201-1 *ET SEQ.***

634.    Plaintiffs incorporate the allegations above as if set forth fully herein.

CONSOLIDATED CLASS ACTION COMPLAINT

635. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-1 *et seq.*

636. Members of the Damages Class purchased iPhones in the Commonwealth of Pennsylvania for personal, family, or household purposes, or resided in Pennsylvania when they purchased iPhones in Pennsylvania for personal, family, or household purposes.

637. Defendants concealed, suppressed, and omitted to disclose material facts to members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for iPhones. The concealed, suppressed, and omitted facts would have been important to members of the Damages Class as they related to the iPhones that they purchased. Thus, members of the Damages Class justifiably relied on the Apple's concealed, suppressed, and omitted facts when purchasing their respective iPhones.

638. Defendants unlawful conduct had the following effects (1) iPhone price competition was restrained, suppressed, and eliminated throughout Pennsylvania; (2) iPhone prices were raised, maintained, and stabilized at artificially high levels throughout Pennsylvania; (3) Members of the Damages Class were deprived of free and open competition; and (4) Member of the Damages Class paid supra-competitive, artificially inflated prices for products containing iPhones.

639. During the Class Period, Defendants' unlawful conduct substantially affected Pennsylvania commerce and consumers.

640. As a direct and proximate result of Defendants' unlawful conduct, members of the Damages Class were injured and are threatened with further injury. Accordingly, members of the Damages Class seek all relief available under the Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-1 *et seq.*

## COUNT XLVI
## PUERTO RICO ANTITRUST ACT,
## 10 L.P.R.A. §§ 257, 260 *ET SEQ.*

641. Plaintiffs incorporate the allegations above as if set forth fully herein.

642. By reason of the conduct alleged herein, Apple violated 10 L.P.R.A. §§ 257, 260 *et seq.*

643. Certain members of the Damages Class purchased iPhones within the Territory of Puerto Rico throughout the Class Period and continuing today.

644. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

645. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the Territory of Puerto Rico.

646. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

647. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

648. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Puerto Rico trade and commerce.

649. Apple's conduct was willful.

650. Apple's unlawful conduct had the following effects: (1) iPhone price competition was restrained, suppressed, and eliminated throughout Puerto Rico; (2) iPhone prices were raised, maintained, and stabilized at artificially high levels throughout Puerto Rico; (3) Members of the Damages Class were deprived of free and open competition; and (4) Members of the Damages Class paid supra-competitive, artificially inflated prices for iPhones.

651. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in Puerto Rico were measurably injured and damaged in an amount to be determined at trial.

## COUNT XLVII
### RHODE ISLAND ANTITRUST ACT, R.I. GEN. LAW §§ 6-36-1, 5 *ET SEQ.*

652. Plaintiffs incorporate the allegations above as if set forth fully herein.

653. By reason of the conduct alleged herein, Apple violated R.I. Gen. Law §§ 6-36-1, *et seq.*

654. Certain members of the Damages Class purchased iPhones within the State of Rhode Island throughout the Class Period and continuing today.

655. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

656. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Rhode Island.

657. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this

complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

658. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

659. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Rhode Island trade and commerce.

660. Apple's conduct was willful.

661. Apple's unlawful conduct had the following effects: (1) iPhone price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) iPhone prices were raised, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Members of the Damages Class were deprived of free and open competition; and (4) Members of the Damages Class paid supra-competitive, artificially inflated prices for iPhones.

662. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in Rhode Island were measurably injured and damaged in an amount to be determined at trial.

## COUNT XLVIII
## RHODE ISLAND UNFAIR TRADE PRACTICES AND
## CONSUMER PROTECTION ACT,
## R.I. GEN. LAWS §§ 6-13.1-1 *ET SEQ.*

663. Plaintiffs incorporate the allegations above as if set forth fully herein.

664. Apple has engaged in deceptive trade practices and unfair methods of competition in violation of R.I. Gen. Laws §§ 6-13.1-1 *et seq.*

665. Members of the Damages Class purchased iPhones within the State of Rhode Island throughout the Class Period and continuing today.

666. Apple deceived or materially misled consumers in Rhode Island in connection with its sale of iPhones through the use of illegal exclusionary tactics within the State of Rhode Island.

667. Apple's conduct was unfair, unconscionable, materially misleading, or deceptive, and substantially affected Rhode Island trade and commerce.

668. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in Rhode Island were measurably injured and damaged in an amount to be determined at trial.

## COUNT XLIX
## SOUTH CAROLINA ANTITRUST STATUTE
## S.C. ST. §39-3-10 *ET SEQ.*

669. Plaintiffs incorporate the allegations above as if set forth fully herein.

670. By reason of the conduct alleged herein, Apple violated S.C. St. §39-3-10 *et seq.*

CONSOLIDATED CLASS ACTION COMPLAINT

172

671. Members of the Damages Class purchased iPhones within the State of South Carolina throughout the Class Period and continuing today.

672. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

673. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of South Carolina.

674. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

675. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

676. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Rhode Island trade and commerce.

677. Apple's conduct was willful.

678. Apple's unlawful conduct had the following effects: (1) iPhone price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) iPhone prices were raised, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Members of the Damages Class were deprived of free and open competition; and (4) Members of the Damages Class paid supra-competitive, artificially inflated prices for iPhones.

679. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in South Carolina were measurably injured and damaged in an amount to be determined at trial.

## COUNT L
## SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT, S.C. CODE ANN., §§ 39-5-10 *ET SEQ.*

680. Plaintiffs incorporate the allegations above as if set forth fully herein.

681. Apple has engaged in unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10 *et seq.* with respect to purchases of iPhones in South Carolina by members of the Damages Class or purchases by South Carolina residents.

682. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within South Carolina.

CONSOLIDATED CLASS ACTION COMPLAINT

174

683. Through Apple's monopolization of the relevant markets, Apple was able to artificially inflate the prices for iPhones to the detriment of members of the Damages Class.

684. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

685. Apple's conduct was unfair, unconscionable, materially misleading, or deceptive, and substantially affected the public interest of South Carolina, as well as the State's trade and commerce.

686. As a direct and proximate result of Apple's unfair and deceptive conduct, members of the Damages Class who purchased their iPhone in South Carolina were measurably monetarily injured and damaged in an amount to be determined at trial.

## COUNT LI
## SOUTH DAKOTA ANTITRUST ACT,
## S.D. CODIFIED LAWS §§ 37-1-3.1, 3.2 *ET SEQ.*

687. Plaintiffs incorporate the allegations above as if set forth fully herein.

688. By reason of the conduct alleged herein, Apple violated S.D. Codified Laws, §§ 37-1-3.1, 3.2 *et seq.*

689. Certain members of the Damages Class purchased iPhones within the State of South Dakota throughout the Class Period and continuing today.

CONSOLIDATED CLASS ACTION COMPLAINT

175

690. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

691. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of South Dakota.

692. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

693. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

694. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected South Dakota's trade and commerce.

695. Apple's conduct was willful.

696. Apple's unlawful conduct had the following effects: (1) iPhone price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) iPhone prices were raised, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Members of the Damages Class were deprived of free and open competition; and (4) Members of the Damages Class paid supra-competitive, artificially inflated prices for iPhones.

697. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in South Dakota were measurably injured and damaged in an amount to be determined at trial.

## COUNT LII
### SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT, S.D. CODIFIED LAWS §§ 37-24-6 *ET SEQ.*

698. Plaintiffs incorporate the allegations above as if set forth fully herein.

699. Apple has engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Dakota Deceptive Trade practices and Consumer Protection Act, S.D. Codified Laws §§ 37-24-6 *et seq.*

700. Apple, through its willful monopolization or illegal attempt to maintain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of South Dakota, was able to inflate the prices for iPhones at artificial and non-competitive levels in South Dakota.

701. Apple deliberately failed to disclose material facts to members of the Damages Class concerning Apple's unlawful activities and artificially inflated prices for iPhones. Apple misrepresented to all purchasers during the Class Period that Apple's iPhones prices were competitive and fair. Apple owed a duty to disclose such facts, and they breached that duty by their silence.

702. Apple's unlawful conduct had the following effects: (1) iPhone price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) iPhone prices were raised, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Members of the Damages Class were deprived of free and open competition; and (4) Members of the Damages Class paid supra-competitive, artificially inflated prices for iPhones.

703. As a direct and proximate result of Apple's violations of law, members of the Damages Class suffered an ascertainable loss of money or property as a result of Apple's use or employment of unconscionable and deceptive commercial practices as set forth above.

704. That loss was caused by Apple's willful and deceptive conduct, as described herein. Apple's deception, including their affirmative misrepresentations and omissions concerning the price of iPhones, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing iPhones at prices set by a free and fair market.

CONSOLIDATED CLASS ACTION COMPLAINT

705.   Apple's affirmative misrepresentations and omissions constitute information important to members of the Damages Class as they related to the cost of the iPhones that they purchased.

706.   Apple has engaged in unfair competition or unfair or deceptive acts of practices in violation of S.D. Codified Laws §§ 37-24-6 *et seq.*, and accordingly, members of the Damages Class seek all relief available under that statute.

## COUNT LIII
### TENNESSEE TRADE PRACTICES ACT,
### TENN. CODE ANN. §§ 47-25-101 *ET SEQ.*

707.   Plaintiffs incorporate the allegations above as if set forth fully herein.

708.   By reason of the conduct alleged herein, Apple violated Tenn. Code Ann. §§ 47-25-101 *et seq.*

709.   Plaintiff Christina Kolinsky and members of the Damages Class purchased iPhones within the State of Tennessee throughout the Class Period and continuing today.

710.   Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

711.   Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Tennessee.

CONSOLIDATED CLASS ACTION COMPLAINT

179

712. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

713. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

714. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Tennessee's trade and commerce to a substantial degree.

715. Apple's conduct was willful.

716. Apple monopolized trade in the smartphone and performance smartphone relevant markets and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices of iPhones, in violation of Tenn. Code. Ann., § 47-25-101 *et seq.*

717. Apple's unlawful conduct had the following effects: (1) iPhone price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) iPhone prices were raised, maintained, and stabilized at artificially high levels

throughout Tennessee; (3) Plaintiff Christina Kolinsky and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff Christina Kolinsky and members of the Damages Class paid supra-competitive, artificially inflated prices for iPhones.

718. As a direct and proximate result of Apple's anticompetitive conduct, Plaintiff Christina Kolinsky and members of the Damages Class who purchased their iPhone in Tennessee were measurably injured and damaged in an amount to be determined at trial.

## COUNT LIV
## UTAH ANTITRUST ACT, AS AMENDED
## UTAH CODE ANN. §§ 76-10-3101, 3104 *ET SEQ.*

719. Plaintiffs incorporate the allegations above as if set forth fully herein.

720. By reason of the conduct alleged herein, Apple violated Utah Code Ann. §§ 76-10-3101, 3104 *et seq.*

721. Members of the Damages Class purchased iPhones within the State of Utah throughout the Class Period and continuing today.

722. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

723. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Utah.

724. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

725. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

726. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected Utah trade and commerce.

727. Apple's conduct was willful.

728. Apple monopolized trade in the smartphone and performance smartphone relevant markets and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or

CONSOLIDATED CLASS ACTION COMPLAINT

182

maintaining prices of iPhones, in violation of Utah Code Ann. §§ 76-10-3101, 3104 *et seq.*

729.   Apple's unlawful conduct had the following effects: (1) iPhone price competition was restrained, suppressed, and eliminated throughout Utah; (2) iPhone prices were raised, maintained, and stabilized at artificially high levels throughout Utah; (3) Members of the Damages Class were deprived of free and open competition; and (4) Members of the Damages Class paid supra-competitive, artificially inflated prices for iPhones.

730.   As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in Utah were measurably injured and damaged in an amount to be determined at trial.

## COUNT LV
## VERMONT CONSUMER FRAUD ACT,
### 9 V.S.A. §§ 2453 *ET SEQ.*

731.   Plaintiffs incorporate the allegations above as if set forth fully herein.

732.   Apple has engaged in unfair or deceptive acts or practices in violation of 9 V.S.A. §§ 2453 *et seq.* with respect to purchases of iPhones in Vermont by members of the Damages Class.

733.   Members of the Damages Class purchased iPhones within the State of Vermont throughout the Class Period and continuing today for personal, family, or

CONSOLIDATED CLASS ACTION COMPLAINT

183

household purposes, or resided in Vermont when they purchased iPhones in Vermont for personal, family or household purposes.

734. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Vermont.

735. As a result, Apple acted in restraint of trade or commerce in a market that includes Vermont, by affecting, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which iPhones were sold, distributed, or obtained in Vermont. Apple deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Apple's unlawful activities and artificially inflated prices for iPhones.

736. Apple owed a duty to disclose such facts, and they breached that duty by their silence. Apple misrepresented to all purchasers during the Class Period that Apple's iPhone prices were competitive and fair.

737. Apple's unlawful conduct had the following effects: (1) iPhone price competition was restrained, suppressed, and eliminated throughout Vermont; (2) iPhone prices were raised, maintained, and stabilized at artificially high levels throughout Vermont; (3) Members of the Damages Class were deprived of free and open competition; and (4) Members of the Damages Class paid supra-competitive, artificially inflated prices for iPhones.

738. Apple's conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

739. Apple's unlawful conduct substantially affected Vermont's trade and commerce.

740. Apple's misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts of practices in violation of 9 V.S.A. §§ 2453 *et seq.*

741. As a direct and proximate cause of Apple's unlawful conduct, the members of the Damages Class have suffered an ascertainable loss of money or property as a result of Apple's use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Apple's willful and deceptive conduct, as described herein. Apple's deception, including their affirmative misrepresentations and omissions concerning the price of iPhones, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing iPhones at prices set by a free and fair market.

742. By reason of the foregoing, members of the Damages Class are entitled to seek all forms of relief under 9 V.S.A. §§ 2453 *et seq.*

## COUNT LVI
### WEST VIRGINIA ANTITRUST ACT,
### WEST VIRGINIA CODE §§ 47-18-1, 4 *ET SEQ.*

743. Plaintiffs incorporate the allegations above as if set forth fully herein.

CONSOLIDATED CLASS ACTION COMPLAINT

744. By reason of the conduct alleged herein, Apple violated West Virginia Code §§ 47-18-1, 4 *et seq.*

745. Certain members of the Damages Class purchased iPhones within the State of West Virginia throughout the Class Period and continuing today.

746. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

747. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of West Virginia.

748. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

749. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

750. Apple's conduct was unfair, unconscionable, or deceptive, and substantially affected West Virginia trade and commerce.

751. Apple's conduct was willful.

752. Apple monopolized trade in the smartphone and performance smartphone relevant markets and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices of iPhones, in violation of West Virginia Code §§ 47-18-1, 4 *et seq.* Defendants' anticompetitive acts were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

753. Apple's unlawful conduct had the following effects: (1) iPhone price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) iPhone prices were raised, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Members of the Damages Class were deprived of free and open competition; and (4) Members of the Damages Class paid supra-competitive, artificially inflated prices for iPhones.

754. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in West Virginia were measurably injured and damaged in an amount to be determined at trial.

## COUNT LVII
## WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT, W. VA. CODE, §§ 46A-6-104 *ET SEQ.*

755. Plaintiffs incorporate the allegations above as if set forth fully herein.

756. Apple has engaged in unfair competition or unfair, unconscionable, or deceptive acts of practices in violation of the West Virginia Consumer Credit and Protection Act, W. Va. Code, §§ 46A-6-104 *et seq.*

757. Apple's unlawful conduct had the following effects: (1) iPhone price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) iPhone prices were raised, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Members of the Damages Class were deprived of free and open competition; and (4) Members of the Damages Class paid supra-competitive, artificially inflated prices for iPhones.

758. During the Class Period, Apple marketed, sold, or distributed iPhones in West Virginia, and Apple's illegal conducted substantially affected West Virginia commerce and consumers.

759. As a direct and proximate result of Apple's unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

760. Apple has engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code, §§ 46A-6-104 *et seq.*, and accordingly,

Plaintiffs and members of the Damages Class seek all relief available under that statute.

**COUNT LVIII**
**WISCONSIN ANTITRUST STATUTE,**
**WIS. STAT. §§ 133.01, .04 *ET SEQ.***

761. Plaintiffs incorporate the allegations above as if set forth fully herein.

762. By reason of the conduct alleged herein, Apple violated Wis. Stat. §§ 133.01, .04 *et seq.*

763. Plaintiff Ken Leinbach and members of the Damages Class purchased iPhones within the State of Wisconsin throughout the Class Period and continuing today.

764. Apple had and still has monopoly power in the smartphone and performance smartphone relevant product markets. This monopoly power applies to the United States, which is the relevant geographic market.

765. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Wisconsin, which substantially affected the people of Wisconsin and impacted the State of Wisconsin.

766. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud

CONSOLIDATED CLASS ACTION COMPLAINT

189

streaming, messaging, wearables, and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

767. There was and remains a dangerous probability that Apple will retain its monopoly in the relevant markets as alleged herein.

768. Apple's conduct was willful.

769. Apple monopolized trade in the smartphone and performance smartphone relevant markets and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices of iPhones, in violation of Wis. Stat. § 133.01, .04 *et seq.* Defendants' anticompetitive acts were knowing, willful and constitute violations or flagrant violations of the Wisconsin Antitrust Statute.

770. Apple's unlawful conduct had the following effects: (1) iPhone price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) iPhone prices were raised, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiff Ken Leinbach and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff Ken Leinbach

and members of the Damages Class paid supra-competitive, artificially inflated prices for iPhones.

771. As a direct and proximate result of Apple's anticompetitive conduct, members of the Damages Class who purchased their iPhone in Wisconsin were measurably injured and damaged in an amount to be determined at trial.

## COUNT LIX
## WIS. STAT. 100.18 *ET SEQ.*

772. Plaintiffs incorporate the allegations above as if set forth fully herein.

773. By reason of the conduct alleged herein, Apple violated Wis. Stat. 100.18 *et seq*.

774. Plaintiff Ken Leinbach and members of the Damages Class purchased iPhones within the State of Wisconsin throughout the Class Period and continuing today.

775. Apple has engaged in unfair or deceptive acts or practices with respect to purchases of iPhones in Wisconsin in violation of Wis. Stat. § 100.18 *et seq*.

776. Apple willfully monopolized or illegally attempted to retain its monopoly of the smartphone and performance smartphone relevant markets through its use of illegal exclusionary tactics within the State of Wisconsin, which substantially affected the people of Wisconsin and impacted the State of Wisconsin.

777. As a result, Apple acted in restraint of trade or commerce in a market that includes Wisconsin, by affecting, controlling, and/or maintaining, at artificial

and non-competitive levels, the prices at which iPhones were sold, distributed, or obtained in Wisconsin. Apple deliberately and deceptively failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Apple's unlawful activities and artificially inflated prices for iPhones.

778. Apple owed a duty to disclose such facts, and they breached that duty by their silence. Apple misrepresented to all purchasers during the Class Period that Apple's iPhone prices were competitive and fair.

779. Apple's unlawful conduct had the following effects: (1) iPhone price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) iPhone prices were raised, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiff Ken Leinbach and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff Ken Leinbach and members of the Damages Class paid supra-competitive, artificially inflated prices for iPhones.

780. During the Class Period, Apple marketed, sold, or distributed iPhones in Wisconsin, and Apple's illegal conducted substantially affected Wisconsin commerce and consumers.

781. As a direct and proximate result of Apple's unlawful conduct, Plaintiff Ken Leinbach and members of the Damages Class have been injured and are threatened with further injury.

782.    Apple has engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.18 *et seq.* and accordingly, Plaintiff Ken Leinbach and members of the Damages Class seek all relief available under that statute.

## XV.    REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

1.    Certify this case as a class action and appoint Plaintiffs as class representatives and interim co-lead counsel as class counsel;

2.    Find that Apple has acted unlawfully to monopolize and retain its monopoly in the performance smartphone market and in the smartphone market in the United States in violation of state and federal law as alleged herein;

3.    Award Plaintiffs and the proposed Classes all appropriate relief, to include, but not be limited to:

    a) declaratory relief, adjudging Apple's abusive and anticompetitive practices unlawful;

    b) injunctive relief, requiring Apple to cease the abusive, anticompetitive, and unlawful practices described herein;

    c) monetary relief, whether by way of damages, including treble or other multiple or punitive damages, or restitution, where mandated by law or equity or otherwise available;

CONSOLIDATED CLASS ACTION COMPLAINT

193

d) costs of suit, to include reasonable attorneys' fees, costs, and expenses; and

e) pre- and post-judgment interest to the maximum levels permitted by law or equity;

4. Grant any additional orders or judgments as may be necessary to prevent continuation of the unlawful practices complained of herein; and

5. Award Plaintiffs and the proposed class any such other favorable relief as may be available and appropriate under federal or state law, or at equity.

## XVI. JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

CONSOLIDATED CLASS ACTION COMPLAINT

194

Dated: July 30, 2025          /s/ Stanley O. King
                              Stanley O. King, Esq.
                              **JAVERBAUM WURGAFT HICKS**
                              **KAHN WIKSTROM & SININS P.C.**
                              1000 Haddonfield-Berlin Road,
                               Suite 203
                              Voorhees, NJ 08043
                              Tel: 856.596.4100
                              Stanley O. King,
                              Attorney ID No. 03413-1996
                              *Liaison Counsel for*
                              *Indirect iPhone Purchaser Plaintiffs*

Michael Dell'Angelo                    Heidi M. Silton
Candice J. Enders                      Jessica N. Servais
J. Taylor Hollinger                    Joseph C. Bourne
**BERGER MONTAGUE PC**                 Michael J.K.M. Kinane
1818 Market Street, Suite 3600         **LOCKRIDGE GRINDAL**
Philadelphia, PA 19103                 **NAUEN PLLP**
Tel: (215) 875-3000                    100 Washington Avenue South,
mdellangelo@bergermontague.com         Suite 2200
cenders@bergermontague.com             Minneapolis, MN 55401
thollinger@bergermontague.com          Tel: (612) 339-6900
                                       hmsilton@locklaw.com
                                       jnservais@locklaw.com
Matthew S. Weiler                      jcbourne@locklaw.com
Todd M. Schneider                      mjkmkinane@locklaw.com
Raymond S. Levine
Suneel Jain
**SCHNEIDER² WALLACE**                 William G. Caldes
**COTTRELL KIM LLP**                   Jeffrey L. Spector
2000 Powell Street, Suite 1400         Rachel Kopp
Emeryville, CA 94608                   **SPECTOR ROSEMAN**
Tel: (415) 421-7100                    **& KODROFF, P.C.**
mweiler@schneiderwallace.com           2001 Market Street, Suite 3420
tschneider@schneiderwallace.com        Philadelphia, PA 19103
rlevine@schneiderwallace.com           Tel: (215) 496-0300
sjain@schneiderwallace.com             bcaldes@srkattorneys.com
                                       jspector@srkattorneys.com
                                       rkopp@srkattorneys.com

CONSOLIDATED CLASS ACTION COMPLAINT

195

*Interim Co-Lead Counsel for Indirect iPhone Purchaser Plaintiffs*

Kimberly Justice
Robert Wozniak
**FREED KANNER LONDON
& MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Tel: (224) 632-4500
kjustice@fklmlaw.com
rwozniak@fklmlaw.com

Michael S. Smith
Elizabeth F. Quinby
**PRETI, FLAHERTY, BELIVEAU
& PACHIOS, LLP**
One City Center
Portland, ME 04101
Tel: (207) 791-3246
msmith@preti.com
equinby@preti.com

Daniel H. Silverman
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
769 Centre Street, Suite 207
Boston, MA 02130
Tel: (617) 858-1990
dsilverman@cohenmilstein.com

Israel David
**ISRAEL DAVID LLC**
60 Broad Street, Suite 2900
New York, NY 10004
Tel: (212) 350-8851
israel.@davidllc.com

Garrett Blanchfield
Brant Penney
**REINHARDT WENDORF
& BLANCHFIELD**
80 South 8th Street, Suite 900
Minneapolis, MN 55402
Tel: (651) 287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com

*Interim Executive Committee Counsel for Indirect iPhone Purchaser Plaintiffs*

Charles J. Kocher
**MCOMBER MCOMBER
& LUBER, P.C.**
50 Lake Center Drive, Suite 400
Marlton, New Jersey 08053
Tel: (856) 985-9800
cjk@njlegal.com

Alec Blaine Finley
**FINLEY PLLC**
1455 Pennsylvania Avenue, N.W.,
Suite 400
Washington, D.C. 20004
Tel: (281) 723-7904
bfinley@finley-pllc.com

CONSOLIDATED CLASS ACTION COMPLAINT

196

Stuart G. Gross
**GROSS KLEIN PC**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
Tel: (415) 671-4628
sgross@grosskleinlaw.com

*Additional Counsel for Indirect iPhone Purchaser Plaintiffs*

# EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: APPLE INC. SMARTPHONE ANTITRUST LITIGATION<br><br>*This Document Relates to*:<br><br>*Giamanco v. Apple Inc.*, 24-cv-7238-JXN-LDW | Civil Action No. 24-md-3113-JXN-LDW<br><br>MDL 3113<br><br><br>**DIRECT APPLE WATCH PURCHASER PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

NATURE OF ACTION ........................................................................................................ 3

PLAINTIFF ......................................................................................................................... 5

DEFENDANT ...................................................................................................................... 5

RELEVANT NON-PARTIES ............................................................................................. 5

JURISDICTION .................................................................................................................. 6

FACTUAL ALLEGATIONS .............................................................................................. 7

    I.     Introduction.................................................................................................... 7

    II.    Apple's Anticompetitive Conduct ............................................................... 10

        A.     The Role of Apps on Smartphones and Smartwatches................................ 10

        B.     Apple's Anticompetitive Agreements ......................................................... 12

            1.     The Developer Program License Agreement and API Restrictions ...................... 14

            2.     The App Review Guidelines........................................................................ 38

        C.     Apple Uses Updates and Design Changes To Disrupt and Degrade Competitor Smartwatches ............................................................................................... 43

            1.     Apple Has Degraded Competitor Smartwatches' Ability To Deliver Information 44

            2.     Apple Disrupts Competitor Smartwatches' Connections to the iPhone ................. 53

    III.   Overall Anticompetitive Effects of Apple's Conduct ...................................... 66

    IV.   Relevant Product Market.................................................................................. 68

        A.     Smartphones and Smartwatches Are Separate Products ............................. 69

        B.     Market for iOS Smartphones....................................................................... 70

        C.     Market for iOS-Connected Smartwatches................................................... 73

        D.     The Relevant Geographic Market is the United States................................ 77

    V.    Monopoly Power............................................................................................... 78

        A.     Apple Has Monopoly Power in the Markets for iOS-Connected Smartwatches and All Smartwatches ............................................................................................... 78

        B.     Apple Has Monopoly Power in the Markets for iOS Smartphones and for All Smartphones.................................................................................................. 82

    VI.   Antitrust Injury and Standing........................................................................... 85

CLASS ACTION ALLEGATIONS .................................................................................. 85

CAUSE OF ACTION I: MONOPOLIZATION................................................................. 88

CAUSE OF ACTION II: ATTEMPTED MONOPOLIZATION........................................ 89

CAUSE OF ACTION III: UNREASONABLE RESTRAINT OF TRADE ............................. 91

CAUSE OF ACTION IV: CARTWRIGHT ACT - UNREASONABLE RESTRAINT OF TRADE ............................................................................................................................ 93

CAUSE OF ACTION V: UNFAIR COMPETITION LAW .............................................. 94

PRAYER FOR RELIEF .................................................................................................... 96

DEMAND FOR A JURY TRIAL...................................................................................... 97

Plaintiff Joseph Giamanco, on behalf of himself and those similarly situated, states as follows:

**<u>NATURE OF ACTION</u>**

1. Apple is the most profitable consumer electronics company in the world. Over the last decade or more, Apple has exploited its dominant position vis-à-vis the iPhone to stifle innovation and gain control of adjacent markets. Apple did not invent the smartwatch, but it now possesses a monopoly over the market for smartwatches that connect to the iPhone. This case challenges Apple's use of anticompetitive acts and agreements to degrade user experience, block innovation, hamper app developers, and stifle competition with its smartwatch—the Apple Watch—enabling Apple to acquire and maintain that monopoly power.

2. Apple has followed the tech monopolist's playbook. It first forces key third parties to sign illegal agreements that block competitors from offering smartwatches with basic features, such as the ability to reply to text messages, and prevent third-party app developers from marketing iPhone apps that work with competing smartwatches. Apple's agreements limit competition from other smartwatches and have contributed to companies such as Samsung and Google declining to make smartwatches that connect to the iPhone, further restricting choice for iPhone users.

3. Then, for the few competitors that remain, Apple ensures they cannot compete on the merits by continually updating and redesigning the iPhone operating system in ways that disrupt and degrade competing smartwatches, harming its own iPhone users who have ventured to purchase competing smartwatches. Apple creates an unending barrage of problems that cause competitor smartwatches to disconnect from paired iPhones and constrain the information competitor smartwatches can provide their users.

4.      Apple's tactics are familiar: Microsoft used a combination of illegal agreements and illegal design choices to exert control over the operating system and web browser markets in the 1990s.[1] And more recently, Google used a combination of illegal agreements and artificial technical constraints to monopolize the markets for digital publisher advertising tools and app stores on Android smartphones.[2]

5.      Apple's monopolistic abuses have been enormously successful. As a result of its conduct, approximately 79% of iPhone owners who own a smartwatch have an Apple Watch. At the same time, competitor smartwatches are disappearing. Less than two years after Apple first released the Apple Watch in 2015, Apple's anticompetitive conduct led to the failure of Pebble, a then-leading maker of iOS-compatible smartwatches. Following Apple's introduction of the Apple Watch, three of the world's largest consumer-technology companies have either stopped making smartwatches that connect to iPhones or declined to enter that market. In 2021, Samsung—the world's leading smartphone manufacturer—stopped making smartwatches that connect to the iPhone. In 2022, Meta abandoned plans to launch a smartwatch that would compete with the Apple Watch. And that same year, Google announced that it would not release its Google Pixel Watch for iOS, citing Apple's anticompetitive restrictions. Meanwhile, Samsung and Google continue to release successful smartwatches that connect to Android smartphones.

6.      Apple's monopolistic abuses have also been enormously profitable. In 2023, Apple reportedly earned an estimated $23.8 billion in revenue from Apple Watch sales, approximately the same annual revenue as McDonald's globally.

---

[1] *U.S. v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001).

[2] *U.S. v. Google LLC*, No. 23-cv-108 (E.D. Va. Apr. 17. 2025), ECF No. 1410; *Epic Games, Inc. v. Google LLC*, No. 20-cv-5671 (N.D. Cal. Jan. 9, 2025), ECF No. 716.

7.      Apple's years-long campaign to limit smartwatch competition has harmed Apple iPhone users. Because of Apple's anticompetitive conduct, iPhone users who want a fully functional smartwatch have only one option: the Apple Watch. And for iPhone users who insist on purchasing a competitor smartwatch, Apple makes that smartwatch needlessly difficult to use. By foreclosing competition, Apple has been able to charge higher-than-competitive prices for its Apple Watch. Plaintiff seeks to put an end to Apple's anticompetitive practices, recover damages for the amount Apple has overcharged its users, and hold Apple responsible for its illegal conduct.

## PLAINTIFF

8.      Plaintiff Joseph Giamanco is a natural person who resides in Bolingbrook, Illinois. On December 2, 2021, Mr. Giamanco purchased an Apple Watch Series 7 from Apple.com for pick up at the Apple Store in Oakbrook, Illinois.

9.      Mr. Giamanco is a cyclist and runner. Mr. Giamanco would prefer to own a Garmin smartwatch and would purchase one but for Apple's restrictions on the Garmin smartwatch's capabilities. Due to restrictions on the Garmin smartwatch's functionality when connected to his iPhone, Mr. Giamanco has purchased the Apple Watch, including an Apple Watch Ultra 2 since initiating this litigation. Because he has no other choice, Mr. Giamanco plans to buy another Apple Watch when it comes time for him to replace his current Apple Watch.

## DEFENDANT

10.     Defendant Apple Inc. ("Apple") is a California corporation with its principal place of business at 1 Apple Park Way, Cupertino, CA 65014.

## RELEVANT NON-PARTIES

11.     Core Devices LLC ("Core Devices") is a California limited liability company and maker of smartwatches that operate on PebbleOS.

12.     Garmin International, Inc. ("Garmin") is a Kansas corporation with its principal place of business at 1200 East 151st Street, Olathe, KS 66062.

13.     Google LLC ("Google") is a Delaware corporation with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043. Employees working on Google's Pixel Watch and Wear OS also work out of Google's office at 320 N Morgan Street, Suite 600, Chicago, IL 60607.

14.     Meta Platforms, Inc. ("Meta") is a Delaware corporation with its principal place of business at 1 Hacker Way, Menlo Park, CA 94025.

15.     Motorola Mobility LLC ("Motorola") is a Delaware corporation with its principal place of business at 222 West Merchandise Mart Plaza, Chicago, IL 60654.

16.     Samsung Electronics America, Inc. ("Samsung") is a New York corporation with its principal place of business at 85 Challenger Road, Ridgefield Park, NJ 07660.

## JURISDICTION

17.     This is a civil action seeking damages and injunctive relief under federal antitrust law and California law. The Court has subject matter jurisdiction over the causes of action under 15 U.S.C. § 26 and 28 U.S.C. §§ 1331, 1337, 1367.

18.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d) because the proposed Class contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one proposed Class Member is a citizen or subject of a foreign state and Defendant is a citizen of the State of California.

19.     The District Court for the Northern District of Illinois, where this action was originally filed, had subject matter jurisdiction for the same reasons under 15 U.S.C. § 26 and 28 U.S.C. § 1331, 1332(d), 1337, 1367.

20.     This Court has personal jurisdiction over Defendant, and venue is proper in this district, under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22. Defendant may be found in and transacts business in this district. Defendant employs hundreds of people and operates numerous retail stores in this district. This Court also has personal jurisdiction over Defendant because Apple has sufficient contacts with this State (and this District) and has purposefully availed itself of the privilege of conducting business in the State and in this District. Venue is thus proper in this District under 28 U.S.C. § 1391.

21.     For these reasons, the District Court for the Northern District of Illinois, where this action was originally filed, also had personal jurisdiction over Defendant and venue was proper in that District.

22.     This Court also has personal jurisdiction over Defendant, and venue is proper in this District, in light of the transfer of this action from the District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1407. *See In re FMC Corp. Pat. Litig.*, 422 F. Supp. 1163, 1165 (J.P.M.L. 1976) ("Transfers under Section 1407 are simply not encumbered by considerations of in personam jurisdiction and venue."); *see also In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 163 (2d Cir. 1987) (explaining that in 28 U.S.C. § 1407, Congress "authoriz[ed] the federal courts to exercise nationwide personal jurisdiction").

## FACTUAL ALLEGATIONS

### I.    Introduction

23.     Smartwatches are wrist-worn devices that tell time while extending and improving the capabilities of smartphones. Among other functions, they may allow users to collect health and fitness data that is synced to a smartphone, view and act on messages and notifications received by the smartphone, track and share location information, exercise control over a smartphone and smartphone apps, access and use a mobile wallet, and take advantage of an app ecosystem for

7

additional functionalities. Smartwatches are thus highly dependent on the smartphones to which they are connected.

24.     Users who purchase Android smartphones—the primary alternative to iPhones in the United States—can choose from a number of competing smartwatches that connect to their Android devices while providing all of the functionality users expect from a smartwatch. Some of these smartwatches are made by Google, the developer of Android, while others are made by leading companies such as Samsung and Garmin.

25.     Americans who purchase iPhones do not benefit from similarly robust smartwatch competition. As detailed below, Apple has for many years limited, disrupted, and degraded the capabilities of competitor smartwatches that connect to iOS, the iPhone operating system. Apple's tactics have caused industry giants such as Samsung to exit the market for iOS-connected smartwatches, while excluding others, such as Google and Meta, from entry altogether.

26.     Those that still compete with Apple, such as Garmin, do so with one hand tied behind their back: they are forced to offer smartwatches that are less reliable and have more limited capabilities than an Apple Watch when connected to iOS—even when those same smartwatches offer comparable or superior functionality to the Apple Watch when connected to an Android smartphone. Accordingly, iPhones users who want a fully functional smartwatch have no choice but to purchase an Apple Watch.

27.     Apple's conduct in the smartwatch market bears a striking resemblance to its conduct in markets for other iPhone-enhancing accessories. At first, Apple appears to allow the arrival of iOS-connected devices because they improve the iPhone user experience, provide innovative functionality, and increase demand for iPhones. But once Apple develops its own competing product, it limits or degrades the functionality of the non-Apple device, interferes with

8

third-party software designed to improve the non-Apple device, and otherwise discourages iPhone users from adopting the non-Apple device.

28.    For example, Apple initially celebrated the creation of location-tracking tags made by Tile, which allowed users to locate physical items with an iPhone app. But when Apple developed its own location-tracking tags (called "AirTags"), Apple sent Tile users iPhone notifications encouraging them to turn off the Tile app's tracking capabilities for privacy reasons. Apple only stopped some of this behavior after Tile's General Counsel and Chief Privacy Officer testified about the consequences of Apple's conduct before the House Antitrust Subcommittee in January 2020. Apple later developed an "accessory program" that gave Tile access to some of the capabilities of its location-sharing platform, but only on the condition that Tile shut down its competing location-sharing network.[3]

29.    Similarly, Apple initially supported and collaborated with Sonos, the maker of high-quality speakers that played music controlled directly from users' iPhones. But things changed when Apple announced its own iOS-connected speakers (called "HomePods"). Apple subsequently removed the ability to control Sonos speaker volume by pressing the iPhone's exterior volume buttons—requiring users instead to unlock their phone, open the Sonos app, and adjust the volume level on a slide. HomePod speakers, meanwhile, can still be controlled with a single push of the iPhone's exterior buttons.

30.    Apple's treatment of Tile and Sonos showcases the company's willingness to employ strategies straight out of the tech monopolist's playbook: Apple will send users distressing

---

[3] Testimony of Kirsten Daru, Chief Privacy Officer and General Counsel for Tile, Inc., *Antitrust Applied: Examining Competition in App Stores*, Before the Senate Committee on the Judiciary, Subcommittee on Competition Policy, Antitrust, and Consumer Rights (Apr. 21, 2021).

and misleading notifications, deprive competitors of key technologies, and redesign its software platform to disrupt competitors' operations—all by exploiting its dominance over iPhone owners.

31.     Apple has employed these practices—in conjunction with anticompetitive contracts—to monopolize the smartwatch market. Apple initially permitted third-party smartwatches to connect to iPhones, as they improved iPhone users' experience and made Apple's flagship product more attractive. But then, once Apple decided to enter the smartwatch market, it began using anticompetitive contracts and its control over iOS to limit, disrupt, and degrade competitor smartwatches. Apple's strategy worked. After it entered a once-diverse and growing smartwatch market, few competitors are left today.

## II.    Apple's Anticompetitive Conduct

32.     The sections that follow detail the contractual and technical means Apple has used to monopolize the iOS-connected smartwatch market.

### A.    The Role of Apps on Smartphones and Smartwatches

33.     Much of the iPhone's functionality is provided by "apps," software programs that allow mobile devices to perform specific tasks. A user who wants to connect a competitor smartwatch to an iPhone must first install a smartwatch "companion app" on the iPhone, downloaded from Apple's App Store. The companion app allows competitor smartwatches to pair and exchange information with the iPhone via Bluetooth. Examples of smartwatch companion apps include the Garmin Connect app, the Fitbit app, and the Samsung Galaxy Watch app. Much of Apple's conduct to restrain smartwatch competition involves these competitor smartwatch companion apps.

34.     There are two types of apps that allow smartwatches to connect with iPhones. The first, "companion" apps, are specifically designed to allow a smartwatch to pair with the iPhone (e.g., the Watch App for Apple Watch, or Garmin Connect for Garmin watches). But there are also

10

other apps (which this complaint will refer to as "sister" apps) that are not essential to pairing, but are designed to enhance the way the smartwatch works, or the way the smartwatch works with an iPhone. Many of these apps can also be controlled by or work in tandem with smartwatches (e.g., pausing music playing through an app on the iPhone by pushing a button in an app on the smartwatch). Sometimes these smartphone apps require installing an app on the smartwatch itself in addition to the iPhone—such as Komoot, an app for hiking, biking, and running that can be installed on Garmin devices and that functions in tandem with the Komoot app on the iPhone. Companion and sister apps for iOS and iPhone are sometimes developed by Apple but typically by third-party software developers.

35.     Because competitor smartwatches depend on iOS companion apps and sister apps to allow users to access many of the features that make smartwatches useful, Apple is able to exercise control over these apps and app developers to harm smartwatch competition.

36.     First, since all apps, including companion and sister apps, must be distributed on Apple's App Store, Apple's smartwatch competitors and developers who make apps for their products have no choice but to agree to Apple's contracts governing iOS apps and their distribution on the App Store. As described in Part II.B below, Apple uses these contracts to limit the features competitor smartwatches can offer iPhone users, as well as to limit support for competitor smartwatches by iOS sister apps.

37.     Second, as detailed in Part II.C below, competitor smartwatches' dependency on companion apps allows Apple to introduce anticompetitive degradations to competitor smartwatches by updating and redesigning iOS software in ways that disrupt and harm competitor smartwatches and their users.

11

## B. Apple's Anticompetitive Agreements

38.     Apple requires virtually all iPhone apps not made by Apple, including all companion apps, to be distributed via the App Store. Because companion apps determine much of the scope of smartwatches' functionality, Apple has significant control over smartwatch app developers and competitor smartwatch makers, and therefore over users' smartwatch experience.

39.     Apple limits iPhone app distribution to the App Store through at least two sets of restrictions.

40.     First, Apple imposes a contractual restriction on third-party app developers and competitor smartwatch makers. All third-party app developers and competitor smartwatch makers must agree to the Developer Program License Agreement (DPLA). Apple will not issue a digital certificate to the developer unless it agrees to the terms of the DPLA. Accordingly, third-party developers must agree to the DPLA for access to the App Store and app distribution. Apple uses this enormous leverage to impose requirements and limitations on third-party app developers and competitor smartwatch makers. The DPLA also incorporates by reference a separate, additional set of requirements called the App Review Guidelines, which establish additional requirements for App Store distribution.

41.     Second, Apple restricts consumers directly through a contract called the iOS and iPadOS Software License Agreement (iOS License Agreement), to which all iPhone users must agree. The iOS License Agreement prevents iPhone users from "sideloading," i.e., modifying their iPhones to install apps that Apple has not certified.[4]

42.     These anticompetitive agreements harm iPhone users and smartwatch competition. Apple uses the DPLA to (1) prevent competitor smartwatches from connecting to the iPhone like

---

[4] Android users, by contrast, can enable sideloading capabilities on their devices.

12

the Apple Watch does; (2) constrain competitor smartwatches from offering iPhone users critical functions, such as the ability to send and reply to text messages or control notifications; (3) enforce anticompetitive App Review Guidelines, which allow Apple to strategically delay the release of competitor smartwatches' companion apps; and (4) prevent third-party developers in their App Store listings from identifying their apps as designed for or compatible with a competitor smartwatch (e.g., restricting terms allowed in an app's metadata in ways that affect a user's search results and prohibiting pictures or descriptions of how the app works with or enhances a competitor smartwatch).

43.     Apple's actions serve no rational purpose beyond suppressing competition. iPhone users would benefit from using critical functionalities (like responding to text messages) on competitor smartwatches, and from being able to find apps in the App Store that support competitor smartwatches. Yet Apple restricts iPhone users' access to these functionalities to suppress competition. Apple knows that few customers can or will abandon the iPhone just to improve the functioning of their smartwatch. Meanwhile, app developers and competing smartwatch makers have no choice but to accept Apple's terms. The alternative is to forgo distributing their apps and smartwatches to iPhone users, who comprise the majority of smartphone owners in the United States. Using these agreements, Apple can exploit its market power, sacrifice the few smartphone users it may lose as a result of its smartwatch restrictions, and foreclose competition in the vast majority of the iOS-connected smartwatch market.

44.     Apple's systematic interference with the functionality of competitor smartwatches when used with iPhones has led the makers of some of the most sophisticated smartwatches on the market to stop supporting iOS. That reduces choices available to iPhone owners. And it enables Apple to charge supracompetitive prices for its smartwatches in the absence of robust competition.

### 1. The Developer Program License Agreement and API Restrictions

45.     Anyone who wants to distribute an iPhone app on Apple's App Store must sign the DPLA. *See* DPLA, Purpose ("Applications developed under this Agreement for iOS, iPadOS, macOS, tvOS, visionOS, and watchOS can be distributed . . . through the App Store, if selected by Apple"); Schedule 1 ("You hereby appoint Apple and Apple Subsidiaries (collectively 'Apple') as . . . [y]our agent for the marketing and delivery of the Licensed Applications to end-users"). The DPLA imposes restrictions on app developers and competitors by limiting their use of iOS Application Programming Interfaces (APIs).

46.     An API is a set of rules, protocols, and functions—engrained in software code— that acts as a bridge between two pieces of software, allowing them to work together. APIs are ubiquitous in smartphone software: they enable a navigation app to receive and display the smartphone user's location, a podcast app to send audio to connected headphones, and a banking app to send a push notification to confirm the user's website login. But APIs are not wide-open portals; they also dictate what data is allowed to pass, and how that data may pass.

47.     Smartwatch companion apps, including Apple's Watch app, rely on APIs to exchange information between an iPhone and a smartwatch. Core smartwatch functions— including text messaging and notification delivery, location sharing, health and fitness tracking, and even the smartwatch Bluetooth connection—all rely on the smartwatch companion app communicating with a smartphone via APIs. In short, if a smartwatch is going to extend and enhance the functionality of a smartphone, it must exchange information with that smartphone via APIs.

48.     Through the DPLA, Apple takes advantage of this reliance on APIs to limit competing smartwatches' functionalities, including through the arbitrary designation of APIs reserved for the Apple Watch as "private" and other APIs available to competitor smartwatches as

public (or "Documented"). The DPLA limits the use of public APIs to whatever purposes Apple deems are appropriate and prohibits competitor smartwatches from accessing other private APIs. *See* DPLA § 3.3.1(A) ("Applications may only use Documented APIs in the manner prescribed by Apple and must not use or call any private APIs."). The App Review Guidelines, incorporated into the DPLA and discussed in the next section, also require that "Apps may only use public APIs" and only "for their intended purposes." App Review Guidelines § 2.5.1.

49.     As a technical matter, there is no difference between a public API and a private API—they both allow apps to exchange data with one another or the iPhone itself. But by designating certain APIs private, and restricting use of public APIs to certain functions, Apple can pick and choose the ways in which competitor smartwatch companion apps can exchange information with the iPhone and other apps. Apple can therefore selectively limit the functionality of competitor smartwatches when paired to an iPhone. Meanwhile, the Apple Watch faces no similar restrictions. The Apple Watch relies on a number of private APIs, including APIs supporting iMessage, and uses public APIs in ways DPLA signatories are not permitted to.

50.     The use of API restrictions to harm competition in smartphone-related markets is a longstanding Apple strategy. The UK's Competition & Markets Authority has recognized that Apple "can determine the functionality available to apps through control of access to APIs," and that Apple has "reserved access to certain hardware functionality" to itself, thereby "protecting its own services from competition and potentially restricting innovation."[5] In *United States v. Apple*— where the Department of Justice and 16 Attorneys General have accused Apple of monopolizing

---

[5] Competition & Markets Authority, *Mobile ecosystems: Market study final report* at 6.261 (June 10, 2022), https://assets.publishing.service.gov.uk/media/63f61bc0d3bf7f62e8c34a02/Mobile_Ecosystems_Final_Report_amended_2.pdf.

the smartphone market in part through the use of strategic API restrictions—the complaint explains that "Apple selectively designates APIs as public or private to benefit Apple, limiting the functionality developers can offer to iPhone users even when the same functionality is available in Apple's own apps."[6]

51.     One example of Apple using API restrictions to its advantage relates to internet browser competition on the iPhone. To give its own Safari internet browser an advantage, Apple for many years reserved for itself a private API that enabled faster page loading and relegated Google's Chrome browser to an inferior API that caused pages to load more slowly.[7] This limitation needlessly harmed iPhone users' experience, but generated additional profits for Apple by encouraging customers to use its browser over Chrome.

52.     Apple employs a number of anticompetitive limitations in the smartwatch context:

### a.   Apple's Restrictions on Messaging APIs

53.     Apple uses the DPLA and its control over iOS APIs to ensure that competitor smartwatches are unable to send, reply, or react to text messages when connected to an iPhone. Meanwhile, the Apple Watch has full text messaging functionality—as do the same competitor smartwatches when connected to Android smartphones.

54.     Apple uses a multi-pronged strategy to block messaging on competitor smartwatches. First, Apple denominates as private the APIs required to send and act on messages over Apple's iMessage platform, foreclosing third parties' ability to use iOS's default messaging platform. Second, Apple restricts access to the public APIs required to send and act on SMS and

---

[6] Complaint at 22, *U.S. v. Apple, Inc.*, No. 24-cv-04055 (D.N.J. Mar. 21, 2024), ECF No. 1.

[7] Thomas Claburn, *Apple frees a few private APIs, makes them public*, The Register (June 13, 2017), https://www.theregister.com/2017/06/13/apple_inches_toward_openness/.

RCS text messages. Finally, Apple restricts smartwatch competitors from securing the ability to send and reply to text messages through private deals with cellular carriers.

(i)    iMessage API Restrictions

55.    Apple first hobbles competitor smartwatches by restricting their access to the APIs for iMessage.

56.    iMessage is the means by which all iPhones send and receive messages with other Apple devices in the Messages app—the messaging app that comes preloaded on the iPhone. iMessage is end-to-end encrypted, offers the ability to send and receive messages on Apple devices such as tablets and laptops, and includes a variety of features iPhone owners have come to expect from a messaging service, such as text and message effects, editing sent messages, and sending high resolution photos and videos.

57.    When an iPhone user wants to send or reply to a text message on an Apple Watch, the user can do so seamlessly in iMessage. This is because the Apple Watch can access private APIs for sending or receiving iMessages and send and receive text messages over the iMessage platform.

58.    Yet Apple prevents competitor smartwatches from developing their own APIs or using the APIs Apple uses itself for sending and receiving iMessages, thus preventing competitor smartwatches from sending and receiving text messages via iMessage, the default iPhone messaging service.

59.    Limiting smartwatch access to iMessage to only the Apple Watch serves no procompetitive purpose. It has long been technologically feasible for non-Apple devices to use the iMessage platform. Emails between Apple executives in 2013 show that Apple Senior VP Eddy Cue advocated for messaging integration with non-Apple devices, and for Apple to "make [iMessage] the industry standard" because it was "the best messaging app." In response, Apple's

17

Senior VP of Software Engineering Craig Federighi wrote that allowing third-party devices to access and integrate with iMessage would "simply serve to remove [an] obstacle to iPhone families giving their kids Android phones."[8] In the years since, Apple has repeatedly decided, for anticompetitive reasons, not to allow non-Apple devices to access the APIs necessary to use iMessage. In an email from March 2016, approximately one year after the release of the Apple Watch, an Apple employee described the "serious lock-in" resulting from iMessage incompatibility on non-Apple devices, calling it "the #1 most difficult" aspect of leaving the "Apple universe." In response to this email, Apple executive Phil Schiller wrote to CEO Tim Cook that "moving iMessage to Android will hurt us more than help us, this email illustrates why."[9]

60.     Recent efforts to work around Apple's restrictions on APIs for sending or receiving iMessages show the value users place on iMessage access, the power of the DPLA to restrict that access, and Apple's willingness to go to extreme lengths to prevent access to iMessage. In 2023, Pebble co-founder Eric Migicovsky released an app called Beeper Mini, which enabled Android smartphone users to message with iPhone users through iMessage. As an indication of the value users place on this ability, although most popular messaging platforms are free, Beeper Mini originally charged a $2/month subscription.

61.     Beeper Mini achieved a remarkable feat: it ran Apple's iMessage and Push Notification service on an Android device. And it allowed users to send end-to-end encrypted messages without providing Beeper Mini or any other entity access to private or sensitive information. The app garnered significant media and consumer attention. Less than a week after

---

[8] Email from Senior VP of Software Engineering Craig Federighi (Apr. 8, 2013).

[9] Email from Apple Executive Philip Schiller (Mar. 3, 2016).

its launch, Apple shut it down. Citing the DPLA, Apple blocked Beeper Mini from the App Store. Apple then reengineered iMessage to prevent other apps from using Beeper Mini's method.

62.     Apple claimed that Beeper Mini posed security concerns, but those assertions were baseless.[10] Beeper Mini made messaging between Android and iOS device users *more* secure by ensuring those messages were encrypted, as opposed to taking place over non-encrypted SMS messaging. Senator Elizabeth Warren made this point in a tweet about Beeper Mini: "Green bubble texts [between Android and iOS devices] are less secure. So why would Apple block a new app allowing Android users to chat with iPhone users on iMessage? Big Tech executives are protecting profits by squashing competitors."[11] The day after this tweet, following significant blowback, Apple allowed the Beeper Mini app to continue operating, albeit in a degraded format that prevented users from enjoying full messaging capabilities with their own phone number (forcing them to rely on their email address instead). And again, Apple reengineered iMessage to prevent other apps from using Beeper Mini's approach, which Beeper Mini had posted online. Since most text messages are directed to and sent from a user's cell phone number, Apple's email-based messaging alternative was far less valuable to users. After Apple's response, Beeper Mini canceled its $2/month subscription charge.[12]

---

[10] Apple has a well-established history of using alleged security concerns to impose anticompetitive restrictions. In a recent decision, a Northern District of California court found that Apple willfully failed to comply with an injunction by restricting app developers' ability to link customers to payment methods outside the App Store. As part of this ruling, the court found the "security risks" Apple claimed justified its restrictions were "pretextual" and "nothing more than after-the-fact litigation posturing or outright misrepresentations to the Court." Order Granting Epic Games, Inc.'s Motion To Enforce Injunction, *Epic Games, Inc. v. Apple Inc.*, No. 20-cv-05640-YGR (N.D. Cal. Apr. 30, 2025), ECF No. 1508 at 31, 78.

[11] Elizabeth Warren (@SenWarren), *X* (Dec. 10, 2023, 3:05 PM), https://x.com/senwarren/status/1733956234200445130.

[12] Eric Migicovsky and Brad Murray, *Beeper Mini Is Back*, Beeper Blog (Dec. 11, 2023), https://blog.beeper.com/p/beeper-mini-is-back.

19

63.     Apple's restrictions on access to iMessage serve no procompetitive purpose—as Apple's own employees and internal communications described above illustrate. The Beeper Mini app presented no privacy or security concerns. Beeper Mini's innovation would allow iPhone users with non-Apple Watch smartwatches to send and receive messages through iMessage—a valuable feature. Apple's restrictions on competitor smartwatches' access to iMessage ensure that those devices cannot provide iPhone users the same messaging capabilities available to Apple Watch users, artificially hampering competition in the iOS-connected smartwatch market.

(ii)     SMS and RCS API Limitations

64.     In addition to restricting competitor smartwatches' ability to respond to iMessages, Apple limits competitor smartwatches' messaging abilities in other ways too. Apple restricts access to public APIs for SMS and RCS text messaging to ensure that competitor smartwatches also cannot send or reply to text messages *outside* the iMessage platform.

65.     SMS and RCS are widely adopted international text messaging protocols that establish a unified system for exchanging messages between devices. One or both of the protocols are supported by most smartphones and smartwatches in the United States. iPhone users most commonly send SMS and RCS messages when communicating with Android smartphone users in the iPhone Messages app—resulting in the familiar "green bubbles" in the iPhone Messages app since Android devices also cannot send messages over iMessage. Similarly, if an iPhone user turns off iMessage, the iPhone sends and receives text messages via SMS or RCS through the Messages app.

66.     Apple locks competitor smartwatches out of SMS and RCS messaging through a pair of API restrictions. First, Apple prevents third-party developers and competitor smartwatch makers from developing or using SMS and RCS messaging APIs. This prevents third-party apps from offering alternative full-service SMS and RCS messaging services on the iPhone. Second,

20

Apple restricts use of APIs for the Messages app such that competitor smartwatches connected to an iPhone cannot send SMS or RCS messages via the Messages app. Together, these API restrictions ensure that competitor smartwatches cannot send or reply to text messages received on the iPhone.

67.     There is no procompetitive justification for these restrictions. Android devices operate smoothly and securely without restricting third-party apps from using APIs to provide full-service SMS messaging—and without restricting third-party smartwatches from accessing APIs to send and reply to text messages via smartphone default messaging apps. In other words, Android devices thus provide multiple avenues through which Android-connected smartwatches can integrate with SMS and RCS messaging platforms in order to send and reply to text messages. Apple has the technological capacity to do the same, but chooses not to for anticompetitive reasons. During his deposition in *Epic Games v. Apple*, Apple Senior VP Eddy Cue acknowledged that Apple could have long ago enabled "cross-compatibility with the iOS platform so that users of both platforms would have been able to exchange messages with one another seamlessly," but that Apple decided against doing so.[13]

                                        (iii)    Cellular-Connected Smartwatch Restrictions

68.     Faced with Apple's onerous restrictions, but recognizing the importance of text messaging functionality on smartwatches, competing iOS-connected smartwatch makers have at times tried to provide text messaging functionality to their users by negotiating deals directly with cellular carriers. By working with cellular carriers directly, competitor smartwatches aim to provide their users the ability to send and reply to text messages over the cellular network—

---

[13] Findings of Fact and Conclusions of Law Proposed By Epic Games, Inc., *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640-YGR-TSH (N.D. Cal. Apr. 7, 2021), ECF No. 407 at 15.

21

without relying on the iPhone to send and receive the messages. If feasible, such arrangements with cellular carriers can also enable competitor smartwatches to send and reply to text messages when not in close proximity to an iPhone. This allows users to leave their cell phone at home and rely on only their smartwatch for basic communication and other tasks.

69.     Consumers clearly value this capability. A substantial portion of Apple Watch users choose to pay an additional $50-100 for a cellular-enabled Apple Watch. These users must then also pay approximately $120 per year to cellular carriers in additional data charges to maintain that cellular capability.

70.     Even when competing smartwatch makers manage to navigate the onerous process of negotiating separate deals with cellular carriers, however, Apple's API restrictions interfere with their ability to provide valuable text messaging features to users with iPhones.

71.     The first competitor smartwatch to attempt a cellular-connected smartwatch was Pebble. In November 2015, it announced a partnership with AT&T to allow iPhone users with Pebble Time smartwatches to dictate voice replies to text messages received on their iPhone. Yet Apple's API restrictions meant that sent messages would not appear in the iPhone Messages app after being sent, and the feature could not be used to reply to group messages. Pebble went out of business in 2016, not long after negotiating this workaround to Apple's restrictions.

72.     In 2019, Garmin released Vivoactive 3 Music Cellular/LTE smartwatch in partnership with Verizon. It was the first Garmin device to give iPhone users the ability to send text messages and reply to text messages they received. Garmin's cellular capability would have allowed its users to send and reply to text messages when they did not have their iPhone with them. Garmin's user base includes many runners and endurance athletes, making this capability especially important. Many runners, hikers, swimmers, cyclists, and other endurance athletes need

22

to be able to set off on long workouts and not bring their iPhone along, while retaining the ability to make calls and send text messages.

73.    Android users with Verizon as their cellular carrier could use the Vivoactive 3 Music Cellular/LTE to send and reply to text messages seamlessly, on the same cell phone number, whether their Android smartphone was nearby or not. Yet Apple's API restrictions, and additional barriers built into the design of iMessage, meant that iPhone users would have to *turn off iMessage* if they wanted to use the phone number associated with their iPhone to send or reply to text messages on their Garmin smartwatch. iPhone users frequently do not know how to turn off iMessage. And as explained below, turning off iMessage is not an attractive option even if they do. But as with Pebble, unless users turned off iMessage, Apple's API restrictions prevented messages sent from a Garmin smartwatch from appearing on the paired iPhone. And Apple's design of iMessage further restricted Garmin's smartwatch by rendering nearly useless the ability to send or reply to messages while away from the iPhone. Specifically, Apple engineered iMessage to "claim" the phone number associated with the iPhone in such a way that text messages to that number would be delivered to iMessage (and thus the iPhone) only. This additional change meant that Garmin customers with iPhones could send text messages while away from their iPhones, but *replies* to those text messages would not be delivered to the smartwatch.

74.    Due to Apple's restrictions, Garmin was forced to offer its users a choice: either "turn off the iMessage[] service" or "set[] up your watch to send and receive text messages with a separate watch phone number."[14] This is the choice third-party iOS-connected smartwatches must offer their users today if they want those users to be able to send and reply to text messages. In

---

[14] Garmin, *I'm a Verizon customer with an iPhone device*, https://www8.garmin.com/manuals/webhelp/vivoactive3musicLTE/EN-US/GUID-DE0568CA-B4B5-42E1-B6E5-5DD4651A08FD.html.

23

other words, as a result of Apple's messaging restrictions, Garmin and other iOS-connected smartwatch makers cannot provide their users with the ability to use their phone number to send text messages—even with a data plan negotiated directly with a cellular carrier—unless the user also turns off iMessage.

75.     Critically, turning off iMessage does not require merely shutting off iMessage on the iPhone and converting the Messages app to an SMS or RCS texting app; it requires shutting off iMessage on *any of the user's other devices*—eliminating iPhone owners' ability to send iMessages from an iPad, MacBook, or other Apple device.

76.     In light of all the barriers Apple has historically erected and continues to erect in messaging between iMessage and non-iMessage users—including limiting group text functionality and text reactions, defaulting messages to non-encrypted, and reducing the quality of multi-media messages—iPhone users do not want to abandon Apple's default messaging platform on any device, let alone all of their devices. Following a review of the Garmin Vivoactive 3 Music Cellular/LTE on a leading wearable technology blog, one commenter wrote:

> I'm sorry, but this is a HUGE issue. You then have to turn off iMessage on your macbook and ipad too. ALL of them, if you have more. But to be fair to Garmin, it's more a flaw in iMessage.[15]

77.     The only alternative for Garmin users with iPhones was to choose a new cell phone number for making calls and sending messages from their iOS-connected smartwatch. This is not a viable alternative, since it requires users to maintain and share two cell phone numbers, maintain separate conversations across two devices, and eliminates the ability of the smartwatch to substitute for some functionalities of the smartphone.

---

[15] DC Rainmaker, *First Look: Garmin Vivoactive 3 Music Cellular/LTE (for Verizon)* (Jan. 7, 2019), https://www.dcrainmaker.com/2019/01/vivoactive-cellular-verizon.html.

78.     Apple's restrictions on phone-number sharing and on texting from a non-Apple smartwatch substantially encumbered Garmin's Vivoactive 3 Music Cellular/LTE. Ultimately, Garmin never again secured a contract with a cellular carrier to bring iOS-connected smartwatch owners the ability to send and reply to text messages.

79.     Apple's interference with phone-number sharing and the difficulties it presents do not affect the Apple Watch. A user of a cellular Apple Watch has a fully integrated text messaging experience: she can send and receive messages on her Apple Watch, regardless of where her iPhone is, and the messages appear simultaneously on her iPhone. Yet to this day, Apple's messaging restrictions prevent competing smartwatch makers from providing users with cellular-enabled smartwatches, since those watches cannot provide iPhone users the ability to send text messages in a manner that would be acceptable to consumers.

80.     There is no procompetitive justification for Apple's restrictions on messaging from a shared phone number. As explained above, the underlying API restrictions with respect to SMS, RCS, and iMessage messaging are not justified on any technological or privacy basis. Instead, Apple has pursued and preserved these restrictions for expressly anticompetitive reasons. Meanwhile, Apple allows an iPhone owner to use the same cell phone number for calls and text messages from her Apple Watch that she uses for calls and text messages from her iPhone. Phone-number sharing is available on third-party smartwatches connected to Android smartphones, yet Apple chooses to preserve these restrictions in order to prevent competing smartwatches from offering users the same capabilities the Apple Watch provides.

> (iv)     Apple's Messaging API Restrictions Foreclosed Competition from Competitor Smartwatches

81.     Apple's interference with basic smartwatch messaging functionality has harmed iPhone users and competing smartwatch makers.

25

82.     ***Apple's messaging restrictions harmed competition from Fitbit.*** Fitbit, the maker of a popular fitness tracker, developed its first smartwatch in 2017. In subsequent years, it developed a series of well-regarded smartwatches compatible with both the iPhone and Android smartphones. In 2018, Fitbit released the Versa. It was $199 (the Apple Watch Series 4 released that year cost $399), offered four days of battery life (the Apple Watch Series 4 offered 18 hours), and was described as lightweight and comfortable (the Apple Watch is often criticized for being relatively heavy and uncomfortable). But Apple's messaging restrictions limited the Versa's functionality, and thus its appeal to iPhone owners. In a 2018 review of the Versa, technology news source The Verge wrote: "Text message notifications from iOS, in particular, are frustrating. They're not remotely actionable on the watch, meaning there's no way to respond to them."[16]

83.     Fitbit made it clear that iPhone users' inability to respond to messages was the result of Apple's restrictions, not its own choices or technical limitations. After the Versa's release, a user on Fitbit's official forum asked, "Will the Versa text message reply options ever work with iPhone? Or will that remain an Android only feature?" A Fitbit forum moderator explained that Apple restricted Fitbit from offering its users the ability to respond to text messages received on the iPhone:

> We are working with partners to find ways to bring quick text replies to messaging apps for iOS . . . we hope to share more on this in the future. We'd love to be able to offer quick text replies to our iOS users now, but Apple operates a closed ecosystem that doesn't allow us to deliver this feature at this time.[17]

---

[16] Lauren Goode, *Fitbit's Versa is its best smartwatch yet*, The Verge (Mar. 26, 2018), https://www.theverge.com/2018/3/26/17163210/fitbit-versa-smartwatch-review-wearable-tech-apple-watch.

[17] Fitbit Community, *Versa text replies and iPhone*, https://community.fitbit.com/t5/Other-Versa-Smartwatches/Versa-text-replies-and-iPhone/m-p/2621821.

84.     This limitation that Apple imposed has continued to plague Fitbit smartwatches. In 2021, Fitbit was acquired by Google. The company's next smartwatch, the Sense 2, was released in Fall 2022 and was compatible with iPhones and Android smartphones alike. The Sense 2 was approximately $100 cheaper than the Apple Watch Series 8 released in September 2022. The Sense 2 also included a number of valuable features not available on the Apple Watch, such as continuous stress tracking, five days of battery life (more than five times longer than the Apple Watch Series 8), and integration with Amazon Alexa and Google Assistant. A 2022 PC Magazine review of the Fitbit Sense 2 praised many of its features and gave the device four stars. But the review observed that, unlike Android users, iPhone users could not respond to text messages on the Sense 2, adding that—as a result—for iPhone users specifically wanting "robust calling and messaging features," their "best bet" would be the Apple Watch.[18]

85.     ***Apple's messaging restrictions harmed competition from Garmin.*** In a 2021 review, The Guardian described Garmin's Venu 2 smartwatch as a "slick, attractive smartwatch that offers world-class fitness features and still lasts longer than big-name competitors such as the Apple Watch."[19] The review observed, however, "You can send quick replies to message notifications when the watch is connected to an Android phone, but not an iPhone."[20]

86.     ***Apple's messaging restrictions harmed competition from Samsung.*** The inability to send and reply to text messages also placed Samsung smartwatches at an immense disadvantage when competing to win over iPhone users. Before 2021, Samsung produced iOS-compatible

---

[18] Angela Moscaritolo, *Fitbit Sense 2 Review*, PC Magazine (Oct. 25, 2022), https://www.pcmag.com/reviews/fitbit-sense-2.

[19] Samuel Gibbs, *Venu 2 review: can Garmin make a good smartwatch?*, The Guardian (July 5, 2021), https://www.theguardian.com/technology/2021/jul/05/venu-2-review-can-garmin-make-a-good-smartwatch.

[20] *Id.*

27

smartwatches that reviewers widely praised. Technology reviewer Tom's Guide described Samsung's Galaxy Watch Active 2 as "a worthy Apple Watch rival."[21] The device retailed for $150 less than the Apple Watch Series 5, was described as more "stylish and elegant," and it had more than twice the Apple Watch's battery life.[22] Samsung improved on other Apple Watch features as well. Tom's Guide praised the Galaxy Watch 3, for instance, for having a keyboard that provided far superior text input than the Apple Watch.[23] Yet users could not use this keyboard to send or reply to text messages if they had an iPhone. Samsung explained on its website that "[s]end and reply functions" were "not supported" due to "compatibility limitations" on iOS.[24]

87.    The effect of this messaging restriction on the Galaxy Watch's ability to compete for iPhone users is apparent from reviews at the time. In a positive review of the Galaxy Watch 3, The Verge explained:

> If you're hoping to use the Watch 3 with an iPhone, my suggestion is: don't. The messaging experience is poor, and the watch will just do fewer things than when it's connected to an Android device. Just get an Apple Watch.[25]

88.    This is precisely the review Apple counts on when it limits competitor smartwatch capabilities. Samsung promised to pose a significant challenge to Apple's dominance in the market for iOS-connected smartwatches, yet Apple's restrictions meant that Samsung smartwatches were

---

[21] Caitlin McGarry, *Samsung Galaxy Watch Active 2 review*, Tom's Guide (last updated Aug. 11, 2021), https://www.tomsguide.com/reviews/samsung-galaxy-watch-active-2.

[22] *Id.*

[23] Kate Kozuch, *Samsung Galaxy Watch 3 review*, Tom's Guide (last updated Oct. 12, 2022), https://www.tomsguide.com/reviews/samsung-galaxy-watch-3.

[24] Samsung, *Samsung Galaxy Watch not receiving message notifications from iPhone*, https://www.samsung.com/us/support/troubleshooting/TSG01202131/.

[25] Dan Seifert, *Samsung Galaxy Watch 3 review: time for a change*, The Verge (Aug. 14, 2020), https://www.theverge.com/21368752/samsung-galaxy-watch-3-review-price-specs-features.

a disappointment for iPhone users, and they failed to gain traction. In 2021, Samsung launched the Galaxy Watch 4 and stopped supporting iOS compatibility.

89.    ***Apple's messaging restrictions harmed competition from Google.*** Google has long been the developer of Wear OS, the largest smartwatch operating system outside Apple's operating system for the Apple Watch. Motorola, Samsung, Fossil, and many other smartwatch manufacturers have used Wear OS as the foundation for some or all of their smartwatches.

90.    At first, Wear OS was not compatible with iOS, a decision Google blamed on Apple's API restrictions. In 2014, Google product manager Jeff Chang told the Huffington Post that Google was interested in expanding to iOS, but explained, "It's not always completely up to us right? There are technical constraints, API constraints so we are trying really hard." He added, "We would love to have [Wear OS] reach as many people as possible but I'll just say that it's not 100 per cent under our control."[26] As a result of these limitations, the earliest Wear OS smartwatches from Samsung and other manufacturers were also not iOS-compatible.

91.    In 2015, Google made Wear OS compatible with iOS and released an iOS app that enabled Wear OS devices to connect to iPhones. Yet as a result of Apple's messaging API restrictions, as well as other restrictions and conduct discussed in this complaint, iOS-connected Wear OS devices struggled. In a 2017 article, The Verge explained these limitations and attributed them to Apple policies:

> Android smartwatches have worked with the iPhone for a year and half now, but with extremely limited functionality. Those limitations come mainly from Apple policies: no access to iMessage replies and difficulties getting third-party apps and faces on the watch.[27]

---

[26] Thomas Tamblyn, *Android Wear For iOS Not Ruled Out Hints Google Exec*, The Huffington Post UK (Oct. 23, 2014), https://www.huffingtonpost.co.uk/2014/10/23/google-android-wear-ios_n_6035512.html.

[27] Dieter Bohn, *Android Wear with an iPhone still can't compete with the Apple Watch*, The

92.     The Verge went on to explain that, with the 2017 release of Wear OS 2.0, Google had sought to "run[] around" Apple's "roadblocks to features" with technical improvements, including installing an app store directly on Wear OS devices. The trouble, the article observed, was that "for everything that works, there are several things that really don't." It went on to emphasize the fact that Apple was choosing *by policy* to restrict non-Apple smartwatches from "access[ing] iMessages beyond seeing incoming notifications arrive."[28] The article concluded bluntly:

> If you're interested in a smartwatch paired to an iPhone, there's only one question: why should you get something besides the Apple Watch? For [Wear OS], the answer is the same today as it was 18 months ago: if you want a round watch instead of a square one. That's kind of it. . . . I will happily grant that Google is facing an uphill battle trying to get [Wear OS] working with what is essentially a hostile platform – iOS – one that's not at all interested in making life easy for third-party smartwatches. . . . I prefer round watches, but not as much as I prefer having a smartwatch that doesn't remind me of its profound limitations every time I get a notification.[29]

93.     Google did not actually manufacture its own Wear OS smartwatch until 2022, when it launched the Pixel Watch on Wear OS 3. The Pixel Watch received positive reviews—it was less expensive, more comfortable, and had longer battery life than an Apple Watch, and it was described by one Wired reviewer as "arguably the prettiest full-featured smartwatch I've ever seen."[30] Yet the Pixel Watch was not iOS-compatible.

---

Verge (Feb. 21, 2017), https://www.theverge.com/2017/2/21/14678288/android-wear-2-0-iphone-review-apple-watch.

[28] *Id.*

[29] *Id.*

[30] Julian Chokkattu, *Google's Long-Awaited Pixel Watch Is Finally Here*, Wired (Oct. 6, 2022), https://www.wired.com/story/google-pixel-watch-features-release-date-price/.

94.     Google publicly stated that it decided not to compete with Apple in the iOS-connected smartwatch market due to Apple's messaging API restrictions. When asked on a media call why the Pixel Watch would not be iOS-compatible, Google reportedly explained that "the main reason was that they didn't feel like they could get the integration they wanted, due to Apple's lack of API for the messaging (both models) and phone number sharing pieces specifically (cellular models)."[31]

95.     The decision by Google—one of the largest and most sophisticated tech companies in the world—not to compete in the iOS-connected smartwatch market shows the effectiveness of Apple's interference with APIs, messaging APIs in particular, on even the most promising and well-resourced potential competitors. If Google cannot offer users a full-featured smartwatch, then many device manufacturers will simply choose not to compete with the Apple Watch. The result is that many of the most sophisticated smartwatches on the market are no longer iOS-compatible, reducing the choice available to iPhone users and enabling Apple to charge supracompetitive prices in the absence of robust competition.

### b.  Apple's Restrictions on Notification APIs

96.     Smartwatches display notifications that, in the absence of interference, permit users to quickly and conveniently receive and respond to prompts (e.g., calendar invites, news alerts, or rideshare updates). Users consider notifications to be among their smartwatches' most important features. Notifications devolve into nuisances, however, if the user cannot select the types they want to exclude (e.g., social media activity and promotional offers), or cannot act on the notifications that they receive (e.g., calendar invites or two-factor authentication requests). Apple

---

[31] DC Rainmaker, *Google's Pixel Watch Hands-On: Here's What You Need to Know* (Oct. 6, 2022), https://www.dcrainmaker.com/2022/10/googles-pixel-watch.html.

31

understands this dynamic and takes advantage of it, utilizing the DPLA to strategically prevent competitors from accessing the APIs that would allow their smartwatch users the same type of control over notifications available to Apple Watch users.

> (i) Apple blocks notification tailoring for competitor smartwatches

97.     Smartphones today are flooded with notifications. Apple Watch users have long enjoyed curation tools that permit them to channel the firehose of notifications to which smart device users are commonly subjected. They can choose to block notifications from specific apps while allowing others through. They can customize their notifications so that some go only to their iPhone and others go only to their Apple Watch (rather than having to choose both or neither). And they can stop their Apple Watch from receiving notifications while their iPhone is unlocked (so that their wrist is not buzzing and chirping to notify them of updates that they are already seeing on their iPhone).

98.     Competitor smartwatches are unable to tailor app or message notifications depending on whether the home screen of the iPhone is locked or unlocked, nor can users of competitor smartwatches set notifications to be delivered to the smartwatch only in particular circumstances. Competitor smartwatch users regularly complain that they receive iPhone notifications on their smartwatches even while they are staring at their iPhone. Third-party smartwatch users must receive every notification on the iPhone in addition to their smartwatch, causing them to hear double the dings, rings, and vibrations for every app or message notification when notifications on both devices are turned on.

99.     Apple restricts competitor smartwatch users from tailoring *which* apps deliver notifications to an iOS-connected smartwatch. As a result, owners of competitor smartwatches, such as Garmin smartwatches, are forced to withstand a torrent of irrelevant app notifications on

their smartwatch. The only alternative is to turn off notifications for a given app *on the iPhone*—

which is not an option for many iPhone users and many apps.

100.    Each of these notification-tailoring API restrictions harms smartwatch competition.

Garmin smartwatch users frequently complain about Apple's restrictions. As one Garmin user on

the Garmin Fenix Reddit forum wrote:

> I recently bought Garmin 6X Pro and I am really annoyed when I use my phone
> (it's unlocked) and still receive notifications on my watch too. Is there any way how
> to mute notifications on my watch when phone (iphone, ios 14) is unlocked like it's
> set on apple watch?
>
> Also is there anyway how can I mute notifications on locked phone and receive
> them only on my watch? Ie. Same thing like on apple watch. Currently I receive
> notifications on my phone and then on my watch 1 sec later. That's quite annoying
> if I have phone on the desk and I receive two notifications of same thing.[32]

101.    The top comment summarized the source of the problem succinctly: "Apple

handicaps the notification system to a Garmin device. . . . It's really awful and this is 1000% better

on Android."[33] The Android operating system enables users to tailor the delivery of notifications

to their smartwatch, including based on whether the smartphone is locked or unlocked.

102.    Another Garmin user posted to Reddit in 2023 to complain about the inability to

limit app notifications: "My watch vibrates all the time due to recieving [*sic*] the same notifications

my phone does, instagram, news etc. [*sic*] Is it possible to choose which notifications I want to

receive?"[34] The top commenter responded, "On an iPhone, it's an all or nothing choice."[35] The

---

[32] Reddit, *How to mute notifications on 6X pro while I use my phone?*,
https://www.reddit.com/r/GarminFenix/comments/kqixf0/how_to_mute_notifications_on_6x_pr
o_while_i_use/.

[33] *Id.*

[34] Reddit, *How do I stop my watch from receiving all the same notifications my iPhone does?*,
https://www.reddit.com/r/Garmin/comments/1593om9/how_do_i_stop_my_watch_from_recievi
ng_all_the/.

[35] *Id.*

next commenter wrote, "Sorry but no. This is the feature I hate the most."[36] Posts on other Reddit

forums repeat the same sentiment: "[T]his is dreadful. i just moved from android to iphone. i

definitely do not want all my notifications on my watch, just a few important ones. i could

customise that on android. . . . is this another way apple tries to move people to their own watch

rather than garmin[?]"[37]

                                              (ii)      Apple blocks actionable notifications for competitor smartwatches

103.     Apple also restricts access to APIs that allow users to act on notifications they

receive. Without the ability to quickly act on a notification, receiving the notification on the

smartwatch is significantly less valuable, as the user must still take out the smartphone to handle

it. The inability to take action on notifications has long harmed smartwatch competition.

104.     The problems were captured in a 2015 review of the Pebble Time smartwatch on

technology website ZDNet:

> Paired with the Asus ZenFone 2, which runs Android 5.0, Pebble Time is handy. I've responded to incoming texts by voice and canned answers and I've triaged email by archiving useless messages. Then I switched phones. As soon as I put my SIM card in an iPhone 6 for some app testing and then paired the Pebble Time, it was like I was wearing a completely different smartwatch, and not in a good way. Gone were mostly all notification actions, save for the ability to dismiss them. No more replying to texts, either by voice or by pre-programmed responses. . . . [T]rying to use the Pebble Time with an iPhone – especially after using it with an Android handset – was like being woken by someone dumping a bucket of cold water [on] my head. To say it's been frustrating is an understatement. In fairness, I can't really blame Pebble here. . . . All of the "missing" notification actions on the Pebble Time, for example, are readily available on the Apple Watch. Pebble might be able to add some of these features in the future, but only if Apple's software allows for it.[38]

---

[36] *Id.*

[37] Reddit, *Notification settings for garmin watch/iPhone*, https://www.reddit.com/r/Garmin/comments/slyqtp/notification_settings_for_garmin_watchiphone/.

[38] Kevin Tofel, *Pebble Time and Android? Great! With an iPhone, not so much*, ZDNet (June 12,

105. The reviewer predicted that Pebble's experience was "a precursor" to what would happen if Google added iOS support for smartwatches on its Wear OS platform: "You won't likely get the full smartwatch experience there either."[39]

106. The harm from Apple's interference with actionable notifications continues today. In 2024, Pebble founder Eric Migicovsky reached an agreement with Google to make the PebbleOS mobile operating system open source so that he could relaunch Pebble devices. In 2025, Migicovsky relaunched Pebble under the name Core Devices LLC. In a post discussing the launch, he explained that Pebble would develop an iOS companion app (and agree to the DPLA restrictions that entails) because a large percentage of the people who expressed interest in purchasing his new Pebble devices own iPhones.[40] Migicovsky acknowledged that, no matter what Core Devices does, "Apple systematically makes it nearly impossible for 3rd party wearable developers to build a smartwatch experience comparable to Apple Watch experience."[41] Among the limitations Migicovsky cited was the fact that it is "impossible" for a third-party smartwatch to "perform actions on notifications (like dismissing, muting, replying)."[42]

107. There is no procompetitive justification for Apple's decision to restrict the ability of third-party smartwatch users to tailor or take action on notifications. It is technologically feasible for Apple to enable these functionalities, as it has for the Apple Watch. Indeed, competitor smartwatches have these functionalities when connected to Android smartphones. Apple could

---

2015), https://www.zdnet.com/article/pebble-time-with-android-vs-iphone-ios/.

[39] *Id.*

[40] Eric Migicovsky, *Apple restricts Pebble from being awesome with iPhones* (Mar. 17, 2025), https://ericmigi.com/blog/apple-restricts-pebble-from-being-awesome-with-iphones.

[41] *Id.*

[42] *Id.*

enable these functionalities with no additional engineering effort—it would only need to permit access to its already-existing APIs. Like all of the restrictions discussed herein, Apple's decision to limit notification APIs harms *its own iPhone customers* with competitor smartwatches, and provides no conceivable benefit beyond coercing those users to purchase Apple Watches instead of competing smartwatches.

### c.  Apple's Restriction on Wallet APIs

108.  Mobile wallets have become a core feature of smartphones. iPhone owners use Apple's mobile wallet ("Apple Wallet") to store and use credit cards, transit cards, boarding passes, concert tickets, student IDs, government IDs, gift cards, membership cards, and a variety of other essential items. A number of states allow residents to store and present their driver's license or state ID using Apple Wallet. Users can even present their license and boarding pass at certain TSA checkpoints using Apple Wallet.

109.  The Apple Watch is integrated with an iPhone user's Apple Wallet by default, such that users can seamlessly call up the Wallet's contents onto their Apple Watch. Apple Watch users can quickly and easily use their watch to pay for coffee, enter the subway, or board a flight. In addition to providing easy access to important cards and tickets, a mobile wallet on a smartwatch can allow an iPhone user to access payment cards and important documents when leaving their iPhone at home, such as on a long run—or in the event their iPhone is out of battery, lost, or stolen.

110.  Samsung and Google both make mobile wallets that work on smartphones and smartwatches alike. As evidence of the importance of mobile wallets for smartwatches, even Garmin—which does not make smartphones and has a far smaller user base—invested the significant resources required to develop a mobile wallet infrastructure called "Garmin Pay" that is available on its smartwatches.

36

111.    With respect to mobile wallets, Apple has once again used iOS API restrictions, enforced through the DPLA, to hobble its competitors. Apple historically restricted the availability of key mobile wallet APIs—including APIs related to near-field communication (NFC) hardware—so that developers could not distribute competing mobile wallet apps to iPhones. The result of this restriction was that iPhone users who had Garmin, Samsung, or Google mobile wallets on their smartwatches could not have the same wallets on their iPhone. This prevented Apple Watch competitors from offering the same sort of integrated mobile wallet solution to iPhone users that the Apple Watch provides.

112.    The refusal to allow mobile wallet apps API access on the iPhone means that a competitor smartwatch can offer a mobile wallet service only where an iPhone user will have to enter all payment cards, transit cards, tickets, and other documents twice—first in Apple Wallet on her iPhone and again in the third-party mobile wallet on her smartwatch. In some cases, transit systems do not permit a user to add a transit card to multiple digital wallets, forcing the user to purchase a new transit card and go through the (often roundabout) process of connecting that transit card to her mobile wallet. And because these mobile wallets are not on the iPhone as well, they cannot readily offer the ability to scan a government ID into the wallet, meaning that Garmin and other Apple Watch competitors are unable to offer iPhone users the ability to store an ID on their smartwatch.

113.    There is no procompetitive justification for this API restriction. There was no technical, privacy, or security reason why Apple could not permit access to NFC and other private APIs necessary for a third-party mobile wallet app to function just as the Apple Wallet does, for the benefit of Apple's own iPhone users with competitor smartwatches. Indeed, in August 2024—following regulatory pressure from the European Commission and the filing of this case, *U.S. v.*

*Apple*, and the associated MDL litigation—Apple announced that it would be providing developers access to the NFC API beginning with iOS 18.1, which was released in March 2025.

### 2. The App Review Guidelines

114. In addition to cementing Apple's API restrictions, the DPLA also requires parties to agree to comply with Apple's App Review Guidelines, a separate set of requirements that govern Apple's review of apps for distribution on the App Store. *See, e.g.*, DPLA § 6.3 ("You acknowledge that Apple may cease allowing download by end-users of some or all of the Licensed Applications, or take other interim measures in Apple's sole discretion, if Apple reasonably believes, based on human and/or systematic review, and, including without limitation upon notice received under applicable laws, that . . . [y]ou have violated the terms of the Agreement, this Schedule 1, or other documentation including without limitation the App Review Guidelines"). As discussed above, every maker of iOS-connected smartwatches must sign the DPLA because Apple requires companies to sign the DPLA before distributing apps through the App Store, and Apple requires users of competitor smartwatches to download a smartwatch companion app from the App Store in order to fully connect their smartwatch and keep it connected to the iPhone. Apple uses this power to review third-party smartwatch companion and sister apps to limit competition with the Apple Watch.

### a. Apple Uses App Review To Undermine and Delay the Launch of iOS Companion Apps for Competitor Smartwatches

115. Apple has historically used its ability to approve or reject third-party apps under the App Review Guidelines to delay the launch of smartwatch competitors' companion apps, preventing them from competing for iPhone users.

116. This first occurred around the time of the first Apple Watch release: Apple refused to approve the Pebble Time iOS app ahead of the launch of the Pebble Time smartwatch, just

weeks after the release of the Apple Watch, despite the absence of problems with the Pebble Time app. As one technology website explained, "Despite its official release at the end of May [2015], Pebble's new Pebble Time watch [was] not yet fully functional for iPhone users" one week after its release, "as its required iOS synchronization app [was] not yet available in the App Store."[43]

117.    Citing the dates it submitted its app to the App Store, Pebble claimed that Apple intentionally delayed the app's approval and described the delay as "obstruction" designed by Apple to undermine Pebble's competing smartwatch.[44] Shortly after this delay was widely reported, and Pebble users began criticizing Apple on Twitter, Apple approved the Pebble Time app.[45]

### b. Apple Restricts the Discoverability of Sister Apps Designed for Competing Smartwatches

118.    Apple has also used the App Review Guidelines to limit support for competitor smartwatches by iOS sister apps, and to limit the discoverability of those few iOS sister apps that opt to support competitor smartwatches despite Apple's restrictions.

119.    Apple's App Store Guideline 2.3.10 provides, "Make sure your app is focused on the iOS, iPadOS, macOS, tvOS or watchOS experience, and don't include names, icons, or imagery of other mobile platforms in your app or metadata, unless there is specific, approved interactive functionality. Make sure your app metadata is focused on the app itself and its experience."

---

[43] Mark Gurman, *Pebble blames Apple for delayed iOS Pebble Time app as first backers receive watches*, 9to5Mac (June 3, 2015), https://9to5mac.com/2015/06/03/pebble-blames-apple-for-delayed-ios-pebble-time-watch-app-as-first-backers-receive-watches/.

[44] *Id.*

[45] *Id.*

120.    This restriction makes it harder for iOS device users with third-party smartwatches to find in the App Store apps that support, or simply work well with, their smartwatch. Metadata is essential for discovery of any app. App metadata provides the keywords that users might search for to discover a particular app. For instance, the Starbucks app might include "coffee" in its app store metadata to ensure that customers searching for coffee-related apps find its app, even though coffee is not in the name and may not even feature significantly in the app description. In the same way, a third-party sister app that provides valuable functionality with Garmin smartwatches, for instance, is restricted by Apple from "focus[ing]" on this fact in metadata to ensure that Garmin smartwatch users find the app at issue.

121.    Apple's App Store Guideline 2.3.10 also enables Apple to dictate the content of App Store listings to prevent iPhone users from finding apps that, while focused on the iPhone or even the Apple Watch, will seamlessly integrate with or otherwise support a competitor smartwatch as well. This includes preventing third-party apps from showing pictures of how they work on iOS-connected smartwatches other than the Apple Watch.

122.    Guideline 2.3.10 substantially limits the incentive of developers to build sister apps that work closely with competitor smartwatches. Since developers cannot advertise this fact in their app store listings or metadata, they have little hope of being found by users of the competitor smartwatch for which their app is designed. For instance, consider a developer who wants to build an app that integrates Garmin health and fitness data with daily readings from a leading electronic scale to provide users with unique insights or exercise encouragement. This app has no means of advertising to users that it works well with Garmin smartwatches (or the electronic scale) without being at risk of being kicked off the App Store. Few developers are willing to invest the time and money required to develop an app that is unlikely to make it into customers' hands.

40

123.    There is no legitimate procompetitive justification for these restrictions; instead, Apple is simply using its control over the App Store to limit competition from Apple Watch competitors. Indeed, in a 2016 email, Apple's Elizabeth Lee wrote that VP Matt Fischer, who is responsible for Apple's App Store, "feels extremely strong about not featuring our competitors on the App Store."[46]

124.    Apple's restrictions on App Store listings harm consumers. Apple Watch users can take advantage of App Store metadata to search for Apple Watch-compatible apps, such as fitness apps that import and display fitness data collected from an Apple Watch. App Store listings for these iPhone apps frequently include images that show the screen displays for their associated Apple Watch apps and describe in detail how information is exchanged between the Apple Watch and the iPhone. This means that users can not only more readily discover and evaluate Apple Watch-compatible iPhone apps, but users also learn about an iPhone app's Apple Watch compatibility *incidentally*, thereby increasing interest in owning or using an Apple Watch.

125.    iPhone users who purchase competitors to the Apple Watch enjoy none of these benefits. Apple's App Store Guidelines entitle Apple to remove an iPhone app listing for merely mentioning a competing smartwatch in App Store metadata so that the app is easier to find (e.g., by searching "Garmin-compatible fitness apps"), for including a picture of how the competing smartwatch companion app will appear to users, or for describing the app's interoperability with competing smartwatches.

126.    Even if Apple never enforced this policy, its existence chills third-party software developers from promoting their apps' capacity to integrate with competitor smartwatches. Moreover, Apple *has* enforced this App Store policy, thereby ensuring that few third-party

---

[46] Email from Elizabeth Lee (May 31, 2016).

developers are willing to take the risk of violating it. In the same month Apple released the Apple Watch, it began blocking updates in the App Store for apps that had historically supported the Pebble smartwatch, citing the content of those apps' listings.

127.    For example, the developer of the marine navigation app SeaNav US reported in April 2015 that Apple had rejected an update for its iOS app because, according to Apple, the app "declare[d] support for the Pebble Smartwatch."[47] Other apps reported having to remove images of Pebble devices in screenshots of their app, as well as any mentions of Pebble in app metadata.[48] The effect of this conduct was to make it more difficult for iPhone users to find apps that supported their Pebble smartwatches, and also to intimidate developers who continued to offer iPhone apps that supported the Pebble after the Apple Watch's release. By June 2016, nearly twice as many apps supported the Apple Watch as supported Pebble.

128.    Apple's App Store Guideline 2.3.10 has a number of negative effects on consumers beyond those described above. It encourages app developers to highlight Apple Watch compatibility even when the app may work better when connected to a competitor smartwatch. It limits users' ability to learn about competing smartwatches through App Store listings. And it bars app developers from accurately describing ways their app may enhance customers' experience of their iPhone by delivering data from a competitor smartwatch or other connected device—as well as any advantages of using a (potentially less expensive) competitor smartwatch over the Apple Watch to deliver that data.

129.    Apple has a long history of restricting the information available to shoppers on the iOS App Store in an anticompetitive manner. In 2024, the EU levied a $2 billion fine against Apple

---

[47] Colin Lecher, *Apple says it removed apps with Pebble compatibility by mistake*, The Verge (Apr. 24, 2015), https://www.theverge.com/2015/4/24/8493483/apple-app-update-pebble-policy.

[48] *Id.*

for practices that included similar restrictions on developers informing consumers of cheaper alternative music apps outside the Apple ecosystem.[49]

130. Apple could easily change the App Store guidelines not to prohibit or intimidate third-party app developers from mentioning competing iOS-connected platforms and devices—or at least competing iOS-connected smartwatches. The only reason for Apple's current policy is anticompetitive: because its executives "feel[] extremely strong[ly] about not featuring our competitors on the App Store."[50] This anticompetitive policy degrades the experience of Apple's own customers by, among other things, making it more difficult for iPhone owners to find apps that work well with third-party iOS-connected smartwatches. It also harms third-party developers, and in turn smartwatch competition, by deterring developers from investing resources in iOS sister apps that support iOS-connected smartwatches other than the Apple Watch.

## C. Apple Uses Updates and Design Changes To Disrupt and Degrade Competitor Smartwatches

131. Apple's anticompetitive conduct extends beyond restrictions it imposes and enforces by contract. Apple frequently updates and redesigns iOS in ways that disrupt and degrade the performance of competitor smartwatches. The harms from Apple's software changes fall into two broad categories: (1) changes that degrade competitor smartwatches' ability to deliver information; and (2) changes that cause competitor smartwatches to disconnect from iPhones.

---

[49] European Commission, *Commission fines Apple over €1.8 billion over abusive App store rules for music streaming* (Mar. 3, 2024), https://ec.europa.eu/commission/presscorner/detail/en/ip_24_1161.

[50] Email from Elizabeth Lee (May 31, 2016).

**1. Apple Has Degraded Competitor Smartwatches' Ability To Deliver Information**

132. Apple has progressively degraded competitor smartwatches' ability to deliver information. At the core of Apple's degradations is "background execution"—the process by which apps (including smartwatch companion apps) operate when they are not open and displayed on the iPhone screen. While background execution is important for a large number of apps, it is particularly important for smartwatches. A smartwatch must continually exchange data with the user's smartphone in order to operate effectively, but users cannot have their iPhone constantly open to their smartwatch companion app. The solution is to have smartwatch companion apps exchange information with both the iPhone and the connected smartwatch on a continual basis in the background.

133. This continual background data exchange is necessary to ensure the smartwatch displays up-to-date information regarding, for instance, user location and weather data (sent by the smartphone); and that the smartphone displays up-to-date information regarding, for instance, health and fitness data (sent by the smartwatch). This two-way data exchange flows through the smartwatch's iOS companion app installed on the iPhone. This exchange takes time.

134. The value of this information is rooted not just in its accuracy, but in smartwatches' ability to send and receive the information when and how users want it. Yet Apple has used its power over iOS to introduce design changes that ensure competitor smartwatches cannot deliver up-to-date information in the manner users want to receive it.

**a. Apple has degraded competitor smartwatches' ability to deliver up-to-date information by reducing time available for background execution**

135. Apple has hamstrung its smartwatch competitors by placing increasingly onerous restrictions on the amount of time smartwatches can spend processing data in the background. In

44

2019 alone, Apple slashed the time available for background execution by 83%. It has imposed further restrictions on background execution time since. As a result, competitor smartwatches do not have sufficient time to exchange relevant information with the iPhone.

136. When the Apple Watch was first released, Apple provided apps with three minutes to complete background execution tasks. This three-minute limit was in place through 2019. Then, with the release of iOS 13 in 2019, Apple introduced its BackgroundTasks framework, which managed the background execution of smartwatch companion apps and other third-party apps, and limited background execution by those apps to approximately *30 seconds*.

137. In slashing background execution time by 83%, Apple dramatically restricted the ability of competitor smartwatches to complete basic tasks in the background. Since the release of iOS 14 in September 2020 and running through iOS 18 in September 2024, Apple has imposed further limits and restrictions on background execution by third-party apps. For instance, beginning with iOS 14, the operating system's algorithms became substantially more aggressive in stopping background execution for apps. These apps were frequently competitor smartwatch companion apps.

138. Due to Apple's restrictions since 2020, competing smartwatch makers today must ensure that their data transfers are completed in *ten seconds* in order to ensure they are completed. Yet ten seconds (or even 30 seconds) is not sufficient time to adequately transfer and keep updated all of the information consumers exchange between their smartwatches and smartphones. Third-party smartwatch companion apps simply cannot transmit all of the information users expect to receive on their iPhone from their smartwatch, as well as all the information users expect to receive on their smartwatch from the iPhone, in these short amounts of time.

45

139.    The Apple Watch does not face similar background execution restrictions. Apple Watch is able to deliver up-to-date health and fitness data *to* the iPhone and retrieve up-to-date weather and location information *from* the iPhone, without running into background execution restrictions.

140.    This is apparent from the result of the European Commission's months' long investigation pursuant to the Digital Markets Act into the interoperability of third-party devices, including smartwatches, with Apple's technology. In its March 19, 2025 Decision, the European Commission ruled that Apple must "allow third parties effective interoperability with the same background execution feature . . . as available to Apple, in a way that is equally effective as the solution available to Apple" and "shall provide interoperability with all functionalities of the background execution feature which are available to Apple's own connected physical devices, including, but not limited to . . . Apple Watch."[51]

141.    Apple's restrictions have far-reaching consequences for third-party iOS-connected smartwatches. For instance, the health and fitness data transferred from competitor smartwatches to iPhone apps is frequently not up-to-date when users open the apps, and the weather information transferred from the iPhone and displayed on competitor smartwatches frequently lags behind current weather conditions. Across many other categories of information, competitor smartwatches lag behind the Apple Watch in the freshness of the data they provide.

142.    iPhone users with competitor smartwatches frequently complain about the slow and infrequent rate at which information is synced between their smartwatch and iPhone and even blame Apple's competitors for the problems Apple has caused. For example, on one Garmin.com

---

[51] European Commission, DMA.100203, *Decision of 19 March 2025 – Final Measures*, https://ec.europa.eu/competition/digital_markets_act/cases/202523/DMA_100203_1655.pdf.

46

forum for owners of the Garmin Fenix 6 smartwatch, a user described needing to manually sync his Fenix 6 to his iPhone any time he wanted to see up-to-date weather information in his Garmin "weather widget." He explained that, as a result, "it's much easier and faster if I just check the weather on the iPhone itself," and "the weather widget [is] basically useless."[52] This user was apparently unaware that Apple's restrictions are what cause the weather widget to not update regularly, and went on to blame Garmin for the problem: "Once again Garmin proved that all the bells and whistles they loaded on the F6 are there just to spec the device and show it's loaded with a lot of features, but in reality most of these features don't have any practical purpose."[53] Because this and other restrictions imposed by Apple are not visible to users, Apple can count on users blaming competing smartwatch makers for the problems Apple causes—and ultimately abandoning their competing smartwatches in favor of the Apple Watch.

143. Apple's limits on background execution have also caused competing smartwatch makers to eliminate certain categories of information from background execution altogether, making those smartwatches less appealing to consumers. For instance, due to Apple's restrictions, Garmin smartwatches do not continually sync health and fitness data to the Apple Health app through background execution. This means that Garmin smartwatch users cannot open their Apple Health app—the default app for health data on the iPhone—and receive an up-to-date snapshot of their health and fitness data from the day. Instead, Garmin users must physically open the Garmin smartwatch companion app, Garmin Connect, on the iPhone foreground for the data to sync to the Health app. This is such a frequent and significant problem for Garmin users that Garmin includes

---

[52] Garmin, *All Weather Widget Issues - Post Here*, https://forums.garmin.com/outdoor-recreation/outdoor-recreation/f/fenix-6-series/225122/all-weather-widget-issues---post-here/1141944.

[53] *Id.*

47

the following among Frequently Asked Questions on its website: "I Have Enabled Data from Garmin Connect to Be Shared But It Is Not Appearing in the Apple Health App."[54] In response, Garmin explains, "Garmin Connect must be open in the foreground to send data to Apple Health."[55]

144.   Apple's restrictions on background execution serve no procompetitive purpose. The company's strict limits on background execution are not technologically necessary. This is demonstrated by the fact that Apple imposes no comparable background execution limits on the Apple Watch. It is also demonstrated by the fact that Android OS does not impose comparably strict limits on background execution. In Android 15, the version of the Android OS released in 2024, apps have three minutes to complete background execution tasks. Android also provides companion devices, like smartwatches, with special permissions for background execution tasks. Moreover, even though Android OS imposes some (more generous) limits on background execution for apps operating on Android devices, users have the option to adjust background execution limits for particular apps at a more granular level. Apple does not offer its users a similar ability to adjust background execution limits for apps that rely heavily on background execution— such as smartphone companion apps. Apple instead imposes strict background execution limits on competitor smartwatches, but not Apple Watches.

---

[54] Garmin, *Sharing Your Garmin Connect Data With Apple Health*, https://support.garmin.com/en-US/?faq=lK5FPB9iPF5PXFkIpFlFPA; *see also* Garmin, *What Garmin Connect Information Can Be Shared With Apple Health?*, https://support.garmin.com/en-IN/?faq=lK5FPB9iPF5PXFkIpFlFPA ("Data will only be sent to Apple Health while the Garmin Connect app is open in the foreground.").

[55] Garmin, *Sharing Your Garmin Connect Data With Apple Health*, https://support.garmin.com/en-US/?faq=lK5FPB9iPF5PXFkIpFlFPA.

**b. Apple has degraded competitor smartwatches' ability to deliver up-to-date information by limiting background execution when iPhones are in Low Power Mode**

145.    Beginning with iOS 13 in 2019, Apple introduced Low Power Mode, a setting that restricts certain smartphone functionalities when the battery reaches a low level. One of the smartphone functionalities that Low Power Mode restricts is background execution by third-party apps—including smartwatch companion apps. These limitations further restrict the already limited background execution resources available to competitor smartwatches.

146.    By default, Low Power Mode turns on *automatically* whenever the iPhone's battery reaches a certain level. For many iPhone users, Low Power Mode turns on every day. Moreover, some iPhone users choose to keep Low Power Mode on at all times to improve their battery performance. The fact that Apple limits the ability of competitor smartwatches to function effectively with iPhones whenever Low Power Mode is on significantly degrades the performance of competitor smartwatches—often on a daily basis and without the user's knowledge. Upon information and belief, Low Power Mode imposes no comparable restrictions on the Apple Watch, even though the Apple Watch also relies heavily on iPhone background execution.

147.    The effect of Low Power Mode on Apple Watch competitors is significant. Third-party smartwatch makers, such as Withings, acknowledge that Low Power Mode disrupts the functioning of their devices. Withings Support says that the setting can disrupt the functioning of its Fitness Level feature.[56] Garmin, too, acknowledges that this Apple setting degrades the performance of its device. Garmin's support page explains, "Low Power Mode reduces the amount of power your iPhone uses when the battery gets low. When this setting is turned on, the Garmin

---

[56] Withings, *ScanWatch Light – I'm having issues with Fitness Level. What should I do?*, https://support.withings.com/hc/en-us/articles/17117469901969-ScanWatch-Light-I-m-having-issues-with-Fitness-Level-What-should-I-do.

Connect app may take longer to update or sync."[57] These reduced update and syncing capabilities are in addition to the restrictions Apple already imposes by limiting background execution on iOS.

148. There is no procompetitive justification for Low Power Mode automatically inhibiting the smooth functioning of competitor smartwatches when Apple does not apply the same limitations to the Apple Watch. Apple benefits from this restriction. Many iPhone users unknowingly degrade the performance of their competitor smartwatches on a daily basis, complaining about performance problems when they have no idea that their iPhone is in Low Power Mode, or that Low Power Mode affects their smartwatch negatively—making them more likely to abandon third-party smartwatches. And even when users know the effect of Low Power Mode, Apple provides them no means to exempt certain apps, such as smartwatch companion apps, from the effects of Low Power Mode in order to preserve smartwatch functionality while simultaneously saving battery.

### c. Apple has degraded the ability of competitor smartwatches to deliver private notifications

149. After iPhones automatically updated to iOS 13 in 2019 or 2020, users learned that they could not receive text messages and app notifications on their competitor smartwatches unless they permitted their iPhone to show previews of those notifications. Apple justified this feature as a "privacy" measure. But the feature *diminished* privacy for competitor smartwatches by requiring notifications and messages to display publicly on their iPhone in order to receive them at all on their competitor smartwatch. Apple imposed this requirement whether or not users wanted notifications on their competitor smartwatch to be visible. Users had no way to receive

---

[57] Garmin, *Some Garmin Connect App Features Are Not Working On My iOS Device*, https://support.garmin.com/en-US/?faq=ZuYlrvyuuP0B6jBJQTJEvA.

50

notifications on their competitor smartwatches unless they eliminated their ability to receive private messages and notifications on their iPhones.

150.    This update caused predictable dismay among users of competing smartwatches. Garmin users took to the company's forums to complain: "What if we do not want our messages to show previews on our iPhones? I like many others want my texts to not display when they come through. Is this going to be fixed? It was never an issue before…"[58] For some users, this update rendered their smartwatches unusable. iPhone users who worked in healthcare, for instance, reported that the nature of their work meant they could not have notification previews publicly displayed on their smartphone screen.[59] Apple continues to impose this restriction to this day.

151.    This purported privacy update affected all third-party iOS-connected smartwatches. One user on Fitbit's community forum wrote:

> I'm so frustrated, I'm ready to sell my Fitbit and look into an Apple Watch. I just love the sleep feature. My versa lite quit giving me notifications after the ios13 update. My husband was able to turn on my on screen notifications for my phone and for some reason I started getting notifications on my Fitbit again. I hate people being able to read my text messages but, it will get me by until Fitbit gets with the program.[60]

This comment once again illustrates one of the most damaging aspects of Apple's conduct. Not only did Apple release a software update that disrupted the experience of iPhone users with Fitbits, but Fitbit users *blamed Fitbit* for the lack of functionality because they incorrectly assumed that it

---

[58] Garmin, *ATTN: iOS Users with issues after updating to iOS 13*, https://forums.garmin.com/apps-software/mobile-apps-web/f/garmin-connect-mobile-ios/193204/attn-ios-users-with-issues-after-updating-to-ios-13/940113#940113.

[59] Garmin, *text message notifications not coming through after iOS 13 update*, https://forums.garmin.com/apps-software/mobile-apps-web/f/garmin-connect-mobile-ios/192559/text-message-notifications-not-coming-through-after-ios-13-update?pifragment-1286=1#pifragment-1286=11.

[60] Fitbit, *Stopped seeing notifications after updating to iOS 13*, https://community.fitbit.com/t5/iOS-App/Stopped-seeing-notifications-after-updating-to-iOS-13/td-p/3779290.

was a problem with Fitbit's software. This is an understandable conclusion when the user sees that the Apple Watch has the very same functionality that the competitor smartwatch lacks. Even if the degraded feature is not itself a deal-breaker for the consumer, the reputation of the competing smartwatch company is damaged, leading consumers to opt for Apple products in the future.

152.    There is no procompetitive justification for Apple's conduct. The very same smartwatches connected to the Android ecosystem do not encounter this problem with private delivery of notifications and messages. Apple has the technical means to allow competitor smartwatches the same granular notification controls available on the Apple Watch. Apple restricts that capability on competitor smartwatches to ensure that iPhone owners have bad experiences on those devices—and choose the Apple Watch instead.

         **d.   Apple has degraded the delivery of health data from third-party smartwatches and the companion and sister apps that support them**

153.    The Health app is the default health-tracking app on iOS. Apple has cemented the app as the central repository for health data collected from a variety of sources. These sources include: wearable devices, including both the Apple Watch and competitor smartwatches, which collect a variety of health metrics and fitness data; third-party apps, including fitness apps such as Strava or the Peloton app, which track detailed data regarding workouts; connected fitness devices, including electronic scales and bicycle computers, which track other specialized health and fitness data; and the iPhone itself, which tracks users' steps, walking distance and steadiness, environmental sound and headphone audio levels, and manually input measurements and data, among other categories of information.

154.    Apple has designed the Health app to display more information from the Apple Watch than from its competitors. For instance, Apple has restricted the display of Heart Rate Variability (HRV) in the Health app to HRV measurements taken using the Apple Watch's method

(the "Standard Deviation of Normal-to-Normal intervals," or "SDNN," method) and has intentionally refused to support HRV measurements taken using the more reliable method employed by competitor smartwatch makers such as Fitbit and Garmin (called the "Root Mean Square of Successive Differences," or "RMSSD" method). This means that iPhone users with Fitbit and Garmin smartwatches cannot see their heart rate variability—an especially important health and fitness metric—in the Health app. This refusal to display measurements from competitors is an anticompetitive act in its own right, since it lacks any procompetitive justification.

155.    There is no procompetitive justification for Apple's differential treatment of its Apple Watch and third-party smartwatches within its Health app. Apple knows that the more iPhone users rely on its Health app for health and fitness data instead of turning to third-party smartwatch companion and sister apps, the more likely those users are to ultimately purchase an Apple Watch. Apple therefore opts to limit iPhone users' access to relevant health and fitness information when they purchase competitor smartwatches, harming its own iPhone users and broader smartwatch competition in the process.

**2.   Apple Disrupts Competitor Smartwatches' Connections to the iPhone**

156.    Apple has also used its power over iOS to introduce a more straightforward barrier to competitor smartwatch functionality: designing iOS in various ways that cause competitor smartwatches to disconnect from the iPhone. This conduct includes issuing software updates that render previously connected smartwatches unable to reconnect to the iPhone, as well as "scare screens," buttons, and app designs that mislead consumers into disconnecting competitor smartwatches.

### a. Apple issues software updates that disrupt competitor smartwatches' ability to connect

157. A frequent problem for Apple Watch competitors is that new iPhones and iOS software updates allow Apple to introduce bugs, delays, and connection issues that degrade competitor smartwatch performance—or in some cases render the devices unable to connect to the iPhone altogether. Among other acts, Apple introduces new hardware and software that it knows or has reason to know will disrupt or substantially disable competitor smartwatches. After this software causes problems for its smartwatch competitors, Apple deliberately delays fixing the issues for weeks or months at a time so that its competitors' devices suffer and the Apple Watch is more attractive to consumers by comparison.

158. One of the earliest iOS-connected smartwatches was the Moto 360, made by Motorola. In 2014, the Moto360 was the top-selling smartwatch in the United States.[61] In a 2014 review, The Verge praised the Moto 360, describing it as the best smartwatch on the market.[62] Apple announced the Apple Watch in September 2014, and first released it in April 2015. Subsequently, in September 2016, The Verge reported that after the release of the iPhone 7, the Moto 360 was "simply unable to pair" with the latest iPhone.[63] The article explained that the same problem affected Fossil and other smartwatches as well, and at the time of writing had persisted for weeks. The reporter described his inability to pair his iPhone to his Motorola smartwatch as

---

[61] Victor Luckerson, *Google's Android Wear Shipping Just 720,000 Units Last Year*, Time (Feb. 11, 2015), https://time.com/3705604/googles-android-wear-shipped-just-720000-units-last-year/ ("The most popular watch [in 2014] was Motorola's round-faced Moto 360").

[62] David Pierce, *Moto 360 review*, The Verge (Sept. 5, 2014), https://www.theverge.com/2014/9/5/6108947/moto-360-review.

[63] Chris Welch, *Many Android Wear watches aren't working with the iPhone 7*, The Verge (Sept. 29, 2016), https://www.theverge.com/circuitbreaker/2016/9/29/13107836/apple-phone-7-android-wear-problems-moto-360.

"annoying" and said the experience "has led me to take a serious look at [the Apple Watch] Series 2."[64] At the end of 2016, Motorola announced it would exit the smartwatch business—at least temporarily. It did not release another smartwatch for three years.

159.    In the same article, The Verge reported that the release of iOS 10 (also in September 2016) had caused "compatibility issues between [Wear OS]" smartwatches and iPhones updated to the new operating system.[65] Compatibility issues caused by Apple's software updates—which it automatically installs on users' iPhones—are a frequent occurrence and cause immense frustration for iPhone owners with third-party smartwatches.

160.    Upon information and belief, Apple knowingly causes compatibility problems with iOS-connected third-party smartwatches through iOS software updates and intentionally delays resolving them to advantage the Apple Watch over its competitors. For instance, following the release of iOS 11 in 2017, Garmin smartwatches, among others, began frequently disconnecting from iPhones—causing them to lose the ability to receive notifications, text messages, or any other data from the iPhone—and also experienced problems syncing data collected by the smartwatches to the iPhone.[66] Apple was aware of this issue affecting Garmin smartwatches, but did not issue a fix for several months.

161.    These problems have only continued. After the release of iOS 14 in September 2020, Garmin users observed that their smartwatches would permanently disconnect whenever they moved out of range of their smartphone, failing to automatically reconnect once back in range as smartwatches ordinarily do (and as the Apple Watch does). Users reported that Garmin's

---

[64] *Id.*

[65] *Id.*

[66] *See, e.g.*, Garmin, *iOS 11 Bluetooth Connection Issues With Garmin Wearable Devices*, https://support.garmin.com/en-HK/?faq=O2rhfvdmhY6uQSUVU3Qvv8.

suggestions were not immediately able to fix the problem. One user concluded based on this "nightmare" experience that "Garmin should say that their watches are not compatible with iphone."[67] Garmin users have reported comparable problems after more recent iOS updates, including being unable to receive notifications on their smartwatch after updating their iPhone to iOS 16 in 2022, and being unable to reconnect their smartwatch to their iPhone after updating to iOS 17 in 2023. Meanwhile, the Apple Watch experiences no comparable problems following iOS updates or following the release of new iPhones.

162. Competing smartwatch makers frequently cannot fix the problems introduced by iOS updates. Instead, they are reliant on Apple to address the problems. Upon information and belief, Apple intentionally delays fixing the problems with its software, giving the Apple Watch (which experiences no similar problems) a significant advantage over its competitors. And even when competing smartwatch makers are able to address these problems with updates or workarounds, the inevitable user frustration causes serious harm to Apple Watch competitors and their customers. Upon information and belief, Apple is frequently aware that its software and hardware updates will disrupt and degrade the operations of competing smartwatches, but releases the updates anyway. Apple also refuses to share sufficient information about its iOS updates and new iPhone releases such that smartwatch competitors can ensure their device operations are not disrupted by the changes to Apple hardware and software. There is no technical or otherwise legitimate reason for Apple's conduct; instead, Apple knowingly degrades iOS users' experiences of competing smartwatches to gain a competitive advantage over other makers of iOS-connected smartwatches.

---

[67] Garmin, *Garmin Connect loses connection, but still connected to iPhone*, https://forums.garmin.com/apps-software/mobile-apps-web/f/garmin-connect-mobile-ios/239623/garmin-connect-loses-connection-but-still-connected-to-iphone.

163.    The intentional nature of Apple's conduct is apparent from the fact that third-party smartwatches that connect to both iPhones and Android suffer no similar problems with Android operating system updates, and Apple Watches suffer no similar iPhone connection problems following updates. It is also apparent from the fact that Apple has shown itself capable of quickly addressing problems with its software updates when they affect *Apple's* iOS-connected products. But Apple acts with no comparable speed when its updates affect competitor iOS-connected products.

### b. Apple imposes disparate "scare screens" that urge users to disable location services necessary for many competitor smartwatch features

164.    Apple encourages iPhone users to stop sharing their location with competitor smartwatches by presenting intrusive and misleading "scare screens" on their iPhone screen that they cannot turn off. In doing so, Apple leads competitor smartwatch users to disable the very location services that are crucial for many competitor smartwatch features to function properly. Those features include, for example, GPS fitness tracking, up-to-date weather, and emergency location sharing. Apple does not, however, bombard Apple Watch users with the same scare screens. Apparently recognizing the essential nature of iPhone location data to smartwatch operations, Apple does not even provide iPhone users the means to turn off iPhone location sharing with the Apple Watch.

165.    Beginning with iOS 13 in September 2019, and continuing through the present, Apple sends iPhone users prompts when third-party apps, including competitor smartwatch companion apps, are accessing iPhone users' location in the background. These prompts initially require customers to give the apps permission to use their location in the background. But even after users give permission, these prompts appear "from time to time," according to Apple, purportedly to remind users that an app is using their location in the background, to "display those

57

locations on a map," and to ask users whether they "want to continue to allow the app to use [their] location in the background."[68]

166.    In the case of competitor smartwatches, Apple presents users with a message that reads, "[Third-party smartwatch companion app] has used your location [X] times in the background over the past [Y] days. Do you want to continue to allow background location use?" This notification is followed immediately by a map that suggests to users that these apps have *tracked them* as they moved about over the Y days listed in the notification. The app then prompts users with two choices: "Change to Only While Using," or alternatively, "Always Allow." If users select "Change to Only While Using," then their smartwatch is no longer able to receive location data via background execution, effectively disabling a variety of location-based functionalities on the smartwatch.

167.    Apple's location scare screen is misleading for a number of reasons. First, the notification presents users with a "map" that implies the third-party app has been tracking them over the course of many days and building a map of their locations over that time. But this map has no meaningful connection to the competitor smartwatch's data collection practices. Garmin, for instance, does not collect users' location information in such a way that it could construct a map of their whereabouts. Garmin accesses users' location data only to provide real-time location information, and does not collect or store that location data over time. Users of Garmin and other third-party smartwatches are nonetheless deceived by Apple into believing they have to turn off access to background location data to protect the privacy of their movements.

---

[68] Apple, *About privacy and Location Services in iOS, iPadOS, and watchOS*, https://support.apple.com/en-us/102515.

58

168.     Second, Apple's scare screens identify the smartwatch *companion app* as using iPhone users' location in the background, without explaining that sharing that location data is what allows their third-party *smartwatch* to access the location data, or that this data is necessary for smartwatches to function effectively.

169.     When customers turn off background location sharing without understanding what they are doing, they may eliminate the smartwatch's ability to provide core functionalities such as up-to-date weather reporting, GPS fitness tracking, and emergency location sharing features designed to send a user's location in the event of an emergency (such as Garmin's Assistance and Incident Detection feature). Apple provides third-party smartwatch owners no ability to turn off these scare screens, so even if users give permission to share their location, and do not choose to disable location sharing when prompted again, they are repeatedly prompted to disable location over the lifetime of the device. For many customers, it is only a matter of time before they disable core smartwatch functionalities accidentally, without understanding what they are doing, or otherwise. And once disabled, Apple does not continue to provide prompts that would allow users to easily reverse their decision. Unsurprisingly, once Apple has what it wants, the prompts go silent.

170.     Despite Apple presenting these scare screens as privacy protections for users, there is no comparable notification presented to Apple Watch users on a periodic basis. This is despite the fact that the Apple Watch receives as much or more location data as competitor smartwatches. As mentioned above, Apple does not even provide iPhone users with a method to stop sharing their location data with a connected Apple Watch—presumably because it recognizes that such data is essential for a smartwatch to operate effectively.

171. Apple increased the disruptive effect of these location sharing scare screens in iOS 14, released in September 2020. With iOS 14, Apple allowed users to limit smartwatch (and other) companion apps to receiving only "approximate location" data, and indeed started prompting users to do so. But Apple did not enable and prompt users to similarly limit its Apple Watch.

172. There is no procompetitive justification for this conduct. There is no legitimate technological or privacy basis for Apple to present users with repeated and misleading notifications about background location data access by their smartwatch. This is apparent from the fact that Apple sends users no comparable prompts with respect to the Apple Watch, despite the fact that the Apple Watch uses customers' location in the background just as competitor smartwatches do.

173. This type of anticompetitive conduct is not a new entry in Apple's playbook. After a 2021 trial on antitrust and unfair competition claims, a Northern District of California court ordered Apple to allow apps to point customers to methods of payment outside the App Store. *See* Order Granting Epic Games, Inc.'s Motion to Enforce Injunction, *Epic Games, Inc. v. Apple Inc.*, No. 20-cv-05640-YGR (N.D. Cal. Apr. 30, 2025), ECF No. 1508 at 2. In a 2025 ruling, the court found Apple responded to this order with a coordinated campaign to "thwart[] the Injunction's goals," including having high-ranking executives "outright lie[] under oath" and the company "at every turn" implementing "the most *anti*competitive option." *Id.* One of Apple's anticompetitive acts aimed at thwarting the injunction was implementing "scare screens" that would pop up to deter customers from following links to alternative means of payment. *Id.*

174. These scare screens would pop up when customers clicked on a link provided by an app developer to an alternative means of payment. Apple's documents reflected that Apple chose the language in its pop up screens to ensure that the customer's choice to use alternative payment methods "sounds scary." *Id.* at 36. When an Apple employee suggested that the company

60

could make its scare screens "even worse" by "add[ing] the developer name rather than the app name"—to further unnerve customers deciding whether to click—another Apple employee responded, "ooh – keep going." *Id.* at 36-37. Apple ultimately chose this "even worse" option of displaying developers' names on the scare screen, a choice the court characterized as Apple again choosing "the most anticompetitive option." *Id.* at 37. Apple CEO Tim Cook also personally recommended changes to make the warning screen more intimidating to consumers. *Id.* at 38. Based on Apple's violation of the Court's injunction, the court held Apple in civil contempt and referred Apple and its Vice President of Finance to the United States Attorney's office for potential criminal contempt prosecution. *Id.* at 63, 78.

### c. Apple imposes disparate Bluetooth controls that cause competitor smartwatches to disconnect from the iPhone

175. When an Apple Watch user turns off Bluetooth from their iPhone Control Center (the screen accessed by swiping down on the top-right corner of the phone), the iPhone by design still maintains its Bluetooth connection with the Apple Watch. In contrast, when a competitor smartwatch user turns off Bluetooth in the Control Center, it severs the Bluetooth connection with the competitor smartwatch. Such severing entirely disables the competitor smartwatch from communicating with the iPhone, harming iPhone users and competition with the Apple Watch.

176. Bluetooth connections are essential to smartwatch functionality. Bluetooth is a wireless technology that allows short-range radio communication between two devices. Both competitor smartwatches and the Apple Watch rely on Bluetooth connections to exchange information between iPhones and smartwatches continuously throughout the day. A consistent and reliable Bluetooth connection to the iPhone is thus essential for the smooth functioning of a smartwatch.

61

177.   One of the features that sets the Apple Watch apart from its smartwatch competitors is the consistency and reliability of the Apple Watch's connection to the iPhone. This consistent and reliable connection ensures smooth data transfer between the Apple Watch and the iPhone—including the background execution that ensures data sent to or from the Apple Watch is up to date.

178.   The Bluetooth connections of third-party iOS-connected smartwatches are far less reliable than Apple Watch Bluetooth connections. One reason is that Apple has designed iOS to ensure that competitor smartwatches' Bluetooth connections are consistently severed by iPhone users, while Apple Watches' Bluetooth connections are not. Apple achieved this by adding a toggle button to the iPhone Control Center that, when clicked, disconnects all devices connected to the iPhone by Bluetooth, but leaves the Apple Watch's connection undisturbed.

179.   Not severing the Apple Watch Bluetooth connection is a reasonable choice by Apple. The Apple Watch relies on Bluetooth for a number of its functionalities, and Apple likely assumes, correctly, that if a user is wearing the Apple Watch, she does not intend to disable it when she toggles Bluetooth off. Disabling Bluetooth while wearing an Apple Watch is second nature to many iPhone users, who may use the Control Center to quickly disconnect Bluetooth headphones, speakers, or other devices while going about their day with a functioning Apple Watch. Users also frequently toggle Bluetooth off in the Control Center by accident.

180.   Despite these advantages to preserving smartwatch Bluetooth connections, Apple uses the Bluetooth toggle to sever the Bluetooth connections of competitor smartwatches. Users have no option to keep their competing smartwatches connected to their phones when they toggle off Bluetooth. Neither competing smartwatch makers nor their customers are able to avoid having

their smartwatch Bluetooth connections severed every time they toggle Bluetooth off in the Control Center.

181.    The European Commission recently recognized the harm of this differential treatment by Apple in its March 2025 Decision under the Digital Markets Act. The Commission explained that the ability to disable Bluetooth connections of smartwatches "through iOS Control Centre," has a "resulting impact on background execution" between the iPhone and competitor smartwatches, as well as other connected devices.[69] The Commission therefore ordered that Apple could only impose such a "limitation or choice on the background execution capabilities of third-party iOS companion apps . . . if the user can take the same action with the same limiting effect regarding Apple's most comparable connected physical devices."[70]

182.    There is no procompetitive justification for Apple's differential treatment of competitor smartwatches: if it is important to iPhone users that their Apple Watches stay connected when Bluetooth is switched off in the Control Center, it is presumably just as important to iPhone users that their third-party smartwatches stay connected when Bluetooth is switched off in the Control Center. Apple could provide the same Bluetooth functionality to competing smartwatches as it provides to the Apple Watch, but chooses not to, degrading users' experiences of those devices in the process.

### d. Apple imposes disparate requirements with respect to smartwatch companion apps that cause competitor smartwatches to disconnect

183.    Another restriction Apple imposes on competing smartwatches is the need to leave the companion app open in the background. Third-party iOS-connected smartwatches cannot

---

[69] European Commission, DMA.100203, *Decision of 19 March 2025 – Final Measures*, https://ec.europa.eu/competition/digital_markets_act/cases/202523/DMA_100203_1655.pdf.

[70] *Id.*

63

exchange information with an iPhone if the companion app for the smartwatch is not open in the background—meaning it is visible in the "app switcher" screen and has not been "force quit" by swiping up on the app to remove it from that screen.

184.    The requirement that the third-party smartwatch app remain open in the background disrupts the functionality of third-party smartwatches. Google forums are full of users who purchased iOS-connected Wear OS smartwatches and discovered that the connection was broken every time they closed the Wear OS app in the background. In one forum discussion, a number of Wear OS smartwatch users complained about their smartwatch repeatedly disconnecting from their iPhone for this reason:

- Jess Langdon (Nov. 2, 2018): I have connected my new watch to my iPhone with no issue but it keeps disconnecting, it seems fine when I have the wear OS app open on my phone, must I keep it open at all times in order to stay connected?

- Google user (Dec. 17, 2018): Have you received any help from someone who is using an iphone? I am having the same issue and hoping there is a work around aside from preventing yourself from closing the app and leaving it running.

- Abdul Basit Memon (Apr. 1, 2019): Have you received any solution? I am also facing this issue in iPhone, I have to keep open app otherwise it disconnect...[71]

185.    As these comments suggest, many iPhone users routinely eliminate the background apps on their device to declutter their screens or in an attempt to save on battery life. Yet once

---

[71] Google, Wear OS by Google Help, *Must I keep the wear OS app open on my iPhone to stay connected?*, https://support.google.com/wearos/thread/496842/must-i-keep-the-wear-os-app-open-on-my-iphone-to-stay-connected?hl=en.

these users acquire a competitor smartwatch, this habitual process causes them to disconnect their smartwatch from all background execution—stopping the syncing of key health and fitness data between the smartwatch and iPhone and many other processes that are essential for an iOS-connected smartwatch to function effectively. Garmin's support page lists a number of specific smartwatch functionalities that may not function if an iPhone user closes the Garmin app in the background: "Activity audio prompts," "All sync-related functions (auto-sync activities, steps, updates)," "Bike alarm notifications," "Calendar widget," "Connect IQ™ app functions, including third-party apps," "Connect IQ™ watch faces," "Connected GPS," "Find My Phone," "Garmin device connection alerts," "Golf courses," "GroupTrack," "Incident Detection," "LiveTrack," "Music controls for your smartphone," "Strava Beacon," and "Weather."[72]

186.    None of this is a problem for Apple Watch users because Apple does not require the Apple Watch to have an app open in the background to stay connected. There is no procompetitive justification for Apple's conduct or Apple's disparate treatment of competitor smartwatches. There is no technical reason Apple must require competing smartwatches to have an app open in the background. The Apple Watch likewise has a companion app—the Watch app—that supports the device like a third-party smartwatch companion app, but the Apple Watch continues to function if the Watch app is force quit. Not only do Apple Watches operate effectively without having an app open in the background, but so do many other devices, including competitor iOS-connected earbuds.

187.    Recognizing the harm of this disparate treatment, in its March 2025 Decision, the European Commission ordered Apple to make "the action of a user terminating a companion or

_____

[72] Garmin, *Some Garmin Connect App Features Are Not Working On My iOS Device*, https://support.garmin.com/en-US/?faq=ZuYlrvyuuP0B6jBJQTJEvA.

sister app in the app switching menu ('force-quitting') . . . as well as the resulting impact on background execution with the connected physical device" equivalent between competitor smartwatches and the Apple Watch.[73] It reached this conclusion after a months-long investigation into, among other things, the technical feasibility of making the changes it ordered.

## III.     Overall Anticompetitive Effects of Apple's Conduct

188.    Each of the tactics described above is anticompetitive on its own. Considered as a whole, Apple's conduct is a highly effective anticompetitive scheme to acquire and maintain a monopoly in the market for iOS-connected smartwatches—forcing out rivals and precluding new entrants, restricting supply, harming competition, and enabling Apple to charge supracompetitive prices for its Apple Watch as a result.

189.    Through its anticompetitive conduct, Apple has substantially foreclosed competition in the market for iOS-connected smartwatches. In 2023, the Apple Watch accounted for approximately 79% of the iOS-connected smartwatch market.[74] Apple's share of the iOS-connected smartwatch market has also increased over time. Meanwhile, as a result of Apple's conduct, three of the largest tech companies in the world—Google, Meta, and Samsung—have either exited or chosen never to enter the market for iOS-connected smartwatches. Others have been forced out of business (Pebble) or temporarily exited the market (Motorola), further cementing Apple's market dominance. Apple's anticompetitive practices challenged here remain an ongoing barrier to entry or re-entry.

---

[73] European Commission, DMA.100203, *Decision of 19 March 2025 – Final Measures*, https://ec.europa.eu/competition/digital_markets_act/cases/202523/DMA_100203_1655.pdf.

[74] Felix Richter, *Apple's Tightly Knit iPhone Ecosystem*, Statista (Mar. 25, 2024), https://www.statista.com/chart/31973/likelihood-of-iphone-users-using-other-apple-devices/.

190.    If, in the alternative, the relevant market is defined as the market for smartwatches, Apple has substantially foreclosed competition in that market as well. Apple has an approximately 60% share of the smartwatch market.

191.    There is no legitimate business justification for Apple's conduct. Even if there were legitimate business objectives for certain of the restrictions and technical limitations imposed on competitor smartwatches, those objectives could be achieved by less restrictive means. Apple continues to engage in the above anticompetitive conduct in order to continue foreclosing competition in the market for iOS-connected smartwatches or, in the alternative, the market for smartwatches generally.



192.    As a result of Apple's conduct, Apple has been able to increase prices and charge supracompetitive prices for the Apple Watch without losing market share. The flagship Apple Watch Series 3 was $329 when released in 2017. The base model Apple Watch Series 9, released in 2023, cost $399, and $499 with cellular service enabled. Above is a chart of flagship Apple Watch prices, with cellular data enabled, over time, as well as a comparison to prices for cellular-enabled Samsung Galaxy Watches and Google Pixel Watches during the class period.

193.    As shown above, prices for Apple Watches have been as much as 66% higher than the comparable or superior Galaxy Watch during the class period, and as much as $100 higher than

67

the comparable or superior Google Pixel Watch. These pricing differentials likely understate Apple's supracompetitive prices. Other comparable or superior Android smartwatches, such as Samsung's Galaxy Watch 6 Classic and OnePlus's Watch 2, sell for $320 and $245 respectively.[75] Apple Watch prices have also consistently been higher than comparable or superior iOS-connected smartwatches, such as the Fitbit Versa 4, which sold for $229 at the time of its release in 2022.[76]

194. Apple has maintained its supracompetitive prices even as low-cost iOS-connected smartwatches have attempted to enter the market. The Amazfit Active 2, a widely praised iOS-compatible smartwatch, retails for as low as $99.99, while Apple's budget smartwatch offering, the Apple Watch SE, retails for $249.

195. In addition to enabling continued supracompetitive pricing, Apple's restrictions substantially degrade the functionality and user experience of third-party iOS-connected smartwatches.

196. Apple's restrictions on competitor smartwatches also harm all smartphone and smartwatch users by restricting the supply of competing smartwatches and smartwatch sister apps, and by artificially restricting the network of customers that can seamlessly message with one another.

## IV. Relevant Product Market

197. The relevant product market in this case is the market for iOS-connected smartwatches. In the alternative, the relevant product market is the market for smartwatches. In the market for iOS-connected smartwatches, Apple competes with other manufacturers to supply

---

[75] Victoria Song, *The best smartwatches for Android*, The Verge (last updated July 8, 2025), https://www.theverge.com/23449363/best-android-smartwatches-wear-os.

[76] Kate Kozuch, *Fitbit Versa 4 review*, Tom's Guide (last updated Feb. 13, 2024), https://www.tomsguide.com/reviews/fitbit-versa-4.

smartwatches to iPhone users. The alternative market for smartwatches includes smartwatches that connect solely to iPhones, i.e., Apple Watches; smartwatches that connect solely to Android devices, such as Google's Pixel Watch; and smartwatches that connect to Android devices and iPhones alike, such as those made by Garmin.

198. Smartwatches' core functionalities include the extension and enhancement of smartphone capabilities. The relevant smartphone market in this case is the market for iOS smartphones or, in the alternative, the market for smartphones generally. The market for iOS smartphones is a market comprising Apple's iPhone devices running the iOS mobile operating system. The market for smartphones generally comprises Apple's iPhone as well as competing smartphones primarily running the Android mobile operating system. Under either smartphone market definition, Apple has monopoly power that it uses to exercise control over the relevant smartwatch market. In the alternative to the two markets defined above, Apple also competes in the relevant market for performance smartphones, which excludes entry-level smartphones. Apple has a monopoly share of that market as well.

**A. Smartphones and Smartwatches Are Separate Products**

199. Smartphones and smartwatches are separate products that must work in close coordination. Smartphones and smartwatches are sold separately: many consumers who buy smartphones do not buy smartwatches. And when smartphone users do buy smartwatches, they typically shop for the two products separately. But even when buying the products separately, a consumer's choice of smartwatch is influenced by the consumer's choice of smartphone. A primary function of a smartwatch is to serve as an extension of a user's smartphone, providing easy, portable access to various smartphone functions. Indeed, many leading smartwatches cannot even be set up and used by their owners unless the owners connect the smartwatch to a smartphone. Samsung Galaxy watches running the Wear OS operating system cannot be used without a

smartphone. The Apple Watch, too, requires the user to have an iPhone to set up and use the device.[77] Apple uses this need to attach a smartwatch to a smartphone to discriminate against Apple Watch competitors. It uses its control over iOS (and the timing of iOS updates and subsequent fixes) to disrupt competitors and strategically restrict access to critical functionalities so that Apple retains control over those portions of the smartwatch market it can dominate, while allowing competitors access to the market where it benefits Apple.

200.    Even for those smartwatches that permit users to set up the devices without a smartphone, the resulting device is severely limited. Many essential smartwatch features presuppose that the user owns a smartphone. Moreover, with the exception of the minority of smartwatches connected to a cellular data plan, the smartwatch not connected to a smartphone will have limited functionality in day-to-day life because the user will lack access to the internet throughout the day. Even certain fitness-oriented devices that do not require a smartphone have more limited capabilities when not synced with a smartphone because they rely on a smartphone's location data, including to provide accurate weather and altitude readings, and rely on certain smartphone apps to sync information with the smartwatch on an ongoing basis.

### B.  Market for iOS Smartphones

201.    Smartphones are mobile devices that combine the functions of cell phones with those of a mobile computer, enabling a user to make phone calls, send emails and text messages, and use a seemingly endless variety of apps on a single mobile device. The majority of smartphones in the United States are iPhones running on Apple's iOS mobile operating system.

---

[77] The only exception is Apple Watches relying on "Family Setup," a feature that allows the Apple Watch to be set up using a family member's iPhone. This feature enables adults to set up (and control) their child's or parent's Apple Watch from their iPhone. Yet Apple Watches relying on Family Setup still require that a family member own an iPhone. *See* Apple Support, *Set up Apple Watch for a family member*, https://support.apple.com/en-us/109036.

70

Nearly all remaining smartphones run on Google's Android mobile operating system. Apple is the only maker of iOS smartphones, while Android smartphones are manufactured by a variety of companies, including Lenovo, Samsung, and Google.

202.   iOS smartphones are a relevant product market. Most adults in the United States now own either an iOS smartphone or an Android smartphone. Having made the choice to use an iOS or Android smartphone, the vast majority of users continue to purchase smartphones on the same operating system in the future. iOS smartphone users do not consider iOS and Android smartphones reasonably interchangeable and generally do not consider purchasing Android smartphones when it comes time to replace their iPhone.

203.   One reason iOS smartphones are not reasonably interchangeable with Android smartphones is that smartphones are long-lasting devices that users spend considerable time learning to use, customizing, and adding valuable content to before replacing. The desire to continue using apps; to preserve data such as messages, photos, and videos; and to continue using a device that one has learned and grown accustomed to means that users generally continue using smartphones on the same mobile operating system once they have begun. This effect is exacerbated by Apple's efforts to tie its products together and lock its customers into the Apple ecosystem, meaning that iPhone users end up purchasing other Apple devices and find that those devices will not work as well with competing smartphones.

204.   Overall, switching between iOS and Android phones is uncommon and users who purchase iPhones tend to continue purchasing them in the future. In the United States, nearly 90 percent of iPhone users replace their iPhone with another iPhone. The iPhone's growing market share also demonstrates that while some Android users switch to the iPhone, users of the iPhone

71

switch to Android smartphones at a substantially lower rate, suggesting that iPhone users do not view Android smartphones as reasonable substitutes.

205.    In the alternative, Apple competes in the market for smartphones. In this market, Apple's iPhone competes against Android smartphones made by Lenovo, Samsung, Google, and other device manufacturers.

206.    However the smartphone market is defined, neither iOS smartphones nor smartphones generally are reasonably interchangeable with "feature phones" or other cell phones that are not smartphones. These cell phones lack the third-party apps, processing power, and hardware capabilities that allow smartphones to perform a broad range of functionalities. Even if key third-party apps were available for these devices, their lower quality cameras, screens, and processing power would significantly limit the ability to use these devices for many common smartphone tasks, such as taking pictures, posting on social media, playing mobile games, or using videoconferencing tools for work or communicating with friends.

207.    iOS smartphones and smartphones generally are also not reasonably interchangeable with laptops or tablets. Among other differences, laptops and tablets are not designed to be carried in a user's pocket, typically lack a cellular data connection, and have cameras that are inferior to smartphone cameras. As a result of their larger size and lack of cellular data connection, laptops and tablets cannot substitute for a variety of smartphone functionalities, including: text messaging, providing in-car navigation, casual mobile gaming (such as during a commute), or on-the-go music streaming. Moreover, the inferior cameras on laptops and tablets, as well as their size, mean that they cannot function as digital cameras or video recorders, one of the most-used features of modern smartphones.

72

208.    Finally, for the reasons explained in the previous section, smartphones are not reasonably interchangeable with smartwatches.

### C. Market for iOS-Connected Smartwatches

209.    Smartwatches are wrist-worn devices that tell time while extending and improving the capabilities of smartphones. Among other functions, they may allow users to collect health and fitness data that is synced to a smartphone, to view and act on messages and notifications received by the smartphone, to track and share location information, to exercise control over a smartphone and smartphone apps, to access and use a mobile wallet, and to take advantage of an app ecosystem for additional functionalities.

210.    Smartwatches are distinct products not reasonably interchangeable with smartphones, wrist-worn health and fitness trackers, or wristwatches. Since smartwatches generally serve to improve and extend the capabilities of smartphones, they cannot be substituted for smartphones themselves. A smartphone also cannot be worn comfortably on the wrist and lacks the fitness and health tracking features common to smartwatches. Smartwatches are also not reasonably interchangeable for health and fitness trackers because these devices generally provide only the health and fitness tracking functionality of a smartwatch, without the third-party app ecosystem, messaging and notification capabilities, and time-telling provided by smartwatches. In other words, while health and fitness trackers may provide health and fitness data that syncs to a smartphone, they do not improve or extend the capabilities of a smartphone in most other respects.

211.    Finally, smartwatches are not reasonably interchangeable with ordinary wrist-watches because ordinary wristwatches typically only display the time, or potentially include basic tools such as stopwatches and alarms. Ordinary wristwatches lack the powerful internal computing power and third-party apps of smartwatches and typically cannot connect to a smartphone to improve or extend smartphone capabilities.

73

212. The relevant product market in this case is the market for iOS-connected smartwatches. The market for iOS-connected smartwatches is the market for wrist-worn devices that tell time and extend and improve the capabilities of the iPhone. Among other functions, iOS-connected smartwatches may allow users to view and act on messages and notifications received by the iPhone, to track and share location information, to exercise control over an iPhone or iPhone apps, to collect health and fitness data and sync it with an iPhone, to access and use a mobile wallet, and to take advantage of an app ecosystem for additional functionalities. As explained above, users typically do, and often must, own a smartphone before purchasing an associated smartwatch. For the same reason, which smartphone a customer owns is highly determinative of the smartwatch that customer will buy; many smartwatches do not work with, or work less effectively with, certain smartphones. This is particularly true for iPhone users. Manufacturers compete to sell smartwatches to users of iPhones.

213. The market for iOS-connected smartwatches includes those manufacturers who sell smartwatches only to users of iPhones, such as Apple, and manufacturers who sell smartwatches that are compatible with iPhones and Android smartphones alike, such as Garmin. iOS-connected smartwatches constitute a distinct market because there is no reasonable substitute for the devices. Consumers with iPhones who want to purchase smartwatches must purchase iOS-connected smartwatches because other smartwatches, such as those that connect only to Android devices, simply do not work.

214. Marketing materials demonstrate that the markets for iOS-connected and Android-connected smartwatches are distinct. On the homepage for Garmin's Instinct Crossover smartwatch, the third fact that Garmin mentions—after describing the analog hands and accurate

74

timekeeping—is that the watch "connects to Android and Apple devices."[78] Garmin recognizes that smartwatch buyers must first determine if the device is compatible with their smartphone before deciding to buy a given smartwatch.

215.    Just as Apple sells smartwatches that connect only to iPhones, Google and Samsung sell smartwatches that connect only to Android smartphones. Those smartwatches are not reasonable substitutes for iOS-connected smartwatches because iPhone users would have to purchase Android smartphones in order to use those companies' Android-only smartwatches.

216.    If there were only one company that made smartwatches that connected to iPhones, that company could profitably institute a small but substantial increase in price above competitive levels, as the vast majority of iPhone users would not switch to Android smartphones just to access Android-only smartwatches. This demonstrates that the market for iOS-connected smartwatches constitutes a distinct market. In economic terms, a hypothetical monopolist could impose a small but significant non-transitory increase in price (SSNIP) in the market for iOS-connected smartwatches and not lose sufficient volume to make the price increase unprofitable. And in fact, that is precisely what Apple has done with its Apple Watches.

217.    When non-smartwatch users purchase an iPhone, particularly their first iPhone, they typically do not consider the costs and difficulties that will be associated with purchasing a non-Apple smartwatch with their device. In many cases, iPhone buyers purchased their smartphones before smartwatches were mainstream products and are now locked into using iPhone devices for the reasons described above. Even for iPhone buyers who are aware that they might want to extend their device's capabilities with a smartwatch, the difficulties with using a third-party smartwatch alongside an iPhone are not well-publicized, especially by Apple itself, which

---

[78] Garmin, *Instinct Crossover – Standard Edition*, https://www.garmin.com/en-US/p/819761.

largely downplays the restraints it imposes as minor security or privacy measures. For instance, Apple has resisted calls to open up access to iMessage in the European Union by presenting itself as committed to the principle that "[a]ccess to private communications needs to remain fully under the control of users."[79] Even if iPhone users are aware of these restraints Apple imposes on third-party connected devices, they have no means of predicting how these restraints will grow or evolve with subsequent updates to the iOS operating system, and thereby further reduce the functionality of their smartwatch. It is therefore difficult for iPhone buyers to adequately determine the costs they will face due to Apple's restrictions in relevant smartwatch markets at the time of their iPhone purchase. When iPhone buyers do become aware of the problems with competitor smartwatches and the high cost of the Apple Watch, they encounter significant costs in switching away from iPhones. This further compounds the problem because iPhone users cannot simply switch to an Android smartphone in order to purchase or use a non-Apple smartwatch after Apple imposes its smartwatch restrictions.

218.    Finally, for the reasons detailed above, iPhones and iOS-connected smartwatches are not part of a single market. Smartphones and smartwatches are not substitutes for one another. Smartwatches function to extend the capabilities of smartphones and consumers cannot reasonably use a smartwatch in place of a smartphone—or vice versa.

219.    In the alternative, Apple competes in the single market for smartwatches. This market is defined as the market for wrist-worn devices that tell time and extend and improve the capabilities of smartphones. Among other functions, smartwatches may allow users to view and act on messages and notifications received by the smartphone, to track and share location

---

[79] Apple, *It's getting personal* (Dec. 2024), https://developer.apple.com/support/downloads/DMA-Interoperability-Dec-2024.pdf.

information, to exercise control over a smartphone and smartphone apps, to collect health and fitness data and sync it with a smartphone, to access and use a mobile wallet, and to take advantage of an app ecosystem for additional functionalities. Apple competes in this market with its Apple Watch. Other competitors in this market include Motorola, Garmin, Samsung, and Google.

### D. The Relevant Geographic Market is the United States

220.    The United States is the relevant geographic market for sales of iOS-connected smartwatches and smartwatches generally, as well as for iOS smartphones and smartphones generally. Smartwatch and smartphone manufacturers, including Apple, employ differentiated pricing for consumers in the United States and outside the United States in both online sales and sales at physical retail stores. Smartwatch prices for consumers are essentially uniform throughout the United States, but deviate widely from the prices offered to consumers in other parts of the world. The prices of smartwatches and smartphones in the United States are also ordinarily lower than in other parts of the world, meaning that, as a practical matter, U.S. consumers purchase these products within the United States. Moreover, smartwatch manufacturers develop and market separate models in and outside the United States based on prevailing data networks.

221.    Smartwatches and smartphones are also subject to significant federal regulation over the sale of devices in the United States. Among other regulations, smartwatch and smartphone manufacturers must obtain authorization from the Federal Communications Commission (FCC) to sell their devices to U.S. consumers. Notably, the FCC has banned major international manufacturers, Huawei and ZTE, from selling devices in the United States that continue to be sold throughout the rest of the world. Moreover, smartphone prices in the United States are regularly influenced by promotions and discounts offered by national cellular carriers who subsidize the cost of the devices in exchange for signing service contracts. Smartwatches, too, are frequently

purchased at stores for national cellular carriers that do not sell outside the United States, as they are sometimes purchased with accompanying data plans.

222. In the alternative, the markets for iOS-connected smartwatches, smartwatches overall, iOS smartphones, and smartphones overall are worldwide.

## V. Monopoly Power

223. Apple has monopoly power in the market for iOS-connected smartwatches, the overall market for smartwatches, the market for iOS smartphones, and the overall market for smartphones.

### A. Apple Has Monopoly Power in the Markets for iOS-Connected Smartwatches and All Smartwatches

224. Apple has monopoly power in the market for iOS-connected smartwatches in the United States. In the alternative, Apple has monopoly power in the market for smartwatches in the United States.

225. The existence of monopoly power is supported by the fact that approximately 79% of iPhone users with smartwatches used an Apple Watch as of 2023. According to a Counterpoint research study of the same year, the next largest competitor was Garmin, with approximately 7% market share. Even if the market is defined to include all smartwatches in the United States, Apple has a market share of approximately 60%.

226. Further evidence of Apple's monopoly power is the fact that it has profitably increased prices of Apple Watches while simultaneously increasing its market share, and consistently charged prices greater than comparable competing devices. The base model of the Apple Watch Series 1, released in 2016, cost $269. Two years later, the base model Apple Watch cost $399. The base model Apple Watch Series 3, released in 2017, cost $399 with cellular service enabled, while the base model Apple Watch Series 9 cost $499 with cellular service enabled. The

Apple Watch Series 10, released after this lawsuit was filed, costs $399 for the Aluminum model with a 42 mm screen, $429 for the Aluminum model with a 46 mm screen, and $699 or $749 for the Titanium models, respectively. In recent years, Apple has added a premium-tier Apple Watch Ultra as well, which debuted in 2022 and cost $799. The Apple Watch Ultra 2 costs $799 as well, or $899 if purchased with a Titanium Milanese Loop band.

227. These price increases have not reflected increasing Apple Watch quality. This is evident from the fact that while the Apple Watch has improved in certain respects, those improvements have been matched (or exceeded) by comparable smartwatches, as detailed below, and those comparable smartwatches have not imposed similar price increases.

228. Throughout this period of price increases, Apple's share of the iOS-connected smartwatch market and the overall smartwatch market increased. This is especially notable because Apple Watches cost significantly more than comparable, competing devices.

229. Setting aside the Apple Watch, the best iOS-compatible smartwatches in 2022, according to PC Magazine, included Garmin's Venu Sq 2 ($249) and Fitbit Versa 4 ($199).[80] Reviews widely praise Fitbit's Versa smartwatches, particularly for their comfort, far superior battery life (six days compared to less than one for the Apple Watch), and fitness features. In the words of one reviewer, the Versa "delivers nearly everything" the Apple Watch provides and does so at a lower cost.[81] Moreover, Fitbit's Versa smartwatches have fallen in price in recent years—from $229 for the Versa 3 to $199 for the Versa 4—while Apple Watch prices have remained constant. Apple's smartwatches are also priced higher than top-rated smartwatches made

---

[80] Angela Moscaritolo and Andrew Gebhart, *The Best Smartwatches for 2024*, PC Magazine (Feb. 29, 2024), https://www.pcmag.com/picks/the-best-smartwatches.

[81] Dawn Allcot, *Apple Watch Series 7 vs. Fitbit Versa 3: Which Smartwatch Deserves a Look*, TheStreet (Apr. 21, 2022), https://www.thestreet.com/personal-finance/apple-watch-series-7-vs-fitbit-versa-3.

exclusively for Android devices, including the Samsung Galaxy Watch 6 and Google Pixel Watch 3.

230.   Since the filing of this complaint, multiple Apple competitors have released smartwatches that compare favorably to the Apple Watch, despite Apple's restraints, but sell for a substantially lower price. For instance, earlier this year, Amazfit released the Active 2, starting at $99.99, which, according to TechRadar, offers 10 days of battery life, workout metrics "right on par with [the] Apple Watch Ultra 2," and a "[b]rilliant classic design."[82] The reviewer went on to praise the Amazfit Active 2 for having "an onboard AI-powered assistant that can actually do things, unlike Siri on the Apple Watch," and added, "In 10 years of using Apple Watch, the $99 Amazfit Active 2 is the closest I've ever come to jumping ship."[83] The Verge also praised the Amazfit Active 2 in a review, stating that it "does not look or feel cheap," was "similar in accuracy to [the] Apple Watch Ultra 2 for GPS runs and heart rate," and delivered a "stacked" and "bonkers" feature set for the price.[84]

231.   Garmin's Vivoactive 5 also currently retails for $269.99 on the Garmin website.[85] The Vivoactive 5 offers users 11 days of battery life (compared to 18 hours on the Apple Watch Series 10), "top-end fitness tracking," and physical buttons.[86] Given its low price and advanced

---

[82] Stephen Warwick, *The best smartwatch for iPhone 2025: Apple Watches and the best alternatives*, TechRadar (Mar. 21, 2025), https://www.techradar.com/news/best-smartwatch-for-iphone-what-great-watches-work-with-your-iphone.

[83] *Id.*

[84] Victoria Song, *Amazfit Active 2 review: outsized bang for your buck*, The Verge (Feb. 9, 2025), https://www.theverge.com/smartwatch-review/608342/amazfit-active-2-review-budget-smartwatch-wearables-fitness-tracker.

[85] Garmin, vivoactive 5, https://www.garmin.com/en-US/p/1057989.

[86] Luke Edwards, *Garmin Vivoactive 5 review: Health and fitness tracking finds a perfect balance*, TechRadar (July 2, 2024), https://www.techradar.com/health-fitness/fitness-trackers/garmin-vivoactive-5-review#section-garmin-vivoactive-5-design-and-screen.

features, TechRadar described this smartwatch as "start[ing] to make a play as an Apple Watch competitor," despite the significant limitations Apple places on its available features.[87]

232.  Amazfit and Garmin have not made significant inroads in the iOS-connected smartwatch market despite offering watches that compare favorably in terms of price and certain features. After praising these competitors to the Apple Watch, TechRadar still recommended that iPhone users purchase an Apple Watch because doing so "will give you the best experience in terms of interoperability, data sharing, and notifications on your wrist."[88]

233.  As a result of the anticompetitive disadvantages Apple has placed on rival smartwatches, the company is able to charge supracompetitive prices while continuing to gain market share. Apple's ability to charge supracompetitive prices while increasing its market share is evidence of its monopoly power. Apple has enjoyed increasing gross profit margins throughout this period as well. Apple's monopoly power in the market for iOS-connected smartwatches and all smartwatches is also supported by the fact that, over time, an increasing share of iPhone users have purchased Apple Watches.

234.  Competitors cannot discipline Apple's exercise of monopoly power in the market for iOS-connected smartwatches or the market for all smartwatches due to the control Apple exercises over iOS and the iPhones to which competing smartwatches must connect. Nor can new entrants significantly discipline Apple's exercise of monopoly power. They too would face the same restrictions resulting from Apple's control over iOS—itself a significant barrier to entry—as well as further very high barriers to entry. Developing a smartwatch requires tens and likely

---

[87] *Id.*

[88] Stephen Warwick, *The best smartwatch for iPhone 2025: Apple Watches and the best alternatives*, TechRadar (Mar. 21, 2025), https://web.archive.org/web/20250408224357/https://www.techradar.com/news/best-smartwatch-for-iphone-what-great-watches-work-with-your-iphone.

hundreds of millions of dollars in investment to build the necessary software and hardware, and to manufacture the device at scale. These barriers to entry are reflected in the increasing consolidation among smartwatch competitors: Fitbit acquired Pebble's intellectual property in 2016, and Fitbit was subsequently acquired by Google in 2021. Google also paid $40 million to acquire smartwatch-related intellectual property and a research and development team from Fossil Group in 2019. In recent years, a number of potential and actual entrants have either abandoned their plans to enter the smartwatch business or abandoned their ongoing smartwatch operations. These include massive technology companies such as Meta, which in 2022 abandoned an iOS-connected smartwatch it was developing and planned to release in 2023, as well as Fossil, which in 2024 announced it would release no new smartwatches.

## B. Apple Has Monopoly Power in the Markets for iOS Smartphones and for All Smartphones

235.    Apple also has monopoly power in the market for iOS smartphones. Apple's iPhone accounts for 100% of sales in the market for iOS smartphones. Apple exercises complete control over iOS, licenses its mobile operating system to no smartphone competitor, and manufactures the iPhone smartphones that account for 100% of the market. Apple's decision not to license iOS means that no entrant can discipline Apple's exercise of monopoly power over iOS smartphones. Apple's monopoly power is further demonstrated by the fact that iPhone prices are rising along with Apple's profit margin on the iPhone, as detailed below.

236.    In the alternative, Apple has monopoly power in the market for smartphones. In the United States, Apple's monopoly power is apparent from its market share. As of the start of 2024, Apple had a greater than 60% share of smartphone shipments in the United States. The company accounted for at least 64% of smartphone shipments in Q4 2023. Also supporting Apple's monopoly power is its dominance in the most profitable premium smartphone segment, where

82

Apple accounts for an even larger share of the market in the United States and around the world. Apple also has a monopoly share in the performance smartphone market, which excludes entry-level smartphones. The iPhone accounts for more than 70 percent of performance smartphone sales in the United States. Apple also controls a greater share of certain critical smartphone sub-markets, including the 18- to 24-year-old demographic. Among 18- to 24-year-olds in the United States, Apple has at least 79% market share.[89]

237.    Apple's monopoly power in the market for smartphones is further demonstrated by the fact that it has increased the price of iPhones even as it has increased its market share and seen its profits grow at the same time. In 2008, the base model iPhone 3G sold for $199. The base model iPhone 15 sold for $799 in 2023. By one measure, between 2020 and 2021 alone, the average price of an iPhone increased by $64. Meanwhile, Apple's gross profit margin has increased more than 7% between Q4 2019 and Q4 2023. Upon information and belief, this increasing margin is attributable in substantial part to Apple's iPhone business, which accounts for more than half of the company's overall revenue.

238.    Competing smartphones do not discipline Apple's exercise of monopoly power in the smartphone market. Apple is a unified smartphone manufacturer with control over the iOS software that runs iPhones, the App Store that provides apps for iPhones, and the physical hardware of the iPhone itself. Apple's smartphone competitors, meanwhile, are highly fragmented. While most of its competitors operate on Google's Android operating system, Google does not have a significant share of the smartphone device market, and no device manufacturer in the United States has even half of Apple's market share. Moreover, two of the strongest global smartphone

---

[89] Bloomberg, *79% of Gen Z US Consumers Prefer iPhones to Rivals, Finds Bloomberg Intelligence*, (Feb. 23, 2023), https://www.bloomberg.com/company/press/79-of-gen-z-us-consumers-prefer-iphones-to-rivals-finds-bloomberg-intelligence/.

companies, Huawei and ZTE, are barred from selling devices in the United States, further preventing checks on Apple's dominance in the U.S. market.

239.    Apple's competitors in the global smartphone market are only more fragmented. As of Q4 2023, Apple had the largest share of the global smartphone market, with nearly 25% of smartphone sales, and the next largest competitor, Samsung, accounted for only 16% of smartphone sales.[90] Meanwhile, in the global smartphone market of the greatest relevance for manufacturers—the market for premium smartphones over $600—Apple's monopoly power is apparent from its market share: in 2022 and 2023 respectively, Apple accounted for 75% and 71% of global premium smartphone shipments.[91]

240.    Nor can new entrants discipline Apple's monopoly power in the smartphone market. The smartphone market has high barriers to entry, requiring immense investments in both software and hardware to develop a competitive device. Many sophisticated technology companies have tried and failed to enter the smartphone business, including Amazon, Microsoft, and Facebook (now Meta). And the iPhone benefits from substantial network effects, including a catalog of millions of apps developed specially for the device.

241.    Also contributing to these network effects is the fact that once consumers have purchased an iPhone, they are locked into that device and the Apple ecosystem. iPhones are high-cost, long-lasting, durable products that users cannot easily switch away from after purchase. iPhones are also regularly subsidized by cellular network providers, further tying users by contract

---

[90] Federica Laricchia, *Global smartphone market share from 4th quarter 2009 to 4th quarter 2023, by vendor*, Statista (Feb. 8. 2024), https://www.statista.com/statistics/271496/global-market-share-held-by-smartphone-vendors-since-4th-quarter-2009/.

[91] Yahoo! Finance, *Apple dominates global premium smartphone market in 2023, but Huawei gains ground on the back of its new 5G handsets* (Jan. 3, 2024), https://finance.yahoo.com/news/apple-dominates-global-premium-smartphone-093000842.html.

to the device for multiple years. And once users purchase an iPhone, they are unlikely to switch to a competing device due to difficulties or perceived difficulties related to the transfer of photos and videos, text messages, and apps.

242. Apple's strategy of tying customers into the Apple product ecosystem means that iPhone customers who have purchased other Apple products, such as an iPad or MacBook, feel constrained to continue purchasing iPhones because those other Apple devices will either not work with, or will work less well with, competing smartphones. This lock-in effect is by design, and Apple's internal emails show that it has prevented interoperability between iPhones and competing devices with the express intention of keeping users locked into the Apple ecosystem.

## VI. Antitrust Injury and Standing

243. Plaintiff and the members of the putative class have suffered antitrust injury as a direct result of Apple's unlawful conduct. Apple's conduct enabled it to charge Plaintiff and the members of the putative class supracompetitive prices for Apple Watches. Plaintiff and the members of the putative class are the direct purchasers of Apple Watches from Apple who paid supracompetitive prices for those devices to Apple.

## CLASS ACTION ALLEGATIONS

244. Plaintiff brings this action on behalf of itself and as a class action pursuant to Federal Rules of Civil Procedure 23(a), and 23(b)(2), 23(b)(3), and/or 23(c)(4) on behalf of the following proposed class:

> **Proposed Class:** All persons in the United States that purchased an Apple Watch directly from Apple, other than for resale, between April 3, 2020, and the present.

245. Excluded from the class are: (a) Defendant; (b) subsidiaries and affiliates of Defendant; (c) any person or entity who is an officer, director, employee, or controlling person of any Defendant; (d) any entity in which Defendant has a controlling interest; (e) the legal

85

representatives, heirs, successors, and assigns of any excluded party; and (f) any judicial officer presiding over this action, the members of his or her immediate family and staff, and any juror assigned to this action.

246. **Numerosity.** The members of the class are so numerous that joinder of all members is impracticable. Apple has sold millions of Apple Watches to people in the United States since 2020. Upon information and belief, there are over 50 million people in the proposed class.

247. **Typicality.** Plaintiff's claims are typical of the claims of the members of the class. On December 2, 2021, Plaintiff purchased an Apple Watch directly from Apple on Apple.com for pickup at the Oakbrook, Illinois Apple Store. Plaintiff's claims are also typical of the other class members in that Plaintiff has been damaged as a result of paying a supracompetitive price to Apple to purchase an Apple Watch and continues to suffer harms due to Apple's anticompetitive conduct.

248. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the putative class and has retained counsel competent and experienced in antitrust litigation and class action litigation. Plaintiff is committed to the vigorous prosecution of this action and has no interests that are adverse or antagonistic to the class.

249. **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of the claims of the members of the class. The damages suffered by some individual members of the class may be relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation required to recover from Apple. It would be impractical for most, if not all, class members to redress the wrongs done to them on an individual basis. Furthermore, individual litigation would be unmanageable for the court system as it would result in hundreds, if not thousands, of individual lawsuits, creating the risk of inconsistent or contradictory judgments and increasing the delay and expense to all parties and the

court system. In contrast, a class action would present far fewer management difficulties. Class action treatment provides the benefits of a single adjudication, economies of scale, and supervision by a single court. The members of the class are ascertainable through methods typical of class action practice and procedure, including through Apple's own records.

250. **Existence and Predominance of Common Questions of Law and Fact.** Numerous questions of law and fact are common to Plaintiff and all members of the class. These common questions will result in common answers for all class members that will impact the resolution of the claims on grounds equally applicable to all class members. These common questions, which predominate over any questions affecting only individual class members, include, but are not limited to:

A. Whether Apple's Developer Program License Agreement with makers of competing smartwatches and with third-party software companies that develop apps for smartphones constitutes an unreasonable restraint of trade.

B. Whether the market for iOS-connected smartwatches in the United States is a relevant antitrust market.

C. Whether Apple has monopoly power in the market for iOS-connected smartwatches in the United States.

D. Whether the market for smartwatches in the United States is a relevant antitrust market.

E. Whether Apple has monopoly power in the market for smartwatches in the United States.

F. Whether Apple has engaged in anticompetitive conduct to illegally maintain a monopoly in the market for iOS-connected smartwatches in the United States.

G.  Whether Apple has engaged in anticompetitive conduct to illegally maintain a monopoly in the market for smartwatches in the United States.

H.  Whether Apple's conduct resulted in supracompetitive prices paid by purchasers of Apple Watches during the class period.

I.  The correct measure of class-wide damages.

J.  Whether injunctive relief is appropriate to restrain Apple from continued anticompetitive conduct in the market for iOS-connected smartwatches.

251.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2), in addition to Federal Rule of Civil Procedure 23(b)(3), because Apple has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the entire Class.

## CAUSE OF ACTION I: MONOPOLIZATION
### (15 U.S.C. § 2)

252.    Plaintiff incorporates by reference each of the allegations set forth in this complaint as if fully set forth herein.

253.    Apple's conduct violates Section 2 of the Sherman Act, which prohibits "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

254.    The market for iOS-connected smartwatches in the United States is a valid antitrust market. In the alternative, the market for smartwatches in the United States is a valid antitrust market.

255.    Apple has monopoly power in the market for iOS-connected smartwatches in the United States—or, in the alternative, the worldwide market for iOS-connected smartwatches. In

88

the alternative, Apple has monopoly power in the market for smartwatches in the United States—or, in the alternative, the worldwide market for smartwatches.

256. Apple has intentionally and unlawfully acquired and maintained monopoly power in the relevant smartwatch antitrust market through the anticompetitive conduct described above.

257. Apple's conduct affects a substantial volume of interstate commerce.

258. Apple's conduct has substantial anticompetitive effects, including reduction in competition in the marketplace, increased prices, as well as reduced quality, innovation, and output in the iOS-connected smartwatch market, the smartwatch market generally, and the market for iOS sister apps for smartwatches.

259. As purchasers of Apple Watches, Plaintiff and the members of the proposed class have been harmed by Apple's anticompetitive conduct in a manner that the antitrust laws were intended to prevent. Among other injuries, Plaintiff and the putative class members paid more for Apple Watches than they would have in the absence of Apple's anticompetitive conduct. Plaintiff and members of the proposed class will continue to suffer injuries until an injunction issues ending Apple's anticompetitive conduct.

## CAUSE OF ACTION II: ATTEMPTED MONOPOLIZATION
### (15 U.S.C. § 2)

260. Plaintiff incorporates by reference each of the allegations set forth in this complaint as if fully set forth herein.

261. Apple's conduct violates Section 2 of the Sherman Act, which prohibits "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

262. The market for iOS-connected smartwatches in the United States is a valid antitrust market. In the alternative, the market for smartwatches in the United States is a valid antitrust

market. In the alternative, the worldwide markets for iOS-connected smartwatches, or smartwatches generally, are valid antitrust markets.

263. If, in the alternative to the above-pleaded monopolization claim, Apple does not have monopoly power in the market for iOS-connected smartwatches in the United States, or in the market for smartwatches in the United States, then there is a dangerous probability that Apple will acquire monopoly power in the market for iOS-connected smartwatches in the United States or, in the alternative, the market for smartwatches in the United States, through its anticompetitive conduct. Apple is willfully engaging in the anticompetitive conduct alleged above with the specific intent of achieving monopoly power and monopolizing the relevant market.

264. This dangerous probability of achieving monopoly power is evident from Apple's rising share of the iOS-connected smartwatch market and smartwatch market. Apple's share of the smartphone market has grown as well, recently reaching an all-time high of approximately 65%. As the percentage of Americans with Android smartphones shrinks, so does the number of smartphone users with devices not encumbered by Apple's restrictions, further limiting the ability of smartwatch companies to compete with Apple and bolster their sales by selling smartwatches to Android users.

265. Apple's conduct in other markets also shows the dangerous probability that it will acquire monopoly power in these relevant markets. In addition to the Department of Justice's litigation against Apple for monopolization of the smartphone market, Apple was recently fined nearly $2 billion by the European Union for anticompetitive App Store rules that led to consumers overpaying for music streaming services. Apple has also shown an ability to rapidly accumulate market share in markets for iPhone- and smartphone-connected devices. This includes the market for headphones, where Apple had acquired nearly 50% market share by 2021 between its Airpods

and Beats headphones brands,[92] as well as the market for lost-item trackers, where, as described above, Apple was accused of anticompetitive conduct by competitor Tile before and after the release of Apple's competing Airtag devices in 2021, and where Apple quickly captured significant market share from Tile.

266.    Apple's conduct affects a substantial volume of interstate commerce.

267.    Apple's conduct has substantial anticompetitive effects, including increased prices, as well as reduced quality, innovation, and output in the relevant product market.

268.    As purchasers of Apple Watches, Plaintiff and the members of the proposed class have been harmed by Apple's anticompetitive conduct in a manner that the antitrust laws were intended to prevent. Among other injuries, Plaintiff and the putative class members paid more for Apple Watches than they would have in the absence of Apple's anticompetitive conduct. Plaintiff and members of the proposed class will continue to suffer injuries until an injunction issues ending Apple's anticompetitive conduct.

**CAUSE OF ACTION III: UNREASONABLE RESTRAINT OF TRADE**
**(15 U.S.C. § 1)**

269.    Plaintiff incorporates by reference each of the allegations set forth in this complaint as if fully set forth herein.

270.    Apple's conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

271.    Apple forces all iOS app developers, including its competitors in the iOS-connected smartwatch market, to enter into its Developer Program License Agreement (DPLA) as a condition

---

[92] Felix Richter, *Apple Dominates the U.S. Headphones Market*, Statista (Feb. 7, 2022), https://www.statista.com/chart/26791/most-popular-headphone-brands-in-the-us/.

of distributing iOS apps. A smartwatch maker cannot compete in the market for iOS-connected smartwatches without distributing an iOS app. A smartwatch maker's ability to compete in the market for smartwatches generally is also substantially harmed by the inability to distribute an iOS app.

272.    The provisions of the DPLA restricting the signatories' access to private APIs, and requiring them to use public APIs "in the manner prescribed by Apple," as well as the provisions of the App Review Guidelines, unreasonably restrain trade in the market for iOS-connected smartwatches in the United States. In the alternative, these DPLA provisions unreasonably restrain trade in the market for smartwatches in the United States.

273.    Apple's agreements with Apple Watch competitors are illegal *per se*. Among other things, the limitations on API access in the DPLA constitutes an agreement between Apple and competing smartwatch makers that these competing smartwatch makers will limit the capabilities of their iOS-connected smartwatches at Apple's discretion, regardless of the technical ability to provide those capabilities to iPhone owners.

274.    Apple's agreements with Apple Watch competitors and other app developers under the DPLA and the App Review Guidelines are also unreasonable restraints of trade when evaluated under the Rule of Reason.

275.    The challenged provisions serve no legitimate or procompetitive purpose.

276.    Apple's conduct affects a substantial volume of interstate commerce.

277.    Apple's conduct has substantial anticompetitive effects, including increased prices and costs, reduced output, and reduced innovation and product quality.

278.    As purchasers of Apple Watches, Plaintiff and the members of the proposed class have been harmed by Apple's anticompetitive conduct in a manner that the antitrust laws were

intended to prevent. Among other injuries, Plaintiff and the putative class members paid more for Apple Watches than they would have in the absence of Apple's anticompetitive conduct. Plaintiff and members of the proposed class will continue to suffer injuries until an injunction issues ending Apple's anticompetitive conduct.

## CAUSE OF ACTION IV: CARTWRIGHT ACT - UNREASONABLE RESTRAINT OF TRADE
### (Cal. Bus. & Prof. Code § 16700 *et seq.*)

279. Plaintiff incorporates by reference each of the allegations set forth in this complaint as if fully set forth herein.

280. Apple's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, among other things, combinations in restraint of trade.

281. A "combination" is formed under the Cartwright Act when the anticompetitive conduct of one firm forces market participants to adhere involuntarily to an anticompetitive agreement or scheme.

282. The market for iOS-connected smartwatches in the United States is a valid antitrust market. In the alternative, the market for smartwatches in the United States is a valid antitrust market.

283. The provisions of the DPLA restricting the signatories' access to private APIs, and requiring them to use public APIs "in the manner prescribed by Apple," as well as the provisions requiring agreement to the App Review Guidelines, unreasonably restrain trade in the market for iOS-connected smartwatches in the United States. In the alternative, these DPLA provisions unreasonably restrain trade in the market for smartwatches in the United States.

284. Apple's agreements are illegal *per se*. The limitations on API access in the DPLA constitute an agreement between Apple and competing smartwatch makers that these competing

93

smartwatch makers will limit the capabilities of their iOS-connected smartwatches at Apple's discretion, regardless of the technical ability to provide those capabilities to iPhone users. Furthermore, the provisions in the App Review Guidelines requiring, among other things, that iOS app developers, including makers of sister apps for third-party smartwatches, not promote their compatibility with any smartwatch other than the Apple Watch constitute a *per se* illegal group boycott under the Cartwright Act.

285.    In the alternative, Apple's agreements with Apple Watch competitors and other app developers under the DPLA and the App Review Guidelines are unreasonable restraints of trade when evaluated under the Rule of Reason.

286.    The challenged provisions serve no legitimate or procompetitive purpose.

287.    Apple's conduct has substantial anticompetitive effects, including increased prices and costs, reduced output, and reduced innovation and product quality.

288.    Apple's conduct harms Plaintiff and the proposed class who, as a direct result of Apple's conduct, have paid supracompetitive prices for Apple Watches, among other harms.

289.     It is appropriate to bring this action under the Cartwright Act because the illegal agreements were made in California, purport to be governed by California law, affect consumers residing in California, Apple is located in California, and overt acts in furtherance of the anticompetitive scheme took place in California.

### CAUSE OF ACTION V: UNFAIR COMPETITION LAW
**(Cal. Bus. & Prof. Code § 17200 *et seq.*)**

290.    Plaintiff incorporates by reference each of the allegations set forth in this complaint as if fully set forth herein.

94

291. Apple's acts or practices described above violate California's Unfair Competition Law ("UCL"), California Business & Professions Code § 17200 *et seq.*, which prohibits any unlawful, unfair, or fraudulent business act or practice.

292. Plaintiff and the proposed class have standing to bring this claim because they have suffered injury in fact and lost money as a result of Apple's unfair competition. Among other things, Apple's conduct caused Plaintiff and the proposed class to pay supracompetitive prices for Apple Watches they purchased.

293. Apple's conduct violates the Sherman Act and the Cartwright Act, and therefore constitutes unlawful conduct under the UCL.

294. Apple's conduct also constitutes unfair conduct under the UCL because it is immoral, unethical, oppressive, unscrupulous, offends public policy, and is substantially injurious to consumers. Apple's unfair practices include (1) conditioning iOS developers' distribution of smartwatch sister apps via the Apple App Store on those developers agreeing not to discuss, promote, or display images of competing smartwatches and agreeing to limit the discoverability of their app by competing smartwatch owners; (2) using its control over the App Store to punish third-party developers that promote smartwatches that compete with the Apple Watch and to limit or delay distribution of competing smartwatches' companion apps; (3) conditioning smartwatch competitors' access to the Apple App Store on their agreement not to use private APIs, or use public APIs in a manner Apple has determined is impermissible, and in effect requiring agreement not to offer features competitive to the Apple Watch at Apple's discretion; and (4) each of the anticompetitive acts detailed in this complaint, including Apple's distribution of updates that harm competing smartwatches and intentionally slow responses to the resulting software problems. Apple engaged in all of this conduct to gain an unfair commercial advantage over its competitors.

95

295.    The injury Apple's conduct caused and continues to cause to consumers is substantial and is not outweighed by any countervailing benefits to consumers or competition. Meanwhile, there were reasonably available alternatives to further Apple's legitimate business interests other than the conduct described herein.

296.    Consumers could not avoid the harmful effects of Apple's conduct because Apple limits the viable alternatives to the Apple Watch and because Apple does not disclose, and indeed misrepresents and obscures, the restrictions it places on competing iOS-connected smartwatches, preventing users from understanding the harmful effect of those restrictions before they purchase an iPhone.

297.    Apple's unlawful and unfair conduct described herein is ongoing and continues to harm consumers, competitors, and the marketplace as a whole.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of himself and the Class, prays for judgment against Defendant as follows:

298.    Determining that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23 and directing that reasonable notice of this action be provided to the Class pursuant to Rule 23(c)(2).

299.    Awarding Plaintiff and the Class treble damages for their injuries caused by Apple's violations of the federal antitrust laws.

300.    Granting Plaintiff and the Class injunctive and other equitable relief enjoining Apple, its officers, agents, servants, and employees, and all those acting in concert with the aforementioned parties, from engaging in the anticompetitive conduct alleged herein.

96

301.    Granting Plaintiff and the Class all appropriate equitable and injunctive relief available under the Unfair Competition Law, including restitution to Plaintiff and the Class for their injuries.

302.    Awarding Plaintiff and the Class reasonable attorneys' fees and costs.

303.    Granting such other and further relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

304.    In accordance with Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury on all issues so triable.

 Dated: July 30, 2025

Respectfully submitted,

By: /s/ *George A. Zelcs*
George A. Zelcs (N.D. Il. Bar No. 3123738)
gzelcs@koreintillery.com
David Walchak (N.D. Il. Bar No. 323422)
dwalchak@koreintillery.com
Daniel Epstein (N.D. Il. Bar No. 6320580)
**KOREIN TILLERY LLC**
205 North Michigan, Suite 1950
Chicago, IL 60601
Tel.: (312) 641-9750 / Fax: (312) 641-9751

Stephen M. Tillery (N.D. Il. Bar No. 2834995)
stillery@koreintillery.com
Carol O'Keefe (N.D. Il. Bar No. 6335218)
cokeefe@koreintillery.com
**KOREIN TILLERY LLC**
505 N 7th Street, Suite 3600
St. Louis, MO 63101

Steven F. Molo (N.D. Il. Bar No. 6184051)
smolo@mololamken.com
Lauren F. Dayton (N.D. Il. Bar No. 6347085)
ldayton@mololamken.com
Eric A. Posner (N.D. Il. Bar No. 6329216)
eposner@mololamken.com
**MOLOLAMKEN LLP**
300 North LaSalle Street
Chicago, IL 60654
Tel.: (312) 450-6700

97

Jennifer E. Fischell
jfischell@mololamken.com
Kayvon M. Ghayoumi
kghayoumi@mololamken.com
Caroline A. Veniero
cveniero@mololamken.com
**MOLOLAMKEN LLP**
600 New Hampshire Ave, N.W.
Washington, DC 20037
Tel.: (202) 556-2000

David C. Frederick
dfrederick@kellogghansen.com
Aaron M. Panner
apanner@kellogghansen.com
Alex A. Parkinson
aparkinson@kellogghansen.com
Scott K. Attaway
sattaway@kellogghansen.com
Ariela M. Migdal
amigdal@kellogghansen.com
Katherine V. Tondrowski
ktondrowski@kellogghansen.com
**KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, DC 20036
Tel.: (202) 326-7900 / Fax: (202) 326-7999

*Attorneys for Plaintiff.*

98

# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>APPLE INC.,<br><br>*Defendant.* | Case No. 2:24-cv-04055 (JXN) (LDW) |

STIPULATION AND ORDER GOVERNING
ELECTRONICALLY STORED INFORMATION AND HARD COPY DOCUMENTS

The Parties hereby submit the following Stipulation and Order Governing Electronically Stored Information and Hard Copy Documents ("ESI Order").

WHEREAS, Rule 26(f) of the Federal Rules of Civil Procedure states that the Parties must develop a proposed discovery plan that states the Parties' views and proposals on, among other things, "any issues about disclosure, discovery, or preservation of electronically stored information, including the form or forms in which it should be produced," Fed. R. Civ. P. 26(f)(3)(C);

WHEREAS, the Parties mutually seek to reduce the time, expense, and other burdens of discovery of certain electronically stored information ("ESI") and privileged materials, as described further below, and to better define the scope of their obligations with respect to preserving such information and materials.

NOW THEREFORE, it is hereby ORDERED.

1

## I.   DEFINED TERMS

For purposes of this ESI Order, the Definitions below shall apply.

1.      "Action" means the action filed in this Court under the caption *United States v. Apple Inc.*, No. 2:24-cv-04055 (JXN)(LDW), as well as any additional actions subsequently consolidated with this Action, including any consolidated discovery, pretrial, trial, post-trial, or appellate proceedings. For the avoidance of doubt, "Action" excludes pre-Complaint investigations by Plaintiffs.

2.      "Electronically Stored Information" or "ESI" carries its broadest possible meaning consistent with Fed. R. Civ. P. 34(a), including, but not limited to, emails, calendar items, instant messages, text messages, chat messages, and other ESI.

3.      "DeNIST" means the act of filtering and removing system files, executable files, application files, program files, and other non-user created data from ESI that has been collected.

4.      "Document" means any document or electronically stored information, as the term is used in Federal Rule of Civil Procedure 34(a).

5.      "Format" means the internal structure of a file, which defines the way it is stored and used.

6.      "Native File" or "Native Format" means or refers to the Format of ESI in the application in which it was originally created and/or used by the Producing Party in the usual course of business and in its regularly conducted activities. If the Receiving Party is unable to use the native application, either due to third-party licensing issues or because the software is hardware-dependent, the Parties will meet and confer to identify an acceptable substitute production format.

2

7. "Non-Custodial Data Source" means an enterprise system or application that stores ESI, such as a collaboration platform or database, but over which an individual custodian does not organize, manage, or maintain the ESI.

8. "Parties" means the United States, each of the Plaintiff States, and Apple, without prejudice to or waiver of the Parties' ongoing disputes as to the proper scope of preservation or discovery.

9. "Plaintiff State" means the State of New Jersey, State of Arizona, State of California, District of Columbia, State of Connecticut, State of Indiana, State of Maine, Commonwealth of Massachusetts, State of Michigan, State of Minnesota, State of Nevada, State of New Hampshire, State of New York, State of North Dakota, State of Oklahoma, State of Oregon, State of Tennessee, State of Vermont, State of Washington, and State of Wisconsin acting by and through their respective Attorneys General, or any other State acting by and through their respective Attorneys General which joins this Action. "Plaintiff State" and "Plaintiff States" are defined for purposes of this ESI Protocol without prejudice to or waiver of the Parties' ongoing disputes as to the proper scope of preservation or discovery.

10. "Producing Party" means a Party that produces documents.

11. "Receiving Party" means a Party to whom documents are produced.

12. "Bates Number" means a unique alphanumeric identifier associated with every physical sheet of paper, electronic file, electronically stored TIFF image or PDF page, or other tangible thing, consisting of:

A. An alphanumeric portion identifying the Producing party and/or other characteristics of the production; and

3

**B.** A numeric portion incremented according to a scheme defined at the Producing Party's discretion to ensure that the alphanumeric identifier for each physical sheet of paper, electronic file, electronically stored TIFF image or PDF page, or other tangible thing is unique. The alphanumeric identifier shall be no more than 25 characters in length.

13. "Metadata" means reasonably accessible non-privileged information (i) embedded in a Native File that is not ordinarily viewable or printable from the application that generated, edited, or modified such Native File; and (ii) generated automatically by the operation of a computer or other information technology system when a Native File is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system.

14. "Static Image" means a representation of ESI produced by converting a Native File into a standard image Format capable of being viewed and printed on standard computer systems. A Tagged Image File Format (TIFF) image is an example of a Static Image.

15. "Load File" means an electronic file containing information identifying a set of paper-scanned images or processed ESI and indicating where individual pages or files belong together as documents, including attachments, and where each document begins and ends. A Load File also contains data relevant to the individual Documents, including extracted and user-created Metadata, coded-data, as well as extracted text files containing any text extracted from a Document or Native File. Generally, optical character recognition ("OCR") may only be used for Load Files when there is no text to extract or when a document contains redactions.

## II.  GENERAL PROVISIONS

1. Except as specifically set forth herein, this ESI Order does not alter or affect the applicability of the Federal Rules of Civil Procedure or Local Rules for the United States District Court for the District of New Jersey.

4

2. The production specifications set forth in this ESI Order apply to Documents and ESI that are to be produced in the first instance in this Action. This ESI Order does not apply to materials previously produced to any Plaintiff as part of a pre-Complaint investigation. No Party is obligated to reformat any such prior production in accordance with the production specifications in this ESI Order.

3. This ESI Order may be modified for good cause by a Stipulated Order of all Parties or by the Court. Parties reserve their rights to seek reasonable modifications of these procedures as appropriate.

4. If disputes arise concerning the scope and nature of a production, the Parties must promptly meet and confer to reach agreement prior to seeking leave of the Court to resolve any disputed issues. If the Parties' disagreement persists after meeting and conferring in good faith, the Parties must notify the Court of their unresolved dispute(s) and seek resolution from the Court.

5. The Parties agree to meet and confer to the extent that new plaintiff states are added later to the Action and those states request reasonable modifications to these production specifications.

## III. PRESERVATION

1. **Materials to Be Preserved.** Each Party will take reasonable and proportionate steps to preserve potentially relevant and discoverable Documents and ESI in compliance with its duties to preserve material under the Federal Rules of Evidence and the Federal Rules of Civil Procedure. The Parties agree to preserve Documents and ESI in such a way that it can be produced as stored in the ordinary course of business or in a reasonably usable form in accordance with Fed. R. Civ. P. 34(b)(2)(E)(ii).

2. **Reduction of Costs.** To reduce the costs and burdens of preservation and to ensure proper ESI is preserved, the Parties agree that each Party must preserve only non-duplicative

5

potentially relevant ESI in its possession, custody, or control. Subject to and without waiving any protection described above, the Parties agree that:

    **A.**    The Parties will endeavor to agree upon a date limitation for the preservation of ESI; and

    **B.**    The Parties will endeavor to agree upon a list of the types of relevant ESI that should be preserved and the custodians for whom relevant ESI should be preserved. The Parties will add or remove custodians as reasonably necessary.

3.    **Evidence Preservation.** The Parties have met and conferred pursuant to Fed. R. Civ. P. 26(f) and L. Civ. R. 26.1 regarding reasonable and proportionate steps taken and to be taken to preserve evidence relevant to the issues reasonably evident in this case. The Parties agree that the following categories of ESI need not be preserved:

    **A.**    Back-up and legacy IT systems and tapes used for disaster recovery;

    **B.**    Information from handsets, mobile devices, personal digital assistants, and tablets that is duplicative of information that resides in a reasonably accessible data source;

    **C.**    Logs of calls made from cellular phones;

    **D.**    Deleted, fragmented, slack, or unallocated data accessible only by forensics;

    **E.**    Data stored in random access memory ("RAM"), temporary files, or other ephemeral non-message data that are difficult to preserve without disabling the operating system;

    **F.**    Systems, server, or network logs;

G. Dynamic fields of databases or log files that are not retained in the usual course of business;

H. Automatically saved interim versions of documents and email;

I. Temporary files;

J. On-line access data such as temporary internet files, history, cache, and cookies;

K. Data in Metadata fields that are frequently updated automatically, such as last-opened date or similar fields;

L. Systems no longer in use that cannot be accessed as of January 6, 2020;

M. Individuals' data subject to routine disposition required by privacy regulations;

N. Information created or copied during the routine, good-faith performance of processes for the deployment, migration, retirement, and/or disposition of computer equipment by the Party that is duplicative of information that resides in a reasonably accessible data source; and

O. Voicemail messages that are not contained in a party's email system.

4. **No Preclusion.** Nothing in this ESI Order prevents any Party from asserting, in accordance with the Federal Rules of Civil Procedure, that other categories of Documents or ESI are not reasonably accessible or otherwise subject to preservation, collection, or production obligations.

5. **Preservation Does Not Affect Discoverability or Claims of Privilege.** By preserving Documents and ESI for the purpose of this Action, the Parties are not conceding that such material is discoverable, nor are they waiving any claim of privilege.

7

## IV.    COLLECTION AND REVIEW

1.      **Meet and Confer.** The Parties agree that in responding to any Fed. R. Civ. P. 34 request, they will meet and confer about methods to search Documents in order to identify Documents that are subject to production in discovery and filter out Documents that are not subject to discovery.

2.      **Excluded from Collection, Review, and Production.** The Parties do not need to collect and review the excluded ESI listed in Section III.3. The State Plaintiffs do not need to produce duplicate materials already produced, or expected to be produced, by the United States.

3.      **TAR, Search Terms, or Other Methods.** The Parties will meet and confer in good faith regarding the use of technology-assisted review ("TAR") or a similar tool, or search terms and custodians used to identify responsive Documents and ESI. If the Parties agree to use search terms and custodians to identify responsive documents, Parties serving requests for production of documents may identify search terms and custodians following service of the requests as a part of the meet and confer process. The Parties will meet and confer in good faith regarding the process for fulfilling document production obligations within 10 days after service of responses and objections. As part of the meet and confer process, when requested, Parties must serve hit reports (at the search phrase and search term level) within 10 days from the date of the request and will provide counterproposals on search terms within 10 days of serving the requested hit reports. The Parties will provide counterproposals on custodians within 10 days after the meet and confer. To the extent the Parties cannot reach agreement on the application of, or procedures for, any search methods, the Parties may raise such issues for resolution by the Court or its designee.

4.      **Responsiveness Review Permitted.** Nothing in this Order may be construed or interpreted as precluding a Producing Party from performing a responsiveness review to

8

determine if Documents and ESI captured by search terms are in fact responsive to the Receiving Party's request.

5.      **Production of All Documents Captured.** Nothing in this Order may be construed or interpreted as requiring the production of all Documents and ESI captured by any search term or TAR if any such Documents are reasonably deemed not responsive to the Receiving Party's request or are otherwise privileged.

6.      **Processing and Filtering.** Each Party will use its best efforts to filter out all common system files, executable files, program files, application executable files, and any other non-user created data, such as those that exist in the National Software Reference Library ("NSRL") hash set list produced by the National Institute of Standards and Technology ("NIST"). The above-described filtering is commonly referred to as "deNISTing." The Parties may also filter out the following files or file types:

(a)     ESI affected by ransomware or malware or that otherwise has been corrupted or is unable to be processed without extraordinary efforts;

(b)     Files that are zero bytes in size (i.e., do not contain content); and

(c)     Other files or file types as agreed to by the Parties.

7.      **De-Duplication.** Each Party is required to produce only a single copy of a responsive document. A Producing Party will use its best efforts to de-duplicate across custodians and at the family-level (i.e., if there are identical child documents that have different parents, they are not duplicative, and an attachment to a document is not a duplicate of the same document maintained as a standalone document). Each Party will use its best efforts to de-duplicate responsive Documents and ESI based on Source Hash, MD5 hash values, or other industry standard methods. For emails with families, the hash value is generated based on the parent/child document grouping. To the extent that de-duplication through hash values is not possible, the

Parties must meet and confer to discuss any other proposed method of de-duplication. A Producing Party must make a reasonable effort to identify all agreed upon Custodians who were in possession of any de-duplicated Documents and ESI through an appropriate Load File field, such as All Custodians. In the event of rolling productions of Documents or ESI, the Producing Party will, as needed, supplement Load Files with updated All Custodian information.

**8.** **Email Threading.** Production of a most inclusive email thread does not relieve the Producing Party of its obligation to produce responsive prior or lesser-included emails. No Document or ESI will be intentionally withheld from production solely on the basis that it is included in a produced more-inclusive email.

## V. PRODUCTION OF ESI

The Parties must produce all Documents and ESI in the following Format:

**1.** **ESI.** ESI and Documents that are produced as scanned images should be produced in Standard Group IV black and white single-page TIFF images at a minimum of 300 DPI, 1 bit, with the exception of certain Documents and ESI identified in Section V.2, below, which may be produced in native Format. If after reviewing any black and white Document or ESI, a Receiving Party requests color in a document, the Parties must engage in discussion regarding production of the specified document in color, which production will not be unreasonably withheld. Any Documents produced in color should be produced as .JPEG files. Hidden content (comments, draft markup, etc.) will be made visible prior to image conversion; if doing so is not technically feasible or reasonable for specific file formats, the Producing Party will so inform the Receiving Party. The Parties must provide image Load Files in Concordance (.OPT) Format to facilitate the use of the produced images by a document management or litigation support system. The extracted, relevant Metadata (including the fields described in Appendix A) should be provided in a Concordance .DAT Format, or other standard, compatible file Format and extension as the Receiving Party

10

specifies. For Documents and ESI from which text cannot be extracted, such as non-native or non-searchable Native Files, the text will be generated using Optical Character Recognition ("OCR") and provided as multi-page text (.txt) files or other standard, compatible file Format as specified by the Receiving Party.

2.      **Native Format.** Parties will produce agreed-upon Documents and ESI in Native Format, including PowerPoints and spreadsheets (e.g., Excel or CSV files), and other files that cannot be converted to TIFF or PDF (such as audio and video files). Native Files should contain the Bates Number in the file title. Native Files should be accompanied by a Bates stamped placeholder slipsheet that contains the beginning Bates Number, any confidentiality designation, and text indicating "FILE PRODUCED NATIVELY" displayed on the page. Wherever feasible, the Producing Party must include accompanying Metadata in the Load File. Spreadsheets with redacted information may be redacted and produced in Native Format; all other documents with privileged or redacted information must be redacted and produced in non-Native Format. For any other types of documents, the Parties will meet and confer to discuss requests for the production of files in Native Format on a case-by-case basis. Notwithstanding any production permitted under this ESI Order in non-Native Format, where the Receiving Party believes that production of the Native File is reasonably necessary to the document's comprehension or use, a request for the Native File shall not be unreasonably denied.

3.      **Parent-Child Relationships.** Except as to the materials listed in Section III.3 that need not be preserved or collected, parent-child relationships (the association between an attachment and its parent Document or ESI) must be preserved whenever reasonable in such a way that a Document or ESI and any attachments to that Document or ESI are produced in the same production set and are identifiable as parent and child. For avoidance of doubt, documents that are

11

linked are not part of the same family for purposes of this ESI Order. Linked Documents are governed by Section V.10 below.

4.      **Metadata Fields.**  The Parties will provide the Metadata fields identified in the attached Appendix A to the extent such fields are reasonably available.

5.      **Document Unitization.**  If hard copy documents are scanned into an electronic form, the unitization of the document and any attachments must be maintained as it existed in the original when creating the image file. For Documents that contain affixed notes, the pages will be scanned both with and without the notes and those pages will be treated as part of the same document. The relationship of Documents in a Document collection (*e.g.*, cover letter and enclosures, email and attachments, binder containing multiple documents, or other documents where a parent-child relationship exists between the documents) must be maintained through the scanning or conversion process.

6.      **Redacted Documents.**  The Parties may redact information that is (1) privileged or protected from discovery as work product or by reason of other applicable privilege or immunity, (2) protected Personal Information as defined in the Protective Order, (3) Highly Confidential Source Code, as defined in the Source Code Protocol or (4) information about unannounced, non-iPhone hardware products that are still in active development. A Party or non-party asserting a privilege claim must redact only those portions of the document that are protected by the privilege. If a document contains both privileged and non-privileged communications, the non-privileged communications must be produced. The Parties do not waive any objections to the production, discoverability, admissibility, or confidentiality of documents.

Documents that contain redactions will be produced in TIFF/JPG or PDF. The Producing Party will provide searchable OCR text for those portions of the document that have not been

12

redacted. The Producing Party will provide a Concordance-delimited DAT file containing the Metadata fields outlined in Appendix A to the extent that such Metadata fields are not part of the redaction, with the exception that if a Party utilizes technology that permits the redaction of files that are not typically produced in image Format (such as spreadsheets), those files may be produced in Native Format with redactions. Documents that are produced with redactions will be noted as "Redacted" in the EProperties field. Documents with any Metadata field redacted will be produced with a Redaction Status "Metadata Redacted" in the EProperties field indicating the Metadata for that document has been redacted in the DAT file.

7. **Production Media.** A Producing Party must produce responsive documents in an encrypted electronic form via Secure File Transfer, external hard drive, or such other readily accessible computer or electronic media as the Parties may hereafter agree upon ("Production Media"). The following information must be provided on the physical Production Media: (1) a reference to this case number, (2) the Producing Party's name, (3) the production date, and (4) the production volume. The Bates Number range(s) of the materials on the Production Media shall also be contained on the Production Media, where practicable, and shall also be provided in an accompanying letter.

8. **Embedded Objects.** Non-image files embedded within Documents and ESI, such as spreadsheets within a PowerPoint or Keynote, must be extracted as separate Documents and treated like attachments to the Document in which they were embedded. Graphic objects embedded within Documents or emails, such as logos, signature blocks, and backgrounds need not be extracted as separate Documents. To the extent that embedded images present recognition problems during processing, the Parties will meet and confer to discuss any proportional and appropriate countervailing measures.

13

9. **Compressed Files.** Container file types (*e.g.*, .CAB, .GZ, .TAR, .Z, .ZIP) must be decompressed in a manner that ensures any and all nested containers are also decompressed into the lowest uncompressed element, resulting in individual files. The container file(s) itself must not be produced.

10. **Linked Files and Collaborative Work Environments.** For each document produced from Collaborative Work Environments for which document-specific URLs are reasonably accessible ("Accessible CWEs"), the Producing Party will populate a metadata field (DOCUMENTURL) with a delimited list of all URLs that uniquely point to that document. The Producing Party will also extract all Accessible CWE URLs from produced documents (HYPERLINKADDRESS), and match the HYPERLINKADDRESS values for produced documents with the DOCUMENTURL metadata for documents produced from Accessible CWEs. For any matches, the Producing Party will provide a cross-reference log that identifies the match. The log will include the following fields: DOCID, populated with the document control number Bates stamped on the first page of the document; HYPERLINKADDRESS, populated with the extracted URLs that link to any Accessible CWEs; and LINKEDATTACHIDS, populated with the DOCIDs of produced documents with DOCUMENTURL values corresponding to that document's HYPERLINKADDRESS entries.

A Receiving Party may make reasonable and proportionate requests that the Producing Party conduct a reasonable manual search for Documents corresponding to links identified by the Receiving Party in produced documents. A Receiving Party will not request documents that are already available in the production and identified by the LINKEDATTACHIDS and DOCUMENTURL fields. That Producing Party shall consider that request in good faith and the request shall not be unreasonably denied if it appears on the face of the produced document that

14

the linked document is relevant. For each link identified by the Receiving Party, the Producing Party shall conduct a reasonable search for the document corresponding with the link. To the extent the Producing Party is able to locate and access the linked documents, the Producing Party shall process and produce relevant, non-privileged documents corresponding with the links with reasonably available Metadata, including DOCUMENTURL, HYPERLINKADDRESS, and LINKEDATTACHIDs, as appropriate. The Producing Party may not be able to guarantee that the document collected is the same version as the shared link but will conduct a reasonable search given available information. For documents produced pursuant to this Section V.10, the Producing Party is not required to conduct any further search of documents corresponding with the links. The provisions of this Section apply to any type of ESI (including emails, presentations, spreadsheets, and other types of documents).

11. **Text and Chat Messages.** The Parties must preserve, collect, and produce relevant text, chat, and ephemeral messages. When producing text and chat messages (*e.g.*, messages sent via SMS, Teams, Slack, WhatsApp, Signal, iMessage, or other short messaging platforms), those messages must be unitized on the conversation/channel level into 24-hour calendar-day chunks, or conversation days, with each conversation day including all messages in that conversation or channel on a given calendar day. Each conversation day must be reviewed and produced as a single record, with any applicable redactions as provided in Section V.6. The records must be produced with the Metadata specified in the "IM/Text/Chat" column in Appendix A, including TXT-THREAD-GROUP (the DOCID of the first conversation day in a given discussion/channel) and TXT-PARTICIPANTS (a list of participant names). The Producing Party will use best available automated solutions to assign full names to participants who are identified only by phone number, email address, handle, or other identifier. If requested by the Receiving Party, the Producing Party

15

agrees to employ commercially reasonable efforts to locate the full names of participants in specific documents identified by the Receiving Party.

12.     **Voice Messages, Audio Files, and Video Files.** The Parties must preserve, and take reasonable steps to identify, collect, and produce all relevant voice messages, audio files, and video files. These records should be produced in MP4, AVI, WAV or MP3 format and adhere to the specifications regarding Native Format. The records must be produced with any applicable metadata fields listed in Section 6(n), including, but not limited to, SENTDATETIME, FROM, and TO fields (with full names assigned for any participants identified only by phone number when those names may be determined by best available automated solutions or manually when specifically requested by the receiving party). In the event a Party is unable to collect and produce the voice messages as native audio or video files, the party shall produce a manual transcription of each relevant file.

13.     **Passwords and Encryption.** To the extent Documents and ESI are password-protected or encrypted, the Producing Party shall use reasonable efforts to produce relevant non-privileged documents without protection or encryption where possible and proportionate to do so. The Parties shall meet and confer to resolve any disputes.

14.     **Foreign Language Documents.** All documents shall be produced in their original language. Where a requested document exists in a foreign language and the Producing Party also has an English-language version or English-language summary of that document that it prepared for non-litigation purposes, the Producing Party shall produce both the original document and all English-language versions or summaries. Any foreign language documents that are referenced or included in an answer to an interrogatory shall be machine translated into English by the Producing Party upon request from the Receiving Party. Nothing in this ESI Order shall require a Producing

16

Party to prepare a translation, certified or otherwise, for foreign language documents that are produced in discovery.

15.    **Re-productions.** Documents previously produced by Defendant in response to any civil investigative demand issued by any Plaintiff need not be re-produced in this case. Documents previously produced in another litigation, arbitration, government inquiry or other matter that are re-produced in this matter may be re-produced in the same manner and form as originally produced in the other matter. For any documents that are reproduced in this manner, if a privilege log was provided in the original matter, the corresponding privilege log entries from the original matter will be produced simultaneously. The Receiving Party may challenge privilege designations using the procedures governing privilege challenges as detailed in the Protective Order in this Action.

16.    **Third-Party Productions.** Notwithstanding the foregoing, all documents that the Producing Party received from third parties should be produced in the same manner and form, including Native Files and all Metadata, as the Producing Party received from the producing third party.

17.    **Databases and Structured Data.** The Parties agree to meet and confer as needed regarding the production Format and scope of data contained in databases, data sources, and logs to ensure that any information produced is reasonably usable by the Receiving Party and that its production does not impose an undue burden on the Producing Party.  To avoid doubt, information will be considered reasonably usable when produced in CSV format or other commonly used electronic formats, including other character-delimited text format, Microsoft Excel format, or Microsoft Access format. To the extent a Party is constrained from producing responsive ESI because of a third-party license or because software necessary to view the ESI is hardware-

17

dependent, the Parties agree to meet and confer in an attempt to reach an agreement on whether alternative methods exist to enable the Receiving Party to view or access the ESI.

## VI.   PRIVILEGE LOGS

1.      **Privilege Log Production.** L. Civ. R. 33.1(c), 34.1, and 36.1(b) apply to assertions of a claim of privilege. All Parties and non-parties will produce privilege logs within 45 days after each document production. For each document on which a privilege is claimed, the privilege logs must provide sufficient information to enable the parties to assess the applicability of the privilege claimed. For any Document or ESI withheld or redacted, the Producing Party will produce privilege logs in MS Excel (.xlsx) Format. A Party or non-party seeking to withhold or redact a document under the attorney-client privilege, deliberative process privilege, work product protection, or any other privilege or protection must, at a minimum, provide the essential elements necessary to sustain a claim of privilege, including a description of the document's subject matter with sufficient detail to enable the Parties to assess the privilege claim and the facts relied upon to support the claim.

The Parties agree that the following privileged or otherwise protected communications may be excluded from privilege logs and can be excluded from production:

A.      Documents or communications sent solely between outside counsel for Defendant (or persons employed by or acting on behalf of such counsel);

B.      Documents or communications sent solely between outside counsel for Defendant (or persons employed by or acting on behalf of such counsel) and Defendant;

C.      Documents or communications sent solely between counsel for the United States (or persons employed by or acting on behalf of such counsel for the

18

U.S. Department of Justice including the United States Attorney for the District of New Jersey);

    **D.**    Documents or communications sent solely between counsel for any Plaintiff States (or persons employed by or acting on behalf of the office of the attorney general of any State);

    **E.**    Documents or communications sent solely between or among counsel for the United States (or persons employed by or acting on behalf of such counsel) and counsel for any Plaintiff States (or persons employed by or acting on behalf of the office of the attorney general of any Plaintiff State);

    **F.**    Privileged draft regulatory filings; and

    **G.**    Privileged draft investigation or litigation filings.

2.    **Placeholder Slipsheets.** If any member of a produced Document family is withheld on grounds of privilege or work-product, the Producing Party will produce a Bates stamped placeholder slipsheet that identifies the Document as withheld as privileged and will identify the Document in the Privilege Log by the Bates Number on the placeholder slipsheet. If the withheld Document is part of a responsive document family, the Parties will insert a placeholder to indicate that the Document has been withheld from that family and will produce all non-privileged Documents in the family.

3.    **Privilege Log Contents.** Privilege logs must contain the following information, to the extent reasonably available:

    **A.**    BegBates;

    **B.**    Where applicable, Parent BegBates;

19

C.     The Custodian or Custodial or Non-Custodial Data Source from which the Document was collected;

D.     The author or sender of the document according to Document Metadata (to the extent a document is comprised of an email chain, the name of the sender on the most recent email in the chain will be identified);

E.     The designated addressees or copyees of the document, including CC and BCC (copyees and blind copyees shall appear in separate fields) according to Document Metadata where available (to the extent a document is comprised of an email chain, the name(s) of the addressee(s) on the most recent email in the chain will be identified);

F.     The number of pages;

G.     The date of the document or communication according to Document Metadata;

H.     The title of the Document or email subject line or Document file name, according to Document Metadata, which may be designated as redacted on the log in accordance with Section V.6;

I.     A description, pursuant to Fed. R. Civ. P. 26(b)(5)(A)(ii), of the nature of the withheld Document that, without revealing privileged or protected information, enables other Parties to assess the claim of privilege or other protection from disclosure;

J.     The name of the attorney(s) or legal organization who provided the legal advice at issue, from whom the legal advice at issue is requested, who

directed the facilitation of the legal advice at issue, and/or who requested or prepared the Document; and

K.     The privilege or protection asserted (i.e., attorney-client privilege, work product doctrine).

4.     **Accompanying Legends.** Each privilege log must include a separate legend that identifies attorneys who acted in a legal capacity that appear on the privilege log. For each entry of the privilege log, all attorneys acting in a legal capacity with respect to that particular document or communication will be marked with the designation ESQ after their names. The privilege log must also include the name and company affiliation for each listed individual. Upon request, a Producing Party must make reasonable efforts to produce the names of all members of a Producing Party's email listserv or group (including last name, first name, and any ESQ designation) for a listserv or group in a privilege log. Upon request, a Producing Party must make reasonable efforts to produce the title of specific individuals listed in a privilege log.

5.     **Categorical Privilege Designations.** If a Producing Party contends that all Documents or ESI of a particular type or category are privileged, or requiring the creation of an individualized privilege log is not reasonable or proportionate for documents of a particular type or category, they will meet and confer with the Receiving Party on identifying such Documents or ESI on a privilege log by category rather than individually. The Receiving Party will consider any such request in good faith. The Producing Party's categorical privilege log entry must still provide the Receiving Party, and the Court if necessary, with information sufficient to evaluate the Producing Party's privilege claims. The Parties need not include in any privilege log the ESI listed in Section III.3.

21

6. **Single Entries.** A single Document containing multiple email messages in the body of the document (i.e., in an email chain) may be logged as a single entry.

7. **Assert All Bases.** If the Producing Party contends that more than one basis for withholding applies to a single document, all bases must be asserted in the privilege log.

8. **Privilege Disputes.** The Parties will comply with L. Civ. R. 37.1 to address any dispute over a Party's claim of privilege or privilege log before seeking the Court's intervention. Upon production of deprivileged documents, the Producing Party will produce an index mapping the Bates Number of each deprivileged document to the privilege log entry number used to identify that document on the privilege log.

## VII. MISCELLANEOUS

1. **Costs of Production.** Unless this Court orders otherwise for good cause shown, each Party and non-party will bear the costs of collecting, processing, reviewing, and producing its own documents.

2. **No Waiver.** Matters not addressed in this ESI Order shall not be deemed waived. Rather, any such matters shall be addressed by the Parties at a later time through additional meeting and conferring, and, if necessary, submitted to the Court for resolution.

3. **Modification.** This ESI Order may be modified by a Stipulated Order of the Parties or by the Court for good cause shown.

Dated: March 31, 2025

/s/ Johnathan Lasken
Jonathan H. Lasken
United States Department of Justice
450 Fifth Street, NW, Suite 4000
Washington, D.C. 20530
Tel: (202) 598-6517
Email: jonathan.lasken@usdoj.gov

*Attorneys for Plaintiff United States of America*

22

Dated: March 31, 2025

*/s/ Lauren Van Driesen*
Lauren E. Van Driesen
Deputy Attorney General
Division of Law – Special Litigation
New Jersey Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (609) 696-5271
Email: lauren.vandriesen@law.njoag.gov
*Attorney for Plaintiff State of New Jersey*

Dated: March 31, 2025

*/s/ Vinny Venkat*
Vinny Venkat
Assistant Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Tel: (602) 542-7757
Email: vinny.venkat@azag.gov

*Attorney for Plaintiff State of Arizona*

Dated: March 31, 2025

*/s/ Brian Wang*
Brian Wang
Deputy Attorney General
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco CA 94102
Tel: (415) 510-3487
Email: Brian.Wang@doj.ca.gov

*Attorney for Plaintiff State of California*

Dated: March 31, 2025

*/s/ Elizabeth Arthur*
Elizabeth G. Arthur
Assistant Attorney General
Public Advocacy Division
400 6th Street NW, 10th Floor
Washington, D.C. 20001
Tel.: (202) 442-9864
Email: elizabeth.arthur@dc.gov

*Attorney for Plaintiff District of Columbia*

23

Dated: March 31, 2025

/s/ Nicole Demers
Nicole Demers
Deputy Associate Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
Tel.: (860) 808-5030
Email: nicole.demers@ct.gov

*Attorney for Plaintiff State of Connecticut*

Dated: March 31, 2025

/s/ Jennifer Linsey
Jennifer Linsey
Deputy Attorney General
Consumer Protection Division
Office of the Indiana Attorney General
Indiana Government Center South, 5th Floor
302 West Washington Street
Indianapolis, IN 46204
Tel.: (463) 261-7401
Email: Jennifer.Linsey@tg.in.gov

*Attorney for Plaintiff State of Indiana*

Dated: March 31, 2025

/s/ Christina Moylan
Christina M. Moylan
Assistant Attorney General
Consumer Protection Division
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel.: (207) 626-8800
Email: christina.moylan@maine.gov

*Attorney for Plaintiff State of Maine*

Dated: March 31, 2025

/s/ David Mlaver
David Mlaver
Assistant Attorney General
Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Tel.: (617) 963-2414
Email: David.mlaver @mass.gov

24

*Attorney for Plaintiff State of Massachusetts*

Dated: March 31, 2025

/s/ *Jason Evans*
Jason R. Evans
Division Chief
Corporate Oversight Division
Michigan Department of Attorney General
525 W Ottawa St.
Lansing, MI 48933
Tel.: (517) 335-7622
Email: EvansJ@michigan.gov

*Attorney for Plaintiff State of Michigan*

Dated: March 31, 2025

/s/ *Justin Moor*
Justin Moor
Assistant Attorney General
455 Minnesota Street, Suite 1400
Saint Paul, MN 55101-2130
Tel.: (651) 724-9627
Email: justin.moor@ag.state.mn.us

*Attorney for Plaintiff State of Minnesota*

Dated: March 31, 2025

/s/ *Raquel Fulghum*
Raquel Fulghum
Deputy Attorney General
Office of the Nevada Attorney General
100 North Carson Street
Carson City, NV 89701-4717
Tel.: (775) 684-1100
Email: rfulghum@ag.nv.gov

*Attorney for Plaintiff State of Nevada*

Dated: March 31, 2025

/s/ *Alexandra Sosnowski*
Alexandra C. Sosnowski
Assistant Attorney General
Consumer Protection and Antitrust Bureau
New Hampshire Department of Justice
Office of the Attorney General
One Granite Place South
Concord, NH 03301
Tel.: (603) 271-2678

25

Email: Alexandra.C.Sosnowski@doj.nh.gov

*Attorney for Plaintiff State of New Hampshire*

Dated: March 31, 2025

*/s/ Elinor Hoffmann*
Elinor R. Hoffmann
Chief, Antitrust Bureau
New York State Office of the Attorney
General
28 Liberty Street
New York, NY 10005
Tel.: (212) 416-8598
Email: Elinor.Hoffmann@ag.ny.gov

*Attorney For Plaintiff State of New York*

Dated: March 31, 2025

*/s/ Elin Alm*
Elin S. Alm
Assistant Attorney General
Christopher G. Lindblad
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of Attorney General
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
Tel.: (701) 328-5570
Email: ealm@nd.gov
clindblad@nd.gov

*Attorney for Plaintiff State of North Dakota*

Dated: March 31, 2025

*/s/ Robert Carlson*
Robert J. Carlson
Senior Assistant Attorney General
Consumer Protection Unit
Office of the Oklahoma Attorney General
15 West 6th Street, Suite 1000
Tulsa, OK 74119
Tel.: (918) 581-2285
Email: robert.carlson@oag.ok.gov

*Attorney for Plaintiff State of Oklahoma*

Dated: March 31, 2025

*/s/ Timothy Smith*
Timothy D. Smith
Senior Assistant Attorney General

26

Antitrust and False Claims Unit
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel.: (503) 934-4400
Email: tim.smith@doj.state.or.us

*Attorney for Plaintiff State of Oregon*

Dated: March 31, 2025

*/s/ David McDowell*
J. David McDowell
Deputy, Consumer Protection Division
Office of the Attorney General and Reporter
P.O Box 20207
Nashville, TN 37202
Tel.: (615) 741-8722
Email: David.McDowell@ag.tn.gov

*Attorney for Plaintiff State of Tennessee*

Dated: March 31, 2025

*/s/ Luminita Nodita*
Luminita Nodit
Assistant Attorney General
Antitrust Division
Washington Attorney General's Office
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Tel.: (206) 254-0568
Email: lumi.nodit@atg.wa.gov

*Attorney for Plaintiff State of Washington*

Dated: March 31, 2025

*/s/ Laura McFarlane*
Laura E. McFarlane
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
Tel. (608) 261-5810
Email: mcfarlanele@doj.state.wi.us

*Attorney for Plaintiff State of Wisconsin*

Dated: March 31, 2025

*/s/ Jill Abrams*
Jill S. Abrams
Assistant Attorney General

27

109 State Street
Montpelier, Vermont
Tel.: (802) 828-1106
Email: jill.abrams@vermont.gov

*Attorney for Plaintiff State of Vermont*

Dated: March 31, 2025

*/s/ Lisa Walsh*
Liza M. Walsh
Douglas E. Arpert
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, New Jersey 07102
Tel.: (973) 757-1100
Email: lwalsh@walsh.law
Email: darpert@walsh.law

Craig S. Primis, P.C.
Winn Allen, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel.: (202) 389-5000
Email: craig.primis@kirkland.com
Email: winn.allen@kirkland.com

Devora W. Allon, P.C.
Alexia R. Brancato, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800
Email: devora.allon@kirkland.com
Email: alexia.brancato@kirkland.com

*Attorneys for Defendant Apple Inc.*

**IT IS SO ORDERED.**

Dated: ___May 22__, 2025

_____
HON. LEDA DUNN WETTRE
United Stated Magistrate Judge

28

**APPENDIX A: METADATA FIELDS FOR EDISCOVERY**

| Field Name | Field Description | Field Type | Hard Copy | Email | Other ESI | Calendar Items | IM/Text/ Chat |
|---|---|---|---|---|---|---|---|
| DOCID | The unique sequential document control number of the first page of the document. Cannot contain spaces or special characters. | Note Text | ✓ | ✓ | ✓ | ✓ | ✓ |
| ENDDOC | The unique sequential control number of the last page of the document. Cannot contain spaces or special characters. | Note Text | ✓ | ✓ | ✓ | ✓ | ✓ |
| COMPANIES | Globally populated field containing the name of producing party (not the law firm or vendor name). Not pulled from metadata. | Multi-Entry | ✓ | ✓ | ✓ | ✓ | ✓ |
| CUSTODIAN | Name of the individual, or group/department for shared resources, from whose files the document originated. Format: Last, First or ABC Dept. Use consistent naming and formatting across all productions. | Note Text | ✓ | ✓ | ✓ | ✓ | ✓ |
| ALLCUSTODIANS | All custodians who were in possession of a deduplicated document, including the person or group identified in the CUSTODIAN field. Format: Last, First or ABC Dept. Use consistent naming and formatting across all productions. | Multi-Entry | ✓ | ✓ | ✓ | ✓ | ✓ |
| MEDIAID | The unique identifier applied to each physical piece of media delivered (e.g., ABC001). | Note Text | ✓ | ✓ | ✓ | ✓ | ✓ |
| VOLUMENAME | Unique production volume identifier applied (e.g., ABC001-001). | Note Text | ✓ | ✓ | ✓ | ✓ | ✓ |
| BEGATTACH | Used for documents in a family group (e.g. an email with attachments). Populated with the document control number of the parent document. Populated for each child document as well as the parent document. | Note Text | ✓ | ✓ | ✓ | ✓ | ✓ |

1

**APPENDIX A: METADATA FIELDS FOR EDISCOVERY**

| Field Name | Field Description | Field Type | Hard Copy | Email | Other ESI | Calendar Items | IM/Text/ Chat |
|---|---|---|:---:|:---:|:---:|:---:|:---:|
| ENDATTACH | Used for documents in a family group (e.g. an email with attachments).<br>Populated with the ENDDOC of the last child record in the family group.<br>Populated for each child document as well as the parent document. | Note Text | ✓ | ✓ | ✓ | ✓ | ✓ |
| EPROPERTIES | Indicates record type, privilege, translation, and other notations. Include all that apply, only the applicable record type or notation category names should be entered:<br>Record Type: Edoc, Edoc Attachment, Email, Email Attachment, Hard Copy, Calendar, Text Message, Text Attachment, IM, Chat, Chat Attachment, Audio, Video, Voicemail<br>Other Notations: Placeholder, Translation, Translated<br>Privilege Notations: Redacted, Privileged, Family Member of Priv Doc | Multi-Entry | ✓ | ✓ | ✓ | ✓ | ✓ |
| TIMEZONE | The time zone in which the custodian is normally located. | Note Text | | ✓ | ✓ | ✓ | ✓ |
| FOLDERLABEL | Full folder path of email within a mail store when collected, including file name; or full folder path of text messages or chats when collected including file name; or Hard Copy folder/bindertitle/label where available. Prepend with Custodian Name (sample: Smith, James-Inbox\Active). | Multi-Entry | ✓ | ✓ | | ✓ | ✓ |
| FROM | Sender of the Email or Calendar item. | Note Text | | ✓ | | ✓ | |

2

## APPENDIX A: METADATA FIELDS FOR EDISCOVERY

| Field Name | Field Description | Field Type | Hard Copy | Email | Other ESI | Calendar Items | IM/Text/ Chat |
|---|---|---|---|---|---|---|---|
| TO | Primary recipients of the Email or Calendar Item. | Multi-Entry | | ✓ | | ✓ | |
| CC | Copyees of the Email or Calendar Item. | Multi-Entry | | ✓ | | ✓ | |
| BCC | Blind Copyees of the Email or Calendar Item, including in deduplicated documents. | Multi-Entry | | ✓ | | ✓ | |
| SUBJECT | Subject line of the Email, Calendar Item, or Notes item. | Note Text | | ✓ | | ✓ | |
| DATEHC | Date of hard copy documents, if coded. Format: MM/DD/YYYY. Leave time segment blank. | Date | ✓ | | | | |
| DATETIMESENT | Date and time the Email or Calendar Item was sent. Format: MM/DD/YYYY HH:MM:SS (use 24 hour times, e.g., 13:32:00 for 1:32 pm); time zone indicators cannot be included). | Date-Time | | ✓ | | ✓ | |
| DATETIMERECEIVED | Date and time the Email or Calendar Item was received. Format: MM/DD/YYYY HH:MM:SS (use 24 hour times, e.g., 13:32:00 for 1:32 pm); time zone indicators cannot be included. | Date-Time | | ✓ | | ✓ | |
| HEADER | The internet header information from each Email. | Note Text | | ✓ | | ✓ | |
| INTERNETMSGID | Internet message ID assigned by the outgoing mail server which typically includes messageid and a domain name. Example: 0E6648D558F338179524D555@m1p.innovy.net | Note Text | | ✓ | | ✓ | |
| EMAILMESSAGEID | Unique identifier of email messages in mail stores. EntryID for Microsoft Outlook, the UniqueID (UNID) for Lotus Notes, or equivalent value for other proprietary mail store formats where available. | Note Text | | ✓ | | ✓ | |
| INREPLYTOID | Internet message ID of the Email being replied to. | Note Text | | ✓ | | ✓ | |

3

**APPENDIX A: METADATA FIELDS FOR EDISCOVERY**

| Field Name | Field Description | Field Type | Hard Copy | Email | Other ESI | Calendar Items | IM/Text/ Chat |
|---|---|---|---|---|---|---|---|
| CONVERSATIONIND EX | Conversation index value for Microsoft Exchange emails. | Note Text | | ✓ | | ✓ | |
| IMPORTANCE | Indicates priority level set for message. | Note Text | | ✓ | | ✓ | |
| DELIVERYRECEIPT | Delivery receipt request notification for Email messages. | Note Text | | ✓ | | ✓ | |
| READRECEIPT | Read Receipt request notification for Email messages. | Note Text | | ✓ | | ✓ | |
| SENSITIVITY | Sensitivity field from Email messages or calendar items. | Note Text | | ✓ | | ✓ | |
| REVISION | Revision number extracted from metadata of native file. | Note Text | | | ✓ | | |
| DATECREATED | Date and time the electronic file was created. Format: MM/DD/YYYY HH:MM:SS (use 24 hour times, e.g., 13:32:00 for 1:32 pm); time zone indicators cannot be included). | Date-Time | | | ✓ | | |
| DATELASTMODIFIE D | Date and time the electronic file was last modified. Format: MM/DD/YYYY HH:MM:SS (use 24 hour times, e.g., 13:32:00 for 1:32 pm); time zone indicators cannot be included. | Date-Time | | | ✓ | | |
| EORGANIZATION | "Company" field value pulled from the metadata of a native file. | Note Text | | | ✓ | | |
| EAUTHOR | Author field value pulled from the metadata of a native file. | Note Text | | | ✓ | | |
| LASTAUTHOR | Last Saved By field value pulled from metadata of a native file. | Note Text | | | ✓ | | |
| ESUBJECT | Title or Subject field value pulled from metadata from electronic file. | Note Text | | | ✓ | | |

4

**APPENDIX A: METADATA FIELDS FOR EDISCOVERY**

| Field Name | Field Description | Field Type | Hard Copy | Email | Other ESI | Calendar Items | IM/Text/ Chat |
|---|---|---|---|---|---|---|---|
| FILENAME | Original file name of the native file, including file extension. | Note Text | | ✓ | ✓ | ✓ | ✓ |
| APPLICATION | Application used to create or transmit the original native files, document, message, appointment (e.g., WhatsApp, Excel, Slack, Outlook, Snapchat, Word, Twitter, Gmail, Tango). | Note Text | | ✓ | ✓ | ✓ | ✓ |
| FILEEXTENSION | File extension of original native file; e.g. XLSX, PDF, DOCX | Max 5 char. | | ✓ | ✓ | ✓ | |
| FILEPATH | Full qualified original path to the native when collected, including original file name. Prepend with recognizable Custodian Name; e.g. Smith, James- C\My Documents\Sales Info\ACME\2017- Monthly-Sales.xlsx | Multi-Entry | | ✓ | ✓ | ✓ | |
| DOCLINK | File path location to the current native file location on the delivery medium. | Note Text | | | ✓ | | |
| DATESTART | Start date and time of calendar appointments or voice messages. For Text Message or Chat Conversation Days, populate with either the date and time of the first message in the Conversation Day, or the date and time that the 24-hour period began. Format: MM/DD/YYYY HH:MM:SS (use 24 hour times, e.g., 13:32:00 for 1:32 pm); time zone indicators cannot be included. | Date-Time | | | | ✓ | ✓ |

5

**APPENDIX A: METADATA FIELDS FOR EDISCOVERY**

| Field Name | Field Description | Field Type | Hard Copy | Email | Other ESI | Calendar Items | IM/Text/ Chat |
|---|---|---|---|---|---|---|---|
| DATEEND | End date and time of calendar appointments or voice messages. For Text Message or Chat Conversation Days, populate with either the date and time of the last message in the Conversation Day, or the date and time that the 24-hour period ended. Format: MM/DD/YYYY HH:MM:SS (use 24 hour times, e.g., 13:32:00 for 1:32 pm); time zone indicators cannot be included. | Date-Time | | | | ✓ | ✓ |
| ACCOUNT | Unique account ID | Note Text | | | | | ✓ |
| DURATION | The elapsed time of the audio, video, voice message. Format HH:MM:SS | Note Text | | | ✓ | | |
| TXT-CHATROOMNAME | Name of chat room used in the communications. | Note Text | | | | | ✓ |
| TXT- PARTICIPANTS | List of participant names and/or telephone numbers. | Note Text | | | | | ✓ |
| TXT-THREAD-GROUP | Populate with the DOCID of the first Text Message or Chat Conversation Day in a conversation or chat. | Note Text | | | | | ✓ |
| HASHMD5 | Document MD5 hash value (used for deduplication or other processing). | Note Text | | ✓ | ✓ | ✓ | ✓ |
| HASHSHA | Document SHA hash value (used for deduplication or other processing). | Note Text | | ✓ | ✓ | ✓ | ✓ |
| DOCUMENTURL | Populated with a delimited list of all URLs that uniquely point to a document produced from an Accessible CWE. | | | ✓ | ✓ | ✓ | ✓ |

Throughout, multiple entries should always be separated with a semi-colon followed by a space.

6

# EXHIBIT F

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA, *et al.*,

Plaintiffs,

v.

APPLE INC.,

Defendant.

Case No. 2:24-cv-04055 (JXN) (LDW)

## DISCOVERY CONFIDENTIALITY ORDER

In the interests of (1) ensuring efficient and prompt resolution of this Action; (2) facilitating discovery by the Parties litigating this Action; and (3) protecting confidential information from improper disclosure or use, the Parties stipulate to the provisions set forth below. The Court, upon good cause shown and pursuant to Federal Rule of Civil Procedure 26(c)(1), ORDERS as follows:

1. The parties acknowledge that this Order does not confer blanket protections on all disclosures during discovery, or in the course of making initial or supplemental disclosures under Rule 26(a). Designations by any Producing Party under this Order shall be made with care and shall not be made absent a good faith belief that the designated material satisfies the criteria set forth below. If it comes to a Producing Party's attention that designated material does not qualify for protection at all, or does not qualify for the level of protection initially asserted, the Producing Party must promptly notify all other Parties that it is withdrawing or changing the designation.

1

### A. **Definitions**

2. As used herein for purposes of this Order only:

(a) "Action" means the above-captioned action pending in this Court, including any related discovery, pre-trial, trial, post-trial, or appellate proceedings.

(b) "Business Decisions" means decisions relating to a competitor, potential competitor, customer, or distribution partner including decisions regarding contracts, marketing, pricing, product or service development or design, product or service offerings, research and development, mergers and acquisitions, or licensing, acquisition, or enforcement of intellectual property rights. It does not include the rendering of legal advice in connection with litigation, compliance, regulatory, or liability issues related to business decisions.

(d) "Confidential" or "Confidential Information" means any information, document, or thing, or portion of any document or thing, produced in any Investigation Materials or Litigation Materials that contains (a) Personal Information; or (b) confidential research or commercial information. Provided, however, that any portion of any Investigation Materials or Litigation Materials, except for Personal Information, that has been published or otherwise made publicly available is not Confidential Information.

(e) "Defendant" or "Apple" means Apple Inc. and its employees, agents, representatives, parents, subsidiaries, affiliates, successors, and assigns.

(f) "Designated In-House Attorneys" means no more than four (4) attorneys employed by Apple who can access Highly Confidential Information provided that they are not currently involved in Business Decisions and whose names, titles, and department are disclosed to the United States, Plaintiff States, and Intervening Non-Parties at least ten (10) business days prior to the effective date of designation, and who are agreed upon by the Parties and Intervening Non-Parties or (in the absence of an agreement) designated by the Court. To the extent Apple seeks to

replace a Designated In-House Attorney, Apple must provide notice to the United States, Plaintiff States, and Intervening Non-Parties at least ten (10) business days prior to the desired effective date of such change, and the replacement must be agreed upon by the Parties and Intervening Non-Parties or (in the absence of an agreement) designated by the Court. Designation of Apple's Designated In-House Attorneys to any Producing Party that is not a Party or an Intervening Non-Party will be made at least ten (10) business days prior to the disclosure of any Highly Confidential Information. An individual who has served as a Designated In-House Attorney shall not—for a period of two years following the last occasion on which Highly Confidential Information is disclosed to such Designated In-House Attorney—(a) participate in or advise on Business Decisions at the Defendant, (b) participate in or advise on Business Decisions involving a Protected Person whose Highly Confidential Information they accessed during the course of this Action at any employer, or (c) participate in or advise on litigation or other legal actions on behalf of Defendant or any other employer where a Protected Person is a party and whose Highly Confidential Information the Designated In-House Attorney accessed in the course of this Action (aside from litigation arising from or related to the allegations in the Complaint in this Action). Any attorney subject to this subsection who leaves the employment of Defendant to work in an unrelated industry shall be presumed to be exempt from the post-employment limits of this provision absent a showing by Plaintiffs or any interested Protected Person that such a person engaged in Business Decision-making.

(g)     "Disclosed" means shown, divulged, revealed, produced, described, transmitted, or otherwise communicated, in whole or in part.

(h)     "Document" means any document or electronically stored information, as the term is used in Federal Rule of Civil Procedure 34(a).

3

(i)     "Highly Confidential" or "Highly Confidential Information" means any information that is extremely confidential and/or sensitive in nature and the Producing Party reasonably believes the disclosure of which is likely to cause economic harm or competitive disadvantage to the Producing Party.  The Parties agree that the following information, if non-public, shall be presumed to merit the Highly Confidential designation: trade secrets, pricing information, financial data, sales information, sales or marketing forecasts or plans, business plans, sales or marketing strategy, product development information, engineering documents, testing documents, employee information, and other non-public information of similar competitive and business sensitivity.

(j)     "Highly Confidential – Outside Counsel Only" or "Highly Confidential Information – Outside Counsel Only" means any Highly Confidential Information that the Producing Party reasonably believes the disclosure of which to Defendant's personnel (including its officers, directors, executives, employees, or in-house attorneys) is likely to cause economic harm or competitive disadvantage to the Producing Party.

(k)     "In-House Attorneys" means any attorney employed by the Defendant.

(l)     "Intervening Non-Party" or "Intervening Non-Parties" means one the following Non-Parties: Capital One Financial Corporation; Garmin International, Inc.; Google LLC; JPMorgan Chase Bank, N.A.; Match Group, Inc.; Meta Platforms, Inc.; Microsoft Corp.; PayPal, Inc.; and Samsung Electronics America, Inc.

(m)     "Investigation" means any pre-complaint review, assessment, or investigation of the matters at issue in this Action by the United States or Plaintiff States.

(n)     "Investigation Material" or "Investigation Materials" means non-privileged documents, data, communications, transcripts of testimony, or other materials relating to the

4

Investigation, including but not limited to documents or information provided pursuant to the Antitrust Civil Process Act, 15 U.S.C. §§ 1311-14 or any State equivalent CID process that prior to the filing of this Action (a) any Non-Party provided to any Party; (b) any Party provided to any Non-Party; or (c) any Party provided to any Party.

(o) "Litigation Material" or "Litigation Materials" means non-privileged documents, data, communications, testimony, or other materials relating to this Action that, after the filing of and during the pendency of this Action, (a) any Non-Party provides to any Party, either voluntarily or under compulsory process; (b) any Party provides to any Non-Party; or (c) any Party provides to any Party.

(p) "Non-Party" means any natural person, partnership, corporation, association, or other legal entity not named as a Party to this Action.

(q) "Outside Counsel" means the law firm(s) who represent or are retained by the Defendant, including any attorneys, paralegals, and other professional personnel (including support and IT staff), agents, or independent contractors retained by the Defendant that such law firm(s) assign(s).

(r) "Party" or "Parties" means any individual Plaintiff or any Defendant in the above-captioned action, or Plaintiffs and Defendants collectively.

(s) "Person" means any natural person, corporate entity, partnership, association, joint venture, governmental entity, or trust.

(t) "Personal Information" means a natural person's non-public personal identifiable information that is linked or reasonably linkable to an identified or identifiable natural person, including, but not limited to, Social Security number; driver's license number, or state or federal government identification number, or foreign country equivalent identification number; passport

5

number; financial account number; credit or debit card number; email address; name, address, or phone number in combination with other personal identifiable information; sensitive personal information regarding genetic or biometric data, precise geolocation data, financial information or transactions, medical or health history and records, and criminal or employment history; and any other protected personal information subject to non-disclosure obligations imposed by governmental authorities, law, or regulation.

(u)   "Plaintiff State" means State of New Jersey, State of Arizona, State of California, District of Columbia, State of Connecticut, State of Indiana, State of Maine, Commonwealth of Massachusetts, State of Michigan, State of Minnesota, State of Nevada, State of New Hampshire, State of New York, State of North Dakota, State of Oklahoma, State of Oregon, State of Tennessee, State of Vermont, State of Washington, and State of Wisconsin acting by and through their respective Attorneys General, or any other State acting by and through their respective Attorneys General which joins this Action.  "Plaintiff States" means collectively all Plaintiff States in this Action.

(v)   "Producing Party" means any Party or Non-Party that discloses or produces or reproduces any Investigation Materials or Litigation Materials in this Action.

(w)   "Protected Material" means any Investigation Material or Litigation Material that is designated as "Confidential," "Highly Confidential," or "Highly Confidential – Outside Counsel Only," as provided for in this Order.  Protected Material shall not include: (i) advertising materials that have been actually published or publicly disseminated; and (ii) materials that show on their face they have been disseminated to the public.

(x)   "Protected Person" means any Person (including any Party or Non-Party) that has provided Investigation Materials or that provides Litigation Materials in this Action.

6

(y)     "Receiving Party" means any Party or Non-Party who receives Investigation Materials or Litigation Materials from a Producing Party.

**B.      Computing Time**

3.      Unless otherwise specified, time will be computed according to Federal Rule of Civil Procedure 6(a).

**C.      Notice to Non-Party Protected Persons of the Terms of This Order**

4.      Within five (5) business days of the Court's entry of this Order, each Party must send by email, facsimile, or overnight delivery a copy of this Order to each Non-Party Protected Person (or, if represented by counsel, the Non-Party Protected Person's counsel) that provided Investigation Materials to that Party.

5.      Any Party that seeks discovery from a Non-Party Protected Person for use in this Action must include a copy of this Order when serving a discovery request or subpoena on the Non-Party Protected Person.  If any Party sent a discovery request or subpoena to any Non-Party Protected Person prior to entry of this Order, that Party must send a copy of this Order to the Non-Party Protected Person within two (2) business days of entry of this Order.

**D.      Modifications of This Order**

6.      If a Non-Party Protected Person determines that this Order does not adequately protect its Protected Material, it may seek additional protection from the Court for its Protected Material within fourteen (14) days after receiving notice of this Order under Paragraphs 4 or 5. by filing a letter application pursuant to Local Civil Rule 37.1(a)(1). If a Non-Party Protected Person timely seeks additional protection from the Court, a Party's obligation to produce that Non-Party Protected Person's documents containing Protected Material, that is the subject of the ~~motion~~ application, is suspended until a decision is rendered by the Court, unless the Non-Party Protected Person who filed the ~~motion~~ application and the Parties reach an agreement allowing production of the Protected Material while the ~~motion~~ application is pending.  If the Court orders the

7

production of the non-Party Protected Person's documents, the Party obligated to produce the Non-Party Protected Person's Protected Material will have seven (7) days to make the production unless a longer period is ordered by the Court.

7.      Nothing in this Order limits any Person, including members of the public, a Party, or a Non-Party Protected Person, from seeking additional protection or modification of this Order upon ~~a motion~~ <u>an application</u> duly made according to <u>Rule 37.1 of</u> the Local Rules of this Court, including, without limitation, an order that certain information need not be produced at all or is not admissible evidence in this Action or any other proceeding.  By stipulating to this Order, the Parties do not waive the right to argue that certain material may require additional or different confidentiality protections than those set forth herein.

**E.      Designation of Protected Material in Investigation Materials**

8.      Any Investigation Materials that Apple previously provided to the United States or any Plaintiff State during an Investigation that Apple designated as Protected Material or for which Apple requested protected or confidential treatment, including, but not limited to, testimony, documents, electronic documents and data, and materials produced pursuant to the Antitrust Civil Process Act, 15 U.S.C. §§ 1311-14, will be treated as containing Confidential Information, or as Highly Confidential if previously designated by Apple.

9.      A Non-Party Protected Person shall have sixty (60) days after receiving a copy of this Order (the "Designation Period") to designate as Highly Confidential Information or Highly Confidential Information – Outside Counsel Only any Investigation Materials to the extent the Non-Party Protected Person determines, in good faith, that the Investigation Materials include Highly Confidential Information or Highly Confidential Information – Outside Counsel Only, and that such designation is necessary to protect the interests of the Non-Party Protected Person.  Such Investigation Materials, including but not limited to testimony, documents, electronic documents

8

and data, and materials produced pursuant to the Antitrust Civil Process Act, 15 U.S.C. §§ 1311-14, or any State equivalent process, may be so designated by providing written notice by overnight mail or email to the Party to which the Investigation Materials were produced and providing a reproduction of the Investigation Materials stamped with the legend "HIGHLY CONFIDENTIAL INFORMATION" or "HIGHLY CONFIDENTIAL INFORMATION – OUTSIDE COUNSEL ONLY," in a manner that will not interfere with legibility, including page numbering, or auditability.

10.    Until the expiration of the Designation Period, all Investigation Materials produced by a Non-Party Protected Person will be treated as Highly Confidential Information – Outside Counsel Only in their entirety. Investigation Materials previously produced by a Non-Party Protected Person that are not designated as Highly Confidential or Highly Confidential Information – Outside Counsel Only by the expiration of the Designation Period shall be treated as Confidential Information for purposes of this Order, whether or not the Non-Party Protected Person requested confidential treatment at the time of production.

**F.    Designation of Protected Material in Litigation Materials**

11.    The following procedures govern the process for all Protected Persons (including any Party or Non-Party) to designate as Protected Material any Litigation Materials, including but not limited to information provided in response to requests under Federal Rules of Civil Procedure 30, 31, 33, 36, or 45, and documents disclosed in response to Federal Rules of Civil Procedure 33(d), 34(b)(2) and (c), or 45.

12.    Any Producing Party may designate Litigation Material with any of the following designations, provided that it meets the requirements for such designations as provided for herein: "Confidential," "Highly Confidential," or "Highly Confidential – Outside Counsel Only."

9

13.     Any production or designation of Protected Material or other written notice to the Parties required by this Order must be provided by email, overnight mail, or hand delivery to the following counsel for the Parties, or any later added lead counsel for a Party:

For Plaintiff United States:
Jonathan H. Lasken (jonathan.lasken@usdoj.gov)
Jennifer Hane (jennifer.hane@usdoj.gov)
Aaron M. Sheanin (aaron.sheanin@usdoj.gov)
Nolan J. Mayther (nolan.mayther@usdoj.gov)
Micah Stein (micah.stein@usdoj.gov)
Lorraine Van Kirk (lorraine.vankirk@usdoj.gov)
Jeremy Keeney (jeremy.keeney@usdoj.gov)
Grace Torrence (grace.torrence@usdoj.gov)
United States Department of Justice
450 Fifth Street, NW, Suite 4000
Washington, D.C.  20530
Tel: (202) 598-6517

For Plaintiff State of New Jersey:
Lauren E. Van Driesen (Lauren.vandriesen@law.njoag.gov)
Deputy Attorney General
Leslie Prentice (Leslie.Prentice@law.njoag.gov)
Deputy Attorney General
Andrew Esoldi (Andrew.Esoldi@law.njoag.gov)
Deputy Attorney General
Yale A. Leber (yale.leber@law.njoag.gov)
Deputy Attorney General
New Jersey Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-7819

For Plaintiff State of California:
Brian Wang (Brian.Wang@doj.ca.gov)
Deputy Attorney General
Cari Jeffries (cari.jeffries@doj.ca.gov)
Deputy Attorney General
Robert McNary (Robert.McNary@doj.ca.gov)
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
 Tel.: (415) 510-4400

For Plaintiff State of Minnesota:

10

Elizabeth Odette (Elizabeth.Odette@ag.state.mn.us)
Assistant Attorney General
Erin Conti (Erin.Conti@ag.state.mn.us)
Assistant Attorney General
Justin Moor (justin.moor@ag.state.mn.us)
Assistant Attorney General
455 Minnesota Street, Suite 1400
Saint Paul, MN 55101-2130
Tel.: (651) 724-9627

For Plaintiff State of Michigan:
Jason R. Evans (EvansJ@michigan.gov)
Division Chief
Scott A. Mertens (MertensS@michigan.gov)
Section Head
Jonathan S. Comish (ComishJ@michigan.gov)
Assistant Attorney General
Leann D. Scott (ScottL21@michigan.gov)
Assistant Attorney General
Corporate Oversight Division
Michigan Department of Attorney General
525 W Ottawa St.
Lansing, MI 48933
Tel.: (517) 335-7622

For Plaintiff State of New York:
Elinor Hoffman (elinor.hoffmann@ag.ny.gov)
Chief, Antitrust Bureau
Amy McFarlane (amy.mcfarlane@ag.ny.gov)
Deputy Chief, Antitrust Bureau
Bryan Bloom (bryan.bloom@ag.ny.gov)
Senior Enforcement Counsel
28 Liberty Street
New York, NY 10005
Tel.: 212-416-8598

For Defendant Apple Inc.:

Liza M. Walsh (lwalsh@walsh.law)
Douglas E. Arpert (darpert@walsh.law)
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, New Jersey 07102
Tel.: (973) 757-1100

11

Craig S. Primis (craig.primis@kirkland.com)
Winn Allen (winn.allen@kirkland.com)
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel.: (202) 389-5000

Devora W. Allon (devora.allon@kirkland.com)
Alexia R. Brancato (alexia.brancato@kirkland.com)
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800

14.     Testimony. All transcripts of depositions taken in this Action will be treated as Highly Confidential – Outside Counsel Only in their entirety for thirty (30) days after the date when a complete and final copy of the transcript has been made available to the deponent (or the deponent's counsel, if applicable). Within two (2) business days of receipt of the final transcript, the Party who noticed the deposition must provide the final transcript to the deponent (or the deponent's counsel, if applicable). Within thirty (30) days following receipt of the final transcript, the deponent (or the deponent's counsel, if applicable) may designate as Confidential, Highly Confidential, or Highly Confidential – Outside Counsel Only, as appropriate, any portion(s) of the deposition transcript, by page(s) and line(s), and any deposition exhibits, or portion(s) of any exhibit(s), that were produced by the deponent or the deponent's employer or former employer. When a Party questions a deponent about Investigation Material or Litigation Material that has been designated by a Non-Party Protected Person as containing Confidential Information, Highly Confidential Information or Highly Confidential Information – Outside Counsel Only, the Party asking the questions must designate as Confidential, Highly Confidential, or Highly Confidential – Outside Counsel Only the portion(s) of the transcript relating to that designated Investigation Material or Litigation Material within thirty (30) days following receipt of the final transcript. To

12

be effective, designations must be provided in writing to the Parties' counsel listed in Paragraph 13 of this Order.

Any portion(s) of a transcript or deposition exhibit(s) not so designated pursuant to this Paragraph 14 shall be treated as Confidential Information, even if the document(s) that become the deposition exhibit(s) or information that is the subject of deposition testimony was subject to a prior higher designation of confidentiality. Any Protected Material that is used in the taking of a deposition shall remain subject to the provisions of this Protective Order. In such cases, the court reporter shall be informed of this Protective Order and shall be required to operate in a manner consistent with this Protective Order.

In the event the deposition is videotaped, the original and all copies shall be marked by the video technicians to indicate that the contents are subject to this Protective Order, substantially along the lines of "This recording contains confidential testimony used in this case and is not to be viewed or the contents thereof to be displayed or revealed except pursuant to the terms of the operative Protective Order in this matter or pursuant to written stipulation of the parties."

Counsel for any Producing Party whose Protected Material is the subject of examination shall have the right to exclude from oral depositions, other than the deponent, deponent's counsel, the reporter, and videographer (if any), any person that is not authorized by this Protective Order to receive or access Protected Material based on the designation of such Protected Material. Such right of exclusion shall be applicable only during the periods of examination or testimony regarding such Protected Material.

15.     Documents Produced in Native Format. When a Protected Person produces electronically stored files or documents in native electronic file format, such electronic files and documents shall be designated by the Protected Person under this Order by (a) appending the suffix

13

"Confidential," "Highly Confidential," or "Highly Confidential – Outside Counsel Only," to the file name or document production number, or (b) including the appropriate confidentiality designation in reasonably accessible metadata associated with the file. When documents that were produced in native file format are printed for use during a deposition, for a court proceeding, or for disclosure to any Person described in Paragraphs 22, 23, and 24, the Party printing the file must affix to the printed version a label containing the production number and the designation associated with the document. No one shall seek to use in this Action a .tiff, .pdf, or other image format version of a document produced in native file format without first: (a) providing a copy of the image format version to the Producing Party so that the Producing Party can review the image to ensure that no information has been altered; and (b) obtaining the consent of the Producing Party, which consent shall not be unreasonably withheld.

16.     <u>Written Discovery and Documents and Data Produced in Hard Copy or Non-Native Format</u>. Written discovery, documents (which include "electronically stored information," as that phrase is used in Federal Rule of Civil Procedure 34(a)), and tangible things that meet the requirements for the confidentiality designations listed in Paragraph 2 may be so designated by stamping or otherwise marking each page or image with the appropriate designation in a manner that will not interfere with legibility. For digital files being produced, the Producing Party may mark each viewable page or image with the appropriate designation, and mark the medium, container, and/or communication in which the digital files were contained. In the event original documents are produced for inspection, the original documents shall be presumed "Highly Confidential – Outside Counsel Only" during the inspection and re-designated as appropriate during the copying process.

### G.   Source Code

17.   The Parties acknowledge that if any Party produces Source Code in this Action, the disclosure of such Source Code to another Party or Non-Party may create a substantial risk of serious harm.  Any production of Source Code by any Party in this Action shall be governed by the Stipulated Protective Order Governing Review, Production, and Handling of Source Code in this Action.  If any Non-Party produces Source Code, Source Code produced by a Non-Party will be subject to separate negotiations and Court order.

### H.   Challenges to Confidentiality Designations

18.   Any Party who objects to any designation of confidentiality (the "Objecting Party") may challenge a designation of confidentiality at any time before the trial of this Action by providing written notice to the Producing Party and to all Parties identifying the challenged designation and stating with particularity the grounds for the objection.

19.   Within fourteen (14) days of the Objecting Party's written notice, the Parties and the Producing Party shall meet and confer in good faith to discuss their respective positions.  If the Parties and the Producing Party cannot reach agreement on an objection to a designation of confidentiality within fourteen (14) days of the Objecting Party's written notice, the Objecting Party may address this dispute to the Court no later than twenty-eight (28) days from the Objecting Party's written notice ^pursuant to Local Civil Rule 37.1(a)(1) by submitting a letter to the Magistrate Judge, or requesting a telephone conference with the Magistrate Judge, to present the challenge.  Formal motions to resolve disputes over confidentiality shall not be filed without prior leave from the Magistrate Judge. If the Objecting Party fails to address this dispute with the Court within twenty-eight (28) days from the Objecting Party's written notice, the challenge will be considered rescinded.

20.   Notwithstanding any challenge to a designation, the Protected Material in question shall continue to be treated as designated under this Order until one of the following occurs: (a) the

15

Party who designated the Protected Material in question withdraws such designation in writing; or (b) the Court rules that the Protected Material in question is not entitled to the designation.

21.     This Order does not: preclude or prejudice a Protected Person or a Party from arguing for or against any confidentiality designation, establish any presumption that a particular confidentiality designation is valid, or alter the burden of proof that would otherwise apply in a dispute over discovery or disclosure of information.

**I.     Disclosure of Protected Material**

22.     Except as provided by Paragraph 28 or pursuant to a court order, Protected Materials designated Confidential may be disclosed only to the following persons:

(a)     the Court and all persons assisting the Court in this Action, including ~~magistrates~~ Magistrate Judges, law clerks, court reporters, and stenographic or clerical personnel;

(b)     counsel for the United States, including any attorneys, paralegals, other professional personnel employed by the United States (including economists, technologists, IT support, and IT staff), and agents or independent contractors retained by the United States to assist in this Action whose functions require access to the Confidential Information;

(c)     counsel for any Plaintiff State, including any attorneys, paralegals, other professional personnel employed by the Plaintiff State (including economists, technologists, IT support, and IT staff), and agents or independent contractors retained by the Plaintiff State to assist in this Action whose functions require access to the Confidential Information;

(d)     Apple's Outside Counsel in this Action, including any attorneys, paralegals, other professional personnel employed by Apple's Outside Counsel (including economists, technologists, IT support, and IT staff), and agents, consultants, or independent contractors retained by Apple's Outside Counsel to assist in this Action whose functions require access to the Confidential Information;

16

(e)     Apple's Designated In-House Attorneys to whom such disclosure is reasonably necessary for this Action, provided that each such person has agreed to be bound by the provisions of the Protective Order by signing a copy of Appendix A;

(f)     In addition to Apple's Designated In-House Attorneys, no more than four (4) In-House Attorneys of Apple to whom such disclosure is reasonably necessary for this Action, provided that each such person has agreed to be bound by the provisions of the Protective Order by signing a copy of Appendix A;

(g)     No more than five (5) officers or employees of Apple who participate in decision-making with respect to this Action or who are persons with whom counsel finds it reasonably necessary to consult in the course of preparing Apple's defense in this Action, provided that each such person has agreed to be bound by the provisions of the Protective Order by signing a copy of Appendix A.  Such individuals will be disclosed to the United States, Plaintiff States, and Intervening Non-Parties at least ten (10) business days prior to the effective date of designation and agreed upon by the Parties and Intervening Non-Parties or (in the absence of an agreement) designated by the Court.  To the extent Apple seeks to replace any individual designated under this provision, Apple must provide notice to the United States, Plaintiff States, and Intervening Non-Parties at least ten (10) business days prior to the desired effective date of such change, and the replacement must be agreed upon by the Parties and Intervening Non-Parties or (in the absence of an agreement) designated by the Court. Designation to any Producing Party that is not a Party or an Intervening Non-Party will be made at least ten (10) business days prior to the disclosure of any Confidential Information.

17

(h)     an author or recipient of the document to whom disclosure of the Producing Party's Protected Material is reasonably necessary, provided that they have agreed to be bound by the provisions of the Protective Order by signing a copy of Appendix A;

(i)     a deponent or witness in this Action who is an officer or employee of a Producing Party, provided that only the Protected Material of that Producing Party is disclosed, the disclosure is reasonably necessary, and the deponent or witness has agreed to be bound by the provisions of the Protective Order by signing a copy of Appendix A;

(j)     outside vendors or service providers (such as copy-service providers and document-management consultants) retained by a Party to assist that Party in this Action, to whom such disclosure is reasonably necessary, provided that (i) an authorized representative first executes an Agreement Concerning Confidentiality in the form attached in Appendix A, and (ii) all employees of such outside vendor or service provider are subject to confidentiality obligations as part of their employment that would maintain the protection afforded under this Order;

(k)     any special master, mediator, arbitrator, trustee, or monitor that the Parties engage in this Action or that this Court appoints;

(l)     any Person retained by a Party to serve as a testifying or consulting expert in this Action, including employees of the firm(s) with which the expert or consultant is associated and independent contractors who assist the expert's work in this Action, the identity of whom needs not be disclosed, provided that: (i) disclosure is only to the extent necessary to perform such work; (ii) they first execute an Agreement Concerning Confidentiality in the form attached in Appendix A; (iii) such expert or consultant is not a current officer, director, or employee of a Party or of a competitor of a Party nor anticipated at the time of retention to become an officer, director, or employee of a Party or a competitor of a Party; and (iv) such expert or consultant agrees to access

18

the materials in the United States only and not transport them to or access them from any foreign jurisdiction;

(m)     Persons or firms retained by or for a Party to assist that Party in this Action, including, but not limited to, technical or litigation support consultants, graphics, translation, design, mock jurors and/or judges engaged in preparation for trial, and trial consultants, provided that they first execute an Agreement Concerning Confidentiality in the form attached in Appendix A; and

(n)     Any other person with the prior written consent of the Producing Party.

23.     Except as provided by Paragraph 28 or pursuant to a court order, Protected Materials designated Highly Confidential may be disclosed only to the following persons:

(a)     the Court and all persons assisting the Court in this Action, including ~~magistrates~~ Magistrate Judges, law clerks, court reporters, videographers, and stenographic or clerical personnel;

(b)     counsel for the United States, including any attorneys, paralegals, other professional personnel employed by the United States (including economists, technologists, IT support, and IT staff), and agents or independent contractors retained by the United States to assist in this Action whose functions require access to the Highly Confidential Information;

(c)     counsel for any Plaintiff State, including any attorneys, paralegals, other professional personnel employed by the Plaintiff State (including economists, technologists, IT support, and IT staff), and agents or independent contractors retained by the Plaintiff State to assist in this Action whose functions require access to the Highly Confidential Information;

(d)     Apple's Outside Counsel in this Action, including any attorneys, paralegals, other professional personnel employed by Apple's Outside Counsel (including economists, technologists, IT support, and IT staff), and agents, consultants, or independent contractors

19

retained by Apple's Outside Counsel to assist in this Action whose functions require access to the Highly Confidential Information;

(e) Apple's Designated In-House Attorneys to whom such disclosure is reasonably necessary for this Action, provided that each such person has agreed to be bound by the provisions of the Protective Order by signing a copy of Appendix A;

(f) an author or recipient of the document to whom disclosure of the Producing Party's Protected Material is reasonably necessary, provided that they have agreed to be bound by the provisions of the Protective Order by signing a copy of Appendix A;

(g) a deponent or witness in this Action who is an officer or employee of a Producing Party, provided that only the Protected Material of that Producing Party is disclosed, the disclosure is reasonably necessary, and the deponent or witness has agreed to be bound by the provisions of the Protective Order by signing a copy of Appendix A;

(h) outside vendors or service providers (such as copy-service providers and document-management consultants) retained by a Party to assist that Party in this Action, to whom such disclosure is reasonably necessary, provided that (i) an authorized representative first executes an Agreement Concerning Confidentiality in the form attached in Appendix A, and (ii) all employees of such outside vendor or service provider are subject to confidentiality obligations as part of their employment that would maintain the protection afforded under this Order;

(i) any special master, mediator, arbitrator, trustee, or monitor that the Parties engage in this Action or that this Court appoints;

(j) any Person retained by a Party to serve as a testifying or consulting expert in this Action, including employees of the firm(s) with which the expert or consultant is associated and independent contractors who assist the expert's work in this Action, the identity of whom needs

20

not be disclosed, provided that: (i) disclosure is only to the extent necessary to perform such work; (ii) that they first execute an Agreement Concerning Confidentiality in the form attached in Appendix A; (iii) such expert or consultant is not a current officer, director, or employee of a Party or competitor of a Party, and does not reasonably anticipate at the time of retention to become an officer, director, or employee of a Party or a competitor of a Party, and is not involved in any capacity in competitive decision-making on behalf of a Party or a competitor of a Party; and (iv) such expert or consultant agrees to access the materials in the United States only, and not transport them to or access them from any foreign jurisdiction;

(k)     Persons or firms retained by or for a Party to assist that Party in this Action, including, but not limited to, technical or litigation support consultants, graphics, translation, design, mock jurors and/or judges engaged in preparation for trial, and trial consultants, provided that they first execute an Agreement Concerning Confidentiality in the form attached in Appendix A; and

(l)     any other person with the prior written consent of the Producing Party.

24.     Except as provided by Paragraph 28 or pursuant to a court order, Protected Materials designated Highly Confidential– Outside Counsel Only may be disclosed only to the following persons:

(a)     the Court and all persons assisting the Court in this Action, including ~~magistrates~~, Magistrate Judges law clerks, court reporters, videographers, and stenographic or clerical personnel;

(b)     counsel for the United States, including any attorneys, paralegals, other professional personnel employed by the United States (including economists, technologists, IT support, and IT staff), and agents or independent contractors retained by the United States to assist

21

in this Action whose functions require access to the Highly Confidential Information – Outside Counsel Only;

(c) counsel for any Plaintiff State, including any attorneys, paralegals, other professional personnel employed by the Plaintiff State (including economists, technologists, IT support, and IT staff), and agents or independent contractors retained by the Plaintiff State to assist in this Action whose functions require access to the Highly Confidential Information – Outside Counsel Only;

(d) Apple's Outside Counsel in this Action, including any attorneys, paralegals, other professional personnel employed by Apple's Outside Counsel (including economists, technologists, IT support, and IT staff), and agents, consultants, or independent contractors retained by Apple's Outside Counsel to assist in this Action whose functions require access to the Highly Confidential Information – Outside Counsel Only;

(e) an author or recipient of the document to whom disclosure of the Producing Party's Protected Material is reasonably necessary, provided that they have agreed to be bound by the provisions of the Protective Order by signing a copy of Appendix A;

(f) a deponent or witness in this Action who is an officer or employee of a Producing Party, provided that only the Protected Material of that Producing Party is disclosed, the disclosure is reasonably necessary, and the deponent or witness has agreed to be bound by the provisions of the Protective Order by signing a copy of Appendix A;

(g) outside vendors or service providers (such as copy-service providers and document-management consultants) retained by a Party to assist that Party in this Action, to whom such disclosure is reasonably necessary, provided that (i) an authorized representative first executes an Agreement Concerning Confidentiality in the form attached in Appendix A, and (ii) all employees

22

of such outside vendor or service provider are subject to confidentiality obligations as part of their employment that would maintain the protection afforded under this Order;

(h)     any special master, mediator, arbitrator, trustee, or monitor that the Parties engage in this Action or that this Court appoints;

(i)      any Person retained by a Party to serve as a testifying or consulting expert in this Action, including employees of the firm(s) with which the expert or consultant is associated and independent contractors who assist the expert's work in this Action, the identity of whom needs not be disclosed, provided that: (i) disclosure is only to the extent necessary to perform such work; (ii) that they first execute an Agreement Concerning Confidentiality in the form attached in Appendix A; (iii) such expert or consultant is not a current officer, director, or employee of a Party or competitor of a Party, and does not reasonably anticipate at the time of retention to become an officer, director, or employee of a Party or a competitor of a Party, and is not involved in any capacity in competitive decision-making on behalf of a Party or a competitor of a Party; and (iv) such expert or consultant agrees to access the materials in the United States only, and not transport them to or access them from any foreign jurisdiction;

(j)      Persons or firms retained by or for a Party to assist that Party in this Action, including, but not limited to, technical or litigation support consultants, graphics, translation, design, mock jurors and/or judges engaged in preparation for trial, and trial consultants, provided that they first execute an Agreement Concerning Confidentiality in the form attached in Appendix A; and

(k)     any other person with the prior written consent of the Producing Party.

25.     Counsel for the Party making a disclosure to a Person identified in Paragraph 22, subparagraphs (e), (f), (g), (j), or (k), Paragraph 23, subparagraphs (e), (f), (g), (i), or (j), or

23

Paragraph 24, subparagraphs (e), (f), (h), or (i), of this Order must obtain and retain the signed version of the Agreement Concerning Confidentiality in the form attached in Appendix A until the final resolution of this Action.

26.     Each Person identified in Paragraphs 22, 23, and 24 of this Order to whom information designated as Protected Material is disclosed must not disclose that Protected Material to any other Person, except as otherwise provided by this Order.

27.     Defendant may at any time before the trial of this Action request that disclosure of specified Highly Confidential Information – Outside Counsel Only be made to Apple's Designated In-House Attorneys. Defendant shall provide a written notice to the Producing Party and all Parties to this Action stating with particularity the need for such disclosure. Defendant must meet and confer with the Producing Party and all Parties to try to resolve the matter by agreement within seven (7) days of the written notice. If no agreement is reached, Defendant may submit a letter to the Magistrate Judge or request a telephone conference with the Magistrate Judge to present the request. Plaintiffs and/or the Producing Party will have seven (7) days to respond to such request. Formal motions to resolve disputes over the request for disclosure of specified Highly Confidential Information – Outside Counsel Only to Apple's Designated In-House Attorneys shall not be filed without prior leave from the Magistrate Judge. Defendant will not disclose any Highly Confidential Information – Outside Counsel Only to Apple's Designated In-House Attorneys pending resolution of the dispute.

28.     Nothing in this Order:

(a)     shall be construed to prevent counsel from advising their clients with respect to this Action based in whole or in part upon Protected Materials, provided counsel does not disclose the Protected Material itself except as provided in this Order;

24

(b)     shall prevent or restrict a Producing Party's own disclosure or use of its own Protected Material for any purpose;

(c)     prevents disclosure of Protected Material with the consent of the Protected Person that designated the material;

(d)     shall be construed to prejudice any Party's right to use any Protected Material in Court or in any Court filing with the consent of the Producing Party or by order of the Court;

(e)     shall restrict in any way the use or disclosure of Protected Material by a Receiving Party: (i) that is or has become publicly known through no fault of the Receiving Party; (ii) that is lawfully acquired by or known to the Receiving Party independent of receipt from the Producing Party during an Investigation or in this Action; (iii) previously produced, disclosed, or provided to that Party without an obligation of confidentiality and not by inadvertence or mistake; or (iv) pursuant to a court order;

(f)     prevents the United States or Plaintiff States, subject to taking appropriate steps to preserve the confidentiality of such information, from disclosing information designated as Confidential, Highly Confidential, or Highly Confidential Information – Outside Counsel Only (i) to the extent permitted or required by law, court order, or regulation upon providing required notice under Paragraphs 32 and 33; (ii) for law enforcement purposes; or (iii) for the purpose of securing compliance with a Final Judgment in this Action; or

(g)     prohibits Non-Parties from negotiating for a different level of confidentiality for specific Protected Material with the Parties, which will be presented to the Court for approval as a modification of this Order.

29.     In the event of a disclosure of any Protected Material to any Person not authorized to receive disclosure under this Order, the Party responsible for the disclosure shall immediately

notify counsel for the Protected Person whose Protected Material has been disclosed and provide to such counsel all known relevant information concerning the nature and circumstances of the disclosure. The responsible disclosing Party shall also promptly take all reasonable measures to retrieve the improperly disclosed Protected Material and ensure that no further or greater unauthorized disclosure and/or use of the material is made.

30.     Unauthorized or inadvertent disclosure does not change the status of the disclosed Protect Material or waive the Protected Person's right to hold or maintain the disclosed material as Protected.

### J.     Use of Protected Material

31.     Except as provided in this Order, all Protected Material produced or reproduced by a Party or a non-Party Protected Person as part of this Action, including materials produced during the Investigation, may be used solely for the conduct of this Action and shall not be used for any other purpose.

32.     If at any time Protected Material is subpoenaed by any court, arbitral, administrative, or legislative body that would require the disclosure of Protected Material, the Party to whom the subpoena or other request is directed shall immediately give prompt written notice thereof to every Party who has produced such Protected Material and to its counsel and shall provide each such Party with an opportunity to move for a protective order regarding the production of Protected Materials implicated by the subpoena.

33.     Any Person that becomes subject to a motion to disclose Protected Material in another case or proceeding must promptly notify the Party or non-Party Protected Person that designated the Protected Material of the motion so the Protected Person has an opportunity to appear in the other case and be heard on whether that information should be disclosed.

26

34.     The protections conferred by this Order cover not only Protected Material governed by this Order as addressed herein, but also any information copied, extracted, or summarized therefrom that would reveal Protected Material.

35.     <u>Court Filings</u>.  If any documents, testimony, or other materials designated under this Order as Protected Material are included in or with any pleading, motion, exhibit, or other paper to be filed with the Court, the Party seeking to file must seek a court order to file such Protected Material under seal, in accordance with Local Civil Rule 5.3.  The Protected Person that designated the Protected Material may not oppose the filing of Protected Material under seal and the filing Party need not meet and confer with the Protected Person before filing the Protected Material under seal.  If this Court grants leave to file a document under seal, the filing Party must file a version of the filing that redacts all Protected Material on the Court's docket if the Party has not already done so.

36.     Nothing in this Order will restrict the Parties or any interested member of the public from challenging the filing of any Protected Material under seal.  Filing another Person's Protected Material under seal does not constitute agreement by the filing party that the information is properly designated, and nothing in this Order should be construed to prevent a Party from later challenging the confidentiality designation of information that was previously filed under seal.

37.     <u>Hearings</u>.  If a Party reasonably expects to disclose Confidential Information, Highly Confidential Information, or Highly Confidential Information – Outside Counsel Only at any hearing, conference, or other proceeding, the Party seeking to make the disclosure shall provide advance notice of their intent to disclose Protected Material to the other Parties to the extent practicable to ensure that only authorized individuals are present at those proceedings and shall request that the Court seal the courtroom. The use of a document at any hearing, conference, <u>by making an application consistent with the 1st Amendment and common law right of public access.</u>

27

or proceeding shall not in any way affect its designation as Confidential, Highly Confidential, or Highly Confidential – Outside Counsel Only.

38.     Trial. Disclosure of documents and information designated as Protected Material in exhibit lists, preparation of exhibits, at trial, or in post-trial filings will be governed pursuant to a separate court order. The Parties will meet and confer and submit a recommended order outlining those procedures.

## K.     Secure Storage

39.     Protected Material must be stored and maintained by a Receiving Party at a location in the United States and in a secure manner that ensures that access is limited to the persons authorized under this Order.

## L.     Data Security

40.     Receiving Party shall comply with applicable security, privacy, data protection, or breach notification laws, rules, or regulations, policies, or directives ("Applicable Data Laws").

## M.     Inadvertent Failure to Designate Properly

41.     Any production of documents or testimony not designated as Protected Material will not be deemed a waiver of any future claim of confidentiality concerning such information if it is later designated as Confidential, Highly Confidential, or Highly Confidential – Outside Counsel Only. If at any time before trial of this Action, a Protected Person realizes that it should have designated as Confidential, Highly Confidential, or Highly Confidential – Outside Counsel Only any Investigation Materials or Litigation Materials that Person previously produced during discovery in the Investigation or this Action, it may so designate such documents, testimony, or other materials by notifying the Parties in writing within a reasonable time from the discovery of the error. The Parties shall thereafter treat the Investigation Materials or Litigation Materials pursuant to the Protected Person's new designation under the terms of this Order.

28

42.     No prior disclosure of newly designated Protected Material will violate this Order. The disclosure of any information for which disclosure was proper when made will not be deemed improper regardless of any such subsequent confidentiality designation.

## N.      Inadvertent Disclosure of Privileged Materials

43.     The production of any information, document, or thing in this litigation shall not constitute a waiver of any attorney-client privilege or work-product protection that may be asserted by the Producing Party either in this case or in any other federal or state proceeding.  This Order shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502(d).  When the production or disclosure of any information, document, or thing protected by attorney-client privilege or work-product protection is discovered by or brought to the attention of the Producing Party, the treatment of such material shall be in accordance with Federal Rule of Civil Procedure 26(b)(5)(B).  That treatment shall be deemed to comply with any obligations the Producing Party would otherwise have had pursuant to Fed. R. Evid. 502(b) or under the common law.  However, nothing herein restricts the right of the Receiving Party to challenge the Producing Party's claim of attorney-client privilege or work-product protection after receiving notice of the production or disclosure of any information, document, or thing that is subject to a claim of attorney-client privilege or work-product protection.

## O.      Miscellaneous

44.     Successors.  This Order is binding on the Parties, any non-Party Protected Persons, and their attorneys, successors, personal representatives, administrators, assigns, parents, subsidiaries, divisions, affiliates, employees, agents, independent contractors, retained consultants and experts, and any persons or organizations over which the Parties or non-Party Protected Persons have control.

29

45.     Right to Assert Other Objections.  By stipulating to the entry of this Protective Order, no Party waives any right it otherwise would have to object to disclosing or producing any information or item.  Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by the Protective Order.  This Order shall not constitute a waiver of the right of any Party to claim in this Action or otherwise that any Investigation Material or Litigation Material, or any portion thereof, is privileged or otherwise non-discoverable, or is not admissible in evidence in this Action or any other proceeding.

46.     Burdens of Proof.  Notwithstanding anything to the contrary above, nothing in this Protective Order shall be construed to change the burdens of proof or legal standards applicable in disputes regarding whether particular Investigation Material or Litigation Material is Protected Material, which confidentiality designation is appropriate, whether disclosure should be restricted, and if so, what restrictions should apply.

47.     Modification by Court.  This Order is subject to further court order based upon public policy or other considerations, and the Court may modify this Order *sua sponte* in the interests of justice.  The United States District Court for the District of New Jersey is responsible for the interpretation and enforcement of this Order.  All disputes concerning Protected Material, however designated, produced under the protection of this Order shall be resolved by the United States District Court for the District of New Jersey.

48.     Discovery Rules Remain Unchanged.  Nothing herein shall alter or change in any way the discovery provisions of the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the District of New Jersey, or the Court's own orders.  Identification of any individual pursuant to this Protective Order does not make that individual available for deposition or any other form of discovery outside of the restrictions and procedures

30

of the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of New Jersey, or the Court's own orders.

49. <u>Re-productions</u>. Notwithstanding any provisions to the contrary, documents that are re-produced in whole or in part from the production files from another investigation, litigation, arbitration, or other matter may be re-produced in the same manner and form as originally produced in the other matter, including with all confidentiality and privilege designations and redactions made in the other matter.

**P. The Privacy Act**

50. This Order, and any subsequent order of this Court governing the United States' production of any document, information, data, communications, transcript of testimony, or other materials in this Action, constitutes a court order within the meaning of the Privacy Act, 5 U.S.C. § 552a (b) (11).

**Q. Procedures Upon Termination of This Action**

51. The obligations imposed by this Order will survive the termination of this Action unless a Producing Party agrees otherwise in writing or the Court orders otherwise. The Court will retain jurisdiction to resolve any disputes arising out of this Order after termination of this Action for a period of two years.

52. Except as otherwise provided in this Order, within ninety (90) calendar days after the expiration of the time for appeal of an order, judgment, or decree terminating this Action, all Persons having received Protected Material must make a good-faith effort to (a) return that Protected Material and all copies that have not otherwise been made public to the Protected Person (or the Protected Person's counsel, if represented by counsel) that produced it or (b) destroy or delete all such Protected Material, unless it may be retained pursuant to this Order Paragraphs 53

31

and 54. All Protected Material returned to the Parties or their counsel by the Court also must be disposed of in accordance with this Order.

53.    Outside Counsel for the Parties will be entitled to retain court papers; deposition, hearing, and trial transcripts; deposition and trial exhibits; and work product, provided that the Parties and their counsel do not disclose the portions of those materials containing Protected Material except pursuant to court order or an agreement with the Protected Person that produced the Protected Material or as otherwise permitted by this Order.

54.    Expert witnesses for the Parties will be entitled to retain their own expert reports, their own deposition and trial transcripts and exhibits, and their own work product, provided such expert witnesses have executed Appendix A to this Order and do not disclose the portions of those materials containing Protected Material except pursuant to a court order or with the consent of the Protected Person that produced the Protected Material or as otherwise permitted herein.

55.    Within ninety (90) days after the expiration of the time for appeal of an order, judgment, or decree terminating this Action, all Persons having received Protected Material must certify compliance with Paragraph 52 of this Order in writing to the Party or Protected Person that produced the Protected Material.

**AGREED TO:**

Dated: January 28, 2025

*/s/ Jonathan H. Lasken*
Jonathan H. Lasken
United States Department of Justice
450 Fifth Street, NW, Suite 4000
Washington, D.C.  20530
Tel: (202) 598-2307
Email: jonathan.lasken@usdoj.gov

*Attorneys for Plaintiff United States of America*

32

Lauren E. Van Driesen
Lauren E. Van Driesen
Deputy Attorney General
Division of Law – Special Litigation
New Jersey Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (609) 696-5271
Email: lauren.vandriesen@law.njoag.gov

*Attorney for Plaintiff State of New Jersey*

Dated: January 28, 2025

/s/ Vinny Venkat
Vinny Venkat
Assistant Attorney General
Consumer Protection & Advocacy Section
2005 N. Central Avenue
Phoenix, AZ 85004
Tel: (602) 542-7757
Email: vinny.venkat@azag.gov

*Attorney for Plaintiff State of Arizona*

Dated: January 28, 2025

/s/ Brian Wang
Brian Wang
Deputy Attorney General
Paula L. Blizzard
Senior Assistant Attorney General for Antitrust
Michael Jorgenson
Supervising Deputy Attorney General
Cari Jeffries
Deputy Attorney General
Robert McNary
Deputy Attorney General
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco CA 94102
Tel: (415) 510-3487
Email: Brian.Wang@doj.ca.gov

*Attorneys for Plaintiff State of California*

Dated: January 28, 2025

/s/ Elizabeth G. Arthur
Elizabeth G. Arthur

33

Assistant Attorney General
C. William Margrabe
Assistant Attorney General
Antitrust and Nonprofit Enforcement Section
Public Advocacy Division
Office of the Attorney General for the District
of Columbia
400 6th Street NW, 10th Floor
Washington, D.C. 20001
Tel. : (202) 442-9864
Email : elizabeth.arthur@dc.gov
will.margrabe@dc.gov

*Attorneys for Plaintiff District of Columbia*

Dated: January 28, 2025

*/s/ Nicole Demers*
Nicole Demers
Deputy Associate Attorney General
Office of the Attorney General of Connecticut
165 Capitol Avenue
Hartford, CT 06106
Tel.: (860) 808-5030
Email: nicole.demers@ct.gov

*Attorney for Plaintiff State of Connecticut*

Dated: January 28, 2025

*/s/ Jesse Moore*
Jesse Moore
Deputy Attorney General
Consumer Protection Division
Office of the Indiana Attorney General
Indiana Government Center South, 5th Floor
302 West Washington Street
Indianapolis, IN 46204
Tel.: (317) 232-4956
Email: jesse.moore@atg.in.gov

*Attorney for Plaintiff State of Indiana*

Dated: January 28, 2025

*/S/ Christina M. Moylan*
Christina M. Moylan
Assistant Attorney General
Consumer Protection Division
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006

34

Tel.: (207) 626-8800
Email: christina.moylan@maine.gov

*Attorney for Plaintiff State of Maine*

Dated: January 28, 2025

/s/ David Mlaver
David Mlaver
Assistant Attorney General
Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Tel.: (617) 963-2414
Email: David.mlaver@mass.gov

*Attorney for Plaintiff State of Massachusetts*

Dated: January 28, 2025

/s/ Jason R. Evans
Jason R. Evans
Division Chief
Corporate Oversight Division
Michigan Department of Attorney General
525 W Ottawa St.
Lansing, MI 48933
Tel.: (517) 335-7622
Email: EvansJ@michigan.gov

*Attorney for Plaintiff State of Michigan*

Dated: January 28, 2025

/s/ Justin Moor
Justin Moor
Assistant Attorney General
455 Minnesota Street, Suite 1400
Saint Paul, MN 55101-2130
Tel.: (651) 724-9627
Email: justin.moor@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

Dated: January 28, 2025

/s/ Raquel Fulghum
Raquel Fulghum
Deputy Attorney General
Office of the Nevada Attorney General
100 North Carson Street
Carson City, NV 89701-4717
Tel.: (775) 684-1100

Email: rfulghum@ag.nv.gov

*Attorney for Plaintiff State of Nevada*

Dated: January 28, 2025

/s/ *Alexandra C. Sosnowski*
Alexandra C. Sosnowski
Assistant Attorney General
Consumer Protection and Antitrust Bureau
New Hampshire Department of Justice
Office of the Attorney General
One Granite Place South
Concord, NH 03301
Tel.: (603) 271-2678
Email: Alexandra.C.Sosnowski@doj.nh.gov

*Attorney for Plaintiff State of New Hampshire*

Dated: January 28, 2025

/s/ *Elinor R. Hoffmann*
Elinor R. Hoffmann
Chief, Antitrust Bureau
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Tel.: (212) 416-8598
Email: Elinor.Hoffmann@ag.ny.gov

*Attorney For Plaintiff State of New York*

Dated: January 28, 2025

/s/ *Elin S. Alm*
Elin S. Alm
Assistant Attorney General
Christopher G. Lindblad
Assistant Attorney General
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
Tel.: (701) 328-5570
Email: ealm@nd.gov
clindblad@nd.gov

*Attorney for Plaintiff State of North Dakota*

Dated: January 28, 2025

/s/ *Robert J. Carlson*
Robert J. Carlson
Senior Assistant Attorney General
Office of the Oklahoma Attorney General
15 West 6th Street, Suite 1000

36

Tulsa, OK 74119
Tel.: (918) 581-2285
Email: robert.carlson@oag.ok.gov

*Attorney for Plaintiff State of Oklahoma*

Dated: January 28, 2025

*/s/ Timothy D. Smith*
Timothy D. Smith
Senior Assistant Attorney General
Antitrust and False Claims Unit
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel.: (503) 934-4400
Email: tim.smith@doj.state.or.us

*Attorney for Plaintiff State of Oregon*

Dated: January 28, 2025

*/s/ J. David McDowell*
J. David McDowell
Deputy, Consumer Protection Division
Office of the Attorney General and Reporter
P.O Box 20207
Nashville, TN 37202
Tel.: (615) 741-8722
Email: David.McDowell@ag.tn.gov

*Attorney for Plaintiff State of Tennessee*

Dated: January 28, 2025

*/s/ Luminita Nodit*
Luminita Nodit
Assistant Attorney General
Antitrust Division
Washington Attorney General's Office
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Tel.: (206) 254-0568
Email: lumi.nodit@atg.wa.gov

*Attorney for Plaintiff State of Washington*

Dated: January 28, 2025

*/s/ Laura E. McFarlane*
Laura E. McFarlane
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857

37

Madison, WI 53707-7857
Tel.: (608) 266-8911
Email: mcfarlanele@doj.state.wi.us

*Attorney for Plaintiff State of Wisconsin*

Dated: January 28, 2025          /s/ Jill S. Abrams

Jill S. Abrams
Assistant Attorney General
109 State Street
Montpelier, Vermont
Tel.: (802) 828-1106
Email: jill.abrams@vermont.gov

*Attorneys for Plaintiff State of Vermont*

Dated: January 28, 2025          /s/ Liza M. Walsh

Liza M. Walsh
Douglas E. Arpert
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, New Jersey 07102
Tel.: (973) 757-1100
Email: lwalsh@walsh.law
Email : darpert@walsh.law

Craig S. Primis, P.C.
K. Winn Allen, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel.: (202) 389-5000
Email: craig.primis@kirkland.com
Email: winn.allen@kirkland.com

Devora W. Allon, P.C.
Alexia R. Brancato
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800
Email: devora.allon@kirkland.com
Email: alexia.brancato@kirkland.com

*Counsel for Apple Inc.*

38

**IT IS SO ORDERED.**

Dated: February 19, 2025

HON. LEDA DUNN WETTRE
United States Magistrate Judge

# APPENDIX A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | |
| v. | Case No. 2:24-cv-04055 (JXN) (LDW) |
| APPLE INC., | |
| *Defendant.* | |

## AGREEMENT CONCERNING CONFIDENTIALITY

I, _____, am employed by _____ as _____.

I hereby certify that:

1.     I have read the Protective Order entered in the above-captioned action, and understand its terms.

2.     I agree to be bound by the terms of the Protective Order entered in the above-captioned action. I agree to use the information provided to me only as explicitly permitted by the Protective Order.

3.     I understand that my failure to abide by the terms of the Protective Order entered in the above-captioned action may subject me, without limitation, to civil and criminal penalties for contempt of Court.

4.     I submit to the jurisdiction of the United States District Court for the District of New Jersey solely for the purpose of enforcing the terms of the Protective Order entered in the above-captioned action and freely and knowingly waive any right I may otherwise have to object to the jurisdiction of said Court.

_____          _____
SIGNATURE                                          DATE

# EXHIBIT G

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

IN RE: APPLE INC. SMARTPHONE
ANTITRUST LITIGATION


*This Document Relates to:*
*ALL ACTIONS*                                    Case No. 2:24-md-03113 (JXN) (LDW)

## DISCOVERY CONFIDENTIALITY ORDER

In the interests of (1) ensuring efficient and prompt resolution of this Action; (2) facilitating

discovery by the Parties litigating this Action; and (3) protecting confidential information from

improper disclosure or use, the Court, upon good cause shown and pursuant to Federal Rule of

Civil Procedure 26(c)(1), ORDERS as follows:

1.      The parties acknowledge that this Order does not confer blanket protections on all

disclosures during discovery, or in the course of making initial or supplemental disclosures under

Rule 26(a). Designations by any Producing Party under this Order shall be made with care and

shall not be made absent a good faith belief that the designated material satisfies the criteria set

forth below.  If it comes to a Producing Party's attention that designated material does not qualify

for protection at all, or does not qualify for the level of protection initially asserted, the Producing

Party must promptly notify all other Parties that it is withdrawing or changing the designation.

This Order is identical to the Order entered by the Court in *United States v. Apple Inc.*, Case No.

2:24-cv-04055 (JXN) (LDW) ("the Government Action"), pending in this Court (*see* Dkt. 235

from the Government Action), except for certain modifications below.

1

## A.  **Definitions**

2.      As used herein for purposes of this Order only:

(a)      "Action" means the above-captioned action pending in this Court, including any related discovery, pre-trial, trial, post-trial, or appellate proceedings.

(b)      "Business Decisions" means decisions relating to a competitor, potential competitor, customer, or distribution partner including decisions regarding contracts, marketing, pricing, product or service development or design, product or service offerings, research and development, mergers and acquisitions, or licensing, acquisition, or enforcement of intellectual property rights. It does not include the rendering of legal advice in connection with litigation, compliance, regulatory, or liability issues related to business decisions.

(c)      [Omitted].

(d)      "Confidential" or "Confidential Information" means any information, document, or thing, or portion of any document or thing, produced in any Investigation Materials or Litigation Materials that contains (a) Personal Information; or (b) confidential research or commercial information. Provided, however, that any portion of any Investigation Materials or Litigation Materials, except for Personal Information, that has been published or otherwise made publicly available is not Confidential Information.

(e)      "Defendant" or "Apple" means Apple Inc. and its employees, agents, representatives, parents, subsidiaries, affiliates, successors, and assigns.

(f)      "Designated In-House Attorneys" means no more than four (4) attorneys employed by Apple who can access Highly Confidential Information provided that they are not currently involved in Business Decisions and whose names, titles, and department are disclosed to Plaintiffs and Intervening Non-Parties at least ten (10) business days prior to the effective date of designation, and who are agreed upon by the Parties and Intervening Non-Parties or (in the absence

of an agreement) designated by the Court.  To the extent Apple seeks to replace a Designated In-House Attorney, Apple must provide notice to Plaintiffs and Intervening Non-Parties at least ten (10) business days prior to the desired effective date of such change, and the replacement must be agreed upon by the Parties and Intervening Non-Parties or (in the absence of an agreement) designated by the Court. Designation of Apple's Designated In-House Attorneys to any Producing Party that is not a Party or an Intervening Non-Party will be made at least ten (10) business days prior to the disclosure of any Highly Confidential Information. An individual who has served as a Designated In-House Attorney shall not—for a period of two years following the last occasion on which Highly Confidential Information is disclosed to such Designated In-House Attorney—(a) participate in or advise on Business Decisions at the Defendant, (b) participate in or advise on Business Decisions involving a Protected Person whose Highly Confidential Information they accessed during the course of this Action at any employer, or (c) participate in or advise on litigation or other legal actions on behalf of Defendant or any other employer where a Protected Person is a party and whose Highly Confidential Information the Designated In-House Attorney accessed in the course of this Action (aside from litigation arising from or related to the allegations in the Complaint in this Action). Any attorney subject to this subsection who leaves the employment of Defendant to work in an unrelated industry shall be presumed to be exempt from the post-employment limits of this provision absent a showing by Plaintiffs or any interested Protected Person that such a person engaged in Business Decision-making.

(g)     "Disclosed" means shown, divulged, revealed, produced, described, transmitted, or otherwise communicated, in whole or in part.

(h)     "Document" means any document or electronically stored information, as the term is used in Federal Rule of Civil Procedure 34(a).

(i)     "Highly Confidential" or "Highly Confidential Information" means any information that is extremely confidential and/or sensitive in nature and the Producing Party reasonably believes the disclosure of which is likely to cause economic harm or competitive disadvantage to the Producing Party. The Parties agree that the following information, if non-public, shall be presumed to merit the Highly Confidential designation: trade secrets, pricing information, financial data, sales information, sales or marketing forecasts or plans, business plans, sales or marketing strategy, product development information, engineering documents, testing documents, employee information, and other non-public information of similar competitive and business sensitivity.

(j)     "Highly Confidential – Outside Counsel Only" or "Highly Confidential Information – Outside Counsel Only" means any Highly Confidential Information that the Producing Party reasonably believes the disclosure of which to Defendant's personnel (including its officers, directors, executives, employees, or in-house attorneys) is likely to cause economic harm or competitive disadvantage to the Producing Party.

(k)     "In-House Attorneys" means any attorney employed by the Defendant.

(l)     "Intervening Non-Party" or "Intervening Non-Parties" means one the following Non-Parties: Capital One Financial Corporation; Garmin International, Inc.; Google LLC; JPMorgan Chase Bank, N.A.; Match Group, Inc.; Meta Platforms, Inc.; Microsoft Corp.; PayPal, Inc.; and Samsung Electronics America, Inc.

(m)     "Investigation" means any pre-complaint review, assessment, or investigation of the matters at issue in the Government Action by the United States or Plaintiff States.

(n)     "Investigation Material" or "Investigation Materials" means non-privileged documents, data, communications, transcripts of testimony, or other materials relating to the

4

Investigation, including but not limited to documents or information provided pursuant to the Antitrust Civil Process Act, 15 U.S.C. §§ 1311-14 or any State equivalent CID process that prior to the filing of the Government Action (a) any Non-Party to the Government Action provided to any party to the Government Action; (b) any party to the Government Action provided to any Non-Party to the Government Action; or (c) any party to the Government Action provided to any party of the Government Action.

(o)     "Litigation Material" or "Litigation Materials" means non-privileged documents, data, communications, testimony, or other materials relating to this Action that, after the filing of and during the pendency of this Action, (a) any Non-Party provides to any Party, either voluntarily or under compulsory process; (b) any Party provides to any Non-Party; or (c) any Party provides to any Party.

(p)     "Non-Party" means any natural person, partnership, corporation, association, or other legal entity not named as a Party to this Action.

(q)     "Outside Counsel" means the law firm(s) who represent or are retained by the Parties, including any attorneys, paralegals, and other professional personnel (including support and IT staff), agents, or independent contractors retained by a Party that such law firm(s) assign(s).

(r)     "Party" or "Parties" means any individual Plaintiff or any Defendant in the above-captioned action, or Plaintiffs and Defendants collectively.

(s)     "Person" means any natural person, corporate entity, partnership, association, joint venture, governmental entity, or trust.

(t)     "Personal Information" means a natural person's non-public personal identifiable information that is linked or reasonably linkable to an identified or identifiable natural person, including, but not limited to, Social Security number; driver's license number, or state or federal

5

government identification number, or foreign country equivalent identification number; passport number; financial account number; credit or debit card number; email address; name, address, or phone number in combination with other personal identifiable information; sensitive personal information regarding genetic or biometric data, precise geolocation data, financial information or transactions, medical or health history and records, and criminal or employment history; and any other protected personal information subject to non-disclosure obligations imposed by governmental authorities, law, or regulation.

(u)     "Plaintiff State" means State of New Jersey, State of Arizona, State of California, District of Columbia, State of Connecticut, State of Indiana, State of Maine, Commonwealth of Massachusetts, State of Michigan, State of Minnesota, State of Nevada, State of New Hampshire, State of New York, State of North Dakota, State of Oklahoma, State of Oregon, State of Tennessee, State of Vermont, State of Washington, and State of Wisconsin acting by and through their respective Attorneys General, or any other State acting by and through their respective Attorneys General which joins the Government Action. "Plaintiff States" means collectively all Plaintiff States in the Government Action.

(v)     "Producing Party" means any Party or Non-Party that discloses or produces or reproduces any Investigation Materials or Litigation Materials in this Action.

(w)     "Protected Material" means any Investigation Material or Litigation Material that is designated as "Confidential," "Highly Confidential," or "Highly Confidential – Outside Counsel Only," as provided for in this Order.  Protected Material shall not include: (i) advertising materials that have been actually published or publicly disseminated; and (ii) materials that show on their face they have been disseminated to the public.

6

(x)     "Protected Person" means any Person (including any Party or Non-Party) that has provided Investigation Materials or that provides Litigation Materials in this Action.

(y)     "Receiving Party" means any Party or Non-Party who receives Investigation Materials or Litigation Materials from a Producing Party.

**B.     Computing Time**

3.     Unless otherwise specified, time will be computed according to Federal Rule of Civil Procedure 6(a).

**C.     Notice to Non-Party Protected Persons of the Terms of This Order**

4.     [Omitted].

5.     Any Party that seeks discovery from a Non-Party Protected Person for use in this Action must include a copy of this Order when serving a discovery request or subpoena on the Non-Party Protected Person.  If any Party sent a discovery request or subpoena to any Non-Party Protected Person prior to entry of this Order, that Party must send a copy of this Order to the Non-Party Protected Person within two (2) business days of entry of this Order.

**D.     Modifications of This Order**

6.     If a Non-Party Protected Person determines that this Order does not adequately protect its Protected Material, it may seek additional protection from the Court for its Protected Material within fourteen (14) days after receiving notice of this Order under Paragraphs 4 or 5 by filing a letter application pursuant to Local Civil Rule 37.1(a)(1).  If a Non-Party Protected Person timely seeks additional protection from the Court, a Party's obligation to produce that Non-Party Protected Person's documents containing Protected Material, that is the subject of the application, is suspended until a decision is rendered by the Court, unless the Non-Party Protected Person who filed the application and the Parties reach an agreement allowing production of the Protected Material while the application is pending.  If the Court orders the production of the non-Party

7

Protected Person's documents, the Party obligated to produce the Non-Party Protected Person's Protected Material will have seven (7) days to make the production unless a longer period is ordered by the Court.

7.      Nothing in this Order limits any Person, including members of the public, a Party, or a Non-Party Protected Person, from seeking additional protection or modification of this Order upon an application duly made according to Rule 37.1 of the Local Rules of this Court, including, without limitation, an order that certain information need not be produced at all or is not admissible evidence in this Action or any other proceeding.  By stipulating to this Order, the Parties do not waive the right to argue that certain material may require additional or different confidentiality protections than those set forth herein.

### E.      Designation of Protected Material in Investigation Materials

8.      Any Investigation Materials that Apple previously provided to the United States or any Plaintiff State during an Investigation that Apple designated as Protected Material or for which Apple requested protected or confidential treatment, including, but not limited to, testimony, documents, electronic documents and data, and materials produced pursuant to the Antitrust Civil Process Act, 15 U.S.C. §§ 1311-14, will be treated as containing Confidential Information, or as Highly Confidential if previously designated by Apple.

9.      A Non-Party Protected Person shall have sixty (60) days after receiving a copy of this Order (the "Designation Period") to designate as Highly Confidential Information or Highly Confidential Information – Outside Counsel Only any Investigation Materials to the extent the Non-Party Protected Person determines, in good faith, that the Investigation Materials include Highly Confidential Information or Highly Confidential Information – Outside Counsel Only, and that such designation is necessary to protect the interests of the Non-Party Protected Person.  Such Investigation Materials, including but not limited to testimony, documents, electronic documents

8

and data, and materials produced pursuant to the Antitrust Civil Process Act, 15 U.S.C. §§ 1311-14, or any State equivalent process, may be so designated by providing written notice by overnight mail or email to the Party to which the Investigation Materials were produced and providing a reproduction of the Investigation Materials stamped with the legend "HIGHLY CONFIDENTIAL INFORMATION" or "HIGHLY CONFIDENTIAL INFORMATION – OUTSIDE COUNSEL ONLY," in a manner that will not interfere with legibility, including page numbering, or auditability.

10.     Until the expiration of the Designation Period, all Investigation Materials produced by a Non-Party Protected Person will be treated as Highly Confidential Information – Outside Counsel Only in their entirety. Investigation Materials previously produced by a Non-Party Protected Person that are not designated as Highly Confidential or Highly Confidential Information – Outside Counsel Only by the expiration of the Designation Period shall be treated as Confidential Information for purposes of this Order, whether or not the Non-Party Protected Person requested confidential treatment at the time of production.

**F.      Designation of Protected Material in Litigation Materials**

11.     The following procedures govern the process for all Protected Persons (including any Party or Non-Party) to designate as Protected Material any Litigation Materials, including but not limited to information provided in response to requests under Federal Rules of Civil Procedure 30, 31, 33, 36, or 45, and documents disclosed in response to Federal Rules of Civil Procedure 33(d), 34(b)(2) and (c), or 45.

12.     Any Producing Party may designate Litigation Material with any of the following designations, provided that it meets the requirements for such designations as provided for herein: "Confidential," "Highly Confidential," or "Highly Confidential – Outside Counsel Only."

9

13.     Any production or designation of Protected Material or other written notice to the Parties required by this Order must be provided by email to all counsel for Plaintiffs (using the listserv AppleAllPlaintiffs@lists.locklaw.com) and to all counsel for Apple (using the listserv Apple-SmartphoneMDL-External@gibsondunn.com).

14.     Testimony.  All transcripts of depositions taken in this Action will be treated as Highly Confidential – Outside Counsel Only in their entirety for thirty (30) days after the date when a complete and final copy of the transcript has been made available to the deponent (or the deponent's counsel, if applicable).  Within two (2) business days of receipt of the final transcript, the Party who noticed the deposition must provide the final transcript to the deponent (or the deponent's counsel, if applicable).  Within thirty (30) days following receipt of the final transcript, the deponent (or the deponent's counsel, if applicable) may designate as Confidential, Highly Confidential, or Highly Confidential – Outside Counsel Only, as appropriate, any portion(s) of the deposition transcript, by page(s) and line(s), and any deposition exhibits, or portion(s) of any exhibit(s), that were produced by the deponent or the deponent's employer or former employer. When a Party questions a deponent about Investigation Material or Litigation Material that has been designated by a Non-Party Protected Person as containing Confidential Information, Highly Confidential Information or Highly Confidential Information – Outside Counsel Only, the Party asking the questions must designate as Confidential, Highly Confidential, or Highly Confidential – Outside Counsel Only the portion(s) of the transcript relating to that designated Investigation Material or Litigation Material within thirty (30) days following receipt of the final transcript.  To be effective, designations must be provided in writing to the Parties' counsel listed in Paragraph 13 of this Order.

10

Any portion(s) of a transcript or deposition exhibit(s) not so designated pursuant to this Paragraph 14 shall be treated as Confidential Information, even if the document(s) that become the deposition exhibit(s) or information that is the subject of deposition testimony was subject to a prior higher designation of confidentiality. Any Protected Material that is used in the taking of a deposition shall remain subject to the provisions of this Protective Order. In such cases, the court reporter shall be informed of this Protective Order and shall be required to operate in a manner consistent with this Protective Order.

In the event the deposition is videotaped, the original and all copies shall be marked by the video technicians to indicate that the contents are subject to this Protective Order, substantially along the lines of "This recording contains confidential testimony used in this case and is not to be viewed or the contents thereof to be displayed or revealed except pursuant to the terms of the operative Protective Order in this matter or pursuant to written stipulation of the parties."

Counsel for any Producing Party whose Protected Material is the subject of examination shall have the right to exclude from oral depositions, other than the deponent, deponent's counsel, the reporter, and videographer (if any), any person that is not authorized by this Protective Order to receive or access Protected Material based on the designation of such Protected Material. Such right of exclusion shall be applicable only during the periods of examination or testimony regarding such Protected Material.

15. <u>Documents Produced in Native Format</u>. When a Protected Person produces electronically stored files or documents in native electronic file format, such electronic files and documents shall be designated by the Protected Person under this Order by (a) appending the suffix "Confidential," "Highly Confidential," or "Highly Confidential – Outside Counsel Only," to the file name or document production number, or (b) including the appropriate confidentiality

11

designation in reasonably accessible metadata associated with the file. When documents that were produced in native file format are printed for use during a deposition, for a court proceeding, or for disclosure to any Person described in Paragraphs 22, 23, and 24, the Party printing the file must affix to the printed version a label containing the production number and the designation associated with the document. No one shall seek to use in this Action a .tiff, .pdf, or other image format version of a document produced in native file format without first: (a) providing a copy of the image format version to the Producing Party so that the Producing Party can review the image to ensure that no information has been altered; and (b) obtaining the consent of the Producing Party, which consent shall not be unreasonably withheld.

16.    <u>Written Discovery and Documents and Data Produced in Hard Copy or Non-Native Format</u>. Written discovery, documents (which include "electronically stored information," as that phrase is used in Federal Rule of Civil Procedure 34(a)), and tangible things that meet the requirements for the confidentiality designations listed in Paragraph 2 may be so designated by stamping or otherwise marking each page or image with the appropriate designation in a manner that will not interfere with legibility. For digital files being produced, the Producing Party may mark each viewable page or image with the appropriate designation, and mark the medium, container, and/or communication in which the digital files were contained. In the event original documents are produced for inspection, the original documents shall be presumed "Highly Confidential – Outside Counsel Only" during the inspection and re-designated as appropriate during the copying process.

**G.    <u>Source Code</u>**

17.    The Parties acknowledge that if any Party produces Source Code in this Action, the disclosure of such Source Code to another Party or Non-Party may create a substantial risk of serious harm. Any production of Source Code by any Party in this Action shall be governed by

12

the Stipulated Protective Order Governing, Review, Production, and Handling of Source Code in this Action. If any Non-Party produces Source Code, Source Code produced by a Non-Party will be subject to separate negotiations and Court order.

### H. Challenges to Confidentiality Designations

18. Any Party who objects to any designation of confidentiality (the "Objecting Party") may challenge a designation of confidentiality at any time before the trial of this Action by providing written notice to the Producing Party and to all Parties identifying the challenged designation and stating with particularity the grounds for the objection.

19. Within fourteen (14) days of the Objecting Party's written notice, the Parties and the Producing Party shall meet and confer in good faith to discuss their respective positions. If the Parties and the Producing Party cannot reach agreement on an objection to a designation of confidentiality within fourteen (14) days of the Objecting Party's written notice, the Objecting Party may address this dispute to the Court no later than twenty-eight (28) days from the Objecting Party's written notice by submitting a letter to the Magistrate Judge, or requesting a telephone conference with the Magistrate Judge, to present the challenge. Formal motions to resolve disputes over confidentiality shall not be filed without prior leave from the Magistrate Judge. If the Objecting Party fails to address this dispute with the Court within twenty-eight (28) days from the Objecting Party's written notice, the challenge will be considered rescinded.

20. Notwithstanding any challenge to a designation, the Protected Material in question shall continue to be treated as designated under this Order until one of the following occurs: (a) the Party who designated the Protected Material in question withdraws such designation in writing; or (b) the Court rules that the Protected Material in question is not entitled to the designation.

21. This Order does not: preclude or prejudice a Protected Person or a Party from arguing for or against any confidentiality designation, establish any presumption that a particular

13

confidentiality designation is valid, or alter the burden of proof that would otherwise apply in a dispute over discovery or disclosure of information.

## I.  **Disclosure of Protected Material**

22.    Except as provided by Paragraph 28 or pursuant to a court order, Protected Materials designated Confidential may be disclosed only to the following persons:

(a)    the Court and all persons assisting the Court in this Action, including Magistrate Judges, law clerks, court reporters, and stenographic or clerical personnel;

(b)    counsel for the United States for as long as the United States remains a plaintiff in the Government Action, including any attorneys, paralegals, other professional personnel employed by the United States (including economists, technologists, IT support, and IT staff), and agents or independent contractors retained by the United States to assist in this Action whose functions require access to the Confidential Information;

(c)    counsel for any Plaintiff State for as long as the Plaintiff State remains a plaintiff in the Government Action, including any attorneys, paralegals, other professional personnel employed by the Plaintiff State (including economists, technologists, IT support, and IT staff), and agents or independent contractors retained by the Plaintiff State to assist in this Action whose functions require access to the Confidential Information;

(d)    the Parties' Outside Counsel in this Action, including any attorneys, paralegals, other professional personnel employed by the Parties' Outside Counsel (including economists, technologists, IT support, and IT staff), and agents, consultants, or independent contractors retained by the Parties' Outside Counsel to assist in this Action whose functions require access to the Confidential Information;

14

(e)        Apple's Designated In-House Attorneys to whom such disclosure is reasonably necessary for this Action, provided that each such person has agreed to be bound by the provisions of the Protective Order by signing a copy of Appendix A;

(f)        In addition to Apple's Designated In-House Attorneys, no more than four (4) In-House Attorneys of Apple to whom such disclosure is reasonably necessary for this Action, provided that each such person has agreed to be bound by the provisions of the Protective Order by signing a copy of Appendix A;

(g)        No more than five (5) officers or employees of Apple who participate in decision-making with respect to this Action or who are persons with whom counsel finds it reasonably necessary to consult in the course of preparing Apple's defense in this Action, provided that each such person has agreed to be bound by the provisions of the Protective Order by signing a copy of Appendix A. Such individuals will be disclosed to lead plaintiffs' counsel, as appointed by the Court (see Dkts. 35 and 57) ("Lead Plaintiffs' Counsel"), and Intervening Non-Parties at least ten (10) business days prior to the effective date of designation and agreed upon by the Parties and Intervening Non-Parties or (in the absence of an agreement) designated by the Court.  To the extent Apple seeks to replace any individual designated under this provision, Apple must provide notice to Lead Plaintiffs' Counsel and Intervening Non-Parties at least ten (10) business days prior to the desired effective date of such change, and the replacement must be agreed upon by the Parties and Intervening Non-Parties or (in the absence of an agreement) designated by the Court. Designation to any Producing Party that is not a Party or an Intervening Non-Party will be made at least ten (10) business days prior to the disclosure of any Confidential Information.

15

(h)     an author or recipient of the document to whom disclosure of the Producing Party's Protected Material is reasonably necessary, provided that they have agreed to be bound by the provisions of the Protective Order by signing a copy of Appendix A;

(i)     a deponent or witness in this Action who is an officer or employee of a Producing Party, provided that only the Protected Material of that Producing Party is disclosed, the disclosure is reasonably necessary, and the deponent or witness has agreed to be bound by the provisions of the Protective Order by signing a copy of Appendix A;

(j)     outside vendors or service providers (such as copy-service providers and document-management consultants) retained by a Party to assist that Party in this Action, to whom such disclosure is reasonably necessary, provided that (i) an authorized representative first executes an Agreement Concerning Confidentiality in the form attached in Appendix A, and (ii) all employees of such outside vendor or service provider are subject to confidentiality obligations as part of their employment that would maintain the protection afforded under this Order;

(k)     any special master, mediator, arbitrator, trustee, or monitor that the Parties engage in this Action or that this Court appoints;

(l)     any Person retained by a Party to serve as a testifying or consulting expert in this Action, including employees of the firm(s) with which the expert or consultant is associated and independent contractors who assist the expert's work in this Action, the identity of whom needs not be disclosed, provided that: (i) disclosure is only to the extent necessary to perform such work; (ii) they first execute an Agreement Concerning Confidentiality in the form attached in Appendix A; and (iii) such expert or consultant is not a current officer, director, or employee of a Party or of a competitor of a Party nor anticipated at the time of retention to become an officer, director, or employee of a Party or a competitor of a Party;

16

(m)     Persons or firms retained by or for a Party to assist that Party in this Action, including, but not limited to, technical or litigation support consultants, graphics, translation, design, mock jurors and/or judges engaged in preparation for trial, and trial consultants, provided that they first execute an Agreement Concerning Confidentiality in the form attached in Appendix A; and

(n)     Any other person with the prior written consent of the Producing Party.

23.     Except as provided by Paragraph 28 or pursuant to a court order, Protected Materials designated Highly Confidential may be disclosed only to the following persons:

(a)     the Court and all persons assisting the Court in this Action, including Magistrate Judges, law clerks, court reporters, videographers, and stenographic or clerical personnel;

(b)     counsel for the United States for as long as the United States remains a plaintiff in the Government Action, including any attorneys, paralegals, other professional personnel employed by the United States (including economists, technologists, IT support, and IT staff), and agents or independent contractors retained by the United States to assist in this Action whose functions require access to the Highly Confidential Information;

(c)     counsel for any Plaintiff State for as long as the Plaintiff State remains a plaintiff in the Government Action, including any attorneys, paralegals, other professional personnel employed by the Plaintiff State (including economists, technologists, IT support, and IT staff), and agents or independent contractors retained by the Plaintiff State to assist in this Action whose functions require access to the Highly Confidential Information;

(d)     the Parties' Outside Counsel in this Action, including any attorneys, paralegals, other professional personnel employed by the Parties' Outside Counsel (including economists, technologists, IT support, and IT staff), and agents, consultants, or independent contractors

17

retained by the Parties' Outside Counsel to assist in this Action whose functions require access to the Highly Confidential Information;

(e)     Apple's Designated In-House Attorneys to whom such disclosure is reasonably necessary for this Action, provided that each such person has agreed to be bound by the provisions of the Protective Order by signing a copy of Appendix A;

(f)     an author or recipient of the document to whom disclosure of the Producing Party's Protected Material is reasonably necessary, provided that they have agreed to be bound by the provisions of the Protective Order by signing a copy of Appendix A;

(g)     a deponent or witness in this Action who is an officer or employee of a Producing Party, provided that only the Protected Material of that Producing Party is disclosed, the disclosure is reasonably necessary, the deponent or witness has agreed to be bound by the provisions of the Protective Order by signing a copy of Appendix A;

(h)     outside vendors or service providers (such as copy-service providers and document-management consultants) retained by a Party to assist that Party in this Action, to whom such disclosure is reasonably necessary, provided that (i) an authorized representative first executes an Agreement Concerning Confidentiality in the form attached in Appendix A, and (ii) all employees of such outside vendor or service provider are subject to confidentiality obligations as part of their employment that would maintain the protection afforded under this Order;

(i)     any special master, mediator, arbitrator, trustee, or monitor that the Parties engage in this Action or that this Court appoints;

(j)     any Person retained by a Party to serve as a testifying or consulting expert in this Action, including employees of the firm(s) with which the expert or consultant is associated and independent contractors who assist the expert's work in this Action, the identity of whom needs

18

not be disclosed, provided that: (i) disclosure is only to the extent necessary to perform such work; (ii) that they first execute an Agreement Concerning Confidentiality in the form attached in Appendix A; and (iii) such expert or consultant is not a current officer, director, or employee of a Party or competitor of a Party, and does not reasonably anticipate at the time of retention to become an officer, director, or employee of a Party or a competitor of a Party, and is not involved in any capacity in competitive decision-making on behalf of a Party or a competitor of a Party;

(k)     Persons or firms retained by or for a Party to assist that Party in this Action, including, but not limited to, technical or litigation support consultants, graphics, translation, design, mock jurors and/or judges engaged in preparation for trial, and trial consultants, provided that they first execute an Agreement Concerning Confidentiality in the form attached in Appendix A; and

(l)     any other person with the prior written consent of the Producing Party.

24.     Except as provided by Paragraph 28 or pursuant to a court order, Protected Materials designated Highly Confidential– Outside Counsel Only may be disclosed only to the following persons:

(a)     the Court and all persons assisting the Court in this Action, including Magistrate Judges, law clerks, court reporters, videographers, and stenographic or clerical personnel;

(b)     counsel for the United States for as long as the United States remains a plaintiff in the Government Action, including any attorneys, paralegals, other professional personnel employed by the United States (including economists, technologists, IT support, and IT staff), and agents or independent contractors retained by the United States to assist in this Action whose functions require access to the Highly Confidential Information – Outside Counsel Only;

19

(c)     counsel for any Plaintiff State for as long as the Plaintiff State remains a plaintiff in the Government Action, including any attorneys, paralegals, other professional personnel employed by the Plaintiff State (including economists, technologists, IT support, and IT staff), and agents or independent contractors retained by the Plaintiff State to assist in this Action whose functions require access to the Highly Confidential Information – Outside Counsel Only;

(d)     the Parties' Outside Counsel in this Action, including any attorneys, paralegals, other professional personnel employed by the Parties' Outside Counsel (including economists, technologists, IT support, and IT staff), and agents, consultants, or independent contractors retained by the Parties' Outside Counsel to assist in this Action whose functions require access to the Highly Confidential Information – Outside Counsel Only;

(e)     an author or recipient of the document to whom disclosure of the Producing Party's Protected Material is reasonably necessary, provided that they have agreed to be bound by the provisions of the Protective Order by signing a copy of Appendix A;

(f)     a deponent or witness in this Action who is an officer or employee of a Producing Party, provided that only the Protected Material of that Producing Party is disclosed, the disclosure is reasonably necessary, and the deponent or witness has agreed to be bound by the provisions of the Protective Order by signing a copy of Appendix A;

(g)     outside vendors or service providers (such as copy-service providers and document-management consultants) retained by a Party to assist that Party in this Action, to whom such disclosure is reasonably necessary, provided that (i) an authorized representative first executes an Agreement Concerning Confidentiality in the form attached in Appendix A, and (ii) all employees of such outside vendor or service provider are subject to confidentiality obligations as part of their employment that would maintain the protection afforded under this Order;

20

(h)     any special master, mediator, arbitrator, trustee, or monitor that the Parties engage in this Action or that this Court appoints;

(i)     any Person retained by a Party to serve as a testifying or consulting expert in this Action, including employees of the firm(s) with which the expert or consultant is associated and independent contractors who assist the expert's work in this Action, the identity of whom needs not be disclosed, provided that: (i) disclosure is only to the extent necessary to perform such work; (ii) that they first execute an Agreement Concerning Confidentiality in the form attached in Appendix A; and (iii) such expert or consultant is not a current officer, director, or employee of a Party or competitor of a Party, and does not reasonably anticipate at the time of retention to become an officer, director, or employee of a Party or a competitor of a Party, and is not involved in any capacity in competitive decision-making on behalf of a Party or a competitor of a Party;

(j)     Persons or firms retained by or for a Party to assist that Party in this Action, including, but not limited to, technical or litigation support consultants, graphics, translation, design, mock jurors and/or judges engaged in preparation for trial, and trial consultants, provided that they first execute an Agreement Concerning Confidentiality in the form attached in Appendix A; and

(k)     any other person with the prior written consent of the Producing Party.

25.     Counsel for the Party making a disclosure to a Person identified in Paragraph 22, subparagraphs (e), (f), (g), (j), or (k), Paragraph 23, subparagraphs (e), (f), (g), (i), or (j), or Paragraph 24, subparagraphs (e), (f), (h), or (i), of this Order must obtain and retain the signed version of the Agreement Concerning Confidentiality in the form attached in Appendix A until the final resolution of this Action.

21

26. Each Person identified in Paragraphs 22, 23, and 24 of this Order to whom information designated as Protected Material is disclosed must not disclose that Protected Material to any other Person, except as otherwise provided by this Order.

27. Defendant may at any time before the trial of this Action request that disclosure of specified Highly Confidential Information – Outside Counsel Only be made to Apple's Designated In-House Attorneys. Defendant shall provide a written notice to the Producing Party and all Parties to this Action stating with particularity the need for such disclosure. Defendant must meet and confer with the Producing Party and all Parties to try to resolve the matter by agreement within seven (7) days of the written notice. If no agreement is reached, Defendant may submit a letter to the Magistrate Judge or request a telephone conference with the Magistrate Judge to present the request. Plaintiffs and/or the Producing Party will have seven (7) days to respond to such request. Formal motions to resolve disputes over the request for disclosure of specified Highly Confidential Information – Outside Counsel Only to Apple's Designated In-House Attorneys shall not be filed without prior leave from the Magistrate Judge. Defendant will not disclose any Highly Confidential Information – Outside Counsel Only to Apple's Designated In-House Attorneys pending resolution of the dispute.

28. Nothing in this Order:

(a) shall be construed to prevent counsel from advising their clients with respect to this Action based in whole or in part upon Protected Materials, provided counsel does not disclose the Protected Material itself except as provided in this Order;

(b) shall prevent or restrict a Producing Party's own disclosure or use of its own Protected Material for any purpose;

22

(c)     prevents disclosure of Protected Material with the consent of the Protected Person that designated the material;

(d)     shall be construed to prejudice any Party's right to use any Protected Material in Court or in any Court filing with the consent of the Producing Party or by order of the Court;

(e)     shall restrict in any way the use or disclosure of Protected Material by a Receiving Party: (i) that is or has become publicly known through no fault of the Receiving Party; (ii) that is lawfully acquired by or known to the Receiving Party independent of receipt from the Producing Party during an Investigation or in this Action; (iii) previously produced, disclosed, or provided to that Party without an obligation of confidentiality and not by inadvertence or mistake; or (iv) pursuant to a court order;

(f)     [Omitted]; or

(g)     prohibits Non-Parties from negotiating for a different level of confidentiality for specific Protected Material with the Parties, which will be presented to the Court for approval as a modification of this Order.

29.     In the event of a disclosure of any Protected Material to any Person not authorized to receive disclosure under this Order, the Party responsible for the disclosure shall immediately notify counsel for the Protected Person whose Protected Material has been disclosed and provide to such counsel all known relevant information concerning the nature and circumstances of the disclosure. The responsible disclosing Party shall also promptly take all reasonable measures to retrieve the improperly disclosed Protected Material and ensure that no further or greater unauthorized disclosure and/or use of the material is made.

23

30. Unauthorized or inadvertent disclosure does not change the status of the disclosed Protect Material or waive the Protected Person's right to hold or maintain the disclosed material as Protected.

### J. Use of Protected Material

31. Except as provided in this Order, all Protected Material produced or reproduced by a Party or a non-Party Protected Person as part of this Action or as part of the Government Action, including materials produced during the Investigation, may be used solely for the conduct of this Action and the Government Action and shall not be used for any other purpose.

32. If at any time Protected Material is subpoenaed by any court, arbitral, administrative, or legislative body that would require the disclosure of Protected Material, the Party to whom the subpoena or other request is directed shall immediately give prompt written notice thereof to every Party who has produced such Protected Material and to its counsel and shall provide each such Party with an opportunity to move for a protective order regarding the production of Protected Materials implicated by the subpoena.

33. Any Person that becomes subject to a motion to disclose Protected Material in another case or proceeding must promptly notify the Party or non-Party Protected Person that designated the Protected Material of the motion so the Protected Person has an opportunity to appear in the other case and be heard on whether that information should be disclosed.

34. The protections conferred by this Order cover not only Protected Material governed by this Order as addressed herein, but also any information copied, extracted, or summarized therefrom that would reveal Protected Material.

35. Court Filings. If any documents, testimony, or other materials designated under this Order as Protected Material are included in or with any pleading, motion, exhibit, or other paper to be filed with the Court, the Party seeking to file must seek a court order to file such

24

Protected Material under seal, in accordance with Local Civil Rule 5.3. The Protected Person that designated the Protected Material may not oppose the filing of Protected Material under seal and the filing Party need not meet and confer with the Protected Person before filing the Protected Material under seal. If this Court grants leave to file a document under seal, the filing Party must file a version of the filing that redacts all Protected Material on the Court's docket if the Party has not already done so.

36.     Nothing in this Order will restrict the Parties or any interested member of the public from challenging the filing of any Protected Material under seal. Filing another Person's Protected Material under seal does not constitute agreement by the filing party that the information is properly designated, and nothing in this Order should be construed to prevent a Party from later challenging the confidentiality designation of information that was previously filed under seal.

37.     <u>Hearings</u>. If a Party reasonably expects to disclose Confidential Information, Highly Confidential Information, or Highly Confidential Information – Outside Counsel Only at any hearing, conference, or other proceeding, the Party seeking to make the disclosure shall provide advance notice of their intent to disclose Protected Material to the other Parties to the extent practicable to ensure that only authorized individuals are present at those proceedings and shall request that the Court seal the courtroom by making an application consistent with the 1st Amendment and common law right of public access.[1] The use of a document at any hearing, conference, or proceeding shall not in any way affect its designation as Confidential, Highly Confidential, or Highly Confidential – Outside Counsel Only.

---

[1] For purposes of clarity, the Party whose Protected Material may be disclosed shall carry the burden for arguing that the courtroom should be sealed.

38.     Trial.  Disclosure of documents and information designated as Protected Material in exhibit lists, preparation of exhibits, at trial, or in post-trial filings will be governed pursuant to a separate court order.  The Parties will meet and confer and submit a recommended order outlining those procedures.

### K.     Secure Storage

39.     Protected Material subject to the United States Export Administration Regulations must be stored at a location in the United States and may not be exported outside the United States or released to any foreign national (even if within the United States).  The Receiving Party will take measures necessary to store and control access to such Protected Materials in compliance with United States Export Administration Regulations.  To the extent the Parties disagree as to whether any Protected Material is subject to the United States Export Administration Regulations, they will work in good faith to resolve the dispute.

### L.     Data Security

40.     In light of the ever-increasing sophistication of malicious actors, including state-sponsored actors, in breaching security measures for electronically secured information established by litigants, vendors, and Courts; and in view of the likelihood that discovery produced by Apple will include proprietary and extremely confidential materials concerning trade secrets, pricing information, financial data, sales information, sales or marketing forecasts or plans, business plans, sales or marketing strategy, product development information, engineering documents, testing documents, and employee information, the disclosure of which would likely cause severe and perhaps irreparable harm to Apple, the Court resolves the Parties' dispute as to the requisite security measures for safeguarding Protected Material by adopting the following requirements proposed by Apple, as modified by the Court.

Receiving Party shall implement an information security management system ("ISMS")

to safeguard Protected Materials, including reasonable and appropriate administrative, physical, and technical safeguards, and network security and encryption technologies governed by written policies and procedures, which shall comply with at least one of the following standards: (a) the International Organization for Standardization's 27001 standard; (b) the National Institute of Standards and Technology's (NIST) 800-53 standard; (c) the Center for Internet Security's Critical Security Controls; or (d) the most recently published version of another widely recognized industry or government cybersecurity framework. The Parties shall implement multi-factor authentication for any access to Protected Materials and implement encryption of all Protected Materials in transit outside of network(s) covered by the Party's ISMS (and at rest, where reasonably practical).

(a)     If Receiving Party becomes aware of any unauthorized access, use, or disclosure of Protected Materials or devices containing Protected Materials ("Data Breach"), Receiving Party shall in the most expedient time possible and without unreasonable delay, consistent with the legitimate needs of law enforcement and any measures necessary to determine the scope of the Data Breach and restore the reasonable integrity of affected data system(s), notify Producing Party in writing and fully cooperate with Producing Party as may be reasonably necessary to (a) determine the source, extent, or methodology of such Data Breach, (b) to recover or to protect Protected Materials, and/or (c) to satisfy Producing Party's legal, contractual, or other obligations. For the avoidance of doubt, notification obligations under this Section arise when the Receiving Party both (a) learns of a Data Breach, and (b) learns that any of the Producing Party's Protected Materials are potentially subject to the Data Breach. The notification obligations set forth in this Section do not run from the time of the Data Breach itself.

(b)     Receiving Party shall promptly comply with Producing Party's reasonable request(s) that Receiving Party investigate, remediate, and mitigate the effects of a Data Breach

27

and any potential recurrence and take all reasonable steps to terminate and prevent unauthorized access. Receiving Party shall promptly provide any information that is reasonably requested by Producing Party and that relates to any such Data Breach, including but not limited to, the Protected Material that was potentially impacted, underlying vulnerabilities or flaws that led to the Data Breach, start or end date of the Data Breach, date of discovery, and specific actions taken to contain, mitigate, or remediate the Data Breach. For the avoidance of doubt, nothing in this Paragraph 40 is intended to create a waiver of any applicable privileges, including privileges applicable to a Party's investigation and remediation of a Data Breach.

(c)    If Receiving Party is aware of a Data Breach, the Parties shall meet and confer in good faith regarding any adjustments that should be made to the discovery process and discovery schedule in this action, potentially including but not limited to (1) additional security measures to protect Protected Material; (2) a stay or extension of discovery pending investigation of a Data Breach and/or implementation of additional security measures; and (3) a sworn assurance that Protected Materials will be handled in the future only by entities not impacted by the Data Breach. Further, the Receiving Party shall submit to reasonable discovery concerning the Data Breach, as ordered by the Court.

(d)    In the event of a Data Breach affecting Protected Material of a Producing Party, at Producing Party's request, Receiving Party within 10 business days shall provide a copy of its most recent ISMS policies and procedures that relate to the safeguarding of Protected Materials and that preceded the Data Breach.

(e)    Receiving Party shall comply with this Paragraph 40 and any applicable security, privacy, data protection, or breach notification laws, rules, regulations, or directives ("Applicable Data Law"). If Receiving Party is uncertain whether a particular practice would conform with the requirements of this Paragraph 40, it may meet and confer with the other Parties; if any Party

28

believes that the proposed practice would violate this Protective Order, it may, within 10 business days, bring the dispute to the Court. The Party challenging the proposed practice would bear the burden of demonstrating a violation.

(f)    Before filing Protected Material with the Court, the parties should consult the procedure for handling Highly Sensitive Documents ("HSD") set forth in District of New Jersey Standing Order 2024-03 and, if appropriate, request treatment of the Protected Materials as an HSD, or make a similar proposal for paper filing of certain Protected Material.

**M.    <u>Inadvertent Failure to Designate Properly</u>**

41.    Any production of documents or testimony not designated as Protected Material will not be deemed a waiver of any future claim of confidentiality concerning such information if it is later designated as Confidential, Highly Confidential, or Highly Confidential – Outside Counsel Only.  If at any time before trial of this Action, a Protected Person realizes that it should have designated as Confidential, Highly Confidential, or Highly Confidential – Outside Counsel Only any Investigation Materials or Litigation Materials that Person previously produced during discovery in the Investigation or this Action, it may so designate such documents, testimony, or other materials by notifying the Parties in writing within a reasonable time from the discovery of the error. The Parties shall thereafter treat the Investigation Materials or Litigation Materials pursuant to the Protected Person's new designation under the terms of this Order.

42.    No prior disclosure of newly designated Protected Material will violate this Order. The disclosure of any information for which disclosure was proper when made will not be deemed improper regardless of any such subsequent confidentiality designation.

**N.    <u>Inadvertent Disclosure of Privileged Materials</u>**

43.    The production of any information, document, or thing in this litigation shall not constitute a waiver of any attorney-client privilege or work-product protection that may be asserted

by the Producing Party either in this case or in any other federal or state proceeding.  This Order shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502(d).  When the production or disclosure of any information, document, or thing protected by attorney-client privilege or work-product protection is discovered by or brought to the attention of the Producing Party, the treatment of such material shall be in accordance with Federal Rule of Civil Procedure 26(b)(5)(B).  That treatment shall be deemed to comply with any obligations the Producing Party would otherwise have had pursuant to Fed. R. Evid. 502(b) or under the common law.  However, nothing herein restricts the right of the Receiving Party to challenge the Producing Party's claim of attorney-client privilege or work-product protection after receiving notice of the production or disclosure of any information, document, or thing that is subject to a claim of attorney-client privilege or work-product protection.

## O.      **Miscellaneous**

44.      <u>Successors</u>.  This Order is binding on the Parties, any non-Party Protected Persons, and their attorneys, successors, personal representatives, administrators, assigns, parents, subsidiaries, divisions, affiliates, employees, agents, independent contractors, retained consultants and experts, and any persons or organizations over which the Parties or non-Party Protected Persons have control.

45.      <u>Right to Assert Other Objections</u>.  By stipulating to the entry of this Protective Order, no Party waives any right it otherwise would have to object to disclosing or producing any information or item.  Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by the Protective Order.  This Order shall not constitute a waiver of the right of any Party to claim in this Action or otherwise that any Investigation Material or Litigation Material, or any portion thereof, is privileged or otherwise non-discoverable, or is not admissible in evidence in this Action or any other proceeding.

46. <u>Burdens of Proof</u>.  Notwithstanding anything to the contrary above, nothing in this Protective Order shall be construed to change the burdens of proof or legal standards applicable in disputes regarding whether particular Investigation Material or Litigation Material is Protected Material, which confidentiality designation is appropriate, whether disclosure should be restricted, and if so, what restrictions should apply.

47. <u>Modification by Court</u>.  This Order is subject to further court order based upon public policy or other considerations, and the Court may modify this Order *sua sponte* in the interests of justice. The United States District Court for the District of New Jersey is responsible for the interpretation and enforcement of this Order.  All disputes concerning Protected Material, however designated, produced under the protection of this Order shall be resolved by the United States District Court for the District of New Jersey.

48. <u>Discovery Rules Remain Unchanged</u>.  Nothing herein shall alter or change in any way the discovery provisions of the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the District of New Jersey, or the Court's own orders. Identification of any individual pursuant to this Protective Order does not make that individual available for deposition or any other form of discovery outside of the restrictions and procedures of the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of New Jersey, or the Court's own orders.

49. <u>Re-productions</u>.  Notwithstanding any provisions to the contrary, documents that are re-produced in whole or in part from the production files from another investigation, litigation, arbitration, or other matter may be re-produced in the same manner and form as originally produced in the other matter, including with all confidentiality and privilege designations and redactions made in the other matter.

**P.      The Privacy Act**

50.      This Order, and any subsequent order of this Court governing the United States' production of any document, information, data, communications, transcript of testimony, or other materials in this Action, constitutes a court order within the meaning of the Privacy Act, 5 U.S.C. § 552a (b)(11).

**Q.      Procedures Upon Termination of This Action**

51.      The obligations imposed by this Order will survive the termination of this Action unless a Producing Party agrees otherwise in writing or the Court orders otherwise. The Court will retain jurisdiction to resolve any disputes arising out of this Order after termination of this Action.

52.      Except as otherwise provided in this Order, within ninety (90) calendar days after the expiration of the time for appeal of an order, judgment, or decree terminating this Action, all Persons having received Protected Material must make a good-faith effort to (a) return that Protected Material and all copies that have not otherwise been made public to the Protected Person (or the Protected Person's counsel, if represented by counsel) that produced it or (b) destroy or delete all such Protected Material, unless it may be retained pursuant to this Order Paragraphs 53 and 54. All Protected Material returned to the Parties or their counsel by the Court also must be disposed of in accordance with this Order.

53.      Outside Counsel for the Parties will be entitled to retain court papers; deposition, hearing, and trial transcripts; deposition and trial exhibits; and work product, provided that the Parties and their counsel do not disclose the portions of those materials containing Protected Material except pursuant to court order or an agreement with the Protected Person that produced the Protected Material or as otherwise permitted by this Order.

54.      Expert witnesses for the Parties will be entitled to retain their own expert reports,

32

their own deposition and trial transcripts and exhibits, and their own work product, provided such expert witnesses have executed Appendix A to this Order and do not disclose the portions of those materials containing Protected Material except pursuant to a court order or with the consent of the Protected Person that produced the Protected Material or as otherwise permitted herein.

55.     Within ninety (90) days after the expiration of the time for appeal of an order, judgment, or decree terminating this Action, all Persons having received Protected Material must certify compliance with Paragraph 52 of this Order in writing to the Party or Protected Person that produced the Protected Material.

**SO ORDERED.**

Dated:     October 7, 2025

　_s/ Leda Dunn Wettre_
Hon. Leda Dunn Wettre
United States Magistrate Judge

33

**APPENDIX A**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

IN RE: APPLE INC. SMARTPHONE
ANTITRUST LITIGATION

*This Document Relates to:*
*ALL ACTIONS*

Case No. 2:24-md-03113 (JXN) (LDW)

**AGREEMENT CONCERNING CONFIDENTIALITY**

I, _____, am employed by _____ as
_____.

I hereby certify that:

     1.    I have read the Protective Order entered in the above-captioned action, and understand its terms.

     2.    I agree to be bound by the terms of the Protective Order entered in the above-captioned action.  I agree to use the information provided to me only as explicitly permitted by the Protective Order.

     3.    I understand that my failure to abide by the terms of the Protective Order entered in the above-captioned action may subject me, without limitation, to civil and criminal penalties for contempt of Court.

     4.    I submit to the jurisdiction of the United States District Court for the District of New Jersey solely for the purpose of enforcing the terms of the Protective Order entered in the above-captioned action and freely and knowingly waive any right I may otherwise have to object to the jurisdiction of said Court.

_____
SIGNATURE

_____
DATE

# Exhibit C

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE APPLE INC. SMARTPHONE ANTITRUST LITIGATION | Civil Action No. 2:24-md-03113-JXN-LDW MDL No. 3113 |
| | Hon. Julien X. Neals, U.S.D.J. Hon. Leda D. Wettre, U.S.M.J. |
| UNITED STATES v. APPLE INC. | Civil Action No. 2:24-cv-04055-JXN-LDW |
| | Hon. Julien X. Neals, U.S.D.J. Hon. Leda D. Wettre, U.S.M.J. |

**NON-PARTY SAMSUNG ELECTRONICS AMERICA, INC.'S OBJECTIONS AND
RESPONSES TO APPLE'S SUBPOENA TO PRODUCE DOCUMENTS,
INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN
A CIVIL ACTION**

Pursuant to Federal Rules of Civil Procedure 26 and 45, Non-Party Samsung Electronics America, Inc. ("SEA") hereby objects and responds to the two Subpoenas to Produce Documents, Information, or Objects or to Permit Inspection Of Premises in a Civil Action (collectively, the "Subpoena") served by the Defendant Apple Inc. ("Apple") on or about February 2, 2026 in the above-captioned cases.[1] SEA stands ready and willing to engage in a coordinated meet and confer with Apple at a mutually-convenient time to discuss the objections and responses below.

**GENERAL OBJECTIONS**

The following General Objections apply to the Subpoena in its entirety and to each individual numbered Document Request ("Request") and shall have the same force and effect as if set forth in full in each of SEA's specific responses below.  By setting forth specific objections to the Requests, SEA does not in any way intend to waive, limit, or modify any General Objection.

1.      SEA objects to any attempt by the parties to this litigation to subject non-party SEA

---

[1] In its accompanying correspondence, Apple requested "only one response" to its two subpoenas, which feature identical discovery requests.

1

to duplicative, redundant, or otherwise unnecessary or harassing discovery requests. To the extent SEA agrees to produce documents in response to any of the requests below, it is the parties' obligation to coordinate their document requests so as to minimize the burdens on SEA. To the extent SEA agrees to search for and/or produce documents in response to any particular request, SEA objects to conducting more than one search for and/or production of materials that may be responsive to substantially similar requests made by multiple parties in related litigation.

2.       SEA objects to the Subpoena to the extent it seeks information that is neither relevant nor proportional to the needs of the case, and to the extent it seeks information of only marginal relevance, which relevance is substantially outweighed by the burden imposed on non-party SEA in having to produce documents as a non-party. *See Audio MPEG, Inc. v. HP Inc.*, 2017 WL 950847, at *4 (N.D. Cal. Mar. 10, 2017) (granting Apple's motion to quash subpoena by Dell, which Dell claimed was relevant to monopolization claim) ("To prevail on a monopolization claim pursuant to Section 2 of the Sherman Act, a plaintiff must show possession of monopoly power in a relevant market, willful acquisition or maintenance of that power in an exclusionary manner, and casual antitrust injury . . . A non-party's motivations and understanding of its relationship with a party accused of monopolization has no bearing on any of these elements . . . Because Dell has, for the most part, failed to show relevance, and because what relevant material there is could be more easily obtained from other sources without causing a burden to non-party Apple, the court grants the motion to quash the subpoena[.]") (internal quotations and emphasis omitted). These burdens are particularly pronounced where, as here, the Subpoena purports to require Samsung to divulge highly confidential and competitively sensitive information in a case involving a direct competitor. *See In re Apple iPhone Antitrust Litig.*, 2020 WL 5993223, at *4 (N.D. Cal. Oct. 9, 2020) ("As a preliminary point, the Court can easily conclude that many of the documents Apple seeks through these requests are entitled to protection under Rule 45(d)(3). High-level documents concerning competition between Samsung's handheld devices and app marketplace, and those of Apple and any other Samsung competitor, are 'confidential, research, development, or commercial information,' Rule 45(d)(3)(B)(i) and 'are plainly the sort of

2

information [Samsung] would not disclose to competitors.'"). Apple's failure to provide any explanation of purported relevance or weighing of burden against relevance renders the Subpoena facially unreasonable and in violation of Rule 45.

3.      SEA further objects to the Subpoena to the extent it seeks documents or information that are not in SEA's possession, custody, or control. SEA does not have physical possession of documents held by other entities, and it objects to purported requests for documents maintained by other entities to which SEA does not have a legal right of access. *See Gerling Int'l Ins. Co. v. Comm'r*, 839 F.2d 131, 140 (3d Cir. 1988) ("In the absence of control by a litigating corporation over documents in the physical possession of another corporation, the litigating corporation has no duty to produce."); *Smart RF Inc. v. AT&T Mobility LLC*, 2025 WL 2412347, at *2 (E.D. Tex. Aug. 20, 2025) ("SEA cannot obtain the Requested Materials from [its parent entity] on demand 'because a subsidiary by definition does not control the parent.'"); *TQ Delta, LLC v. Samsung Elecs. Am., Inc.*, 2021 WL 6049908, at *3 (D.N.J. Dec. 20, 2021) ("Under the federal rules, a party may obtain documents and other tangible items that 'are in the possession, custody or control of' the subpoenaed party . . . Indeed, it is well-established that, in the absence of control, the target of the subpoena has no duty to produce . . . Control means the 'legal right to obtain the documents requested on demand.'"); *In re Novartis & Par Antitrust Litig.*, 2019 WL 5722055, at *6 (E.D. Pa. Nov. 5, 2019) ("The [Third Circuit] has declined to apply a broader definition of 'control' that would also include an inquiry into the practical ability of the subpoenaed party to obtain documents . . . [S]eparate and distinct corporate identities are not readily disregarded, 'except in rare circumstances justifying the application of the alter ego doctrine to pierce the corporate veil of the subsidiary.'"). To the extent SEA agrees to produce any documents or information, that agreement is made solely on behalf of SEA—the only proper entity to which the Subpoena is directed—and not on behalf of any other entity.

4.      SEA further objects to the Subpoena to the extent it seeks information that is equally or more readily available to Apple from the parties to the litigation, other non-parties, publicly available sources, or otherwise.

3

5.      SEA further objects to the Subpoena to the extent it is vague, ambiguous, overbroad, confusing, and/or unclear, including in its use of terms or phrases that are undefined or susceptible to multiple meanings.

6.      SEA further objects to the Subpoena to the extent it fails to limit its requests to a reasonable geographic scope or a reasonable time period, which is facially unreasonable, harassing, overbroad, unduly burdensome, and not proportional to the needs of the case.

7.      SEA further objects to the Subpoena to the extent it seeks confidential or proprietary information pertaining to SEA's business, including but not limited to trade secrets or other confidential research, development, financial, strategic, or competitive commercial information that cannot be adequately protected by the Protective Order entered in this case. *See* Fed. R. Civ. P. 45(d)(3)(B)(i); *see also In re Apple iPhone*, 2020 WL 5993223, at *4 ("As a preliminary point, the Court can equally conclude that many of the documents Apple seeks [from SEA] through these requests are entitled to protection under Rule 45(d)(3). High-level documents concerning competition between Samsung's handheld devices and app marketplace, and those of Apple and any other Samsung competitor, are 'confidential, research, development, or commercial information'…and 'are plainly the sort of information [Samsung] would not disclose to competitors.''). SEA reserves the right to withhold information, even where a protective order has been entered, because certain information is so sensitive that it should not be provided in a litigation to which it is not a party and where it cannot effectively police the use of that information—particularly where, as here, the defendant directly competes with Samsung. *See e.g., Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2929439, at *3 (N.D. Cal. July 7, 2017) ("Defendants' suggestion that the protective order covering this case ameliorates any confidentiality concerns, and that the non-party 'may limit disclosure only to outside counsel of record. . . and thus the documents and information produced cannot be used for business purposes' . . . is unavailing."); *Waymo LLC v. Uber Techs. Inc.*, 2017 WL 3581171, at *1 (N.D. Cal. Aug. 18, 2017) ("While the information could be produced subject to an attorneys-eyes-only protective order, such orders do not guarantee that the information will not be disclosed. Thus, there is no rule that a competitor

4

has to reveal its trade secrets merely because they are produced subject to a protective order."); *Am. Standard, Inc. v. Pfizer, Inc.*, 828 F.2d 734, 741 (Fed. Cir. 1987) ("Courts have presumed that disclosure to a competitor is more harmful than disclosure to a noncompetitor.").  Further, no justification for why Apple has a substantial need for SEA's confidential information has been provided, and no such need exists.  *See Gonzales v. Google, Inc.*, 234 F.R.D. 674, 685 (N.D. Cal. 2006) ("The determination of substantial need is particularly important in the context of enforcing a subpoena when discovery of trade secret or confidential commercial information is sought from non-parties.") (citing *Mattell, Inc. v. Walking Mountain Prod.*, 353 F.3d 792, 814 (9th Cir. 2003)); *In re Apple iPhone*, 2020 WL 5993223, at *9 (internal information about competitor apps "definitely counts as 'confidential research, development, or commercial information,' Fed. R. Civ. P. 45(d)(3)(B)(i), and Apple has not shown 'a substantial need for . . . the material that cannot be otherwise met'"); *In re eBay Seller Antitrust Litig.*, 2009 WL 5205961, at *3 (W.D. Wash. Dec. 23, 2009) ("EBay does not have a substantial need to force Amazon to turn over market analyses that eBay could conduct on its own.").

8.    SEA further objects to the Subpoena to the extent it seeks any other non-party's confidential information subject to a confidentiality agreement that requires notice and/or consent prior to disclosure.  SEA will not provide any confidential information absent a protective order and confirmation of compliance with all applicable non-party confidentiality provisions.

9.    SEA further objects to the Subpoena to the extent it seeks information protected by the attorney-client privilege, the attorney work product doctrine, common interest privilege, joint defense privilege, and/or any other applicable law, privilege, protection, or immunity.

10.    SEA further objects to the Subpoena to the extent that Apple has not taken "reasonable steps to avoid imposing undue burden or expense" on non-party SEA as required by Fed. R. Civ. P. 45(d)(1).  The Subpoena purports to foist significant expenses on non-party SEA. Where parties issue subpoenas on non-parties that impose significant costs, Rule 45 plainly mandates cost-shifting.  *See Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013) ("Rule 45(d)(2)(B)(ii) requires the district court to shift a non-party's costs of compliance with a

5

subpoena, if those costs are significant."); *R.J. Reynolds Tobacco v. Philip Morris, Inc.,* 29 F. App'x 880, 882–83 (3d Cir. 2002) ("[Rule 45(d)(2)(B)] imposes mandatory fee shifting and directs the court to 'protect' a nonparty from 'significant expense resulting from inspection and copying commanded.'"); *Linder v. Calero-Portocarrero*, 251 F.3d 178, 182 (D.C. Cir. 2001) ("[T]he court must protect the non-party by requiring the party seeking discovery to bear at least enough of the expense to render the remainder 'non-significant.'").  Accordingly, SEA will require Apple to bear the costs of any agreed search and production associated with their burdensome and overbroad Subpoena.

11.     SEA further objects to the Subpoena to the extent that it seeks "all documents and communications" for any Request on the grounds that such Request is overbroad, unduly burdensome, harassing, and not reasonably proportionate to the needs of the case.

12.     Where SEA agrees to search for documents, unless otherwise specified or agreed, SEA will agree only to conduct a reasonable search of the identified scope.

13.     SEA's responses to these requests are made solely for the purpose of this action. Each response is made subject to all objections as to competence, relevance, materiality, propriety, admissibility, privilege, privacy, and proprietary and/or confidential information, and any and all other objections on grounds that would require the exclusion of any responses herein if such were offered in Court, all of which objections and grounds are reserved and may be interposed at any time, including at the time of trial.

14.     No incidental or implied admissions are intended in these responses. SEA's response to any request should not be taken as an admission that SEA accepts or admits the existence of any fact(s) or any document(s) assumed by that request, or that such response constitutes admissible evidence. SEA's response to any such request is not intended to be, and shall not be construed as, a waiver by SEA of any or all objection(s) to the request.

15.     To the extent SEA agrees to search for and produce any information in response to the requests, that does not constitute a representation that such information exists or that any such information is in SEA's possession, custody, or control.

6

17.     In making these responses, SEA does not concede the relevancy or materiality of any of Apple's requests; nor does SEA concede the relevancy or materiality of any of the subjects and/or documents to which those requests relate or refer.

18.     To the extent any request, definition, or instruction may be construed as calling for the disclosure of privileged or immune information, including, without limitation, information subject to the attorney-client privilege, common-interest privilege, work-product doctrine, joint defense privilege, and/or any other privilege or immunity from discovery, SEA hereby claims such privileges and immunities and objects to the disclosure of any documents or information subject thereto. Any disclosure of privileged or protected documents, materials, or information is inadvertent and not intended to waive those privileges or protections.

19.     SEA objects to any request, definition, or instruction that calls for the disclosure of information that would violate the legitimate privacy rights and expectations of SEA's employees, directors, officers, affiliates, or subsidiaries, both current and former, or other individuals, to the extent that such privacy rights or expectations are protected by the U.S. Constitution, state law, or public policy.

20.     To the extent any request, definition or instruction may be construed as requiring SEA to characterize documents or their contents or to speculate as to what documents may or may not show, SEA objects to such definition, instruction, or request as vague, ambiguous and calling for legal conclusions and speculation.

21.     SEA objects to each and every request, definition, and instruction to the extent that it is overbroad, unduly burdensome, oppressive, harassing, vague, and/or ambiguous.

22.     SEA objects to each and every request to the extent it is duplicative of, or unreasonably cumulative to, other discovery propounded and/or produced in this action.

23.     SEA objects to each and every request, definition, and instruction to the extent that it seeks documents or information that are neither relevant to any claims or defenses in this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

24.     SEA further objects to the Subpoena in its entirety to the extent it purports to impose

7

discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, Federal Rules of Evidence, the Local Rules of the U.S. District Court for the District of New Jersey, the Court's Orders in this case, and/or any other applicable court order, rule, or statute.

25.    SEA objects to each and every request, definition, and instruction to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business.

26.    SEA objects to Apple's requests, definitions, and instructions to the extent that they seek the discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this and any potential litigation, and beyond the jurisdiction or reach of the laws of the United States or any State.

27.    SEA objects to each and every request, definition, and instruction to the extent that it seeks documents or information, the disclosure of which is prohibited by law, regulation, or order of a court or another authority of the foreign jurisdiction in which the documents or information are located.

## OBJECTIONS TO CERTAIN DEFINITIONS

In addition to its General Objections, SEA objects to certain of Apple's purported definitions as set forth below:

**Definition No. 1:** "Alleged Conduct" shall mean all (and any component of) the conduct alleged to be unlawful in the Complaints, including any alleged monopolization or attempted monopolization by Apple of any alleged markets. Alleged Conduct includes but is not limited to:

a.    Any alleged restrictions that Apple has placed on third-party developers' ability to offer Apps for download in the Apple App Store or in any other App Marketplace;

b.    Any alleged restrictions Apple has placed on third-party developers' access to iPhone features and development tools, including APIs and SDKs;

8

    c.   Any alleged restrictions Apple has placed on third-party access to Apple's In-App Purchase or alternatives to In-App Purchase;

    d.   Any alleged restrictions Apple has placed on products, services, Apps, or technology that allegedly facilitate users' ability to switch between the iPhone and non-Apple Smartphones, or vice versa, including those described in the Complaints as middleware;

    e.   Any alleged restrictions Apple has placed on interoperability concerning Smartphones or policies or practices that allegedly make it harder for consumers to switch between competing Smartphones; and

    f.   Any alleged restrictions Apple has placed on Super Apps; Cloud Streaming Apps, Messaging Apps, Wearables, and Digital Wallets.

**OBJECTION:** SEA objects to the Subpoena's definition of "Alleged Conduct" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 2:** "API" shall mean an application programming interface and shall have the same meaning as used in the Complaints, including without limitation Paragraphs 158 through 163 of the DOJ Complaint.

**OBJECTION:** SEA objects to the Subpoena's definition of "API" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 3:** "Apple" shall mean Apple Inc. and its predecessors, wholly owned or controlled subsidiaries or affiliates, successors, parents, departments, divisions and any organization or entity managed or controlled by Apple Inc.

**OBJECTION:** SEA objects to the Subpoena's definition of "Apple" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 4:** "App" or "Application" shall be defined as in the Complaints, including in Paragraphs 158 through 163 of the DOJ Complaint.

**OBJECTION:** SEA objects to the Subpoena's definition of "App" or "Application" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 5:** "App Marketplace" shall mean any online storefront where Apps are offered for download or purchase, including the Apple App Store, Amazon Appstore, Amazon Underground, Android Market, Aptoide, BlackBerry World, Chrome Web Store, Epic Games Store, GetJar, Google Play Store, Microsoft Store, Origin, Samsung Galaxy Store, Steam, Windows Phone Store, AltStore, TutuApp, and online storefronts distributing games and digital content for Xbox, PlayStation, and Nintendo.

**OBJECTION:** SEA objects to the Subpoena's definition of "App Marketplace" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 6:** "App Review" shall mean Apple's or any other Person's processes of reviewing Apps or App updates for potential inclusion on App Marketplaces.

**OBJECTION:** SEA objects to the Subpoena's definition of "App Review" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the

10

Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order.  SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 7** "Business" shall be defined as all actual or potential operations, services, products, technologies, activities, and business opportunities conducted or pursued by or on behalf of You.

**OBJECTION:** SEA objects to the Subpoena's definition of "Business" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order.  SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 8:** "Cloud Streaming App" shall be defined as in the Complaints, including in Paragraphs 10 and 71 through 79 of the DOJ Complaint.

**OBJECTION:** SEA objects to the Subpoena's definition of "Cloud Streaming Act" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order.  SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 9:** "Communication" shall mean any exchange or transmission of words or ideas to another Person or entity, whether accomplished Person to Person, by telephone, in writing, via electronic mail or text message, via social media, or through any other medium, and shall include discussions, conversations, negotiations, conferences, meetings, speeches, memoranda, letters, correspondence, notes, blogs, postings, statements, and questions.

**OBJECTION:** SEA objects to the Subpoena's definition of "Communication" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order.  SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

11

**Definition No. 10:** "Companion App" shall be defined as in the Complaints, including in Paragraphs 33 through 34 of the Smartwatch Complaint.

**OBJECTION:** SEA objects to the Subpoena's definition of "Companion App" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 11:** "Complaints" shall mean the DOJ Complaint and any MDL Complaint.

**OBJECTION:** SEA objects to the Subpoena's definition of "Complaints" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 12:** "Contactless Card" means any debit, credit, or other payment card accessing an account issued by an issuer and offered on a Payment Network that allows users to make purchases at point of sale by tapping or holding their card over a payment terminal.

**OBJECTION:** SEA objects to the Subpoena's definition of "Contactless Card" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 13:** "Data Dictionary" shall mean documentation of the organization and structure of the databases or data sets that is sufficient to allow their reasonable use by Apple, including, for each table of information: (a) the name of the table; (b) a general description of the information contained within it; (c) the size in both number of records and megabytes; (d) a list of fields available for each record; (e) the format, including variable type and length, of each field; (f) a definition for each field as it is used by You, including the meanings of all codes that can appear as field values; (g) the fields that are primary keys for the purpose of identifying a unique

12

observation; (h) the fields that are foreign keys for the purpose of joining tables; and (i) an indication of which fields are populated. A database schema is an example of a Data Dictionary.

**OBJECTION:** SEA objects to the Subpoena's definition of "Data Dictionary" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order.  SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 14:** "Digital Wallet" shall be defined as in the Complaints, including in Paragraphs 10 and 104 through 118 of the DOJ Complaint.

**OBJECTION:** SEA objects to the Subpoena's definition of "Digital Wallet" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order.  SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 15:** "Document" shall have the full meaning ascribed to it under Rule 34 and Rule 45 of the Federal Rules of Civil Procedure and shall include Communications; memoranda; records; Reports; books; records, and summaries of personal conversations or interviews; diaries; presentations; slide decks; graphs; charts; spreadsheets; diagrams; tables; photographs; recordings; tapes; microfilms; minutes; records and summaries of meetings or conferences; press releases; blog posts; stenographic handwritten or any other notes; work papers; checks, front and back; check vouchers, check stubs, or receipts; tape data sheets or data processing cards or discs; or any other written, recorded, transcribed, punched, taped, filmed, or graphic matter, however produced or reproduced; and any paper or writing of whatever description, including information contained in any computer although not yet printed out. The term "Document" further includes all copies where the copy is not identical to the original.

**OBJECTION:** SEA objects to the definition of "Document" as vague, ambiguous, overbroad, and unduly burdensome and oppressive, particularly to the extent this definition purports to bring within the ambit of the Subpoena documents from entities other than SEA. SEA

13

cannot respond on behalf of persons or entities other than SEA. Therefore, in responding to the Subpoena, SEA construes "Document" as referring to documents from SEA, to which the Subpoena was directed and on which the Subpoena was served, and no other entity or person. SEA further objects to the definition as overbroad, unduly burdensome, and oppressive to the extent it purports to impose burdens upon SEA that are not permitted by law, or seeks to impose greater obligations than those imposed under the Federal Rules of Civil Procedure, the Local Rules, or any order of Court. Moreover, SEA objects to this definition to the extent that it seeks documents that are not in the possession, custody, or control of SEA, or are equally or more readily available from the parties or otherwise. SEA further objects to this definition to the extent it calls for the disclosure of documents or information protected from discovery by the attorney-client privilege and/or work product doctrine. Finally, SEA objects to this definition to the extent it calls for the disclosure of documents or information that would violate the legitimate privacy rights and expectations of SEA employees, directors, officers, affiliates, and subsidiaries, both current and former, and other individuals, to the extent that such privacy rights and expectations are protected by law, contract, or public policy.

**Definition No. 16:** "DOJ Complaint" shall mean the First Amended Complaint or any future amended complaints against Apple filed by the United States Department of Justice, several states, and the District of Columbia in the United States District Court for the District of New Jersey on June 11, 2024 (Case No. 2:24-cv-04055, Dkt. No. 51), which is attached hereto as Exhibit A.

**OBJECTION:** SEA objects to the Subpoena's definition of "DOJ Complaint" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 17:** "Government Action" means *United States of America v. Apple, Inc.*, No. 2:24-cv-4055-JXN-LDW (D.N.J.).

14

**OBJECTION:** SEA objects to the Subpoena's definition of "Government Action" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 18:** "Identified Product or Service" means each product or service within one or more of the following categories: Cloud Streaming Apps, Super Apps, Messaging Apps, Digital Wallets, and Wearables.

**OBJECTION:** SEA objects to the Subpoena's definition of "Identified Product or Service" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 19:** "In-App Purchase" shall mean the purchase of a product, feature, service, or functionality for a fee that occurs within an App.

**OBJECTION:** SEA objects to the Subpoena's definition of "In-App Purchase" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 20:** "Including," "included," "includes," and "include" shall not be construed as limiting any Request, and shall mean the same as "including, but not limited to."

**OBJECTION:** SEA objects to this definition to the extent that it purports to broaden these terms beyond their ordinary meaning or impose obligations on SEA broader than or inconsistent with the obligations created by the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order. SEA will interpret and respond to Requests using these terms consistent with their ordinary meaning.

15

**Definition No. 21:** "Investigation" shall mean the pre-DOJ Complaint investigation into Apple's Alleged Conduct, conducted by the United States Department of Justice, several states, and the District of Columbia.

**OBJECTION:** SEA objects to the Subpoena's definition of "Investigation" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order.  SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 22:** "MDL" means *In re Apple Inc. Smartphone Antitrust Litigation*, 24-md-3113-JXN-LDW.

**OBJECTION:** SEA objects to the Subpoena's definition of "MDL" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order.  SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 23:** "MDL Complaint" shall mean any of the consolidated complaints in any actions coordinated as part of *In re Apple Inc. Smartphone Antitrust Litigation*, No. 24-MD-3113 (D.N.J.), including the Direct iPhone Purchaser Plaintiffs' Consolidated Class Action Complaint (Dkt. No. 87) filed on July 30, 2025, attached hereto as Exhibit B; the Indirect iPhone Purchaser Plaintiffs' Corrected Consolidated Class Action Complaint (Dkt. No. 109) filed on September 11, 2025, attached hereto as Exhibit C; and the Direct Apple Watch Purchaser Plaintiffs' First Amended Class Action Complaint (Dkt. No. 86) filed on July 30, 2025 ("Smartwatch Complaint"), attached hereto as Exhibit D.

**OBJECTION:** SEA objects to the Subpoena's definition of "MDL Complaint" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order.  SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

16

**Definition No. 24:** "Messaging App" shall be defined as in the Complaints, including in Paragraphs 10 and 80 through 93 of the DOJ Complaint, and shall include without limitation Samsung Messages, Beeper, BlueChat, Discord, Facebook Messenger, Google Messages, KakaoTalk, Line, Microsoft Messaging, Signal, Skype, Slack, Snapchat, Teams, Telegram, Texts, Viber, WhatsApp, and Apple's Messages App.

**OBJECTION:** SEA objects to the Subpoena's definition of "Messaging App" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 25:** "Mini-Program" shall have the same meaning as used in the Complaints, including in Paragraphs 60 through 70 of the DOJ Complaint.

**OBJECTION:** SEA objects to the Subpoena's definition of "Mini-Program" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 26:** "Multimedia Messaging Service" or "MMS" shall be defined as in the Complaints, including in Paragraph 83 and Footnote 1 of the DOJ Complaint.

**OBJECTION:** SEA objects to the Subpoena's definition of "Multimedia Messaging Service" or "MMS" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 27:** "Payment Network(s)" means any one or more of Visa, MasterCard, Discover, American Express, or any other similar network permitting businesses and/or consumers to engage in financial transactions using a credit, debit, or prepaid card.

**OBJECTION:** SEA objects to the Subpoena's definition of "Payment Network(s)" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent

17

with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court

Order. SEA also objects to this definition as vague, ambiguous, overbroad, and unduly

burdensome.

**Definition No. 28:** "Person" shall mean any natural individual, partnership, corporation,

company, association, organization, joint venture, government, agency, or entity.

**OBJECTION:** SEA objects to the Subpoena's definition of "Person" to the extent it

purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the

Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA

also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 29:** "QR Code-Based Payments" means contactless payments at point of

sale that are facilitated using Quick Response Codes (i.e., QR codes).

**OBJECTION:** SEA objects to the Subpoena's definition of "QR Code-Based Payments"

to the extent it purports to impose discovery obligations on SEA that are broader than, or

inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any

applicable Court Order. SEA also objects to this definition as vague, ambiguous, overbroad, and

unduly burdensome.

**Definition No. 30:** "Report" shall mean any written reports, research, papers, memoranda,

presentations, reviews, statistical compilations, or other analyses.

**OBJECTION:** SEA objects to the Subpoena's definition of "Report" to the extent it

purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the

Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA

also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 31:** "Rich Communication Services" or "RCS" shall have the same

meaning as used in the Complaints, including in Paragraph 89 of the DOJ Complaint.

**OBJECTION:** SEA objects to the Subpoena's definition of "Rich Communication

Services" or "RCS" to the extent it purports to impose discovery obligations on SEA that are

broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules,

18

and/or any applicable Court Order.  SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 32:** "Samsung," "You," and "Your" shall mean Samsung Electronics America, Inc. ("SEA"); its parent company, Samsung Electronics Co., Ltd. ("SEC"); and each of SEA's and SEC's officers, directors, employees, representatives, consultants, agents, accountants, and any other Person acting on their behalf; as well as SEA's and SEC's predecessors, successors, and subsidiaries, including, without limitation, Harman International Industries, Samsung Display, Samsung SDI, Samsung Electro-Mechanics, Samsung Semiconductor, Samsung Research, Samsung SDS, Samsung Networks, Samsung Foundry, and Samsung Austin Semiconductor; and any Person that SEA or SEC manages or controls.

**OBJECTION:** SEA objects to the Subpoena's definition of "Samsung," "You," or "Your" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order.  SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 33:** "Senior Personnel" shall mean any current or former officer or employee of Samsung who holds, or held at any time relevant to this subpoena, a senior executive, officer, or managerial position, including but not limited to: (a) members of Your executive leadership or "C-suite" (including the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, Chief Technology Officer, Chief Information Officer, Chief Legal Officer, and any equivalent positions); (b) Presidents; (c) Executive Vice Presidents, Senior Vice Presidents, and Vice Presidents; (d) Directors; and (e) General Managers, as well as any other employee with comparable authority, responsibility, or decision-making power over corporate strategy, operations, finances, product development, data, or compliance.

**OBJECTION:** SEA objects to the Subpoena's definition of "Senior Personnel" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court

19

Order.   SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 34:** "SDK" shall mean Apple's Software Development Kit.

**OBJECTION:** SEA objects to the Subpoena's definition of "SDK" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order.  SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 35:** "Short Message Service" or "SMS" shall be defined as in the Complaints, including in Paragraphs 45 and 82 through 83 of the DOJ Complaint.

**OBJECTION:** SEA objects to the Subpoena's definition of "Short Message Service" or "SMS" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order.  SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 36:** "Smartphone" shall be defined as in the Complaints, including in Paragraphs 148 through 163 of the DOJ Complaint.

**OBJECTION:** SEA objects to the Subpoena's definition of "Smartphone" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order.  SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 37:** "Super App" shall be defined as in the Complaints, including in Paragraphs 10 and 60 through 70 of the DOJ Complaint.

**OBJECTION:** SEA objects to the Subpoena's definition of "Super App" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order.  SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

20

**Definition No. 38:** "Threat Model" shall mean with respect to the privacy and security of hardware, operating systems, software, data centers, servers, or services, any formal or informal assessments, analyses, Reports, summaries, assumptions, studies, or other understandings about attacker characteristics, goals, capabilities, limitations, or assets. Threat Models also include Documents and information reflecting assumptions (including the bases for such assumptions) and understandings about the security posture of a system, hardware, or software, including possible threats, vulnerabilities, potential mitigations, and tradeoffs.

**OBJECTION:** SEA objects to the Subpoena's definition of "Threat Model" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 39:** "Trade-In" shall mean a transaction pursuant to which a Person transfers ownership of a previously owned product to a seller, manufacturer, carrier, retailer, or its agent, and, in exchange, receives a credit, discount, payment, or other consideration that is applied toward, or reduces the amount payable for, the purchase of a new product.

**OBJECTION:** SEA objects to the Subpoena's definition of "Trade-In" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 40:** "Virtual Card" shall mean any digital version of a credit or debit card that is designed to be stored and used within Digital Wallets or online payment systems.

**OBJECTION:** SEA objects to the Subpoena's definition of "Virtual Card" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 41:** "Wearables" shall have the same meaning as used in the Complaints, including in Paragraphs 21, 131, 202, 208, 214, and 221 of the DOJ Complaint, and shall include

21

any "Smartwatch" as that term is used in the Complaints, including in Paragraphs 10 and 94 through 103 of the DOJ Complaint.

**OBJECTION:** SEA objects to the Subpoena's definition of "Wearables" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 42:** "Web Browsers" shall have the same meaning as used in the Complaints, including in Paragraphs 43, 120, and 163 of the DOJ Complaint.

**OBJECTION:** SEA objects to the Subpoena's definition of "Web Browsers" to the extent it purports to impose discovery obligations on SEA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure, the Court's local rules, and/or any applicable Court Order. SEA also objects to this definition as vague, ambiguous, overbroad, and unduly burdensome.

**Definition No. 43:** The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Requests all Documents, materials, or responses that might otherwise be construed to be outside of their scope.

**OBJECTION:** SEA objects to this definition to the extent that it purports to broaden these terms beyond their ordinary meaning or impose obligations on SEA broader than or inconsistent with the obligations created by the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order. SEA will interpret and respond to Requests using these terms consistent with their ordinary meaning.

**Definition No. 44:** The terms "any," "each," and "all" are mutually interchangeable and are meant to encompass each other.

**OBJECTION:** SEA objects to this definition to the extent that it purports to broaden these terms beyond their ordinary meaning or impose obligations on SEA broader than or inconsistent with the obligations created by the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order. SEA will interpret and respond to Requests using these terms consistent with their ordinary meaning.

**Definition No. 45:** The terms "concerning," "reflecting," "regarding," and "related to" mean in whole or in part, concerning, reflecting, regarding, related to, relating to, in connection with, involving, supporting, addressing, analyzing, constituting, containing, commenting on, discussing, describing, identifying, referring to, reporting on, stating, dealing with, or in any way pertaining or bearing a logical connection to.

**OBJECTION:** SEA objects to this definition to the extent that it purports to broaden these terms beyond their ordinary meaning or impose obligations on SEA broader than or inconsistent with the obligations created by the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order. SEA will interpret and respond to Requests using these terms consistent with their ordinary meaning.

**Definition No. 46:** The use of the singular form of any word includes the plural and vice versa as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of their scope.

**OBJECTION:** SEA objects to this definition to the extent that it purports to broaden these terms beyond their ordinary meaning or impose obligations on SEA broader than or inconsistent with the obligations created by the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order. SEA will interpret and respond to Requests using these terms consistent with their ordinary meaning.

**Definition No. 47:** The use of the feminine form of any word includes the masculine form and vice versa as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of their scope.

**OBJECTION:** SEA objects to this definition to the extent that it purports to broaden these terms beyond their ordinary meaning or impose obligations on SEA broader than or inconsistent with the obligations created by the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order. SEA will interpret and respond to Requests using these terms consistent with their ordinary meaning.

23

**Definition No. 48:** The past tense shall be construed to include the present tense and vice versa as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of their scope.

**OBJECTION:** SEA objects to this definition to the extent that it purports to broaden these terms beyond their ordinary meaning or impose obligations on SEA broader than or inconsistent with the obligations created by the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order. SEA will interpret and respond to Requests using these terms consistent with their ordinary meaning.

## OBJECTIONS TO CERTAIN INSTRUCTIONS

In addition to its General Objections and Objections to Definitions, SEA objects to certain of Apple's purported instructions as set forth below:

**Instruction No. 1:** All Documents should be produced in electronic form in accordance with the Electronically Stored Information ("ESI") Protocol attached hereto as Exhibit E.

**OBJECTION:** SEA objects to this instruction as oppressive and unduly burdensome, particularly to the extent it purports to impose burdens upon SEA that are not permitted by law, or seeks to impose greater obligations than those imposed under the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order.

**Instruction No. 2:** For purposes of interpreting or construing the scope of these Requests, the terms used shall be given the most expansive and inclusive interpretation, unless specifically limited in the Request.

**OBJECTION:** SEA objects to this instruction as oppressive and unduly burdensome, particularly to the extent it purports to impose burdens upon SEA that are not permitted by law, or seeks to impose greater obligations than those imposed under the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order.

**Instruction No. 3:** All Documents requested herein must be produced in their entirety, with all attachments and enclosures.

24

**OBJECTION:** SEA objects to this instruction as oppressive and unduly burdensome, particularly to the extent it purports to impose burdens upon SEA that are not permitted by law, or seeks to impose greater obligations than those imposed under the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order.

**Instruction No. 4:** In responding to these Requests, You shall produce all Documents in Your possession, custody, or control, and all Documents reasonably available to You, including those in the possession, custody, or control of any Person acting on Your behalf.

**OBJECTION:** SEA objects to this instruction as oppressive and unduly burdensome, particularly to the extent it purports to impose burdens upon SEA that are not permitted by law, or seeks to impose greater obligations than those imposed under the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order. SEA further objects to this instruction as vague, ambiguous, overbroad, and unduly burdensome and oppressive to the extent it purports to apply to persons and entities other than SEA. SEA cannot respond on behalf of persons or entities other than SEA, to which the Subpoena was directed and on which Subpoena was served. SEA objects to this instruction to the extent it calls for the disclosure of information subject to the attorney-client privilege or work-product doctrine. Moreover, SEA objects to this instruction to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State.

**Instruction No. 5:** These Requests shall not be deemed to call for identical hash duplicates (e.g., MD5, SHA 256, or other industry standard) of Documents. "Identical" means precisely the same in all respects; for example, a Document with handwritten notes or editing marks shall not be deemed identical to one without such notes or marks. Additionally, for Documents with attachments, the hash value shall be generated based on the parent/child Document grouping. Otherwise identical Documents with unique family members are not identical, and both must be produced. You shall produce as a separate Document any Document that contains any notation,

25

addition, insertion, or marking of any kind that renders it not entirely identical to a version of that Document without such marks.

**OBJECTION:** SEA objects to this instruction as oppressive and unduly burdensome, particularly to the extent it purports to impose burdens upon SEA that are not permitted by law, or seeks to impose greater obligations than those imposed under the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order.

**Instruction No. 6:** If there are no Documents responsive to a category in these Requests, You shall so state in writing.

**OBJECTION:** SEA objects to this instruction as oppressive and unduly burdensome, particularly to the extent it purports to impose burdens upon SEA that are not permitted by law, or seeks to impose greater obligations than those imposed under the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order.

**Instruction No. 7:** If You object to a portion of any Request, You shall state the legal and factual basis for Your objection with specificity and respond to all parts of the Request to which You do not object.

**OBJECTION:** SEA objects to this instruction as oppressive and unduly burdensome, particularly to the extent it purports to impose burdens upon SEA that are not permitted by law, or seeks to impose greater obligations than those imposed under the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order.

**Instruction No. 8:** If You encounter any ambiguity in the Requests, in a definition, or in an instruction relevant to the Requests, explain what You find to be ambiguous and what construction You used in providing Your response. If You contend that You do not understand the definition of any term or phrase used in a Request, You shall explain in detail what it is that You do not understand about the term or phrase at issue, and You shall respond to that part of the Request that You do understand.

**OBJECTION:** SEA objects to this instruction as oppressive and unduly burdensome, particularly to the extent it purports to impose burdens upon SEA that are not permitted by law, or

26

seeks to impose greater obligations than those imposed under the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order.

**Instruction No. 9:** If You object to any Request on the grounds that responding is unduly burdensome, describe the undue burden.

**OBJECTION:** SEA objects to this instruction as oppressive and unduly burdensome, particularly to the extent it purports to impose burdens upon SEA that are not permitted by law, or seeks to impose greater obligations than those imposed under the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order.

**Instruction No. 10:** If You contend that any part of a Request is overbroad, You shall explain in detail why it is that You consider that part of the Request to be overbroad, and You shall produce Documents in response to the remainder of the Request that You do not consider to be overbroad.

**OBJECTION:** SEA objects to this instruction as oppressive and unduly burdensome, particularly to the extent it purports to impose burdens upon SEA that are not permitted by law, or seeks to impose greater obligations than those imposed under the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order.

**Instruction No. 11:** In producing Documents responsive to these Requests, You must Bates stamp them in a manner that clearly identifies that each such Document has been produced by You.

**OBJECTION:** SEA objects to this instruction as oppressive and unduly burdensome, particularly to the extent it purports to impose burdens upon SEA that are not permitted by law, or seeks to impose greater obligations than those imposed under the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order.

**Instruction No. 12:** If any requested Document is withheld on the basis of any claim of privilege, You must set forth the information necessary for Apple to ascertain whether the privilege properly applies, including all information identified in Section VI of the ESI Protocol attached hereto as Exhibit E.

27

**OBJECTION:** SEA objects to this instruction as oppressive and unduly burdensome, particularly to the extent it purports to impose burdens upon SEA that are not permitted by law, or seeks to impose greater obligations than those imposed under the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order.

**Instruction No. 13:** All productions shall be governed, as applicable, by the Discovery Confidentiality Orders attached hereto as Exhibits F and G.

**OBJECTION:** SEA objects to this instruction as oppressive and unduly burdensome, particularly to the extent it purports to impose burdens upon SEA that are not permitted by law, or seeks to impose greater obligations than those imposed under the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order.

**Instruction No. 14:** If any portion of any Document responsive to these Requests is withheld under claim of privilege, all non-privileged portions must be produced with the portion(s) claimed to be privileged redacted and logged in a privilege log pursuant to the preceding instructions.

**OBJECTION:** SEA objects to this instruction as oppressive and unduly burdensome, particularly to the extent it purports to impose burdens upon SEA that are not permitted by law, or seeks to impose greater obligations than those imposed under the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order.

**Instruction No. 15:** Unless otherwise specified in the Requests, in searching for and producing Documents responsive to these Requests, You shall use a reasonable time period to be agreed upon with Apple in advance of productions.

**OBJECTION:** SEA objects to this instruction as oppressive and unduly burdensome, particularly to the extent it purports to impose burdens upon SEA that are not permitted by law, or seeks to impose greater obligations than those imposed under the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order. SEA also objects to this purported instruction on the grounds that it is hopelessly vague and provides no semblance of what constitutes a "reasonable time period."

28

**Instruction No. 16:** Specified date ranges are inclusive. Unless otherwise stated, a year includes all days of that year from and including January 1 to and including December 31.

**OBJECTION:** SEA objects to this instruction as oppressive and unduly burdensome, particularly to the extent it purports to impose burdens upon SEA that are not permitted by law, or seeks to impose greater obligations than those imposed under the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order.

**Instruction No. 17:** To the extent required by the Federal Rules of Civil Procedure and applicable case law, these Requests are continuing and require further and supplemental production if additional Documents are received, generated, or discovered after the time of the original production. If after responding to these Requests, You obtain or become aware of any additional Documents that are directly or indirectly responsive to any part of any of these Requests, You shall promptly produce any additional responsive Documents.

**OBJECTION:** SEA objects to this instruction as oppressive and unduly burdensome, particularly to the extent it purports to impose burdens upon SEA that are not permitted by law, or seeks to impose greater obligations than those imposed under the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order.

**Instruction No. 18:** Apple serves these Requests without prejudice to its right to serve additional requests for production of Documents or other requests or subpoenas.

**OBJECTION:** SEA objects to this instruction as oppressive and unduly burdensome, particularly to the extent it purports to impose burdens upon SEA that are not permitted by law, or seeks to impose greater obligations than those imposed under the Federal Rules of Civil Procedure and/or any applicable Local Rule or other Court Order.

## RESPONSES AND OBJECTIONS TO REQUESTS FOR PRODUCTION

Subject to any Specific Objections set forth below, and specifically incorporating each of the foregoing General Objections, Objections to Certain Definitions, and Objections to Certain

29

Instructions into each response below, and without waiving said objections, SEA responds as follows:

**REQUEST FOR PRODUCTION NO. 1:**

All Documents responsive to Requests for production of Documents served by any party in the Government Action or the MDL.

**RESPONSE TO REQUEST NO. 1:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information protected by the attorney-client privilege, the attorney work product doctrine, common interest privilege, joint defense privilege, and/or any other applicable law, privilege, protection, or immunity. SEA further objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it requests "all Documents and Communications." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity. SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will produce documents that it has produced in response to requests from the Department of Justice or to the Plaintiffs in the MDL in either litigation.

30

**REQUEST FOR PRODUCTION NO. 2:**

Documents sufficient to show Your corporate structure, including any corporate parents, subsidiaries, joint ventures, boards of directors, and related or affiliated entities.

**RESPONSE TO REQUEST NO. 2:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information protected by the attorney-client privilege, the attorney work product doctrine, common interest privilege, joint defense privilege, and/or any other applicable law, privilege, protection, or immunity. SEA further objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "corporate structure" and "related or affiliated entities." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 3:**

Organization charts, to the extent they exist, or Documents otherwise sufficient to identify the Senior Personnel responsible for Your Smartphones, Wearables, App Marketplace, and/or Apps, their roles with respect to those products and services, and their reporting relationships.

**RESPONSE TO REQUEST NO. 3:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "Senior Personnel" and "reporting relationships." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 4:**

All Documents related to the nature and extent of SEA's ability to request, access, or obtain Documents or information from SEC or any other Samsung entity, including:

a. Policies, agreements, guidelines, or practices governing Document sharing, data access, or information exchange between SEA and SEC;

32

b. Corporate governance or internal control Documents (including charters, bylaws, compliance manuals, delegation-of-authority Documents, or similar materials) addressing SEA's authority or rights to obtain Documents or information from SEC;

c. Communications, instructions, or directives from SEC to SEA concerning Document production, litigation support, or regulatory inquiries;

d. Descriptions of IT systems, shared platforms, or databases accessible by SEA that contain SEC Documents or data;

e. Documents regarding any instances in which SEA has obtained, requested, received, produced, transmitted, or shared Documents or information from or to SEC for business, regulatory, compliance, or litigation-related purposes;

f. Organizational charts, reporting structures, or similar Documents reflecting overlapping or shared officers, directors, employees, or reporting lines between SEA and SEC; and

g. Documents concerning SEA's role as agent, representative, or intermediary for SEC in the United States, including any authority granted to SEA to act on SEC's behalf in commercial, regulatory, compliance, or legal matters.

**RESPONSE TO REQUEST NO. 4:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information protected by the attorney-client privilege, the attorney work product doctrine, common interest privilege, joint defense privilege, and/or any other applicable law, privilege, protection, or immunity. SEA further objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it requests "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "request, access, or obtain" and "Samsung entity." SEA objects that the Request is also unduly burdensome and overbroad to

33

the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

**REQUEST FOR PRODUCTION NO. 5:**

Documents sufficient to show each instance where SEC initiated, defended, or otherwise participated in any litigation or arbitration in the United States.

**RESPONSE TO REQUEST NO. 5:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information protected by the attorney-client privilege, the attorney work product doctrine, common interest privilege, joint defense privilege, and/or any other applicable law, privilege, protection, or immunity. SEA further objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "initiated," "defended," and "otherwise participated in." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to

34

persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

**REQUEST FOR PRODUCTION NO. 6:**

Documents sufficient to show all Smartphone models produced or sold by You since January 1, 2010, including specifications, features, launch date, price at launch, and discontinuation date.

**RESPONSE TO REQUEST NO. 6:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "specifications," "features," "launch date," and "discontinuation date." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent

35

that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 7:**

All Documents related to price, price-setting, terms of sale (including rebates, fees, promotions, discounts, and financing), licensing terms or conditions, pricing plans, price lists, and pricing strategies for Your Smartphones.

**RESPONSE TO REQUEST NO. 7:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information protected by the attorney-client privilege, the attorney work product doctrine, common interest privilege, joint defense privilege, and/or any other applicable law, privilege, protection, or immunity. SEA further objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it requests "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "licensing terms or conditions," "pricing plans," "price lists," and "pricing strategies." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds

36

that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 8:**

All Documents after January 1, 2010 related to competition concerning Smartphones offered by You or any other Smartphone manufacturer, including:

a. Relative quality or features, including technology, performance, privacy, security, user experience, brand strength, customizability, ability to integrate with or interoperate with other hardware or software, network effects, and cost;

b. Entry, expansion, exit, scale, and repositioning;

c. Market segmentation by geography, type of consumer, Smartphone type, Smartphone features, sales channel, or Smartphone price or price band;

d. Competitive positioning and differentiation;

e. Sales volumes, revenue, and profitability;

f. Installed base;

g. Market shares, segment shares, or relative sales or volume shares; and

h. Competitive threats, disintermediation, and commoditization.

37

**RESPONSE TO REQUEST NO. 8:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information protected by the attorney-client privilege, the attorney work product doctrine, common interest privilege, joint defense privilege, and/or any other applicable law, privilege, protection, or immunity. SEA further objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "Relative quality or features," "integrate with," "interoperate with," "network effects," and "competitive threats." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a

38

reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 9:**

All Documents related to any actual or potential barriers or impediments to entry, output expansion, or repositioning related to Smartphones and mobile operating systems.

**RESPONSE TO REQUEST NO. 9:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information protected by the attorney-client privilege, the attorney work product doctrine, common interest privilege, joint defense privilege, and/or any other applicable law, privilege, protection, or immunity. SEA further objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "actual or potential barriers to entry," "output expansion," and "repositioning." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant.  Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information. SEA also

39

objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 10:**

All regularly or specially prepared business Reports, strategic plans, competitive plans, marketing plans, promotional plans, competitive assessments or benchmarking analyses prepared by or for You concerning Your strategies, objectives, research, development, investments, roadmaps, marketing, innovations, and features for Your Smartphones.

**RESPONSE TO REQUEST NO. 10:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information protected by the attorney-client privilege, the attorney work product doctrine, common interest privilege, joint defense privilege, and/or any other applicable law, privilege, protection, or immunity. SEA further objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all" of the listed categories of materials. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "strategic plans," "competitive plans," "marketing plans," and "promotional plans." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. Moreover, SEA objects to this Request to the extent it seeks discovery of

40

information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 11:**

All Documents concerning the security and privacy architecture, safeguards, vulnerabilities, and data protection features of Your Smartphones, including changes to such features over time.

**RESPONSE TO REQUEST NO. 11:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information protected by the attorney-client privilege, the attorney work product doctrine, common interest privilege, joint defense privilege, and/or any other applicable law, privilege, protection, or immunity. SEA further objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it requests "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought

41

with reasonable specificity including without limitation as to the terms "security and privacy architecture" and "data protection features." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant.  Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 12:**

All financial statements, budgets, profit and loss statements, cost Reports, profitability Reports, annual Reports, regulatory Reports, and any other financial Reports (reflecting or relating to revenues, costs, margins, and/or profitability) regularly prepared by or for You on any periodic basis concerning Your Smartphones.

**RESPONSE TO REQUEST NO. 12:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not

42

proportional to the needs of the case, particularly because SEA is a non-party and it requests "all" of the listed categories of materials. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "financial statements" and "relating to." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 13:**

All studies, analyses, Reports and other Documents concerning how any Identified Product or Service may affect users' Smartphone purchasing decisions, including user satisfaction, Smartphone switching, consumer perceptions and attitudes, preferences, usage, purchase intentions, and all other related metrics, key performance indicators, and measures.

**RESPONSE TO REQUEST NO. 13:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein,

43

SEA objects to this Request to the extent it seeks information protected by the attorney-client privilege, the attorney work product doctrine, common interest privilege, joint defense privilege, and/or any other applicable law, privilege, protection, or immunity. SEA further objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it requests "all" of the listed categories of materials. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "purchasing decisions," "user satisfaction," "Smartphone switching," "perceptions and attitudes," "usage," "purchase intentions," and "related metrics." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 14:**

All studies, Reports, and analyses concerning the customer lifetime value of Smartphone consumers, including any studies estimating or measuring the customer lifetime value of users of Your Smartphones, and any analyses comparing customer lifetime value across different Smartphone brands.

**RESPONSE TO REQUEST NO. 14:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it requests "all" of the listed categories of materials. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the term "customer lifetime value." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a

45

reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 15:**

All studies, analyses, Reports, and other Documents discussing factors affecting consumer demand for any Smartphone model or brand, including the Smartphone's price, features, or quality (including quantity, price, and quality of available Apps, hardware accessories, or other complementary products and services); usage of any Identified Product or Service; and metrics, key performance indicators, and measures related to consumer demand for any Smartphone brand or model.

**RESPONSE TO REQUEST NO. 15:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it requests "all" of the listed categories of materials. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "consumer demand" and "key performance indicators." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State.  SEA also objects to this Request to the extent that it seeks

46

information that is equally or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 16:**

All Documents related to any factors affecting the ability or incentive for developers or third parties to create Apps usable with a particular Smartphone, including the size and characteristics of the installed base of users of a particular Smartphone or type of Smartphone, the ease of developing Apps for a particular Smartphone's operating system, the costs, fees, or commissions charged by the Smartphone provider, features offered by the Smartphone, technological restrictions imposed by the Smartphone provider or operating system, and any other terms of dealing.

**RESPONSE TO REQUEST NO. 16:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "incentive," "ease," "technological restrictions," and "terms of dealing." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data

47

compilations that do not exist or that are not ordinarily kept in the normal course of business.

Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding

business operations outside of the United States and unrelated to United States commerce, on the

grounds that such requests are overbroad, unduly burdensome, and irrelevant.  Such operations are

beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United

States or any State. SEA also objects to this Request to the extent it seeks the disclosure of

confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential

information. SEA also objects to this Request to the extent that it seeks information that is equally

or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA

will not comply with this Request as written but is willing to meet and confer to discuss a

reasonable narrowing of and otherwise appropriate limitations to this Request, including a

reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding

to this Request.

**REQUEST FOR PRODUCTION NO. 17:**

Documents sufficient to show Your plans, strategies, and analyses relating to the sale of

used or refurbished Smartphones, including acquisition strategies for any re-seller, Smartphone

Trade In values, incentives or credits offered to the Person trading in the device, and the countries

where used or refurbished Smartphones are sourced and sold.

**RESPONSE TO REQUEST NO. 17:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to

Certain Instructions, each of which is incorporated by reference as though fully set forth herein,

SEA objects to this Request to the extent it seeks information protected by the attorney-client

privilege, the attorney work product doctrine, common interest privilege, joint defense privilege,

and/or any other applicable law, privilege, protection, or immunity. SEA further objects to this

Request to the extent it seeks information and documents that are cumulative and duplicative of

other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs

48

of the case, particularly because SEA is a non-party. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "plans," "strategies," and "analyses." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant.  Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 18:**

All Documents and data related to any Smartphone's usable life, the length of time over which consumers use it, the number and type of consumers that use it, its quality and value at any point in time, and all related metrics or key performance indicators.

**RESPONSE TO REQUEST NO. 18:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative

and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "All Documents and data." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the term "usable life." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant.  Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 19:**

From 2007 to the present, all contracts between You, U.S. wireless carriers, or any other retailer relating to Your Smartphones, and all Documents from 2015 onwards related to the negotiations of those contracts or to carrier or retailer sales or promotions.

**RESPONSE TO REQUEST NO. 19:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein,

50

SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all contracts." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "contracts," "retailer," and "relating to." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. SEA also objects to this request on the grounds that the specified time period is overbroad. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 20:**

All Documents related to consumer views about the privacy, security, user experience, or quality of Smartphones, including how consumers' views:

a. are affected by Smartphone manufacturers' product decisions and marketing strategies and campaigns;

b. are affected by the product decisions and marketing strategies and campaigns related to any Identified Product or Service;

51

c. compare to actual differences in Smartphone privacy, security, and quality; and

d. affect Smartphone demand, purchase intentions, switching, and consumer satisfaction.

**RESPONSE TO REQUEST NO. 20:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "All Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "user views," "privacy," and "user experience." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant.  Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a

reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 21:**

All Documents related to user switching between Smartphones or any models thereof (e.g., switching between Your Smartphones and iPhone and vice versa, switching between Your Smartphones and other Android Smartphones and vice versa, switching between models of Your Smartphones, etc.), including:

a. the ease or difficulty of switching;

b. the costs of switching;

c. the relationship between the cost or difficulty and likelihood of switching;

d. customer loyalty or churn;

e. tools and support services available for switching;

f. the duration of time between switching (e.g., how long a user has used an iPhone before switching to a non-Apple Smartphone);

g. consumer views about switching;

h. the availability and performance of complementary products and services (such as the Identified Products or Services), including any changes thereto;

i. any connection between eSIM, cloud storage Apps, and Web Browsers and user switching;

j. relative ease or difficulty of switching depending on users' brand of Smartphone;

k. the ability of any Identified Product or Service to facilitate or impede switching; and

l. any products, services, initiatives, or partnerships that facilitate switching (including from iPhone to Your Smartphones, and vice versa).

**RESPONSE TO REQUEST NO. 21:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative

53

and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "All Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the term "user switching." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant.  Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 22:**

All studies, analyses, investigations, and Reports related to fraudulent, malicious, misleading, or deceptive activity, code, content, information, or patterns within or related to the use of Your Smartphones or any App Marketplaces available on Your Smartphones, including any threat assessment or Threat Model, in whatever form it may exist, and Your response(s) (if any) to such threats.

54

**RESPONSE TO REQUEST NO. 22:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all" of the listed categories of materials. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "fraudulent," "malicious," "misleading" and "deceptive." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

55

**REQUEST FOR PRODUCTION NO. 23:**

Documents sufficient to show all Wearable models produced or sold by You from 2015 onwards, including specifications, features, launch date, price at launch, and discontinuation date.

**RESPONSE TO REQUEST NO. 23:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "specifications," "features," and "discontinuation date." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant.  Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise. SEA also objects to this request on the grounds that the specified time period is overbroad.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a

reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 24:**

All Documents related to price, price-setting, terms of sale (including rebates, fees, promotions, discounts, and financing), licensing terms or conditions, pricing plans, price lists, and pricing strategies for Your Wearables.

**RESPONSE TO REQUEST NO. 24:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "All Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "terms of sale," "licensing terms or conditions," "pricing plans," and "pricing strategies." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 25:**

All financial statements, budgets, profit and loss statements, cost Reports, profitability Reports, annual Reports, regulatory Reports, and any other financial Reports (reflecting or relating to revenues, costs, margins, and/or profitability) regularly prepared by or for You on any periodic basis concerning Your Wearables.

**RESPONSE TO REQUEST NO. 25:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all" of the listed categories of materials. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "annual Reports," "regulatory Reports," and "other financial Reports." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or

58

reach of the laws of the United States or any State. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 26:**

All Documents after January 1, 2010 related to competition concerning Wearables offered by You or any Person, including:

a. Relative quality or features, including technology, performance, privacy, security, user experience, brand strength, customizability, ability to integrate with or interoperate with other hardware or software, network effects, and cost;

b. Entry, expansion, exit, scale, and repositioning;

c. Market segmentation by geography, type of consumer, Wearable type, Wearable features, sales channel, compatibility with a certain Smartphone or mobile operating system, or Wearable price or price band;

d. Competitive positioning and differentiation;

e. Sales volumes, revenue, and profitability;

f. Installed base;

g. Market shares, segment shares, or relative sales or volume shares; and

h. Competitive threats, disintermediation, and commoditization.

**RESPONSE TO REQUEST NO. 26:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative

59

and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "All Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "competition," "quality," "integrate with," "interoperate with," "network effects," "competitive threats," "disintermediation," and "commoditization." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this request on the grounds that the specified time period is overbroad. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 27:**

All Documents related to any actual or potential barriers or impediments to entry, output expansion, or repositioning related to Wearables and Wearable operating systems.

**RESPONSE TO REQUEST NO. 27:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it requests "All Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "potential barriers," "impediments to entry," "output expansion," and "repositioning." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant.  Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 28:**

All regularly or specially prepared business Reports, strategic plans, competitive plans, marketing plans, promotional plans, competitive assessments or benchmarking analyses prepared by or for You concerning Your strategies, objectives, research, development, investments, roadmaps, marketing, innovations, and features for Your Wearables.

**RESPONSE TO REQUEST NO. 28:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all" of the listed categories of materials. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "business Reports," "strategic plans," "competitive plans," "marketing plans," "promotional plans," and "competitive assessments." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 29:**

All studies, analyses, and Reports, related to how the features, functionality, and interoperability of Wearables may affect users' Wearables purchasing decisions, including Documents related to user satisfaction, switching, consumer perceptions and attitudes, preferences, usage, purchase intentions, and all other relevant metrics, key performance indicators, and measures.

**RESPONSE TO REQUEST NO. 29:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all" of the listed categories of materials. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "interoperability," "purchasing decisions," "user satisfaction," "switching," and "consumer perceptions." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly

63

burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 30:**

All Documents, including studies, analyses, or Reports, discussing factors affecting consumer demand for Wearables, such as a Wearable's price, features, or quality (including quantity, price, and quality of available Apps, hardware accessories, or other complementary products and services); and Documents related to metrics, key performance indicators, and measures related to consumer demand for a Wearable.

**RESPONSE TO REQUEST NO. 30:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the term "complementary products and services." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for

64

documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant.  Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 31:**

All Documents related to user switching between Wearables or any models thereof (e.g., switching between Your Wearables and the Apple Watch and vice versa, switching between Your Wearables and other non-Apple Wearables and vice versa, switching between models of Your Wearables, or switching from one of Your Wearables to another of Your Wearables, etc.), including Documents related to the following topics as they concern switching between Wearables:

a. the ease or difficulty of switching;

b. the costs of switching;

c. the relationship between the cost or difficulty and likelihood of switching;

d. customer loyalty or churn;

e. tools and support services available for switching;

65

f. the duration of time between switching (e.g., how long a user has used an Apple Watch before switching to a non-Apple Wearable);

g. consumer views about switching; h. the availability and performance of complementary products and services (such as the Identified Products or Services), including any changes thereto;

i. relative ease or difficulty of switching depending on users' brand of Smartphone; and

j. any products, services, initiatives, or partnerships that facilitate switching (including from Apple Watch to Your Wearables, and vice versa).

**RESPONSE TO REQUEST NO. 31:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "switching," and "complementary products and services." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

66

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 32:**

All Documents related to the choice of operating system for Your Wearables, including the decision to switch from Tizen OS to Wear OS for Samsung Smartwatches.

**RESPONSE TO REQUEST NO. 32:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the term "decision to switch." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

67

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 33:**

All Documents concerning Your decision of whether to make Your Wearables compatible with any Smartphone (including iPhone), including decisions to enable or disable connectivity between Your Wearables and any Smartphone (including iPhone), any decisions to discontinue any model or line of Wearables compatible with any Smartphone (including iPhone), and the rationale for such decisions.

**RESPONSE TO REQUEST NO. 33:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "compatible" and "connectivity." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant.  Such operations are beyond the scope of this litigation, and beyond the jurisdiction

68

or reach of the laws of the United States or any State. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 34:**

All Documents concerning the ability of Your Wearables to connect to, stay connected to, exchange data with, or otherwise interact with Smartphones through Bluetooth or Wi-Fi.

**RESPONSE TO REQUEST NO. 34:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "connect to," "stay connected to," "exchange data with," and "interact with." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are

69

beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 35:**

All Documents concerning any security or data privacy risks associated with the use of Your Wearables, including any comparisons of those risks when Your Wearables are paired with an iPhone versus a non-Apple Smartphone.

**RESPONSE TO REQUEST NO. 35:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the term "security or data privacy risks." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks

70

discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant.  Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 36:**

Documents sufficient to identify all Companion Apps compatible with Your Smartphones, including concerning such Apps' access to APIs and ability to run in the background.

**RESPONSE TO REQUEST NO. 36:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "compatible," "access to APIs," "ability to run," and "background." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls

71

for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 37:**

All Documents concerning the ability of Wearables to receive, manage, or respond to notifications or text messages (including SMS, MMS, RCS, or iMessages) when paired with Smartphones.

**RESPONSE TO REQUEST NO. 37:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "text

72

messages" and "paired with" SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 38:**

All agreements, guidelines, policies, and procedures concerning the Samsung Galaxy Store, including any App Review guidelines, developer agreements, terms and conditions, license agreements, and consumer terms of use, as well as all Documents concerning any changes to such agreements, guidelines, policies, and procedures.

**RESPONSE TO REQUEST NO. 38:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative

73

and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all" of the listed categories of materials. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "agreements," "guidelines," "policies," and "procedures." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 39:**

Documents sufficient to show the commission and revenue share rates and other fees You have charged to App developers during each calendar quarter during the period since You launched the Samsung Galaxy Store, including all headline, effective and average rates, all commission and revenue share rates and fees applicable to specified categories of transactions, and all commission and revenue share rates and fees You have negotiated individually with App developers.

74

**RESPONSE TO REQUEST NO. 39:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "commission," "revenue share rates," and "headline." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant.  Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 40:**

Documents sufficient to describe any features, SDKs, APIs, or other technical support You offer to App developers to support development of Apps for the Samsung Galaxy Store, and the terms and conditions governing App developers' use of such tools and technologies.

75

**RESPONSE TO REQUEST NO. 40:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "features" and "governing." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 41:**

Documents sufficient to show for Your App Review process on the Samsung Galaxy Store (a) the percentage of Apps reviewed through human (manual) review versus automated or algorithmic review for each month since January 1, 2010; and (b) the types of tools used by You

76

in Your App Review process, including software, machine learning systems, internal platforms, and third-party services.

**RESPONSE TO REQUEST NO. 41:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "Your App Review process," "human (manual) review," and "automated or algorithmic review." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this request on the grounds that the specified time period is overbroad.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

77

**REQUEST FOR PRODUCTION NO. 42:**

All Documents concerning comparisons between Your approach to App Review on the Samsung Galaxy Store and any other App Marketplace provider's approach to App Review, including with respect to security and privacy.

**RESPONSE TO REQUEST NO. 42:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "Your approach" and "other App Marketplace provider's approach." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant.  Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a

reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 43:**

All Documents concerning the Alleged Conduct, including those relating to any adverse impact on consumers, App developers, or You or Your Business.

**RESPONSE TO REQUEST NO. 43:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the term "adverse impact." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a

79

reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 44:**

All Documents concerning Your efforts, plans, strategies, and decisions to develop or offer Samsung Pay, including regarding (a) the launch of Samsung Pay; (b) decisions about the devices and/or App Marketplaces on which to make Samsung Pay available or not available; (c) offering Samsung Pay on iPhone, Apple Watch, or the Apple App Store; and (d) making Samsung Pay usable across different mobile and non-mobile platforms.

**RESPONSE TO REQUEST NO. 44:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "efforts," "plans," and "strategies." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 45:**

All Documents concerning Digital Wallets on Your Smartphones, including (a) the APIs or other capabilities concerning Digital Wallets or near-field communication access that You made available to third parties; (b) policies or practices concerning access to near-field communication or methods of authentication of digital payment options on online checkout pages; (c) restrictions placed on any third-party access to APIs or capabilities concerning Digital Wallets or near-field communication access; and (d) any privacy or security risks concerning Digital Wallets.

**RESPONSE TO REQUEST NO. 45:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "capabilities" and "near-field communication." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests

81

are overbroad, unduly burdensome, and irrelevant.  Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 46:**

All Documents concerning competition between Digital Wallets and other forms of payment, including "chip" or traditional "swipe" payment cards, Apple Pay, Google Pay, Samsung Pay, Contactless Cards, Virtual Cards, QR Code-Based Payments, or cash.

**RESPONSE TO REQUEST NO. 46:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "other forms of payment" and "'chip' or traditional 'swipe' payment cards." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data

82

compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 47:**

All Documents concerning (a) analyses, studies, consumer surveys, Reports and assessments of the use of Smartphones for gaming (including relative strengths and weaknesses) compared to consoles, laptop and desktop computers, tablets, and other devices for gaming; (b) Your efforts to attract or retain game developers; (c) Your investments in or development of software or hardware features to enhance gaming; (d) consumer use of and preferences regarding Cloud Streaming Apps; and (e) Your efforts, plans, strategies, and decisions to develop or offer Samsung Gaming Hub (https://www.samsung.com/us/apps/gaming-hub/), including regarding (i) the launch of Samsung Gaming Hub; (ii) decisions about the devices and App Marketplaces (including the Apple App Store) on which to make Samsung Gaming Hub available or not available; and (iii) making Samsung Gaming Hub available across different mobile and non-mobile platforms.

**RESPONSE TO REQUEST NO. 47:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein,

83

SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "gaming," "consumer use," "preferences," and "platforms." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 48:**

All Documents concerning Your past or present policies or practices concerning Messaging Apps relating to (a) the development, launch, and offering of Samsung Messages, as well as (b)

84

the cross-platform availability, default settings, presets, restrictions, and functionality of Messaging Apps.

**RESPONSE TO REQUEST NO. 48:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "cross-platform availability," "restrictions," and "functionality." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a

reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 49:**

All Documents, including studies, Reports, and analyses, concerning adoption of RCS messaging by users of Your Smartphones since 2012.

**RESPONSE TO REQUEST NO. 49:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the term "adoption." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant.  Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise. SEA also objects to this request on the grounds that the specified time period is overbroad.

86

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 50:**

All Documents concerning competition between Messaging Apps, between Messaging Apps and other forms of instant message communication such as SMS, MMS, RCS, and email, and between the SMS, MMS, and RCS messaging protocols.

**RESPONSE TO REQUEST NO. 50:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "competition between Messaging Apps" and "other forms of instant message communication." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent that it seeks

87

information that is equally or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 51:**

All Documents concerning Your past or present policies or practices concerning Super Apps or Mini-Programs.

**RESPONSE TO REQUEST NO. 51:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the term "concerning Super Apps or Mini-Programs." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant.  Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State.

88

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 52:**

All Documents concerning the security or data privacy risks associated with the use of Super Apps or Mini-Programs.

**RESPONSE TO REQUEST NO. 52:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the term "security or data privacy risks." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

89

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 53:**

Each database or data set, as well as any associated Data Dictionaries and documentation, relating to studies, Reports, and analyses of consumers, developers, or other groups related to Smartphones or Wearables. These include surveys, polls, focus groups, market research, market segmentations, online anthropologies, A/B testing or other experiments, and choice modeling. They exclude databases and data solely related to purely cosmetic hardware changes.

**RESPONSE TO REQUEST NO. 53:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "each" or "any" type of the specified categories of materials. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "market segmentations," "online anthropologies," "A/B testing," and "choice modeling." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly

90

burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 54:**

Each database or data set, as well as any associated Data Dictionaries and documentation, relating to Your Smartphones after January 1, 2010, containing information derived from users in the United States, Australia, Brazil, Canada, China, France, Germany, India, Indonesia, Japan, Malaysia, Mexico, Norway, Russia, Singapore, South Korea, Thailand, and/or United Kingdom, that contains information relating to:

a. relationships between or among Your other users, such as family plans;

b. specific devices used (e.g., Smartphone model, year, and storage);

c. ownership, activation, or deactivation of Your devices;

d. ownership, activation, deactivation, or usage of third-party devices;

e. switching to, from, or among devices;

f. purchase, download, removal, or usage of Your and third-party Super Apps, Cloud Streaming Apps, Messaging Apps, Companion Apps, Digital Wallets, Browsers, and Cross-Platform Cloud Storage Apps;

g. aggregate App purchase, download, removal, or usage; and

91

h. to the extent reasonably accessible without undue burden, unique identifiers sufficient to link the user across data sets produced in response to these Requests.

**RESPONSE TO REQUEST NO. 54:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "each" or "any" type of the specified categories of materials. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "relationships between or among," "switching to," and "unique identifiers." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this request on the grounds that the specified time period is overbroad.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

92

**REQUEST FOR PRODUCTION NO. 55:**

Monthly aggregated, structured, machine-readable data sufficient to reflect all sales, Trade Ins, and returns of Smartphones and Wearables, during the period from January 1, 2015 to present, broken out by calendar month and sales channel, including offline sales through Samsung retail stores, online sales through Samsung's website, sales through wireless carriers broken out by carrier, and sales to other resellers including third-party retailers, including Documents or data evidencing:

a. the geographic scope (by city and state) of sales reflected, and, where applicable, identification of whether sales occurred online, whether through Samsung.com or another retailer, or in physical retail locations;

b. data fields sufficient to uniquely identify product name, type, characteristics and technical specifications (e.g., "Samsung Galaxy S25 Ultra");

c. the total number of units sold and returned, including the condition of devices sold (e.g., new, used, refurbished), and net units sold;

d. the average gross list price per unit and average net realized price per unit;

e. the total gross or list revenue per unit, before discounts or adjustments;

f. the total value of all discounts, rebates, promotions, bundles, credits, free goods, financing or pay-over-time adjustments, and other price adjustments applied, exclusive of Trade In value;

g. the total amount of taxes, customs, tariffs, duties, or other governmental fees collected;

h. the total net revenue received (after discounts and adjustments);

i. the total revenue attributable to Trade In transactions, including the total number of transactions that included a Trade In and the total Trade In value credited to buyers;

j. the total cost of goods sold during the month, including manufacturing cost, acquisition cost, and any other cost fields associated with the products sold, including total shipping and handling costs, and identification of whether shipping costs are included in other reported revenue fields;

93

k. the total gross profit retained by Samsung;

l. identification of any wireless carriers associated with devices sold, aggregated by carrier within each sales channel where applicable;

m. plan type associated with devices sold (e.g., prepaid, postpaid), aggregated by plan type within each sales channel;

n. the total number of returns processed and the associated value of returned products; and

 o. any fields sufficient to link monthly sales of Smartphones and Wearables to the purchase of related or complementary products.

**RESPONSE TO REQUEST NO. 55:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it data related to "all sales." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "sales channel," "technical specifications," "pay-over-time adjustments," and "total cost." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this request on the grounds that the specified time period is overbroad. SEA also objects to this Request to the extent it seeks the

94

disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 56:**

Documents sufficient to identify any Super Apps, Cloud Streaming Apps, Messaging Apps, Companion Apps, Digital Wallets, Browsers, or Cross-Platform Cloud Storage Apps downloaded by users of Your Smartphones, and for each of those Apps, for each country or country storefront in which that App was available, on a monthly basis (unless otherwise indicated):

a. the number of downloads;

b. the total amount paid for such downloads;

c. the number of daily, weekly, and monthly active users;

d. the average number of times per user per day the App is accessed by users;

e. the average amount of money spent per user on In-App Purchases (differentiating between one-time purchases and subscriptions); and

f. the average number of In-App Purchases per user (differentiating between one-time purchases and subscriptions).

**RESPONSE TO REQUEST NO. 56:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable

95

specificity, including without limitation as to the terms "average amount of money spent" and "average number of In-App Purchases." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 57:**

Documents sufficient to show, for each Super App, Cloud Streaming App, Messaging App, Companion App, Digital Wallet, Browser, or Cross-Platform Cloud Storage App on Your Galaxy Store, on a monthly basis and differentiated by country:

a. the App's name and App ID;

b. the App's genre (e.g. games, social media);

c. the App's developer, developer ID, and developer country of origin;

d. each country or country storefront in which the App was available;

e. the number of original downloads of the App;

f. the App's billings, separately by paid downloads and In-App Purchases;

g. commissions (gross and net) paid to You for transactions for the App; and

h. the App's number of monthly active users.

96

**RESPONSE TO REQUEST NO. 57:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party. SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity. SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant.  Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent it seeks the disclosure of confidential trade secrets, financial, commercial, strategic or otherwise proprietary or confidential information.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

**REQUEST FOR PRODUCTION NO. 58:**

All Documents reflecting or concerning Your Communications with any third party (including any third party's counsel) regarding government antitrust litigation against Apple, or regulation, legislation, or public debate relating to Apple's policies or practices.

97

**RESPONSE TO REQUEST NO. 58:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information protected by the attorney-client privilege, the attorney work product doctrine, common interest privilege, joint defense privilege, and/or any other applicable law, privilege, protection, or immunity. SEA further objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the terms "government antitrust litigation," "regulation," "legislation," and "public debate." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA objects to this request to the extent that it calls for the creation of documents or data compilations that do not exist or that are not ordinarily kept in the normal course of business. Moreover, SEA objects to this Request to the extent it seeks discovery of information regarding business operations outside of the United States and unrelated to United States commerce, on the grounds that such requests are overbroad, unduly burdensome, and irrelevant. Such operations are beyond the scope of this litigation, and beyond the jurisdiction or reach of the laws of the United States or any State. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

**REQUEST FOR PRODUCTION NO. 59:**

All Documents produced by You to any party in *Epic Games, Inc. v. Google LLC, et al.*, No. 3:20-cv-05671-JD (N.D. Cal.), *In re Apple iPhone Antitrust Litigation*, No. 11-cv-06714 (N.D. Cal.), and *Epic Games v. Apple, Inc.*, No. 20-cv-5640 (N.D. Cal.), including all Documents produced in any state government investigation preceding such litigation; all transcripts of

98

depositions and trial testimony by any of Your employees taken in that litigation; and all sealed filings by You in the litigation.

**RESPONSE TO REQUEST NO. 59:**

In addition to its General Objections, Objections to Certain Definitions, and Objections to Certain Instructions, each of which is incorporated by reference as though fully set forth herein, SEA objects to this Request to the extent it seeks information protected by the attorney-client privilege, the attorney work product doctrine, common interest privilege, joint defense privilege, and/or any other applicable law, privilege, protection, or immunity. SEA further objects to this Request to the extent it seeks information and documents that are cumulative and duplicative of other requests. Such Request is overbroad, unduly burdensome, and not proportional to the needs of the case, particularly because SEA is a non-party and because it seeks "all Documents." SEA further objects that this Request is vague, ambiguous, and fails to describe the documents sought with reasonable specificity, including without limitation as to the term "state government investigation." SEA objects that the Request is also unduly burdensome and overbroad to the extent it is directed to persons and entities other than SEA, and calls for documents that are not in SEA's possession, custody, or control. SEA also objects to this Request to the extent that it seeks information that is equally or more readily available from the parties, publicly available sources, or otherwise.

Subject to and without waiver of the foregoing objections, SEA responds as follows: SEA will not comply with this Request as written but is willing to meet and confer to discuss a reasonable narrowing of and otherwise appropriate limitations to this Request, including a reasonable agreement on subpoenaing parties' payment of SEA's costs associated with responding to this Request.

Dated: February 25, 2026

/s/ Bradley D. Small
Bradley D. Small #012662012
Mackenzie G. Newman (*pro hac vice*)

/s/ Michael W. Scarborough
Michael W. Scarborough (*pro hac vice*)
Dylan I. Ballard (*pro hac vice*)

99

**VINSON & ELKINS LLP**
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel: (212) 237-0268
Email: bsmall@velaw.com
        mnewman@velaw.com

M. Kevin Costello (*pro hac vice*)
**VINSON & ELKINS LLP**
555 Mission Street, Suite 2000
San Francisco, CA 94105
Tel: (415) 979-6935
Email: mscarborough@velaw.com
        dballard@velaw.com
        kcostello@velaw.com

*Attorneys for Non-Party*
*Samsung Electronics America, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 25, 2026, a true and correct copy of the foregoing **NON-PARTY SAMSUNG ELECTRONICS AMERICA, INC.'S OBJECTIONS AND RESPONSES TO APPLE'S SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION** was served by email on the following counsel:

| | |
|---|---|
| Cynthia E. Richman<br>**GIBSON, DUNN & CRUTCHER LLP**<br>1050 Connecticut Avenue, N.W.<br>Washington, DC 20036<br>Tel.: (202) 955-8500<br>Email: crichman@gibsondunn.com | *Counsel for Defendant Apple Inc.* |
| Apple-SmartphoneMDL-External@gibsondunn.com | *Defendant Apple Inc. Email Distribution List* |

/s/ Michael W. Scarborough
Michael W. Scarborough

101

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>               Plaintiffs,<br><br>v.<br><br>APPLE INC.,<br><br>               Defendant. | Case No. 2:24-cv-04055<br><br>Hon. Julien X. Neals, U.S.D.J.<br>Hon. Leda D. Wettre, U.S.M.J. |
| IN RE: APPLE INC. SMARTPHONE ANTITRUST LITIGATION | Case No. 2:24-MD-3113<br><br>MDL No. 3113<br><br>Hon. Julien X. Neals, U.S.D.J.<br>Hon. Leda D. Wettre, U.S.M.J.<br><br>***Document filed electronically*** |

**[PROPOSED] ORDER**
**GRANTING APPLE INC.'S MOTION FOR ISSUANCE OF LETTER OF REQUEST UNDER THE HAGUE EVIDENCE CONVENTION TO SAMSUNG ELECTRONICS CO., LTD. IN THE REPUBLIC OF KOREA**

**THIS MATTER** having come before the Court by way of the Motion of Defendant Apple Inc. by and through its attorneys for the entry of an Order Issuing a Letter of Request to Samsung Electronics Co., Ltd. pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, March 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444, and 28 U.S.C. § 1781 (the "Motion"), and the Court having considered the submissions of the parties and argument of counsel (if any), and for good cause having been shown,

IT IS ON THIS ___ day of _____, 2026

**ORDERED** that Defendant's Motion is hereby **GRANTED**; and it is further

**SO ORDERED** The Court shall execute the submitted Letter of Request For International Judicial Assistance with an original signature, to which the clerk shall affix an original seal, and two hard copies of said document will be forwarded to counsel for Apple to allow for service in accordance with the provisions of the Hague Service Convention.

_____
Hon. Leda D. Wettre
United States Magistrate Judge