UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, et al., Plaintiffs, | . | Case No. 24-cv-04055 |
| vs. | . | Newark, New Jersey March 18, 2026 |
| APPLE INC., Defendant. | . | |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE LEDA DUNN WETTRE
UNITED STATES MAGISTRATE JUDGE

This transcript has been reviewed and revised in accordance with L. Civ. R. 52.1.

APPEARANCES (the parties appeared in person):

For the United States:
JONATHAN LASKEN, ESQ.
JACK LERNER, ESQ.
MATTHEW MANDELBERG, ESQ.
RACHEL JOHNSON, ESQ.
Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 8600
Washington, DC 20530

Audio Operator:

Transcription Service:
KING TRANSCRIPTION SERVICES, LLC
3 South Corporate Drive, Suite 203
Riverdale, NJ 07457
(973) 237-6080

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

(APPEARANCES continued)

| | |
|---|---|
| For the United States: | AARON MICHAEL SHEANIN, ESQ.<br>DOJ-ATR<br>Antitrust Division<br>450 Golden Gate Avenue, Suite 10-0101<br>San Francisco, CA 94102 |
| For the State of New Jersey and Plaintiff-States: | DAVID REICHENBERG, ESQ.<br>BRIAN MCDONOUGH, ESQ.<br>New Jersey Attorney General<br>124 Halsey Street, 5th Floor<br>Newark, NJ 07102 |
| For the Defendant: | LIZA M. WALSH, ESQ.<br>LAUREN R. MALAKOFF, ESQ.<br>Walsh Pizzi O'Reilly Falanga LLP<br>Three Gateway Center<br>100 Mulberry Street, 15th Floor<br>Newark, NJ 07102 |
| | WINN ALLEN, ESQ.<br>CRAIG S. PRIMIS, ESQ.<br>Kirkland & Ellis, LLP<br>301 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20004 |
| | DEVORA W. ALLON, ESQ.<br>Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022 |
| | KEVIN M. JONKE, P.C., ESQ.<br>Kirkland & Ellis LLP<br>333 West Wolf Point Plaza<br>Chicago, IL 60654 |

(Commencement of proceedings)

THE CLERK: Okay, Judge Wettre. We are on the record.

THE COURT: Okay.

Good morning, everyone. We are on the record in U.S., et al., versus Apple Inc., 24-cv-4055.

May I have appearances from the plaintiffs, please.

MR. LASKEN: Good morning, Your Honor. May it please the Court, Jonathan Lasken, counsel for the Government.

I also wanted to share that Mr. Boccio and Mr. Basiak aren't available today, and they send their regrets. So sorry about that.

MR. SHEANIN: Good morning, Your Honor. Aaron Sheanin on behalf of the United States.

THE COURT: Good morning.

MR. LERNER: Good morning, Your Honor. Jack Lerner on behalf of the United States.

THE COURT: Good morning.

MS. JOHNSON: Good morning, Your Honor. Rachel Johnson on behalf of the United States.

THE COURT: Good morning.

MR. REICHENBERG: Good morning, Your Honor. David Reichenberg of the New Jersey Attorney General's Office on

behalf of the New Jersey and the plaintiff States.

THE COURT: Good morning.

MR. MANDELBERG: Good morning, Your Honor. Matt Mandelberg for the United States.

MR. MCDONOUGH: Good morning, Your Honor. Brian McDonough from the New Jersey Attorney General's Office for New Jersey for the plaintiff States.

THE COURT: Okay. That's all the plaintiffs?

Good morning, all.

And for Apple?

MS. ALLON: Good morning, Your Honor. Devora Allon from Kirkland & Ellis for Apple.

THE COURT: Good morning.

MR. ALLEN: Good morning, Your Honor. Winn Allen from Kirkland on behalf of Apple.

MR. PRIMIS: Craig Primis from Kirkland & Ellis for Apple.

THE COURT: Good morning.

MR. JONKE: Good morning. Kevin Jonke, J-o-n-k-e, from Kirkland for Apple.

THE COURT: Hi, you're new. Good morning.

Ms. Walsh, good morning again.

MS. WALSH: Liza Walsh.

THE COURT: Okay.

And good morning, again, Ms. Malakoff.

MS. MALAKOFF: Good morning.

THE COURT: Okay.

So why don't I let -- I did receive and read several letters that came in. I have no preference as to the order in which we address the issues.

So why don't I let the United States start.

MR. LASKEN: Thank you, Your Honor. Am I hearable today? I know last time I was keeping my voice down.

THE COURT: Yeah. You could be a little louder.

MR. LASKEN: All right. I will --

THE COURT: We're loud here in Jersey.

MR. LASKEN: I will do my best.

THE COURT: You have to be heard.

MR. LASKEN: I will do my best.

THE COURT: All right.

MR. LASKEN: So I think there's really two issues today, the data 30(b)(6) issue and the schedule. I think we've resolved productively the custodian issues and those things.

And I am happy to talk through the schedule. And I know Your Honor had questions.

And also, for what it's worth, if it's helpful to the Court for us to participate in the MDL conference so all the positions come at once, we're always happy to do that.

THE COURT: Okay. Yeah, let me know in the future

if you think you should participate at least in part of the MDL conference.

I think it's working well to have the conferences back to back.

MR. LASKEN: I agree, Your Honor. I just -- I wanted to offer because, you know, I just -- we were here, and we didn't want to interrupt.

But if the Court wants our position at the same time and that's easier for the Court, we're happy to offer it.

THE COURT: Okay.

And those on the phone, please mute yourselves. We're getting some background noise.

All right. Go ahead, Mr. Lasken.

MR. LASKEN: So, Your Honor, our proposed schedule accounts for Apple's June 15th deadline in it, takes us to trial.

We think the timelines in the schedule are appropriate and reasonable and they're timelines Apple can meet. And we think we know that because they're seven months longer than any other case of this type, and that's -- a good barometer for what can be done.

THE COURT: I question that. But I know you assert it.

MR. LASKEN: Fair enough.

THE COURT: But anecdotally, it doesn't necessarily comport with my understanding.

But, go ahead.

MR. LASKEN: Okay. Well, I -- so when we say a case of this type, we're referring to the Government actions, not the MDLs.

But anyway, what matters to us, Your Honor --

THE COURT: Well, we have an MDL we're coordinating with this case, and the Government agreed to coordination to some extent; right?

MR. LASKEN: I agree with that, Your Honor. That's not uncommon.

THE COURT: So when you cite me Eastern District of Virginia cases, are they standalone Government cases? Or that you have an accompanying MDL?

MR. LASKEN: They do. They're not uncommon, actually. So the Eastern District of Virginia case had an MDL that was ongoing in New York, I believe; I defer to my State colleagues on this, but there are actually multiple MDL's behind that one.

It's a pretty common posture for there to be a Government action and follow-on cases in an MDL.

So that's not uncommon.

We only cited that case, Judge Wettre. We cited all the recent cases. So we're not suggesting this Court

should use the rocket docket as its barometer. It's just we cited all the recent cases we brought.

I think, though, what I would say about this is this: What matters to us here is really fixing the end point, because our experience has been in these cases and I think courts have found that once an end point is fixed, it helps everyone focus their minds, meet the deadlines that are set, and get the case moving forward.

And so I say that to say if the Court feels more comfortable with two months added to every deadline, you know, that's fine with us, we're focused on that right now.

THE COURT: Well, what's the end point when you make that statement? Which end point are you talking about? Summary judgment? Trial?

MR. LASKEN: Trial. Trial, Your Honor, because in our experience, the parties --

THE COURT: How do you set a trial date if there are going to be gargantuan summary judgment motions, and we're in an overburdened District Court, and the Court needs time, and you would want the Court to take adequate time to consider everything in the motion papers?

MR. LASKEN: So, Your Honor, I would make the point this is a bench trial; right? And so summary judgment functions a little differently here.

And we have -- as has been pointed out, we have a

four-year investigation. I think it's going to be really challenging -- and I've never seen a successful summary judgment motion in a case like this.

Now, that doesn't mean that a narrow motion on a particular issue -- right? -- might help narrow something. I can't say that.

But it is very uncommon, if not -- I am not sure if it ever has happened to have a case like this dissolved on summary judgment.

So --

THE COURT: Well, whether or not, the likelihood of summary judgment being granted is great, the process of deciding it and briefing it still has to be undertaken.

MR. LASKEN: Yeah, absolutely --

THE COURT: And we can't preclude -- because it's a bench trial, we can't preclude parties from filing.

MR. LASKEN: Absolutely, Judge Wettre. And I am not suggesting that; right?

What I'm suggesting, though, is all the more reason to sort of ascertain the amount of time the Court believes is necessary. We're not trying to rush anyone for that. And set a trial date.

In Google Search, for example, which was a longer-running case, that happened; right? Summary judgment was set, trial dates were set. It helped everyone meet the

deadlines; right?

And so, you know, if the Court believes it needs more time than we've offered to decide summary judgment, then, you know, we're not going to object to the Court adding time for that; right?

But we do think it's important for everyone to understand that the case will have an end date -- right? -- and that people need to keep moving forward expeditiously.

And so that's our position.

THE COURT: I understand.

Why don't you address the length of time that you're proposing for depositions to be taken, including addressing how many depositions in total are likely and breaking that down into party witnesses and third parties by subpoena.

MR. LASKEN: Yes, Your Honor.

So for depositions, we have an agreement with Apple that Apple will complete production or substantially complete production for eight custodians by April 1st; for another 15 by May 15th; and then the rest by June 15th.

I heard the MDL ask for 30 days' notice. We're happy to gave 30 days' notice of any deposition after those productions are complete so that everyone has the documents. That's not a problem for us. We're happy to do that.

We're going to take rolling depositions.

Our belief is no more than --

THE COURT: Even for the 10 priority depositions that Mr. Musico referenced?

MR. LASKEN: Yeah, we are happy to give 30 days' notice for -- you know, that would be May 1st. Right? I think we had suggested something like that.

THE COURT: Okay. So be in the meet and confers on those issues, and maybe will that be resolved.

MR. LASKEN: Yeah. So we're happy to do that.

THE COURT: Okay.

MR. LASKEN: That's not a problem for us.

I would think no more than 30 depositions of Apple. Apple has put 12 people on its initial disclosures. We obviously have to take those 12 people. There is a handful of other people that I would anticipate we would take.

And then, really, the question of how many more turns on -- you know, for example, Mr. Cook, their CEO, is on a deposition notice. How complete are his answers, or is he deferring to people? If he's deferring to people, you have to take a few more. Right? And I am not -- that's not to judge or not judge what a CEO may know. It's just a question of sort of what comes out of that priority deposition.

But I would not think any more than 30 by us of Apple.

THE COURT: Apple's agreeing to produce him?

MR. LASKEN: He's on their initial disclosures. I mean, they -- I don't know how they could not; right?

THE COURT: Okay.

MR. LASKEN: So that would be -- those would be examples; right?

But no more than 30 deposed.

I believe on our initial disclosures -- I don't have the exact number in front of me -- we identified 46-or-so witnesses with asterisks as the most likely. I assume Apple's going to want to take most of those.

We've suggested as third-party depositions -- you know, we have suggested in the past --

THE COURT: Wait. You said as third-party depositions?

MR. LASKEN: So these are third parties. Our initial disclosures -- right? -- identify third parties who are likely to have information, because that's where the facts come from.

THE COURT: Okay.

MR. LASKEN: Right? And so our overall disclosures were 110, which is anyone we ever talked to in the course of the investigation. Everyone always wants to know that in these cases. So we gave it to Apple.

We then gave them a narrowed version where we put sort of asterisks on them and said these are the people who

are most likely to have information. And I believe -- you know, again, I don't have it in front of me -- I believe that's about half -- maybe it's 46.

So I think Apple would want to take those. We don't need those; right? The third parties. That's an Apple question, how many they want to take.

THE COURT: Okay.

MR. LASKEN: So from our perspective, you know, we're talking -- I don't know -- overall 60, 70, 80 -- a max of a hundred. So really --

THE COURT: So 50 to 100 is about an accurate range.

MR. LASKEN: I'll agree with that, Your Honor.

THE COURT: Okay.

And what period of time do you think realistically, including with the MDL plaintiffs suggesting that there might have to be a second day with many of these witnesses, how long do you need take 50 to 100 depositions, half of which may have to be two-day depositions.

MR. LASKEN: So I think, Judge Wettre, we proposed September 9th because we believe we can do that relatively easy. Apple has eight law firms representing --

THE COURT: That's less than -- July, August -- that's less than three months from substantial completion of document production.

MR. LASKEN: So most of the substantial completion witnesses that Apple produced, we're not going to depose; right? That's why we have the priority custodians; right? Those --

THE COURT: So, in other words, depositions, you anticipate, would start sooner than June 15th.

MR. LASKEN: Yeah, so when -- I apologize if this wasn't clear from our filing. We anticipate noticing the depositions of people as they're completed; right? If we can give 30 days' notice --

THE COURT: You mean as their productions are completed?

MR. LASKEN: Correct.

THE COURT: Okay.

MR. LASKEN: So, you know, I don't want to use the name of a witness, but there's an Apple executive who Apple's going to complete production of on April 1st, substantially complete production of her documents.

We would anticipate taking her in May -- right? -- not waiting until after June 15th, to take her deposition.

THE COURT: Okay. So the first witnesses in May. All right.

MR. LASKEN: Yeah, so for us, Your Honor, that would be May, June, July, August, first week of September. So that's four and a half weeks [sic]. And then --

THE COURT: And everyone's happy to sit for deposition in August and July.

MR. LASKEN: I mean, Your Honor, obviously, we would --

THE COURT: I don't mean to make a joke of it. But, I mean, how many thousands of cases I've supervised discovery in now, and, you know, people have the best of intentions at the time you set the schedule. "Oh, I am not taking vacation. That witness will be available. This is very important to that witness" -- and it always goes south.

MR. LASKEN: Yeah, so, Your Honor, I would just defer back to my original suggestion, which is we really are focused on an end point. And if the Court feels that it would be better to, you know, leave it to September, October, and move everything back by two months, you know, we would be fine with that with an end point. Our concern is that in these cases, unavailability can drag and can be very long, and without the understanding that there really is going to be an end point, and it really is going to be a problem. My experience is September and October people can be equally unavailable as July and August.

THE COURT: I agree.

MR. LASKEN: And so we're not going to object to the Court adding a few weeks if the Court is more comfortable with that or adding a month or two.

And, obviously, it's totally in the Court's discretion.

THE COURT: I guess what I'm more concerned about is no one, including the Court, wants witnesses to unnecessarily sit more than once because the MDL plaintiffs have a longer discovery period, they haven't been able to participate or cross-notice or they have unique witnesses, and then the Government may be interested in those witnesses.

Getting disparate from the MDL schedule by even eight weeks could turn out to be more trouble than it's worth. And they've agreed on until the end of January.

MR. LASKEN: Yeah, so my experience, Judge Wettre, for whatever it's worth -- I did one of these cases in Michigan. And there were multiple cases behind it. We took 200 depositions there. Typically the MDL doesn't actually use -- it doesn't require two days. We ask our questions. They have a few more; right? I think the depositions we're really talking about are depositions on issues that we don't care about: class certification issues, you have commonality, damages issues.

And I think one concern we have is that is getting imported into this case so there are witnesses, now third parties who are being subpoenaed who are on neither side's initial disclosures, they're getting subpoenas in this case because they happen to be subpoenaed in the MDL-- like a

retailer. And my understanding of that retailer is they're probably relevant to the MDL for damages. They want to know the price. They want to understand.

That doesn't need to happen during our discovery period, and we don't think it should. Right?

And so I think actually taking discovery on the violation and then forking the cases is a typical way to deal with it where I let them backload that discovery, and if there are a handful of Apple witnesses, they're going to sit a second day anyway and talk about class issues, you know, let them take a second deposition later -- right? -- at that time if there's good cause for it.

That would be my suggestion, Judge Wettre. And I think that also may resolve a lot of the 10-hour issues.

But, again, like I don't want to speak for the MDL or Apple.

THE COURT: Okay. I'll take that into consideration.

MR. LASKEN: Thank you, Your Honor.

The other thing I wanted to just briefly address is there are some other things in Apple's letter about work to do that, you know, leads --

THE COURT: That what?

MR. LASKEN: That would lead to additional time.

THE COURT: Okay.

MR. LASKEN: So, for example, they talk about discovery on us, they talk about third-party discovery.

On the third-party discovery, you know, as I mentioned, they've known about these people for a long, long time. We served initial disclosures a year before discovery. We gave them a list four months before discovery.

They waited to subpoena most of these people until four or five months in the discovery period.

There is a witness in their motion to dismiss, Samsung. They just subpoenaed him on January 30th, and now they want to do international discovery. You know, a lot of this is a problem of Apple's own making.

But I do think our schedule gives them time to actually solve it if they're reasonable.

They've indicated third parties are going to be producing in the summer. We've talked to the third parties.

Third parties have told us they think they can produce in April. They're having problems with Apple dragging its feet and sort of taking scorched-earth stances. Right? And so they're not here today to talk about it; so I wanted to share that with the Court. But that is not a third-party request--

As it relates to discovery, you know, there was a suggestion to take 21 depositions of the Government. We directed the Court to the Hackensack opinion in this Court.

Those are typically, if I'm understanding it, contention depositions. It's unclear to me why we would need or want 21 contention depositions on the same complaint, if they're even allowed; right? There's a standard for that. And usually that's addressed through written discovery.

And then the last point is on the federal agency discovery, you know, most of the things Apple is asking for are facially privileged or completely irrelevant. If there is something to produce at the end of that, it's going to be small.

So to give you an example, they have a request, give us --

THE COURT: Is this what's going to be briefed in April?

MR. LASKEN: It's going to be briefed in April. I only want to tell the Court for the purposes of the schedule, I don't think it's necessary to run out the schedule extensively for it because it is not going do lead to a massive production given that most of it anyway would fall under privilege assertions; right? And so that is what I wanted to share about that.

THE COURT: Okay.

MR. LASKEN: I'm happy to answer any questions, Your Honor. Talk more about anything. But otherwise I will --

THE COURT: Okay. Why don't we pause there. And I'll have Apple address what -- the topics that you've covered so far.

MR. LASKEN: Thank Your Honor, yes.

THE COURT: Ms. Allon.

MS. ALLON: Thank you, Your Honor. Devora Allon for Apple.

What I thought I'd do is just give the Court a little bit of information on the progress we've made since the last conference, what remains to be done, and how that kind of leads into the schedule that we've proposed.

So since the last conference on January 22nd, we have reached agreement with the Government on 53 custodians.

THE COURT: Bravo.

MS. ALLON: Yes. We kept our word. There was no motion to compel on that issue. We added five; they dropped three. So we got to an agreement there, and we have a solution with the remaining others that everybody's reserving their rights.

THE COURT: Thank you.

MS. ALLON: So we have agreement.

We have agreed to prioritize custodians at the DOJ's request, as Mr. Lasken said. So we have eight custodians that we believe will be substantially complete by April 3rd; 15 more by May 15; and then the remaining 30 will

be substantially complete by the deadline of June 15.

Since the January 22nd conference, we have continued to make extensive rolling document productions. April's made nine productions, consisting of a little bit over than 315,000 documents of over 2.5 million pages. So we have continued to make good progress. We have a review population that currently stands at about 10.8 million documents -- so consistent with what we talked about.

But we are on track for those deadlines, and we are on track to substantially complete our document production by June 15th.

So what else has to get done before we can conclude fact discovery?

Well, first of all, Apple has to produce privilege logs. Under the ESI protocol, privilege logs are due 45 days from the productions from which documents were withheld.

Now, we can't tell the Government that they have to wait to take depositions until they have our privilege logs.

But what I can say is I think that would be a big mistake because they're going get our privilege logs and they're going to get downgraded document -- right? -- documents that in the course of our review may have been withheld as privileged but we determined, in fact, are not privileged.

If they want to go forward before then, I can't

stop them, but I can say that we're not going to reproduce witnesses.

And so I think it would be a much wiser course of action to get those privilege logs and the corresponding downgrade productions before they take depositions. Again, I am not telling them what to do, but I am pointing that out that privilege logs have to be produced.

The second thing that has to happen is the plaintiffs have to complete their document productions. You know, we raised this in our letter earlier this month, but as of today, the United States and several states have yet to produce a single document besides from their investigative file. The other states have started to make productions. We're meeting and conferring with them and working that out. But we need those productions, of course, before fact discovery can conclude.

Obviously, we have the issue with the Rule 45 subpoenas to the federal agencies. That will be resolved by the Court. But there will be some -- you know, some additional process there. We would have to speculate on what that process would be.

And we have the Rule 45 subpoenas to the state agencies that we're negotiating.

So all of those plaintiff documents have to be collected, reviewed, and produced to Apple, obviously, so

that we can go forward and take depositions.

The third thing that has to happen before the close of fact discovery is we have to continue to pursue the third-party depositions and discovery. There are 45 subpoenas -- 47 subpoenas outstanding in this case, not counting anything for the MDL to third parties. I obviously vehemently disagree with Mr. Lasken that we have in any way delayed. Both parties, I think, have pursued third-party discovery. The DOJ served two new subpoenas just last week to two new third parties, to Epic and to Snap. So I think both parties, as they see the discovery, are continuing to serve third-party subpoenas.

And, obviously, as we do that, you know, we are very cognizant that these are third parties, and we are trying to be diplomatic and respectful of the burden placed on those third parties in terms of how we handle the negotiations, what we ask them to do, any subsequent motion practice, and then, of course, the scheduling of the depositions. So all of that has to happen.

I would say tens of thousands of documents have been produced by third parties, but many, many subpoenas are outstanding and still to be negotiated.

And all of that has to happen before those depositions can take place.

And then, once all of that, you know, document

discovery is completed, obviously, we have to schedule and take depositions. I would say my estimate is closer to the higher end --

THE COURT: Hold on one second.

Mute yourself on the phone, please. We're getting background.

Go ahead.

MS. ALLON: I would say, you know, my estimate for how many depositions we'll end up with is probably closer to the higher end of Mr. Lasken's range. I think --

THE COURT: Hold on.

We can still hear you on the phone. And I will terminate the connection for everyone if you don't mute yourselves right now. If I hear one more sound, I'm disconnecting.

Thank you.

MS. ALLON: I think we're probably looking at a total universe of 80 to 100 or 110 depositions when we think about the depositions of Apple, the depositions of the plaintiffs, and the depositions of third parties. Obviously, we have not yet exchanged our lists of who everybody wants to depose. The Government has made some requests. But when we get in that process, we'll have a better sense. But we are talking about a lot of depositions, many of which will be two days because the MDL plaintiffs will want a second day or

they'll want some additional amount of time that can't be done in one day.

And so I just don't think it's possible, whether depositions start, you know -- we can debate if it's May or June if they wait for the privilege logs, but if they start sometime in the spring, there are just not enough days to get done by the beginning of September.

And, Apple, obviously, will do its best to make our witnesses available.

But when we're talking about third parties, I do think there is a certain level of, you know, deference and coordination to the calendars of those witnesses who are not parties in this action that has to be taken into account, and, you know, the Government's proposal, I think -- there's just not enough days to get it done: Even if we did a deposition every single day Monday through Friday, we wouldn't get done by September.

Our proposal gives us time. By my count, ir would still put us at about two depositions a week. So it is not a leisurely schedule for anybody, two multi-day depositions per week.

So we're spending a lot of time taking and defending depositions. But I think it's a schedule that is realistic and achievable and, you know, tailored to the needs of this case.

I said this last time, and I'll say it again this time: I don't think it's a particularly helpful comparison to look at other cases in other jurisdictions. I think the schedule should be tied to the needs of this case. And so that's why --

THE COURT: And that is -- that's why you have a magistrate judge and not a computer or AI to decide a schedule because I have to assess on the ground what's actually going on and to weigh it and to balance it. And I try to keep things as trim as I can. But I also am a realist about how long depositions -- or discovery takes.

MS. ALLON: Thank you, Your Honor.

And the last point I'll just make, you know, in response to -- the real disagreement is about the close of fact discovery. Other than that, we're pretty much agreed. We have one small disagreement, I think, about how many days after rebuttal reports. That's just a consequence of how many depositions you think we'll take then.

And then the last point of disagreement, I think, is on the question of whether the Court should set deadlines not for summary judgment and trial. You know, our view is it's somewhat premature. I'll just say, my experience, the last case I had before Judge Neals, he didn't want, for example, Dauberts at the same time as summary judgment. He wanted summary judgment and then Dauberts. And so a lot of

this, obviously, depends on Judge Neals's preference. So we think it's premature --

THE COURT: And his schedule and his criminal calendar and a lot of other variables.

MS. ALLON: Exactly. And it's not -- it's not consistent with my experience in this District to set these deadlines this early. I think they'll be much more informed once we get past fact discovery and expert discovery.

So we would say it's premature to set them now.

THE COURT: Could you address whether you think the MDL fact discovery and the Government fact discovery dates should be identical or whether there should be a fork, as Mr. Lasken referred to it.

MS. ALLON: So I do think they should be the same.

I think that with respect to the rest of the case, they should not be the same. I don't disagree --

THE COURT: No. I mean, class certification doesn't apply. I get that.

But fact discovery.

MS. ALLON: Yeah, I do think they should be the same. In my experience, 99 percent of the discovery that's taken from Apple goes to the merits, whether it's MDL or DOJ.

Class certification discovery, if you think about it, is mostly discovery -- discovery that is mostly what's relevant to class certification. And so with respect to the

merits issues, which overlap, those are the same.

And the need for coordination is important because, you know -- I completely understand Your Honor's comments. There may be a situation where witnesses have to be deposed twice. That may happen.

But the default should be one deposition. That's why these cases were coordinated, and that just can't be done if you have different deadlines. If there's one fact discovery deadline, depositions can be coordinated, and the cases can proceed on parallel but different tracks, depending on the needs of each case. I think to do otherwise would in some ways, you know -- of this rate, what the JPML expected when they consolidated all the cases here, that sort of coordination.

THE COURT: Okay. Thank you.

MS. ALLON: Thank Your Honor.

THE COURT: So let's talk about -- I see that you have an agreement to a schedule for producing data. And, you know, maybe I'm missing something at a very fundamental level.

I don't know how that agreed schedule relates to the 30(b)(6) of -- which I thought was to discover what data exists in order to pinpoint productions more precisely. I don't understand how those two issues relate, if at all.

So why don't I have the Government address that.

MR. SHEANIN: Good morning, Your Honor. Excuse me -- Aaron Sheanin on behalf of the United States.

The Court, last time we were here, asked us to put together a schedule for the completion of data samples so that we could ultimately get to completion of data production. And we did that and made an agreement with Apple to do that.

What we did, as you were -- as you point out, serve a 30(b)(6) notice to try to make sure that we understood exactly what data Apple has.

We served that deposition notice in January because we had not been able to get the answers that we needed from Apple up until that point. And we had hoped and assumed that we'd be able to take that deposition at some point in February so it could help us to inform the schedule that we had to produce to the Court and it would help us to inform exactly what we needed to get and ask for in the ultimate data production.

We have some information from Apple on certain databases as to what they have. But there are many others where we are absolutely missing vast swaths of information. We simply don't know. They've not been able to tell us --

THE COURT: Might some of your questions be answered by the initial productions of data on the agreed schedule?

MR. SHEANIN: So our problem is we've gotten certain data samples in certain areas, but those are not complete. And I can give you specific examples, if you would --

THE COURT: That would be helpful.

MR. SHEANIN: Pardon me?

THE COURT: That would be helpful --

MR. SHEANIN: Sure.

THE COURT: -- to get specific examples.

MR. SHEANIN: So, for example, with respect to certain financial information, operating margin is an issue that is relevant and important. And operating expenses are necessary to calculate the operating margins for the iPhone.

Apple produced a sample from a financial database without including operating expenses. And that was a concern for us because in the prior investigation, they had produced data from a predecessor database that did have that information and that did include those operating expenses.

So we raised that issue with Apple and said, look, the sample was not complete.

And we raised that about a month ago. We have yet to hear a response from Apple on that.

With respect to revenue, before Apple produced data samples during the litigation, we asked Apple to include fields that were necessary to merge a revenue dataset with a

revenue adjustment dataset: So what did you take in versus what discounts and adjustments did you make?

Apple produced samples without those necessary fields. And we have tried to raise that with Apple. They have yet to indicate that they're going to complete that or make that tie -- provide that tie-in.

Our problem, then, is as to the data samples that have been produced to date, we are missing information that is necessary.

Apple has also produced its samples on the basis of fields it has chosen, while we asked for produce the fields --

THE COURT: Can I just stop you for a second.

MR. SHEANIN: Sure.

THE COURT: If there were more transparency -- and I am not staying there isn't transparency from Apple's lawyers -- but if there were more transparency, in your discussion of what's missing, when are you getting it, is it the same as what you received before, et cetera, would that obviate the need for a 30(b)(6) deposition?

MR. SHEANIN: At this point, we are concerned that we are not getting enough transparency, and even if the Court were to order more transparency, I am not sure we would still get there.

Apple -- we've asked Apple, for example, for

information about a particular customer usage database. We see the information in the documents that we've already had. There is a particular database from which a lot of customer usage information occurs. And Apple uses it in the ordinary course.

We've asked about it. Apple has given -- Apple's counsel has given us different answers at different times. On the one hand, that database doesn't exist. On the other hand, that database did exist or does exist but is now being deprecated and will be moved to another database. On the other hand, that's a colloquialism but not the actual usage, not the actual database.

I don't know, honestly. And I am not sure whether or not Apple's counsel knows.

But I do think a witness will know. I do think a witness will be able to --

THE COURT: Can I ask you something. Have you served a 30(b)(6) notice with topics?

MR. SHEANIN: Yes, we have, Your Honor. And we provided that to the Court in the initial letter that raised the issue.

THE COURT: Sorry. Then I missed it.

MR. SHEANIN: It's all right. I didn't want to provide it to you twice.

THE COURT: Okay.

MR. SHEANIN: But it is in connection with the initial letter that we raised. There are four topics. The first topic -- the first three are basically the same. The first one goes to finances. --

THE COURT: And this is attached to the March 5th letter?

MR. SHEANIN: Yes, correct.

THE COURT: All right. Let me -- let me go to it.

MR. SHEANIN: I'm sorry. Not the March 5th letter. The letter that predated that. Forgive me for not knowing --

THE COURT: Yeah, I won't have it, then. I have the March letters that were for this hearing.

MR. SHEANIN: Sure.

THE COURT: Okay. But you've answered my question: You've served topics.

MR. SHEANIN: We've served topics, and we've served topics that ask -- and we'd ask the Court to take a look at it.

THE COURT: And has Apple responded to those topics with objections or?

MR. SHEANIN: No. Apple has not. Apple sent us a letter on February 11th saying broadly we object to overbreadth, burdensome and premature.

And then Apple said, "We will serve objections and responses in due course."

We have not received objections and responses from Apple at all. It's been 50 days since we served the deposition notice.

Instead, we said, "So are you planning to appear for the deposition?"

They said, "No. We're not planning to appear for the deposition on the date you scheduled. And we won't appear for that deposition until approximately 90 days after we've served" -- so at the end of April for financial data and approximately 120 days for all of the other data, by the end of May.

And I said, "Well, are you planning to move for a protective order?"

And the response to that was no.

And that's what brought us to this Court right now because that, in our view, under the federal rules, is inexcusable. It violates the federal rules not to seek a protective order and not to designate a witness for deposition.

We've cited a number of cases for that.

Apple has said that they disagree, but they haven't cited a single case otherwise.

And the only thing they suggest as authority on this is Local Rule 37.1. But Local Rule 37.1 simply gives a process for the parties to raise disputes to the Court. It

doesn't substantively preclude them from seeking a protective order.

So we --

THE COURT: Well, it's supposed to precede a protective order, but it would be a protective order by letter, essentially.

MR. SHEANIN: Correct. I am not --

THE COURT: Or a motion for a protective order by letter.

MR. SHEANIN: Right. I am not asking for a formal motion. But they could have made their request to the Court in that context.

They didn't.

So we're now being prejudiced by this. And I think that this goes back to the original question that you had: How did we wind up getting with this schedule? And what do we need?

We need a deposition promptly to give us the transparency that we've been unable to obtain through the course of meet and confers. And the course of meet and confers is not just the last month. We've asked for information on these databases since we served requests in June, you know, since we sought individual -- you know, a dedicated meet and confer in August, since we served an interrogatory in September to ask for similar information,

and since we started getting some conversations at the very end of November and then off and on through February.

We're being prejudiced because we're unable to get that information to determine what we actually need. We don't want to get every single shred of data from Apple for any of these databases. We want to actually take a look at it and say, great, this is the slice we want. That stuff we don't want.

THE COURT: You might be overwhelmed if you got beyond what is relevant to you.

MR. SHEANIN: We might. But we've handled large datasets before in the Antitrust Division. We're prepared to do it again.

THE COURT: All right. I hear you.

Let me hear from Apple on this.

MR. SHEANIN: Thank you, Your Honor.

THE COURT: It doesn't preclude you from continuing.

I mean, I did suggest this because this sounds massive. They're trying to streamline. I get the discomfort with putting someone under oath. But they serve -- they did what I asked them to. They served a 30(b)(6) notice. You haven't even responded to it?

MR. ALLEN: Your Honor, we did respond to it via letter and expressed our concerns.

THE COURT: Well, respond to it the way you're supposed to respond to it. This is a big case, and this was an issue that I suggested.

MR. ALLEN: And, Your Honor, we're not opposed to --

THE COURT: So it should have been treated with a little more focus.

MR. ALLEN: Understood, Your Honor. Our position is not that the 30(b)(6) deposition should not happen or cannot happen. We've agreed to put witnesses up on all these topics. And, again, they have 19 subtopics per --

THE COURT: But you want to do it after you've produced all your data.

But the whole idea is to finish substantial completion by June 15th, not to have them just -- the Government realize June 15th that they don't have what they need, and then we are talking about, you know, more motions to compel and --

MR. ALLEN: Respectfully, Your Honor, that's not quite our position.

Our position is we'll put a witness up after they have the data samples from us, which they will have by April 15.

And the reason for that is we have already produced 10 data samples for them. Not full datasets. Just the

samples.

We're going to substantially complete the rest of our data samples productions by April 15. We're also supplementing interrogatories --

THE COURT: Let me stop you. So I think I heard you say you'll put a 30(b)(6) witness up after April 15th.

MR. ALLEN: Yes, our --

THE COURT: Okay. All right. So stop.

Is that acceptable? That's pretty soon?

MR. SHEANIN: Your Honor, we'd prefer to have that witness up even sooner. We'd prefer to have that witness --

THE COURT: You might be going to a special master who's going to go deep in the weeds on this and is probably not going to have an answer before April 15th.

MR. SHEANIN: I understand that, Your Honor. And I am not trying to create a problem for the Court.

The reason why we're asking for it sooner is because we'd like to --

THE COURT: Can you live with post April 15?

MR. SHEANIN: Yes, Your Honor.

THE COURT: Because I think de facto that's what it's going to be.

MR. SHEANIN: We can live with post April 15th.

What I would say to the Court is that the process that now Apple is going to -- has proposed and it appears the

Court is going to adopt is going to mean that we will get the samples and then we'll be negotiating over the samples afterwards.

It would have been more helpful if we would have had the transparency earlier that the Court has suggested --

THE COURT: You can't go back in time.

MR. SHEANIN: I understand that.

And to get -- to have those discussions with Apple and to have the witness testimony from Apple before production of samples so we can help guide that process.

But if Court is going to order depositions after April 15th, we would like it as soon as we can.

THE COURT: All right. Why don't you meet and confer about a deposition, a 30(b)(6) deposition post April 15th?

And you need to respond to their topics.

MR. ALLEN: Understood. We will, Your Honor.

THE COURT: What's the date certain by which you'll respond?

MR. ALLEN: We'll respond to their topics by -- what's today? March? -- we'll respond by the end of the month. The end of March.

THE COURT: March.

MR. ALLEN: 30th.

THE COURT: You can't do that sooner? You've been

sitting on that notice for a long time now.

MR. ALLEN: We can. We can do --

THE COURT: March 27.

MR. ALLEN: March 27.

THE COURT: That's a week from Friday.

MR. ALLEN: We'll do that, Your Honor.

THE COURT: Okay.

Work on that.

MR. SHEANIN: Thank you, Your Honor.

THE COURT: Okay.

All right. So that was a subject of dispute. There weren't many.

Was there any -- were there any other topics for the U.S.?

And then I shouldn't neglect the States. I'll let the States bring up anything they wish to.

MR. LASKEN: There are no other current topics. Obviously, we have the dispute that's coming -- right? -- over the agency discovery.

The only other thing I'd -- the only thing I did want to mention is look at the table: We've got four able-bodied lawyers on both sides. I think we can do more than two depositions a week in this case. We all know how to divide and conquer.

So -- but for us, Your Honor, there's no other

disputes at this time.

THE COURT: Okay.

The States, anything to raise?

MR. REICHENBERG: Yes, Your Honor -- thank you. We wish to provide an update to the Court on the dispute between the parties --

THE COURT: Could you pull the microphone close to you.

And I don't mind if you even sit down, just so you are near the microphone.

MR. REICHENBERG: Thank you, Your Honor.

THE COURT: Okay.

MR. REICHENBERG: We wanted to provide an update on the dispute between the parties on Apple's Rule 11 basis for its second affirmative defense that it pled in July of 2025.

Your Honor may recall there was a series of letters submitted to the Court on this proposing a joint date of submission. Your Honor responded and said, "Please meet and confer further to make sure that you have a dispute. And then if you still do, please propose a date."

We are at that point, Your Honor, after three-plus months of negotiations and two supplements by Apple to its interrogatory response. It is beyond clear that we are at impasse.

What's un- -- the reason I bring it to Your Honor

today is that there's ongoing prejudice on this issue. This affirmative defense asserts that Apple purportedly --

THE COURT: Is this what you were going to tee up the letter for yesterday on?

MR. REICHENBERG: That is correct.

THE COURT: Did we get it?

MR. REICHENBERG: No, because --

THE COURT: Okay.

MR. REICHENBERG: -- we wanted to further meet and confer and get Your Honor's guidance.

THE COURT: Okay.

So do you want to propose a date for a letter?

MR. REICHENBERG: I do. I would like to propose some point next week for a letter.

THE COURT: Okay.

And would that be acceptable to Apple? It'll be, assuming it's a joint letter.

MR. ALLEN: I mean, Your Honor, I -- next week get -- I don't know why it needs to be that fast. We'd ask for one week after that, if that's possible.

So what is that? First week of April? Look at my calendar.

MR. REICHENBERG: The parties were prepared to proceed yesterday. We have a few additional things. Because of the ongoing prejudice, Your Honor, we shouldn't have to

deal with it with an affirmative defense that doesn't have a Rule 11 basis.

MR. ALLEN: Your Honor, respectfully --

THE COURT: How about March 31st?

MR. ALLEN: That's fine by us, Your Honor.

MR. REICHENBERG: If that works for Your Honor, that works for us.

THE COURT: Okay.

Anything else, Mr. Reichenberg, for the States?

MR. REICHENBERG: That's it. I just -- wish to update the Court that the Plaintiff States are substantially complete with respect to the productions that we promised to Apple with respect to the documents that they requested from us. There have been belated letters from Apple claiming that they are insufficient. We continue to work with them on that.

But I did want to put a statement on the record that the States have updated Apple that we are -- almost every State is substantially complete with respect to what we agreed to give them.

THE COURT: Thank you.

MR. REICHENBERG: You are welcome.

THE COURT: All right. Anything further from Apple?

MS. ALLON: No, Your Honor.

THE COURT: Okay.

MR. ALLEN: No, Your Honor.

THE COURT: All right. Thank you very much.

What about the date for next conference? Do you agree with the MDL that it -- or what that time frame of around the time of substantial completion in June?

MR. LASKEN: Judge Wettre, my suggestion would be, because you've got the dispute coming in front of you on the agency discovery, our understanding is the parties kind of wanted two weeks to prepare for those. So maybe it would make sense to have the next conference -- I think that would make it April 30th or early May.

THE COURT: I'll wait until I see it. It's going to depend on my schedule, whether I'm going to be the one handling it. Whether I -- if I am, it's going to require a lot of my time in researching, thinking about it, and preparing. So I'll hold on that.

But assuming that there isn't a hearing -- why don't we say, assuming there's a hearing required on that, let's treat that as a separate matter.

But in the ordinary course of just checking in with you status-wise, what's the Government's view, the U.S. Government, on timing?

MR. LASKEN: Yes, Your Honor. I think the two months proposed by the MDL would make perfect sense to us. I

think we'd have a little bit of concern with three months. We do have some interim things we're working on with Apple, as you know, and I think if for some reason we're not meeting those, we'd want an opportunity to address the Court.

THE COURT: Okay. All right.

And what about Apple's view?

MS. ALLON: Your Honor, we're fine with two months, three months. I do think the setup of MDL conference, DOJ conference frankly works well because there end up being overlaps. So I think makes sense to have everyone here together.

But --

THE COURT: Right.

MS. ALLON: -- beyond that, we defer to the Court.

THE COURT: Okay. I think I'll do that in about two months, I'll set another conference. And someone's rising, just state your name again.

MR. ATTAWAY: Scott Attaway for the Watch Plaintiffs.

THE COURT: Go ahead.

MR. ATTAWAY: Very briefly, Your Honor, with respect to the Rule 30(b)(6) notice for the data that the Government served, each of the individual plaintiff groups served their own notices as well. And we would just ask for --

THE COURT: Why? You're not going to wait and see what the Government gets out of that deposition? You have a concern about data dictionaries?

MR. ATTAWAY: We have the same concern as the Government, but beyond that, we need to identify class members and prove damages. And those are different data requests that we've made.

And we, likewise are curious and don't know where the --

THE COURT: Sounds like a separate subject.

Did you serve your own 30(b)(6) notice?

MR. ATTAWAY: Yes.

THE COURT: And does it overlap with the Government's topics -- the U.S. Government's topics?

MR. ATTAWAY: We adopted the Government's topics because we're interested in those, but we also have our own individual class member identification topics.

THE COURT: So what is your ask?

MR. ATTAWAY: Just that they respond in the time frame under the rules.

THE COURT: Okay.

Can you respond the same date to their notice?

MR. ALLEN: We will, Your Honor. The only point I'd make is if they're going to participate in that deposition, we'd obviously like that dep to happen at the

same time as the Government's.

THE COURT: Okay. Well, you'll continue to confer about that.

MR. ALLEN: We will.

MR. ATTAWAY: If our deposition needs to go later, we can probably work with that. But the presumption seems to be that we'd have to be on the Government's schedule. So we're just trying to comply with that.

THE COURT: Okay. So you'll get a response to your 30(b)(6) notice March 27 from Apple. And continue to meet and confer about participating in that 30(b)(6) deposition or having your own.

Thank you. All right.

Anything else? Thank you, everyone. I appreciate it.

UNIDENTIFIED SPEAKERS: Thank you, Your Honor.

THE CLERK: All rise.

Judge, you're off the record.

(Conclusion of proceedings)

Certification

I, SARA L. KERN, Transcriptionist, do hereby certify that the 48 pages contained herein constitute a full, true, and accurate transcript from the official electronic recording of the proceedings had in the above-entitled matter; that research was performed on the spelling of proper names and utilizing the information provided, but that in many cases the spellings were educated guesses; that the transcript was prepared by me or under my direction and was done to the best of my skill and ability.

I further certify that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

S/ Sara L. Kern April 6, 2026

Signature of Approved Transcriber Date

Sara L. Kern, CET**D-338
King Transcription Services, LLC
3 South Corporate Drive, Suite 203
Riverdale, NJ 07457
(973) 237-6080